

Jeff Nestler
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW Washington, D.C. 20530

July 31, 2022

Mr. Nestler:

I reference my outstanding requests on January 25, 2022, January 26, 2022 (and Carmen Hernandez' email of the same day), January 31, 2022, February 3, 2022, May 26, 2022, May 27, 2022, and your most recent response on June 22, 2022. I renew my prior requests, including that you provide any and all information you have regarding Suspicious Actors One.  Also we request information about Suspicious Actors Two that includes new identified material witnesses along with some *actual perpetrators* and individuals that we now identified from Suspicious Actors One that we were able to identify from public sources *with almost no government help* that has not been provided in discovery as far as we know.

While I appreciate yesterday's promise of Suspicious Actors One discovery files, I now see the predicament we are all in with a discovery clearing house where assigned DOJ prosecutors have all the risk and the clearing house does all the slow rolling.  This crucial evidence comes too late to make use of it at trial and its prejudicing not only trial preparation, but also motion practice.

This renewed request includes my requests for assistance in identifying the individuals listed through geo-fencing, facial recognition or through the extensive knowledge held by your assigned investigative agents.  It includes all investigative files, whether they are unidentified or identified symbolled assets, confidential informants or sources, registered sources or informants, paid or unpaid or just providers of voluntary information. We need full pre-trial services and probation background investigations and raw files on charged defendants and all investigative files on Suspicious Actors 1 and 2.

The Government complying with its discovery obligations may lead to new claims regarding selective prosecution, the public authority defense and even entrapment. Most importantly, my client is charged with crimes, none of which he committed, but here now, only through extensive investigative work since the last status hearing, often being requiring us to rely on public information triggered by the filing of Jan 6 cases, we can see other subjects committing the crimes on video that is kept away from public review through protective orders. Statements around some of the most culpable



Suspicious Actors openly and embarrassingly brag about being "cleared" by the FBI.

The *Capitol Siege Cases, Global Discovery Production Unit* may have fallen behind in production of Brady disclosures. It's possible there is a disconnect between what the *Capitol Siege Unit* has in its files and what it releases to trial staffs to comply with trial staffs' obligations under Brady. This is in addition to problems associated with discovery on Confidential Human Sources (CHS) not making its way over to the *Capitol Siege Unit*.

Just one anecdote among many: in advance of a defense counsel meeting in Dallas, the Government helpfully provided a proposed stipulation based on *dramatically misdescribed conditions* of the Capitol at the time the Oath Keepers entered the Capitol complex. The stipulation describes physical conditions before trained provocateurs— "Suspicious Actors"—removed them, often taking great pains to conceal the removed fencing and barriers. The proposed stipulation prompted me to search for video in the discovery that made this point to demonstrate the issue for the Government. How can this be? [Then I saw a tweet from Pam Hemphill.](#) Hemphill captured the condition of Capitol grounds in the morning—before Suspicious Actors appeared and dramatically changed conditions. I did a search in the Relativity database and there are documents that suggest her phone was seized, but there is no information that I can find based on a search for "Hemphill." It then occurred to me: line prosecutors and assigned agents don't have access to this information that is derivatively being denied to the defense. But Brady obligations are based on constructive knowledge. If line staffs have agents at any level that have knowledge of exculpatory information in a discovery clearance house or has knowledge of CHS, this knowledge is imputed to line staffs. We are 18 months post arrest--seven superseding indictments in--and we are still missing core Brady evidence.

The Government has provided us a cursory and insufficient response to our concerns regarding the opening of the Columbus Doors on June 22, 2022 when it summarized prior statements from the Capitol Police but did not actually give us those reports saying that they are not normally released to the public. It provided one FBI 302 which suggests that the doors were pushed open shortly after 2:05 pm yet the claim is that our clients in the indictment forcibly entered later showing a significant time gap leaving out crucial context and evidence. *See email correspondence of June 22, 2022, Captioned Discovery Re: Columbus Doors.*

The Government has provided us Confidential Human Source (CHS) productions regarding only one (1) subject. I can't find a single defense counsel who believes there was only one (1) Oath Keeper-related CHS. Particularly since we now see a reference to



a FISA application in January 2021, we see documented approaches being made on Oath Keeper Jeremy Brown to make him a paid informant in November and December 2020, it is insulting to our investigative agencies to think that they would only have been able to procure one Oath Keeper-CHS. As I have mentioned multiple times, many defense counsels with whom I have spoken are concerned that CHS information is not making its way to DOJ trial staffs. The only antidote is more time because with proper time, these disclosures will make their way to the Government. We all know that once DOJ trial staffs receive the information, we will receive the information *ex post haste*.

If I recall, in an April status hearing we were to receive all investigative files (of defendants, subjects etc.) on a rolling basis towards the end of May. If I recall it was 600 or 800 investigation files that were promised for production on a rolling basis beginning in May for a July trial. Because even that lapsed production timetable would have not been in time for a July trial date, I tried with Suspicious Actors One to help frame the government around the evidence the defense was in search of showing other people committed the crimes the Oath Keepers are accused of having committed with possible support by proxies of government agencies domestic or foreign or even independent organizations. We filed ECF 127-2 that showed actual provocateurs engaged in the plan to attack the Capitol and influence and control rally attendees.

