**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-15 (APM)** |
| | : | |
| **ELMER STEWART RHODES III,** | : | |
| **KELLY MEGGS,** | : | |
| **KENNETH HARRELSON,** | : | |
| **JESSICA WATKINS, and** | : | |
| **THOMAS CALDWELL,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR JUDGMENTS OF ACQUITTAL**

The United States respectfully opposes the motions for judgments of acquittal that have been made by Defendants Elmer Stewart Rhodes III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell. The evidence presented in the government's case in chief has established that in the days and weeks following the 2020 U.S. Presidential Election, the defendants entered into an agreement to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force. On January 6, 2021, the defendants, along with hundreds of other rioters, attacked the United States Capitol, delayed the certification of the Electoral College vote, prevented Members of Congress from discharging their duties, and caused more than $1,000 of damage to the building. In the weeks that followed, the defendants continued to plot ways to forcibly oppose the transfer of presidential power, and they destroyed evidence of their participation in the attack on the Capitol. The evidence adduced at trial in the government's case-in-chief, viewed in the light most favorable to the government, is more than sufficient to permit a rational trier of fact to find the essential elements of the crimes charged in the Indictment

with respect to each defendant beyond a reasonable doubt.  Accordingly, defendants' motions for

judgments of acquittal should be denied.

I.     **Background**

A.  **Procedural Background:  Allegations in the Indictment**

All defendants stand charged with seditious conspiracy, in violation of 18 U.S.C. § 2384

(Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k)

(Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18

U.S.C. §§ 1512(c)(2) and 2 (Count Three); and conspiracy to use force, intimidation, or threats to

prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372

(Count Four).  ECF No. 167.  Meggs, Watkins, and Harrelson are additionally charged with

destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and

2 (Count Five), for damage to the East Rotunda Doors entrance area that they attempted and aided

and abetted as they breached the building.  *Id.*  The Indictment further charges Watkins with civil

disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count Six), for her

efforts to push past a line of riot police to gain access to the Senate Chamber.  *Id.*  Finally, Rhodes,

Meggs, Harrelson, and Caldwell are charged with tampering with documents or other objects and

aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Counts Seven through Nine

and Thirteen), for destroying digital evidence of their participation in the attack on the Capitol and

encouraging others to do so.  *Id.*

With respect to the conspiracy charges, the Indictment alleges that between November

2020 and January 2021, the defendants entered into an unlawful agreement "to oppose the lawful

transfer of presidential power by force, by opposing by force the authority of the Government of

the United States and by preventing, hindering, or delaying by force the execution of the laws

2

governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." ECF No. 167 at ¶ 16. The Indictment further alleges that, between December 2020 through January 2021, the defendants agreed "to corruptly obstruct, influence, and impede . . . the Certification of the Electoral College vote," *id.* at ¶ 136, and "to prevent by force, intimidation, and threat . . . . Members of Congress from discharging [their] duties . . . and to induce [them] by force, intimidation, and threat . . . to leave the place where their duties as officers were required to be performed," *id.* at ¶ 140.

### B. Factual Background: Evidence Introduced to Support the Charges

#### a. Evidence of the Conspiracy

The evidence presented by the government has established that in the days after the election, Rhodes proposed that he and other Oath Keepers members and affiliates forcibly oppose the lawful transfer of presidential power from President Donald J. Trump to President Joseph R. Biden, Jr. Meggs and Watkins were among the first to join in this agreement, as demonstrated by their words and actions on November 9, and in the weeks that followed. As legal challenges to the election sputtered, and President Trump gave no indication that he would invoke the Insurrection Act to halt the certification of the election result, Rhodes and his co-defendants explicitly discussed the need to use any means necessary, up to and including the use of force, to oppose the transfer of power, and they began to focus on January 6 as a day of action for their objective. Then, on January 6, the defendants seized the opportunity to advance their conspiratorial goal by participating in the attack on the Capitol. The statements and conduct of Rhodes, Meggs, Harrelson, Watkins, and Caldwell in late December through January 6 illustrate their agreement to oppose the lawful transfer of presidential power by force and to do so on January 6 by participating in the attack on the Capitol. And their conduct after January 6 demonstrates

continued efforts to oppose by force the lawful transfer of power, evidencing their criminal intent throughout the charged timeframe of the conspiracy. Finally, their coordinated campaign to delete certain relevant evidence—in addition to being independently criminal—highlights their consciousness of guilt.

### i. After the Election through Mid-December

In the days after the 2020 U.S. Presidential Election, Rhodes began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and encouraging message recipients to forcibly oppose the lawful transfer of presidential power from President Trump to President Biden. On November 5, 2020, Rhodes told those on the "Leadership intel sharing secured" chat (also known as the "OLD Leadership CHAT"), including Meggs, that they "MUST refuse to accept Biden as a legitimate winner" and warned, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit." Gov. Exh. 6615.A (Msg. 1.S.696.12491). Two days later, on the same day that most major media outlets called the election for President Biden, 10/4/22AM Tr. at 1435-36, Rhodes used the same secure Signal group chat to urge message recipients to follow the example of Serbians who had achieved regime change in their country by "[m]illions gather[ing] in [the] capital," breaking through barricades, and storming the legislature. Gov. Exh. 6615.B (Msgs. 1.S.696.12970-71, 12977). As early as November 7, Rhodes was advocating for the use of force to oppose the authority of the government, telling those on the leadership chat that "The answer must be to refuse to accept, acknowledge, respect, or obey any of these imposters or their pretend legislation. .... and get your gear squared away and ready to fight." Gov. Exh. 6615.C (Msg. 1.S.696.13005); *see also* Gov. Exh. 6615.C (Msg. 1.S.345.156 ("The final defense is us and our rifles.")).

The weekend of November 7-8, 2020, Rhodes traveled to the Washington, D.C. Metropolitan area with his "Oath Keepers tactical leaders for a possible DC op, to do a leaders recon and make plans." Gov. Exh. 6615.B (Msg. 1.S.345.58); *see also* Gov. Exh. 6923 (Msg. 1.S.376.388 (North Carolina Oath Keepers Leader "Ranger" Doug Smith: "Stewart and I are in Virginia at a Stop the Steal campaign, these campaigns, will be springing up Nation wide, President Trump will not step down, Oathkeepers will stand behind the President at every level State and National,,, we will be bringing the battle to the enemy, Highly trained soldiers will be asked to step forward and be prepared to travel to Washington DC, all others will support these operations until we have secured our Constitution.")).  While there, Rhodes attended a rally at which he met Caldwell.  As Caldwell later described the meeting:

> We are going to win this election.  I'm still praying.  Was asked to be one of the speakers on Sunday. . . . Met some VERY interesting special operators there, some of whom are coming back in town this week for an op along the lines of what we discussed.  Coming in numbers.  You and Kenny should meet them.  I am helping with intel and logistics.  They are nation wide.

Gov. Exh. 6923 (Msg. 2006.T.1.296).

On November 9, 2020, Rhodes held a private call on GoToMeeting—an online meeting site that allows users to host conference calls and video conferences via the Internet—titled, "Oath Keepers National Call – Members Only," which was attended by Meggs and Watkins and other co-conspirators.  10/4/22AM Tr. at 1442-81; Gov. Exhs. 1000.1 through 1000.11, 6611, 6615.D (Msg. 1.S.696.13376).  During the meeting, Rhodes outlined an objective to stop the lawful transfer of presidential power, including by preparing for the use of force, and urged those listening to participate.  He told those on the call, "There's no such thing as another election in this country of any meaningful sense of the term if you let this stand," Gov. Exh. 1000.1; "You're from Oath Keepers - you've got a responsibility and duty," Gov. Exh. 1000.5; and "You've got to go there

[to Washington, D.C.] and you've got to make sure he knows that you are willing to die to fight for this country," Gov. Exh. 1000.7.  Rhodes stated his intent to organize an "armed QRF" or "quick reaction force" outside the city to support operations inside.  Gov. Exh. 1000.7.  He stated, "We're very much in exactly the same spot that the founding fathers were in like March 1775.  Now—and Patrick Henry was right.  Nothing left but to fight.  And that's true for us, too.  We're not getting out of this without a fight."  *Id.*  Rhodes also continued to reference a need to follow the example of Serbians who engaged in a "color revolution" to oppose the transfer of power following an election perceived as fraudulent in their country.  Gov. Exh. 1000.8.

West Virginia Oath Keeper Abdullah Rasheed was present on the call and recorded it because, in his words, "the more I listened to the call, it sounded like we were going to war against the United States government, and I wasn't comfortable, so I started to record it." 10/6/22PM Tr. at 2024.  To Rasheed, "It sounded like we were going to war with—we were going to overthrow the United States government and start shooting everybody."  *Id.* at 2045.  A couple of weeks after the call, Rasheed began contacting the Federal Bureau of Investigation ("FBI"), the U.S. Capitol Police, and several politicians to try to warn them about what Rhodes had said on the call. *Id.* at 2026-2027.

Meggs and Watkins not only attended this November 9 GoToMeeting but also participated at the end of the call in a discussion of what weapons could be brought lawfully into the city in support of what Rhodes was proposing.  Gov. Exhs. 1000.10-1000.11.  Immediately after that meeting, Meggs sent a message to an invitation-only Signal group chat titled, "OKFL Hangout" ("OKFL Hangout Chat"), which included co-defendants and other co-conspirators, in which he stated, "Anybody not on the call tonight.  We have been issued a call to action for DC.  This is the moment we signed up for . . . ." Gov. Exh. 6616.B (Msg. 1.S.656.4143).  Watkins also sent

messages, during and after the meeting, that showed her intent to join the criminal agreement. *See* Gov. Exh. 6617.B (Msg. 192.T.426 (To Rhodes: "Montana and I at your disposal. I'd like a medical role personally.")); (Msgs. 192.T.406, 408, 418-19 ("Stewart said it. Going to DC. Guys outside DC with guns, awaiting orders to enter DC under permission from Trump, not a minute sooner. We can have mace, tasers, or night sticks. QRF staged, armed, with our weapons, outside the city. If it gets bad, they QRF to us with weapons for us.")); (Msg. 192.T.409 ("We march on D.C. on Saturday. This is the real for real shit. No weapons allowed, be prepared to fight hand to hand. Want to come? It's now or never time.")); (Msg. 2003.T.250 (to co-conspirator Donovan Crowl: "Be ready to march on D.C. on Saturday. Driving out Friday night. Hooah? This is what we've been waiting for. It's not just an Oath keeper mission. Patriots everywhere. 3 Percenters too. Let's make history motherfucker.")).

The weekend after the November 9 GoToMeeting, Rhodes, Meggs, Watkins, and Caldwell traveled to the Washington, D.C. Metropolitan area for an operation to coincide with the so-called "Million MAGA March." Caldwell hosted Oath Keepers members and affiliates at his Virginia residence, including Watkins and two members of her team from Ohio, as well as North Carolina leaders Doug Smith and Paul Stamey, and others from their state such as North Carolina Oath Keeper John Zimmerman. 10/16/2022AM Tr. 1891-96. According to Zimmerman's testimony, Rhodes visited Caldwell's property the evening of Friday, November 13, to address those gathered there. *Id.* at 1896-98. Among other things, Rhodes told the group they needed to be prepared to take up arms if President Trump invoked a law called "the Insurrection Act" and called up groups like the Oath Keepers to help him oppose the "rogue government" or those in Congress who had gone rogue. *Id.* at 1900-02, 1909. Late that night, Caldwell told a friend:

> Sure wish you were coming along tomorrow. If we cannot get the President another
> term, we are well and truly fucked. If we don't start mowing down masses of these

shitballs they will come for all of us. Its kill or be killed I am afraid.  I don't want to live in a communist country.  I kinda hope there is some shit tomorrow in some ways just so we can get ON with it!

