**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-15 (APM)** |
| | **:** | |
| **ELMER STEWART RHODES III,** | **:** | |
| **KELLY MEGGS,** | **:** | |
| **KENNETH HARRELSON,** | **:** | |
| **JESSICA WATKINS, and** | **:** | |
| **THOMAS CALDWELL,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR JUDGMENTS OF ACQUITTAL**

The United States respectfully opposes the motions for new trial, pursuant to Rule 33(b)(2) of the Federal Rules of Criminal Procedure, filed by Defendants Elmer Stewart Rhodes III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell. On November 29, 2022, after a roughly seven-week trial, the jury convicted all defendants on multiple counts. Defendants timely moved for new trial, and with leave of the Court, filed their joint written memorandum in support on December 23, 2022.

Defendants submit three grounds for the granting of a new trial: (i) the Court's admission of evidence of the government's summary exhibits; (ii) the court's precluding the testimony of a witness named Michael Nichols; and (iii) several statements by the government during its rebuttal argument, which defendants claim were not supported by evidence introduced during trial and/or improperly calculated to inflame the passions of the jurors. In addition to the fact that the defendants failed to raise some of these objections during trial, none of these factors warrant setting aside the jury's verdict and ordering a new trial.

## I.    **Background**

The evidence presented by the government at trial established that in the days and weeks following the 2020 U.S. Presidential Election, the defendants entered into an agreement to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force.  On January 6, 2021, the defendants, along with hundreds of other rioters, attacked the United States Capitol, delayed the certification of the Electoral College vote ("Certification proceeding"), prevented Members of Congress from discharging their duties, interfered with officers trying to protect the building, and caused more than $1,000 of damage.  In the weeks that followed, the defendants continued to plot ways to forcibly oppose the transfer of presidential power, and they destroyed evidence of their participation in the attack on the Capitol.

At the conclusion of the trial, the jury returned a verdict convicting Rhodes and Meggs of seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); Meggs and Watkins of conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); and Meggs, Watkins and Harrelson of conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four).  All defendants were convicted of obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three).  Watkins was further convicted of civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count Six), for her efforts to push past a line of riot police to gain access to the Senate Chamber— an offense she admitted during her testimony and her counsel conceded during closing argument, 11/16/22PM Tr. at 9406; 11/21/22 Tr. at 10194.  Finally, Rhodes, Meggs, Harrelson, and Caldwell were convicted of tampering with documents or other objects and aiding and abetting, in violation

of 18 U.S.C. §§ 1512(c)(1) and 2 (Counts Seven through Nine and Thirteen), for destroying digital evidence of their participation in the attack on the Capitol and encouraging others to do so.

The Court may grant a defendant's motion for new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "While the determination as to whether a new trial would be in the interest of justice is left to the Court's sound discretion, the Court should not set aside the verdict simply because it feels that some other result would be more reasonable.  Even where errors occur, a new trial should be granted only if the moving party has shown that the error was substantial, not harmless, and that the error affected the defendant's substantial rights."  *United States v. Walker*, 899 F. Supp. 14, 15 (D.D.C. 1995).

## II.   <u>Argument</u>

The issues raised by the defense do not constitute error, much less substantial error, and their motions for new trial should be denied.

### a.  Government's Summary Exhibits

The defendants challenge the government's use of "so-called 'montage' exhibits."  Mot. at 3.  Because the defendants fail to specify which exhibits they are challenging, it is difficult if not impossible for the government to respond or for the Court to assess this challenge.  The defendants' motions should be summarily denied on this issue.

In the alternative, if defense is challenging the summary exhibits addressed by the Court in its instruction to the jury on November 28, 2022—Government Exhibits 1500, 1501, 1502, 1530.1, 1540, 1555, and 6925—these exhibits were all properly admitted.  Federal Rule of Evidence 1006 allows the use of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  "The voluminous underlying records must themselves be admissible and 'must be made reasonably available for

inspection and copying.'" *United States v. Abou-Khatwa*, 40 F.4th 666, 684-85 (D.C. Cir. 2022) (quoting *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014)). "As long as the summaries of those voluminous records are accurate and nonprejudicial, the summaries can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses or documents throughout the trial." *Id.* (citing *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)) (cleaned up). Under Rule 1006, these exhibits are substantive evidence and need no limiting instruction. *See id.* at 688 (citing *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008); *United States v. Weaver*, 281 F.3d 228, 233 (D.C. Cir. 2002)). As the Circuit held in *Abou-Khatwa*, quoting from a treatise: "Federal Rule 1006 is clear that summaries admitted under its terms are evidence themselves, substituting for the voluminous documents that are not admitted into evidence. And because such summaries are substantive evidence, no limiting instruction is given to the jury as to its use and it may be taken into the jury room during deliberations." *Id.* (quoting 2 McCormick on Evidence § 241 (8th ed. 2020)).

