UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:22-cr-15 |
| | : | |
| | : | |
| V. | : | |
| | : | |
| | : | |
| JESSICA WATKINS | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S POSITION
REGARDING SENTENCING**

COMES NOW, the Defendant herein, Jessica Watkins (henceforth referred to as Ms. Watkins), through undersigned counsel, and pursuant to Fed. R. Crim. P. 32(i)(3) and 18 U.S.C. § 3553(a), to provide Probation and the Court with relevant information to consider in determining a sentence that is no greater than necessary to achieve the goals of sentencing under § 3553(a) and in response to the Final Presentence Report (henceforth referred to as PSR).

As an initial matter, Ms. Watkins stands before this Court accepting her punishment. In providing the Court with this memorandum, she in no way minimizes her conduct as she recognizes and acknowledges the severity of her crimes which require punishment from this Court.

**Defendant History and Characteristics**

Ms. Watkins was born in 1982 to Stanley and Melinda Watkins in Rochester, New York. (PSR Paragraph 149). Ms. Watkins was born biologically male and given the name Jeremy David Watkins. *Id.* Ms. Watkins initially grew up in Rochester, New York, until her family moved to Hilliard, Ohio. (PSR Paragraph 150). She has one (1) sibling; a younger sister, Sarah Watkins, who still resides in Rochester. (PSR Paragraph 149). Ms. Watkins and her sister were raised by both parents. (PSR Paragraph 150). Her father worked outside the home while her mother provided in-home care for her and her sister. (PSR Paragraph 149).

Living in a one-income household meant that Ms. Watkins and her sister had the basic necessities, however, the location of their home was not always safe. (PSR Paragraph 150). She recalled seeing used needles at the park and an incident in which a stray bullet went through the family home and hit a dresser. *Id.*

Ms. Watkins and her sister were provided with an exceedingly strict, religious upbringing. (PSR Paragraph 151). The family attended church five (5) days a week during her formative years. *Id.* Ms. Watkins's family attended the Assembly of God church. *Id.* Ms. Watkins's parents frequently utilized corporal punishment to discipline her and her sister. *Id.* Ms. Watkins, however, does not presently like to discuss the abuse she endured because she believes her parents are different people today. *Id.*

Ms. Watkins's parents were not supportive of her during her gender transition. _Id._ As a result, she and her parents did not maintain communication for upwards of fifteen (15) years. _Id._

After graduating high school, Ms. Watkins enlisted in the United States Army in 2001. (PSR Paragraph 153). She completed basic training at Fort Benning, Georgia. _Id._ Upon completion of basic training, Ms. Watkins was stationed in Savannah, Georgia, and Fort Bragg, North Carolina. _Id._ Ms. Watkins's military career ended in late 2003 when she went absent without leave (AWOL). _Id._ Her AWOL status was resultant of the harassment she endured in the services because of her gender identity. (PSR Paragraph 184). Ms. Watkins and was ultimately discharged from the Army in 2003. (PSR Paragraph 153).

Following her discharge from the Army, Ms. Watkins drifted around the east coast working odd jobs, not staying anywhere for long. _Id._ In 2005, she finally secured steady employment in Wilmington, Delaware, where she remained until 2009. _Id._ She relocated in 2009 to Fayetteville, North Carolina. _Id._ She returned to her hometown of Hilliard, Ohio, in 2014 and remained there for four (4) years after which point, she relocated to Woodstock, Ohio, with her fiancé, Montana. (PSR Paragraphs 153 and 154). Ms. Watkins and Montana resided in an apartment above the bar the couple also owned and operated. Ms. Watkins remained in Woodstock until her arrest in January 2020. (PSR Paragraph 154).

