UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:22-cr-15 |
| | : | |
| V. | : | |
| | : | |
| JESSICA WATKINS | : | |

**Defendant Watkins' Reply Brief**

I. **The "administration of justice" enhancements should not apply**

<u>The 2J1.2(b)(2) adjustment for substantial interference does not apply</u>

Like the injury and property damage adjustment, Section 2J1.2(b)(2) does not apply to *every* January 6 defendant. It only applies if the relevant conduct of *these* defendants resulted in the "unnecessary expenditure of substantial governmental or court resources." *Id*. This is an individual, not a collective, question. The defense does not contest that "[t]he events of January 6" as a whole resulted in substantial expenditures, including "damages…[to] the U.S. Capitol totaling more than $2.8 million." Gov't Mem. at 38. But there is no genuine dispute that the Oath Keepers did not personally take part in any property damage. Likewise, "the evacuation of hundreds of lawmakers and the suspension of the certification proceedings," *id*., was not caused by these defendants, but by initial breachers who apparently acted in

accordance with a preestablished plan.[1] Nor did these defendants "substantial[ly]" delay the reentry of Congress. §2J1.2(b)(2). None were in the building for more than 12 to 20 minutes, they exited without significant resistance, and they were far from the last to remain in the building. Simply put, this enhancement should be reserved for defendants who conduct was most responsible for the expense of January 6 either because they acted first, delayed things the longest, or contributed to particular damage. The Oath Keepers did none of those things.

## II. The offense conduct does not qualify as "terrorism" under §3A1.4, cmt. n.4

The government requests a four-level upward departure for "terrorism" under §3A1.4, cmt. n.4 ("Note 4"). Gov't Mem. 56. Note 4 provides for a discretionary departure where the "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." §3A1.4, cmt. n.4. The government misunderstands the meaning of "terrorism" and Note 4, however. By its terms, Note 4 applies when an offense (like a kidnapping or bombing) is committed for the "calculated" purpose of derivatively influencing government conduct, §3A1.4, cmt. n.4; it does not encompass situations where

---

[1] The government attempts to justify the defendants' personal responsibility for the substantial expenditure of resources by arguing that "[d]efendants…were unlawfully on the Capitol grounds before the Senate went into emergency recess at 2:13 p.m., and…before the House went into emergency recess at 2:29 p.m." Gov. Mem. 39. But the testimony of Congressional staff established that it was the presence of rioters "in the building," *id.*, that required the recesses. *See* 10/26/22AM Tr. at 5428–29 (Hawa); 1/6/23AM Tr. at 3315–18, 3352-55 (Fleet).

offense conduct (like interrupting a proceeding) *directly* achieves the ends of the completed offense itself (*e.g.*, interrupting the proceeding), without any further need to influence the government. This derivative, "calculated" requirement, *id.*, is the essence of "terrorism."

A hypothetical involving animal rights activists illustrates this distinction. Suppose a group of activists, driven by sympathy for a chimpanzee being used for medical experimentation at a government facility, raids the facility and directly frees the chimp by force. Even though this crime would involve the direct application of coercive force on the government, the force directly achieves its ends, and is not "calculated" to intimidate or coerce the government to take some action. Thus, Note 4's terrorism departure would not apply. However, it would apply if the activists planted a bomb on a bridge and threatened to detonate it if the facility did not end animal experimentation and free the chimpanzee. In that case, the offense conduct (planting a bomb) would be calculated to coerce or intimidate the government into altering its policy.

Missing this distinction, the government spends much of its argument disproving its case by recounting the intent reflected in the jury verdicts. As recounted by the government, the jury found that the defendants agreed (1) *directly* "to use force to prevent, hinder, or delay the execution of the laws governing the presidential transfer of power," (2) *directly* "to obstruct or impede the certification

proceeding" by force; and (3) "to use 'force' or 'intimidation' to [*directly*] stop Members of Congress from discharging their duties." Gov't Mem. 59–60. As this language reflects, the defendants did not commit a separate crime to intimidate Members of Congress to change their votes or policies, but to directly stop the proceeding altogether—the completed crime of § 1512(c). In the words of Connie Meggs, as recited by the government, "'everyone went to the capital to stop the vote,'" *id*. at 53 (quoting Gov. Ex. 6734 (Msg. 2400.T.3.34)—not to commit offenses "calculated" to intimidate or coerce Congress members to alter their votes by, say, upholding objections they otherwise would have overruled. That is the equivalent of animal rights activists forcibly imposing their will in freeing a government-owned chimp—a crime, but not one that matches the definition of "terrorism" under Note 4.

