### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **ELMER STEWART RHODES III,** **KELLY MEGGS,** **KENNETH HARRELSON,** **JESSICA WATKINS,** **ROBERTO MINUTA,** **JOSEPH HACKETT,** **DAVID MOERSCHEL, and** **EDWARD VALLEJO,** | **Case No. 22-cr-15-APM** |
| **Defendants.** | |

### <u>UNITED STATES BRIEF REGARDING RESTITUTION</u>

When thousands of persons stormed the United States Capitol Building on January 6, 2021 in an attempt to prevent the Constitutionally mandated transfer of Presidential power, they overwhelmed the severely outnumbered United States Capitol Police officers, thinning their ranks as they tried to hold back the mob. These nine defendants joined the riotous attack, and their offenses of conviction contributed to the harm inflicted upon the officers and property. It matters not whether they personally damaged or stole property, or whether they personally injured any of the hundreds of police officers who had to seek medical treatment. Those who actually damaged property and injured police officers could not have done so without the weight of the mob behind them, and the building could not be secured until every last rioter was removed. Amid the violent Capitol attack, these defendants reasonably foresaw the likelihood of damage to the Capitol building and injuries to the police officers who were guarding it that day. Their offenses proximately caused injury to police officers and damage to property, so they are liable for restitution under either or both the Victim Witness Protection Act, 18 U.S.C. § 3663, and the

Mandatory Victim Protection Act, § 3663A. Finding otherwise would effectively render the victims of January 6 incapable of being made whole.

Because many actors with divergent roles in the riot converged to cause victims' injuries, all convicted January 6 defendants are liable for restitution amounts that reflect their relative role in causing the victims' losses. The way the January 6 defendants caused losses to the victims may be unique in many respects, but the need to provide restitution to victims, indeed the Congressional mandate to do so in many cases, is clear. Case law resoundingly reflects the overarching principle that analytical difficulties in defining causation or apportioning damages should not prevent courts from making victims whole. So, to reflect the incremental damage all January 6 defendants proximately caused, the government has requested, defendants have agreed, and courts have imposed (in hundreds of cases) $2,000 in restitution for felony defendants and $500 for misdemeanor defendants, plus any sums from damage each defendant personally caused.

All eight defendants in this case, therefore, should be ordered to pay some amount in restitution for their roles in contributing to the riot and the harm they proximately caused to the victims. For most of the defendants, the government submits that the standard $2,000 is a reasonable and appropriate amount. Certain defendants, however, including Stewart Rhodes and Kelly Meggs, are responsible for incrementally more harm than others. Both of these defendants organized and directed multiple coconspirators on January 6, ordering them or leading them into the Capitol and adding to the size and damage of the riot with not just themselves but others they controlled. Indeed, Rhodes conspired with and ordered at least twenty individuals into the building through his deputies and Signal group chats, and Kelly Meggs followed that order and led thirteen of those individuals into the building himself. As described below, in addition to their own $2,000 fair share of restitution, both should be held liable for that amount multiplied by the number of

individuals they ordered or led into the riot and Capitol—that is $42,000 for Rhodes and $28,000 for Kelly Meggs.

> **A.**    **Factual Summary: These Defendants Committed Offenses that Harmed Victims.[1]**

On January 6, when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes sent out a call to action to his coconspirators. They complied. Kelly Meggs, leading defendants Joseph Hackett and David Moerschel and other coconspirators, joined other rioters at the Capitol using their hands, flags, and chemical spray to assault the United States Capitol Police (USCP) officers guarding the Capitol doors to force entry, causing considerable damage. Once inside the building, several of the coconspirators joined the mob moving towards the Senate Chamber. Only by deploying chemical spray in the Senate Hallway were Metropolitan Police Department (MPD) officers able to repel the rioters and hold their line. Meanwhile, other conspirators, including defendants Kelly Meggs, Hackett, and Moerschel, pushed into the House side of the building in search of Speaker of the House Nancy Pelosi where they confronted additional USCP officers.  Soon after, Roberto Minuta and his coconspirators, wearing protective vests and goggles, joined the mob outside the Capitol. They eventually breached the Capitol through the same East Rotunda doors, pushed against a line of MPD officers, and were eventually pushed out of the Rotunda by officers who had to deploy chemical spray inside the Capitol.

---

[1] The facts across both trials are described in detail in the government's oppositions to the defendants' motions for judgments of acquittal and new trials, ECF 383, 440, 441, 442, 517, 540, and the government's sentencing memorandum and reply, ECF 565 and 580.