As far as I know, despite my vouching for the Government in the last hearing in terms of the Government's willingness to assist us with this information, nothing has happened to materially change the situation except the situation has actually deteriorated as it seems that multiple government agencies are withholding discovery. We have also had discussions with the government in a good faith effort to confer to acquire geo fencing and facial recognition used to help identify Suspicious Actors and material witnesses that are specific to our clients that remain outstanding. Further we have not been given warrants that may include FISA applications[1] or out of district search warrant applications that under some circumstances may be problematic and provide a basis for suppression.

On July 7, 2022 the Government produced roughly 100 scoped evidence sets reproduced on a hard drive. I don't think I received this drive. I have reports from co-counsel that they are having consistent trouble downloading this information. Search warrants only have an FBI number or an IBID Number and it's not clear whether we have search warrant affidavits and supporting information in the submissions. We only have these scoped returns on the defendants so we have no idea what material witnesses have

---

[1] There are references in discovery to FISA.



been searched, which of our listed material witnesses and actual suspects in Suspicious Actors 1 and 2 have been searched, identified or charged or actively ignored through official policy; or anyone else that may be relevant to our defense.

On July 13, 2022, the government initially responded to my earlier requests for Capitol Police social media and text messages which document a number of officers posing with protestors or appearing to be sympathetic to protestors. But the government disagreed that defendants have a right to review any and all texts from January 2021 that are discoverable under the basis that the discovery requirement is too broad. However, you recognized that the USCP seemed to get along well with protestors, with normal interactions among people who "support the blue" as they shook hands, took photos, or just acted in an ambivalent way toward protestors which in turn caused confusion on the issue of whether individuals were invitees or given license to be where they were located. Clearly, the texts you have disclosed are exculpatory evidence but as they have only been reviewed by the government and defendants and remain hidden from the public, we do not know what else is out there.

We also don't have texts from the officers who acted in anger and with force outside training and policy protocols.[2]  Have you provided the USCP use of force policy and rules of engagement for the use of force? We know from video that officers shot rubber bullets, pepper rounds, CS canisters, and concussion grenades or flash bangs, but these munitions were sent deep into a peaceful crowd from an elevated angle and were not used as dispersal measures.  *Radio transmissions we have on these points don't have the use of force references we would expect to find.*  We also have video of other officers using their batons repeatedly to beat people but we have no readily findable discovery on the instances shown in many videos and reported by peaceful protestors.  We also have no discovery on USCP, MPD, and VSP training for crowd management, crowd control responses and measures, and the chain of command authorities for use of force against a crowd that is not even in contact with police. We lack a complete record of reporting and orders within the authority chain from ground police squads up to supervisors and the USCP command center. It is logical that a ground LE officer who requested assistance from some Oathkeepers would have reported that - and the record communications transcript is exculpatory.

---

[2] This is the latest "take" on January 6 as more of this protected video gets disclosed: https://www.theepochtimes.com/the-real-story-of-jan-6-documentary_4596670.html



**<u>Were the Oath Keepers Invitees or did they have justifiable reasons to enter restricted space or enter the Capitol?</u>**

The evidence shows that the Columbus inner door is an electronic, magnetically locked door that was not opened by force. It appears that this door the capability to be unlocked remotely and it should be electronically monitored. Video reviews strongly suggest a third party released the magnetic locks.

In reviewing correspondence, I am seeking to obtain crucial Brady evidence for our defense which directly impacts due process rights. The Capitol/ Congress is one of the alleged victims in this case, and was the site of the alleged incident, and as such, may have the custody and control of the information sought. I submit that this information, under Brady, if not disclosed, compels dismissal.



**Above: as #SmokyInsider looks on, (who, we now know from multiple, previously suppressed video angles, coordinated and worked together with Suspicious Actors from multiple locations, broke one of the inner Columbus Door windows, entered the Capitol and body slammed a police officer). Our best information is he is still at large. We see that to open the door the sign requires the release bar to be depressed for three seconds, at which time a buzzer sounds, and, 15 seconds later, the door**



releases.



**The windows on the inner Columbus Doors remained intact with only the exterior layers broken by #smokyinsider, #pencilbeardinsider with assistance from SA's and crisis actors we have identified and that sourced and provided the crowbar and other tools. The sealed French video shows the Suspicious Actors crisis actors procuring and handing a crowbar—held aloft so it can be captured by unknown photographers--forward for the camera.**

Our best photographic evidence suggests the press bar is electronic. There is a keypad to its right. It is likely that the physical key is chipped and that all this information is collected somewhere. It is hard to imagine how a door with this sophisticated engineering, with indicia strongly suggesting electronic operation, would not have remote monitoring and access capability. It is *res ipsa loquitor*, the thing speaks for itself, where someone inside the Capitol released the door…twice. Radio transmissions we have been able to review also seem to confirm there was a remote



unlocking system. We have been provided no discovery as to control and security of keys, how and when the keys can be copied, and what digital information regarding the keys exists on-line subject to copying. Ops audio shows nobody knew who had the keys over the course of January 6, 2021. Calls went out asking those with keys to lock doors when protestors entered the grounds. There is no confirmation that doors that must be opened from the inside were locked. Therefore knowledge of who had keys will allow for witness examination of what doors were confirmed locked and how and when they may have been subsequently unlocked - with what and from where.