Gov. Exh. 6923 (Msg. 2006.T.1.335).

On November 14, Zimmerman volunteered his van to serve as the "QRF" that would be prepared to ferry weapons to those inside the city should the President invoke the Insurrection Act. 10/16/2022AM Tr. 1900-02, 1909.  On the morning of November 14, those gathered at Caldwell's property deposited approximately 10-15 long guns and 6 pistols into the back of Zimmerman's van.  *Id.* at 1903.  Zimmerman and three other North Carolina Oath Keepers, including Paul Stamey, then spent the day at Arlington Cemetery on standby in the event the QRF was activated. *Id.* at 1903-07.  Zimmerman explained that Oath Keeper members and affiliates communicated that day on a Zello channel that Watkins had set up the night before.  *Id.* at 1916-17.  Ultimately, the QRF was not activated that day, and everyone gathered back up that evening at Caldwell's residence.  *Id.* at 1919.

The November 14 event forged bonds among some of the individuals who later became integral members of this conspiracy, such as Caldwell, Watkins, and co-conspirators Donovan Crowl and Paul Stamey.  As Caldwell wrote to Stamey in a Signal message on the evening of Sunday, November 15, "Let the word go out from this time and this place: you have true friends in Virginia!  It was an honor to invest time in a new relationship with a patriot.  I love me some Marine! I WILL see you again!"  Gov. Exh. 6619 (Msgs. 22.S.456.A-22.S.458.B).  Similarly, Crowl texted Caldwell, "I truly treasure your Friendship. Brother. War is on the Horizon. Until We go to ground...Semper Fidelis."  Gov. Exh. 6825.2 (Msg. 22.T.14.14).  Caldwell told Crowl the very next night, "I am already working on the next D.C. op."  Gov. Exh. 6825.2 (Msg. 22.T.14.20/3).

Following the November event, Watkins stepped up her efforts to recruit others to the cause. As she told Donovan Crowl, she joined Parler because she was "[t]rying to recruit." Gov. Exh. 6825.9 (Msg. 2003.T.267). Watkins told one recruit she should get comfortable with the idea of dying for her country to oppose the incoming Biden Administration, because, "[I]f Biden get the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet." Gov. Exh. 6825.8 (Msgs. 192.T.984, 987-99, 996).

Meggs, too, recruited others to the conspiracy during this time period. On the OKFL Hangout chat, Meggs applauded new, young members like co-conspirator Caleb Berry, calling him "Patriot" and saying things like, "Well thank you for stepping up !! That sir makes you a badass !" Gov. Exh. 6860 (Msg. 1.S.656.5363). Meggs also continued to prepare for firearms training for his group. On November 27, Meggs purchased a firearms training class advertised as "private training for up to five people" from a company called Combat Art Training at which he, Harrelson, and other co-conspirators had previously taken classes, including a "Rifleman I" class that "teaches you how to gunfight at close distance with a rifle in a fast and effective manner." Gov. Exh. 4800.1, 4801.5, 4805.1, 4807.4. Around this same time, Meggs wrote to the "OKFL Hangout" Signal group chat, "Like we were told on the call the other night , training is coming if all kinds. Let's just all commit to get involved. Even as instructors like You Cape !! Get involved in it and help train people locally. We need everyone to work together and train each other." Gov. Exh. 6860 (Msg. 1.S.656.5132).

In early December, Harrelson switched from using his real name to the moniker "Gator 6" on the GoToMeeting application. Gov. Exh. 6850. He also became an organizer rather than just an attendee of these meetings, organizing about a dozen Florida Oath Keeper virtual meetings in

December through early January, including recurring "warrior Wednesday with gator 6" and "oath keepers friday night free for all" meetings. *Id.*

Around this time, Caldwell was also making efforts to arm himself and prepare to use force to oppose the transfer of power. On November 21, Caldwell purchased a gun disguised to look like a cell phone from an online retailer. Gov. Exh. 2867.1. On December 4, Caldwell wrote Crowl, "Ranger is thinking we should hold off on an op surrounding the maga march and plan for the NEXT op which may be much larger and involve supporting the President directly and taking our country back. That would be our last chance to save the country and may be quite violent." Gov. Exh. 6825.3 (Msg. 200.F.1.1). On December 23, after Caldwell and other co-conspirators began discussing traveling to Washington, D.C., for January 6, Caldwell followed up on the cell phone gun order, writing to the seller, "I am eager to receive this weapon."

### ii. Mid-December through Early January

Beginning in mid-December 2020, Rhodes and his co-defendants began to call more directly for the use of force to oppose the transfer of power—regardless of the President's direction—and to focus on the Certification proceeding set to take place on January 6, 2021 as a day of action to advance their criminal objective.

### 1. Focus on Force to Oppose the Government and January 6, 2021

As early as December 10, Rhodes began expressing in private circles his skepticism that the President would invoke the Insurrection Act and his belief that he and other Oath Keepers members and affiliates would need to take matters into their own hands. In a message to Kellye SoRelle and two other acquaintances, Rhodes wrote, "[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection

(rebellion) Against the ChiCom puppet Biden. Take your pick."  Gov. Exh. 6748 (Msg. 1.T.2186.50).

On December 14, the day that the Electors of the Electoral College met in their respective states and cast votes that resulted in the necessary number for President Biden to be elected, Rhodes told co-conspirators on the OLD Leadership CHAT, "Trump has one last chance to act. He must use the insurrection act. Unless we fight a bloody civil war/revolution."  Gov. Exh. 6701 (Msgs. 1.S.696.15779, 15784).  That same day, Rhodes posted similar messages in the various Signal group chats. *See, e.g.,* Gov. Exh. 6803.2 (Msg. 1.S.233.1513 (To GA OK General Chat: "If he doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors.")).

A week later, President Trump still had not invoked the Insurrection Act, and Rhodes began to prime his co-conspirators to act—with or without the President's orders.  On December 21, Rhodes wrote to the OKFL Hangout chat:

> We need to push Tump to do his duty.  If he doesn't, we will do ours.
> Declare Independence.
> Defy
> Resist
> Defend
> Conquer or Die
> This needs to be our attitude.

Gov. Exh. 5310 (Msg. 1.S.656.9254).

According to the testimony of co-conspirators who read and heard these words in real time, this was not mere rhetoric.  To Florida Oath Keeper and co-conspirator Jason Dolan, that message meant that "we saw ourselves as patriotic Americans, [were] willing to fight back against an illegitimate government and—and support what we saw as the rightful President against an

illegitimate President." 10/18/22PM Tr. at 4099. Asked how the group would fight to support

President Trump against the illegitimate government, Dolan explained:

> Any way we could. I believe at this point we were preparing for a trip to D.C. I'm
> not sure of the exact date. But if need be, then to—to take up arms and fight back,
> because that's—that's what we have been talking about. That's—we may not have
> exactly been saying it, but that was the tenor; we have to fight back. We have to
> fight back. And—and it was—it was a feeling like our country or—was slipping
> out of our fingers and we needed to defend our country. Conquer or die.

*Id.*

Accordingly, the co-conspirators began to make plans for January 6. On December 20,

Joshua James, the Alabama Oath Keeper who later led one group of co-conspirators into the

Capitol on January 6, messaged the OLD Leadership CHAT, "SE Region is creating a

NATIONAL CALL TO ACTION FOR DC JAN 6TH.... 4 states are mobilizing." Gov. Exh.

6803.3 (Msg. 1.S.696.16531). That same day, Caldwell posted a message in response to a

Facebook friend's retweet of a President Trump tweet with the comment "@realDonaldTrump.

We've got your back 100%!! #fightfortrump." In his message, Caldwell stated, "Yeah, but what

are WE supposed to do? Tell me who to shoot first and I'm all in!" Gov. Exh. 6923 (Msg.

2001.T.54.2). Two days later, Caldwell sent a Signal message to Doug Smith stating:

> Spoke with Paul last night. I will be at the march on the 6th. I have booked a hotel
> room in arlington. We do not yet know what may go down but this room gives us
> a spot to stage materials should things go high order. 10 minutes from the potomac.
> Sharon and I will be there 5th and 6th. Wanted you to know this for contingency
> planning. Close hold you and Paul only for now, pls.

*Id.* (Msg. 22.S.553.A).

On December 22, the day he was named State lead of Florida, Gov. Exh. 6868 (Msg.

2000.T.1070), Meggs told those on the OKFL Hangout chat: "It's easy to chat here. The real

question is who's willing to DIE , that's what the Patriots did by the thousands . We are worried

about getting the day off." Gov. Exh. 6860 (Msg. 1.656.9322). The following day, Meggs

continued, "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside ! Scare the hell out of them with about a million surrounding them should do the trick !" *Id.* (Msg. 1.S.656.9619).  He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of the Capitol !!" *Id.* (Msg. 1.S.656.9620).  On December 24, Meggs wrote to the same chat, "We have 10-12 staying there.  So it's gonna be a WILD time in DC we gotta get the crowd going during the day.  I think we get everyone up good and close to the Capitol bldg so they can here is inside.  Then at night well whatever happens happens ." *Id.* (Msg. 1.S.656.9990).

On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  Gov. Exh. 1008.  Rhodes warned in the open letter that if the President failed to take action to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." *Id.*

These words prompted Michael Adams, the leader of the Florida chapter of Oath Keepers prior to Kelly Meggs, to resign his position. Adams testified that these "letters indicated that if the President—the current President, Trump at the time, did not declare the Insurrection Act—I don't know if I'm saying that properly—and call up the militias and stand this down, if—if he didn't do that, then we would have to do that.  And I was concerned about who 'we' [was]."  10/6/22PM Tr. at 2059.  According to Adams, he did not want to be part of that "we." *Id.* at 2059-60.

Others did.  On December 25, co-conspirator Graydon Young asked Stewart Rhodes on the OKFL Hangout chat, "What's your opinion on the likely outcome on 1/6 based on the current situation and Trumps dithering?" Gov. Exh. 6860 (Msg. 1.S.656.10091). Rhodes responded:

He is being advised to wait till the 6th in reliance on Congress. His "legal advisors" are NOT actually advising him (not laying out all his actual options like a real staff member should, and then let him decide). They are instead acting ags if his only option is to hope Congress does the right thing - which is extremely unlikely. I'm working to get him to see other options and put them on the table. I think Congress will screw him over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen.