The government's video and audio compilations introduced as Exhibits 1500, 1501, 1502, 1530.1, 1540, 1555, and 6925 constitute appropriate summary exhibits. First, the defense failed to object during trial to the admission or display of a number of these exhibits. Additionally, as the Court has ruled, these exhibits were "a visual way of compiling disparate evidence into a more digestible form for the jury." 10/19/22AM Tr. at 4183-4184. That disparate evidence is comprised of voluminous records from a variety of sources, including: videos from public sources and legal process executed on digital devices and accounts; surveillance video from the Capitol building and grounds; audio recordings from open sources and legal process; photographs from open sources and legal process; location information from open sources and legal process; call detail records

from legal process served on numerous telephone providers; GoToMeeting records from legal process; and various maps. The defense was provided these underlying records in discovery and had the opportunity to cross-examine the witnesses whom the government called to introduce the summary exhibits at issue. These summary exhibits helped the jury organize and evaluate evidence which was factually complex and fragmentally revealed in the testimony of a multitude of witnesses and documents throughout the trial. *See Abou-Khatwa*, 40 F.4th at 684-85.

A proper foundation was laid for these exhibits. The component parts of these summary exhibits were all authenticated and independently admitted or identified through testimony, stipulation, or business records certification. The order in which the component part exhibits were arranged and the time stamps, name identifiers, and map markers that accompanied these component parts were explained and authenticated by the FBI agent witnesses through whom they were introduced. This Circuit does not require that the witness introducing a summary exhibit have prepared it. In *Lemire*, this Circuit approved of the testimony of a government witness, even though he did not prepare the summary charts, because he reviewed the charts and ensured they reflected information contained in documents already in evidence and was able to identify the source of the information in the charts and how certain calculations were derived. *Lemire*, 720 F.2d at 1349; *see also United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014) ("And although [the government witness] did not prepare Exhibit 104 [the summary exhibit] himself, he testified that he supervised a team of auditors who reviewed the raw data and prepared the summary, and that he then reviewed the summary.").

These exhibits also did not, contrary to the defendants' claim, *see* Mot. at 4-5, constitute illustrative or pedagogical summaries, such that they should have been introduced solely for demonstrative purposes. Pedagogical devices are "summaries or illustrations, such as chalkboard

drawings, graphs, calculations, or listings of data taken from the testimony of witnesses or documents in evidence, which are intended to summarize, clarify, or simplify testimonial or other evidence that has been admitted in the case, but which are not themselves admitted, instead being used only as an aid to the presentation and understanding of the evidence." *United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).   Here, the government's summary exhibits compiled disparate and voluminous records, video, audio, and other records and documents.   They were not meant to simplify or explain but to present voluminous evidence in a concise and clear manner. Accordingly, they were appropriately admitted under Rule 1006 and not just used as demonstratives.

Nor did these exhibits "go far beyond accurately summarizing voluminous content and instead are designed to instruct the jury what inferences to make about the underlying content." Mot. at 4 (citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985)).   There were no conclusions contained within or suggested by the exhibits.   The Court even gave limiting instructions to ensure that the jury did not give these exhibits and the testimony that accompanied them any greater weight or evidence than they deserved.   11/28/22 Tr. 10480-10481.