Ms. Watkins currently suffers from elevated cholesterol and edema in her legs. (PSR Paragraph 160). She is currently taking the medication Simvastatin. *Id.* Ms. Watkins has also suffered severe weight gain since the commencement of her incarceration. *Id.* Ms. Watkins underwent a bilateral orchiectomy (removal of the testes) prior to her incarceration. (PSR Paragraph 162). As a result of this procedure, she was initially prescribed the hormone replacement medication Premarin but, since incarceration, has been switched to the estrogen replacement medication of Estradiol which is taken daily. *Id.*

During her time in the military, Ms. Watkins was hazed and threatened. (PSR Paragraph 165). Ms. Watkins first sought mental health treatment during her time in the military. *Id.* She received treatment at Fort Bragg up until her discharge. *Id.* She does not recall a formal diagnosis being given, nor was she prescribed any medications. *Id.* In the years following her discharge, Ms. Watkins continued her mental health treatment and was eventually diagnosed with Post Traumatic Stress Disorder (PTSD), depression, and anxiety. *Id.* A few years later, in her thirties, Ms. Watkins fell into a major depression. *Id.* This depressive episode led Ms. Watkins to engage in self-harm. She estimated she has about two to three dozen scars from burns on her arm from the self-harm. *Id.* Her bout of self-harm continued through the COVID-19 pandemic. *Id.* Ms. Watkins sought counseling for mental health while

incarcerated but was only offered prescription medication by the mental health staff.
*Id.*

Ms. Watkins also struggled with substance abuse throughout her life. (PSR Paragraphs 167-169). Ms. Watkins utilized alcohol as a form of self-medication. (PSR Paragraph 168). She consumed alcohol for the first time in 2002 while she was in the military. *Id.* After returning home from Afghanistan, she admittedly began consuming more alcohol than she should have. *Id.* This alcohol use briefly dwindled following her discharge due to her inability to afford it. *Id.*

Conversely, Ms. Watkins's marijuana use varied over time; at certain points she used marijuana daily but then ceased use for years at a time. (PSR Paragraph 167). Ms. Watkins resumed marijuana use during the pandemic while her business was shut down. *Id.* Once her business reopened, her marijuana use decreased again and became sporadic. *Id.* Ms. Watkins's last time using marijuana occurred during the days following 6 January. *Id.* Since being incarcerated she has been voluntarily attending drug and alcohol treatment classes. (PSR Paragraph 169). She has attended the classes weekly since 2022 but does not feel she requires continuation of this treatment upon release given her lack of desire to resume substance abuse. *Id.*

Ms. Watkins began her employment history with her enlistment in the Army in 2001. (PSR Paragraph 184). She was discharged from the Army in December of 2003. *Id.* Ms. Watkins then held a variety of jobs throughout 2004, from Best Buy,

Auntie Anne's Pretzels, and Ruby Tuesday to Manhattan Bagel. (PSR Paragraphs 182 and 183). The closing of Manhattan Bagel's business led her to her position of assistant manager at Arby's restaurant in 2005. (PSR Paragraphs 181-182). Ms. Watkins left her position of assistant manager to serve as the interim IT director for Connections Community Support Program in Wilmington, Delaware; a position she held for three (3) years beginning in 2006 and ending in 2009. (PSR Paragraphs 180-181). In 2009, Ms. Watkins worked at Manhattan Bagel in Wilmington, Delaware, as a part-time bakery manager. (PSR Paragraph 179). Upon relocating to North Carolina, Auntie Anne's Pretzels as a shift manager until becoming a firefighter. (PSR Paragraph 178). For four (4) years, from 2010-2014, she served as a firefighter, emergency medical technician, and rescue technician for the Stony Point Fire Department in Fayetteville, North Carolina. (PSR Paragraph 177). In 2014, Ms. Watkins served as a part-time crew member for McDonald's and a delivery driver for Marco's Pizza. (PSR Paragraph 176).

From 2015 through 2018, Ms. Watkins worked as the business operations manager for Old Navy in Hillard, Ohio, until she took over Jolly Roger Bar & Grill in 2018. (PSR Paragraph 175). Ms. Watkins served as the Chief Executive Officer of Jolly Roger Bar & Grill and initially invested $2,000.00. (PSR Paragraph 174). Unfortunately, the business was struggling financially prior to her arrest. *Id.* Following her arrest, the seller reclaimed the business. *Id.*

In preparation for sentencing, Ms. Watkins collected character letters from various family members and close friends to present to this Honorable Court. These letters present a remarkably clear portrait of the genuinely kindhearted individual devoted to helping others that Ms. Watkins is.