The cases cited by the government (at 57–70) further illustrate this requirement of a calculated, derivative purpose for the defendant's offense conduct:

- In *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009), the defendants committed crimes to "save the earth" and for "the purpose…[of] further[ing] [their] political agenda: the end to industrial society." Gov't Mem. 58.

- In *United States v. Wright*, 747 F.3d 399, 410 (6th Cir. 2014), members of the "Occupy Cleveland" movement plotted to bomb a bridge in order to "prompt [government agencies] to take heightened security measures." Gov't Mem. 59. They did not plot to bomb the bridge merely because they directly opposed the bridge's existence and wanted to remove it.

- In *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021), the defendant had a "plan to burn down buildings in a Muslim community, seeking to 'set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to' the defendant's planned attacks, 'or to give in and capitulate.'" Gov't Mem. 66 (quoting ECF 343 at 6, No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020). He did not merely intend to commit arson for arson's sake.

- In *United States v. Patrick*, No. 16-cr-51- BR-9 (D. Or. Feb. 18, 2018), the defendant "block[ed] the entrance of personnel from the Fish and Wildlife Service and other federal agencies" with the "aim[] to…'compel the release of two other ranchers who had been convicted of arson on federal land.'" Gov. Mem. 67 (quoting Sent. Tr. at 43-45). He did not simply wish to trespass on and control federal land.

- In *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd, United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds* in 333 F. App'x 213 (9th Cir. 2009), the defendant conspired "to commit vandalism and arson of SUVs in connection with environmental extremist organization." Gov't Mem. 68. He did not simply enjoy the crime of vandalism, but sought through it to intimidate and retaliate against those perceived as harming the environment.

- In *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd, United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005), the defendant "planned [the] bombing of abortion clinics…to dissuade doctors from performing abortions." Gov't Mem. 68. He did not simply want to render particular clinics inoperable.

- In *United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1-5, the defendant was "convicted of attempted arson of a synagogue." Gov. Mem. 68. He was not simply a pyromaniac or someone who wanted a specific plot of land cleared, but intended through arson to intimidate the Jewish people.

In each of these cases, the offense conduct was calculated to achieve a broader goal through intimidation. By contrast, as the government concedes, courts in this District have declined to apply an upward terrorism departure under Note 4 in January 6

cases where even extremely violent conduct was a means of *directly* stopping the certification, not derivatively obtaining a change of government policy by committing some other crime. *See United States v. Gardner*, No. 21-cr-622; *United States v. Judd*, No. 21-cr-40; *United States v. Wright*, No. 21-cr-341; *United States v. Reffitt*, No. 21-cr-32.[2]

Like those in *Gardner*, *Judd*, *Wright*, and *Reffitt*, the defendants here were convicted of taking direct action to forcibly stop Congress from proceeding with the certification. They allegedly did so *not* as a means of intimidating the government into altering its policy or taking some further action, but because the certification was the direct means by which Joseph Biden became the President-Elect under the Twelfth and Twentieth Amendments—something they wanted to stop. This kind of direct action against the government violated § 1512(c) and other statutes protecting government officers; but it was not a form of "calculated" terrorism under Note 4.

---

[2] As the government explains,

> Gardner sprayed a bottle of OC spray at the guarding officers and Judd throw a lit firecracker into the tunnel, endangering the officers and others there. The defendant in *Wright* pushed a metal barricade against officers at the east front of the Capitol grounds, before entering the building. In *Reffitt*, the defendant was one of the first to storm up the west terrace steps, charging towards law enforcement with a holstered pistol….

Gov't Mem. 70. In all of these cases of violent conduct against government officials, the defendants "made statements indicating their intent to disrupt and even overthrow Congress," *id.*; but they committed the violence in a direct attempt to stop the certification, not as acts of intimidation to coerce some change in government policy.

Recognizing that this and other courts in this District have declined to apply the discretionary upward departure it seeks, the government argues that the defendants in those cases "did not engage in the same level of organizational planning or action as any of these defendants and their Oath Keepers co-conspirators." Gov. Mem. 70. But purpose, not planning, is the focus of Note 4; and as the government concedes, "the defendants in *Gardner*, *Wright*, *Judd*, and *Reffitt* made statements indicating their intent" was the *same*: "to disrupt and even overthrow Congress by force." *Id*. Moreover, the government's attempt to invoke "planning" as a distinction fails, because, as discussed above, the Oath Keepers' planning related to security details. Ex. EV 13. Their later decision to join the crowd attacking the Capitol was utterly unplanned, with leaders like Rhodes and Greene caught off guard without equipment and without knowing where other Oath Keepers (including themselves) were. For all these reasons, the discretionary upward departure in Note 4 does not apply to the defendants' offense conduct, and would result in an unwarranted departure even if it did.