**B.    Restitution under the VWPA and MVRA Is Appropriate to Compensate the Victims[2] for Harm January 6 Defendants Have Caused.**

Under both the VWPA and MVRA, Congress has given the courts broad discretion to craft restitution orders that fully compensate crime victims while recognizing defendants' varying degrees of culpability. Because the January 6 cases involve the related criminal conduct of hundreds of defendants, all of whom proximately caused loss to the victims, the courts can allocate restitution based on incremental culpability and, in the conspiracy cases, impose joint and several liability. Critically, because most, if not all, January 6 defendants proximately caused harm to the victims in this case, restitution ought to be imposed regardless of whether a defendant personally injured a police officer or damaged property. The United States has generally sought $2,000 in restitution from felony defendants and $500 from misdemeanor defendants. These numbers are based on an estimate of the damage to the Capitol and compensable expenses to injured officers divided by the estimated number of felony and misdemeanor defendants prosecuted for the January 6 events.

**1.    The VWPA Permits Restitution for Title 18 Offenses, and the MVRA Requires Restitution for Some Offenses that are Crimes of Violence or Property Offenses.**

Restitution seeks to make crime victims whole. It's purpose is to provide recompense for harm that convicted criminals have inflicted upon victims and put them in the place, at least

---

[2] The victims here are the Architect of the Capitol, the federal agency charged with operating and maintaining the physical and esthetic integrity of the Capitol Building and Grounds, the House Chief Administrative Officer, the Secretary of the Senate, the Senate Sargent at Arms, and the United States Capitol Police Department, several hundred of whose officers were guarding the Capitol Building and Grounds on January 6 when they suffered physical and/or emotional injuries as a direct result of the riot. *See* 18 U.S.C. § 3664(i) (authorizing restitution to federal agencies). The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is a victim under the analysis set forth above. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as discussed in this memorandum. However, in consultation

financially, where they stood before they were victimized. *See Paroline v. United States*, 572 U.S. 434, 456 (2014) ("The primary goal of restitution is remedial or compensatory."); *Dolan v. United States*, 560 U.S. 605, 612 (2010) (the MVRA "seeks primarily to ensure that victims of a crime receive full restitution"). But a federal court possesses no "inherent authority to order restitution," and can impose restitution only when authorized by statute. *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012).

Two general restitution statutes authorize sentencing courts to compensate crime victims. The Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663, "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). And the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires restitution for a subset of crimes covered in the VWPA. *Id.* The applicable procedures for restitution orders under these two statutes is found in 18 U.S.C. § 3664. 18 U.S.C. § 3663(d) (VWPA); 18 U.S.C. § 3663A(d) (MVRA). *See also* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (interpreting the MVRA). Both define a victim as "a person directly and proximately harmed as a result of" the offense of conviction. 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2) (MVRA). Both identify similar covered costs, including lost property and certain expenses from bodily injury. § 3663(b)

---

with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

(VWPA); § 3663A(b) (MVRA). And under both statutes, the government must establish the amount of loss suffered by the victim by a preponderance of the evidence. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

To determine whether a criminal defendant bears responsibility for the harm the offense caused, the relevant inquiry is the scope of the defendant's offense conduct and the harm the victim suffered as a result. *See Hughey,* 495 U.S. at 413 (Congress "authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction"). Broader restitution is permitted where the offense of conviction contains as an element a scheme, conspiracy, or pattern of criminal activity, 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2) (MVRA), or if a plea agreement allows for a greater amount. *United States v. Thomas*, 862 F. Supp. 2d 19, 21 (D.D.C. 2012).

Significantly for the January 6 cases, a "reasonable estimate" or reasonable approximation of loss is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *see also Paroline*, 572 U.S. at 459 (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry"). "The determination of an appropriate restitution amount is by nature an inexact science." *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993). "[W]here the precise amount [of restitution] owed is difficult to determine, 18 U.S.C. § 3664 authorizes the court to reach an expeditious, reasonable determination

of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." *Id.* (citing S. Rep. No. 532, 97th Cong., 2d Sess. 31, reprinted in 1982 U.S. Code Cong. & Admin. News 2515, 2537) (cleaned up).

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 (or certain other offenses inapplicable here). 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must consider the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, the MVRA requires imposition of full restitution without respect to a defendant's ability to pay. § 3664(f)(1)(A); *see United States v. Ghuman*, 966 F.3d 567, 580 (7th Cir. 2020) (explaining that "the MVRA elevates the victim's right to full restitution over the defendant's ability to pay").