**Workers replacing glass in inner Columbus Doors after January 6. There is a rectangular unit of some kind above the door in the foreground. This magnetic locking system must also have carried electronics signals. To have a door of this engineering complexity and design and not to include a remote access system that releases the door, is hard to imagine. That a door of with this engineering could operate without sending information to another location to be monitored and stored is hard to imagine. We need all engineering and signals information about this door. Reportedly this far, emergency opening of a door sounds the alarm. The questions of where are the alarms monitored and who from what location controls the ability to turn off alarms are not answered in discovery.**





**Here again we see that the right door handle does seem to have been pried off by Suspicious Actors, some of whom we have featured and in the last few weeks based on government filings made public, we can now see exactly what happened.   The door frame remains intact.  Notice there is no locking mechanism visible on the edge of the door confirming this is an electronic, magnetic locking and closure system.**

---

[3] https://twitter.com/ArianaFreeman12/status/1351902443035107332?s=20&t=eFCn87-N1XHxsYHqGzJTew



We have no discovery regarding the engineering of the Columbus inner door or its security features, or any information about the ability to disarm the magnetic locks remotely. Nothing in the video evidence suggests that the activity on either side of the Columbus Doors could have or did in fact cause the doors to open. In fact, one can view the videos as consistent with a view that Suspicious Actors (SA's), some of whom appear to be acting under color of law that we have now been able to identify from public information with less than exemplary assistance by the Government, were on both sides of the door engaged in futile behavior that could not have opened the door, or even more nefariously, were engaged in activities designed to create the appearance of a fraudulent cause and effect relationship to the door's opening.

As you will see Suspicious Actors Two, *that came almost exclusively from the public record and not from Government discovery unless it was public derivative from another case*, we now have established common interest between George Amos Tenney III, who opened the door with other Suspicious Actors in Columbus Door Opening One, and Bill Dunfee (formerly "14-#PasterBill" in the first Suspicious Actors filing), that we were able to identify in the last few weeks without any material assistance from the government.

Representative Kinzinger's tweet below suggests that a Congressional subcommittee has heard witness testimony about the circumstances of the inner Columbus door opening. The Congressional subcommittee has access to door operations information and security intelligence that Jan 6 defendants do not. It is a matter of public record that the Committee has reports documenting 1,000 interviews. It also has access to witnesses and evidence that we do not.[4] Representative Kinzinger also seems to have information regarding the identity of Suspicious Actors who entered the Capitol and who were around the second floor balcony area, who may have walked in through open doors. In any event, regardless of what Tenney was told by Suspicious Actors or Congressional personnel, no manual force that he applied to the inner Columbus Door could have resulted in the door opening on its own.

---

[4] Capitol tours while helpful were strictly chaperoned and prevented any meaningful inspection of the door, the door area, the area outside the door, the East stairs, the security control rooms and the rea in the balcony above the Annex area. All photography was prohibited in these areas. This is unacceptable.





Not only have we developed significant information around Tenney, it appears that Bill Dunfee had a group of now identified provocateurs who pushed through the barriers in the East in coordination with a group we have identified that came through from the West (Senate side) barriers. They may have approached Ethan Nordean in the morning to join their attack as we see on video. In stark contrast to defendant herein - Sgt. Kenneth Harrelson, retired, who had no plan to attack the Capitol - we have now documented what can only be characterized as an extensive plan carried out by Suspicious Actors, some identified, who seem to have participated within a comprehensive plan developed before January 6 to create chaos and force entry into the Capitol. Part of the plan, as seen in the East, appears to include provocateurs who lured innocent rally attendees caught up in the moment to funnel into areas where suspicious actors agitated confusion and violence, while the overwhelming majority of protestors had no illegal intent and were enticed into a false sense or impression of legality. Part of the plan in the West more than seems to have been designed to antagonize



the crowd, and to provoke fight or flight responses, and then responses to calls for help, among the protestors.

Only now after spending months digging into the bowels of the internet only made necessary because of gross discovery failures, we can now see evidence of coordination between Suspicious Actors in the East and West, and possibly complicity by USCP and/or MPD, that we are only now developing the capability to discern and document.

In the East, but for the concerted actions of these Suspicious Actors, ***there would have been no entry onto restricted ground***. The circumstances of this concerted and sophisticated effort to overwhelm USCP, forced the Oath Keepers into an impossible position since for more than ten years they provided security details and responded to conflict areas where there was acrimony between protestors and residents or police. On January 6, Oath Keepers responded to assist police (MPD and USCP) and responded to injured citizens many times. Unfortunately, because of blanket, rubber stamped protective orders most of this extensive evidence has been suppressed from District of Columbia residents who will form the jury pool, and from the American people.