*Id.* (Msg. 1.S.656.10094-95). Young then wrote, "That's what i would have guessed... one damned week left ... I'm going to DC but it feels like a fool's errand based on current events." *Id.* (Msg. 1.S.656.10095). Rhodes answered:

It's not a fools errand. It has benefits regardless of outcome and regardless of what we then do. Trump needs to know we support him in using the Insurrection Act. And that needs to be the message – If Congress rubber stamps an unconstitutional fraud, President Trump must defend the Constitution and we URGE him to use the Insurrection Act to do so. And we will support him with our boots on the ground nationwide and we will protect him, and assist him. He needs to know that to his bones. We need to make it clear. And we need to have that message echoing off every roof top from now till that day. Focus like a laser on it. And he needs to know that if he fails to act, then we will. He needs to understand that we will have no choice.

Gov. Exh. 6860 (Msg. 1.S.656.10101-02). To Young, Rhodes's messages "regalvanized" him to go to Washington, D.C. on January 6 and play a role in the "resistance" to President-elect Biden from assuming power. *Id.* at 5766. The enemy, he testified, was "a corrupt element within the government," including "Congress and President Biden." *Id.*

Similarly, on December 29, Rhodes wrote to the OLD Leadership CHAT, which by now included Watkins, "I think that part of him now understands that the Insurrection Act and warfare - with him as Commander in Chief - is the only way that he can save our Republic. But he needs to know that if he doesn't do it, we will." Gov. Exh. 6701 (Msg. 1.S.696.17485-86). Over the course of the next week, Rhodes and his co-defendants made their arrangements to carry out this objective.

### 2.  *Logistical Plans for January 6, 2021*

In late December, Rhodes, Meggs, Watkins, Harrelson, and their co-conspirators created and administered encrypted chats on Signal with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6" for coordinating their plans for January 6.  Rhodes described DC OP: Jan 6 21 as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership."  Gov. Exh. 6701 (Msg. 1.S.159.108).  On December 30, Rhodes told the DC OP: Jan 6 21 chat that he was "putting Don Siekerman in overall command of this op.  And then Whip, Josh and Kelly as his seconds because they have been to DC prior." Gov. Exh. 6701 (Msg. 1.S.159.83).  On these chats, they coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 6825.12, 6860, 6870, 6923.  They also held a series of "DC planning" GoToMeetings in the week leading up to January 6. Gov. Exhs. 6850, 6856, 6857.

As these plans grew more concrete and more violent, the group discussed the need for operational security and used encrypted communications applications, such as Signal and Proton Mail.  In Florida, co-conspirator Joseph Hackett encouraged handwriting sensitive messages in cursive and attaching them to digital communications.  Gov. Exh. 4653.  Hackett explained, "I believe we only need to do this when important info is at hand like locations, identities, Ops planning."  *Id.*  Rhodes expressed the need to discuss more sensitive matters in a phone call as opposed to Signal.  Gov. Exh. 6803.2 (Msg. 1.S.233.1598 ("Good topic for a phone call."))  As Caldwell explained to Crowl, "Then I will find another format to send you the simple process we can use for secure text and document comms. I think our time is coming." Gov. Exh. 6825.2 (Msg. 200.F.1.3 (Caldwell messaging Crowl about using Proton Mail)).

The defendants, along with co-conspirator Paul Stamey and others, then took the lead in planning the logistics for the QRF that would support the operation inside D.C. with firepower. On December 30, Watkins wrote to Siekerman, an operational leader for January 6, "We are coming again. I talked to Tom, I guess he won't be using his property as a Rally Point again, so we need a new Rally Point. I'll txt Stewart today and sort it out. We will be there on the 5th as well." Gov. Exh. 6825.10 (Msg. 2050.T.3.2.).  She continued, "Looks like Ranger Doug and NCOK crew should be coming.  Tom's not able to have us stage at his property again, so we are sorting out a new RP." *Id.*; *see also* Gov. Exh. 6923 (Msg. 111.S.1 (Joshua James to Brian Ulrich: "Were working on a Farm location. Some are bringing long rifles some firearms…I'm bringing sidearm.")).

That same day, Caldwell updated Watkins:

> Talked to Paul.  At least one full bus 40+ people coming from N.C.  Another group (unclear if Mississippi guys) also a bus.  Busses have their own lane on the 14th street bridge so they will be able to get in and out.  Paul is driving plus 1 and arriving nite before.  As we speak he is trying to book a room at Comfort Inn Ballston/Arlington because of its close-in location and easy access to downtown because he feels 1) he's too broken down to be on the ground all day and 2) he is committed to being the quick reaction force and bringing the tools if something goes to hell.  That way the boys don't have to try to schlep weps on the bus.  He'll bring them in his truck day before.  Just got a text from him he WAS able to book a room in that hotel I recommended which is on Glebe Road in Arlington.  However it goes  it will be great to see you again!  I sure hope your arm is getting better!

Gov. Exh. 6923 (Msg. 192.T.1417).  As Caldwell sent those messages, he received a message from Stamey stating, "Booked Rm 252 5 an 6th . . . Same Comfort Inn." *Id.* (Msgs. 22.S.487.A, C). Records from the hotel show that Stamey ultimately booked three rooms at that hotel (one of which was used by his North Carolina team, one for the Florida QRF, and one by the Arizona QRF team). Gov. Exh. 2600.4; 10/14/22AM Tr. at 3394, 3409-22; 10/17/22AM Tr. at 3521-69.   Other

defendants and co-conspirators who stayed at the hotel included: Watkins, Crowl, Sandra and Bennie Parker, and a team of Oath Keepers from South Carolina. *Id.*

On the morning of January 2, Meggs messaged Rhodes, "Last night call … we discussed a QRF RP so we may do that.  As well as the NC team has a hotel room close by." Gov. Exh. 6923 (Msg. 1.S.613.173).   There had, in fact, been a GoToMeeting call the night before, titled "conference call for dc leadership/team leaders only," which had been attended by Meggs, operational leader Siekerman, and Southeast team leader James, among others. Gov. Exh. 6900. As discussed above, the hotel room reserved by the NC team that Meggs referenced was the room Caldwell directed him to book.  Gov. Exh. 2600.4.  Rhodes responded to Meggs' messages about the QRF planning to say, "Ok.  We WILL have a QRF.  this situation calls for it."  Gov. Exh. 6923 (Msg. 1.S.613.175).  Meggs went on to elaborate the plan for the QRF: "Yes we have the overlay maps of street closures and it looks like Lincoln is our RP of SHTF .  Lots of access roads on the edge of main area." *Id.* (Msg. 1.S.613.176).  Rhodes answered, "That's good. Both in and out is very useful." *Id.* (Msg. 1.S.613.177).

Later in the morning of January 2, Meggs messaged the DC OP: Jan 6 21 Signal chat, "Good call last night.  Lots covered, I'll get with NC team today and find out QRF location[.]" *Id.* (Msg. 1.S.159.450.)  By that evening, Stamey knew Meggs' plans for the Florida co-conspirators, as he informed Caldwell: "FLA. 2 Men left back [presumably for the QRF]. 12 to 15 going in DC." *Id.* (Msg. 22.S.508.A).  Meggs also wrote to the DC OP: Jan 6 21 Signal chat to inform the co-conspirators of the "QRF Rally Points," sending a map showing locations near the Lincoln Memorial and West Potomac Park, explaining, "1 if by Land, North side of Lincoln Memorial, 2 if by Sea, Corner of west basin and Ohio is a water transport landing !!" *Id.*  (Msgs. 1.S.159.524-25).  Meggs explained that the water transport landing would be used if "the bridges get closed."

*Id.* Stamey chimed in to say, "My sources DC working on procuring boat transport as we speak." *Id.* (Msg. 1.S.159.526). At almost the exact same time, Caldwell was reaching out to acquaintances to ask them if they had a boat to contribute for the QRF. *Id.* (Msgs. 2001.T.169.12, 22.T.15.26, 22.S.624-626, 22.S.517.A). Caldwell also shared maps with Stamey showing the route from the hotel into the city, and discussed with North Carolina leader Doug Smith the distance from the QRF hotel to the Capitol. *Id.* (Msgs. 22.E.1-3, 22.S.565.A-C).

Florida Oath Keeper and co-conspirator Jason Dolan testified about his understanding of the purpose of the QRF, based on what he had heard from Rhodes, Meggs, and Harrelson, among others:

> [W]e would have our firearms in—in Virginia. The overall goal why is if the Insurrection Act was declared, we would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress. . . . And if [President Trump] didn't do it, then we would need to step up and stop the certification of what—what I saw—I don't want to put words in his mouth, but as what I saw as an illegitimate election. So the certification process would still have to be stopped.

10/18/22PM Tr. at 4109-10. Dolan explained that it was Rhodes's messages like, "If [Trump] doesn't do his duty, we will do ours," that were "why we brought our firearms." *Id.* Dolan then showed the jury the rifle and pistol he personally brought to D.C. to support this mission. *Id.* at 4100-4101. He identified these guns as "arms" that he was willing to take up against the government to stop the lawful transfer of presidential power. *Id.*

On the way to D.C., Watkins and Meggs both confirmed the location of the QRF drop-off point. On the afternoon of January 4, Watkins messaged the OK FL DC OP Jan 6 chat, "We will be in VA @ 8pm. Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow." Gov. Exh. 6923 (Msg. 85.S.193808.C). The next morning, Harrelson messaged the same chat, "We get that QRF hotel address yet?" *Id.* (Msg.

85.S.194617.D).   Kelly Meggs responded by directing Harrelson to "Dm" him. *Id.* (Msg. 85.S.194617.E).

On the morning of January 5, Rhodes messaged the DC OP: Jan 6 21 chat, "Do NOT enter DC with ANYTHING that would be deemed illegal in DC.  Or even questionable.  The DC police have arrested multiple people for items they cannot bring into DC, including Enrique Tarrio, president of Proud Boys.  But he's not the only one.  Three others have also been arrested.  They are setting traps.  Do NOT even cross over into DC at all, for any reason, with anything on you or in your vehicle that could get you into trouble."  Gov. Exh. 6923 (Msg. 1.S.159.817).  Meggs responded, "We are ready !! Should be in DC by noon."  And then shared a link to a dropbox site containing a video set to rock music that depicted Meggs, Harrelson, and other co-conspirators firing weapons at targets shaped like humans at a September 2020 training they had attended.  Gov. Exh.6863 (Msg. 1.S.159.818).

When the co-conspirators arrived in the D.C. area on January 5, 2021, the defendants and their co-conspirators dropped off firearms, ammunition, and tactical equipment with members of the QRF at the hotel in northern Virginia that Caldwell had identified. 10/17/22AM Tr. at 3521-69.  Shortly after noon on January 5, Meggs wrote to Rhodes, "[W]e are just outside of town unloading at QRF on our way in. Left Rangers place at 4:30am." Gov. Exh. 6928 (Msg. 1.T.2315.10).  Rhodes responded, "Good to go. See you soon." *Id.* (Msg. 1.T.2315.11).  Terry Cummings, who traveled with Dolan and Harrelson and admitted to leaving his own rifle with the QRF, described the volume of weapons in the Florida team's QRF room: "I had not seen that many weapons in one location since I was in the military."  10/12/22AM Tr. at 2728.  According to Dolan—who testified that he dropped off a rifle, a pistol, and a few hundred rounds of ammunition, while Harrelson dropped off a bigger rifle case that could hold at least two firearms—he was

informed by Meggs and Harrelson that "[t]hat room could be used for the staging area for the firearms," and that the person assigned with guarding the weapons "was good to go." 10/18/22PM Tr. at 4112-14, 4117-18. Dolan said his understanding was that, if called upon, the QRF would bring the firearms to those on the ground in D.C., by either vehicle or boat, or they would go back to the QRF hotel to retrieve their firearms. *Id.* at 4119.