Finally, to the extent that the defendants now complain about two limited alleged errors contained within these exhibits, any such errors do not mean the exhibits were improperly admitted.   *See Hemphill*, 514 F.3d at 1359 ("Even if the calculations [in a summary chart] are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it.") (citing *United States v. Evans*, 910 F.2d 790, 799–800 (11th Cir. 1990)).   Indeed, the defense pointed out those errors on cross examination and referenced them in closing to try to convince the jury about the unreliability of the exhibits.   *See, e.g.*, 10/21/22AM Tr. at 4894 (cross-examination regarding Gov. Exh. 6731); 11/2/22 Tr. at 6584-6596

(cross-examination about the accuracy of Gov. Exh. 1555); 11/21/22 Tr. at 10210 (closing argument regarding the delay in receipt of some communications among co-conspirators).

Accordingly, the government's summary exhibits were properly admitted and their introduction into evidence was not error and does not justify defendants' request for a new trial.

### b. Exclusion of Testimony of Michael Nichols

Next, the defendants claim a new trial is required because the court excluded the testimony of Michael Nichols, an Oath Keeper from New York who was present on the Capitol grounds on January 6 but who was not alleged to have been a co-conspirator, did not participate in any key planning and coordination chats, and did not act in concert with any of the defendants or their alleged co-conspirators on January 6. During trial, the defendants proffered that Mr. Nichols would testify about how he assisted a member of the United States Capitol Police ("USCP") in escorting certain USCP officers out of the Capitol; that he saw information on the Oath Keepers website prior to January 6 that suggested Oath Keepers would be providing security on January 6; and about a prior "Back the Blue" program allegedly discussed on the Oath Keepers website, which they say would have shown that Oath Keepers are encouraged to approach officers to offer assistance in times of need. 11/15/22AM Tr. at 8884-8900. They contend that the exclusion of this testimony hindered their efforts to present the defense that would negate any criminal *mens rea* and show the defendants were just trying to help officers on January 6.

The Court properly excluded this testimony. "The balancing of probative value versus prejudicial effect required by Rule 403 is, of course, committed to the discretion of the trial judge." *United States v. Perholtz*, 842 F.2d 343, 358 (D.C. Cir. 1988) (citing *Carter v. District of Columbia*, 795 F.2d 116, 126 (D.C. Cir. 1986). The trial court's exercise of discretion on such issues is not to be disturbed "save for grave abuse." *United States v. Wright*, 489 F.2d 1181, 1186

(D.C. Cir. 1973). In their proffer regarding his testimony, the defendants admitted that Mr. Nichols would not testify that any of the defendants or their alleged co-conspirators joined him in or encouraged him to provide the assistance that he gave to the USCP on January 6. 11/15/22AM Tr. at 8887-8888. Nor would they proffer any coordination by this witness with the defendants and their co-conspirators. In short, Mr. Nichols would not have provided any testimony about the intent of any of the defendants or their co-conspirators with respect to the offenses charged in the Indictment. Accordingly, the probative value of the proffered testimony was negligible, while its potential prejudice was high. The evidence was therefore properly excluded.

### c. Government's Closing Arguments

Finally, the defendants contend that the government misstated the evidence and made improper argument during its closing and rebuttal arguments. ECF 434 at 8-16. The Court should deny the defendant's request for a new trial on these grounds. First, the defendants cannot establish that the government's statements were erroneous. Nor did the government improperly characterize the evidence. Further, the government did not make any improper appeals to the prejudices or sympathies of the jury. Even assuming, however, that the government erred in its statements to the jury, the defendant did not suffer substantial prejudice to warrant the drastic remedy of a new trial. The Court properly instructed the jury about its consideration of the prosecutors' statements. And there is no reasonable probability that any erroneous remarks by the government swayed the jury's verdict because of the strength of the evidence of the defendants' guilt on the counts of conviction. The chance of prejudice here is particularly unlikely, in light of the fact that the jury returned a split verdict. Accordingly, the Court should decline to upend the jury's considered judgment in this case.

i. <u>Legal Standard</u>

This Court uses "a relatively consistent set of criteria for evaluating the potential prejudice of closing argument errors…: the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *United States v. Fahnbuelleh*, 752 F.3d 470, 479-80 (D.C. Cir. 2014) (quotation marks omitted). "In weighing these factors," the Court "presume[s] that a jury acts with common sense and discrimination when confronted with an improper remark from a prosecutor and owes deference to the district court's assessment of such a statement's prejudicial impact on the jury." *United States v. Childress*, 58 F.3d 693, 715 (D.C. Cir. 1995) (quotation marks omitted); *see also United States v. Venable*, 269 F.3d 1086, 1090 (D.C. Cir. 2001) ("statements made in the heat of oral argument are not and cannot be read with an editor's red pencil in hand").