Melinda Watkins, Ms. Watkins's mother, describes her daughter "to be a good person" who "has always looked for ways to help people." (Exhibit 1). Melinda notes Ms. Watkins is "honest, kind and driven to help others." *Id.* Melinda noted there was "a gap in our relationship due to our regrettable shortcomings when she came out" but they have since been able to reconnect and Ms. Watkins is more than welcome to stay at her home upon release *Id.*

Ms. Watkins's fiancé, Montana Siniff, who described Ms. Watkins as having "a history of law-abidingness rooted in a strong sense of justice, compassion for and desire to be of help to people, and a sense of duty to these common goods." (Exhibit 2). Mr. Siniff further noted this spirit was not dwindled by her incarceration: "despite the constraints of her confinement, both related to the nature of jail compared to a prison. . . Jess has managed to employ herself in writing fiction." *Id.*

Ms. Watkin's devotion to help others is further noted by Adita Harless, a former U.S. Army Counterintelligence Agent. During her time with Ms. Watkins, Ms. Harless "observed that Jessica has a heart for serving others, and a desire to

protect and help those in need." (Exhibit 3). Ms. Harless further explained that "[d]oing the right thing when no one is looking is my definition of integrity, and I know Jess to embody this virtue." *Id.* Ms. Harless closes her letter by conveying Ms. Watkins's desire is "to adopt a simple, obscure life apart from any activism or controversy. I plead with the court to allow her to do so." *Id.*

## Acceptance

Ms. Watkins admitted to her conduct at trial and has since complied with pretrial confinement thereby illustrating acknowledgment of the severity of her crimes and acceptance of her punishment.

## PSR Objections

Ms. Watkins expressed objections to the initial PSR that was filed on 24 March 2023. These objections are included in the addendum to the PSR filed by the probation office on 27 April 2023. In these objections, Ms. Watkins reserved the right to argue mitigating factors under 18 U.S.C. § 3553(a).

Enhancement for Specific Offense Characteristics: Cause or Threat of Physical Injury, Substantial Interference with Justice, and Extensive in Scope

The PSR added three (3) specific offense characteristics, the first of which included the addition of eight levels under U.S.S.G. §2J1.1(b)(1)(B). Following this recommendation would result in legal and factual error. The relevant specific offense characteristics provided are as follows:

> If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

The second specific offense characteristic added three levels under U.S.S.G. §2J1.2(b)(2) because Ms. Watkins's offense "resulted in substantial interference with the administration of justice." PSR Paragraph 132. The relevant specific offense characteristics provide as follows:

> If the offense resulted in substantial interference with the administration of justice, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

An application note states that "substantial interference with the administration of justice" includes:

> A premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Lastly, the PSR added two levels under U.S.S.G. §2J1.2(b)(3).

The tools utilized by the Court in interpretation of Sentencing Guidelines are those which are employed during statutory interpretation. United States v. Martinez, 870 F.3d 1163, 1166 (9th Cir. 2017). This inquiry into the meaning "will most often begin and end with the text and structure of the Guidelines." Id. "The language of

the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." United States v. Fulford, 662 F.3d 1174, 1177 (11th Cir. 2011). In accordance with proper inquiries, the Court must apply the same meaning of the phrase "administration of justice" to the Guidelines as it appears in Title 18; the Court may not set aside or overlook the plain meaning of a guideline in order to achieve a preferred policy outcome.

The court in United States v. Montgomery, in denying a Motion to Dismiss the 1512(c) charge, found "[c]ongress does not engage in . . . 'the administration of justice.'" United States v. Montgomery, 578 F. Supp. 3d 54 (D.D.C. 2021); see also United States v. Sandlin, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'"). The Court therefore cannot find that "administration of justice" now means something different under the Guidelines. In accordance with Carr, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." United States v. Carr, 557, F.3d 93,101 (2d Cir. 2009).