### III. No other upward departures are warranted

Finally, the government seeks upward departures under §5K2.7 (Disruption of Governmental Function); §5K2.0(a)(3) (Circumstances Present to a Degree Not Adequately Taken Into Consideration); and §5K2.6 (Weapons). For §5K2.7, the government concedes that this provision does not usually apply to crimes that by

their nature disrupt government functions, such as "'obstruction of justice.'" Gov. Mem. 71 (quoting §5K2.7). That makes sense, since upwardly departing in such cases would essentially be double-counting. To get around this, the government argues that the certification is "unusual" because it is "integral to our democracy and is mandated by the Constitution." *Id*. But uncorrupted, unobstructed Article III courts are also integral to our constitutional system. And in any event, the government made the same argument to justify the 3-level enhancement for "substantial interference" under §2J1.2(b)(2), Gov. Mem. 36–37. Thus, to the extent the Court applies that enhancement, any "unusual circumstances" have already been taken into account through a 3-level increase in the offense level.

The government also asks for an upward departure under §5K2.0(a)(3) (Circumstances Present to a Degree Not Adequately Taken Into Consideration) to reflect the defendants' "'intent to frighten, intimidate, and coerce'" federal lawmakers. Gov. Mem. 73 (quoting *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008)). But again, "threats" to lawmakers were used by the government to justify an extraordinary 8-level increase in the offense level under §2J1(b)(1)(B). *Id*. at 35. Although the defense maintains that this enhancement should not apply, to the extent that it does, its 8-level increase more than adequately takes into consideration the circumstances of the offense cited by the government, so no further upward departure would be justified. Indeed, this same guideline

provision, §5K2.0(a)(3), also permits courts to depart *downward* where the circumstances addressed in the other provision were "substantially below that which ordinarily is involved in that kind of offense." Thus, if the Court increases the base offense level by 8 levels under §2J1(b)(1)(B) based on property damage or injuries caused by other rioters in the vicinity of these defendants, and to which these defendants merely contributed to by their presence, the Court should use §5K2.0(a)(3) to depart downward towards a more reasonable offense level adjustment that adequately accounts for the Oath Keepers' minimal time in the building (12 to 20 minutes), lack of causing any direct property damage, apparent assistance to Officer Dunn (according to Caleb Berry), and lack of causing any direct physical injuries.

Finally, the Court should reject the government's request for a discretionary upward departure under §5K2.6 (Weapons). The government claims that "the conspirators' staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River means they 'used or possessed' weapons to obstruct Congress…." Gov. Mem. 72 (quoting §5K2.6). On the contrary, however, the uniform evidence established that firearms brought to Virginia by individual Oath Keepers and left at the "QRF" had no offensive purpose and were never intended to be used as part of any plan to attack the Capitol. Rather, the uniform evidence established the QRF was only intended to save lives in an emergency or in service

of the government if President Trump invoked the Insurrection Act, and played no role in the offense conduct.

This uniform evidence includes: (1) testimony of cooperating witnesses, including Graydon Young, Caleb Berry, and Brian Ulrich; (2) testimony of uncharged witnesses such as John Zimmerman and Joe Herrington; (3) documentary evidence discussing the planning of the January 6 QRF, including references to saving lives and extracting people; and (4) documentary evidence of QRFs in other operations discussing an extraction purpose. Although the government incessantly refers to Vallejo's offers of help, *one* of which used the term QRF, Vallejo never touched any weapons, much less loaded them onto his trucks for use at the Capitol. *See* Vallejo Sent. Ex. 1 at 2 (Letter of Kelly Carter); Sent. Ex. 3 (Grand Jury Testimony of Kelly Carter). At the very least, the government has not proven a factual basis for this departure by a preponderance of the evidence.

And again, the government already invoked the firearms at the QRF to justify application of an extraordinary 8-level increase in the offense level based on "threats" under §2J1.2(b)(1)(B). Gov. Mem. 35–36. The defense maintains that this enhancement should not apply, but to the extent that the Court does apply it, no further increase under §5K2.6 is warranted.

Defendant Watkins further joins in and adopts those arguments posited by Edward Vallejo at document number 576. For the foregoing reasons and for those listed in the defendant's objections to the PSR and the sentencing memorandum, the defense submits a sentence consistent with an offense level of 21 or 19 after calculation of her acceptance and extensive cooperation is taken into account is more appropriate.

Respectfully submitted,
CRISP AND ASSOCIATES, LLC

Date: 11 May 2023

/s/Jonathan W. Crisp
Jonathan W. Crisp, Esquire
4031 North Front St.
Harrisburg, PA  17110
I.D. # 83505
(717) 412-4676
jcrisp@crisplegal.com
Attorney for Defendant