### 2. The Defendants' Offenses Warrant Restitution Because They Proximately Caused the Victims' Harm.

Restitution recompenses victims for the harm a defendant's offense causes. *United States v. Simon*, 12 F.4th 1, 65 (1st Cir. 2021) (cleaned up) ("Every loss that factors into the restitutionary amount must have an adequate causal link to the defendant[s'] criminal conduct."). These defendants are convicted of crimes that, at a minimum, are covered by the VWPA if not also by the MVRA.[3] Both restitution statutes require that the offense *proximately* cause the victim's harm.

---

[3] All offenses charged in the January 6 cases, save for those under 40 U.S.C. § 5104 (unlawful activities in the Capitol and grounds), are Title 18 offenses that fall under the discretionary restitution provisions in the VWPA. A subset of these crimes also falls under the mandatory restitution provisions in the MVRA, which applies to crimes of violence and property offenses. For example, January 6 defendants have regularly been charged with crimes of violence under 18 U.S.C. § 1752(a)(4) (physical violence against person or property in any restricted building on

*See* 18 U.S.C. § 3663(a)(2) (VWPA defines "victim" as one who is "directly and proximately harmed as a result of the commission of an offense"); 18 U.S.C. § 3663A(a)(2) (MVRA's same language).

The January 6 cases present a relatively common restitution question about proximate causation—how to recompense victims for their losses where multiple defendants' actions have caused harm. Although the absence of a particular defendant, or even dozens of defendants, from the mob of rioters may have made little difference to the damages caused by the riot, that does not mean that any particular rioter may avoid restitution liability because his personal contribution to the aggregate loss is *de minimis*. If that were so, most rioters would escape restitution altogether. Given the broad compensatory goals of the restitution statutes, Congress could not possibly have intended that a massive, unprecedented riot causing millions of dollars of loss would not trigger *any* restitution from those who criminally participated.

The Supreme Court confronted an analogous issue in *Paroline*. The defendant was one of many, perhaps thousands, of individuals who possessed the child victim's pornographic images,

---

Capitol grounds) and 18 U.S.C. § 111(b) (assault on an officer or official with a deadly or dangerous weapon or that causes bodily injury). *See* § 3663A(c)(1)(A)(i) (incorporating the definition of "crime of violence" under 18 U.S.C. § 16(a)). *See also United States v. Williams*, 353 F. Supp. 3d 14, 19 (D.D.C. 2019) (applying the categorical approach to determining whether an offense is a crime of violence under 18 U.S.C. § 3663A(c)(1)(A)(i)).

January 6 defendants also have regularly been charged with offenses against property. Unlike the categorical approach that applies to crimes of violence, in determining whether an offense is against property, "courts may consider the facts and circumstances of the crime that was committed." *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020). *See United States v. Collins*, 854 F.3d 1324, 1334 (11th Cir. 2017) (rejecting "a categorical approach" to property offenses); *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017) (same); *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013) (same). In the context of the January 6 Capitol riot, property offenses may include 18 U.S.C. § 1752(a)(1)-(3) (entering or remaining in restricted buildings or grounds and obstructive conduct inside), 18 U.S.C. § 641 (theft of public money or property), 18 U.S.C. § 1361 (destruction of government property).

and the victim sought restitution from the defendant in the full amount of her damages. *Id.* at 449. Interpreting a restitution statute for child pornography offenses that shares the same causation language as the VWPA and MVRA, the Supreme Court held that restitution is available "only to the extent the defendant's offense proximately caused a victim's losses." *Paroline*, 572 U.S. at 448 (interpreting restitution under 18 U.S.C. § 2259). Proximate cause, the Court explained, is "a flexible concept that generally refers to the basic requirement that there must be 'some direct relation between the injury asserted and the injurious conduct alleged." *Id*. at 444 (cleaned up). "A requirement of proximate cause thus serves, *inter alia,* to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* at 445.

The Court then addressed the "difficult question" of how to determine what losses a defendant had caused. *Id.* at 449. The Court recognized that strict but-for causation—the traditional causal requirement—cannot be established when a victim's images are widely distributed across the internet: "Even without [the defendant's] offense, thousands would have viewed and would in the future view the victim's images, so it cannot be shown that her trauma and attendant losses would have been any different but for [the defendant's] offense." *Id.* at 450. Yet the Court refused to deny restitution on that ground, explaining that "there can be no doubt Congress wanted victims to receive restitution for harms like this." *Id*. at 457. "While it is not possible to identify a discrete, readily definable incremental loss [the defendant] caused, it is indisputable that he was a part of the overall phenomenon that caused [the victim's] general losses." *Id*.