The planning executed in the East and the West seems to have included coordination for synchronized actions of individual or small group actions. We now see extensive evidence of coordination and timing. That these individuals are more likely to remain unidentified, are more likely to have their activities documented on video under protective order, are less likely to be charged if they are identified, and, if charged, the charges often involve long delays with undercharging compared to others, are more than indicative of affiliation with some federal agency. Further indications include their inexplicable released pre-trial (sometimes on their own recognizance) when others similarly situated or with no violent acts are jailed after strong unexplainable Government opposition to pretrial release. These activities are **a source of well-founded and reasonable suspicion that over time will cause reasonable Americans, future reviewing courts and reviewing officials, grave concern about the integrity of the DOJ and justice system**. A glaring pattern already emerged for public scrutiny with distrust of the justice system —seemingly untethered from DOJ policy established over decades-- that here includes grossly disparate charging, coercive overcharging, and questionable application of sentencing guidelines enhancements. Growing numbers of Americans are finding it hard to ignore - and would find it impossible to ignore if they knew - that the Government is labelling



those charged as "domestic terrorists" and has used "domestic terrorism investigation" to ignore the Fourth Amendment search requirements of the U.S. Constitution. The issue of the Suspicious Actors, whether they were acting under government agency or as material witnesses, are being ignored with an increasingly demonstrable record of discovery hidden or presented as being next to impossible to find if it exists at all, and this only exacerbates what will come out as truth in the end.

What information does the Government have on these "provocateurs" or Suspicious Actors that we witness on video doing all the things the Oath Keepers are falsely accused of doing in regard to the Capitol attack: planning, coalescing, dividing labor, and pursuing a timed goal? Further, what information do you have on how Megan Paradise, Ronald Loehrke, Ricky Christopher Willden, Bill Dunphee, Jeff Cline, and James Haffner (and others I referenced in Suspicious Actors 1 and 2) who all seem to work and coordinate together? Does the Government have information regarding public reports that Paradise's Aunt told a podcast audience that her niece had been cleared and that she had turned over her phone to the FBI? Where is the crucial discovery from her phone? Who paid for Epps, Paradise's and Eric Christie's (#fagsfortrump) travel? With whom were they communicating? What is Paradise's status and has she been arrested? Where are the investigative files on Paradise, Christie, Haffner, and Loerhke and all the other SA's we have identified? What information is there regarding Loerhke's and Haffner's eyebrow raising pre-trial release, when they functioned in a coordinated manner beginning with the initial Ray Epps breach and then, at each juncture, led the push at each successive barrier - including the inner Columbus Doors opening where Haffner, Willden and 4-6 others can be seen clearly attacking police with chemical spray? The Oath Keepers are nowhere nearby but are alleged to have "forcibly entered." What evidence is there regarding Willden's actions? He appears to have been released at some point pre-trial, despite what the sealed video shows. How was Willden not charged with 18 USC Section 1512, and how did he get pretrial release with seven balks at urine tests? We have evidence of Willden and Haffner both spraying down police with chemical irritants (where use by others is labelled use of a deadly or dangerous weapon). There exists video with 4-6 other Suspicious Actors spraying mace at police in a concerted attack timed to the National Anthem with other Suspicious Actors physically assaulting police or aiding in assault where none have been charged or detained. There exists video of #JamesDeanWannabe with full facial images and seen using a cellphone but he, unlike Haffner, Willden and so many others we have laid out, is not detained let alone even identified?



Further questions include:  How did this multitude of individuals function as two coordinated groups that broke through two breach points simultaneously (in front of the Senate bike racks and in front of the East steps) to then march to the East Steps while barricades were removed or toppled in 40 seconds? Why did they mix and mingle with people that they should not have known based on where they lived and worked to then launch a coordinated push through on the East steps on January 6?  What discovery do you have on the timing of their actions, since it appears that both breaches occurred just as Vice President Pence's motorcade pulled out and vehicles were repositioned in front of the East Steps? Review of surveillance video reveals that USCP personnel exited all vehicles except one: the armored assault vehicle.  What discovery do we have showing why any personnel remained inside this parked vehicle and specifically, what were their assignments?  What surveillance equipment was mounted inside the vehicle  and used; and where is all this discovery? Did those inside the vehicle communicate, monitor, film, or collect? Where are their reports?

We have no discovery referencing USCP or any other personnel in this armored vehicle. The vehicle antennas as well as standard gear carried by LEOs on January 6 more than indicate the occupants had communications and other equipment.  It is only logical that this information, with their radio or cell traffic, would show a better picture related to signals information about alarms and door status, and possibly about mass surveillance collections. Those in the vehicle should have been linked, as would be video and other electronics about the door and alarms to monitoring and control by the USCP command and control center. The USCP control center is likely to the same center that Steven A. Sund, Former Chief of Police, occupied for much of the day monitoring video.

Even though actions, orders, and decisions directed from the top level and then the ground tactical operations centers referenced in Ops 1 and Ops 2 audio are crucial to our defense, after 15 months and requests, we still do not have this information.