As the defendants and their co-conspirators descended upon D.C. in the days before January 6, their intent for that day was clear. On December 29, Rhodes privately messaged SoRelle:

> And then I'll turn my attention to what I need to do as the founder and leader of Oath Keepers to prepare for what comes after Trump fails to do his duty. I'll also have a small contingency plan for what to do if he suddenly grows a pair. But most of my focus will be on presuming he won't. And preparing for the worst. . . . This will be DC rally number three. Getting kinda old. They don't give a shit how many show up and wave a sign, pray, or yell. They won't fear us till we come with rifles in hand. Only reason to go is so Trump knows we support him in taking Reg gloves off and kickin ass. That's why I'm going. It's to send HIM a message. Not Congress. I'm done talking to them.

Gov. Exh. 6749 (Msg. 1.S.737.2820). On January 3, Meggs told one acquaintance on Facebook, "The natives are very restless . Tell your friend this isn't a Rally," and told another acquaintance, "1776 we are gonna make history." Gov. Exh. 6868 (Msgs. 2000.T.289, 2000.T.1164). As Caldwell posted in a comment on Facebook on December 31, the kettle was "set to boil." Gov. Exh. 6923 (Msg. 2001.C.2 ("It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets. Let them try to certify some crud on capitol hill with a million or more patriots in the streets. This kettle is set to boil….")).

### iii. January 6, 2021

On the morning of January 6, as they watched and waited from the QRF staging location with the weapons, co-conspirators Edward Vallejo and Todd Kandaris discussed the possibility of

"armed conflict" and "guerilla war" if President Trump or Vice President Michael R. Pence did not stop the Certification Proceeding that day. Gov. Exh. 1052. They explained that "there are people who are prepared, have the will, have the facilities to do more than taunt." *Id.*

Later that day, around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted." Gov. Exh. 1500. At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." Gov. Exh. 1500. Similarly, at 1:41 p.m., Rhodes sent a message to the OLD Leadership CHAT stating, "Hey, the founding generation stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought. That's where we are now. Next comes our 'Lexington.'" *Id.* In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to January 6, these words were a call to action.

Indeed, shortly thereafter, as video recovered from Watkins' phone shows, members of Stack One started moving from the Ellipse towards the Capitol. *Id.*; 192.V.1. As she marched with Stack One down Pennsylvania Avenue at approximately 1:50 p.m., Watkins announced over the "Stop the Steal J6" Zello channel, "We have a good group. We've got about 30, 40 of us. We're sticking together and sticking to the plan." Gov. Exh. 1500, 1502. She elaborated, "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol." *Id.* She continued, "Trump's been trying to drain the swamp with a straw. We just brought a shop vac." *Id.* Then, at about 2:00 p.m., Watkins told those on the Zello channel, "We're one block away

from the Capitol now. I'm probably gonna go silent when I get there because I'm gonna be a little busy." *Id.*

Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, co-conspirator James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" Gov. Exh. 1500. Rhodes responded, "Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]" *Id.* James responded, "We're coming to the Capitol ETA 30 MIN." *Id.* James and several co-conspirators (including Roberto Minuta, Mark Grods, and Brian Ulrich) then headed toward the Capitol. *Id.*

By 2:30 p.m., Rhodes had entered the Capitol grounds himself and had begun explicitly directing his co-conspirators to come to the Capitol to join him. Gov. Exh. 1500. Florida Oath Keeper Terry Cummings testified about Stack One's march towards the Capitol. He recalled that on the way, Meggs mentioned that people had breached the Capitol. 10/12/22AM Tr. at 2732, 2739-41. Meggs then "was wondering about whether we should enter the Capitol." *Id.* at 2741. Cummings continued, "He was wanting to find someone to talk to them." *Id.* Cummings then took a wisely timed bathroom break, and when he returned, Stack One was gone. *Id.* According to Young, Kelly Meggs was his superior and was attempting to "rendezvous with Stewart" to decide "next actions as a group." 10/31/22PM Tr. at 5857.

At about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was already on the phone with Michael Greene, an operational leader for January 6. Rhodes merged them into a three-way call. Gov. Exhs. 1500, 6740; 10/20/22PM Tr. at 4709-10. Moments later, Meggs led Stack One up the east steps of the Capitol to the area outside the East Rotunda doors, where rioters

22

were using their hands, flags, and chemical spray to assault the officers guarding the doors, , and violently trying to force entry.  Gov. Exhs. 1500; 10/20/22PM Tr. at 4710-12.  For minutes, the crowd—including Meggs, Watkins, Harrelson, and other co-conspirators—attempted to break into the Capitol.  When the doors eventually opened, Meggs motioned for Stack One to enter.  *Id.*

Once inside, half of Stack One, led by Watkins, tried to force their way past riot police to the Senate Chamber.  Gov. Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-98.  The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six of her co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber.  Gov. Exh. 1505. District of Columbia Metropolitan Police Department (MPD) Officer Christopher Owens, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described the size and force of the mob and how it continued to push back the police line.  10/26/22AM Tr. at 5446-54.  Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line. Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-54.  Watkins later described her conduct in that hallway: "We were in the thick of it. Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans." Gov. Exh. 6734 (Msg. 192.T.1521).

Meanwhile, the other half of Stack One, led by Meggs and Harrelson, pushed into the House side of the building, in search of Speaker of the House Nancy Pelosi.  Gov. Exhs. 1500, 1505, 1506, 6734 (Msgs. 7.T.570.9758, 9760-61).  There, they encountered U.S. Capitol Police Officer Harry Dunn, who was guarding a staircase down to the Crypt level of the building. 10/31/22AM Tr. at 5593.  Officer Dunn and U.S. Capitol Police Special Agent David Lazarus explained that Meggs and Harrelson and their co-conspirators were only about ten feet from the

entrance to Speaker Pelosi's office suite at this time; however, the sign to the office had fortunately already been torn down by rioters, obscuring the nature of the office.  10/31/22AM Tr. at 5658-59.

While the members of Stack One breached the east side of the Capitol and split into teams pushing toward the House and Senate, Caldwell had, in his words, "climbed the steps after breaking 2 rows of barricades" and "got on the parapets" on the west side of the Capitol.  Gov. Exhs. 1500, 6734 (Msg. 22.T.27.2883).  There, Caldwell joined the mob that was assaulting officers and trying to break into the building.  As Caldwell later described it, "[T]he people in front of me broke through the doors and the doors and started duking it out with the pigs who broke and ran.  Then we started stealing the cops riot shields and throwing fire extinguishers through windows. It was a great time." *Id.*

Half an hour later, another group of co-conspirators breached the Capitol through the very same doors as Stack One. Stack Two, led by James and Minuta, arrived at the Capitol grounds shortly after 2:30 p.m.  Gov. Exh. 1500; 10/20/22PM Tr. at 4798-4805.  Stack Two then penetrated the restricted Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m.  *Id.*  Members of Stack Two tried to force their way into the Rotunda and assaulted law enforcement officers while screaming that this was "our fucking building."  Gov. Exh. 1500.  These Stack Two co-conspirators were eventually expelled by riot police officers who had begun clearing the building.  *Id.*  After they left the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol.  11/02/22AM at 5981-83; Gov. Exh. 5306.1.

Co-conspirators Dolan and Young both testified that their actions on January 6 were directly linked to the implicit agreement they had entered into with other Oath Keeper members

and affiliates—including the defendants—to stop the lawful transfer of presidential power by any means necessary. Dolan testified that his understanding of the criminal objective was derived from messages like the December 25 messages sent by Rhodes to the OKFL Hangout chat, where Rhodes stated that if President Trump did not act to stop the election fraud, then the Oath Keepers would have to. Dolan explained:

> Well, that's my exact understanding: If the president didn't act, then we needed to. We were up in D.C. We were there. We were on location. So when the Capitol Building—when the doors opened, we get—went in. I mean, we were all in line. We could have gotten out of line. We could have moved out of the way. We—it probably would have been hard or difficult. But we went in. And it's—it's this—it was that same idea of the—the texts over and over: We will do something. We will do something. We will do something. And now here we are in front of the Capitol doors, and they opened. And it was: Let's do something.

10/19/2022PM Tr. 4417-18.

Young testified: "We talked about doing something about the fraud in the election before we went there on the 6th. And then when the crowd got over the barricade and they went into the building, an opportunity presented itself to do something. We didn't tell each other that." 10/31/2022PM Tr. 5853. Rather, in Young's words, it was "common sense." *Id.* Young further explained that he and his co-conspirators had come to D.C. on January 6 prepared to fight against "[t]he corrupt elements in the government that were allowing the election to proceed, and obviously leftists and extremists and whoever else was in the way." 10/31/2022PM Tr. at 5866. Young acknowledged that in so doing, he was "acting like a traitor." *Id.*

### iv. After January 6

In the messages they sent on the evening of January 6, the defendants struck a tone of defiance and showed an intent to continue opposing the lawful transfer of power by force. "You ain't seen nothing yet," Rhodes wrote to the DC OP: Jan 6 21 Signal chat. Gov. Exh. 6732 (Msg 1.S.159.1322). He continued, "Patriots entering their own Capitol to send a message to the traitors

is NOTHING compared to what's coming." *Id.* (Msg. 1.S.159.1328). Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!! We are reloading!!" *Id.* (Msg. 1.S.159.1326). Caldwell wrote to Crowl, "We need to do this at the local level. Lets storm the capitol in Ohio. Tell me when!" *Id.* (Msg. 2002.T.79C). Watkins posted to Parler, "We stormed the Capitol, personally. Got tear gassed and everything. We won't back down in fear. We are. AMERICANS!" Gov. Exh. 6734 (Msg. 2050.C.176).

In the following weeks, the defendants continued to take actions in furtherance of the conspiracy. In a message titled "Critical Message for Oath Keepers and Patriots Part I," which he posted to the OLD Leadership CHAT on January 14, Rhodes wrote:

> Now that it is regretfully becoming clear that President Trump will not be taking the decisive action we urged him to take, using the Insurrection Act and a declass/data dump, let's follow the Founders' game plan, using their strategies and methods, which focused first on declarations of illegitimacy, nullification (declaring unconstitutional acts to be null and void from inception, and refusing to obey them), unified mass non-compliance with unconstitutional and oppressive actions and then on self defense, mutual defense, and resistance when the domestic enemies of the Constitution come for us. That's how the Founders did it, and it worked. There is nothing new under the sun. Let us adapt their game plan to our current situation.