Even where improper statements or arguments are made in closing or rebuttal, an instruction that the arguments of counsel are not evidence "is usually a strong ameliorative consideration[.]" *United States v. (Rodney) Moore*, 651 F.3d 30, 54 (D.C. Cir. 2011); *see also United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998) (where "the judge gave the standard limiting instruction that lawyers' arguments are not evidence and that the jury's recollection of the evidence controls," the courts "have repeatedly said this kind of instruction can mitigate the impact of erroneous jury argument"). Granting a new trial "is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (quotation marks omitted).

ii.  <u>Factual Errors Claimed by Defendants</u>

Defendants cite six alleged misstatements of fact during the government's argument: (1) that defendants did not go to the Capitol on January 6 as part of a provision of security services because, "That speaker, that rally, whatever that was that was going to happen, that was never actually going to happen," 11/21/22 Tr. at 10325; (2) that Kelly Meggs responded to Jason Dolan's message that he was ready to die or be convicted of treason with "Let's do it," *id.* at 10301; (3) that, as Judge Mehta had instructed the jury, there is "no requirement of the government [to] prove that the conspirators agreed to the details of the . . . agreement or even that the agreement even had any details," *id.* at 10297; (4) that the government suggested the jury could find an agreement based on the notion of "the commander's intent," *id.* at 10302; (5) that the defendants "stopped the lawful transfer of presidential power," and "physically drove members of Congress from the Capitol Building, and they halted Congress's joint session," *id.* at 10294; and (6) that "[t]hese defendants used force and violence to breach the building, pushing past Officer Salke," and "they used force and violence to penetrate further into the building, trying to push past that line of MPD riot officers, including Officer Owens," *id.* at 10307.

At the outset, it is worth noting that the defendants objected to only one of these alleged errors contemporaneously,[1] which suggests that counsel did not perceive the comments to be unfairly prejudicial at the time.  *United States v. Joyner*, 492 F.2d 650, 654 (D.C. Cir. 1974) (noting that "none of the experienced trial counsel made any objection to the prosecutor's argument" in determining that prosecutor "did not exceed the bounds of legitimate advocacy").  *United States*

---

[1] Defendant Meggs objected to the government characterizing his response to Jason Dolan's assertion that he was prepared to die or be charged with reason as "Let's do it," 11/21/22 Tr. at 10302.

*v. Fennell*, 53 F.3d 1296, 1303 (D.C. Cir. 1995) (same).   More to the point, none of these statements were inaccurate.

First, the government made the statement that Ali Alexander's rally on the Capitol grounds, for which his event planner Stephen Brown had obtained a permit, was "never actually going to happen" in the context of explaining why the jury should not believe that the defendants went to the Capitol on January 6 as part of the provision of security services to Mr. Alexander and his team.  11/21/22 Tr. at 10324-10327.   Brown testified that as he stood on the Capitol grounds on the afternoon of January 6, waiting for the event to begin, a riot broke out.  11/9/22PM Tr. at 8174-8177.   Neither Ali Alexander nor Stewart Rhodes or any other of the Oath Keepers ever showed up at the stage.  *Id.* at 8186-8187.   And Brown acknowledged that the Oath Keepers were not a "real" security company; they were just for show.  *Id.* at 8186.   The government thus argued that

> the best example of why the PSD story is just plain bunk is what actually occurred on the afternoon of January 6th. Rhodes called all of his conspirators to the Capitol Building. Meggs brought them all to the Capitol Building. If you are protecting a human being, do you bring them to the riot or away from the riot? It is just that simple.

11/21/22 Tr. at 10326.  In this context, the government's statement that Ali Alexander's event on the Capitol grounds was "never actually going to happen" was not meant to suggest that Alexander obtained the permit as some type of cover or front for an attack on the Capitol but, rather, to argue that that event was not the reason the defendants and their co-conspirators went to the Capitol on the afternoon of January 6. *See United States v. Mellen*, 393 F.3d 175, 182 (D.C. Cir. 2004) (noting that it is important to evaluate arguments in context).  In this light, this comment was neither error nor improper.