Furthermore, the phrase "administration of justice" has routinely been interpreted as a reference to judicial proceedings. United States v. Richardson, 676 F.3d 491, 502-503 (5th Cir. 2012)("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); United States v. Brenson, 104 F.3d 1267, 1279-80 (11th Cir. 1997)("due administration of justice"

means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); United States v. Warlick, 742 F.2d 113, 116 (4th Cir. 1984) (*defining* obstruction of the "administration of justice" as acts that "thwart the judicial process"); United States v. Rasheed, 663 F.2d 843, 851 (9th Cir. 1981)("administration of justice" commences with "a specific judicial proceeding"). The government, and by extension the probation office, failed to adduce evidence, or even a mere explanation, as to how Congress's electoral vote count on January 6 constituted a judicial proceeding. The application note to U.S.S.G. §2J1.2(b) provides further examples of what suffices to constitute substantial interference with the "administration of justice". Each example involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

The imposition of U.S.S.G. §2J1.2(b) would also constitute a factual error. The government failed to adduce evidence at trial that Ms. Watkins "caus[ed] or threaten[ed] to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. §2J1.2(b)(1)(B). The PSR states Ms. Watkins "and others tried to force their way past riot police. Defendant Watkins yelled, 'Push! Push! Push!' and 'Get in there' and 'They can't hold us!'" PSR Paragraph 57. The PSR does not cite any actual physical injury sustained to a person

or property damage following these statements from Ms. Watkins. This therefore fails to illustrate that Ms. Watkins caused physical injury or property destruction.

There is also no evidence Ms. Watkins threatened to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. On a denotative basis, "[t]hreatening to cause physical injury to a person" references assault; mere "interference" does not constitute assault. Assault bears an intent element; meaning, if a defendant intended his acts to interfere with a person but not threaten him or her with bodily injury, the defendant is not guilty of assault. United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990); *see also* United States v. Roberts, 915 F.2d 889, 890 (4th Cir. 1990), cert. denied, 498 U.S. 1122, 111 S. Ct. 1079, 112 L. Ed. 2d 1184 (1991).

In the instant case, there is a lack of evidence illustrating that Ms. Watkins possessed the requisite knowledge of who was at the other end of the group's pushing attempt. There is no evidence Ms. Watkins intended harm to others on the other end at the time she made those statements. Ms. Watkins therefore lacked the requisite intent to harm. Ms. Watkins's statements of "push" and "they can't hold us" do not rise to a threat.

Lastly, the "substantial interference" specific offense characteristic does not apply. U.S.S.G. 2J1.2(b)(2). The PSR lacks a factual basis supporting the application of this enhancement. In accordance with an application note, "substantial

interference" with the administration of justice refers to acts that materially affect the outcome of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. In the instant case, Ms. Watkins's actions had no causal relationship with the outcome or duration of the joint session given it was suspended prior to her entrance into the Capitol Building. (Tr. 4442-43). The joint session did not recommence until hours after her exit. (Tr. 4442-43. 4457-58). Furthermore, it was elicited at trial that a police involved shooting at 2:44 p.m. inside the Capitol was a contributing factor to the "hours" delay. (Tr. 4033-35, 4058). There is no factual basis for referring to Ms. Watkins's conduct as "substantially" obstructive.

The enhancements under U.S.S.G. 2J1.2(b) are therefore inapplicable as such enhancements require interference with the administration of justice which fails to exist in the instant case.

<u>Adjustment for Role in the Offense: Organizer or Leader</u>

In the PSR, Probation attributed a sentencing enhancement of +4 to Ms. Watkins, stating that she was an "organizer or leader of a criminal activity that involved five (5) or more participants or was otherwise extensive..." Specifically, Probation states that Ms. Watkins was the leader of the "Ohio group of Oath Keepers. She recruited others into the conspiracy and led a group of co-conspirators towards the Capitol on January 6, 2021. She helped prepare, coordinate, and attack

the US Capitol." PSR Paragraph 135. The evidence at trial does not establish that

Ms. Watkins was a leader or an organizer; therefore, this enhancement should not

apply. Nor does the evidence suggest the Ohio State Regular Militia (OSRM) was

an extension of the Oathkeepers. There were members of the OSRM who were not

members of the Oathkeepers.

USSG §3B1.1(a), Application Note 4 provides a list of factors that courts

should consider when distinguishing whether someone was a leader, organizer, or

merely a manager. These factors include:

> exercise in decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree of
> control and authority exercised other others.

Furthermore, the D.C. Circuit has consistently held that for a defendant to receive

an enhancement under USSG §3B1.1, the defendant, "...receiving the enhancement

must exercise some control over others." United States v. Quigley, 373 F.3d 133,

139 (D.C. Cir. 2004) (citing United States v. Graham, 162 F.3d 1180, 1185 [D.C.