The Supreme Court elaborated that while "[e]very event has many causes, . . . only some of them are proximate, as the law uses that term." *Id*. at 444. Proximate cause requires that an event be both "an actual cause or cause in fact" and "that there must be some direct relation between the

injury asserted and the injurious conduct alleged." *Id.* (cleaned up). "Proximate cause is often explicated in terms of *foreseeability or the scope of the risk created by the predicate conduct*." *Id.* at 445 (emphasis added).

Requiring strict "but for" causation in Paroline's case inadequately captured his responsibility for the victim's harm. The victim's losses (as here) were caused by the aggregate criminal conduct of an unknowable number of offenders, and the government was generally unable to demonstrate that any individual defendant's offense conduct was a cause in fact of the victim's loss. To address the statutory command that a defendant whose criminal conduct contributed to the loss must pay restitution, the *Paroline* Court addressed "aggregate causation theories," which hold that "when the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." 572 U.S. at 451 (cleaned up). The theory posits that "a wrongdoer's conduct, though alone insufficient to cause the plaintiff's harm, is, when combined with conduct by other persons, more than sufficient to cause the harm." *Id*. at 452. Such "aggregate causation theories … are []relevant to determining the proper outcome in cases like this." *Id.* at 456. So where a defendant's criminal conduct contributes, even minimally, to "the victim's general losses," he proximately caused that loss even if "it is not possible to identify a discrete, readily definable incremental loss he caused." *Id*. at 456-57. "[W]here it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court … should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id*. at 458.

The *Paroline* Court recognized that "[t]his approach is not without its difficulties," "involv[ing] discretion and estimation." *Id*. at 462. But the Court emphasized that "[d]istrict courts routinely exercise wide discretion both in sentencing as a general matter and more specifically in fashioning restitution orders," and recognized that courts "can only do their best to apply the statute as written in a workable manner." *Id*. As a result, the Court explained, there can be no "precise algorithm" for computing individual restitution awards. *Id*. at 459-60.

The same principles apply here.  As in *Paroline*, it is impossible to trace a particular amount of losses to these defendants' offense conduct by recourse to a more traditional causal inquiry, but the defendants' offenses still proximately contributed to the losses the victims suffered. When properly aggregated, each January 6 defendant's conduct was a proximate cause of the losses sustained during the Capitol breach. Whether any one defendant personally hit an officer or broke a window, they were part of a collective whole that overran the outnumbered officers stationed at the Capitol, dissipating their lines, and giving others the opening to hit and break throughout the building. Whereas an individual trespasser, acting alone or in a small group, might not reasonably foresee that his trespass would lead to destruction and injury, it was reasonably foreseeable for such trespass in the context of January 6 to result in the damages that occurred. The police officers sought to protect the Capitol not from a single trespasser, not from several, and not even dozens, but from thousands, all of whom contributed incrementally to the harm which, in the aggregate, harmed multiple victims. Each defendant's own conduct played a part in the causal process, and each defendant is responsible for the foreseeable "consequences and gravity" of that conduct. *Paroline*, 572 U.S. at 462. Even if any one defendant's role in the overall causal process may be relatively small, that fact does not prohibit restitution outright—it just means that their share should be relatively smaller.

Many judges of this Court have properly embraced this legal liability in the context of deciding various other motions, utilizing the same type of analysis authorized by the Supreme Court in the context of restitution. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK) dkt. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions); *id*. ("Indeed, even the presence of one unauthorized person in the Capitol is reason to suspend Congressional proceedings"); *id*. at 12 ("the law permits the factfinder to infer that a person intends the natural and probable consequences of their actions . . . As Captain Mendoza aptly explained, the probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings."); *United States v. Grider*, 21-cr-22 (CKK), dkt. 150 at 24 (same); *United States v. MacAndrew*, 21-cr-730 (CKK), dkt. 59 at 14 (same); *United States v. Griffith*, 21-cr-244 (CKK), dkt. 142 at 12 (same); *United States v. Alford*, No. 21-cr-0263 (TSC), Tr. Oct. 4, 2022, pp. 747-48 ("Judge Kollar-Kotelly's analogy to "raindrops in a flood" made as part of our conclusions of law and facts in *United States v. Rivera*, is particularly apt. [The defendant] may have just been one of many people in the Capitol that day, and he may not stand accused of any violent conduct, but his presence was an aspect of the disorder and disruption of the Capitol on January 6. . . . And as Lieutenant McCree testified, the Electoral College vote-counting process was, in fact, disrupted by the continued presence of [the defendant] and others in the Capitol. It could not continue until he and everyone else not authorized to be