Who was in the central command center and control room(s), and how many control rooms were there?  What could be monitored from these rooms? What lines of communications, imagery, and SIGINT  came into these rooms? Who was in these one or more rooms throughout the day? Are the control rooms themselves monitored?  Where are the record logs that will include call logs, communications logs, attendance logs, recordings of events etc.?  None have been provided. Where are records of visitors?



Further, as previously mentioned not only is the January 6 Committee suppressing 1,000 interviews that are being withheld from USDOJ and our defense, it's been reported that they intend to have more hearings in September. What made for TV fiction will they presenting in September as "evidence" to damn all January 6 defendants?

Is it the Sund command or control room where Ops 1 and Ops 2 channels were routed? Why did MPD's Robert Glover get situational control of Capitol Grounds and how was this decision and the decision made and communicated? His response seems to have had the effect of drawing resources to the scaffolding while it starved USCP to a skeleton force in the East? Is this where the landlines were located that are referred to on Ops 1 and Ops 2 or did they go to wherever Robert Glover was stationed? Why did leadership direct certain USCP to refrain from discussion on radio and to call on a landlines, presumably through the use of personal cell phones? Police are captured on video making prodigious use of cellphones. Where are these communications in the discovery? Where are the logs and any records from their phones and the command-and-control center? We have none of the communications with Senate security that Commander Sund referenced, nor any of communications with USCP chains including Speaker Pelosi, Majority Leader McConnel, and the Sergeants at Arms in the House and Senate. Where are even the reports to USCP directors that evidence the time required and involved with delays in clearing and restarting. What caused any delay between six and eight p.m. when all protestors were out of the building and pushed forcibly well away from the building? Audio indicates USCP was trying to determine who would work where and when, and how the police would get water and food rather than overcoming something that prevented the sessions from reconvening. Were the Senators and House representatives told to go eat dinner and return by a certain time despite the building being "clear" by 6 p.m.? Where is this information since very complaint and indictment may falsely be representing the cause of the time delay? More importantly, how much of any time delay was due to USCP senior leadership maintaining next to zero command and control over ground units, with no net report the entire day for units to report locations, where evidence available indicates the USCP leadership was responsible for hours of delay and overall failed to use available resources?

We further, obviously, do not have any of the Secret Service texts, which upon information and belief, seem to have been completely erased.[5] Further

---

[5] https://nypost.com/2022/07/21/dhs-launches-criminal-probe-into-deleted-jan-6-secret-service-texts-report/



relevant to the events as they played out is the investigation or lack thereof regarding the recovered bombs at the Republican and Democrat clubs? We have almost nothing about the bombs or investigation of the bombs. Has the government run geo-fencing on the bomber's time and location that can be seen on surveillance video. If not, why not?

We also need discovery regarding the "explosives" you are proposing to introduce in a 404B motion from an RV in MD that never entered the District, including any police reports documenting any weapons on the day of the subject incident. We need the search warrants with affidavits, including the dates of investigation, of Jeremy Brown's residence, RV and trailer, and most critically the TEDAC or any other forensic report with all findings, including whether there were fingerprints, hairs, fibers, DNA on any grenade or the tape. We need all reports of the results, and whether any of the hair, fibers, fingerprints, or DNA on the inside of the tape wrapping the grenade to determine whether it matched Jeremy Brown or the carpet fiber or dog hair collected on a second invasive search where the agents cut out carpet in the middle of multiple rooms. Additionally, we need the TEDAC or any forensic reports of the inside of the tape wrapped around the short-barreled firearm(s) and whether the fingerprints, hairs, fibers, DNA extracted from the tape matched Brown. We request all forensic reports including the technique used (such as mass spectrometry) and we will eventually require all written reports and reference materials that the Government expert will use or rely upon. Also please provide the most recent inspections and compliance reports for the labs involved. Please provide any discovery relevant to Jerry Brown's whereabouts on January 6th and whether he is alleged to have had any weapons in Washington DC. If a witness alleged that they saw any weapons and explosives, there is no report in discovery, either here or in Tampa, that states anyone ever saw any explosives or weapons in the R.V. either en route to or in Maryland. There is not a single detail or anything of particularity to indicate that the explosives' claim was not fabricated by a person arrested for their January 6th actions, and who was then promised a better plea deal and leniency if they said something against Jeremy Brown. Indicators more than portend that the allegation came from an FBI informant placed in the Oathkeepers for the very purpose of informing and who was possibly paid. Where are all the FBI 302's similar to those for John Knowles? We need you to identify any January 6th defendant who is a witness and originated the search predicate, and who will testify to: seeing explosives, when he saw them, and exactly what type and where he saw them since the FBI search warrant affidavit never provided a single credible detail of a type explosive or its presence outside of Florida ever, even assuming such



explosive was not planted prior to the search.

We have no information or discovery about the multitude of federal agents from many agencies who were embedded in the crowd which has been reported.[6] Follow up questions include why were agents reportedly embedded with "shoot to kill authority" and why do we have no discovery about this?