Gov. Exh. 9073.1 (Msg. 1.S.696.19133). During the two-week period from the January 6 attack to the January 20 Inauguration, Rhodes spent more than $17,000 on firearms and tactical equipment. *Id.*

Rhodes also summoned co-conspirators to join him in Texas. Gov. Exhs. 9062 (Msg. 54.S.95.2), 9064, 9065, 9066. James answered the call and collected what he referred to as "all available firearms" to take to Texas, where he stayed with Rhodes and others. Gov. Exh. 9066. On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !" Gov. Exh. 9072. Meanwhile, Watkins told Crowl about how she and other Oath Keepers in the

Midwest were "organizing a bugout plan if the usurper is installed," Gov. Exh. 9079 (Msg. 2003.T.280.C), which she described as, "Something like 20+ Oathkeepers going to Kentucky mountains on hundreds of acres." *Id.* (Msg. 2003.T.280.E). She continued, "Gives us the high ground, and makes tunneling out fighting positions great (above water line). Be like the NVA and network tunnels." *Id.* (Msg. 2003.T.281.C). (As Special Agent Jack Moore testified, the "NVA" is an apparent reference to the North Vietnamese Army, which used "guerilla tactics" against the government, like Watkins described using.) 11/02/22PM Tr. at 6540-41. For his part, Caldwell wrote to a Facebook acquaintance:

> Sharon and I were in D.C. as you must know and while not in the VERY thick of it, we were in the middle of some heavy stuff. We are, of course, both o.k. and we are planning for the worst and have been for awhile. More on that through secure comms. We are patriots and we are aligned with others. Welcome to the fight.

Gov. Exh. 9078 (Msg. 2001.24.C).

The FBI began arresting co-conspirators three days before the Inauguration, starting with Watkins on January 17, and Caldwell on January 19. 11/02/22PM Tr. at 6556-57, 6559-60. The defendants who had not yet been arrested took note and altered their behavior accordingly. On the date of Watkins' arrest, Rhodes messaged Meggs, "Call me please ASAP," and sent Meggs contact information for a criminal defense attorney. Gov. Exh. 9082 (Msgs. 1.S.613.181-182). On January 20, Meggs messaged Rhodes, "I am going totally dark I will stay in touch." *Id.* (Msg. 1.S.613.183).

### b.  Evidence of Obstruction of an Official Proceeding

As discussed above, the defendants and their co-conspirators joined with thousands of other rioters in breaching the Capitol building and grounds on January 6. U.S. Capitol Police Captain Ronald Ortega presented testimony and video evidence demonstrating the way in which the rioters swarmed the building and overwhelmed law enforcement—including on both the west and east

sides of the Capitol, where the defendants and their co-conspirators were engaged in their criminal acts in and around the building. Gov. Exh. 1515; 10/18/22AM Tr. at 3920-46; 10/18/22PM Tr. at 3998-4061. Through the testimony and video admitted through Thomas Wickham, the former Parliamentarian of the U.S. House of Representatives who was present at the Capitol in a consulting capacity on January 6, the government established that the conduct of the defendants and the other rioters caused Congress to recess the Certification proceeding and prevented Congress from being able to reconvene until late in the evening on January 6. Gov. Exh. 1516; 10/19/22PM Tr. at 4420-73.

### c.  Evidence of Interfering with Law Enforcement During a Civil Disorder

As noted above, Count Six of the indictment charges Watkins with committing an act to obstruct, impede, or interfere with law enforcement officers lawfully carrying out their official duties incident to a civil disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count Six). As discussed in greater detail above, Watkins led six other co-conspirators down the hallway leading to the Senate Chamber, and joined the mob trying to force their way past riot police to gain access to the Chamber. Gov. Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-98. MPD Officer Christopher Owens, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described how the conduct of Watkins and other members of the mob interfered with his abilities to do his job. 10/26/22AM Tr. at 5446-54. Only by deploying chemical spray were Officer Owens and his fellow officers able repel Watkins, her co-conspirators, and the rioters back and hold their line. Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-54.

The government established that this conduct was part of a civil disorder through the testimony of USCP Captain Ronald Ortega and the video introduced during his testimony. Gov. Exh. 1515; 10/18/22AM Tr. at 3920-46; 10/18/22PM Tr. at 3998-4061. This testimony and video

evidence established the immense nature and scale of the attack on the Capitol, as well as the tremendously taxing impact it had on the resources of not only the U.S. Capitol Police, but numerous other law enforcement agencies in this area. The government further established that this civil disorder obstructed, delayed, and adversely affected interstate commerce, the movement of articles and commodities in interstate commerce, and the conduct or performance of a federally protected function. First, the government established an adverse effect on interstate commerce through the testimony of Edgar Tippett, district manager for Safeway Stores Incorporated who manages the region that includes all of the 12 Safeway grocery stores located in the District of Columbia. 10/31/22AM Tr. at 5667. Safeway closed all of its stores in the District of Columbia from 4:00 p.m. on the afternoon of January 6, 2021, through 6:00 a.m. on the morning of January 7, 2021, in order to comply with a curfew that had been put into place by District of Columbia Mayor Muriel Bowser as a result of the civil disorder at the Capitol. Gov. Exh. 3510.1; 10/31/22AM Tr. at 5667-70. As the parties agreed in a stipulation moved into evidence and published to the jury on October 31, 2022:

> On January 6, 2021, at 2:31 p.m., Washington, D.C. Mayor Muriel Bowser ordered a citywide curfew for the District of Columbia to be effective from 6:00 p.m. on Wednesday, January 6, until 6:00 a.m. on Thursday, January 7, 2021, because of what the Mayor asserted was a civil disorder occurring at the United States Capitol on January 6, 2021. During the hours of the curfew, no person, other than persons designated by the Mayor, was legally able to walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District of Columbia.

Gov. Exh. 3006. As a result of the closures, all of the Safeway stores in the District saw earnings on January 6 that were well below the projected earnings for that day. Gov. Exh. 3510.2; 10/31/22AM Tr. at 5671-80. The curfew also resulted in the Safeway stores in the District being unable to receive shipments from their primary supplier in Lancaster, Pennsylvania. 10/31/22AM Tr. at 5680-81. "That put us entirely—put us a day behind, as many as two days depending on

your volume, because our D.C. stores normally do particularly well high sales—they're a high-sales stores," Mr. Tippett testified.  *Id.*

Second, the government presented evidence that the civil disorder at the Capitol impeded the conduct and performance of a federally protected function, namely, the ability of the United States Secrete Service, a component of the executive branch Department of Homeland Security, in protecting the Vice President of the United States.  The government presented the testimony of Lanelle Hawa, an Inspector with the United States Secret Service who was serving on January 6 as a liaison to facilitate visits of Secret Service protectees like the Vice President to the U.S. Capitol.  10/26/22AM Tr. at 5408-11.  Vice President Pence was visiting the Capitol on January 6 to participate in the Certification Proceeding.  Gov. Exh. 9053; 10/26/22AM Tr. at 5411-16. Inspector Hawa testified that the rioters' breach of the Capitol forced the Secret Service to relocate the Vice President's Motorcade, evacuate the Vice President from the Senate floor to his office, and ultimately relocate him to a more secure location within the Capitol complex.  Gov. Exhs. 9052, 9054; 10/26/22AM Tr. at 5416-29.  According to Inspector Hawa, it took nearly five hours to expel the rioters and clear the building, so that the Vice President and other members of Congress could return and resume the Certification Proceeding. 10/16/22AM Tr. at 5428-29.

### d.  Evidence of Destruction of Property

Meggs, Harrelson, and Watkins stand charged in Count Five with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Five), for damage to the East Rotunda Doors entrance area that they attempted and aided and abetted as they breached the building.  The evidence at trial established that Meggs, Harrelson, and Watkins joined with the mob that forced entry through these doors at approximately 2:39 p.m. The video evidence of that breach showed that the crowd violently pushed and pulled on the doors,

threw projectiles at the doors, jabbed flagpoles at them, and deployed chemical towards them.  *See, e.g.*, Gov. Exh. 1503.  The video evidence also showed that Meggs, Harrelson, and Watkins joined this mob, helping to push towards the doors, and ultimately forcibly enter the Capitol through them.  *Id.*  Jason McIntyre, who works for the office of the Architect of the Capitol as a Deputy Superintendent for the United States Capitol and Capitol Visitor Center, testified about the damage sustained to the East Rotunda Doors and the ornate Columbus Doors that surround them, including three panes of glass broken to the East Rotunda Doors, a door handle that had been pulled off, a door closer that was damaged, and the damage caused to the bronze detailing on the Columbus Doors from residue from chemical irritants that were sprayed both by the rioters and by the police in trying to expel the rioters.  Gov. Exhs. 2122-2125; 10/26/22AM Tr. at 5462-76.  It cost a total of over $24,000 to repair the damage to the doors.  *Id.*

### e.  Evidence of Obstruction / Tampering with Evidence

In the days and weeks after January 6, all the defendants deleted or encouraged others to delete digital evidence of these crimes. On January 8, Rhodes, through Kellye SoRelle's phone, sent a message to the OLD Leadership CHAT that stated, "We are still in the twighlight before open conflict. In this environment 'law fare' by the black hats is a very real threat.  They WILL be coming after anyone they can identify as being in the building.  Do not make it easier for them. Make them do their own work." Gov. Exh. 9061 (Msg. 54.S.125.2871).  He continued:

> Let me finish this point: DO NOT chat about Oath Keepers members allegedly doing anything at capitol. Go dark on that. Do not discuss. That's what I would advise any criminal defense client to to anyone who is at risk of being accused and indicted. Let me put it in infantry speak: SHUT THE FUCK UP! Do not discuss who did what. Go silent. Comms discipline. Don't write AARs, don't do verbal AARs, don't chat with your buddies. Or your team. Clam up.

*Id.* (Msg. 54.S.125.2874).  And six minutes later, Rhodes through SoRelle's phone put a final point on the matter:

> YOU ALL NEED TO DELETE ANY OF YOUR COMMENTS REGARDING
> WHO DID WHAT.  You are under zero obligation to leave them up.  You/we have
> not yet gotten a preservation order instructing us to retain those chat comments.  So
> DELETE THEM.  I can't delete them because this is a legacy Signal chat that
> doesn't let me delete comments.  Only the comment author can delete a comment.
> So GET BUSY.  DELETE your self-incriminating comments or those that can
> incriminate others.  Start now.  Each of you Go back to before the event and scroll
> forward and hunt down any comment you made that can be used against you, other
> Oath Keepers, or the org and delete them.  And especially AARs and war stories.
> Kill em. Do it now.

*Id.* (Msg. 54.S.125.2878-79).