Next, the defense takes issue with the government's assertion that Kelly Meggs responded to Jason Dolan's message that he was ready to die or be convicted of treason with "Let's do it."

Mot. at 9-10.  In government's exhibit 5308, the government introduced a message Jason Dolan

sent to the OKFL Hangout Signal chat on December 6, 2020, in which he stated,

> For most of my life I've been on the front lines.  I shouldn't be alive today.  I am
> here by the grace of God and for no other reason.  After I retired I had many
> opportunities to join multiple NGOs/ federal agencies.  I declined (even though I
> wanted to) because my wife was done with my deployments.  I'm asking her to put
> up with it again but this time there is no coming back, no pay, now awards, no
> homecomings, and **if I'm lucky I get a prison sentence, tagged with treason, or
> a bullet from the very people I would protect.  Yet I swore to defend this
> country against all enemies foreign & domestic.  I think my biggest trouble is
> trying to convince myself to say good bye to my family**, after all they had to
> endure, with the likelihood of never seeing them again...again.

Msg. 1.S.656.6542 (emphasis added).   Three messages (twelve minutes) later, Kelly Meggs

responded:

> Dude , stand ready but focus on that family . **Our battle doesn't start with us .
> Our battle ends with us .** Not just OK but all of us . The thousands of Patriots in
> your town you don't even know exist . We have to stop acting like it's just us . It's
> not everyone but there's gonna be a lot . If it ever happens we have to make sure
> the ones that stand up know what they are doing !!! That's our mission ! Your fear
> needs to be your motivation ! We have more time than you think but not enough !
> We need to get this done ! Teach your neighbors , teach your friends , teach anyone
> that will let you teach them . **Get them ready . 100 guys go to prison , 1000 guys
> get in a battle , 10,000 guys get in a war .**
>
> 72,000,000. is a massive patriotic movement . We won't go alone !!
>
> Let's Prepare those going with us !

Gov. Exh. 5308 (Msg. 1.S.656.6545) (emphasis added).   While Meggs did not utter the words,

"Let's do it," those words accurately capture the sentiment of Meggs' lengthy message,

particularly the parts emphasized above in bold, that Meggs agreed with Dolan's call to action.

The plain meaning of Meggs' words establish that he agreed with Dolan.  It is true, as defendants

point out in the motion, that Meggs also went on in the following messages to say, "They have to

be able to provide and survive for their families," and "They have to be able to provide medical

care to their families." Msgs 1.S.656.6546-6548.  But these messages were all to make the point

that the defendants needed to ready their community so that they could then go engage in war. The government did not say "Let's do it"was a quotation.

These messages also were all admitted in evidence, so the defense was free to argue their own inferences from the messages, and the jury was able to draw their own conclusions from Meggs' words and actions. Gov. Exh. 5308. And the Court instructed the jury that their recollection of the evidence should control. ECF No. 400 at 2. To the extent the Court concludes that the government, in attempting to argue the import of Meggs' response, suggested "Let's do it" was a verbatim quote, the Court should conclude that its instruction mitigated against the impact of this argument. *See Gartmon*, 146 F.3d at 1026 (D.C. Cir. 1998) (where "the judge gave the standard limiting instruction that lawyers' arguments are not evidence and that the jury's recollection of the evidence controls," the courts "have repeatedly said this kind of instruction can mitigate the impact of erroneous jury argument").

Moving on to the third and fourth alleged errors, the Court *did* instruct the jury that there is "no requirement of the government [to] prove that the conspirators agreed to the details of the . . . agreement or even that the agreement even had any details," *id.* at 10297. *See* ECF No. 400 at 18 ("The government does not have to prove the existence of a formal or written agreement, or an express oral agreement spelling out the details of the understanding. The government also does not have to prove that all members of the conspiracy directly met, or discussed between themselves their unlawful objectives, or agreed to all the details, or agreed to what the means were by which the objectives would be accomplished."). That is an accurate statement of law. *See United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) ("In order to prove that an agreement existed, the government need only show that the conspirators agreed on 'the essential nature of the plan,' not

that they 'agreed on the details of their criminal scheme.'") (quoting *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985)).