Cir. 1998]).

Here, the evidence does not establish that Ms. Watkins exercised any degree

of control over other participants to achieve a criminal act, a required fact to apply

this enhancement. See Quigley, 162 F.3d at 1185. The evidence established that Ms.

Watkins was a leader of OSRM, and not the Oath keepers. When it came to her

involvement, Ms. Watkins never directed any other member to go to the January 6 march, direct them inside the Capitol, or control where individuals would be during the events of January 6. Looking at the factors at large, Ms. Watkins never exercised any decision-making authority to move supplies for the QRF or enter the Capitol, contrary to Probation's claims. Additionally, and arguably most importantly, Ms. Watkins was not found guilty of Seditious Conspiracy.

Recruitment into the OSRM is a factor that the Government will likely argue makes Ms. Watkins an applicable defendant for this enhancement. A case to match the Government's contention could be found in United States v. Brodie. In Brodie, defendant Brodie received an enhancement under §3B1.1 when Brodie engaged in a scheme with others to fraudulently obtain mortgage loans and commit wire fraud. Brodie, 524 F.3d 259 (D.C. Cir. 2008). To complete his scheme, Brodie recruited a team of individuals with certain special skills like a person to appraise the property, another to prepare false financial documents, and another to submit the false loan applications. See Brodie, 524 F.3d at 270. Ultimately, the D.C. Circuit upheld the enhancement, citing to Brodie's recruitment of those with special skills, directing of the conspirators to complete tasks, and possession of the "fruits of the crime." Id. Ms. Watkins' cases bears no similarity to the facts in Brodie. Nowhere did evidence establish that Ms. Watkins targeted and recruited those with special skills to engage in any criminal enterprise. Ms. Watkins did not direct those she recruited to complete

tasks, to move to various places in the Capitol, or to follow her commands. Because of this, an enhancement under USSG §3B1.1 should not apply to Ms. Watkins' case. Moreover, any recruitment activities in which she engaged for the *OSRM* pre-dated any planned events of 6 January and were unrelated to the events of that day. There is ample evidence from the testimony of Ms. Watkins as well as her two witnesses indicating the intent of the training was to repel any UN invasion or a Chinese invasion, not overthrowing the election of President Biden.

## Adjustment for Obstruction of Justice

Next, Probation states that Ms. Watkins engaged in obstruction of justice by deleting her Signal messages during the period of the conspiracy and providing false testimony during the trial. Due to this, Probation applied a +2 under USSG §3C1.1. Neither of these instances have the requisite evidence required to apply this enhancement to Ms. Watkins. The Government holds the burden to demonstrate that an enhancement has the actual evidentiary foundation to apply it. Here, the Government fails to show that Ms. Watkins deleted the messages in question or even if so, that it was done to prevent law enforcement from accessing her records. On the contrary, Ms. Watkins actually acted in a manner that would incriminate her. The jury heard that the FBI searched Ms. Watkins' home to find her gear worn during the January 6 incident, as well as her phone. Indeed, she left the password and phone in a neat pile at her home with instructions to Montana Siniff to provide the same to

law enforcement should they arrive. She further provided the same in her multiple proffers. Based on these facts, this Court should not find that Ms. Watkins acted in a way to obstruct justice by deleting messages since the Government did not meet its burden.

Ms. Watkins did not provide materially false testimony during the trial. According to Probation, Ms. Watkins provided false testimony by stating that she was somber and realized her presence in the Capitol was wrong after attempting to push through officers. Probation's evidence of this falsehood comes from their perceptions that Ms. Watkins' conduct of smoking marijuana in the Rotunda and postings on social media implies otherwise.

In the analysis of whether a defendant has committed perjury, the D.C. Circuit applies a different test that requires more than a typical sentencing enhancement. Here, this Court must reach an independent finding that Ms. Watkins gave false testimony by clear and convincing evidence, as opposed to a preponderance of the evidence. *See* United States v. Montague, 40 F.3d 1251 (D.C. Cir. 1994). In applying this standard, the district court, "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." Montague, 40 F.3d at 1255 (citing United States v. Dunnigan, 113 S.Ct. 1111 [1993]).