there that day were cleared from the premises."); *United States v. Chan*, No. 21-cr-00668 (TNM), Tr. Jan. 24, 2023, pp. 15-16 ("Of course, part of the danger of mobs is the sheer volume of people. Had [the defendant] or any one of his fellow rioters been in the Capitol alone, they could have quickly been dealt with by the police. [The defendant] by his presence and actions was also acting to protect and insulate the other rioters from arrest."); *United States v. Speed*, No. 22-cr-244 (TNM), Tr. Mar. 7, 2023, p. 11) ("First, I think the defendant did engage in disruptive conduct. I make this finding not based on any shouting or other notable actions by the defendant alone, but, rather, for his knowing and intentional participation in a mob that broke into the Capitol. As I see it, even though his conduct in isolation wasn't terribly disruptive, a mob in the Capitol is almost inherently disruptive, and the defendant intended this disruption by joining that mob."); *United States v. Brock*, No. 21-CR-140 (JDB), ECF 81 at 8-9 (Tr. p. 393-94, transcript of ruling on Rule 29 motion; adopting reasoning in *Rivera*), and at ECF 81 at 12 (Tr. p. 397) ("In any event, '[t]he law permits the factfinder to infer that a person intends the natural and probable consequences of their actions.' That's from *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010), and it is reasonable that [the defendant] would have expected that breaching the Capitol building during the election certification proceedings would cause those proceedings to halt during the period in which there were unauthorized people, many people, including himself, within the Capitol building roaming the halls of the Capitol and at the locations of events that were to take place in the Capitol in the context of certification of the election proceedings.").

All in all, *Paroline*'s proximate cause analysis recognizes aggregate causation where many defendants incrementally and foreseeably cause harm. *Paroline* involved a group of temporally and physically distinct criminal actors, each of whom harmed the victim in a reasonably foreseeable way. The January 6 defendants are criminal actors who were *not* temporally or

physically remote from each other, but instead acted in concert as a mob to cause disruption, which reasonably foreseeably led to harm and damage. Providing compensation to the victims harmed by their concerted action is in keeping with *Paroline's* pragmatic view of proximate cause. And, to be clear, in cases where individual defendants caused a direct harm—like breaking a window or medically incapacitating a law enforcement officer—the government appropriately seeks a larger share of fault. Nevertheless, on a macro level, imposing restitution in every case is recognition that the offenses perpetrated by individual defendants caused at least an incremental amount of harm.

### C.    Courts Have Ordered Hundreds of January 6 Defendants to Pay Restitution.

Just as the *Paroline* Court concluded that individual defendants should be responsible for a share of the victim's total loses, the January 6 defendants are responsible for their fair share of restitution. And just as the *Paroline* Court approved "rough guideposts" for trial courts to follow in determining a perpetrator's "relative causal role" in a victim's injury, 572 U.S. at 460, so too should the court here.

The D.C. Circuit considered how to apply those guideposts in *United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019). *Monzel*, like *Paroline*, involved restitution for the victim of child pornography under § 2259. *Id*. The D.C. Circuit affirmed the district court's award of $7,500 in restitution toward more than $3 million total loss, by a single defendant who possessed a single pornographic image of the victim. *Id*. And, like *Paroline*, the *Monzel* Court approved restitution even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm." *Id*. at 477. In setting the restitution amount, the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment." *Id*. at 485.

Ultimately, the restitution award was permissible because it "reflect[ed] a reasonable exercise of discretion guided by *Paroline* guideposts." *Id.*

Here the United States has sought $2,000 in restitution from felony defendants and $500 from misdemeanor defendants whether or not they actually injured a police officer or damaged property, because, regardless, they proximately contributed to the damages the victims in this case suffered. These numbers are based on damages to the Capitol and compensable expenses to injured officers divided by the early estimated number of misdemeanor and felony defendants responsible for the losses caused by the riot. When the United States can prove that a particular defendant in fact injured an officer or damaged property, the actual amount of those damages has been added to the baseline $2,000/$500 figures. *See Monzel*, 930 F.3d at 478 (explaining that where a defendant was not substantially more involved in causing compensable loss than most others "his relative share of restitution should not be severe, but neither should it be token or nominal. Instead, it should be reasonable and circumscribed") (cleaned up).