Among a range of challenges this lack of disclosure poses to the defense is that it makes it impossible to deconflict actual federal agents from our growing list of Suspicious Actors as contained in a motion that the Court withdrew with an understanding that I professed that the government would assist us in identifying them and agreed to provide all required discovery.  Further, it may lead to a public authority defense since according to page 23 of the Ops 1 transcript, it seems as if unlimited force was being authorized just as or just prior to the Oath Keepers being ushered in front of the Columbus door. This is crucial defense information because as you know, my client and other Oath Keepers, later came to the defense of Harry Dunn who was alarmed, agitated, and had a loaded M-4 at the "low ready" and was issuing extreme threats to the crowd. Was it leadership and lack of training failures that caused Officer Dunn to threaten protestors by saying "I'll take as many of you guys out as I can before you get to me."?  Or had he heard the authorization to use any force necessary to keep people out of the building? Who issued that order? This is the point when the Oath Keepers inserted themselves between Dunn and the crowd clearly putting their backs to Dunn and opposing the crowd.

Further, we need all discovery on the actions of the Oath Keeper Jeremy Brown who saved a woman from being beaten by police and after being forced to the ground, from being trampled as police were acting to stampede people who would run over her. Other Oath Keepers escorted Police inside and outside of the Capitol.  Oath Keeper Meggs directed foot traffic as he chatted with police. Oath Keeper Crowell escorted a woman to police and then to a medical station at the ellipse. After Oath Keepers exited the Capitol they mulled with police and were asked to guard the broken window.  Further, we need discovery on  training regarding crowd control and crowd management including de-escalation techniques in managing crowds that MPD and Capitol Police received at any time prior to January 6th, 2021. We need the training records for use of gas masks since many did not know how to properly seal their masks and after police use gas, these officers succumbed to "friendly fire" and had to be decontaminated. Many

---

[6] https://www.newsweek.com/exclusive-secret-commandos-shoot-kill-authority-were-capitol-1661330



officers can be seen on video being instructed and assisted with donning masks because they did not know how. Others can be seen being haphazardly handed OC gas cannisters and then having to instruct right then and there of how to activate the cannister because the officer had never used or been instructed on this previously. Of particular need is the documented instruction and the use orders on January 6, 2021 given to every LEO who was issued and employed concussion grenades, rubber bullets, batons and chemical gel or gas.

*Where, when and what DoD resources from any agency as well as from the CIA or NSA, were employed before or on January 6? When did the FBI and DOJ declare any January 6 defendant a domestic terrorist? Was it within days of January 6 when Director Wray declared this/ Or had any Oathkeeper or Proudboy been declared a terrorist prior to January 6 and placed under "domestic terrorism investigation?" Were FISA warrants issued prior to or by mid-January 2021 for January 6 defendants?*

*The presence of these extraordinary forces under the control of the Attorney General—and mostly operating under contingency plans that Congress and the U.S. Capitol Police were not privy to—added an additional layer of highly armed responders. The role that the military played in this highly classified operation is still unknown, though FBI sources tell Newsweek that military operators seconded to the FBI, and those on alert as part of the National Mission Force, were present in the metropolitan area. The lingering question is: What was it that the Justice Department saw that provoked it to see January 6 as an extraordinary event, something that the other agencies evidently missed.[7]*

Confusion and chaos reigned throughout the day with broad swings by police of overreaction and underreaction. Once we have discovery to which we are entitled to, it's possible a use of force expert will testify about what caused this confusion and will help provide accurate context. Further, in addition to any public authority defense, we need to know about the presence of any plain clothes officers, some presumably dressed as provocateurs to blend in, some dressed as protestors, and some dressed as members of the media, and what affect did this have on how the day transpired. Specifically, how many federal agents or persons under their agency were present at the US Capitol on January 6 under the cover of "press?" Who were they? Did any tell people to go across a police line or to enter the building?

---

[7] Id.



While the media has reported about such persons, we have no such information in discovery. It appears from Chief Sund's letter that he had no knowledge about these units or the underlying intelligence reports that caused Acting Attorney General Jeffrey Rosen to take what may be an unprecedented step. Was this transmitted to USCP and how did this impact its response?

Also since the last status hearing, we have seen public reporting of a secret surveillance unit deployed by Metro Police Department, but we have no such discovery. We have long wondered what caused so many members of media in great numbers to skip the ellipse and report in the morning of January 6 directly to the Capitol, but now this raises the possibility that much of what we are seeing are MPD officers posing as tactical camera crews.[8] We have some interviews of Capitol Police, we have some interviews of MPD, but that's about all we have. This is missing evidence that is crucial for our defense. These people must be identified and interviewed. Also, where is the photography and video that was generated by these police? What is it these police photographers were told they were going to film and photograph?

### *Columbus Door and Door Operations around the Campus*

In the face of overwhelming video evidence that Door Openings One and Two occurred with third party assistance, we need more information.

To know for sure, we need the engineering specs on this door and the relevant acquisition specs and requests for proposals. The relevant NAICS codes should be 332510, 332321, 334290, 335999, 423390, 423440, 423710, 444190, 541310, 541410, 561621, 561622.