Rhodes's co-conspirators, including all four of his co-defendants, deleted evidence from their phones in the weeks that followed.  Co-conspirator James forwarded Rhodes's message encouraging deletion to another co-conspirator, Mark Grods, and wrote, "We need to make sure that all signal comms about the op has been deleted and burned."  Gov. Exh. 9066 (Msg. 111.S.12, 111.S.1413 - B).  Grods later indicated that he had complied.  *Id.*  A week later, on January 14, when Watkins fled Ohio with co-conspirator Crowl to hide out at Caldwell's residence, she left her phone behind.  11/02/22PM Tr. at 6548.  When her phone was seized three days later, and searched pursuant to warrant, it no longer had the Signal application installed.  *Id.*

Meanwhile, on January 14, as Watkins and Crowl were on their way to hide at his home, Caldwell "unsent" and deleted over 175 messages from his Facebook account that, based on the timing and context, likely referenced his role in the conspiracy.  11/01/22PM Tr. at 6197.  For example, on January 2, about 1.5 hours after co-conspirator Stamey told those on the DC OP: Jan 6 21 chat, "My sources DC working on procuring Boat transport as we speak," Caldwell sent a message, which he unsent on January 14, but which prompted the response, "Damn I wish I did lol. I'd be your captain for sure! And off the top of my head I can't think of anyone with a boat. Smoot has a bass boat. It wouldn't go on the Potomac though." Gov. Exh. 6923 (pages 61-63). Similarly, the government was also able to show through the Facebook records and phone of co-

conspirator Crowl, who received and downloaded some of these messages, that some of them referenced videos which Caldwell identified as showing his, Watkins', and Crowl's participation in the attack on the Capitol.  Gov. Exhs. 1051.1, 1105, 6734 (Msg. 2002.T.85E), 9079 (Msgs. 22.F.1.30-33); 11/02/22PM Tr. at 6553-54.

A couple of weeks later, on February 4, 2021, after Watkins, Crowl, and Caldwell had been arrested, and the first indictment in this case had been publicly filed, Meggs and Harrelson exchanged the following messages on Signal:

> Harrelson: Is there anyway we can clear out the messages in our chats, I don't think it would be a bad idea, clear out all the talk of hiding the tools and shit
>
> Meggs:    We can delete the old and start a bee
>
> Meggs:    New
>
> Harrelson: Let's do that as long as you think it deletes everything, I don't want the boys to have anything to look at if you know what I mean, I'll run through let me delete our DMs real quick, send one in like 2 minutes, if that works on my end then we'll just repeat the process
>
> Harrelson: Yep cleared it right out

Gov. Exh. 9086 (Msgs. 7.S.34.21-25); 11/02/22PM Tr. at 6566.  When Meggs was arrested two weeks later, he had deleted all Signal messages from the time period of the conspiracy (although not the above messages with Harrelson discussing deleting messages).  *Id*.  When Harrelson was arrested in March 2021, all Signal data had been deleted from his phone.  11/02/22PM Tr. at 6566-67.

The parties stipulated that a grand jury for the United States District Court for the District of Columbia opened its investigation into the attack on the Capitol on or about January 8, 2021. Gov. Exh. 3012. The nature of the deleted evidence, combined with messages sent by the defendants discussing the need to delete incriminating digital evidence, suggests that this conduct

was undertaken with the intent to impair these items' integrity or availability for use in an official proceeding.

### C.  Legal Background

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  When ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt."  *See United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)); *United States v. Duran*, 884 F. Supp. 577, 583 (D.D.C. 1995), *aff'd*, 96 F.3d 1495 (D.C. Cir. 1996).  The Court must "accord[ ] the government the benefit of all legitimate inferences," *see United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), *cert. denied* 104 S. Ct. 1285 (1984), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant['s guilt." *See United States v. Weisz*, 718 F.2d at 437 (emphasis in original) (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); s*ee also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for

judgment of acquittal] must be granted."), *cert. denied*, 331 U.S. 837 (1947).

## II.     Argument

The evidence adduced in the government's case-in-chief is more than sufficient to establish the elements as to each of the defendants on every charge in the Indictment.

### A.  Seditious Conspiracy (18 U.S.C. § 2384)

Count One charges all defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384.  Section 2384 prohibits a conspiracy to "overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof."  18 U.S.C. § 2384.  The defendants are alleged to have violated Section 2384 by conspiring "to oppose by force the authority of the Government of the United States," and "by force to prevent, hinder, and delay the execution of any law of the United States," namely, the "laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code."  ECF No. 167 at ¶ 16.  The evidence establishes their guilt with respect to both goals.

A violation of Section 2384 under either of the two prongs charged here requires proof that a defendant agreed to use force against the "government *as a government*," and thus requires that a defendant planned to use force "to resist some positive assertion of authority by the government" or to resist "the authority of the United States while endeavoring to carry the laws into execution." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887) (emphasis added).  The evidence must establish that defendants planned a "forcible resistance of the authority of the United States while endeavoring to carry the laws into execution."  *Id.*  The evidence demonstrates that the defendants planned to

use force to oppose or otherwise prevent the transfer of presidential power as reflected in the certification of the Electoral College vote required by the Constitution, *see* U.S. Const. art. II, § 1, cl. 3, amend. XII, amend. XX, and the Electoral Count Act of 1887, *see* 3 U.S.C. § 15 *et seq.*

Establishing a violation of Section 2384 as charged in this case requires two elements. First, that the defendant conspired or agreed with at least one other person with the goal of either (a) opposing by force the authority of the Government of the United States, or (b) preventing, hindering, or delaying the execution of any law of the United States by force.  And second, that the defendant joined or entered into that agreement with awareness of one or both of its unlawful goals.  *Joint Proposed Jury Instructions*, at 16, at 10.[1]

To prove a conspiratorial agreement, "the government need only show that the conspirators agreed on 'the essential nature of the plan,' not that they 'agreed on the details of their criminal scheme.'"  *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (quoting *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985) (citation and quotation marks omitted)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)).  As the Supreme Court in *Blumenthal v. United States*, 332 U.S. 539 (1947), explained, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."  *Id.* at 557 (footnote omitted).  "Otherwise," the Supreme Court observed, "the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity."  *Id.*  It follows, therefore,

---

[1] The *Joint Proposed Jury Instructions* cited here refer to the version filed by the government on November 2, 2022.  *See* ECF No. 380.

that the evidence need not establish that the defendants settled on every detail of an intricately developed plan. Nor does it matter whether the persons who formed the agreement actually carried out their plans or whether the agreement ultimately was successful; though, proof concerning the accomplishment of the object of the conspiracy may certainly be evidence of the existence of the conspiracy itself. *See, generally, Proposed Jury Instructions*, at 10-12 (describing what is required to establish the existence of a conspiratorial agreement).

The evidence must also show that a defendant conspired or agreed with at least one other person to accomplish either of the alleged goals: "opposing by force the authority of the Government of the United States, or preventing, hindering, or delaying the execution of any law of the United States by force." *Joint Proposed Jury Instructions*, at 16. A conspiracy to oppose the government's authority entails that a principal purpose of the defendants' agreement was to "adversely affect the ability of the United States government to govern or perform one of its proper functions." *Id.* at 17. And, as charged in this case, a conspiracy to prevent, hinder or delay the law requires proof that the defendants agreed to target laws governing the transfer of presidential power, including the constitutional and federal statutory provisions identified above. *Id.* at 18. For either unlawful aim, the evidence must also establish that the defendants agreed to use force, understood in its ordinary sense to mean an act or acts "that threaten[] or result[] in violence" or "threaten[] or result[] in harming or destroying property or harming or killing people." *Id.*[2] The

---

[2] That understanding of force draws on the common-law linkage between force and violence, *see Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) ("common-law authorities frequently used the terms 'violence' and 'force' interchangeably"), and reflects mid-nineteenth-century legal definitions of force that would have informed the legislators who drafted and enacted the original seditious conspiracy provision. *See Webster's American Dictionary of the English Language* (1828) (force defined as "any unlawful violence to person or property"); *see also Stokeling*, 139 S. Ct. at 550 (defining "force" as either "power, violence, or pressure directed against a person or thing," or "unlawful violence threatened or committed against persons or property") (citing dictionaries).

defendants need not, however, actually use force to violate Section 2384. *Id.* at 18-19; *see Bryant v. United States*, 257 F. 378, 385-86 (5th Cir. 1919); *see also Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish.").

Second, the evidence must demonstrate that a given defendant "joined or entered into that agreement with awareness of one or both of its unlawful goals." *Joint Proposed Jury Instructions*, at 16. Specifically, the evidence must show that the defendant "intentionally participated" in the conspiracy "with knowledge of its unlawful purposes, and with the intent to further its unlawful objectives." *Id.* at 12. A defendant may join a conspiracy without knowing "the full extent of the conspiracy or all of the activities of all of its participants" or "every other member of the conspiracy." *Id.* at 13. A defendant may join a conspiracy "at any time in its progress" and "still be responsible for all that was done before he joined" as long as "those acts were reasonably foreseeable and within the scope of the defendant's agreement." *Id.* at 14. And once an individual knowingly joins a conspiracy, that individual retains "continuous membership in that conspiracy unless and until the defendant withdraws." *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011).

The evidence, when viewed in the light most favorable to the government, amply establishes beyond a reasonable doubt each seditious conspiracy element for each defendant. First, the evidence described above demonstrates that a conspiratorial agreement existed that encompassed the defendants and others. *See supra* at 3-27. In short, beginning not long after the November 2020 presidential election, the defendants, led by Stewart Rhodes, began scheming to stop the transfer of presidential power prescribed under the Constitution and federal law when an individual secures sufficient Electoral College votes to be declared the President-Elect. In early

November 2020, Rhodes was advocating force to oppose any transfer of power through leadership chat messages, *see* Gov. Exh. 6615.C ((Msg. 1.S.696.13005), and in a GoToMeeting call, 10/4/22AM Tr. at 1442-81; Gov. Exhs. 1000.1 through 1000.11, 6611, 6615.D (Msg. 1.S.696.13376)—both of which were sent to Meggs and Watkins.  At the GoToMeeting call on November 9, for example, Rhodes sketched out the details of how the defendants would achieve their objective: an armed QRF would stand by as those committed to his vision of the country readied themselves to fight to stop what they viewed as a fraudulent election.  Rhodes urged those on the call to follow the example of Serbians who (as Rhodes had earlier described in detail in Signal chats) had enacted regime change by breaking through barricades and storming the legislature. *See supra* at 4-6.  In something of a dry run for January 6, certain defendants—Rhodes, Meggs, Watkins, and Caldwell—traveled to Washington, D.C. in mid-November 2020, during which Rhodes indicated that they planned to oppose the "rogue government," 10/16/2022AM Tr. 1900-02, 1909.  Coming out of that event, this group of defendants began recruiting others to join their conspiracy, *see supra* 8-9 (describing Watkins' and Meggs' recruiting efforts), and taking more active roles within the larger Oath Keepers organization, *id.* at 9-10 (describing Harrelson).

By early December, the defendants began to focus their efforts on using force against the government.  Rhodes repeatedly told his co-conspirators that they had to fight against what they viewed as an illegitimate government.  *See* Gov. Exh. 6748 (Msg. 1.T.2186.50) (describing then President-Elect Biden as "the ChiCom puppet").  Similarly, as Jason Dolan observed, the co-conspirators in December were preparing to "take up arms and fight back" against "an illegitimate government" and "support what [the co-conspirators] saw as the Rightful President." 10/18/22PM Tr. at 4099.  On December 20, 2020, Alabama Oath Keeper Joshua James alerted others on a chat that the "SE Regional" branch of the Oath Keepers were mobilizing, while Caldwell messaged

Doug Smith about "stag[ing] materials" and "contingency planning." *Supra* 12.  In an open letter two days later, Rhodes wrote that if the President did not act to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty."  Gov. Exh. 1008.