The government then referenced the notion of "the commander's intent," *id.* at 10302, a military concept discussed during the testimony of both Jason Dolan and Stewart Rhodes, in support of its argument that the jury could find here an implicit agreement to use force to stop the lawful transfer of power by participating in the attack on the Capitol on January 6. Rhodes testified that he understood the commander's intent to be the idea that "that leadership not try to micromanage, should select good leaders, they should understand the mission and give them discretion to work the mission." 11/7/22PM Tr. at 7414. He acknowledged that he employed this process for his group's January 6 operation, by selecting Donald Siekerman and Michael Greene as operational leaders, and that he made the mission clear to them and gave them discretion to enforce it. *Id.* Jason Dolan testified that the commander's intent explained why he felt his participation on the attack on the Capitol was consistent with the group's implicit agreement to use any means necessary to stop the lawful transfer of power:

> [T]he commander's intent describes why. So I guess within the Oath Keepers, you -- there wasn't a specific mission. But I guess along with the text and the talks and everything, we kind of had a why. We wanted to -- we were going to have our firearm[s]. For instance, we would have our firearms in -- in Virginia. The overall goal why is if the Insurrection Act was declared, we would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress. . . . If -- if the President invoked the Insurrection Act, then we would be stopping -- he would be stopping the certification of the election of President Biden by invoking the Insurrection Act. And if he didn't do it, then we would need to step up and stop the certification of what -- what I saw -- I don't want to put words in his mouth, but as what I saw as an illegitimate election. So the certification process would still have to be stopped.

10/18/22PM Tr. at 4109.

So when the government told the jury, "The commanders' intent explains the reasons why the group wants to achieve the common goal," 11/21/22 Tr. at 10302, this was an accurate

summary of the evidence and a fair argument as to why the jury could find an implicit agreement to oppose the authority of the government of the United States by force. That Mr. Meggs was never a member of the military is of no moment.[2] Mr. Dolan's point—and the government's argument to the jury—was simply that all the members of the conspiracy knew and agreed to its goal—and saw the attack on the Capitol as consistent with this goal—without having to say it explicitly out loud.

Finally, the defense attacks the government's statements that the defendants "used force and violence to breach the building, pushing past Officer Salke," and "used force and violence to penetrate further into the building, trying to push past that line of MPD riot officers, including Officer Owens," "physically drove members of Congress from the Capitol Building," "halted Congress's joint session," and "stopped the lawful transfer of presidential power." ECF No. 434 at 14-15 (citing 11/21/22 Tr. at 10294, 10307). The government did use these phrases, to properly advance its theory of how the evidence fit the elements of the offenses charged. The defense's attack here on whether the evidence truly showed these things is more properly considered as an argument as to the sufficiency of the evidence than as an argument about the propriety of the government's closing argument. In response, the government adopts by reference its opposition to the defendants' motions for judgement of acquittal, being filed under separate cover today.

### iii.  Allegations of Improper Argument

Defendants point to three aspects of the government's argument that they contend were improperly designed to inflame the passions of the jurors: (1) having an agent display one of the firearms admitted into evidence while referencing, "the AR-15 that Mr. Dolan brought with him to the Comfort Inn in Virginia," 11/21/22 Tr. at 10304-10305; (2) stating, "It is disgusting, frankly,

---

[2] That being said, the government did introduce a stipulation about which members of the conspiracy had a military background, so the jury was aware of this fact. Gov. Exh. 3004.

ladies and gentlemen, to hear these defendants and these defense counsel argue that the Capitol police officers didn't do anything, just let the defendants into the building like they strolled in, or to hear Defendant Watkins talk about how it felt like Black Friday at a Target, everyone was racing to get the next toy for Christmas. Look at what was actually happening. It really was a life or death scenario for many of these police officers," *id.* at 10318; and (3) comments made at the end of the government's rebuttal argument that the defendants "took matters out of the hands of the people and put rifles into their own hands," "took aim at this city we're in right now," and that "January 6th was the first shot in a war," *id.* at 10346-10348.

With respect to the display of the firearm to the jury, the government accompanied this display with the words,

> Jason Dolan sat on the witness stand and told you he was prepared to take up arms against the government, and he understood that his fellow conspirators were prepared to do the same. Agent Palian is holding right now in his hands Exhibit 37, the AR-15 that Mr. Dolan brought with him to the Comfort Inn in Virginia.