When weighing the testimony, this Court should not find that Ms. Watkins gave materially false testimony about her somber and remorse nature after attempting to push past law enforcement. In fact, Ms. Watkins admitted to the jury that in the days after the January 6 incident, "I was absolutely proud." Trial Transcript 9406. The same can be said for Ms. Watkins's messages on social media after the incident at the Capitol. Based on the testimony, Ms. Watkins expresses her remorsefulness when reflecting on January 6, not while she was experiencing it. Contrary to probation's requests, this Court should not find that Ms. Watkins testified falsely nor obstructed justice. Clearly the probation office has failed to appreciate the temporal contrast between what she felt at that time and shortly thereafter and what she has now come to realize and sought to find an enhancement for merely retributive reasons.

<u>Acceptance of Responsibility</u>

Lastly, Probation recommended that Ms. Watkins receive a 0-point reduction for Acceptance of Responsibility. USSG §3E1.1 provides that "if the defendant clearly demonstrates acceptance of responsibility for his offense." then a reduction should apply to the offense level. Here, Ms. Watkins expressed her acceptance of responsibility *before* and during the trial. Thus, Ms. Watkins should receive a reduction.

According to Application Note 1 of USSG §3E1.1, this Court should appropriately consider the following factors when determining whether a defendant as clearly demonstrated an acceptance of responsibility:

> truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting relevant conduct, voluntary termination or withdrawal from criminal conduct or associations, voluntary payment of restitution, voluntary surrender to authorities promptly after commission of the offense, voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense, voluntary resignation from the office or position held during the offense, post-offense rehabilitative efforts, and the timeliness of the defendant's conduct in manifesting an acceptance of responsibility.

Application Note 2 provides that while a reduction under §3E1.1 is not intended to apply to a defendant who deny guilt and require the government to meet its burden, there are instances where a defendant may clearly demonstrate an acceptance of responsibility for criminal conduct and still exercise their constitutional right to trial. In addition, when a defendant "pleads guilty to some counts but goes to trial on others, the Court must assess the 'totality of the circumstances' in deciding whether to grant a reduction for acceptance of responsibility." United States v. Williams, 344 F.3d 365, 379 (3d Cir. 2003) (citing United States v. Cohen, 171 F.3d 796, 806 [3d Cir. 1999]).

Here, Ms. Watkins' actions comport with certain of the factors listed in Application Note 1. Before trial, Ms. Watkins gathered her gear worn to the January 6 incident in her house with the intent to leave it for authorities. After this

action, she went to turn herself in to local authorities in Ohio and did not attempt to remain on the run. While in custody, Ms. Watkins agreed to and in fact did engage in four (4) proffers with the government, sharing information about what she did and who she was with on January 6th and the days leading up. During the trial, Ms. Watkins admitted she interfered with the police and the performance of their duties. Trial Transcript 9406. She denied destroying property or engaging in any seditious behavior and the jury concurred. Based on these actions, Ms. Watkins voluntarily surrendered to authorities, truthfully admitted to conduct, and assisting law enforcement for many hours by gathering all her gear and phone for collection and proffering multiple times. While Ms. Watkins did not plead guilty in a traditional sense, her admission to the jury that she interfered with police and the performance of their duties should operate as a de facto plea for this Court's consideration.

In addition, Ms. Watkins offered to plead guilty to exactly what she was found guilty of in June 2022. Prior to trial through undersigned counsel, Ms. Watkins offered to plead guilty to everything except Seditious Conspiracy; however, was told by the Government that since they had indicted on the Sedition then Ms. Watkins' suggested plea was not acceptable, and she would have to plead to the indictment if a deal was to be made. Ms. Watkins should not be responsible for the Government's inflexible position and overreach or the federal system's

inability to accept a mixed plea akin to what occurs in military courts, in which an Accused is permitted to plead to certain offenses on a charge sheet out outside the jury's presence, and the government is permitted to then prove up the remaining charges should it desire. Taking all the factors into consideration, this Court should find Ms. Watkins accepted responsibility.