This restitution approach is a reasonable estimate based on the total loss to the U.S. Capitol and its protecting agencies and the number of defendants the government anticipated it may charge based on the projected numbers of those who illegally trespassed. Realistically, and perhaps importantly, the $2,000/$500 restitution paradigm will not currently exceed the total losses. In other words, if every person currently charged paid their restitution dues, it would not exceed the $2.9 million loss incurred by Congress. This approach thus seeks a reasonable extrapolation that does not exceed what any restitution statute authorizes.

**Damages to the Capitol Building and Grounds**

| Architect of the Capital | $1,177,254.03 |
|---|---|
| House Chief Administrative Officer | $547,411.27 |
| Secretary of the Senate | $32,075.00 |
| Senate Sargent at Arms | $79,490.05 |
| Total | $1,836,230.35 |

**Damages Incurred by the United States Capitol Police Department**

| Continuation of Pay (COP)/Workers Comp and Medical Treatment | $1,045,129.80 |
|---|---|
| Lost and Damaged Property | 41,719.90 |
| Total | $1,086,849.70 |

**Total[4]**

| Total for both groups | $2,923,080.05 |
|---|---|

Courts across this district have imposed restitution in this way in hundreds of misdemeanor and felony cases to date, totaling at least $471,000 in approximately 516 individual cases. And in many of these cases, courts have explicitly recognized that a single defendant's offense conduct contributed to the mob's success. Below is a sampling of comments from judges emphasizing the collective action of January 6 defendants and also their liability for restitution even if they were not directly responsible for property damage or personal injury:

1.  *United States v. Rubenacker*, (1:21-cr-193) Tr. 05/26/2022 at 146-47 (J. Howell): Where, as here, the case involves the related criminal conduct of multiple defendants, the procedures for awarding restitution under both the MVPA and the VWPA allow the Court discretion to hold the defendants jointly and severally liable for the full amount of restitution or apportion restitution and hold the defendant responsible only for his own individual contribution to the victim's loss.

2.  *United States v. Griffin,* (1:21-cr-0092) Tr. 06/17/2022 at 41 (J. McFadden): While there's no evidence that you damaged property yourself and you did not even enter the Capitol Building, I do believe that the combined actions from you and others caused significant damage to the inauguration stage itself, and I do believe the actions of the rioters complicated law enforcement's efforts to prevent damage to the Capitol Building itself.

---

[4] Supporting materials underlying these figures have been attached as Exhibit One.

3.    *United States v. Webster*, (1:21-cr-208) Tr. 09/01/2022 at 23-25 (J. Mehta):
You know, given the nature of the overall conduct, you can't have any particular
person responsible for all $2 million, but it's certainly safe to say that the $2 million
in damage could not have happened but for the collective action of each individual
person who was there on January the 6th. And so everybody who was there in a
sense, whether they directly destroyed property or not, certainly contributed and
caused it, and so I think the amount of $2,000 that's been requested is fair in terms
of a restitution amount, for a total amount of $2,060 as restitution in this case.

4.    *United States v. Wood*, (1:21-cr-223) Tr. 11/28/2022 at 42 (J. Mehta):
And while Mr. Wood did not do so directly—he didn't break anything. He didn't
destroy anything—certainly his presence there aided and abetted, particularly given
how close he was to some of the windows that were shattered, in that conduct, in
assisting and aiding and abetting that conduct. I do think the $2,000 is appropriate
as restitution as that is consistent with the felony amounts that have been—with
felonies, as has been the case across these January 6th proceedings.

5.    *United States v. Council*, (1:21-cr-207) Tr. 12/12/2022 at 61 (J. McFadden):
I note that the Government is seeking restitution, not for the officer, but for the
damage done to Congress, to the Capitol Building. And even though there's no
evidence that the Defendant specifically sought to destroy property, his actions
were part of the harms being done against Congress here.

6.    *United States v. Sargent*, (1:21-cr-258) Tr. 12/12/2022 at 61-63 (J. Hogan):
My finding is that you participated in the riot with the attempt to assault the police
officer and you were intending to do that to cause further damages and riot and
delay or obstruct in the—by your civil actions to Count 1, the civil unrest that you
contributed to, resulting in the delaying of the Electoral College vote. And so you
should be responsible for some type of restitution. You saw the damage being done.
You were on the tower. You saw the people going through the barricades, the police
being attacked, the tear gas being expended, officers fleeing. You were all part of
that in the midst of that. In fact, you forced your way to the front of the line to join
in that. So I think it's appropriate that you be assessed restitution under the law.[5]

7.    *United States v. Meteer*, (1:21-cr-00630) Tr. 04/21/2022 at 33 (J. Nichols):
But there's at least a colorable argument Mr. Meteer is part of a group that
collectively caused harm to the Capitol and Capitol officers, and Mr. Meteer has
agreed to pay restitution in the amount of $500. Because of the plea agreement and
that colorable argument, I consider an appropriate order for him to pay restitution
in the agreed-upon amount of $500.