Please provide the electronics schematics to this door.

We would like the government to identify the contract officer as a potential witness.

We would also request the right to inspect, photograph and test the operation of

---

[8] https://www.theepochtimes.com/mkt_app/jan-6-electronic-surveillance-unit-was-illegal-says-rep-gohmert-attorney-suggests-entrapment_4544981.html



the door under USCP supervision.

### *Control Rooms*

There has to be a control room that monitored ingress and egress into and out of the Capitol on that day. We would like the names of the officers who manned the control room(s) on that day and what unit of Capitol Security manages this office. Is this control room monitored? Are operations monitored and recorded? If so we would like this information.

Is this the same office that MPD's Robert Glover occupied? Other agency control rooms?

We need officers referenced on Ops 1 and Ops 2 fully identified. We need all communications from management chains including MPD's Robert Glover (Cruiser 50). A use force expert is evaluating information contained in Ops 1 and Ops 2 and Cruiser 50 seems to make numerous exaggerated and panicked reports. It seems that munitions are being used prior to authority being requested. How was MPD permitted to seemingly run the response and where is this in our discovery? Page 261 MPD transcript reports a segment of the West crowd broke North (to coordinate the East breakthrough), but we need meta data and time stamps to sync this up with our surveillance video study. A force of use expert may testify that drawing all resources to the scaffolding drew away resources and put USCP officers in danger. Video review now to shows use of non-lethal weapons being used before authority was requested or authorized on Ops 1 or Ops 2. We have video showing police launching cs gas, rubber and pepper rounds, from elevated positions deep into the crowd where it may have been operationally counterproductive and unjustified. Almost unbelievably, Cruiser 50 at one point states: "break this up from the air," seemingly calling in an air strike while he systematically draws resources away from USCP personnel in the East.

In addition to inspection of the door, perhaps with a presentation on its operation, we need to visibly inspect the upper balcony, the annex area, the area in front of the Columbus door (exterior), the window that Hunter Ehmke broke out and the area in front of the East Steps.

If there are control rooms like the one referenced by Mr. Sund, this cannot



be kept a mystery. It would be good to know what the rooms are called, where they are located, what they track and what information is stored. Again, it is unreasonable to think there would surveillance cameras everywhere except in front of the main entrance to the Capitol on the entire exterior Columbus Door level and where the Harry Dunn exchange occurred. We would like to inspect and photograph these areas and may seek to use any equipment that our experts deem necessary to determine if cameras were ever housed there.

## Police and Interagency Communications and Presence

In a mass spectacle event like this one, that involved the interaction of tens thousands of protestors and hundreds of law enforcement personnel, and when the government has issued thousands of discovery requests and search warrants for text information and social media accounts, it would seem that a narrow discovery request for one month of texts and social media posting for all USCP personnel is reasonable and constitutes core defense information that almost certainly will yield Brady information.

The Government stated that:

*That said, we have made disclosures and will continue to do so where law enforcement actors' conduct on January 6 might be material to a defense of encouragement or permission by law enforcement (see, e.g., 8/5/2021 discovery regarding the MAGA hat wearing officer), and where those investigations have uncovered relevant social media information we have also provided that in discovery. More specifically, in global discovery, we have disclosed social media information that the United States Capitol Police gathered in the course of investigations conducted by the USCP's Office of Professional Responsibility into officer conduct on January 6, 2021.*

This is a narrow interpretation of the government's obligations. Yes, we are most certainly interested in texts and social media posting for the above reasons you state, but there are other reasons as well. For instance: we need to understand the extent of police collaboration with inauthentic provocateurs, suspicious actors if you will, that has now been documented on video and that we will supplement in the coming weeks. Now that we can see coordination between the East and West and finally begin to understand how the space fit together, it makes the communications between and among law enforcement crucial for a defense. We must get all discovery in this area.

Inter-agency communications between agencies and intra-agency communications within agencies help establish the accurate context of what occurred. This gets distorted when only the most prejudicial video information



gets released to the public and the officers who were in the West, like Officer Dunn and other's, become media stars based on exaggerations, outright falsehoods and an impartial record based on the most damning video, most of it from the West, and almost none of it involving the charged Defendants.

USCP inexplicably did not wear body video streaming or recorders. In the West, cams on MPD officers served as a limitation on government embellishment and inaccurate recollections that have evolved over time and been allowed to persist because of protective orders.

With rare exceptions, in the East, we do not have information on how USCP interacted with each other and with protestors. USCP Communications around and after January 6th may be just as important for us in disproving the government's case as the hundreds of Jan 6 search warrants capturing contemporaneous conversations of everyone except USCP. This absence of relevant information has systemically distorted the process.

This official USCP decision to not use recorders puts anyone entering through the East at a profound disadvantage in putting on a defense.

Worse, the USCP has claimed there is no video surveillance outside the Columbus Doors. This already looks suspect—since this is essentially the front door to the Capitol, but there is also crucial surveillance footage of the Harry Dunn incident that was not covered by surveillance cameras. Among the hundreds of cameras, the USCP apparently didn't have cameras where you would most expect to find them that also just happen to be crucial to our defense.