The conspiratorial agreement crystallized in late December 2020 and early January 2021 as the defendants and other co-conspirators ramped up logistical plans focused on January 6, the day that Congress met to certify the results of the 2020 Presidential Election.  *See supra* 15-20. Throughout that period, the evidence of the defendants' conspiracy included the defendants arming themselves, traveling to the District of Columbia, discussing different strategy and tactics, and delivering a cache of firearms to the "QRF hotel" in Northern Virginia, all while regularly communicating with each other, including over encrypted Signal chats.  In the days leading up to January 6, the defendants acknowledged that they were "done talking" (Rhodes); that their preparations were not in service of a "Rally," but instead to "make history" (Meggs); and that if Congress sought to "certify some crud on capitol hill," the "kettle [was] set to boil" (Caldwell).

The defendants' coordinated actions on January 6, moreover, provide compelling evidence of their conspiratorial agreement.  Unlike many other rioters on January 6, the defendants focused on "sticking together and sticking to the plan."  Gov. Exh. 1500, 1502 (Watkins).  As Rhodes stood by on Capitol grounds, Meggs, Harrelson, Watkins and others formed into a stack formation (Stack One), marched up east side of the Capitol building, breached the interior, split into two teams of seven (one that marched toward the House, the other toward the Senate) and tried to force their way past police officers.  As that was occurring, Caldwell climbed up the outside of the Capitol building and tried, ultimately unsuccessfully, to break into the building.  Approximately thirty minutes later, another group of co-conspirators, Stack Two, also surged into the building through

the same doors as Stack One.  Further evincing their close coordination, the co-conspirators—including those who breached the building and those who had not—met together on Capitol grounds within hours of Stack One and Stack Two breaching the building.

Nor did the defendants' unlawful agreement cease on January 6.  Meggs and Caldwell exultantly spoke of "reloading" or "storm[ing] another [C]apitol."  *Supra* 26.  Between January 6 and the Inauguration on January 20, Rhodes did reload—to the tune of $17,000 in firearms and tactical equipment—while also summoning other co-conspirators, including Joshua James (who brought "all available firearms" to Texas).  *Id.*  Watkins suggested making preparations to wage guerilla warfare against the government, while Caldwell wrote to an acquaintance over Facebook, "Welcome to the fight."  *Supra* 27.

All of this evidence from November 2020 through January 2021 not only establishes beyond a reasonable doubt the existence of a conspiracy; it likewise proves the second element of seditious conspiracy, namely, that the defendants and their co-conspirators agreed both to oppose the authority of the government by force and to by force hinder, prevent, or delay the execution of laws governing the transfer of presidential power.  Testimony from Thomas Wickham established the constitutional and federal statutory provisions requiring that the Vice President, as the President of Senate, must in the presence of the Senate and House of Representatives open all the certificates for presidential election sent by the Electors to Congress; that the Senate and House of Representatives must meet for that purpose at 1 pm on January 6 following a presidential election; and that the person with the greatest number of votes, after that person takes the required oath, shall become president on January 20.  Section 2384 "protects basic societal interests and must be read to cover a wide spectrum of activities," *United States v. Rahman*, 854 F. Supp. 254, 259 (S.D.N.Y. 1994), which surely encompasses the transfer of power from one presidential

administration to another.  Indeed, seeking to stop the presidential transfer of power strikes "against the government as a government."  *Baldwin*, 120 U.S. at 693.

The evidence recounted above demonstrates that the defendants' conspiracy targeted precisely these critical government functions.  Rhodes repeatedly made clear his views that the presidential election was fraudulent and the then-President-elect was a "ChiCom puppet."  And all of the defendants, through words, actions, or both, indicated that they shared the same goal of— as one testifying co-conspirator described it—"fight[ing] back against an illegitimate government."  10/18/22PM Tr. at 4099 (testimony of Jason Dolan).  *See* Watkins ("[I]f Biden get the steal, none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair yet."); Meggs ("It's easy to chat here . The real question is who's willing to DIE , that's what the Patriots did by the thousands . We are worried about getting the day off."; "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick !"); Harrelson (storming inside the Capitol on January 6, 2021, with Jason Dolan and other co-conspirators while chanting "Treason!"); Caldwell ("Ranger is thinking we should hold off on an op surrounding the maga march and plan for the NEXT op which may be much larger and involve supporting the President directly and taking ]our country back. That would be our last chance to save the country and may be quite violent.").

The evidence also demonstrated that the defendants agreed to use force to carry out their unlawful objectives.  Most obviously, the defendants transported scores of firearms to the QRF hotel in Virginia, ultimately amassing an arsenal so extensive that, in the experience of one former Oath Keeper, it was rivaled only by military stockpiles.  *See* 10/12/22AM Tr. at 2728.  And at least Rhodes continued to amass firearms after January 6, when he purchased over $17,000 in new

weapons and related equipment before the Presidential Inauguration.  The defendants extensively discussed what kind of weapons, including those less lethal than firearms, they could and did bring with them to the District of Columbia.  Additionally, many of the defendants' actions on January 6—aligning in stack formation, marching up the steps of the Capitol building and damaging property as they forced their way inside, dividing up once inside, and pushing against police lines—offered proof that the defendants intended to use, and did use, force in service of their unlawful objectives.

Nor was the defendants' agreement either lawful or merely conditional because it contemplated the President's invocation of the Insurrection Act, 10 U.S.C. §§ 251 *et seq.*  The Insurrection Act allows the President to call into service "the militia of any state" and "the armed forces" when the President "considers that unlawful obstructions, combinations, or assemblages, or rebellion against the United States, make it impractical to enforce" federal law.  10 U.S.C. § 252. Before invoking the Act, the President must "by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time."  § 254.  Although evidence concerning the Insurrection Act during the government's case-in-chief was limited principally to the defendants' passing references to the Act, that evidence also included the undisputed fact that the President never issued a proclamation for "insurgents" to disperse, let alone actually invoked the Insurrection Act itself.

Instead, the evidence concerning the Insurrection Act further confirmed the unlawful nature of the defendants' conspiracy.  For one, as early as the GoToMeeting on November 9, 2020, Rhodes referred to the Insurrection Act as supplying "legal cover" to justify the defendants' plans to use force to stop the transfer of presidential power.  Gov. Exh. 1000.7.  Rhodes echoed that view—that he and others stood ready to use force to oppose the government whether or not the

43

President invoked the Insurrection Act—both publicly and in encrypted Signal chats.  *See* Gov. Exh. 1.S.656.10102 (December 25, 2020 Signal chat: President "needs to know that if he fails to act, then we will.  He needs to understand that we will have no choice."); Gov. Exh. 1.S.696.17710 (December 31, 2020 Signal chat: "Be prepared for a major let down on the 6-8th.  And get ready to do it OURSELVES.").  And all the defendants made abundantly clear on January 6 that their conspiracy to use force was not predicated on a presidential invocation of the Insurrection Act. Rhodes observed that the President was merely "complaining" with "no intent . . . to do anything," which required "patriots" to "tak[e] it into their own hands."  Gov. Exh. 1.S.159.1043.  He then called his co-conspirators to the Capitol and engaged in a phone conversation with Kelly Meggs. Minutes later, Meggs led Stack One up to and inside the Capitol building.  In short, the evidence makes clear that the defendants' conspiratorial agreement was in no way contingent on being called into action under the Insurrection Act.

But even if viewed as a contingent or conditional conspiracy, the defendants' agreement to use force to oppose the transfer of presidential power nonetheless subjects them to criminal liability.  Liability for a conspiracy based on a contingent agreement "should attach if the defendant reasonably believed the conditions would obtain."  *United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000).  A "reasonable" belief means that conspiracy liability should not attach only "[i]f there is virtually no chance that the condition would be fulfilled," such that "there is virtually no likelihood that the defendant presents any risk of actual dangerousness."  *United States v. Dworken*, 855 F.2d 12, 19 (1st Cir. 1988).  For example, an agreement to "horsewhip Idi Amin if he ever shows his face on Rush Street" in Chicago would not give rise to conspiracy liability because the condition would be known "to be impossible of fulfillment when the agreement was made," such that the agreement "could not sensibly be understood as an agreement to do

something; it would be a mere rhetorical flourish." *United States v. Podolsky*, 798 F.2d 177, 179 (7th Cir. 1986). Here, the defendants agreed to oppose the transfer of power and were prepared to deploy force as necessary. The evidence adduced in the government's case-in-chief shows that the conspiracy presented a risk of actual dangerousness: some co-conspirators had firearms ready to deploy for a potential attack on the Capitol, while others forcibly entered the Capitol in a manner that endangered the legislators meeting there and those assigned to protect them. This is sufficient. Requiring that the contingencies envisioned in conspirators' plans come about before criminal liability attached would allow the government "no redress against preparation by force and arms to resist" its authority until "it might well be too late." *Bryant*, 257 F. at 386.

Finally, the evidence establishes the third element, that each defendant joined the agreement with awareness of one or both of the conspiracy's unlawful objectives. Rhodes, the identified leader of the Oath Keepers, articulated the conspiracy's unlawful aims in both public and private communications to the defendants, other co-conspirators, and other Oath Keepers affiliates. Meggs and Watkins discussed plans and recruited co-conspirators in early November, the same day they actively participated in the November 9 GoToMeeting call led by Rhodes. Harrelson similarly assumed a more active leadership role in the Florida Oath Keepers chapter, and he participated (along with Rhodes, Meggs, and Watkins) in many of the Signal chats, including Signal leadership chats. On January 6, Meggs engaged in a phone conversation with Rhodes; minutes later, Meggs led Stack One (which included Watkins and Harrelson) into the Capitol building. And Caldwell joined Rhodes, Meggs, and Watkins on the dry run in November 2020 and played a leadership role for the QRF on January 6, including by planning potential access to the District of Columbia by boat. The evidence sufficiently meets every element of Section 2384 for all five defendants.

### B. Conspiracy and Substantive Obstruction of a Congressional Proceeding (18 U.S.C. § 1512)

Counts Two and Three charge all the defendants with conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2). Section 1512(c)(2) makes it a crime to corruptly obstruct or impede an official proceeding, which includes the Certification of the Electoral College vote. *See United States v. Caldwell*, 581 F. Supp. 3d 1, 11-15 (D.D.C. 2021). The same general conspiracy principles described above apply here. *See Joint Proposed Jury Instructions*, at 19 (incorporating conspiracy principles for Count Two). A violation of Section 1512(c)(2) requires proof that the defendant (1) obstructed or impeded an official proceeding; (2) intended to obstruct or impede that proceeding; (3) acted knowingly, with awareness that the natural and probable effect of the defendant's conduct would be to obstruct or impede the official proceeding; and (4) acted corruptly. *Id.* at 20. The evidence establishes both conspiracy and substantive violations of Section 1512(c)(2) for all defendants.

As to the conspiracy violation, the evidence supporting the defendants' agreement to use force to oppose the authority of the government and hinder, prevent, or delay a federal law similarly suffices to establishes that the defendants agreed to corruptly obstruct the January 6 Certification proceeding. Beginning no later than December 2020, as the defendants began making logistical plans to come to the District of Columbia, they plotted the various means by which they would achieve their criminal objective of stopping Congress's certification of the Electoral College vote on January 6, 2021.