11/21/22 Tr. at 10304-10305. The government displayed just this one firearm out of nearly a dozen that were admitted over the course of its two arguments. Not surprisingly, defense cites no law for the proposition that the government's display of admitted evidence during closing argument is somehow improper. There was nothing improper or particularly inflammatory about displaying admitted evidence.

In addition, Defendant Watkins contemporaneously objected to the display of the weapon, 11/21/22 Tr. at 10305, and though the Court overruled the objection, it asked that the agent displaying the weapon then put it away, and the agent complied, *id.* Thus, the Court took an effective measure to mitigate the effects of any prejudice caused by showing the weapon. *See, e.g., (Rodney) Moore*, 651 F.3d at 54; *Childress*, 58 F.3d at 716. The Court should not find here

any error that so inflamed the jurors' passions that it affected the defendants' ability to receive a

fair trial.

Next, the defendants highlight the following statement by the government:

It is disgusting, frankly, ladies and gentlemen, to hear these defendants and these
defense counsel argue that the Capitol police officers didn't do anything, just let
the defendants into the building like they strolled in, or to hear Defendant Watkins
talk about how it felt like Black Friday at a Target, everyone was racing to get the
next toy for Christmas. Look at what was actually happening. It really was a life or
death scenario for many of these police officers.

11/21/22 Tr. at 10318.  This argument was supported by the evidence: Officer Salke testified that

it really was a life or death scenario for him and the officer in "hard" riot gear that he was bear-

hugging at the threshold of the East Rotunda Doors at the time Defendants Meggs, Watkins, and

Harrelson (and their conspirators) forced their way inside, to prevent that officer from being

knocked to the ground and trampled to death.  *See* 10/28/22PM Tr. at 5309.

Moreover, the Circuit has made clear the Court should consider context in assessing

whether the government's response to a defense argument was prejudicial.  *See, e.g.*, *Childress*,

58 F.3d at 717 ("[A]ttacks by defense counsel on the prosecution may be taken into account when

assessing the prejudice that may have resulted from a prosecutor's excesses."); *United States v.*

*Perholtz*, 842 F.2d 343, 361 (D.C. Cir. 1988) ("The remarks were not the product of an improper

motive on the part of the prosecutor to excite the prejudices of the jury [citation omitted], and

seemed to be a response to defense counsel's suggestions"); *cf. United States v. Young*, 470 U.S.

1, 11–12  (1985) (prosecutor's improper remarks in rebuttal did not rise to level of plain error, in

part because of defense counsel's improper closing argument).

Here, defendants did refer to their conduct as merely "strolling" around the Capitol.  *See*

Watkins' Closing Argument, 11/21/22 Tr. at 10211 ("If this was truly a plan to do something

nefarious, you think they'd be strolling, talking on their phone, doing this?").  And Defendant

Watkins did, during her testimony, say the breach of the East Rotunda doors was like "Black Friday when everybody wanted to get in there and get a flat screen for 200 bucks."  11/16/22PM Tr. at 9400-9401.  These comments made light of the violent assault on the officers and entrance that *these defendants* took part in, as documented by the government's video evidence.  It was thus fair game to remind the jury of the severity of the attack on the officers and the significance of the attack on the seat of government, because the weight of these moments bore directly upon the defendants' guilt for the serious offenses alleged in the Indictment.

Even if the Court finds that the word "disgusting" went too far, the jury likely understood this purpose of the government's comment.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974) (cautioning that a court should not lightly infer that a jury will draw the most damaging meaning from a prosecutor's remark in closing argument); *(Rodney) Moore*, 651 F.3d at 51 (concluding that "this court will presume that a jury acts with common sense and discrimination when confronted with an improper remark from a prosecutor") (internal quotation marks omitted).

Finally, the defense attacks the government's use of the defendants' employ of firearms in the QRF as a metaphor for their overall conduct in this conspiracy, suggesting to the jury that the defendants "took matters out of the hands of the people and put rifles into their own hands," "took aim at this city we're in right now," and that "January 6th was the first shot in a war."  11/21/22 Tr. at 10346-10348.  These phrases were "nothing more than a rhetorical flourish."  *United States v. Meadows*, 867 F.3d 1305, 1318 (D.C. Cir. 2017) (rejecting claim of improper rebuttal argument).