## ARGUMENT

Section 3553(a) is comprised of two (2) distinct parts: the sentencing mandate contained in the prefatory clause of § 3553(a), and the factors to be considered in fulfilling that mandate. The overriding mandate of § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four (4) purposes of sentencing set forth in § 3553(a): (a) retribution; (b) deterrence; (c) incapacitation; and (d) rehabilitation. United States v. Yeaman, 248 F.3d 223, 237 (3d Cir. 2001).

In determining whether the sentence is sufficient to comply with the § 3553 purposes of sentencing, the Court must consider several factors listed in § 3553(a). These factors include:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, the need for deterrence, the need to protect the public, and the need to provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the Sentencing Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid

unwanted sentencing disparities; and (7) the need to provide restitution
to victims.

18 U.S.C. § 3553(a). While district courts must consider the sentencing guideline

range, the guidelines do not diminish the other factors in § 3553(a). United States v.

Booker, 543 U.S. 220, 245-46 (2005). The "sufficient, but not greater than

necessary" requirement is often referred to as the "parsimony provision." United

States v. Ferguson, 456 F.3d 660, 667 (6th Cir. 2006). It is the parsimony provision

that serves as the "guidepost for sentencing decisions post-Booker." Id.

In keeping with the sentencing mandate under 18 U.S.C. § 3553(a), which

requires this Court to impose a sentence that is "sufficient, but not greater than

necessary", mitigating factors that this Honorable Court should take into

consideration under § 3553(a) include: (1) the Defense objections to Ms. Watkins's

PSR and (2) Ms. Watkins's personal history.

1. Factor 1:

This memo will focus primarily on the particular actions of Ms. Watkins

during and after 6 January 2021. Ms. Watkins stepped on the Northwest Drive

sidewalk at approximately 2:21 PM (Govt. Exh. 1056.603.0224). At the time Ms.

Watkins stepped onto the Northwest Drive sidewalk, the barriers and signs

indicating restricted portions of Northwest Drive had already been taken down

(Caldwell Exhibit 80). Ms. Watkins therefore did not move any barriers from

around the Capitol grounds. Ms. Watkins remained inside the Capitol building for

a duration of twenty (20) minutes total. Upon her entry, law enforcement officers were standing to the side. (Trial Transcript 9615-9620). She did not force her way through police or any physical obstructions when entering the Capitol building. Once inside, Ms. Watkins did not participate in any violence. While Probation alleges Ms. Watkin's assistance of a crowd in the Senate hallway and her yells of "Push! Push! Push!" evidences her participation in violence, these actions in and of themselves do not constitute violence.

2. Factors 2

Ms. Watkins has respected the law for the entirety of her life. Ms. Watkins has been compliant with pre-trial confinement. The need to protect the public from Ms. Watkins is exceedingly low considering her actions on the day in question as well as her non-existent criminal history. Additionally, Ms. Watkins understands the seriousness of the offense. This can be seen in her testimony given to the jury during trial.

While Ms. Watkins is not in need of educational or vocational treatment, she needs medical care as well as mental health treatment. Ms. Watkins is currently receiving treatment for alcohol and substance abuse, which will need to continue. Although §5H1.4 of the U.S.S.G. indicates alcohol and substance abuse is not ordinarily a reason for departure, the provision does not explicitly prohibit the Court from taking this factor into consideration. Furthermore, the need for

rehabilitation may not serve as the basis for the imposition of a lengthier prison sentence. <u>United States v. Vazquez-Mendez</u>, 915 F.3d 85, 88 (1st Cir. 2019) (*citing* <u>Tapia v. United States</u>, 564 U.S. 319, 335 [2011]).

Ms. Watkins is also in need of mental health treatment for her PTSD, anxiety, and depression diagnoses. Lastly, Ms. Watkins is still in the process of transition, which will require specialized medical treatment and maintenance of prescriptions.

3. <u>Factors 3-5</u>

While the PSR from the probation office correctly describes the range of sentences available to the Court, the PSR applies enhancements under the Sentencing Guidelines. The inapplicability of the enhancements under the Sentencing Guidelines is discussed at length in the "PSR Objections" portion of this Sentencing memorandum. Ms. Watkins incorporates those arguments herein.