---

[5] The court reduced the restitution from $2,000 to $500 in this case based on the defendant's
poverty. *Id.*

As it did in *Wood*, this Court can and should order restitution to the victims harmed on January 6 in an amount that reflects each defendant's relative role in the causal process underlying the victims' losses. To that end, because the felons convicted in any January 6 case committed crimes in which the defendants acted with a more serious criminal intent and involved greater injury or monetary loss, they are appropriately more culpable and contributory than a misdemeanant. "A precise mathematical inquiry"; "algorithm[s]" and "rigid formula[s]" that felons caused four times as much loss, on average, as misdemeanants, is not required and its absence does not make the four to one ratio unreasonable or irrational. *See Monzel*, 930 F.3d at 481 (such determinations are not required). The $2,000 for felons/$500 for misdemeanants' formula has been accepted by defendants and judges alike as a rough approximation of relative culpability. It should reasonably apply here as well.

### D.    Restitution in Conspiracy Cases Allows for Joint and Several Liability And Allocation Based on Culpability.

In this case, these defendants' collective actions ahead of, during, and after January 6 directly correlate with their contribution to the riot and, as a result, to the victims' losses. Conspirators are liable for restitution even if they are not the person who most directly caused the loss. *See e.g.*, *United States v. Collins*, 854 F.3d 1324, 1336 (11th Cir. 2017) (holding that although a coconspirator was the mastermind and primary actor in a bank fraud scheme, the defendant's offense conduct was a proximate cause of the bank's loss, which "'would not have occurred but for' [the defendant's] conduct"). Indeed, "[b]ecause a conspiracy participant is obligated for the acts of his or her coconspirators until the conspiracy accomplishes its goals or that conspirator withdraws, the losses caused by the entire conspiracy, not just the losses caused by those acts committed by the defendant, can be attributed to the defendant when the district court orders restitution." *Brewer*, 983 F.2d at 185 (citations omitted); *see also id*. ("[B]y participating in the

conspiracy, Defendants' actions caused the loss."). And, to be sure, "*Paroline* did not abrogate [this] longstanding rule"; rather, "*Paroline* expressly distinguished cases in which wrongdoers act in concert with each other." *United States v. Grovo*, 826 F.3d 1207, 1220 (9th Cir. 2016) (citing *Paroline*, 572 U.S. at 1725). Ultimately, "[w]hen the 'offense' is conspiracy, *Paroline* requires restitution for any losses proximately caused by the conspiracy—not those caused by the individual defendant." *Id.*

In multi-defendant cases, where a sentencing court finds that more than one defendant has contributed to a victim's loss, 18 U.S.C. § 3664(h) permits the court to make each defendant liable for the "full amount of restitution" or to "apportion liability among the defendants" to reflect each defendant's relative culpability and, for cases governed by the VWPA, their economic circumstances. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."). And in exercising its discretion to ensure that the victim receives full restitution, a court may craft a "hybrid approach," imposing joint and several liability up to the maximum amount of the loss while also apportioning restitution based on relative culpability. *See e.g.*, *United States v. Yalincak*, 30 F.4th 115, 121-26 (2d Cir. 2022) (discussing apportioned, joint and several, and hybrid restitution orders). This approach is particularly useful in conspiracy cases when a defendant organizes a criminal scheme and enlists others to play specialized roles in the crime.

A hybrid restitution order "accounts for multiple defendants' varying degrees of contribution to a victim's total loss, while also prioritizing the victim's likelihood of recovery." *Id.* at 124. "[T]he most significant offender may be held liable for the full amount of the loss, while

lesser participants are required to contribute lesser amounts." *Id.*; *see also United States v. Salti*, 59 F.4th 1050, 1055-57 (10th Cir. 2023) (holding that the court may apportion restitution and, to ensure the victim is fully compensated, order that a defendant's restitution obligation is not satisfied until the defendant has paid the amount apportioned to that defendant individually or the victim has been made whole for the entire harm).