From Coms 1 and Coms 2, we can see clearly that important conversations at critical times are being held off-line through the use of landlines. By definition and this shows USCP requiring its officers to have off-line communications with government phone lines using personal cellphones. This is documented on video. The radio logs seem to show that landlines are being used to place and receive calls to and from cellphones. Officers can be seen using what look like personal cellphones.

We have a right to this information. As such, I would request the government answer the questions above and provide the following discovery:

Did USCP have body video cam equipment on hand on that day?

Were body cams worn by USCP in the past? If so, when?

Was there an official policy on body cam use? Can we have any and all information about policies regarding body cam use and communications about body cam



use leading up to and including January 6?

Can we have a list of all USCP government issued cellphones and to whom they are assigned?  Can we get telephone call logs and all texting information for these phones?

Does USCP prohibit the use of personal cellphones while on duty? Does USCP prohibit officers from carrying personal cellphones while on duty? Can we have any and all information regarding the use of cellphones including all policies regarding the possession and use of cellphones while on duty.
Does the USCP have a policy that prevents USCP from calling or texting each other during or after shifts about official business?

Is there any USCP email production in relativity?  Do USCP officers and supervisory chains have email accounts?  I have never seen any production on this, but I suspect I am just missing this. I think we are entitled to these communications among line USCP officers in advance and after January 6 for some period of time. One month seems reasonable.

**Eyewitnesses and/or Suspicious Actors**

Please supplement my earlier requests[9] to include all government files maintained by any of the eyewitnesses and/or Suspicious Actors we have identified or for whom we are seeking identifying information about.  Please add to the overlapping list of Suspicous Actors and/or material witnesses in Suspicious Actors Two.

*Please include all information including raw investigation files for symbolled assets, regardless of security classification, all confidential informants, all confidential sources whether registered or unregistered and regardless of whether they are paid. Also include all government files on all providers of information.*

*Please include all payments to these individuals or organizations for which they are members or regarding which they have ownership or management responsibility. This includes direct and indirect payments including grants to NGO's, companies, or individuals. Please include all pre-trial services files and probation reports.*

---

[9] ECF 127-2 and please see my email of May 27, 2022



**<u>Big Voice</u>**

We need an inventory list of all Big Voice and voice amplification devices that were in use and available for use on January 6th. We need any and all communications about deployment or use of this equipment or, more importantly, decisions not to use this equipment.

Mystifyingly, we find no evidence that a general cease and desist announcement was issued at the Capitol until 4:00 p.m. We see speakers and public address system equipment (some installed and some portable) from surveillance video, but we can't find any law enforcement officials that issued warnings. Lack of a public address to rally attendees until 4:00 pm is very hard to understand.

**<u>Stingray, Gboxes, Jamming Devices</u>**

Rally attendees report an inability to get service, receive texts, upload or send emails or texts. Our inside experts see evidence of jamming, but they suggest that that this is also a possible result of use of stingray equipment and/or gboxes as signals are queued and diverted to government equipment or third party contractor equipment. We need to know if this equipment was being used on January 6.

We need an inventory list of all data collections and jamming devices that were deployed around the Capitol grounds that may have impacted rally attendees. Oath Keepers (and many rally attendees) had significant communications disruptions and if this was at the hands of government we need to know.

Part of the Government's theory is that communications by cellphone, text and chat occurred, that never connected or was not received until much later. Rally attendees who earlier had agreed to meet up at the Capitol in many instances did not receive texts from associates or loved ones to meet somewhere else.  This resulted in higher volumes, tighter crowds and communications failure.  This caused additional confusion.

**<u>Drones</u>**

Page 275 of Ops 1 has Cruiser 50 saying that they need to "break this up from the



air." Later, on page 328 a drone is reported to be on the SW corner of the Capitol.

This is the first we are hearing about the possibility of drone footage or the capability to strike (militarily?) from the air.

Along with video, were SIGINT or warrantless collections occurring here or elsewhere? Where was this video going?

**FISA**

We have found evidence that a FISA was issued in the matter prior to March 2022. We would like any and all information about use of FISA applications.

We would like a list and underlying documents for every out of district physical location search warrant that was issued in this matter against rally attendees, including Oath Keepers and Proud Boys, prior to May, 2022.

For all of the reasons above, the Government should consider joining me for a six month continuance so that we can afford all institutions and agencies involved the benefit of time. It is as much for them as it is for my client that I set forth these discovery failings because we all have a common interest in protecting our Nation's institutions and the Rule of Law system. With time, and without an impossible trial date looming, we can work through these issues, everyone can catch their breath and catch up with events. It is as much out of loyalty to my former colleagues who have been assigned as trial staffs or assigned as trial agents as it is for my client that I raise these issues. I earnestly hope you will take it in that spirit.



Very truly yours,

FormerFedsGroup.Com LLC

By: /s/ Brad Geyer _____

Bradford L. Geyer, Esq.

Bradford.Geyer@FormerFedsGroup.Com

(856) 607-5708