Each of the defendants is also guilty of substantive obstruction. Either through direct action such as breaching the Capitol using physical force (Meggs, Watkins, and Harrelson) and its grounds and barriers (Caldwell), or through either aiding and abetting liability or bearing substantive criminal responsibility under *Pinkerton v. United States*, 328 U.S. 640, 647-648

(1946), for such conduct (Rhodes), all defendants obstructed or impeded the certification proceeding.  Second, the defendants through either their statements or their actions (or both) evinced the intent to stop the proceeding.  Third, evidence of the defendants' conscious participation in the attack on January 6 indicates that each acted knowingly and with the awareness that the natural and probable consequences of their conduct would be, as it was, to obstruct the Certification proceeding.

Finally, each defendant acted corruptly.  To prove that a defendant acted corruptly for purposes of Section 1512(c)(2), the government must establish that the defendant acted either "with a corrupt purpose" or through "independently corrupt means," or both, *see* 575 F. Supp. 3d 16, 31 (D.D.C. 2021) (quoting *United States v. North*, 910 F.2d 843, 942-43 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *see also Joint Proposed Jury Instructions*, at 21.  The government must also prove that the defendant acted "with consciousness of wrongdoing," namely with "an understanding or awareness that what the person is doing is wrong."  *See United States v. Reffitt*, No. 21-cr-32, ECF No. 119 at 26 (D.D.C. Mar. 7, 2022); *see Arthur Andersen*, 544 U.S. at 706 (faulting jury instructions in Section 1512 case for "fail[ing] to convey the requisite consciousness of wrongdoing").  As applied here, the evidence establishes both corrupt means and corrupt purpose.  As described in detail above, the defendants invaded the restricted Capitol grounds, and, in the case of Meggs, Watkins, and Harrelson, further penetrated the Capitol building by breaching (and damaging) the doors and pushing past police officers.  As noted above, although no evidence shows that Rhodes or Caldwell entered the Capitol building, they aided and abetted those actions undertaken by the other defendants, and bear substantive criminal liability for those actions under *Pinkerton*.  And the defendants' amassing of firearms and

expressed intentions to use violence to further accomplish their obstructive aims further prove that they acted with corrupt purpose.

### C.  Conspiracy to Prevent Officers from Discharging Their Duties (18 U.S.C. § 372)

Count Four charges the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372.  To prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that the conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat," *United States v. Beale*, 620 F.3d 856, 864 (8th Cir. 2010), or to leave the place where the officer's duties are required to be performed; *accord Joint Proposed Jury Instructions*, at 26.

As with Count One (seditious conspiracy) and Count Two (conspiracy to obstruct an official proceeding), the evidence demonstrating the defendants' conspiratorial agreement and the fact that they knowingly joined in the agreement consists of the many statements and actions described in detail above.  To recap in a sentence: the defendants agreed to take whatever steps necessary, up to and including using force, to stop the transfer of presidential power following the 2020 election because they believed the election was rife with fraud, and they conspired together, in person, over calls, and through Signal chats to halt that transfer.  As relevant to Count Four, the evidence adduced in the government's case-in-chief included facts that defendants' conduct (along with the conduct of other rioters) on January 6 caused Members of Congress to evacuate the House and Senate floors where they were in the process of certifying the Electoral College vote.  In so

doing, the defendants conspired to (and did) prevent the Members of Congress from discharging their duties and induced them by force to leave their duty stations.

### D.  Destruction of Government Property (18 U.S.C. § 1361)

Count Five charges Meggs, Harrelson, and Watkins with felony destruction of government property, in violation of 18 U.S.C. § 1361.  To establish a felony violation of Section 1361, the government must prove that the defendant injured, damaged, or destroyed property; that the defendant did so willfully; that the property involved was property of the United States; and that the damage or attempted damage to the property in question exceeded the sum of $1,000.  *Joint Proposed Jury Instructions*, at 27.

The evidence established each element beyond a reasonable doubt.  First, testimony and video evidence established that Meggs, Watkins, and Harrelson were part of Stack One, which merged with the violent crowd trying to breach the East Rotunda doors at approximately 2:39 p.m. on January 6, 2021.  *See* Gov. Exh. 1503.  Working in tandem with the crowd—and therefore aiding and abetting the other crowd members just as those crowd members were aiding and abetting Meggs, Watkins, and Harrelson—those defendants (and others in Stack One) were able to push open the doors and forcibly enter the Capitol.  *Id.*  That video evidence established both the defendants' destructive conduct and their willful state of mind.  Third, testimony from an employee of the Architect of the Capitol testified that the damage sustained by the sustained to the East Rotunda Doors and the ornate Columbus Doors exceeded $24,000, well above the $1,000 threshold.  *See* Gov. Exhs. 2122-2125; 10/26/22AM Tr. at 5462-76.

### E.  Interfering with Law Enforcement During a Civil Disorder (18 U.S.C. § 231)

Count Six charges Watkins with interfering with a law enforcement officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), a charge that she conceded in opening.  10/03/22PM

Tr. at 1241.  To establish a violation of Section 231, the government must prove that Watkins (1) knowing committed an act with the intended purpose of interfering with a law enforcement officer; (2) at the time of Watkins's act, the officer in question was engaged in the lawful performance of his or her official duties incident to and during a civil disorder; and (3) the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.  *See United States v. Webster*, No. 21-cr-208 (APM), ECF No. 101 at 15-16 (D.D.C. Aug. 2, 2022); *see Joint Proposed Jury Instructions*, at 30-31 (listing same elements, but breaking them into four parts).

The evidence readily established all the elements here.  First, after Stack One had breached the Capitol building, Watkins led six other co-conspirators down the hallway leading to the Senate Chamber in an effort to force her way into the Chamber. Gov. Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-98.  Along the way Watkins encountered MPD Officer Christopher Owens, who described how the conduct of Watkins and other members of the mob interfered with his abilities to do his job—which included trying keep rioters out of the Senate Chamber.  10/26/22AM Tr. at 5446-54. Only by deploying chemical spray were Officer Owens and his fellow officers able to push the rioters back and hold their line. Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-54.  That evidence established the first two elements.

Additional evidence proved that the civil disorder[3] adversely affected both commerce and a federally protected function.  Commerce refers to both commerce or travel between one state,

---

[3] The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.  *See* 18 U.S.C. § 232(1).  Ample evidence from trial showed that civil disorder was occurring at the relevant time period on January 6, 2021, including testimony of USCP Captain Ronald Ortega and the video

including the District of Columbia, and any other state, including the District of Columbia and commerce wholly within the District of Columbia. *Joint Proposed Jury Instructions*, at 31; 18 U.S.C. § 232(2). Testimony from a district Safeway manager that Safeway closed its stores in the District of Columbia because of the riot and the curfew imposed as a result of the riot established the requisite effect on commerce. Gov. Exh. 3510.1; 10/31/22AM Tr. at 5667-70; *see also* Gov. Exh. 3006 (stipulation addressing the curfew).

The term "federally protected function" includes any function, operation, or action carried out, under the laws of the United States, by any department or agency. *See* 18 U.S.C. § 232(3). One such federally protected function is the United States Secret Service's statutory obligation to protect certain individuals, including the Vice President. *See* 18 U.S.C. § 3056(a)(1). Because the civil disorder on January 6 required the Secret Service to move the Vice President to a secure location, *see* Gov. Exh. 9053; 10/26/22AM Tr. at 5411-16 (testimony of Secret Service Inspector Hawa), the disorder in some "way or degree obstruct[ed], delay[ed], or adversely affect[ed]" that protective function.

### F. Evidence Tampering (18 U.S.C. § 1512(c)(1))

Counts Seven, Eight, Nine, and Thirteen[4] charge Rhodes, Meggs, Harrelson, and Caldwell with evidence tampering, in violation of 18 U.S.C. § 1512(c)(1). A violation of Section 1512(c)(1) occurs where the defendant (1) altered, destroyed, mutilated, or concealed a record, document, or other object; (2) acted knowingly; (3) acted corruptly; (4) acted with the intent to impair the object's integrity or availability for use in an official proceeding. *United States v. Robertson*, No.

---

introduced during his testimony. Gov. Exh. 1515; 10/18/22AM Tr. at 3920-46; 10/18/22PM Tr. at 3998-4061.

[4] Pursuant to the parties request at the conference on October 26, 2022, Count Thirteen in the Indictment will be "Count Ten" for the purposes of the jury instructions and verdict form.

21-cr-34 (CRC), ECF No. 86 at 26 (D.D.C. Apr. 8, 2022); *accord Joint Proposed Jury Instructions*, at 34-35. The parties agree that the official proceeding for purposes of these Counts is the grand jury investigation into the role of Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, Thomas Caldwell, and others in the attack on the United States Capitol on January 6, 2021. While the defendant must act with intent to obstruct the official proceeding, this need not be the defendant's sole purpose—a defendant's unlawful intent to obstruct justice is not negated by the simultaneous presence of another purpose for the defendant's conduct. *Cf. Joint Proposed Jury Instructions*, at 21.

The evidence at trial established violations of each of these counts. Through Special Agent Moore, the government presented numerous messages from Rhodes to various co-conspirators that he relayed through Kellye SoRelle after his and his co-conspirators' actions on January 6, 2021, *see supra* at pg. 30-31, including messages to "DELETE your self-incriminating comments or those that can incriminate others." Gov. Exh. 9061 (Msg. 54.S.125.2878). And co-conspirators, in fact, followed Rhodes's instructions on the same day. Joshua James sent a screenshot of Rhodes's message to another co-conspirator who had breached the Capitol, adding: "We need to make sure that all signal comms about the op has been deleted and burned." Gov. Exh. 9066 (Msgs. 111.S.12, 111.S.1413-A and B). Grods then confirmed that he deleted the messages. *Id.* (Msg. 111.S.12, 111.S.1413-E). Likewise, the evidence established Counts Eight and Nine, against Meggs and Harrelson, respectively. *See supra* at pg. 31. On February 4, 2021, Harrelson and Meggs messaged one another about "clear[ing] out the messages in our chats," and later confirmed that they had, in fact, done so. *Id.*; Gov. Exh. 9086 (Msg. 7.S.34.21). Harrelson made it clear to Meggs why they should engage in such obstruction: "I don't want the boys to have anything to look at," clearly referring to any future investigations into their criminal conduct. *Id.*;

Gov. Exh. 9086 (Msg. 7.S.34.24). And Special Agent Moore testified that, upon their arrest, law enforcement did not find Signal content during the time of the conspiracy on either Meggs' or Harrelson's phones. *Id.* Finally, the evidence through the Facebook custodian clearly established that Caldwell deleted over 175 messages on his Facebook account, including messages he had sent to co-conspirators like Donovan Crowl in which he discussed their actions on January 6, 2021. *See supra* at pgs. 31-32; *see also* 11/01/22PM Tr. at 6197; Gov. Exhs. 1051.1, 1105, 6734 (Msg. 2002.T.85E), 9079 (Msgs. 22.F.1.30-33).

## III.    Conclusion

The Court should deny each defendant's motion for judgment of acquittal under Rule 29.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:            /s/
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

/s/
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004


/s/ James I. Pearce
James I. Pearce
N.C. Bar No. 44691
Appellate Counsel, Capitol Siege Section
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
james.pearce@usdoj.gov