Moreover, the rhetorical flourish was accurate.  As the evidence showed and the jury found, the defendants did have their weapons at the QRF trained on D.C. and Congress on January 6.  As such, the reference was entirely in accord with the Circuit's guidance on this issue:

> First, it was not error for the prosecution to call Gartmon a liar, or to describe various of his statements and actions as "lies." We do not, of course, condone the use of insults or slurs in lawyers' arguments. But here the words were not used as free-floating allegations about Gartmon's character or as expressions of the prosecutor's opinion. Rather, they were tied to specific conduct at issue in the trial—ranging from the falsehoods Gartmon told Glascoe in order to control her, to the false claims for compensation they submitted to George Washington.

*Gartmon*, 146 F.3d at 1024; *see also United States v. Miller*, 799 F.3d 1097, 1107 (D.C. Cir. 2015) (no misconduct where, "the references to 'con artist' and 'con man' were permissibly 'tied to specific conduct at issue in the trial' and used as a 'description of the manner in which [Miller] conducted the scheme charged in the indictment.'"); *United States v. Dean*, 55 F.3d 640, 665 (D.C. Cir. 1995) (in perjury prosecution, not error to argue that the defendant lied: "'Lies' and 'lying' are hard words. But this was closing argument, not a polite social conversation.").

Even if the Court were to conclude that the descriptions were inartful, they would still not constitute a basis for a mistrial. *See, e.g., United States v. Borda*, 848 F.3d 1044, 1062 (D.C. Cir. 2017) (noting that not "every jarring or badly selected metaphor renders a trial fundamentally unfair"); *United States v. McGill*, 815 F.3d 846, 920 (D.C. Cir. 2016) (finding no substantial prejudice, even where "[t]he prosecution's argument theme and statements were entirely improper, unprofessional, and wholly unbefitting of those who litigate in the name of the United States of America"); *United States v. Spencer*, 25 F.3d 1105, 1114 n.1 (D.C. Cir. 1994) ("The prosecutor's technique [in closing argument] may have created some ambiguity but it did not create a reversible error.").

iv.   <u>Strength of Government's Case & Jury's Verdict Suggests No Prejudice</u>

Should the Court find any improprieties in the government's arguments to the jury, it should not find that the defendants' right to a fair trial was substantially prejudiced by these comments.  Given the strength of the government's evidence and the Court's jury instructions, there is no basis upon which to find that any erroneous remarks unfairly swayed the guilty verdicts.  *See e.g., United States v. Vega*, 826 F.3d 514, 525 (D.C. Cir. 2016) (in international cocaine trafficking case, reference to "America's drug problems" was harmless in light of the strength of the evidence, even if error); *United States v. Wheeler*, 753 F.3d 200, 207 (D.C. Cir. 2014) (no error in government fraud case, where prosecutor suggested that "taxpayers (including, by implication, [jurors]) were the victims").  Moreover, the jury's thoughtful verdict and acquittals on some counts suggests that their judgment were not clouded by passions inflamed by the government's closing remarks.  *See United States v. Small*, 74 F.3d 1276, 1284 (D.C. Cir. 1996) (holding that "the peculiar circumstances here, due largely to the split verdict, persuade us that Small's right to a fair trial was not prejudiced" by the prosecutor's repeated improper references to drug courier profiles).

### III.     Conclusion

The defense fails to establish any error, much less one that substantially affected the defendants' rights.  Accordingly, the interests of justice would not be served by setting aside the jury's thoughtful verdict, following a seven-week trial and several days of deliberation.  The Court should deny the defendants' motions for new trial under Rule 33 on all grounds.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              UNITED STATES ATTORNEY
                              D.C. Bar No. 481052

          By:

                              Kathryn L. Rakoczy
                              Assistant United States Attorney
                              D.C. Bar No. 994559
                              Troy A. Edwards, Jr.
                              Jeffrey S. Nestler
                              Louis Manzo
                              Assistant United States Attorneys
                              U.S. Attorney's Office for the District of Columbia
                              601 D Street, N.W.
                              Washington, D.C. 20530

                                   /s/
                              Alexandra Hughes
                              Trial Attorney
                              National Security Division
                              United States Department of Justice
                              950 Pennsylvania Avenue
                              NW Washington, D.C. 20004