4. <u>Factor 6</u>

To avoid sentencing disparities, this Court needs to prevent the Government from impermissibly circumventing the jury's findings. Here, the Government is attempting to obtain the same result in a sentence of finding Ms. Watkins guilty of Seditious Conspiracy because they failed to obtain the underlying conviction. Although Probation neglected to afford Ms. Watkins a downward departure for acceptance of responsibility, the totality of the circumstances must be examined.

Ms. Watkins participated in multiple proffer sessions with the Government, in which she noted she was willing to plead to all Counts she was indicted on but for seditious conspiracy. It is imperative to note Ms. Watkins was acquitted of the seditious conspiracy. The sentencing disparity between the ringleader of a seditious conspiracy, and a foot soldier who was acquitted of said offense would be extreme and unreasonable.

In comparing relevant sentences for this Court's consideration, Matthew Bledsoe (1:21-cr-204) was found guilty of 18 U.S.C. 1512(c), Obstruction of an Official Proceeding, among other charges. Mr. Bledsoe was sentenced to forty-eight (48) months incarceration. Scott Kevin Fairlamb (1:21-cr-120) plead guilty to 18 U.S.C. §1512(c)(2) as well as 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers. Mr. Fairlamb was sentenced to 41 months incarceration. Timothy Hale-Cusanelli (1:21-cr-37) was found guilty of 18 U.S.C. §1512(c)(2), among other charges, receiving 48 months incarceration. Douglas Jensen (1:21-cr-6) was found guilty of 18 U.S.C. §1512(c)(2) among six (6) other counts and four (4) other felony offenses. Mr. Jensen received 60 months in prison.

Here, Ms. Watkins has been found guilty of the same and similar offenses as the above defendants. By taking probation's suggestion of sentencing Ms. Watkins to a 135-168 months, this Court would create an undue sentencing disparity. Under

a plain reading of Factor 6, such a sentence is against the "need to avoid unwarranted sentence disparities."

Additional Personal History/Characteristics

In accordance with § 3553(a), Ms. Watkins requests this Honorable Court take her personal history into consideration when sentencing. Ms. Watkins was raised by exceedingly strict, religious parents. She and her younger sister were subjected to corporal punishment on a regular basis; corporal punishment that amounted to abuse. Ms. Watkins spent her childhood in dangerous environments and was exposed to used needles and stray bullets that pierced her home.

The family's religious background led Ms. Watkins to struggle with accepting herself and her gender identity. Her gender identity impacted her career path; while she strived to be a successful soldier in the Army, she was subject to ridicule and harassment. Following her discharge, Ms. Watkins struggled to maintain a consistent home and employment. She spent the bulk of her adult life bouncing around the east coast as she could not return home given her parents' lack of support for her transition and their lack of contact for upward of fifteen (15) years. Ms. Watkins has struggled with mental health, substance abuse issues, and self-harm throughout the entirety of her life. She has actively sought treatment for each of these issues and continues to do so during incarceration.

§5H1.11 of the U.S.S.G. discusses the consideration of military service in a sentencing factor. As established in <u>Porter</u> "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service" <u>Porter v. McCollum</u>, 130 S.Ct. 447, 455 (2009). Like <u>Porter</u>, the fact Ms. Watkins went AWOL should not reduce the consequential impact her service had on her life. As previously discussed, Ms. Watkins's AWOL status was resultant of harassment, bullying, and threats she endured because of her gender identity. The fact she went AWOL should not permit her time in the service to be discounted. Ms. Watkins strived to serve her country and others but was unfortunately inhibited from achieving this lifelong dream simply because of who she is.

These personal considerations should be factored into determining her sentence.

WHEREFORE, in light of the foregoing, Ms. Watkins respectfully requests that this Honorable Court take into consideration the above requests prior to

imposing her sentence. The Court should consider Ms. Watkins's personal

circumstances. Ms. Watkins should be sentenced in accordance with the parsimony

provision of § 3553: sufficient, but not greater than necessary to meet the

sentencing goals of the statute.


Respectfully submitted,

CRISP AND ASSOCIATES, LLC


Date: 5 May 2023          /s/Jonathan W. Crisp
                          Jonathan W. Crisp, Esquire
                          4031 North Front St.
                          Harrisburg, PA  17110
                          I.D. # 83505
                          (717) 412-4676
                          jcrisp@crisplegal.com
                          Attorney for Defendant