Victims may not recover more than the total loss they have suffered. So "'each defendant's liability ends when the victim is made whole.'" *United States v. Wall*, 349 F.3d 18, 26 (1st Cir. 2003) (quoting *United States v. Scott*, 270 F.3d 30, 52 (1st Cir. 2001)). When there is overlapping liability, the total amount of restitution apportioned to the defendants may well exceed the victim's total injury. But so long as the government does not collect more from all defendants together than will make the victim whole, the hybrid approach is permissible. *Yalincak*, 30 F.4th at 122. And a sentencing court may include language in the restitution order that restitution obligations are satisfied once the victim has been made whole for the entire harm. *See United States v. Wall*, 349 F.3d 18, 26 (1st Cir. 2003) (recommending that district courts specify in restitution orders that joint and several liability is "up to the maximum amount of the loss").

To account for these eight defendants' concerted actions from November 2020 through January 2021 at heart of their conspiracy convictions along with their coordinated actions in furtherance of those conspiracies on January 6th, the Court should require them all to pay at least the default amount of $2,000 regardless of whether they personally damaged property or injured officers. The conspirators here committed offenses of a different character than an average January 6 defendant. And as the *Monzel* court recognized, "the essential character of the individual perpetrator's offense . . . would generally seem to be indispensable to evaluating a defendant's relative causal role." 930 F.3d at 481. That these defendants were conspirators acting in accordance

with a complex and long-evolving scheme both made their criminal conduct worse and increased their contribution to the damages resulting from the riot. And, for many, they contributed to the riot's damages by breaching the Capitol themselves or, in Vallejo's case, emboldening his co-conspirators by staging with weapons nearby and offering to provide transportation to and from the crime scene.

Further, Rhodes's and Kelly Meggs's conduct warrants substantially higher amounts in restitution in light of their direct orders and leadership on January 6 that caused more harm to the victims. The evidence made clear that, at the very least, Stewart Rhodes led and messaged hundreds, if not thousands, of followers throughout the conspiracy about the need to travel to Washington, D.C. prepared to act if President Trump did not. *See, e.g.*, Gov. Exs. 1002, 1008. And, on the day of, Rhodes gave the green light for at least twenty charged individuals, among others, to act, ordering them to go to the Capitol and to "storm the governor's mansion." Gov. Ex. 1500. Likewise, Kelly Meggs vetted, coordinated, and motivated, numerous other Florida Oath Keepers throughout the conspiracy to travel to Washington, D.C. prepared to act in large numbers at the Capitol. *See* Gov. Ex. 6860 (Msg. 1.S.656.9990) ("[I]t's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside."); *id*. (Msg. 1.S.656.10107) ("We need to make those senators very uncomfortable with all of us being a few hundred feet away. Our peaceful protests need to have a little more teeth. They aren't listening."). And, like Rhodes, Kelly Meggs acted on his statements on January 6th, leading thirteen others into the Capitol. Gov. Ex. 1503.

To narrow the gap between the victims' losses and the amount of restitution ordered across all expected cases, and consistent with *Paroline*'s point that participants in a mass crime with higher culpability should pay a larger amount of restitution than those with lower culpability, *see*

572 U.S. at 460 (directing the sentencing court to consider "other facts relevant to the defendant's relative causal role"), this Court should order the two leaders of the charged conspiracies, Rhodes and Meggs, to pay a larger amount of restitution than the default amount of $2,000 for felons. Rhodes and Meggs are responsible for incrementally more harm than those who did not undertake that planning and coordination and did not engage in such orders and leadership. Along with their own $2,000 share of restitution, both should be held jointly and severally liable for that amount multiplied by the number of individuals they led and ordered to participate in breaching the Capitol, thinning and interfering with the law enforcement response, and harming the victims here.

### E.    Conclusion

For the foregoing reasons, the Government respectfully submits that restitution is appropriate, as all eight sentenced defendants proximately caused harm and damage to the victims in this case. And so the government requests that this Court impose restitution against the defendants as follows:

- Stewart Rhodes: $42,000
- Kelly Meggs: $28,000
- Kenneth Harrelson: $2,000
- Jessica Watkins: $2,000
- Roberto Minuta: $2,000
- Joseph Hackett: $2,000
- David Moerschel: $2,000
- Edward Vallejo: $2,000

The government is prepared to address this request and any additional inquiries the Court may have on the issue at an oral hearing at the Court's convenience.

Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    _____
Troy A. Edwards, Jr.
Assistant United States Attorney
NY Bar No. 5453741
Alexandra Hughes
Jeffrey S. Nestler
Kathryn L. Rakoczy
Assistant United States Attorneys
Louis Manzo
Trial Attorney, U.S. Department of Justice