```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,      ) Criminal Action
 3                                   ) No. 1:22-cr-00015-APM
                      Plaintiff,     )
 4                                   ) Jury Voir Dire - Day 1
      vs.                            ) (afternoon session)
 5                                   )
      ELMER STEWART RHODES III,      )
 6    et al.,                        ) Washington, D.C.
                                     ) September 27, 2022
 7                    Defendants.    ) Time:  2:00 p.m.
      _____
 8
         Transcript of Jury Voir Dire - Day 1 (afternoon session)
 9                          Held Before
                    The Honorable Amit P. Mehta
10                  United States District Judge
      _____
11
                      A P P E A R A N C E S
12
      For the Government:      Kathryn L. Rakoczy
13                            Troy A. Edwards, Jr.
                              Jeffrey S. Nestler
14                            UNITED STATES ATTORNEY'S OFFICE
                              FOR THE DISTRICT OF COLUMBIA
15                            601 D Street, Northwest
                              Washington, D.C. 20579
16
                              Alexandra S. Hughes
17                            Justin T. Sher
                              U.S. DEPARTMENT OF JUSTICE
18                            950 Pennsylvania Avenue, Northwest
                              Washington, D.C. 20530
19
      For the Defendant Elmer Stewart Rhodes III:
20                            Phillip A. Linder
                              James L. Bright
21                            Edward L. Tarpley, Jr.
                              BARRETT BRIGHT LASSITER LINDER
22                            3300 Oak Lawn Avenue, Suite 700
                              Dallas, Texas 75219
23

24

25
```

```
1     For the Defendant Kelly Meggs:
                              Stanley E. Woodward, Jr.
2                             BRAND WOODWARD LAW
                              1808 Park Road, Northwest
3                             Washington, D.C. 20010

4                             Juli Z. Haller
                              LAW OFFICES OF JULIA HALLER
5                             601 Pennsylvania Avenue, Northwest
                              Washington, D.C. 20036
6
      For the Defendant Kenneth Harrelson:
7                             Bradford L. Geyer
                              FORMERFEDSGROUP.COM LCC
8                             141 I Route 130 South, Suite 303
                              Cinnaminson, New Jersey 08077
9
      For the Defendant Jessica Watkins:
10                            Jonathan W. Crisp
                              CRISP AND ASSOCIATES, LLC
11                            4031 North Front Street
                              Harrisburg, Pennsylvania 17110
12
      For the Defendant Thomas Caldwell:
13                            David W. Fischer, Sr.
                              FISCHER & PUTZI, P.A.
14                            7310 Governor Ritchie Highway
                              Glen Burnie, Maryland 21061-3065
15    _____

16    Stenographic Official Court Reporter:
                              Nancy J. Meyer
17                            Registered Diplomate Reporter
                              Certified Realtime Reporter
18                            333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
19                            202-354-3118

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (REPORTER'S NOTE:  The morning session of the trial
 3     was reported by William P. Zaremba who prepared said
 4     transcript.)
 5              (REPORTER'S NOTE:  Prospective Juror 1369 enters.)
 6              THE COURT:  Sir, how are you?
 7              THE PROSPECTIVE JUROR:  Good.  Thank you, sir.
 8         Yourself?
 9              THE COURT:  Good.  Thank you.
10         Feel free to remove your mask, if you'd like.
11         You are Juror 1369?
12              THE PROSPECTIVE JUROR:  Yes.
13              THE COURT:  All right.  And do you have your juror
14     questionnaire there in front of you?
15              THE PROSPECTIVE JUROR:  Yes, I do.
16              THE COURT:  Feel free to refer to it, if you wish;
17     and if you would just speak up into the microphone there so
18     everyone can hear you.
19         All right.  So thank you for coming in and completing
20     your questionnaire and for your service today.  Let me turn to
21     Question 45, which is on page 11 of your questionnaire.
22              So Question 45 asked:  Do you have such a strong opinion
23     about any aspects of the events that occurred at the
24     U.S. Capitol on January 6th that would affect your ability to
25     be a fair and impartial juror in this case?  Can you tell me --
```

1    you answered that question yes.  Can you tell me why you

2    answered that question yes.

3              THE PROSPECTIVE JUROR:  It was very sad for me to see

4    what happened that day.

5              THE COURT:  Okay.  Anything more than -- than your

6    sense of sadness of observing what was happening?

7              THE PROSPECTIVE JUROR:  No.  That's all I can say.

8              THE COURT:  Okay.  So this case, obviously, is about

9    the events of January the 6th, in part, and if you were

10   selected as a juror, you would hear evidence about things that

11   happened on January the 6th.  Do you think your -- and that's

12   okay.  But your job as a juror is slightly different, if you're

13   selected, which would be to view the evidence that's presented

14   in this case and apply the law as I instruct it to you.

15       Do you think that's something you could do even though

16   you experienced sadness about what you saw on January the 6th?

17             THE PROSPECTIVE JUROR:  I don't think so, sir.

18             THE COURT:  No?

19             THE PROSPECTIVE JUROR:  No.

20             THE COURT:  No prospect that you think you could be

21   fair to these defendants?

22             THE PROSPECTIVE JUROR:  No, sir.

23             THE COURT:  Okay.  Any objection?

24             MR. LINDER:  No, sir.

25             MR. NESTLER:  Yes, we'd like to ask a couple of

```
 1    additional follow-up questions.

 2              THE COURT:  Sure.  Go ahead.

 3              MR. NESTLER:  Hello, sir.

 4              THE PROSPECTIVE JUROR:  Hello.

 5              MR. NESTLER:  Can you explain for us what you mean

 6    by that; you don't think you could be fair and impartial.  Why

 7    is it that you have that belief?

 8              THE PROSPECTIVE JUROR:  I can't say right now, sir.

 9              MR. NESTLER:  Okay.  Do you -- you said you had seen

10    some news coverage about what happened at the Capitol; is that

11    correct?

12              THE PROSPECTIVE JUROR:  That is correct.

13              MR. NESTLER:  Were you personally impacted by what

14    happened at the Capitol on January 6th?

15              THE PROSPECTIVE JUROR:  No, I was not.  I was at work

16    at the time.

17              MR. NESTLER:  Okay.  And do you work close by?

18              THE PROSPECTIVE JUROR:  No, sir.  I was about a block

19    away from the White House.

20              MR. NESTLER:  Okay.  And do you have any friends or

21    family who were at the Capitol Building?

22              THE PROSPECTIVE JUROR:  No, sir.

23              MR. NESTLER:  Okay.  So what is it about what you saw

24    that happened at the Capitol on January 6th that means that you

25    personally couldn't be fair to people who are charged with
```

1    crimes related to that day?

2           THE PROSPECTIVE JUROR:  I observed the rioters going

3    into the Capitol.

4           MR. NESTLER:  Sure.  Right.  You observed rioters

5    going into the Capitol that day?

6           THE PROSPECTIVE JUROR:  Yes.

7           MR. NESTLER:  And so if the judge tells you that you

8    have to decide this case based on all the evidence you see here

9    in court -- so you're going to hear evidence over the next

10   several weeks here in court, and you have to decide the case

11   based on what you hear and see in court, not based on what you

12   saw on TV -- Would you be able to do that?

13          THE PROSPECTIVE JUROR:  No, sir.

14          MR. NESTLER:  And why is that?

15          THE PROSPECTIVE JUROR:  Because I believe what

16   happened should not have happened.

17          MR. NESTLER:  Okay.

18          THE COURT:  All right.

19          MR. NESTLER:  All right.  Thank you.

20          THE COURT:  All right, sir.  Thank you.

21       Mr. Douyon will show you out of the courtroom.

22          THE PROSPECTIVE JUROR:  Thanks.

23          THE COURT:  Thank you very much.  He'll provide you

24   with additional instructions.

25

```
 1              (REPORTER'S NOTE:  Prospective Juror 1369 left.)

 2              (REPORTER'S NOTE:  Prospective Juror 1582 enters.)

 3              THE COURT:  Sir, how are you?

 4              THE PROSPECTIVE JUROR:  Fine.

 5          How are you?

 6              THE COURT:  Feel free to remove your mask, if you'd

 7      like, while we're having this discussion.

 8          You are Juror 1582?

 9              THE PROSPECTIVE JUROR:  I am.

10              THE COURT:  All right.  I'm going to ask you to speak

11      into the microphone so everybody can hear you.

12              THE PROSPECTIVE JUROR:  Sure.

13              THE COURT:  You have -- or should have -- your juror

14      questionnaire there in front of you.

15              THE PROSPECTIVE JUROR:  I do, yeah.

16              THE COURT:  So feel free to refer to it, if you wish.

17          So let me begin with Question 11.  And in it, you were

18      asked if -- anything about the case that might affect your

19      ability to be fair and impartial, something we should know; and

20      your response was that you worked as a volunteer on the

21      Biden 2020 campaign.

22          Help us understand why you think that might impact your

23      ability to be fair and impartial in this case.

24              THE PROSPECTIVE JUROR:  Sure.  I was a member of the

25      National Finance Committee, and I raised money for the
```

```
 1    campaign.
 2              THE COURT:  Okay.
 3              THE PROSPECTIVE JUROR:  I was a named bundler for the
 4    campaign; and I felt like if I was on the jury, that some of
 5    the individuals that are highly partisan might use that as a
 6    credibility issue.  That's why I wrote it down, to be
 7    transparent.
 8              THE COURT:  Okay.  When you say -- sorry.  Who would
 9    use it as a credibility issue?
10              THE PROSPECTIVE JUROR:  The defendant or their
11    lawyer.
12              THE COURT:  Okay.  All right.  Understood.  So it's
13    helpful that you've explained that to us.
14         I think the question is, you know, we all bring our
15    experiences to a courtroom as a potential juror, but the
16    question is, ultimately, whether that experience and having
17    raised money for the Biden campaign would impact your ability
18    to be fair and impartial as to -- to these defendants in this
19    case.
20              THE PROSPECTIVE JUROR:  No, I don't think so.
21              THE COURT:  And --
22              THE PROSPECTIVE JUROR:  There might be, frankly,
23    other things that actually give me greater pause.  Yeah.
24              THE COURT:  Okay.  Well, we may get to those other
25    things in a moment.  And even if you were to learn that these
```

1    defendants were supporters of President Trump and, as alleged,

2    actively attempt -- or actively conspired to prevent

3    President Biden from taking office, do you think you could

4    still be fair and impartial to them?

5              THE PROSPECTIVE JUROR:  I guess I have to understand

6    the first part of that question, Judge.

7              THE COURT:  Sure.

8              THE PROSPECTIVE JUROR:  What was the first part?

9              THE COURT:  So the first part was -- let me rephrase

10   it -- which was that your job as a juror is, obviously,

11   different than your job as a citizen.

12             THE PROSPECTIVE JUROR:  Sure.

13             THE COURT:  In other words, whatever you have done

14   out in the world, slightly different than what you need to do

15   as a juror.  As a juror, your job would be to focus on the

16   evidence and apply the law as it pertains to this case.  Okay?

17        So the question is:  If you were to learn during the

18   course of the case that these defendants supported

19   President Trump and stand accused of conspiring to oppose

20   President Biden's transition of power to President Biden in

21   office, could you be fair and impartial to them?

22             THE PROSPECTIVE JUROR:  Of course.  I'm an American

23   citizen.

24             THE COURT:  Okay.  So even though you've raised money

25   for President Biden, do you think you could still be fair and

1    impartial to these defendants?

2              THE PROSPECTIVE JUROR:  Based -- right.  On that

3    question, sure.  Yep.

4              THE COURT:  Okay.  Let's turn to Question 17 that

5    concerns firearms.  And the question was:  Do you have such

6    strong feelings about firearms or laws concerning firearms that

7    would make it difficult for you to be fair and impartial in

8    this case?  Can you help us understand why you filled that

9    question out yes -- or answered that question yes.

10             THE PROSPECTIVE JUROR:  Yeah.  I live in the

11   District, obviously.  I've lived here for 27 years, and I have

12   two small children that are in K through 8.  And on the day of

13   the insurrection, my then-wife and I discussed whether or not

14   we should leave to protect them.  The night before I was

15   walking our dog about a block from our house, and I saw a

16   number of them staying at a hotel.  And I was afraid for my

17   safety.  And I was afraid for the safety of my children; that

18   these people would actually have firearms in the city, because

19   I know that they generally have a disrespect for firearm laws.

20   And I'm a hunter.  I've hunted since I was 15 years old.  And

21   so I guess that's why I wrote it because, again, I felt the

22   duty to be as transparent as possible.

23             THE COURT:  I appreciate that, and that's exactly

24   what we would have hoped you would have done by completing the

25   questionnaire.

1          So, I mean, you've identified a number of things that, I

2    think, give rise to some of your yes questions.  So let's stick

3    with the gun issue.  You yourself said you're a hunter.  It

4    sounds like you said you had some concerns about people on

5    January 6th abiding by the gun laws.

6          THE PROSPECTIVE JUROR:  Uh-huh.

7          THE COURT:  There's likely to be evidence in this

8    case that these defendants either directly possessed or caused

9    guns to be brought to northern Virginia.  However, there's no

10   charge in this case that any of them unlawfully possessed the

11   weapons.

12         THE PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  Do you think your views of the gun laws

14   would prevent you from being fair and impartial based upon the

15   allegation that they brought weapons, even though it's not

16   alleged that was illegal in and of itself?

17         THE PROSPECTIVE JUROR:  No.  I mean, clearly, the

18   laws of Virginia are different from the laws of D.C.

19         THE COURT:  Okay.  If you could keep your voice up.

20   You said the laws --

21         THE PROSPECTIVE JUROR:  I said clearly the laws of

22   Virginia are different from the laws of D.C.

23         THE COURT:  Okay.  You also answered Question 18

24   stating that you or close friends or family members have

25   attended rallies and protests in the last five years.  Can you

1    tell us a little bit about that.

2            THE PROSPECTIVE JUROR:  Let's see.  Yeah, I think my

3    ex-wife went down and protested with our daughter on some issue

4    that was clearly contrary to these folks' point of view and the

5    issue at hand.

6            THE COURT:  Do you recall what that issue was?

7            THE PROSPECTIVE JUROR:  I think it was -- no, I

8    don't.  It might have been -- I don't, actually.

9            THE COURT:  Okay.  But your impression is that it was

10   a cause or a --

11           THE PROSPECTIVE JUROR:  Uh-huh.

12           THE COURT:  -- subject matter that would be different

13   than what you perceived these defendants to believe?

14           THE PROSPECTIVE JUROR:  Yeah.

15           THE COURT:  Do you think that would affect your

16   ability as a juror to be fair and impartial?

17           THE PROSPECTIVE JUROR:  No.  Again, I'm an American

18   citizen that follows the rules; so I'll be very fair and

19   impartial.

20           THE COURT:  Okay.  You answered the various

21   Questions 19 through 22 yes.  So can you tell us, at least with

22   respect to January 6th, which close friend or family member you

23   had living on the Hill or who was actually at the Capitol on

24   January the 6th.  And perhaps --

25           THE PROSPECTIVE JUROR:  Sure.  I mean, I worked on

1    Capitol Hill for ten years for a former United States Senator,

2    and so we still have a lot of friends that work on the Hill,

3    and I used to live on the Hill.  On that day, the godmother

4    to my -- both my children was living on the Hill, seven blocks

5    behind the Hill.  So we were worried for their safety as well,

6    and we still have friends that work for different members of

7    Congress that were still in the Hill that day.

8              THE COURT:  So, look, you've got, obviously, very

9    close ties and connections to the Hill, and events of that day

10   were directed at a place you worked, people who may or may not

11   have been there that day, but certainly worked there.  You

12   know, given all that, do you think you could be fair to these

13   defendants given what they've been charged with?

14             THE PROSPECTIVE JUROR:  Again, I mean, I moved to

15   Washington, D.C., 27 years ago to be a part of working for an

16   entity that believes in the Constitution.  So, yeah, I could be

17   fair and impartial.

18             THE COURT:  Okay.

19             THE PROSPECTIVE JUROR:  I can -- I can set aside my

20   honest opinions about my point of views that are clearly

21   different than theirs.

22             THE COURT:  Right.  So, say, you know -- how do you

23   think -- the fact that -- I mean, that these defendants may

24   have different points of view politically than you, how do you

25   think that will affect your ability to judge them if you're

```
1    seated as a juror?

2              THE PROSPECTIVE JUROR:  I mean, I think there's a

3    line.  You know, my point of view is different than the law;

4    right?  I think -- but I can't dismiss the fact that it's

5    there, as far as the difference in my point of view and,

6    frankly, my anger over what they did and others did that day.

7              THE COURT:  Do you think -- let me ask you this:  Are

8    you at all concerned that the emotions that you've just talked

9    about and your views could influence how you view these

10   defendants?

11             THE PROSPECTIVE JUROR:  I can't -- I can't tell you

12   with a hundred percent certainty.

13             THE COURT:  Sure.  I understand.

14             THE PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  But I guess what I'm just asking is what

16   your general --

17             THE PROSPECTIVE JUROR:  I haven't seen the evidence.

18   I don't know the whole thing; so, I mean, it's hard for me to

19   say.  I guess that's a question of how do you make sure your

20   emotions don't override the reason and what's right.

21             THE COURT:  Right.  So say --

22             THE PROSPECTIVE JUROR:  Right.  I think I could do

23   that, but I want to be fully transparent about everything that

24   I feel and I've experienced.

25             THE COURT:  So say, for instance, as I would expect,
```

1    there will be videos, for example, shown of the events of

2    January the 6th.  Some of them may be showing images of

3    violence.  Do you have a concern or would you be concerned that

4    seeing such videos in this case might affect how you feel and,

5    therefore, affect how you would view the evidence and the

6    defendants in the case?

7        THE PROSPECTIVE JUROR:  Not necessarily.  I've seen

8    them so many times.  I don't think it would be anything new.

9    So no.

10        THE COURT:  All right.  So I think you've -- is there

11    anything else that we should know about in response -- or why

12    you answered Questions 19, 20, 21, and 22 yes?  You've told us

13    about why you were concerned for your safety and the safety of

14    family members.

15        THE PROSPECTIVE JUROR:  Sure.  I think we covered

16    everything in 19 through 22 in my remarks.

17        THE COURT:  Okay.  So why don't we turn then to

18    Question 45, 46, 47.  And, sir, you answered those three

19    questions yes, including the question as to what you had --

20    that you had seen, read, or heard something about the

21    Oath Keepers organization.  So why don't we start there.  Can

22    you tell us what you've read, seen, or heard about the

23    organization.

24        THE PROSPECTIVE JUROR:  I'm sure, like many Americans

25    that follow the news closely, I -- I've heard that they're one

 1    of the two major organizations that came here and organized

 2    individuals on that day.

 3             THE COURT:  Okay.  And in terms of -- other than

 4    their presence here on January the 6th, is there anything else

 5    that you have learned or read or listened to about the group?

 6             THE PROSPECTIVE JUROR:  No.

 7             THE COURT:  You've said that what you do know, read,

 8    seen, or heard about the Oath Keepers would affect your ability

 9    to be fair and impartial.  This is Question 47.  Can you tell

10    us why you answered that question yes.

11             THE PROSPECTIVE JUROR:  Because I live in

12    Washington, D.C., and I -- this is my home, and I felt like

13    they invaded my home.

14             THE COURT:  Okay.

15             THE PROSPECTIVE JUROR:  And I couldn't help, but --

16    I've seen over the last year or two numbers of photographs of

17    them with -- dressed up like military people that were invading

18    the place I live with my small children that are 9 and 14.

19             THE COURT:  Okay.  Question 45, same type of question

20    about strong views of January the 6th.  Basis for the response

21    there, I take it, is the same thing?

22             THE PROSPECTIVE JUROR:  Yeah, it's the same thing,

23    but I think it's even deeper than that.  I'm not -- I mean, I

24    believe in -- yeah, I believe in -- I believe in process, and I

25    believe that -- you know, this was a really, really unjust

1    thing that was done by these people, to try to call it a

2    process.  It clearly was a process that had gone correctly.

3              THE COURT:  Do you have any legal training or anybody

4    close to you has legal training?

5              THE PROSPECTIVE JUROR:  No.  I worked at a law firm

6    for seven years, though.  I worked with lawyers.

7              THE COURT:  Okay.

8              THE PROSPECTIVE JUROR:  But my LSAT score was too low

9    to get to law school.

10             THE COURT:  I think you should consider yourself

11   fortunate.

12         All right.  Mr. Nestler, do you have any questions you'd

13   like to ask?

14             MR. NESTLER:  Yes, Your Honor.  Thank you.

15         Good afternoon, sir.

16         You've indicated several times you may have seen some

17   coverage of the Oath Keepers organization on TV or news

18   coverage; is that right?

19             THE PROSPECTIVE JUROR:  Sure.

20             MR. NESTLER:  Do you know anything about these

21   particular defendants who are standing trial?

22             THE PROSPECTIVE JUROR:  No.  I mean, I've seen the

23   gentleman in the press.  He's very noticeable, yeah.

24             MR. NESTLER:  But aside from seeing anything about

25   the organization, do you have any opinions about the defendants

1    sitting here based on their names?

2         THE PROSPECTIVE JUROR:  Not beyond what I've already

3    told you.

4         MR. NESTLER:  Okay.  So what you've told us is that

5    you are -- as a resident of D.C., you're unhappy with people

6    coming into the city and doing things you don't agree with; is

7    that right?

8         THE PROSPECTIVE JUROR:  I think it's greater than

9    that.  I felt actually threatened.

10         MR. NESTLER:  And -- well, the judge is going to

11    instruct you that if you're a juror in this case you have to

12    decide the case based on the facts as you hear them in the

13    courtroom, not as you may have seen them on TV, because we

14    may -- know that information received from the news may not

15    always be accurate.

16         THE PROSPECTIVE JUROR:  Yep.

17         MR. NESTLER:  So if the judge instructs you that you

18    have to decide this case based on the facts as you hear them

19    sitting in this courtroom here, will you be able to do that and

20    putting things you've heard or may have learned outside of this

21    courtroom out of your mind so you can decide the case based on

22    what you hear in the courtroom?

23         THE PROSPECTIVE JUROR:  Yeah, of course.

24         MR. NESTLER:  And that's ultimately going to be your

25    job as a juror.  You understand that; is that right?

```
 1                 THE PROSPECTIVE JUROR:  Correct.  I've sat on a jury
 2      before and --
 3                 MR. NESTLER:  Okay.  So you understand the role of a
 4      juror?
 5                 THE PROSPECTIVE JUROR:  I do.  I sat on a murder
 6      trial, actually, in D.C. in Superior Court about 20 years ago.
 7                 MR. NESTLER:  Okay.  All right.  Thank you.
 8                 MR. LINDER:  I don't have any questions, Your Honor.
 9                 THE COURT:  All right, sir.  Thank you very much for
10      your time and your service this morning.
11             Mr. Douyon will show you out of the courtroom and
12      provide you with some additional instructions.  Thank you.
13                 THE PROSPECTIVE JUROR:  Leave this here?
14                 THE COURT:  Yes.
15                 (REPORTER'S NOTE:  Prospective Juror 1582 left.)
16                 THE COURT:  Okay.  So 1582 will be stricken for
17      cause.  Notwithstanding some of his responses, I just did not
18      think overall he was going to be in a position to be
19      dispassionate about the evidence in this case given -- his
20      responses clearly seem to me to be more emotional and evocative
21      than, for example, the juror we had just before lunchtime.  And
22      the fact that he said he was fearful for his children, I think,
23      also puts this in a slightly different category than somebody
24      who might be generally fearful for an adult.
25                 I also don't think I put on the record that 16 -- excuse
```

 1    me -- 1369 was stricken for cause too.

 2                   (REPORTER'S NOTE:  Prospective Juror 1560 enters.)

 3                   THE COURT:  Ma'am, how are you this morning [sic]?

 4                   THE PROSPECTIVE JUROR:  I'm well.

 5         Yourself?

 6                   THE COURT:  Good.  Thank you.

 7         Feel free to take your mask off, if you'd like.  So are

 8    you Juror 1560?

 9                   THE PROSPECTIVE JUROR:  Yes.

10                   THE COURT:  So I'll ask you to -- your juror

11    questionnaire should be in front of you.  If you would speak

12    loudly and into the microphone when you respond.

13         Let me ask you, first and foremost, you answered yes to

14    the question about hearing on Question 8.  Let me ask you:

15    This morning -- when I was instructing and speaking to you-all

16    this morning, did you have any trouble hearing or understanding

17    me?

18                   THE PROSPECTIVE JUROR:  No, I didn't.

19                   THE COURT:  Okay.  And can you just tell us what, if

20    any, concerns you might have or what assistance you might need

21    to help you hear, if you think you need something.

22                   THE PROSPECTIVE JUROR:  Well, the doctor says that my

23    hearing isn't bad enough yet for hearing aids.

24                   THE COURT:  It's not bad enough for hearing aids?

25                   THE PROSPECTIVE JUROR:  Yeah.  It's a slight

1    infraction [sic].

2                 THE COURT:  Okay.  So do me a favor.  If at any point

3    in time this morning you can't hear me or hear any of the

4    lawyers who are questioning you, please let me know.  Okay?

5                 THE PROSPECTIVE JUROR:  Yeah.

6                 THE COURT:  Question 14, you were asked:  Have you or

7    a close friend or family member ever been employed by the

8    federal government, and you answered yes.  Can you tell us

9    about that.

10                THE PROSPECTIVE JUROR:  My aunt, Tina, she worked for

11   the -- for the Department of Commerce, I believe it was.

12                THE COURT:  Okay.  And does she still work for the

13   commerce department?

14                THE PROSPECTIVE JUROR:  No.

15                THE COURT:  And do you know what she did, generally,

16   at commerce?

17                THE PROSPECTIVE JUROR:  No, sir.

18                THE COURT:  All right.

19                THE PROSPECTIVE JUROR:  I have no idea.

20                THE COURT:  Let me ask you to turn to page 10, if you

21   would, please.

22          So if you look at Questions 39, 40, 41, 42, 43, you've

23   indicated that you've not seen any -- first of all, you have

24   not seen any videos about the events of January the 6th; is

25   that right?

1      THE PROSPECTIVE JUROR:  That's correct.  I don't

2  really watch the news and social media and stuff like that.

3      THE COURT:  Okay.  So if I understood you correctly,

4  you're not a social media, blog follower?

5      THE PROSPECTIVE JUROR:  No.

6      THE COURT:  That's probably a good thing.

7      You're not watching TV news regularly, it sounds like.

8      THE PROSPECTIVE JUROR:  No, I do not watch the news.

9  It messes with my mental.  I don't like it.

10      THE COURT:  When you say -- when you say that, what

11  do you mean?

12      THE PROSPECTIVE JUROR:  It makes me upset to see the

13  things that's going on; so I don't watch the news.

14      THE COURT:  Okay.  And when you say you're upset, is

15  it specific to the events of January the 6th or the --

16      THE PROSPECTIVE JUROR:  No, just news in general.

17      THE COURT:  Just the world at large?

18      THE PROSPECTIVE JUROR:  Yeah.

19      THE COURT:  And have you read anything about the

20  events of January the 6th?

21      THE PROSPECTIVE JUROR:  No, sir.

22      THE COURT:  Anything about the group known as the

23  Oath Keepers?  Have you ever even heard of them?

24      THE PROSPECTIVE JUROR:  No, sir.

25      THE COURT:  And there have been hearings in Congress

1    about the events of January the 6th.  Have you watched any of

2    that?

3                 THE PROSPECTIVE JUROR:  No, sir.

4                 THE COURT:  Read about any of it?

5                 THE PROSPECTIVE JUROR:  No, sir.

6                 THE COURT:  Any reason you think you could not be a

7    fair and impartial juror if you were to serve in this case?

8                 THE PROSPECTIVE JUROR:  No, sir.  I would be fair and

9    impartial.

10                THE COURT:  Okay.  You answered Question 57 yes,

11   which is if you have a friend -- close friend or family member

12   who's ever been arrested, charged, prosecuted, or convicted of

13   any crime -- of a crime.  Can you tell us about that.

14                THE PROSPECTIVE JUROR:  Yes.  My son.  He was

15   arrested some years ago as a juvenile.

16                THE COURT:  Okay.  Here in Washington, D.C.?

17                THE PROSPECTIVE JUROR:  Yes.

18                THE COURT:  And was he prosecuted?

19                THE PROSPECTIVE JUROR:  Yes.

20                THE COURT:  And was he -- I guess in juvenile court

21   it's called adjudicated.  Was he adjudicated for the offense?

22                THE PROSPECTIVE JUROR:  I'm not 100 percent sure.  He

23   served his time.

24                THE COURT:  He did?

25                THE PROSPECTIVE JUROR:  Yeah.  He's out on probation.

 1            THE COURT:  So anything about your son's experience

 2    that would cause you to think you might not be able to be fair

 3    to the prosecution in this case?

 4            THE PROSPECTIVE JUROR:  No.

 5            THE COURT:  And I expect there will be testimony from

 6    police officers and law enforcement in this case.  Do you think

 7    anything about what your son experienced might cause you to be

 8    unfair?

 9            THE PROSPECTIVE JUROR:  No.

10            THE COURT:  Or cause you to question the testimony of

11    police officers relative to other witnesses?

12            THE PROSPECTIVE JUROR:  No, I do not.

13            THE COURT:  Okay.  All right.

14        Mr. Linder?

15            MR. LINDER:  No questions, Your Honor.  Thank you.

16            THE COURT:  Mr. Nestler?

17            MR. NESTLER:  Good afternoon, ma'am.

18            THE PROSPECTIVE JUROR:  Good afternoon.

19            MR. NESTLER:  What is it that you do for a living?

20            THE PROSPECTIVE JUROR:  I work in childcare.

21            MR. NESTLER:  Okay.  How long have you been doing

22    that?

23            THE PROSPECTIVE JUROR:  For three years.  And before

24    I worked in childcare, I worked with children with special

25    needs.

1          MR. NESTLER:  Great.  Thank you so much.  We

2     appreciate that.

3          THE PROSPECTIVE JUROR:  You're welcome.

4          THE COURT:  Ma'am, thank you for your time and being

5     here this morning [sic].

6          Mr. Douyon will show you out of the courtroom and

7     provide you additional instructions.  Okay?  Thank you.

8          (REPORTER'S NOTE:  Prospective Juror 1560 left.)

9          (REPORTER'S NOTE:  Prospective Juror 0671 enters.)

10          THE COURT:  Okay.  Sir, good afternoon.  How are you?

11          THE PROSPECTIVE JUROR:  Very well.  Thank you.

12          THE COURT:  You are Juror 0671?

13          THE PROSPECTIVE JUROR:  That is correct.

14          THE COURT:  Feel free to remove your mask, if you'd

15     like.

16          Thank you for completing your questionnaire and for your

17     service.

18          So let me ask you some follow-up questions of your

19     responses to the questionnaire.  If we could turn to page 11,

20     and we'll start with Questions 45 and 47.

21          Question 45 asked about strong opinions about aspects of

22     the events occurring on January 6th that would affect your

23     ability to be fair and impartial.  And 47 asked whether you had

24     read, seen, or heard anything about Oath Keepers, the

25     organization, that would affect your ability to be fair and

1    impartial.  Can you share with us why you answered those

2    questions yes.

3         THE PROSPECTIVE JUROR:  Of course, I'd be happy to.

4    With respect to 45, I -- you know, I live in Washington.  I was

5    really afraid for about six months last year -- or about

6    two years ago, leading up to January 6th.  I work near the

7    White House.  I have friends in Capitol Hill.  I was here in --

8    9/11.  To see people coming from out of town marching on the

9    streets, see people randomly carrying military weapons as I was

10   leaving my office at night to go home, just very disconcerting,

11   very alarming for me personally.

12        I remember on January 6th our office was closed because

13   of the events going on in the Mall, and I was working from

14   home.  I had gone to the gym, and I was watching on TV -- and I

15   remember 9/11, I was watching on TV at the gym.  And I just

16   started crying.  I -- I went home, and I cried all night for

17   what was going on.

18        THE COURT:  Okay.  Well, thank you for sharing that

19   with us.

20        I guess the question, sir, is -- well, or to put it

21   differently, which is people are -- have been and are impacted

22   about the events of that day in different ways.

23        THE PROSPECTIVE JUROR:  Uh-huh.

24        THE COURT:  And we don't expect anybody to come in

25   here without having some experience with respect to the day.

 1    Your job as a juror would be slightly different, which is that

 2    your job would be to review and consider the evidence that's

 3    presented in this case and apply the law as it is instructed to

 4    you by me.

 5        And so the question is:  Would you be able to separate

 6    your emotions and your experiences about that day and focus on

 7    the evidence, and be fair and impartial, and apply the law

 8    fairly and impartially to these defendants?

 9        THE PROSPECTIVE JUROR:  I -- I can say that I would

10    not come here with an agenda, and I would try to be fair and

11    impartial, and I would listen.  And I would listen to the

12    evidence, and I would try to be impartial.

13        I believe I probably could be, but to be honest,

14    honestly answer the question, it would be something I would be

15    trying to do every day.

16        THE COURT:  Okay.  And is -- that's something you

17    think you would have difficulty doing, or is that something

18    that you think would come naturally to you?

19        THE PROSPECTIVE JUROR:  Probably not difficulty.

20        THE COURT:  Not difficulty?

21        THE PROSPECTIVE JUROR:  Yeah.

22        THE COURT:  So, I mean, look, the question is simply

23    this, which is:  If you were to be seated as a juror, do you

24    think you could faithfully carry out your duty to presume these

25    defendants innocent?  Could you do that?

1          THE PROSPECTIVE JUROR:  I think I could.

2          THE COURT:  Could you put the government to its

3    burden of carrying its -- its burden of -- in order to prove

4    guilt beyond a reasonable doubt?

5          THE PROSPECTIVE JUROR:  I could.

6          THE COURT:  And if you thought the government had

7    fallen short in its proof, do you think you could vote to

8    acquit?

9          THE PROSPECTIVE JUROR:  I think I could.

10          THE COURT:  Any reason to think you couldn't?

11          THE PROSPECTIVE JUROR:  Again, I wouldn't bring an

12    agenda to it.  I might lean more heavily towards pretty darn

13    close, but, yes, I think I could demand what is required of the

14    government.

15          THE COURT:  All right.  When you say lean toward

16    "darn close," I want to make sure I understand what you're

17    saying but also what you understand the --

18          THE PROSPECTIVE JUROR:  I do.  I do.  And I

19    understand beyond a reasonable doubt.  I know the standard

20    of -- of the word.

21          THE COURT:  Yeah.  I mean, this is not a tie goes to

22    the government type of situation.

23          THE PROSPECTIVE JUROR:  Yes.  Exactly.

24          THE COURT:  They bear the heaviest burden there is

25    under the law.  It's beyond a reasonable doubt.  Is that a

1      standard you think you could apply?

2              THE PROSPECTIVE JUROR:  I understand that, yes.

3              THE COURT:  All right.  And, again, if -- if you

4      felt -- you personally felt -- even if others disagreed with

5      you, that you personally felt that the government had fallen

6      short, could you vote to find these defendants not guilty?

7              THE PROSPECTIVE JUROR:  If I felt the government fell

8      short, I could vote to acquit.

9              THE COURT:  Okay.  Let me go back to the beginning of

10     the questionnaire.  Question 13 asked whether you have close

11     friends or family members who have ever been employed at the

12     U.S. Capitol in any capacity.  Can you tell us about that.

13             THE PROSPECTIVE JUROR:  I -- actually, I was employed

14     at the U.S. Capitol.  I was a page in Congress for two years.

15     I worked on the House Floor.  I was a House Democratic

16     cloakroom page, and I worked in the Capitol for those two

17     years.  I worked on the floor of the House for those two years,

18     and I was an intern at my congressman's office for two summers

19     after that.

20             THE COURT:  Okay.  And have you worked on

21     Capitol Hill or -- or either worked on Capitol Hill or had

22     reason to have business on Capitol Hill since then?

23             THE PROSPECTIVE JUROR:  I have not.

24             THE COURT:  And how, if at all, do you think your

25     experience having interned and worked as a page on Capitol Hill

1    would affect your -- affect you as a juror if you were serving

2    in this case?

3                    THE PROSPECTIVE JUROR:  I -- excuse me.  I -- I think

4    the Capitol is a sacred space.  I think it is more sacred than

5    a church.  And, again, that's why I was so tearful watching the

6    events of January 6th.

7                    THE COURT:  So feeling the way you do, if there are

8    allegations and evidence in this case that some number of these

9    defendants entered the building that day --

10                   THE PROSPECTIVE JUROR:  Uh-huh.

11                   THE COURT:  -- how -- do you think you could still

12   honestly and fairly evaluate their conduct against the law and

13   evaluate the evidence?

14                   THE PROSPECTIVE JUROR:  I think if the evidence was

15   that they illegally entered the building and they damaged the

16   building, I would -- I would not be happy with that.

17                   THE COURT:  Okay.  But, again --

18                   THE PROSPECTIVE JUROR:  If there was a question as to

19   whether or not they entered the building or a question of did

20   somebody open the door and welcome them in, I -- I would

21   respect that.

22                   THE COURT:  Okay.  So if I understand you correctly,

23   you would maintain an open mind about hearing whatever defense

24   there may be to having entered the building?

25                   THE PROSPECTIVE JUROR:  Yes, I would.

 1            THE COURT:  Question 14 asked whether you or a close

 2    family, friend -- close friend or family member has ever been

 3    employed by the federal government.  Can you tell us about

 4    that.

 5            THE PROSPECTIVE JUROR:  Obviously, as a page I was

 6    employed by the federal government.  My sister retired as a

 7    captain in the Air Force and is now in civil service.  She's

 8    been in the civil service for about 19 years.  I have a very

 9    close friend who is in the United States Postal Service.  I

10    have a friend who is in the State Department.  I have a friend

11    who works in the agricultural department.  I'm sure I have

12    others.  It's hard not to have friends in Washington.

13            THE COURT:  Of course.  And any of your friends or

14    your family or your sister -- I believe, you said -- do any of

15    them work in a law enforcement capacity for any of those

16    agencies?

17            THE PROSPECTIVE JUROR:  No.  No.

18            THE COURT:  All right.  So Question 19 I think you've

19    answered.

20        Let me just actually back up to Question 18; that

21    concerned whether a close friend or family member has

22    participated in a rally, protest, or demonstration; and you

23    said do not know, and you said I have not.  So do I understand

24    that you personally have not and you're just not sure about --

25            THE PROSPECTIVE JUROR:  That's right.  That's right.

```
 1            THE COURT:  Gotcha.

 2            Question 19, I think you've told us your reasons for

 3    having been inside the Capitol.

 4            Question 20 asked whether you or a close friend or

 5    family member was living on the Hill on January the 6th of

 6    2011 -- excuse me -- of 2021.

 7            THE PROSPECTIVE JUROR:  I do have family and close

 8    friends who live on Capitol Hill East.

 9            THE COURT:  And did you talk to them on January

10    the 6th or soon after?

11            THE PROSPECTIVE JUROR:  Just texted with them to make

12    sure they were okay and at home safely.

13            THE COURT:  Anything about the fact that you know

14    people who live on the Hill and did live on the Hill on

15    January 6th cause you to think you might not be able to be fair

16    and impartial?

17            THE PROSPECTIVE JUROR:  I don't think so, no.

18            THE COURT:  22 asks concern for safety of yourself,

19    close friend, family member.

20            THE PROSPECTIVE JUROR:  Again, my office was closed

21    for safety reasons.

22            THE COURT:  Okay.

23            THE PROSPECTIVE JUROR:  So, yes, I did have concern.

24            THE COURT:  So let me turn then to Question 37.  That

25    asked you whether you recognized any of the names on the list
```

1    that you were given of potential witnesses or persons whose

2    names might appear during the trial.

3              THE PROSPECTIVE JUROR:  Uh-huh.

4              THE COURT:  You named John Eastman and Peter Navarro.

5    I don't have any reason to think that either will be witnesses

6    in this case or likely to be mentioned.  As far as Roger Stone

7    goes, I don't believe he will be a witness in this case, but it

8    may be his name is mentioned.

9              THE PROSPECTIVE JUROR:  Uh-huh.

10             THE COURT:  If his name is mentioned -- if his name

11   were to be mentioned, how would you view the mentioning of his

12   name in this -- in the context of this case?

13             THE PROSPECTIVE JUROR:  Generally speaking, my

14   impression of him is not favorable.

15             THE COURT:  Okay.  And if you were to learn that a

16   defendant in this case, for example, associated with Mr. Stone

17   in some way, how would that affect your view of that defendant?

18             THE PROSPECTIVE JUROR:  I'm sure Mr. Stone has a lot

19   of friends and associates who are not bad people.  So that fact

20   alone would not make me think less of that person.

21             THE COURT:  Okay.  You've also said that you've seen

22   a lot of videos, read a lot of news coverage.  Have you read

23   any news coverage or seen videos about January 6th since you

24   completed the questionnaire?

25             THE PROSPECTIVE JUROR:  No.

1          THE COURT:  And in terms of the videos and news

2    coverage that you watched, do you think you could set that

3    aside and focus only on the evidence in this case and decide

4    the case based only on the evidence?

5          THE PROSPECTIVE JUROR:  I think I could.

6          THE COURT:  All right.  Question 44 asks whether you

7    have listened to, attended, or viewed any of the January 6th

8    hearings.  Can you tell us a little bit about that.

9          THE PROSPECTIVE JUROR:  I only viewed what was on

10   the -- what was broadcast on television in June of this year,

11   maybe into July.

12         THE COURT:  Okay.  And do you recall whether

13   anything -- well, do you recall anything from that hearing that

14   concerned a group called the Oath Keepers?

15         THE PROSPECTIVE JUROR:  I don't remember

16   specifically.

17         THE COURT:  Do you think you would be able to put out

18   of your -- put to the side, I should say, whatever you may have

19   heard or learned from the January 6th committee hearings and

20   focus on the evidence in this case?

21         THE PROSPECTIVE JUROR:  I think I could.

22         THE COURT:  Question 47 asked whether you -- 46 and

23   47 said -- asked whether you had read, seen, or heard anything

24   about the Oath Keepers organization, and perhaps we went over

25   this.  If we did, forgive me.  Can you tell us what you have

1    read, seen, or heard about the organization?

2          THE PROSPECTIVE JUROR:  In details, no.  No, I

3    remember the Oath Keepers were involved, I think, in the

4    Seattle, Portland activities up there.

5          THE COURT:  Uh-huh.

6          THE PROSPECTIVE JUROR:  I know they were involved in

7    January 6th.  I -- that's really pretty much it, just in that

8    context.

9          THE COURT:  Okay.  And you answered Question 47 yes.

10   And so what is it about what you've just described and your

11   knowledge about the Oath Keepers that caused you to answer

12   Question 47 yes?

13         THE PROSPECTIVE JUROR:  I -- that's the -- yeah, I

14   just -- from what I know, I think of the Oath Keepers as a

15   bunch of bullies who are a paramilitary, vigilante group, and

16   impose themselves on other people in dangerous ways.

17         THE COURT:  Okay.  So the organization is not on

18   trial in this case.  There are five defendants here who are

19   alleged to be members of the organization.  And, you know, the

20   impressions that you have based upon the media, what you've

21   read or seen, you know, the question for you as a juror would

22   be what these defendants are accused of and whether the

23   evidence makes out the case of what they're accused of.

24         Could you put aside your views or your impressions, I

25   should say, of what you believe the organization -- that you've

1    just described about the organization, could you put those to

2    the side and view the evidence in this case fairly and in an

3    unbiased way?

4              THE PROSPECTIVE JUROR:  I -- I think so.

5              THE COURT:  All right.  So you answered a number of

6    these questions, and we've talked about this, and I think your

7    responses generally have been I think so.

8          So let me ask this, which is:  Do you have reason to

9    doubt that you would be able to be fair and impartial and view

10   the evidence dispassionately in this case?

11             THE PROSPECTIVE JUROR:  I could suppress the doubts

12   that I would have, but I really -- I'd have to be honest.  I

13   would -- it would be -- it wouldn't be hard to suppress those

14   doubts, but -- but it would be something I would be trying to

15   do.

16             THE COURT:  Okay.  Okay.  I understand.  I

17   understand.

18         Let me ask you about Question 50.  It asks whether you

19   know anybody in the legal field or whether you yourself are in

20   the legal field as a lawyer, prosecutor, criminal defense

21   lawyer.

22             THE PROSPECTIVE JUROR:  I am a practicing lawyer.

23             THE COURT:  Pardon?

24             THE PROSPECTIVE JUROR:  I'm a practicing lawyer.

25             THE COURT:  You're a practicing lawyer; right.

| | |
|---|---|
| 1 | And so have you done any criminal work in your career? |
| 2 | THE PROSPECTIVE JUROR:  I have not. |
| 3 | THE COURT:  And do you have friends or know people |
| 4 | who have done criminal work? |
| 5 | THE PROSPECTIVE JUROR:  I -- I'm in a law firm.  We |
| 6 | have a white-collar crime criminal practice. |
| 7 | THE COURT:  Okay. |
| 8 | THE PROSPECTIVE JUROR:  We represent defendants in |
| 9 | that. |
| 10 | THE COURT:  And you -- and your partners represent |
| 11 | defendants in that case? |
| 12 | THE PROSPECTIVE JUROR:  Yeah. |
| 13 | THE COURT:  Okay.  Question 54 asks you whether you |
| 14 | have a close family or -- close friend or family member who's |
| 15 | ever been a victim of a crime.  Can you tell us about that. |
| 16 | THE PROSPECTIVE JUROR:  Yeah.  I mean, my -- my |
| 17 | daughter was raped. |
| 18 | THE COURT:  Okay.  Sorry to hear that.  I'm really |
| 19 | sorry to hear that.  And -- |
| 20 | Let me ask you:  Was there somebody charged? |
| 21 | THE PROSPECTIVE JUROR:  No. |
| 22 | THE COURT:  No. |
| 23 | THE PROSPECTIVE JUROR:  No. |
| 24 | THE COURT:  And what is your -- I mean, did it happen |
| 25 | in the District of Columbia? |

```
 1                THE PROSPECTIVE JUROR:  No.

 2                THE COURT:  What is your sentiment toward law

 3     enforcement or prosecutors as a result of that episode?

 4                THE PROSPECTIVE JUROR:  That episode would not inform

 5     any opinion of law enforcement or prosecutors.

 6                THE COURT:  Okay.  What about defendants, people who

 7     have been charged with a crime?  How would that episode inform

 8     your view of somebody who has been accused of a crime?

 9                THE PROSPECTIVE JUROR:  I don't think it would affect

10     my views.

11                THE COURT:  Okay.  You had indicated potential

12     hardship by serving for the length of this trial.  Can you

13     share with us a little bit more detail about what the issues

14     would be.

15                THE PROSPECTIVE JUROR:  Sure.  I think I said in --

16     in this, I'm a practicing transactional attorney.  I have three

17     closings in October.  I have meetings to be had and conference

18     calls and documents to negotiate.  Some of that I can do after,

19     in the evening; and I would expect that if I were here, I would

20     be going home and working until midnight and 1:00 in the

21     morning.  Not convenient or pleasant, but I could do that.

22     That's not a substitute for not having meetings and conference

23     calls during the day.

24                So working itself is -- is a problem.  I'm in a firm

25     where I am compensated based on the hours I bill.  So this
```

1    would have an impact on my compensation.

2        And I'm a 65-year-old man who lives alone.  So I would

3    have to postpone medical appointments.  I would have to, you

4    know, just -- it's -- it's largely inconvenient for a five-week

5    trial.

6        THE COURT:  Okay.  So you will appreciate, being a

7    lawyer yourself, that jury service obviously --

8        THE PROSPECTIVE JUROR:  I know it's my duty, yes.

9        THE COURT:  -- involves impositions on -- on daily --

10   on someone's both professional and personal life.  And absent

11   sort of extraordinary circumstances, I typically do not excuse

12   someone for professional obligations, and I hope you can --

13       THE PROSPECTIVE JUROR:  I understand that.

14       THE COURT:  -- appreciate and understand that.

15       Okay.  All right.  Mr. Linder?

16       MR. LINDER:  One second, Your Honor.

17       Good afternoon, sir.  How are you?

18       THE PROSPECTIVE JUROR:  Good.  Thank you.

19       How are you?

20       MR. LINDER:  Good.  Good.  Thank you.

21       Thanks for filling out the questionnaire, and thanks for

22   being here.

23       The -- as far as the hardship goes, originally when

24   you-all -- you guys filled out these questionnaires, it was

25   expressed that it might be for a month or more.  Is it even a

1    bigger hardship if this trial were to go six or seven weeks as

2    opposed to four or five?

3              THE PROSPECTIVE JUROR:  Yes.

4              MR. LINDER:  And you have to be working until about

5    1 o'clock in the morning most nights?

6              THE PROSPECTIVE JUROR:  I mean, if I were here 9:00

7    to 5:00, yes.

8              MR. LINDER:  So do you think that would

9    affect your -- would that affect your concentration here and

10   then maybe your work product later if you were having to sit

11   through this all day and then work until 1:00 in the morning?

12             THE PROSPECTIVE JUROR:  Probably not.

13             MR. LINDER:  Okay.

14             THE PROSPECTIVE JUROR:  But maybe.

15             MR. LINDER:  But maybe.

16             THE PROSPECTIVE JUROR:  Probably not.  I think I

17   could focus while I'm here, but it might --

18             MR. LINDER:  You're acting like a good lawyer, a lot

19   of I thinks and maybes.

20        So I want to ask you again.  I know the judge tried to

21   circle back up with you on -- that you think you could be fair.

22   You have friends on the Hill when January 6th happened;

23   correct?

24             THE PROSPECTIVE JUROR:  Uh-huh.

25             MR. LINDER:  So you have strong opinions about it.

1    And you have -- what are your opinions about the Oath Keepers?

2    I know the judge asked you a question.  What were your opinions

3    about them as an organization or as -- or members of an

4    organization?

5              THE PROSPECTIVE JUROR:  As an organization, it's not

6    an organization that I think is -- is good.  I think it's -- my

7    impression is that it's an unlawful organization that does

8    unlawful things to -- to cause harm to property and people.

9              MR. LINDER:  Okay.  Is knowing or feeling that way,

10    is it going to be easier for the government to get to that

11    burden of proof level they're supposed to get to if you've

12    already started them off thinking that they're an unlawful

13    organization the way you believe?

14              THE PROSPECTIVE JUROR:  I would listen to the

15    evidence dispassionately, and, again, I would try very hard to

16    be -- to be fair and impartial; and I know that's my duty.

17         If I had zero knowledge or opinion of the Oath Keepers,

18    that would be easier --

19              MR. LINDER:  Okay.

20              THE PROSPECTIVE JUROR:  -- than having read and seen

21    things over the past few years.

22              MR. LINDER:  Okay.

23              THE PROSPECTIVE JUROR:  But, yes, I mean, I -- I

24    understand the duty to be fair and impartial.  And I could

25    focus over the course of the trial to listen and try, but I

1    can't erase what's in the back of my mind.

2              MR. LINDER:  So do you think that your knowledge of

3    them as an organization now already somewhat affects your

4    potential ability to be fair, even though you would try to be

5    fair?

6              THE PROSPECTIVE JUROR:  Even though I would try to

7    be, it could.  It could.  I would expect my knowledge of the

8    Oath Keepers would become more informed as a result of this

9    trial, and perhaps I would discover that my impressions were

10   invalid.

11             MR. LINDER:  Okay.  So you -- so you're open to

12   evidence that may be different from the opinion you have at

13   this point?

14             THE PROSPECTIVE JUROR:  Yes.  That's fair.

15             MR. LINDER:  Okay.  Would you agree with me that the

16   opinion you probably have at this point -- and I'm not saying a

17   lot of other people have the same opinion -- is based on, kind

18   of, media accounts?

19             THE PROSPECTIVE JUROR:  Uh-huh.

20             MR. LINDER:  Kind of the way they're portrayed in the

21   media?

22             THE PROSPECTIVE JUROR:  Absolutely.

23             MR. LINDER:  So you would be open-minded if you heard

24   facts from actual witnesses that said something different?

25             THE PROSPECTIVE JUROR:  On the contrary, yes, I would

1    be open-minded.

2              MR. LINDER:  Okay.  In your civil practice, do you

3    ever get involved in the civil lawsuits?

4              THE PROSPECTIVE JUROR:  No.

5              MR. LINDER:  Okay.  So burdens of proof, you

6    understand it's preponderance, and this is beyond a reasonable

7    doubt.  This is much higher than what would come up in your

8    industry?

9              THE PROSPECTIVE JUROR:  Right.  Right.

10             MR. LINDER:  Okay.  And you believe even the way you

11   feel about the Oath Keepers, you could hold the government to

12   their burden of proof?

13             THE PROSPECTIVE JUROR:  Yes.

14             MR. LINDER:  I appreciate it.  Thank you very much.

15             THE COURT:  Mr. Nestler?

16             MR. NESTLER:  We have no questions, Your Honor.

17   Thank you.

18             THE COURT:  All right.

19        Sir, thank you very much for your time.

20        Mr. Douyon will show you out of the courtroom and

21   provide you additional instructions.

22             (REPORTER'S NOTE:  Prospective Juror 0671 left.)

23             THE COURT:  Mr. Geyer, could I ask you to come up,

24   please.  If somebody from the government would come up.

25             THE COURT REPORTER:  Judge, do you want this on the

1    record?

2                THE COURT:  (Shakes head.)

3                MR. LINDER:  I would move to strike Juror No. 0671

4    based on the inconsistency of his -- two reasons:  based on the

5    inconsistency of his written answers versus his oral recitation

6    here with you, Your Honor; but also on -- he's a billing

7    attorney, and he's -- he's going to work --

8                THE COURT:  You're not going to get any -- you're not

9    going to get any sympathy from me on that.

10               MR. LINDER:  You know, if this was a one-week jury

11   trial or two, it'd be different, but this is potentially six or

12   seven weeks, so for what it's worth.

13               THE COURT:  Understood.

14               MR. LINDER:  Thank you.

15               THE COURT:  I think it's a close call, but I think

16   ultimately I fall on the side of not dismissing him.  Unlike

17   some of the others who have come before us, he didn't -- he

18   didn't display some of the emotion, for example, that the

19   earlier juror did.  I thought he was honest and candid and was

20   genuine in saying, look, these are the things that I know about

21   this organization and what I've learned on January 6th, but I

22   would do what I need to do to be fair and impartial.

23               And, in fact, when you asked him about the Oath Keepers

24   and whether he would keep an open mind about viewing the

25   organization differently, he didn't hesitate to say yes, I

1    would keep an open mind.

2         And, frankly, attorneys are usually pretty good jurors

3    because they understand what the rules of the road are and

4    understand what their obligations are.

5         So I will deny the request to strike 0671 for cause.

6         MR. CRISP:  A point in counter, if I may.  I mean, he

7    did -- he equated this to 9/11 twice.  He said he cried all

8    night.  So he had a highly emotional response, and he clearly

9    said that he holds the Capitol -- where there's going to be

10   evidence that certain members were -- to be a greater entity

11   than a church, which is -- to me this is -- we've invaded his

12   religion and violated his religion.  I don't know how much more

13   of a visceral, emotional response one can get in that scenario.

14   So I have grave concerns that as he's watching this going

15   again, he's not going to have a similar response.  So --

16         THE COURT:  Well, I mean, I asked him that,

17   Mr. Crisp.  I mean, I asked him point blank whether his

18   feelings about the Capitol Building and the like, how it would

19   affect him.  I asked him how he would feel if he saw video of

20   the defendants entering the Capitol, and I think he was honest

21   in his response.  But then, ultimately, he said, you know, if

22   there were reasons they went in, including whether somebody

23   opened the door, you know, he would consider that; and I wasn't

24   troubled by -- by his response, at least the issues that you've

25   cited.

```
 1              MR. CRISP:  The concern with that, though, is that
 2    that's not just what this case is about, whether or not they
 3    were invited in.  It was the intent behind it.
 4              THE COURT:  Sure.
 5              MR. CRISP:  So it's a somewhat -- it's not
 6    somewhat -- it's a much more nuanced answer, but I
 7    understand your -- I won't belabor the point.
 8              THE COURT:  That's okay.  Look, there's -- there's
 9    going to be more close calls, and sometimes you win and
10    sometimes you don't.
11              MR. CRISP:  That's it.
12              (REPORTER'S NOTE:  Prospective Juror 0926 enters.)
13              THE COURT:  Ma'am, how are you?
14              THE PROSPECTIVE JUROR:  I'm okay.
15         How are you?
16              THE COURT:  Thank you very much for asking.  Fine.
17         You are Juror 0926?
18              THE PROSPECTIVE JUROR:  Correct.
19              THE COURT:  Feel free to remove your mask, if you'd
20    like, while we're having our conversation.
21         Your juror questionnaire should be in front of you.
22              THE PROSPECTIVE JUROR:  Yes, sir.
23              THE COURT:  So let me begin with Question 14, which
24    asks whether you have any close family or friends who have been
25    employed by the federal government.  You answered that question
```

1    yes at the bottom of page 6.

2                THE PROSPECTIVE JUROR:  Number 14?

3                THE COURT:  Yes.

4                THE PROSPECTIVE JUROR:  Yes.

5                THE COURT:  Can you tell us about that.

6                THE PROSPECTIVE JUROR:  Yes.  I work at the

7    Smithsonian's National Zoo where there are federal employees.

8    So I have a number of close friends who are federal employees.

9                THE COURT:  Okay.  Can you tell us what you do at the

10   zoo.

11               THE PROSPECTIVE JUROR:  Yes.  I'm the animal welfare

12   and research manager.  So I work with our living collection.

13               THE COURT:  Okay.  Let me ask -- next question,

14   Question 19, concerns -- or actually Question 18 -- excuse

15   me -- asks whether you or a close friend or family member has

16   participated in any rally, protest, or demonstration, or march

17   in the last five years.

18               THE PROSPECTIVE JUROR:  Yes.  So I first -- I wrote

19   that no, and then I had to do some math.  So I have not myself

20   in the past five years.

21               THE COURT:  Okay.

22               THE PROSPECTIVE JUROR:  But I have had friends who I

23   work with and do not work with who have attended protests in

24   D.C. in the past five years.

25               THE COURT:  Okay.  And can you just tell us generally

1       what those protests concerned.

2                THE PROSPECTIVE JUROR:  I think the second March For

3       Science march and also the Black Lives Matter's protests.

4                THE COURT:  Okay.  So let me ask you this:  If you

5       were to learn during the course of this trial that the

6       defendants in this case may hold political views that are

7       different than your friends who attended these rallies and

8       marches, how would that affect your ability to be fair and

9       impartial?

10               THE PROSPECTIVE JUROR:  I -- I don't think it would

11      affect it.

12               THE COURT:  Okay.

13               THE PROSPECTIVE JUROR:  I work with a broad spectrum

14      of folks, and that's the way life is.

15               THE COURT:  Everybody on the political spectrum loves

16      animals is what you're saying?

17               THE PROSPECTIVE JUROR:  Absolutely.  And thank

18      goodness for that.

19               THE COURT:  All right.  So Question 19 asks have you

20      ever been on Capitol Grounds or inside the Capitol Building.

21      Can you just share with us when you've been inside the Capitol.

22               THE PROSPECTIVE JUROR:  I'm going to take you back to

23      the early '90s on a seventh-grade trip.

24               THE COURT:  Okay.  All right.  Question 24 asked you

25      about prior jury service in 2005.  Was that here in

```
 1    Washington, D.C.?
 2              THE PROSPECTIVE JUROR:  No.  It was in New York City.
 3              THE COURT:  And it was a criminal case.  It looks
 4    like the jury reached a verdict.  Would you be able to --
 5    whatever you may have learned about the criminal justice system
 6    and the trial process, would you be able to put that to the
 7    side and follow the instructions as I give them to you?
 8              THE PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  All right.  So Questions 39, 40, 41, sort
10    of get at the question of how much news and video coverage you
11    have seen of the events of January the 6th.  Let me ask you
12    this as a general proposition:  Could you -- whatever you've
13    learned in the media and seen on television, perhaps, or on
14    social media, could you put that to the side and just view the
15    case on the facts as they're presented here and apply the law
16    as I instruct you?
17              THE PROSPECTIVE JUROR:  Yes.
18              THE COURT:  Is there anything about the -- what
19    you've learned in the media or anything you've seen on video
20    that would cause you to question whether you could be fair and
21    impartial?
22              THE PROSPECTIVE JUROR:  No.
23              THE COURT:  Question 50 asks whether you have any
24    family members who are in the legal field, as lawyers,
25    prosecutors, et cetera.
```

 1                    THE PROSPECTIVE JUROR:  Yes.  This would have been

 2       related to -- I have an uncle who was in the FBI for 30 years.

 3                    THE COURT:  Okay.

 4                    THE PROSPECTIVE JUROR:  My father was the inspector

 5       general for the U.S. Air Force material command for a number of

 6       years in the '90s.  And that's the extent of that.

 7                    THE COURT:  Is your uncle still working for the FBI?

 8                    THE PROSPECTIVE JUROR:  No.  He's very much retired.

 9                    THE COURT:  Okay.  And when you say "very much,"

10       is -- recently or some number of years ago?

11                    THE PROSPECTIVE JUROR:  Over -- over 20 years ago.

12                    THE COURT:  Oh.  He retired over -- okay.

13                    THE PROSPECTIVE JUROR:  Yes, uh-huh.

14                    THE COURT:  Fine.  So you've got -- your father,

15       uncle, close members of your family who have been in law

16       enforcement.  There are going to be law enforcement witnesses

17       in this case.  Do you think that, notwithstanding your

18       relationship with your father and your uncle, that you could

19       view law enforcement testimony as you would any other witness

20       testimony?

21                    THE PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  And do you have any reason to think you

23       would favor law enforcement testimony over any other type of

24       witness testimony?

25                    THE PROSPECTIVE JUROR:  No.

1           THE COURT:  Question 51 asks -- again, I think this

2     is the same answer.  Family member in local, state, or federal

3     law enforcement.  Is that the same answer we just talked about?

4           THE PROSPECTIVE JUROR:  Yes, sir.

5           THE COURT:  Question 54 asks whether you or a close

6     friend or family member have ever been the victim of a crime.

7     And if the issue is a personal one, we can take it off the

8     public record.

9           THE PROSPECTIVE JUROR:  I guess this would be my --

10    at my place of employment.  So I was there by default.  I

11    worked at a -- a factory in the early 2000s where we were

12    burgled.

13          THE COURT:  Okay.

14          THE PROSPECTIVE JUROR:  Trying to think through if

15    there were other moments.  I have -- is this witnessed?  No.

16    That's the next one.

17          THE COURT:  Okay.  So you were an employee at a

18    factory that was burgled; is that right?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And Question 55, is that the same answer

21    in terms of being a witness to a crime?

22          THE PROSPECTIVE JUROR:  No.  I wrote yes to this

23    because I wasn't quite sure how to put it, but it felt like a

24    yes answer to me.  So during the riots that happened in D.C. in

25    June of -- I can't recall the year -- where there were a lot of

1    pharmacy break-ins that were happening, my apartment is on the

2    ground floor next to a pharmacy, and I was woken up in the

3    middle of the night by people breaking into that establishment

4    and running by my apartment, with pills flying everywhere.  And

5    so that's my witnessed.

6              THE COURT:  Let me ask you this:  So you were

7    somebody who lived amongst people who were rioting.  The

8    allegations in this case and the likely evidence will show

9    people who are rioting, and the allegations and the evidence

10   may show or likely will show that some of these defendants were

11   among those people.

12        How do you think the fact that you lived through and

13   experienced what you did some years ago would affect your

14   ability to be fair and impartial in this case as a juror?

15             THE PROSPECTIVE JUROR:  I do not think it would

16   impact my ability to be fair and impartial.

17             THE COURT:  Okay.  Would it be a hardship for you to

18   begin jury service at 8:30 in the morning?

19             THE PROSPECTIVE JUROR:  No.  That would be a sleep-in

20   for me.

21             THE COURT:  That would be a sleep-in for you.

22        And have you watched or read any news or social media

23   accounts of this case or January 6th since you completed the

24   questionnaire?

25             THE PROSPECTIVE JUROR:  No, I have not.

```
 1                    THE COURT:  All right.

 2              Mr. Linder?

 3                    MR. LINDER:  No questions.  Thank you very much.

 4                    THE COURT:  Mr. Nestler?

 5                    MR. FISCHER:  Your Honor, if I could ask a few

 6     questions.

 7              Ma'am, first of all, thank you for filling out the

 8     questionnaire and for being here today.

 9              Just a couple of questions.  Do you understand that in

10     the trial that would take place in this case that there's --

11     the defendants -- some of the defendants are part of an

12     organization called the Oath Keepers?  Are you aware of that?

13                    THE PROSPECTIVE JUROR:  I presume that by the

14     question, No. 46.

15                    MR. FISCHER:  Could -- could you put into your --

16     into your own words to describe what you believe about the

17     Oath Keepers.

18                    THE PROSPECTIVE JUROR:  Yes.  I actually -- I don't

19     know that phrase.  I watched a lot of -- I'm a bad citizen.  I

20     watched a lot of the news initially, and then to save money, I

21     stopped getting live television.  And so I've been primarily

22     watching, like, Bones and Hulu and things like that.  Yeah.

23                    MR. FISCHER:  Good decision.

24              But could you -- just in your own words, if you had to

25     describe to a complete stranger who maybe came from a different
```

1     country and you had to describe if they asked you who are these

2     Oath Keepers, how would you describe them?

3               THE PROSPECTIVE JUROR:  I assume it's someone who

4     prescribes to a belief that they feel the need to uphold.

5               MR. FISCHER:  Okay.  And the trial in this case, the

6     defendants, at least some -- many of the defendants, at least,

7     were supporters of President Trump.  Okay?  Would that affect

8     your ability to be fair and impartial in this case?

9               THE PROSPECTIVE JUROR:  No.

10              MR. FISCHER:  And do you have -- if you could put

11    into your own words, do you have an opinion about those who

12    support President Trump?

13              THE PROSPECTIVE JUROR:  I -- my opinion is that we --

14    we differ in a lot of our beliefs, and I don't live in a

15    bubble.  So I need to be listening to other people to see if

16    that can change my perspective, but so far it has not.

17              MR. FISCHER:  Fair enough.

18         And if you were picked as a juror, you could certainly

19    promise and guarantee to both sides that you would be fair and

20    impartial and follow the law?

21              THE PROSPECTIVE JUROR:  Yes, sir.

22              MR. FISCHER:  All right.  Thank you.

23         I have nothing else, Your Honor.

24              THE COURT:  Thank you, Counsel.

25         Mr. Nestler?

```
 1              MR. NESTLER:  We have no questions, Your Honor.
 2    Thank you very much.
 3              THE COURT:  All right.  Thank you, ma'am, for your
 4    time.
 5         Mr. Douyon will show you out of the courtroom and
 6    provide you additional instructions.
 7              THE PROSPECTIVE JUROR:  Can I leave this here?
 8              (REPORTER'S NOTE:  Prospective Juror 0926 left.)
 9              THE COURT:  Counsel, I should have done -- should
10    have said this earlier, I -- we'll see where we are as the week
11    progresses.  I know I've said we won't sit on Friday, but if
12    we're at an inflection point where we can get this jury finally
13    selected by Friday, we'll sit Friday morning.  I was going to
14    attend Justice Jackson's investiture, but if it means missing
15    that to get this jury selection done by the end of the week,
16    then I'll do that.  Okay?
17              MR. MANZO:  Does she know that?
18         Thanks, Judge.
19              THE COURT:  She doesn't, but I think my absence will
20    not be a problem.
21              (REPORTER'S NOTE:  Prospective Juror 1233 enters.)
22              THE COURT:  Sir, how are you this afternoon?
23              THE PROSPECTIVE JUROR:  I'm doing well.
24         How about yourself?
25              THE COURT:  Good.  Thank you for asking.
```

1          Feel free to remove your mask, if you would like.

2          Are you Juror 1233?

3               THE PROSPECTIVE JUROR:  Yes; that's correct.

4               THE COURT:  Your juror questionnaire should be there

5     in front of you, and feel free to refer to it, if you'd like.

6               THE PROSPECTIVE JUROR:  Okay.

7               THE COURT:  So, first of all, thank you for coming in

8     and answering the questionnaire and also coming in today.

9          Let me direct you to Question 46, if you would, please,

10    on page 11.

11              THE PROSPECTIVE JUROR:  Sure.

12              THE COURT:  That question asked whether you had read,

13    seen, or heard anything about the Oath Keepers organization.

14    Can you tell us what you have read, seen, or heard.

15              THE PROSPECTIVE JUROR:  Sure.  In the limited

16    coverage I've seen of the January 6th hearings, I did hear the

17    Oath Keepers names come up along with the Proud Boys as one of

18    the major organizations involved on January 6th.

19              THE COURT:  Okay.  And, specifically, can you tell us

20    what you recall hearing about the involvement of the

21    Oath Keepers.

22              THE PROSPECTIVE JUROR:  Yes.  I know they -- the

23    claims are they're involved in some coordination of groups that

24    take -- took place and the protests and the breaching of the

25    Capitol on that day.  I also seem to recall that they may have

1  been either planning to bring in weapons or something like

2  that.  But that it was a group planning to breach the Capitol

3  Building.

4          THE COURT:  Okay.  So the congressional hearing was

5  sort of a one-way street, if you will.  Evidence was only being

6  presented from one side.

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  If you heard -- let me put it this way:

9  Would you be open-minded to hearing evidence that would be

10  different than or contradict what you heard during the

11  January 6th committee hearings about the Oath Keepers

12  organization?

13          THE PROSPECTIVE JUROR:  Yes.  Absolutely.

14          THE COURT:  And evidence that might contradict what

15  the -- you heard during the committee hearings about what they

16  did that day?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  And during the course of those hearings,

19  do you recall anybody specifically testifying about the

20  organization?

21          THE PROSPECTIVE JUROR:  About the Oath Keepers?

22          THE COURT:  Yes.

23          THE PROSPECTIVE JUROR:  I vaguely recall one

24  individual, but I can't remember if he was with the

25  Oath Keepers or the Proud Boys.  I do not remember his name.  I

1    just remember one member of one of those organizations

2    presented briefly, but I only watched probably an hour total of

3    the hearings.

4            THE COURT:  Okay.  You mean across all the hearings

5    or just that one?

6            THE PROSPECTIVE JUROR:  Across all the hearings.  I

7    think it's -- I forget her name.  Cassidy Hutchinson or

8    something like that.  That's the other bit I saw.

9            THE COURT:  So you said you recall there may have --

10    or that there was a witness who may have testified either about

11    the Oath Keepers or, I think you may have said, Proud Boys;

12    right?

13            THE PROSPECTIVE JUROR:  One of them, yes.  I can't

14    remember which.

15            THE COURT:  Can you share with us what, if any,

16    impressions you have been left with about that testimony?

17            THE PROSPECTIVE JUROR:  All I remember is that

18    individual, I think, regretted being involved with the

19    organization and felt like they had been misled; but I don't

20    remember anything gripping about the testimony, I think, that

21    really stuck beyond that.

22            THE COURT:  Okay.  So let me ask you this:  In

23    Question 44, as you've just told us, you have listened to a

24    portion of the congressional hearings.  Would you -- do you

25    think you would have any difficulty setting aside what you've

1    learned and heard from those hearings and evaluate the evidence

2    in this case as it's presented and apply the law as it's

3    been -- as it would be presented to you by me?

4              THE PROSPECTIVE JUROR:  No, I don't think so.

5              THE COURT:  You've indicated above here in

6    Questions 39, 40, 41, that you've reviewed videos and news

7    coverage of the events of January the 6th.  Do you consider

8    yourself someone who's an avid consumer of January 6th news or

9    somebody who sees it if it happens to be in front of them?

10             THE PROSPECTIVE JUROR:  Much more if it happens to be

11   in front of me.  I just consume just a lot of news in general.

12   It's not ever specific to January 6th.

13             THE COURT:  Okay.  But it sounds like you're not

14   somebody -- would you -- you wouldn't consider yourself

15   somebody who sort of actively seeks out news about January 6th?

16             THE PROSPECTIVE JUROR:  No.

17             THE COURT:  And have you since completing the

18   questionnaire viewed any or listened to any news or social

19   media about the events of January the 6th or this case?

20             THE PROSPECTIVE JUROR:  No.  I avoided it per

21   instruction.

22             THE COURT:  Thank you.

23         And would you be able to set aside whatever you've

24   learned in the news coverage of January the 6th or about this

25   case and consider the evidence fairly and impartially as to

1    these jurors [sic]?

2                THE PROSPECTIVE JUROR:  Yeah, I believe so.

3                THE COURT:  Let me ask you to turn to page 7.  You

4    ask -- were asked in Question 18 whether you have any close

5    friends or family who have attended a rally, protest,

6    demonstration, or march in the last five years, and you

7    answered that yes.  Can you tell us about that.

8                THE PROSPECTIVE JUROR:  Yes.  The sole protest I

9    attended was right after the -- the notional decision on

10   overturning *Roe v. Wade* was announced.  I did go with my

11   partner to the Supreme Court that day.

12               THE COURT:  And if you were to learn or come to

13   believe that people in this case might have different views

14   than you do about abortion and abortion rights, how would that,

15   if at all, impact your ability to be a fair juror?

16               THE PROSPECTIVE JUROR:  I don't think it would impact

17   my ability.

18               THE COURT:  You've indicated you've been inside the

19   Capitol Grounds -- or on the Capitol -- on the Capitol Grounds

20   or inside the Capitol Building.  Can you just tell us in which

21   context.

22               THE PROSPECTIVE JUROR:  Yes.  It was years and years

23   ago.  We had a friend who was a congressional staffer.  So he

24   brought us into the building.  I want to say this was 2011,

25   2010.  It was, yeah, well over a decade ago.  And he showed us

1    around the building.  Showed us the underground railway, showed

2    us, I think, the congressperson's office that he worked for;

3    and that's pretty much it.

4            THE COURT:  And does that friend still work on

5    Capitol Hill?

6            THE PROSPECTIVE JUROR:  It was a friend of a friend,

7    and I have no idea.  I would assume no.

8            THE COURT:  Okay.  And so there's likely to be --

9    you'll likely hear evidence in this case about the layout of

10   the Capitol Grounds, the interior of the Capitol Building.

11   Would you be able to set aside whatever you saw and learned

12   during that visit and focus only on the evidence as it's been

13   presented?

14           THE PROSPECTIVE JUROR:  Yes.  I do not have an

15   accurate map in my mind.

16           THE COURT:  All right.  Question 54 asks whether you

17   or a close friend or family member has ever been the victim of

18   a crime.  If this is a sensitive topic, we can take it off the

19   public record.

20           THE PROSPECTIVE JUROR:  Oh, about close friends.  I

21   know have I friends who have been in domestic violence

22   situations and so forth.  That's pretty much what I was

23   alluding to here.

24           THE COURT:  Okay.  And those friends who have been

25   involved in those kind of altercations, disturbances, what have

1    you -- have you come away from that with any views about law

2    enforcement?

3              THE PROSPECTIVE JUROR:  I would say no.  I was not

4    directly involved in any of those.  No.

5              THE COURT:  Any views that you would have about

6    somebody that's been charged with a crime because you know

7    people who have been the victim of domestic violence?

8              THE PROSPECTIVE JUROR:  I don't think so, no.

9              THE COURT:  Okay.  Mr. Linder?

10             MR. LINDER:  Briefly.

11         Good afternoon.  How are you?

12             THE PROSPECTIVE JUROR:  Good.

13         How about yourself?

14             MR. LINDER:  Good.  Good.

15         Thanks for filling out the questionnaire and coming down

16    here today.

17         You said you've only lived in D.C. for two years?

18             THE PROSPECTIVE JUROR:  No, no, not at all.  I've

19    lived in D.C. for -- I started in graduate school here in 2010.

20    I briefly moved back -- I'm originally from Pittsburgh.  I

21    lived in Pittsburgh from 2015 to 2016 and then moved back to

22    the area.

23             MR. LINDER:  Okay.  Thank you very much.

24         No further questions.

25             THE COURT:  Mr. Nestler?

```
1              MR. NESTLER:  We have no questions, Your Honor.

2      Thank you.

3              THE COURT:  So would it present you any hardship if

4      you were asked to report for jury service at 8:30?

5              THE PROSPECTIVE JUROR:  At 8:30?  No.

6          Is that tomorrow?

7              THE COURT:  No, no, no.  Just --

8              THE PROSPECTIVE JUROR:  In general?  No, that should

9      be fine.

10             THE COURT:  In general.

11         All right.  Thank you very much.

12         Mr. Douyon will show you out of the courtroom and

13     provide you with additional instructions.

14             THE PROSPECTIVE JUROR:  Great.  Thank you.

15             (REPORTER'S NOTE:  Prospective Juror 1233 left.)

16             (REPORTER'S NOTE:  Prospective Juror 0856 enters.)

17             THE COURT:  Hi, sir.  How are you?

18             THE PROSPECTIVE JUROR:  Good.  Thank you, Your Honor.

19             THE COURT:  Feel free to remove your mask, if you'd

20     like, while we're having this conversation.

21         You are Juror 0856?

22             THE PROSPECTIVE JUROR:  Correct.

23             THE COURT:  And your juror questionnaire should be in

24     front of you.  So feel free to refer to it, if you wish.

25             THE PROSPECTIVE JUROR:  All right.
```

1          THE COURT:  Let me -- I'm going to bounce around a

2     little bit.  Let me first direct you to page 9, Question 33.

3     Question 33, whether you -- asked whether you know or you've

4     had any social or professional contact with me or my staff, and

5     you answered do not recall.

6          THE PROSPECTIVE JUROR:  Correct.

7          THE COURT:  Okay.  Do you have reason to think

8     that you and I have met or you've got any interaction with my

9     staff?

10          THE PROSPECTIVE JUROR:  I'm a practicing lawyer.  So

11     I may have had a case, but I couldn't say for certain.

12          THE COURT:  Okay.  All right.  And for the record,

13     I -- I don't have a recollection of you appearing before me,

14     which is not to say you haven't, but I don't -- I see a lot of

15     lawyers.

16          You've indicated in Question 34 that you know

17     Justin Sher, who is representing the United States in this

18     case.

19          THE PROSPECTIVE JUROR:  Correct.

20          THE COURT:  And how do you know him?

21          THE PROSPECTIVE JUROR:  I believe he was a prosecutor

22     in a case involving the Abramoff matter, and the defendant was

23     David Safavian.

24          THE COURT:  Okay.

25          THE PROSPECTIVE JUROR:  And I was one of the defense

1      lawyers on the defense team.

2              THE COURT:  Okay.  Do you know if it's the same?

3              MR. NESTLER:  Different Justin Sher.

4              THE COURT:  Okay.  Is he the one now in private

5      practice?

6              MR. NESTLER:  Yes.

7              THE COURT:  So different Justin Sher.

8          Let's turn to Question 45, which is on page 11; top of

9      page 11.

10          That question asked whether you have a strong opinion

11     about any aspect of the events that occurred at the

12     U.S. Capitol on January 6th that would affect your ability to

13     be a fair and impartial juror, and your answer was not sure.

14     Can you explain why that was your answer.

15              THE PROSPECTIVE JUROR:  Only because I guess I've

16     lived in the District for about 22 years, and over that time,

17     I've seen numerous protests in the District that have disrupted

18     things in one way or another.  And, you know, I guess in the

19     last five to ten years, it seems like some of these protests

20     have become more disruptive and potentially unlawful, with

21     destruction of property and, you know -- and destruction of --

22     I guess violence towards -- towards citizens.

23          And, you know, I'm in favor of law enforcement.  So, you

24     know, I notice that in -- I think in 2020, it may have been

25     after the George Floyd killing, that there were protesters in

 1    town who were destroying buildings, breaking Starbucks'

 2    windows, throwing bricks through cars; and the police were able

 3    to round up, you know, many of these people and put them in

 4    jail, you know, pending charges.  But from my review of the

 5    articles, you know, that came out at that time, the -- the

 6    individuals were ultimately released and nobody was prosecuted

 7    for -- for these offenses.

 8          And also there were people that were pulling down

 9    statues in D.C. on federal property, federal monuments and

10    statues, setting them on fire.

11          THE COURT:  Sir, I would like to interrupt you for a

12    moment, and I want to follow up on your answer there.  But I

13    want to come back to the heart of the question which is about

14    January the 6th.

15          And so is there anything about what occurred on that

16    day, as opposed to, you know, protests that preceded that day,

17    that would cause you to question your ability to be fair and

18    impartial?

19          THE PROSPECTIVE JUROR:  Nothing about the events on

20    that particular day.

21          THE COURT:  Okay.  Is there anything about

22    January 6th -- I'm not sure what else there would be other than

23    the events of the day, but is there anything about that event

24    that would cause you to think you could not be fair and

25    impartial?

1        THE PROSPECTIVE JUROR:  Well, I guess what I'm trying

2    to say is that, you know, before being summoned for jury duty,

3    I followed coverage not, you know, I guess, with the same

4    interest that somebody affected by the matter would have.  But

5    I -- I've seen people being, you know, sentenced to eight-year

6    terms of prison for their involvement.  And I understand that

7    the FBI has rounded up maybe 800 of the people -- of the 2,000

8    people that were involved.

9        But in looking at it and comparing it to the treatment

10   of other protesters who engaged in violent acts of misconduct

11   and seeing them not prosecuted, I guess it troubles me a little

12   bit that eight-year sentences are being handed out like pieces

13   of gum and -- and there could be some, you know,

14   differentiation between culpability.

15       But from what I watched on TV, there was obviously

16   misconduct, criminal misconduct.  I'm in favor of law

17   enforcement, but out of 2,000 people, I would imagine that some

18   of the people were just sort of standing around.  And, yes, you

19   know, you could take the elements of an offense and say, okay,

20   you've -- you've committed this crime.  And, you know, if

21   you're talking about treason -- I don't know if treason is

22   still a crime.  Sedition.  But, you know, if somebody can get a

23   death sentence for standing around and technically violating

24   the statute, I guess that troubles me.

25       THE COURT:  Just a few things.  First and foremost,

1    nobody in this case is being charged for just standing around.

2    The charges are more -- are greater than that.  Let me just put

3    it that way.

4        The question -- and I understand you have views about

5    how the government may or may not have prosecuted other

6    offenses, but the question ultimately for you -- and you're a

7    lawyer -- could you evaluate the evidence presented in this

8    case and follow my instructions and apply the law to make a

9    determination of whether these defendants are guilty beyond a

10   reasonable doubt and, specifically, whether the government has

11   carried its burden of proving guilt beyond a reasonable doubt?

12   Is that something you think you could do?

13            THE PROSPECTIVE JUROR:  I -- I think so.

14            THE COURT:  Any reason to think you might not be able

15   to do that?

16            THE PROSPECTIVE JUROR:  Well, I've shared with you my

17   concerns, and that's -- I guess that's really all I can say.

18            THE COURT:  Okay.  But how would those concerns

19   affect your -- what I'm trying to understand, how those

20   concerns would affect your ability to evaluate the evidence in

21   this case.

22            THE PROSPECTIVE JUROR:  Well, I guess the way it

23   would affect it is, you know, here's Bob Smith.  And the

24   government has now proven beyond a reasonable doubt that he did

25   A, B, and C, which are the predicate elements of this offense.

1    So, therefore, he's guilty.  And I know that that person is now

2    subject to incarceration for eight years.  And the

3    evidence that allowed him to be convicted of this offense is,

4    you know, he was -- you know, he walked up the steps of the

5    Capitol after being told don't do that.  And so that's,

6    therefore, a violation.

7        And so now you, as a juror, you are compelled by my

8    instructions to convict him.  And then, you know, I, as the

9    judge in this case, will be compelled by the sentencing

10   guidelines to impose this sentence for this offense and

11   that's -- that's the way this is going to work.

12            THE COURT:  Well, let me -- let me make the following

13   observations.  One is the government makes charging decisions.

14   And your job as a juror would not be to question the charging

15   decisions in this case or any other case.  Do you think you

16   could do that?

17            THE PROSPECTIVE JUROR:  I would certainly do my best.

18            THE COURT:  Okay.  Any reason to think you could not

19   do that?

20            THE PROSPECTIVE JUROR:  Not -- not as I sit here.

21            THE COURT:  You could not sort of put out of your

22   mind the fact that, in your view, others who should have been

23   charged with crimes were not charged with crimes?  You could

24   not put that out of your mind?

25            THE PROSPECTIVE JUROR:  It's -- it's really hard to

1    say.

2          THE COURT:  Okay.  And as far as sentencing goes, as

3    you know, that's the responsibility of the judge, not the jury.

4    Do you think you could -- you know, you're a lawyer; so you

5    understand how the system works.  Do you think the concept of a

6    sentence or the possibility of a sentence would affect your

7    ability to judge the evidence fairly on guilt or innocence?

8          THE PROSPECTIVE JUROR:  Well, I mean, I'm not -- I'm

9    not a robot; so, you know, I can look at the information and --

10   and see, well, you know, this is -- like I said, this -- this

11   is going to result in this person getting an eight-year period

12   of incarceration for --

13         THE COURT:  But, again, it's not for you to either

14   (a) impose sentence or either presume what the sentence will

15   be.  Is that something you could do?  Every case is different.

16   And so somebody who may have received an eight-year sentence is

17   in a different position than somebody else who has committed a

18   different offense.  So would you be able to put that out of

19   your mind and put it to the side, whatever has happened to

20   others, and just focus on the evidence and apply it in this

21   case?

22         THE PROSPECTIVE JUROR:  I would -- I would have to be

23   in the situation and -- and see the evidence and understand it,

24   I think, to -- to judge -- to answer that question.

25         THE COURT:  So that's not a question you think you

1    can answer right now?

2            THE PROSPECTIVE JUROR:  I -- I don't think so.  I

3    mean, if -- you know, if -- if you see there's going to be a

4    travesty and you're to be a part of it and you're just going to

5    say to yourself, you know, well, all I did was evaluate the

6    facts and figure out whether the predicate elements of the

7    offense have been proven and, yes, you know, A, B, and C, you

8    know, were proven so, sorry, Joe, now you'll have to deal with

9    the judge and take it up with appeal and --

10           THE COURT:  Sounds like --

11           THE PROSPECTIVE JUROR:  -- hope for a pardon.

12           THE COURT:  And would you have a problem with that as

13   a juror?

14       In other words, if the government proved its case beyond

15   a reasonable doubt, would you have any difficulty rendering a

16   guilty verdict?

17           THE PROSPECTIVE JUROR:  I can't give a definitive yes

18   or no to that, candidly, because it wouldn't assuage my

19   conscience to say, well, you know, this person got railroaded

20   here and it's a miscarriage of judgment -- justice.  But my

21   role is very small; I simply convicted the person, and it was

22   the judge who imposed this outrageous sentence.  If that -- I'm

23   not saying that's what the Court would do.  I'm just saying, my

24   conscience would be, you know, bothered by -- by that scenario

25   if I, you know, helped set this train in motion.

```
1          And I realize that other people made the decision which
2     charges to prosecute -- which defendants to prosecute, and
3     somebody else, Your Honor, will make the sentencing decision,
4     and the Court of Appeals will decide if it was appropriate or
5     not.  Maybe it will be a pardon.
6          But my role -- and I can't just say, okay, well, you
7     know, my role is very limited and, you know, it wasn't just me.
8     It was the other jurors too.  We all agreed upon it.  So,
9     therefore, I shouldn't feel bad about it, because I would.
10              THE COURT:  Okay.  All right.
11         Any objections?
12              MR. NESTLER:  Not from the government.
13              MR. LINDER:  Not from the defense.
14              MR. FISCHER:  Not from the defense, Your Honor.
15              THE COURT:  All right.  Thank you for your time and
16    appreciate your service.
17         Mr. Douyon will show you out of the courtroom and
18    provide you with additional instructions.
19              THE PROSPECTIVE JUROR:  Leave this here?
20              THE COURT:  Yes, please leave that there.
21              (REPORTER'S NOTE:  Prospective Juror 0856 left.)
22              THE COURT:  Okay.  0856 will be stricken for cause.
23         Let's take our afternoon break.  It is now 3:25.
24    Let's -- sorry, 3:35.  Let's try and resume as close to 3:50 as
25    we can and get through as many folks as we can today.  All
```

1    right?

2         Thank you, everyone.

3              (Recess taken.)

4              (REPORTER'S NOTE:  Prospective Juror 1104 enters.)

5              THE COURT:  All right.  Sir, welcome.  Nice to have

6    you.

7         You are Juror 1104?

8              THE PROSPECTIVE JUROR:  That's correct.

9              THE COURT:  And feel free to remove your mask if you

10   feel comfortable doing so.  You should have your juror

11   questionnaire in front of you.

12             THE PROSPECTIVE JUROR:  Okay.

13             THE COURT:  So let me go to a couple of questions in

14   tandem.  Question 11 and Question 32, you indicate that your

15   job with a local television affiliate, essentially, has exposed

16   you to a fair amount of coverage.  And I take it as a part of

17   that you have concerns about whether you could follow an

18   instruction not to follow any news or social media if you were

19   selected as a juror.

20             THE PROSPECTIVE JUROR:  That would be correct.

21             THE COURT:  Okay.  Can you just help us understand

22   that, in part, because if you were selected -- let me ask this:

23   If you were selected, would you still -- I don't know if

24   your -- daytime work, evening work.  What's your --

25             THE PROSPECTIVE JUROR:  It would be --

1           THE COURT:  How would work be impacted?

2           THE PROSPECTIVE JUROR:  Overnight, early morning.

3           THE COURT:  Overnight.  Early morning.

4           THE PROSPECTIVE JUROR:  Yeah.

5           THE COURT:  So would you -- I take it you would not

6    then go to work, or would you try to do both?

7           THE PROSPECTIVE JUROR:  I would probably -- I would

8    probably be on leave, most likely.

9           THE COURT:  You would be on leave?

10          THE PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  Okay.  So if you were on leave and,

12   therefore, not required to, you know, follow the news as you do

13   for your job, would you still have difficulty being able to

14   follow the instruction not following the news about this case

15   or events of January 6th?

16          THE PROSPECTIVE JUROR:  I'm sure -- well, a lot of my

17   friends and colleagues would also probably text me about it,

18   most likely, so it'd probably be difficult.

19          THE COURT:  Okay.  All right.  And you think they

20   would do that even if you sort of said, look, I'm a juror, you

21   can't keep doing this?

22          THE PROSPECTIVE JUROR:  Maybe.  Yeah.

23          THE COURT:  Yeah what?  That you could prevent them.

24   Or you could tell them stop texting me; I'm a juror in this

25   case.  Is that something that could happen?

```
1            THE PROSPECTIVE JUROR:  Probably, yes.

2            THE COURT:  All right.  So let's go to the earlier

3     question.  I think, essentially, the -- what I think you're

4     trying to get at in Question 11 and then in some of your

5     responses later on, Question 45, 46, 47, 48, 49, is that you by

6     virtue of your job have a fair amount of -- have had a fair

7     amount of exposure to the events of January the 6th and even

8     perhaps the Oath Keepers and these defendants.  Can you tell

9     us -- if you sort of look at Questions 45 through 49 -- why you

10    answered those questions yes.

11           THE PROSPECTIVE JUROR:  Just the amount of coverage

12    that we just had, just from working at the station, especially

13    since it was a localized event here in D.C., that we just kept

14    hearing it and hearing it and seeing it and having coverage.

15    That would probably just make it difficult for me to be not

16    biased about it.

17           THE COURT:  Okay.  And would you say you have

18    formed -- well, I hear you saying you have formed views or

19    opinions about the defendants in this case.

20           THE PROSPECTIVE JUROR:  I believe so, yes.

21           THE COURT:  All right.  And can you -- well, let me

22    ask you this:  If you were selected as a juror, do you think

23    you could put those preconceptions aside and focus only on the

24    evidence that's presented in this case?

25           THE PROSPECTIVE JUROR:  I would think so.
```

```
1          THE COURT:  And let me just, sort of, ask, as I'm
2    sure Mr. Linder will ask you:  What are your preconceptions of
3    these defendants?
4          THE PROSPECTIVE JUROR:  I just didn't think it was
5    a -- I don't know.  I just thought it was embarrassing.
6          THE COURT:  I'm sorry.  You thought it was
7    embarrassing?
8          THE PROSPECTIVE JUROR:  Embarrassing, yeah.
9          THE COURT:  You thought what was embarrassing?
10         THE PROSPECTIVE JUROR:  That they actually went into
11   the Capitol and just did that.
12         THE COURT:  Okay.  So would you be open to the idea
13   if the evidence was presented that there were different reasons
14   than what the media has suggested and what the charges may
15   suggest as -- there were reasons to go inside for different
16   reasons?
17         THE PROSPECTIVE JUROR:  I could look at different
18   reasons, yeah.
19         THE COURT:  And, you know, could you consider
20   evidence that -- you've seen a lot in the media, obviously, but
21   there may be evidence in this case that you as a journalist or
22   you as a news -- someone that works in the newsroom has not
23   seen before.  Could you consider that evidence alongside of all
24   the other evidence in this case and render a fair and impartial
25   judgment?
```

```
1                    THE PROSPECTIVE JUROR:  Uh-huh.  That's likely.

2                    THE COURT:  That's likely?

3                    THE PROSPECTIVE JUROR:  Uh-huh.

4                    THE COURT:  Does that mean you think you could put

5       aside what you have learned or what you think you know about

6       this case and about these defendants in evaluating the evidence

7       in this case?

8                    THE PROSPECTIVE JUROR:  Yeah.  I mean, despite what

9       I've seen, yeah.

10                   THE COURT:  Do you have any doubt in your mind that

11      you would be able to do that?

12                   THE PROSPECTIVE JUROR:  I mean, I just think the

13      amount of coverage that we've seen, it's -- it's hard because

14      I've seen a lot.

15                   THE COURT:  Right.

16                   THE PROSPECTIVE JUROR:  That's my only -- that's my

17      only caveat with that.

18                   THE COURT:  Okay.  And by that caveat, what -- do you

19      mean to say that you are not -- that you cannot -- let me ask

20      you differently.

21          What degree of certainty -- with what degree of

22      certainty could you say that you could set aside what you have

23      seen as part of your job and focus only on the evidence

24      presented in this case?

25                   THE PROSPECTIVE JUROR:  In -- in what way?  Just to
```

1    put aside what I've seen?

2              THE COURT:  Right.

3              THE PROSPECTIVE JUROR:  That's -- that's difficult.

4    I'd say maybe 50/50.

5              THE COURT:  Okay.  Can I ask you, did you cover or

6    were you in the newsroom on the evening of January the 6th?

7              THE PROSPECTIVE JUROR:  No.  I watched the live

8    coverage.  The morning after when I went in, like, it was

9    just -- everything was just --

10             THE COURT:  Okay.

11             THE PROSPECTIVE JUROR:  -- the wall-to-wall live

12   coverage that we had.  The localized.

13             THE COURT:  Okay.  All right.

14          Any objections, Counsel?

15             MR. NESTLER:  Yes, Your Honor.

16             THE COURT:  Okay.

17             MR. NESTLER:  Sir, can I ask, so you -- you indicated

18   you're familiar with the events of January 6th.  You watched

19   the coverage.  Do you have any recollection of knowing anything

20   or seeing anything about these specific defendants?

21             THE PROSPECTIVE JUROR:  I don't, no.  That was

22   probably just months afterwards.

23             MR. NESTLER:  Okay.  But at the time it was just the

24   event itself?

25             THE PROSPECTIVE JUROR:  Correct.

1        MR. NESTLER:  And the judge asked you to sort of

2   indicate how certain you could be about putting things out of

3   your mind.  So maybe just to be a little bit clearer, if the

4   judge instructs you you have to decide this case as a juror

5   based on what you hear in court, the videos you see in court,

6   the evidence you hear in court, the testimony you hear in

7   court, and not decide the case based on what you may have seen

8   or heard elsewhere on news media or at work, do you think

9   you're able to do that and follow those instructions?

10        THE PROSPECTIVE JUROR:  Yep.

11        MR. NESTLER:  Thank you.

12        THE COURT:  Sir, can I ask -- I should have asked

13   these questions myself.  But you've indicated that you have

14   seen, read, heard things about the Oath Keepers as an

15   organization.  And while you may not have seen their conduct on

16   the 6th itself, have you seen video of members of the

17   Oath Keepers in connection with January 6th since that date?

18        THE PROSPECTIVE JUROR:  We have run stuff on --

19   on-air, yes.

20        THE COURT:  You have run stuff on-air?

21        THE PROSPECTIVE JUROR:  Yeah.

22        THE COURT:  And you contributed to the identifying of

23   video that would run alongside those stories?

24        THE PROSPECTIVE JUROR:  Me, not specifically, no; but

25   we have run certain pieces on evidence that has come out.

1           THE COURT:  Okay.  And did you play any role in

2    selecting what video or other evidence would be part of

3    stories?

4           THE PROSPECTIVE JUROR:  I have not, no.

5           THE COURT:  And who would have done that?

6           THE PROSPECTIVE JUROR:  That's usually our night side

7    or anybody that's an executive producer.

8           THE COURT:  Okay.  So do you have any editorial role

9    in that process?

10          THE PROSPECTIVE JUROR:  That's probably legal.

11          THE COURT:  I'm sorry?

12          THE PROSPECTIVE JUROR:  That's probably our legal

13    department that would probably do that, since it's coming from,

14    I guess -- I don't know -- FBI or government or whoever else

15    that's --

16          THE COURT:  My question --

17          THE PROSPECTIVE JUROR:  -- releasing those videos.

18          THE COURT:  Yeah.  Maybe my question wasn't clear,

19    which is that when putting a story together -- when your

20    station has put a story together about the events of

21    January 6th, and in particular about the Oath Keepers, do you

22    have any role in how to present the story, what video goes into

23    the story?  That's what I mean by editorial.

24          THE PROSPECTIVE JUROR:  Well, the producers or the

25    talent that's selecting that video will probably want specific

1    videos to go in that story.

2              THE COURT:  Okay.  And --

3              THE PROSPECTIVE JUROR:  So I don't -- I wouldn't have

4    any choice of what gets shown.

5              THE COURT:  You don't have any role in that?

6              THE PROSPECTIVE JUROR:  Correct.

7              THE COURT:  Okay.  And can you just tell me what you

8    think you have learned or what you believe you have learned

9    about the Oath Keepers organization.

10              THE PROSPECTIVE JUROR:  I guess that it's just the

11    far right organization, and they -- they value, I guess,

12    freedom over government.

13              THE COURT:  Okay.  And is there anything more that

14    you have learned or heard about the organization?

15              THE PROSPECTIVE JUROR:  Nothing that would be

16    concrete, no.

17              THE COURT:  Okay.  Well, what about not concrete;

18    even just impressions that you have as opposed to concrete

19    facts?

20              THE PROSPECTIVE JUROR:  I -- I don't know.  I guess

21    just racially motivated, I would assume.

22              THE COURT:  Where do you think that -- that view

23    comes from?

24              THE PROSPECTIVE JUROR:  Probably just from media and

25    just other things that -- that have come out in the last year

```
 1    and a half or so.
 2              THE COURT:  Okay.  Did you -- I mean, you've
 3    indicated that you followed either work-wise or professionally
 4    the January 6th hearings.
 5              THE PROSPECTIVE JUROR:  Uh-huh.
 6              THE COURT:  Do you recall any testimony or commentary
 7    during the January 6th hearings about the Oath Keepers?
 8              THE PROSPECTIVE JUROR:  I don't know.  I've only --
 9    I've only watched probably -- what? -- three of them.
10              THE COURT:  Okay.
11              THE PROSPECTIVE JUROR:  I haven't seen all of them.
12              THE COURT:  And do you recall among the ones that
13    you've seen any commentary or testimony about the Oath Keepers?
14              THE PROSPECTIVE JUROR:  I do not, no.
15              THE COURT:  And what you said earlier about your
16    views on the organization, can you -- you said it was from the
17    media?
18              THE PROSPECTIVE JUROR:  Uh-huh.
19              THE COURT:  Can you elaborate a little bit; so what
20    your basis is.  In other words, what sources from which you
21    might have gotten that impression.
22              THE PROSPECTIVE JUROR:  Just different reports that
23    I've seen over the last, like, year and a half or so.
24              THE COURT:  Okay.  All right.  Okay.  Sir, thank you
25    for your time and your service.
```

1          Mr. Douyon will show you out of the courtroom and

2     provide you further instructions.  Thank you.

3              THE PROSPECTIVE JUROR:  Thank you.

4              (REPORTER'S NOTE:  Prospective Juror 1104 left.)

5              THE COURT:  1104 will be stricken for cause given his

6     exposure to the events and media about the events of

7     January 6th and these defendants, and his impressions of the

8     Oath Keepers organization.

9              (REPORTER'S NOTE:  Prospective Juror 1558 enters.)

10             THE COURT:  Ma'am, how are you?

11             THE PROSPECTIVE JUROR:  Good.

12         How are you doing?

13             THE COURT:  I'm good.  Thank you.

14         Thank you for being here, and thank you for completing

15     your questionnaire.

16         Feel free to remove your mask if you would like.

17         You are Juror 1558; is that right?

18             THE PROSPECTIVE JUROR:  That's correct.

19             THE COURT:  And you have your juror questionnaire in

20     front of you?

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  So let me ask you, if you would please,

23     to turn to page 7 and to Question 17.  That question asks:  Do

24     you have such strong feelings about firearms or the laws

25     concerning firearms that would make it difficult to be a fair

1    and impartial juror in this case?  And you answered that

2    question yes.  Can you tell us why you answered that question

3    yes.

4                THE PROSPECTIVE JUROR:  Which page?

5                THE COURT:  Page 7.  Page numbers are at the bottom.

6    And so it's page No. 7 at the bottom.

7                THE PROSPECTIVE JUROR:  Yeah.  I just feel strongly

8    for gun control, and I feel this country disproportionately has

9    casualties because of our loose gun control laws; so that's my

10   feelings.

11               THE COURT:  Okay.  So it's not the least bit

12   surprising that jurors would come into the courtroom with views

13   about guns and gun control.  The question, though, for you as a

14   potential juror, is if you heard evidence in this case about

15   guns and gun possession, would you be able to put your -- some

16   policy and political views aside about guns and view the

17   evidence fairly and impartially as it relates to these

18   defendants under the laws as I instruct you?

19               THE PROSPECTIVE JUROR:  Yes.

20               THE COURT:  And to be precise here, there -- more

21   precise, is that there is no -- there's likely to be evidence

22   in the case of gun possession by these defendants.  However,

23   there's no charge in this case of unlawful possession of a

24   firearm.  Knowing that, how would that impact your view on your

25   ability to be fair and impartial?

```
 1              THE PROSPECTIVE JUROR:  So they were following the

 2    laws?

 3              THE COURT:  Well, that is a question that may come

 4    for a later day.  But I can tell you there is no charge -- they

 5    have not been charged with possessing a weapon unlawfully.

 6    There's no such charge in this case.

 7              THE PROSPECTIVE JUROR:  Okay.

 8              THE COURT:  Okay.

 9              THE PROSPECTIVE JUROR:  Okay.

10              THE COURT:  All right.  So knowing that, would it be

11    fair to say that you could set aside your personal views and

12    view the evidence as it's presented in this case?

13              THE PROSPECTIVE JUROR:  Yes, I would.

14              THE COURT:  Okay.  Question 18 asked whether you have

15    a close friend or family member in the last five years who's

16    attended a rally, protest, or demonstration.  Can you tell us

17    about that.

18              THE PROSPECTIVE JUROR:  Yes, I attended the rally to

19    uphold *Roe v. Wade*.

20              THE COURT:  Okay.  So if you were to learn or --

21    during the course of this trial that, perhaps, the defendants

22    have different political views than you, how would that affect

23    your capacity as a fair and impartial juror, if at all?

24              THE PROSPECTIVE JUROR:  It would be difficult.

25              THE COURT:  It would be difficult if the defendants
```

```
 1    had different political views than you --

 2              THE PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  -- to be fair to them?

 4              THE PROSPECTIVE JUROR:  Yes.  Yes, I would be fair,

 5    but it would be difficult.

 6              THE COURT:  Okay.  And when you -- I'm sorry.  But

 7    you said you would be fair, but it would be difficult to be

 8    fair; is that what I heard you say?

 9              THE PROSPECTIVE JUROR:  Yes, because I believe some

10    political parties are unfair.

11              THE COURT:  Okay.  So this case doesn't involve

12    policy questions or questions about political parties, although

13    it is likely you would hear the defendants in this case are

14    supporters of the former President.  Knowing that and

15    perhaps -- I take it that you would, perhaps, not have

16    supported the former President, could you be fair to these

17    defendants even though you may have different political views

18    from them?

19              THE PROSPECTIVE JUROR:  I could try.

20              THE COURT:  Okay.  Do you have any reason to think

21    that you wouldn't be able to do that successfully?

22              THE PROSPECTIVE JUROR:  I tend to think they tend to

23    be racist, the people who showed up for the rally.

24              THE COURT:  I'm sorry.  Say that again.

25              THE PROSPECTIVE JUROR:  I tend to think that they are
```

 1    racist, and I'm a Black woman.  So it would be difficult.

 2              THE COURT:  Okay.  So just to make sure I heard you

 3    correctly, your impression was the people who attended the

 4    rally were motivated by --

 5              THE PROSPECTIVE JUROR:  Neo-Nazis.

 6              THE COURT:  I'm sorry.  Say that again.

 7              THE PROSPECTIVE JUROR:  Neo-Nazis.

 8              THE COURT:  Okay.  So those are impressions formed by

 9    media and things that you've seen.  If the evidence in this

10    case didn't support that, would you be open to the idea that --

11    or would you be open to hearing evidence -- or put it

12    differently, if that is not an issue in this case and there's

13    not going to be any evidence on that issue one way or the other

14    in this case, would that affect your ability -- how would that

15    affect your ability to be fair and impartial as a juror?

16              THE PROSPECTIVE JUROR:  I would be open.

17              THE COURT:  I'm sorry?

18              THE PROSPECTIVE JUROR:  I would be open.

19              THE COURT:  You would be open?

20              THE PROSPECTIVE JUROR:  I would be open.

21              THE COURT:  Okay.

22              THE PROSPECTIVE JUROR:  I'll take this off.

23              THE COURT:  Let me ask you this:  How strongly

24    ingrained do you think your view is of people who attended the

25    rally on the 6th and their motivation for being there as you've

1    described it?

2              THE PROSPECTIVE JUROR:  It's pretty strong.  I'm

3    disappointed.

4              THE COURT:  Okay.  Do you think you could overcome

5    that disappointment and sit as an impartial juror in this case,

6    notwithstanding the allegation that these defendants were at

7    the Capitol on January the 6th?

8              THE PROSPECTIVE JUROR:  I could.

9              THE COURT:  You could?

10             THE PROSPECTIVE JUROR:  I could.

11             THE COURT:  Are you certain of that?

12             THE PROSPECTIVE JUROR:  Yes, I am certain I could.

13             THE COURT:  Okay.  Let me ask you, if you would,

14   please, to turn to page 11.  You answered Questions 39, 40, and

15   41, saying that you've seen some videos and some coverage of

16   the events of January the 6th.  Would you describe yourself as

17   someone who sort of actively seeks out news about January the

18   6th or someone who sort of receives it passively when it comes

19   across whatever you're viewing?

20             THE PROSPECTIVE JUROR:  Passively.

21             THE COURT:  And do you think you would have any

22   difficulty putting aside what you've learned and seen in the

23   media and focus only on the evidence that's presented in this

24   case?

25             THE PROSPECTIVE JUROR:  Yes, I could do that.

1          THE COURT:  And have you watched or read any news or

2     reviewed any social media about the events of January the 6th

3     or this case since you completed the questionnaire?

4          THE PROSPECTIVE JUROR:  I have not.

5          THE COURT:  Question -- let me just confirm.  Have

6     you -- you answered Question 46 no.  That was a question about

7     read, seen, or heard anything about the Oath Keepers

8     organization.  Just want to confirm that prior to filling out

9     this questionnaire, you had not heard the term Oath Keepers or

10    had not heard of the Oath Keepers organization?

11         THE PROSPECTIVE JUROR:  I'm not sure what that is.

12         THE COURT:  Okay.  Question 50 asked whether you or a

13    close member of your family -- or close -- excuse me -- close

14    friend or member of your family has worked in the legal field.

15    Can you tell us about that.

16         THE PROSPECTIVE JUROR:  My father is a D.C. criminal

17    defense lawyer.

18         THE COURT:  Okay.  And does he practice in this

19    court?

20         THE PROSPECTIVE JUROR:  He's half retired, but he has

21    for the past 35 years.

22         THE COURT:  He has.  All right.

23         And I suspect that you have talked to your father about

24    his work in this -- in the criminal defense field.  Has it

25    caused you to form any views about the criminal justice system?

```
1            THE PROSPECTIVE JUROR:  I suppose I'm partial to the

2    criminal defense lawyers.

3            THE COURT:  Could you set aside that partiality and

4    still be fair to the government in this case?

5            THE PROSPECTIVE JUROR:  I could.

6            THE COURT:  And do you think you would have any

7    difficulty if, for example, you thought the government had met

8    its burden beyond a reasonable doubt reporting back to your

9    father that you were on a jury that convicted?

10           THE PROSPECTIVE JUROR:  I don't understand that

11   question.

12           THE COURT:  All right.

13           THE PROSPECTIVE JUROR:  Yeah.

14           THE COURT:  If you believed -- if you came to the

15   conclusion that the government had carried its burden of

16   proof -- that is, beyond a reasonable doubt -- do you think you

17   would have any difficulty going back to your father or telling

18   your father that you sat on a trial jury that convicted

19   defendants?

20           THE PROSPECTIVE JUROR:  I would not have a problem.

21           THE COURT:  Question 57 asked whether you or a close

22   friend or family member has ever been arrested, charged,

23   prosecuted, or convicted of a crime.  Can you tell us about

24   that.

25           THE PROSPECTIVE JUROR:  Extended family.
```

1          THE COURT:  Okay.  And can you just share with us a

2     little bit about what that may involve.

3          THE PROSPECTIVE JUROR:  It's like a second cousin.  I

4     don't know the specifics, but I know he went to jail.

5          THE COURT:  Okay.  Anything about his experience or

6     what you know about it that might affect your ability as a

7     juror in this case?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Question 14, if I could just go back to

10    it, because I skipped over it, and ask whether you have any

11    close friends or family members who work for the federal

12    government.  Can you tell us about that.

13         THE PROSPECTIVE JUROR:  My aunt passed away, but she

14    worked for FDIC for 42 years.

15         THE COURT:  And did she work, to your knowledge, in

16    any sort of enforcement capacity for FDIC?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  All right.  Okay.

19        Mr. Linder?

20         MR. LINDER:  I have no questions, Your Honor.

21         THE COURT:  Okay.

22         MR. FISCHER:  Your Honor, if I could, just briefly.

23        Good afternoon.

24         THE PROSPECTIVE JUROR:  Good afternoon.

25         THE REPORTER:  Can I ask you what your name is.

```
 1                  MR. FISCHER:  Sure.  David Fischer, F-i-s-c-h-e-r.
 2                  THE REPORTER:  Thank you.
 3                  MR. FISCHER:  And I am a criminal defense attorney.
 4                  THE PROSPECTIVE JUROR:  Lovely.  Perfect.
 5                  MR. FISCHER:  I'm partial to them too.
 6             So, ma'am, just a couple of questions.  You know this
 7       particular case, the defendants in this case, at least most of
 8       them -- I can't speak for everybody.  I represent one.  But
 9       most of them were supporters of former President Donald Trump.
10       Are you aware of that?
11                  THE PROSPECTIVE JUROR:  I made a strong guess.
12                  MR. FISCHER:  I'm sorry?
13                  THE PROSPECTIVE JUROR:  I made a guess, yes.
14                  MR. FISCHER:  Could you -- could you describe in your
15       own words your -- what your feelings are about individuals who
16       support Donald Trump.
17                  THE PROSPECTIVE JUROR:  Right -- right now, not a
18       good impression.
19                  MR. FISCHER:  Okay.
20                  THE PROSPECTIVE JUROR:  Do you want further
21       clarification?
22                  MR. FISCHER:  Sure.
23                  THE PROSPECTIVE JUROR:  I suppose before Donald Trump
24       was President, I was impressed with him as a business person,
25       but I think his presidency has created racism, division,
```

```
 1    misogyny, and invoked hate.  And the people who voted for him,

 2    to me, are modern-day racists and misogynists.

 3              MR. FISCHER:  Okay.

 4         Nothing else, Your Honor.

 5              THE COURT:  All right.

 6         Mr. Nestler?

 7              MR. NESTLER:  We have no questions, Your Honor.

 8    Thank you.

 9              THE COURT:  All right.  Thank you for your time.

10         Mr. Douyon will show you out of the courtroom and

11    provide you with further instructions.

12              THE PROSPECTIVE JUROR:  Thank you.

13              (REPORTER'S NOTE:  Prospective Juror 1558 left.)

14              THE COURT:  Okay.  I'll strike 1558 for cause.

15              MR. NESTLER:  Let me ask for further clarification,

16    Your Honor.  I believe all of her questions indicated that she

17    could be fair and impartial.

18              THE COURT:  Yeah.  Look, she may have said that, but

19    the firmness with which she declared her views of people who

20    voted for the former President, I think, creates real problems

21    in terms of her ability to be fair and impartial.

22              MR. NESTLER:  We don't believe any evidence is going

23    to come out about what anyone -- who anyone voted for.  I mean,

24    that's not -- I know that Mr. Fischer asked that question, but

25    that's not really going to be evidence in this case.  If he
```

```
1    wanted to inject it, that's a little different.

2              THE COURT:  I don't have any doubt that voting

3    records won't be part of this case, but I don't think it will

4    be a secret who these defendants support.

5              MR. NESTLER:  We understand that.  We don't -- we

6    believe the record was clear she could be fair and impartial.

7              THE COURT:  I understand, but she also had some other

8    things that would suggest otherwise.

9              (REPORTER'S NOTE:  Prospective Juror 1489 enters.)

10             THE COURT:  Hi, ma'am.  How are you?

11             THE PROSPECTIVE JUROR:  Fine.  Doing well.  Thank

12   you.

13             THE COURT:  Feel free to remove your mask, if you'd

14   like, while we have this conversation.

15        You are Juror 1489?

16             THE PROSPECTIVE JUROR:  That is correct.

17             THE COURT:  Your juror questionnaire should be there

18   in front of you, and feel free to refer to it, if you need to.

19        Let me ask you, if you would, please, start with

20   Question 18, which is on page 7 -- or at least what's numbered

21   page 7 of the questionnaire.  That asks have you or a close

22   friend or family member in the last five years attended a

23   rally, protest, demonstration, or march of any type.  And your

24   answer to that was yes.  Could you elaborate on that answer,

25   please.
```

```
1                  THE PROSPECTIVE JUROR:  I think it was February 2018,
2       a friend and I swung by the Women's March for a couple hours --
3                  THE COURT:  Okay.
4                  THE PROSPECTIVE JUROR:  -- down by the Reflecting
5       Pool.
6                  THE COURT:  So let me ask you this:  If you were to
7       learn in this case that the defendants have political views
8       that are different than yours, do you think that would create a
9       problem in terms of you being fair and impartial to these
10      defendants?
11                 THE PROSPECTIVE JUROR:  I'd like to think that I can
12      be fair and impartial.  I try to weigh different viewpoints.
13      I've had various political views in my lifetime.  I have
14      friends with different political views.
15                 THE COURT:  So just to be clear, you know, a criminal
16      trial is not about a policy or -- or who's right or wrong in a
17      particular issue.  It's, rather, about the facts of the case,
18      what defendants have been charged with, and whether the
19      government has met its burden under the law.  And so the
20      question was more to ask you whether you could sort of set
21      aside your political views and apply the facts and the law --
22      excuse me -- apply the law to the facts in this case
23      dispassionately and impartially.
24                 THE PROSPECTIVE JUROR:  I believe I could.
25                 THE COURT:  Okay.  Question 39 -- or, actually, let's
```

1    start with Question 37.  You had indicated that you recognized

2    a couple of witnesses' names or individuals whose names might

3    be mentioned in this case.  Alex Jones is one.  I don't think

4    there's any reason to think Mr. Jones will be a witness in this

5    case, but perhaps his name may be mentioned.  I don't know that

6    it will, but perhaps -- and Robert Contee, who is the former

7    D.C. Chief of Police, may be a witness in this case.  Do you

8    know him personally?

9              THE PROSPECTIVE JUROR:  No, I do not.

10             THE COURT:  You just know him reputationally?

11             THE PROSPECTIVE JUROR:  Just -- yeah.

12             THE COURT:  And what are your views of Chief Contee?

13             THE PROSPECTIVE JUROR:  I actually don't really know

14   much about D.C. politics or D.C. government.

15             THE COURT:  Okay.  Do you have any impressions about

16   his job as a -- as a police chief?

17             THE PROSPECTIVE JUROR:  Honestly, I have no -- no

18   experience with his record.

19             THE COURT:  Fair enough.

20        Question 39 through 41 asked the extent to which you've

21   watched video and followed media about the events of January

22   the 6th.  Would you characterize yourself as someone who

23   actively seeks out news media about January the 6th or someone

24   who sees it passively and reads it if it's in front of them?

25             THE PROSPECTIVE JUROR:  I think mostly passively.

1    If -- you know, there's a lot of targeted media on Facebook and

2    Instagram, and so you kind of, you know, click through that.

3    And that's been probably the majority of what I've seen.

4        THE COURT:  Okay.  Would you be able to -- so put to

5    the side whatever you've read and learned through the media --

6    and judge this case only -- and these defendants only on the

7    facts that are presented here in court?

8        THE PROSPECTIVE JUROR:  I -- I'd like to think that I

9    could.  I believe I could.

10        THE COURT:  Okay.  And, you know, just to be clear,

11    everybody has -- not everybody.  But most everyone has read

12    something about January 6th, and so -- and that's not

13    disqualifying.  The ultimate question is whether,

14    notwithstanding what you've seen and read, you could swear to

15    view the evidence dispassionately in this case and evaluate

16    whether the government has met its burden of proof at this

17    trial.  Is that something you could do?

18        THE PROSPECTIVE JUROR:  Yes.

19        THE COURT:  Okay.  Question 42 asks whether you

20    follow anyone on a social media platform who regularly reports

21    or comments on the events of January the 6th.

22        THE PROSPECTIVE JUROR:  As I said, I have friends

23    with different political views, and oftentimes different things

24    pop up on Instagram stories, and they repost or comment on

25    things.

```
1              THE COURT:  Okay.  Is there any particular
2     journalist, for example, that you follow who regularly posts
3     about January 6th?
4              THE PROSPECTIVE JUROR:  NPR, probably, I follow, and
5     their account on Instagram.
6              THE COURT:  That's just a -- the NPR account
7     generally or a particular reporter?
8              THE PROSPECTIVE JUROR:  I don't follow any particular
9     reporters that I can think of.
10             THE COURT:  Okay.  Question 54 asks whether you or a
11    close friend or family member has ever been the victim of a
12    crime.  And if there's a personal response here, we can take
13    that in a more private setting.
14             THE PROSPECTIVE JUROR:  Sorry.  Can you --
15             THE COURT:  Sorry.  Question 54.
16             THE PROSPECTIVE JUROR:  54.  I mean, besides like a
17    few car break-ins, I've had friends -- I've had a friend be a
18    victim of an assault.
19             THE COURT:  Okay.  And did that happen in Washington,
20    D.C., or elsewhere?
21             THE PROSPECTIVE JUROR:  It was childhood.
22             THE COURT:  Childhood.  Okay.
23         And did that happen in D.C. or somewhere where you grew
24    up?
25             THE PROSPECTIVE JUROR:  Elsewhere.
```

```
1                    THE COURT:  Elsewhere.  All right.

2              Okay.  Mr. Linder, any additional questions?

3              MR. FISCHER:  If I may.

4         Good afternoon, ma'am.

5              THE PROSPECTIVE JUROR:  Hello.

6              MR. FISCHER:  Thank you for filling the questionnaire

7     out and for being here today.  Just a couple of questions.

8              You understand that in this trial the individuals who

9     are on trial -- I can't speak for everybody.  I represent one

10    gentleman.  But most of them were supporters of the former

11    President Donald Trump.  Are you aware of that?

12             THE PROSPECTIVE JUROR:  I am.

13             MR. FISCHER:  Okay.  And I understand you said you

14    have friends that have different political views; is that

15    correct?

16             THE PROSPECTIVE JUROR:  I do.

17             MR. FISCHER:  If I could inquire.  You don't have to

18    name your friends, but are any of your friends, are they Trump

19    supporters?

20             THE PROSPECTIVE JUROR:  Yes.

21             MR. FISCHER:  Okay.  And in your own words, could

22    you -- could you describe your opinion of what you believe

23    about Trump supporters.  Do you have any feelings or any words

24    come to mind?

25             THE PROSPECTIVE JUROR:  You know, it -- sorry.
```

1          MR. FISCHER:  That's okay.  Take your time.

2          THE PROSPECTIVE JUROR:  I would say that while I may

3    personally disagree with their views, that everybody is

4    entitled to their opinions; and I can respect people who have

5    strong views either way who are, you know -- have their

6    convictions.

7          I'm sorry.  I don't know if that answers.

8          MR. FISCHER:  No, that's fair enough.

9          The Oath Keepers, you heard of the organization before?

10         THE PROSPECTIVE JUROR:  Maybe in passing.

11         MR. FISCHER:  Could you describe what you believe

12   with your -- just observations or what you know about the

13   Oath Keepers in a few words?

14         THE PROSPECTIVE JUROR:  Honestly, I don't know much

15   about that particular organization.  I mean, I could, like,

16   make inferences based on --

17         THE COURT:  Just, again, whatever -- if you can

18   answer the question based upon what you know, but we're not

19   asking you to speculate or guess or make things up.

20         THE PROSPECTIVE JUROR:  Okay.  I think I probably

21   heard it talked about on different, like -- I get most of my

22   news either from, like, scrolling through things or from NPR on

23   my commute in the morning.

24         MR. FISCHER:  Understood.  There's -- there will be

25   some testimony regarding firearms and the defendants perhaps

1    either having firearms or having access to firearms.  Does that

2    give you pause or any trouble specifically?

3              THE PROSPECTIVE JUROR:  No.

4              MR. FISCHER:  Okay.  And so you could -- you could

5    give both sides your word that if you were a juror, you would

6    be fair and impartial and you would follow the Court's

7    instructions?

8              THE PROSPECTIVE JUROR:  Yes.

9              MR. FISCHER:  Fair enough.

10         Thank you, Your Honor.

11             THE COURT:  All right.  Thank you, Mr. Fischer.

12         All right, ma'am.  Thank you very much.

13         Mr. Douyon will show you out of the courtroom and

14    provide you with some additional instructions.

15             THE PROSPECTIVE JUROR:  Thank you.

16             (REPORTER'S NOTE:  Prospective Juror 1489 left.)

17             (REPORTER'S NOTE:  Prospective Juror 1140 enters.)

18             THE COURT:  Hi, sir.  How are you?

19             THE PROSPECTIVE JUROR:  Good.  Thank you.

20             THE COURT:  Feel free to remove your mask, if you

21    would like.

22         You're Juror 1140?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And you should have your juror

25    questionnaire in front of you.  So if I could ask you to turn

1    to page 11 and direct you, first, to Question 46.  That

2    question asked you whether you have read, seen, or heard

3    anything about the Oath Keepers organization.  Can you tell us

4    what you have read, seen, or heard about the Oath Keepers

5    organization.

6              THE PROSPECTIVE JUROR:  I am aware that it is -- I've

7    read that it is an organization that -- how do I describe that?

8    It is -- it is one that has a very rigid view of the

9    United States and that you're only supposed to be doing things

10   a certain way, and that's why they're Oath Keepers.  And

11   then they -- they are on the -- you know, the right of the

12   political spectrum.

13             THE COURT:  Okay.  So is there anything else that you

14   have learned about the organization?

15             THE PROSPECTIVE JUROR:  Not really.

16             THE COURT:  Okay.  And just to be -- the defendants

17   in this case who are listed there in Question 48, have you --

18   do you know anything about those defendants?

19             THE PROSPECTIVE JUROR:  No.

20             THE COURT:  All right.  Now, the organization itself

21   is not on trial in this case.  These defendants are.  And they

22   are alleged to be members of the organization.  Do you think

23   that what you have learned about the organization might affect

24   your ability to be fair and impartial to them in this case?

25             THE PROSPECTIVE JUROR:  No.

```
1              THE COURT:  All right.  Do you have any -- you know,
2     let me just ask because I know it's going to be asked.  Do you
3     have any impressions positive or negative of the Oath Keepers
4     as an organization?
5              THE PROSPECTIVE JUROR:  I don't have positive
6     impressions.
7              THE COURT:  Okay.
8              THE PROSPECTIVE JUROR:  Let's put it that way.  Yeah.
9              THE COURT:  So, you know, this is not a case that's a
10    referendum on the organization or -- or its mission, if you
11    will --
12             THE PROSPECTIVE JUROR:  Right.
13             THE COURT:  -- but, rather, is a case about
14    individual defendants.  And I think you're a lawyer; so you
15    would understand that.
16             Would you have any trouble putting aside your impression
17    about the organization in evaluating the evidence fairly and
18    impartially?
19             THE PROSPECTIVE JUROR:  No.
20             THE COURT:  If we could go back to Question 19.  It
21    asks whether you've ever been on the Capitol Grounds --
22    actually, excuse me.  Before we get to Question 19, Question 18
23    asks whether you or a close friend or family member in the last
24    five years has attended a rally, protest, or demonstration.
25    Can you tell us a little bit about that.
```

1        THE PROSPECTIVE JUROR:  Yes.  A number of my friends,

2   after one of those school shootings, organized a group to go

3   down close to the Capitol, you know, some sort of -- you know,

4   gun control, you know, trying to stop school shootings.

5        THE COURT:  Sure.  Do you, sir, have -- personally,

6   do you have strong views about gun laws?

7        THE PROSPECTIVE JUROR:  Well, I have -- I have, you

8   know, feelings.  I wouldn't really say strong feelings, no.  I

9   don't want a gun in my house ever, and I know the

10  Second Amendment exists.  I don't -- I'm not sure it's been

11  interpreted appropriately.

12       THE COURT:  So this case -- it's my expectation that

13  there will be evidence about gun possession and access to guns.

14  However, there's no allegation, no -- I should say there's no

15  charge in this case about unlawful gun possession.  Knowing

16  that, how do you think that might affect your ability to serve

17  as a fair and impartial juror in this case?

18       THE PROSPECTIVE JUROR:  It -- I don't think it would

19  affect it.

20       THE COURT:  It wouldn't have any effect.

21       And if you were to learn that, you know -- that -- that

22  the defendants in this case had -- or you were to infer that

23  they had different views about gun possession than your friends

24  who attended the rally, for example, do you think you could

25  still be fair and impartial to them?

1          THE PROSPECTIVE JUROR:  Yes, I think I could be.

2     Yes.

3          THE COURT:  Do you have any --

4          THE PROSPECTIVE JUROR:  I mean, the -- let me -- I

5     don't know if you're ever going to ask this.  But do I want to

6     be on this jury?  It's like, not really.  But could I be

7     impartial?  I think so.

8          THE COURT:  Okay.  Well, look, I can understand that

9     nobody wakes up in the morning and says, you know, I want -- I

10    can't wait to get on the jury.  Very few people have that view,

11    but, you know, you're a lawyer.  You understand it's a

12    constitutional duty and -- as a citizen.  And if you are

13    selected, that you would be selected to serve.

14         THE PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Question 14 asks whether you or a close

16    friend or family member has ever been employed by the federal

17    government.  Can you --

18         THE PROSPECTIVE JUROR:  My wife is -- which is on the

19    next page, is an attorney with the FCC.

20         THE COURT:  And is she doing any enforcement work at

21    the FCC?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Question 19 asked about being on the

24    Capitol Grounds or inside the Capitol.  Can you elaborate on

25    that.

```
1              THE PROSPECTIVE JUROR:  Just as a tourist.  And,
2     actually, once I took a client down to see some congressman's
3     aide, but, you know --
4              THE COURT:  Okay.
5              THE PROSPECTIVE JUROR:  -- not -- not much.
6              THE COURT:  All right.  Question 37 asked you to
7     identify people that you might recognize on the list of
8     witnesses or people whose names might appear in the case.  And
9     you identified Alex Jones, Peter Navarro, Roger Stone, and
10    John Eastman.  I certainly don't expect any of the four to be
11    witnesses in this case.  However -- and I think it's unlikely
12    that Mr. Jones, Mr. Navarro, or John Eastman's name will come
13    up in this case, but Mr. Stone's name may come up.  And if you
14    were to hear his name and to learn that a defendant had some
15    association with Mr. Stone, how would that impact your ability
16    to be fair as a juror?
17             THE PROSPECTIVE JUROR:  It wouldn't.
18             THE COURT:  Okay.  You've indicated that you've seen
19    some videos, watched some news about the events of January
20    the 6th.  Would you consider yourself somebody who was a
21    passive recipient of news about January 6th or someone who sort
22    of actively seeks out stories?
23             THE PROSPECTIVE JUROR:  Certainly not an active --
24    yeah, I would be more -- you know, like you got to be
25    up-to-date on what's going on, but more passive.  It's not like
```

1    I go searching it out at all.

2            THE COURT:  And do you -- do you think you could sort

3    of put aside what you read and seen in the media and -- and

4    evaluate the evidence in this case against these defendants?

5            THE PROSPECTIVE JUROR:  Yes.

6            THE COURT:  And you've indicated that you have

7    watched some portion of the January 6th hearings; is that

8    right?

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Can you give us a sense of how frequently

11   and to what extent you watch those hearings and follow those

12   hearings.

13           THE PROSPECTIVE JUROR:  Not terribly closely, but

14   certainly -- I think it was the first one, sort of laid out the

15   predicate of what they were doing, and so, yes.  But I -- you

16   know, just sort of, like, I don't go searching it out.  I don't

17   go searching out these hearings.

18           THE COURT:  Okay.  And do you recall -- from what you

19   have seen or read about the hearings, do you recall whether

20   there have been any mentions of Oath Keepers or testimony about

21   Oath Keepers during those hearings?

22           THE PROSPECTIVE JUROR:  I do not recall.

23           THE COURT:  Question 50 asks whether you or a close

24   friend and family in the legal field.  You yourself are a

25   lawyer; is that right?

1          THE PROSPECTIVE JUROR:  Correct.

2          THE COURT:  Do you do any kind of litigation or -- I

3     should put it differently.

4          Have you done any criminal work in your --

5          THE PROSPECTIVE JUROR:  No.  No, criminal work

6     whatsoever, and no real litigation.  Only administration law

7     litigation, which is a different animal.

8          THE COURT:  And are you affiliated with a law firm or

9     another organization?

10         THE PROSPECTIVE JUROR:  Yes, with a law firm.

11         THE COURT:  Are there criminal defense lawyers in

12    your law firm?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  And question -- do you know people who

15    are prosecutors or criminal defense attorneys?

16         THE PROSPECTIVE JUROR:  Yes.  Spouses of friends, you

17    know, but they're not close friends, but they're -- I do know

18    them.

19         THE COURT:  Okay.  That's fine.

20         THE PROSPECTIVE JUROR:  A couple of prosecutors, yes.

21         THE COURT:  And then Question 54 asked:  Have you or

22    a close friend or family member ever been the victim of a

23    crime?  And if there's a personal answer associated with this,

24    we can -- we can take that in a private setting.

25         THE PROSPECTIVE JUROR:  Right.  No.  This is, you

1  know, again, obviously a very broad question.  You know,

2  somebody broke into my car a couple times.

3              THE COURT:  Okay.  And is that something you reported

4  to the police?

5              THE PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  Is that -- have those experiences

7  left you with any impression about -- well, let me ask this

8  first:  Did that happen in the District of Columbia?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  All right.  Have those experiences left

11  you with any impressions about law enforcement in the District

12  of Columbia?

13             THE PROSPECTIVE JUROR:  No.

14             THE COURT:  Any impressions about people who were

15  charged with criminal offenses in the District of Columbia?

16             THE PROSPECTIVE JUROR:  No.

17             THE COURT:  Any questions from defense counsel?

18             MR. FISCHER:  A few, Your Honor.

19             THE COURT:  Mr. Fischer.

20             MR. FISCHER:  Good afternoon, sir.

21         Sir, I understand you're an attorney; is that correct?

22             THE PROSPECTIVE JUROR:  Correct.

23             MR. FISCHER:  First of all, my condolences, I would

24  say.

25         But more to the point, you understand that this trial

1    could actually last six to eight weeks.  Would that cause any

2    type of hardship with your employment?

3             THE PROSPECTIVE JUROR:  Yes.  I would prefer very

4    much not to be on this jury for -- for exactly that reason.  I

5    mean, I -- I actually have -- I don't -- you know, as you just

6    said, I don't want to be on a jury.  I don't want to pass

7    judgment on anybody, but if this is a one- or two-day trial,

8    it's like, yeah.  But six to eight weeks, it's like, oh, I

9    really do not want to do this.

10            THE COURT:  Excuse me, Mr. Fischer.

11        I mean, as I said, I don't think anybody wakes up and

12   says that they want to do it, and everybody has professional

13   obligations.  Everybody has work commitments, but unless they

14   are highly unusual or extraordinary, I hope you can understand

15   that I don't release people just based on ordinary work

16   obligations.

17            THE PROSPECTIVE JUROR:  Right.  No, I understand

18   that, but I did want to say that, though.

19            THE COURT:  Sure.  No problem.

20            MR. FISCHER:  Understood.  Fair enough.

21        And, sir, obviously you -- you understand that the

22   defendants in this case were -- were supporters of former

23   President Donald Trump.  You understand that?

24            THE PROSPECTIVE JUROR:  I assumed.

25            MR. FISCHER:  Okay.  Does that give you any pause

1        about whether you could be fair and impartial on a jury?

2                    THE PROSPECTIVE JUROR:  No.

3                    MR. FISCHER:  Okay.  Fair enough.

4              Your Honor, I have nothing further.  Thank you.

5                    THE COURT:  Thank you, Mr. Fischer.

6              Mr. Nestler?

7                    MR. NESTLER:  No questions, Your Honor.

8                    THE COURT:  All right, sir.  Thank you for your time

9        and your service this afternoon.

10             Mr. Douyon will show you out of the courtroom and

11       provide you additional instructions.

12                   THE PROSPECTIVE JUROR:  Okay.  Thank you.

13                   (REPORTER'S NOTE:  Prospective Juror 1140 left.)

14                   MR. NESTLER:  Your Honor, can I just make one point

15       regarding Mr. Fischer's line of questioning about being

16       supporters of President Trump.  I don't believe it's

17       appropriate to continue asking those questions.  I don't

18       believe that evidence is going to come out here.  In fact, the

19       evidence will show that starting on January 6th these

20       defendants said they were not supporters of President Trump.

21       They were going to act without him, that he was a traitor, and

22       it was up to them to take action into their own hands.

23             I just don't see how them being supporters of

24       President Trump is at all relevant to any prospective juror's

25       qualifications.

278

1          THE COURT:  Well, I don't know -- you know,

2     Mr. Fischer, if you want to word it differently and just ask

3     if -- if -- if these defendants -- if you think these

4     defendants have different political views than yours, that's

5     something that you would find an alternative -- that would be

6     acceptable for the answers you're trying to sort out.

7          MR. FISCHER:  Your Honor, one problem with that is

8     the young lady who -- a couple of witnesses ago, the young lady

9     who the Court struck for cause who had the answer regarding

10    Trump supporters and went on quite the diatribe as to what her

11    opinion was.  I mean, quite frankly, it's disingenuous for the

12    government to suggest that Donald Trump isn't casting his

13    shadow over this -- over this entire proceeding.

14          And these defendants are clearly -- my client was

15    dressed in -- and his wife were dressed in an outfit --

16    Donald Trump regalia, I think it's -- quite frankly, it's a

17    little beyond the pale.  I think we have to ask the question.

18    I think I've asked it gently.  It's an open-ended question.  I

19    think it's fair.

20          THE COURT:  Look, I'm not -- I don't think anybody

21    has been on either side unfair in their questioning.  So I

22    thought I would just, you know --

23          Mr. Nestler?

24          MR. NESTLER:  Yeah.  I guess my point is asking

25    someone's opinion of Trump supporters is fine, saying to the

1  defen- -- the prospective jurors all of these defendants are

2  supporters of President Trump, how do you feel about it, it's

3  that prefatory part of the question that is introducing a fact

4  that may not come into evidence.  And if it does, it should

5  come in as evidence, not based on questioning of *voir dire*.

6          THE COURT:  Okay.  If you would just phrase the

7  question differently, Mr. Fischer, to avoid the predicate.  I

8  think you can phrase the question in a way that avoids the

9  concern the government is raising.

10          MR. FISCHER:  Understood.  Thank you.

11          THE COURT:  All right.

12          (REPORTER'S NOTE:  Prospective Juror 1431 enters.)

13          THE COURT:  Hi, sir.  How are you?

14          THE PROSPECTIVE JUROR:  Good.

15          THE COURT:  Thank you for being with us today.  If

16  you'd like to remove your mask, feel free to do so.

17          You are Juror 1431; is that right?

18          THE PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Okay.  Your juror questionnaire is in

20  front of you.  If you'd like to refer to that, feel free to do

21  so.

22          Let me just start with Question 11.  You were asked if

23  there's anything about you the Court should know that might

24  affect your ability to be a fair and impartial juror in this

25  case.  And you answered:  I have no respect for and are

1    completely outraged that the citizens, lawmakers, and the

2    former President would perpetrate such an act on our freedoms.

3    I would not be impartial in my judgment.

4         So everyone -- well, some people have views about the

5    events of January the 6th.  Some -- and they've run the

6    spectrum.  The question as a juror is a slightly different one,

7    which is that -- could you set aside what your views are about

8    the events of that day and view the evidence in this case and

9    weigh it, evaluate it, and apply the law as I instruct you

10   fairly and impartially as to these defendants in this case?  Is

11   that something you think you could do?

12        THE PROSPECTIVE JUROR:  Yes, I believe I could.  I

13   think it -- I -- it's hard not to kind of personalize those

14   events that happened because I found them to be very

15   triggering.  While at home, if that comes on TV, I can leave

16   the room because it -- I -- I just -- I just -- it's just an

17   inward reaction to that and just everything that -- that stood

18   for -- you know, with -- with the prior administration and --

19   and the folks that did that.

20        I've always seen myself as an impartial person through a

21   lot of things.  I mean, I served in the service.  And being a

22   federal -- federal employee in my job, it just -- it just

23   seemed like a difficult -- it just seemed like it would be a

24   difficult thing.  I -- I can -- I think that -- yes, I believe

25   that I could do -- follow the directions of the Court.

1    I just don't know all of -- when the evidence is

2    presented, if the law is going to actually require me to

3    disregard what I've seen as far as connecting the individuals

4    that are going to be on trial; seeing actually, potentially,

5    their actions; and then having instruction to just disregard

6    that because the law won't allow me to do -- you know, do that.

7    And that's something that I've just kind of seen played out.

8        THE COURT:  Okay.  If I could interrupt you just to

9    ask a couple follow-ups.

10        THE PROSPECTIVE JUROR:  I'm sorry.

11        THE COURT:  No.  That's okay.

12    Let me ask you this:  There's undoubtedly going to be

13    video played in this trial of the events of January the 6th.

14    Some of that video may involve these defendants.  How do you

15    think you will react -- can you anticipate how you will react

16    if you watch that video?  Do you think it will be something

17    that you can view dispassionately, or do you think it will

18    bring back memories and emotions of the kind that you just

19    described?

20        THE PROSPECTIVE JUROR:  There would -- there would

21    likely be reactions.  I mean, I won't be able to, you know, get

22    up and walk out of the room, other than maybe -- maybe asking

23    for some sort of prescription to just be able to kind of deal

24    with that on a daily basis for a month or more.  That's just,

25    you know -- this right here is just me being honest, and it --

1   and it just comes from just the principles or of the thoughts

2   behind that whole event and it taking place.  So.

3            THE COURT:  Well, I mean --

4            THE PROSPECTIVE JUROR:  I wish -- I wish it were

5   another instance where I could say, you know, okay, I can kind

6   of sit here and just calculate things and not be affected; but

7   for whatever reason, you know, that event and everything that

8   led up to it beforehand, you know, is -- is just very

9   triggering.

10            THE COURT:  Okay.  Well, I -- you know, that was the

11   purpose of this questionnaire is to --

12            THE PROSPECTIVE JUROR:  Yes, sir.

13            THE COURT:  -- elicit people's truthful and honest

14   opinion and answers, and so I appreciate that.

15        Any objection?

16            MR. LINDER:  No objection.

17            MR. NESTLER:  No, Your Honor.

18            THE COURT:  All right.  Sir, thank you for your time

19   and your jury service.

20        Mr. Douyon will show you out of the courtroom and

21   provide you further instructions.

22            THE PROSPECTIVE JUROR:  Okay.  Thank you, sir.

23            THE COURT:  You're welcome.

24            (REPORTER'S NOTE:  Prospective Juror 1431 left.)

25            THE COURT:  1431 will be stricken for cause.

```
 1                (REPORTER'S NOTE:  Prospective Juror 0775 enters.)
 2           THE COURT:  Sir, come on up and have a seat right up
 3      here.  No, right here by the -- come on up.
 4           All right.  How are you, sir?
 5           THE PROSPECTIVE JUROR:  Good.  Good.
 6           THE COURT:  Feel free to remove your mask while we
 7      are chatting.
 8           You are Juror 0775; is that right?
 9           THE PROSPECTIVE JUROR:  Yes.
10           THE COURT:  And your juror questionnaire is in front
11      of you.  So feel free to refer to it, if you need to.
12           Let me just ask some follow-up questions based upon
13      answers you've given in your questionnaire.  If you would just
14      turn to page 10 and just look at paragraphs -- excuse me --
15      Questions 39, 40, and 41.  Are you with me on page 10?
16           THE PROSPECTIVE JUROR:  Ten?
17           THE COURT:  I'm sorry.
18           THE PROSPECTIVE JUROR:  Okay.  Okay.
19           THE COURT:  You're there.
20           THE PROSPECTIVE JUROR:  Okay.
21           THE COURT:  So you had -- you were asked questions
22      about the amount of news coverage you've seen and videos of
23      January the 6th.  Can I ask you, do you consider yourself
24      somebody who was -- actively looks for news about January
25      the 6th or someone who reads it if it -- if you come across it?
```

```
1              THE PROSPECTIVE JUROR:  Yeah, the thing is my home on
2     YouTube, I follow the news.
3              THE COURT:  You follow the news on YouTube?
4              THE PROSPECTIVE JUROR:  YouTube, yeah.
5              THE COURT:  Okay.  But when you're watching news on
6     YouTube, do you specifically look for January the 6th news, or
7     is it something that happens to come on, you watch it?
8              THE PROSPECTIVE JUROR:  Sure.  The time before
9     January 6th, I'm driving Uber.  Sometimes people protesting on
10    weekend, on -- after the election, every Saturday and Sunday,
11    people in D.C. while I driving in D.C.  I watch them doing
12    protest.
13             THE COURT:  You've watched people protest?
14             THE PROSPECTIVE JUROR:  Yes.
15             THE COURT:  Now, let me ask you this:  Your job as a
16    juror would be to look at the evidence and consider the
17    evidence, and determine if the government in this case has met
18    its burden to prove guilt of these defendants.  Okay?  That
19    would be your job as a juror.  Does the fact that you have
20    given rides to people who have been protesters after the
21    election, does that cause you to think you might not be fair
22    and impartial in this case?
23             THE PROSPECTIVE JUROR:  Can you repeat that question.
24             THE COURT:  Sure.  Of course.  The fact that you have
25    driven people after protests, how do you think --
```

1          THE PROSPECTIVE JUROR:  Oh, no, no.  I see them while

2     I'm driving on the street.

3          THE COURT:  Right.

4          THE PROSPECTIVE JUROR:  Walking and having American

5     flag.

6          THE COURT:  Right.

7          THE PROSPECTIVE JUROR:  And that's all.

8          THE COURT:  You've seen them?

9          THE PROSPECTIVE JUROR:  I've seen them.

10          THE COURT:  Okay.  And how do you think having seen

11     those protesters would affect you as a juror?  Would it make

12     any difference?

13          THE PROSPECTIVE JUROR:  At the time I see them, they

14     walking.  They have the American flag and peaceful.

15          THE COURT:  And that's it.  They're peaceful?

16          THE PROSPECTIVE JUROR:  Peaceful.  That's what I

17     seen.

18          THE COURT:  Okay.  Let me ask you, on Question 42 you

19     answered that you follow someone on social media who regularly

20     reports or comments on the events of January the 6th.

21          THE PROSPECTIVE JUROR:  Yeah, there is -- I see not

22     always because whenever I have time, I see the news on YouTube.

23          THE COURT:  Sir, can I ask you to just move forward

24     and speak into the microphone.

25          THE PROSPECTIVE JUROR:  Oh, into the microphone.

1    Okay.

2         So I see on YouTube, I have different news up.  And,

3    yeah, I see some reports.

4         THE COURT:  And do you follow anyone specifically

5    who -- who only -- who reports a fair amount on January the 6th

6    events?

7         THE PROSPECTIVE JUROR:  No.  One time I hear there

8    was protests, preparation for protests in downtown D.C. after

9    this January 6th happen.  People tried protests near the --

10   from people -- not from the news sources, from other people.

11   They say tomorrow there's protests.

12        THE COURT:  Okay.  So you'll forgive me for asking

13   this, but is -- I take it English is not your first language?

14        THE PROSPECTIVE JUROR:  English, no, it's not my

15   first language.

16        THE COURT:  Okay.

17        THE PROSPECTIVE JUROR:  So.

18        THE COURT:  And, for example, this morning, when I

19   was giving instructions to all of the jurors, did you have any

20   difficulty following what I was saying this morning?

21        THE PROSPECTIVE JUROR:  No.  No.

22        THE COURT:  Okay.  And do you have any concerns about

23   your understanding of English that would cause you to think you

24   might not be able to hear and understand everything that

25   happened at the trial?

1          THE PROSPECTIVE JUROR:  Yeah, because as I said, the

2     words, most of the words --

3          THE COURT:  I'm sorry?

4          THE PROSPECTIVE JUROR:  The words, like social

5     science.  So everything -- every day I hear them.  So it's not

6     difficult for me.

7          THE COURT:  It's not difficult for you?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  So just to be clear, do you -- do

10    you believe you could follow what is said and what is presented

11    at the trial based upon your level of understanding and ability

12    to speak and hear the English language?

13         THE PROSPECTIVE JUROR:  Yeah.  I will try my best.

14         THE COURT:  You'll try your best?

15         THE PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  You'll have to forgive me -- and I

17    continue to ask this question because it's important that --

18    that you would be in a position to actually understand

19    everything that was said here.  So do you think you would have

20    any difficulty understanding all of the testimony and evidence

21    that might be presented here, if you think you have any

22    limitations on the English language?

23         THE PROSPECTIVE JUROR:  Yeah.  Yeah, I don't -- my

24    language is good.  But hundred percent, I'm not hundred

25    percent.  Not a hundred percent.

```
 1              THE COURT:  Not a hundred -- I'm sorry?

 2              THE PROSPECTIVE JUROR:  Not hundred percent.

 3              THE COURT:  Not a hundred percent.

 4              THE PROSPECTIVE JUROR:  But I'll try my best.

 5              THE COURT:  Okay.  All right.

 6         Any objections, Counsel?

 7              MR. NESTLER:  No, Your Honor.

 8              MR. LINDER:  No, Your Honor.

 9              THE COURT:  All right.  Mr. Douyon will show you out

10    of the courtroom.

11         Thank you for your time and your service.

12              THE PROSPECTIVE JUROR:  Okay.

13              THE COURT:  He'll provide you some additional

14    instructions.

15                (REPORTER'S NOTE:  Prospective Juror 0775 left.)

16                (REPORTER'S NOTE:  Prospective Juror 1301 enters.)

17              THE COURT:  Hi, sir.  How are you?

18              THE PROSPECTIVE JUROR:  All right.

19         How are you doing?

20              THE COURT:  I'm good.  Thank you.

21         You are Juror 1301?

22              THE PROSPECTIVE JUROR:  That's correct.

23              THE COURT:  All right.  Feel free to remove your

24    mask, if you feel comfortable doing so.  Thank you for

25    completing your questionnaire and your service.
```

1           Let me ask you -- if you could turn in your

2       questionnaire, which is in front of you, to page 11.

3               THE PROSPECTIVE JUROR:  Yep.

4               THE COURT:  And let's start with Question 45.  That

5       question asked:  Do you have such a strong opinion about any

6       aspect of the events that occurred at the U.S. Capitol on

7       January 6th that would affect your ability to be fair and

8       impartial?  Could you share with us why you answered that

9       question yes.

10              THE PROSPECTIVE JUROR:  Well, you know, it was a

11      pretty tough day because I live pretty close to the Capitol.

12      And, you know, I had a kid in the school down the street from

13      the Capitol.  You can hear the helicopters flying overhead.

14      And, yeah, you're, you know, glued to what's going on and

15      worried about it spreading out and people starting to, you

16      know, attack houses or things like that, so.

17              THE COURT:  Did you -- did you fear for your personal

18      safety on that day or for the safety of your children?

19              THE PROSPECTIVE JUROR:  A bit, you know, in the

20      morning, probably, you know, and then as time went on, things

21      dissipated.

22              THE COURT:  Okay.

23              THE PROSPECTIVE JUROR:  Yeah.

24              THE COURT:  And what would you say, generally

25      speaking, is your perception of people who participated in the

1  events of that day?

2         THE PROSPECTIVE JUROR:  Well, they were a bit out of

3  control --

4         THE COURT:  Okay.

5         THE PROSPECTIVE JUROR:  -- you know, and -- well, so

6  I'm not supposed to speculate about anything; right?  But, you

7  know, they -- I had worked -- well, as I answered here, I

8  worked in the Capitol for a number of years too.  So.

9         THE COURT:  Let me ask you the follow- --

10        THE PROSPECTIVE JUROR:  A little bit more personal.

11        THE COURT:  I understand.

12      So the question, ultimately, as a juror is can you put

13  aside the personal feelings that you've described and view the

14  evidence fairly and dispassionately in this case against these

15  defendants.

16        THE PROSPECTIVE JUROR:  Yeah, well, I've got to;

17  right?  I understand what that means.

18        THE COURT:  Sure.  But, you know, again, everybody

19  has got different capacities, and I want -- our goal is to pick

20  a fair and impartial jury.  And so do you think you would be --

21  do you consider yourself so affected by the events of that day

22  that you would not be able to be fair and impartial as a juror

23  in a case involving people who were involved in those events?

24        THE PROSPECTIVE JUROR:  Well, I think I can be fair.

25        THE COURT:  Okay.  You had also answered Question 46,

1    which had asked whether you had read, seen, or heard anything

2    about the Oath Keepers organization.  Can you tell us what you

3    have read, seen, or heard.

4            THE PROSPECTIVE JUROR:  Well, sure.  So, actually,

5    you know, years leading up to this, you know, friends were

6    pointing out, you know, hey, keep an eye out on groups like the

7    Oath Keepers and the Proud Boys and -- and others, because, you

8    know, there was sort of a right wing extremist intent from

9    those organizations.  So, I mean, that was probably the start

10   of it.  And, obviously, as time went on, there was, you know,

11   Trump stating, you know, standby, guys, and that sort of thing.

12   So you certainly heard about it.  It was in the news.

13           THE COURT:  Sure.  So, you know, the organization

14   itself is not on trial.

15           THE PROSPECTIVE JUROR:  Uh-huh.

16           THE COURT:  But defendants who are alleged to have

17   been members of the group are on trial.

18           THE PROSPECTIVE JUROR:  Okay.

19           THE COURT:  Does the mere fact that these defendants

20   are affiliated or associated with that group, does that give

21   you pause in thinking you could be fair and impartial?

22           THE PROSPECTIVE JUROR:  No, I don't think so.

23           THE COURT:  All right.  So even knowing what you have

24   just said or at least char- -- understanding that the group is

25   characterized in a particular way, you think you could still be

1    fair and impartial?

2              THE PROSPECTIVE JUROR:  Yeah, because -- well, I

3    think they're -- you know, you've got the individual; right?

4              THE COURT:  Right.

5              THE PROSPECTIVE JUROR:  And whatever --

6              THE COURT:  And would you consider yourself somebody

7    who would be open in hearing evidence to the contrary; that is,

8    evidence that might support a different view than what you've

9    heard about the organization?

10             THE PROSPECTIVE JUROR:  Well, yeah, I'd like to think

11   that.

12             THE COURT:  I'm sorry?

13             THE PROSPECTIVE JUROR:  I'd like to think that, yes.

14             THE COURT:  Okay.  Any doubt in your mind that you

15   would not be able to keep an open mind?

16             THE PROSPECTIVE JUROR:  Well, it's hard -- hard to

17   know until you go through this.

18             THE COURT:  Sure.  But as you sit here today, do you

19   have such strong opinions or views of the organization that if

20   you heard contrary evidence, it's not something you think you

21   would be able to accept?

22             THE PROSPECTIVE JUROR:  Well, you know -- well, you'd

23   have to hear it and you'd have to understand what -- what the

24   folks are saying, so.

25             THE COURT:  Sure.

1          THE PROSPECTIVE JUROR:  I think I could be fair in

2     that, I think.

3          THE COURT:  Okay.  Let me ask if you would, please,

4     to turn to page 6.  Question 13 asked whether you or a close

5     friend or family member have ever been employed by the

6     U.S. Capitol in any capacity.  Now, you mentioned that you had

7     been employed --

8          THE PROSPECTIVE JUROR:  Right.

9          THE COURT:  -- on the Hill for some period of time;

10    is that right?

11         THE PROSPECTIVE JUROR:  That's correct.

12         THE COURT:  Can you tell us about that.

13         THE PROSPECTIVE JUROR:  Sure.  I worked for

14    Congressman Charlie Rose, but this is 1991 up through -- into

15    '94; but then continued to work on the Hill through '99.

16         THE COURT:  Okay.  And can you tell us, just

17    generally speaking, what capacity you worked for these --

18         THE PROSPECTIVE JUROR:  I did a few different things.

19    So I worked on a joint Senate House committee.  So my office

20    was in the Hart building.  Worked on special projects.  So at

21    the time the House Administration committee offices and their

22    hearing room were in the west front of the -- the third floor

23    of the Capitol.  So I spent a lot of time there.  Had some

24    special projects that I worked on for that committee.

25         And then after -- well, after the Democrats lost the

House, I -- at that point I shifted over to the House Information Systems. So the computer organization. Office over in the Ford building. And then was in information security. So worked with -- in that capacity. So a lot with, you know, internet for the House of Reps. That started in '94 and then continued.

THE COURT: So --

THE PROSPECTIVE JUROR: And then --

THE COURT: I'm sorry to interrupt. Do you still have former colleagues who are still working on the Hill?

THE PROSPECTIVE JUROR: You know -- you know, Rose passed away, and I was up at an event in the Longworth building for him and ran into some people. I think a lot of the people I work with have left the Hill, so.

THE COURT: Okay. You were asked, Question 14 -- I think you've already answered some of this -- close friend or family members ever been employed by the federal government.

THE PROSPECTIVE JUROR: Well, yeah. I've got -- so my cousin used to be a federal prosecutor, and she is now -- I forget which agency. She works for -- her husband is an attorney for the State Department.

THE COURT: Okay. Your cousin is a federal prosecutor. Do you know where she's a prosecutor?

THE PROSPECTIVE JUROR: Well, she was. She moved out of that position.

```
1              THE COURT:  Okay.  All right.  And when she was a

2    prosecutor, do you know which office?

3              THE PROSPECTIVE JUROR:  Well, it dealt with sex

4    crimes primarily, but I can't remember which.

5              THE COURT:  Was that here in Washington, D.C., or --

6              THE PROSPECTIVE JUROR:  Yeah, it was in the D.C.

7    area.  She's here -- she's still here now.

8              THE COURT:  Okay.  But let me ask just very

9    specifically.

10             THE PROSPECTIVE JUROR:  Yeah, I don't know.

11             THE COURT:  Do you know whether she was employed by a

12   prosecutorial office in the District of Columbia or in a

13   different jurisdiction?

14             THE PROSPECTIVE JUROR:  I don't know.

15             THE COURT:  Okay.  Anything about the fact that your

16   relative -- your sister [sic] was a prosecutor cause you to

17   think you couldn't be fair to the defense in this case?

18             THE PROSPECTIVE JUROR:  No.

19             THE COURT:  Question 18 asked whether you or a close

20   friend or family member in the last five years has attended a

21   rally, protest, or demonstration, or march of any type.  Can

22   you tell us about that.

23             THE PROSPECTIVE JUROR:  Sure.  Sure.  So right after

24   Trump was elected, there's a huge Women's March.  My sister

25   came up.  And, you know, the whole family, we did that.  And
```

296

1    couple years later, there was a March for Science.  One of my

2    kids is a big science guy.  So, you know, we did that.

3                    THE COURT:  Right.

4                    THE PROSPECTIVE JUROR:  So it was the last

5    five years.  I think those are the two primary ones.

6                    THE COURT:  So if you were to get the sense in this

7    case that -- that the defendants had political views that are

8    different than yours, that, say, at one point they supported

9    the former President, do you think you could still be fair to

10   these defendants?

11                   THE PROSPECTIVE JUROR:  Yeah, I'd like to think that

12   I can be fair.

13                   THE COURT:  Okay.

14                   THE PROSPECTIVE JUROR:  I understand.  I grew up in a

15   very political family, but you have to understand that there

16   are opposing views.

17                   THE COURT:  All right.  And do you think you could

18   set aside your own personal views and -- and view the evidence

19   fairly in this case?

20                   THE PROSPECTIVE JUROR:  Yeah.

21                   THE COURT:  And if, for example, you came to the

22   conclusion that the government had not met its burden of proof

23   to prove guilt, would you have any trouble voting to acquit?

24                   THE PROSPECTIVE JUROR:  Yeah, I think I can hold them

25   to, you know, their burden of proof.

1          THE COURT:  Okay.  I think you've told us why you've

2     been at the Capitol before.  Question 20 asked whether you or a

3     close friend or family member -- I think you said you were

4     living near the Capitol.  So we've talked about that.  And

5     you've also talked about your concern for safety.

6          Now, Question 24 talks about prior jury service, and it

7     looks like you have served a number of times in different

8     capacities.

9          THE PROSPECTIVE JUROR:  Uh-huh.

10         THE COURT:  Just want to make sure you understand

11    that, you know, this is a criminal case and the burden in this

12    case is beyond a reasonable doubt and, therefore, higher than

13    the probable cause standard you would have had as a grand

14    juror.

15         THE PROSPECTIVE JUROR:  You're right.

16         THE COURT:  Is higher than a preponderance of the

17    evidence standard as a juror in a civil case.  Do you

18    understand that?

19         THE PROSPECTIVE JUROR:  Right.  Yep.

20         THE COURT:  And whatever you may have learned about

21    the criminal justice system from prior jury service, would you

22    be able to put that out of your mind and follow the

23    instructions that I gave you?

24         THE PROSPECTIVE JUROR:  Yeah.  Of course.

25         THE COURT:  All right.  You've also indicated that

 1    you have watched -- or that you are familiar with some

 2    individuals whose names might be mentioned in this case.  This

 3    is Question 37.  Alex Jones and Peter Navarro.  Those two

 4    individuals, I think, are not likely to testify, and it's

 5    unlikely their names will be mentioned.  And Roger Stone, who I

 6    think is unlikely to testify, but his name might be mentioned.

 7          If you were to learn that a defendant in this case had

 8    some association with Mr. Stone, how would that affect your

 9    views of that defendant?  And do you think it would affect your

10    ability to be fair and impartial toward that defendant?

11          THE PROSPECTIVE JUROR:  These are hard questions,

12    yeah.

13          THE COURT:  It's -- that's why I get paid the big

14    bucks.

15          THE PROSPECTIVE JUROR:  You know these people and

16    their reputation.  I know.  One of my friends is a federal

17    judge now, so.

18          And to be fair, this is a very long list of names, and

19    I'm not great with names.  So I'm just -- I was looking

20    through, going, well, I don't know.  I grew up in

21    North Carolina.  I might know them.  I don't know.

22          THE COURT:  So with respect to Mr. Stone, is that --

23          THE PROSPECTIVE JUROR:  Right.

24          THE COURT:  Again, if the evidence was such that you

25    learned that some defendant had an association with him, do you

1    think you could put aside whatever views you may have about him

2    and still view the evidence fairly and impartially as to the

3    defendants?

4              THE PROSPECTIVE JUROR:  You know, I would try to do

5    my best there.  That's -- that's --

6              THE COURT:  You've also said you've seen a lot of

7    videos, a lot of news coverage.  Would you describe yourself as

8    somebody who is actively seeking out this news or somebody who

9    if it -- you know, you were an avid news reader and if it's

10   there, you would read it?

11             THE PROSPECTIVE JUROR:  It's probably the latter.  I

12   mean, I get the *Post* in paper form, so.  And it's always there

13   in the metro section what's going on with -- with these trials.

14             THE COURT:  And would you be able to sort of set

15   aside what you've read in the press and, again, focus on the

16   evidence that's presented in the case?

17             THE PROSPECTIVE JUROR:  Yeah.  Yeah.  I can do that.

18             THE COURT:  You've said you've listened to some

19   portion or watched some portion of the January 6th hearings; is

20   that correct?

21             THE PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  And can you just give us a sense of how

23   much of those hearings you have viewed?

24             THE PROSPECTIVE JUROR:  Yeah.  Not -- not C-SPAN.

25             THE COURT:  Okay.

1      THE PROSPECTIVE JUROR:  So I didn't just sit there,

2  but, you know, usually -- usually excerpts or, you know, things

3  like that, so.

4      THE COURT:  And do you -- from what you recall

5  watching or reading about those hearings, do you recall

6  anything about -- being said or any testimony about the

7  Oath Keepers as a group?

8      THE PROSPECTIVE JUROR:  Well, yeah.  I couldn't give

9  the details, but, yes, it was brought up.

10      THE COURT:  And what do you remember being brought

11  up?

12      THE PROSPECTIVE JUROR:  Just -- just the name.

13      THE COURT:  Just the name.  Anything more than that?

14      THE PROSPECTIVE JUROR:  No.  I couldn't remember -- I

15  can't recall that.

16      THE COURT:  That's fair.

17      I think I asked this question.  If I didn't -- and if

18  I'm repeating myself -- I will -- I apologize.

19      Question 46 asks whether you have read, seen, or heard

20  anything about the Oath Keepers organization.

21      THE PROSPECTIVE JUROR:  Yeah, you -- you did ask me

22  about that.  So, yeah, friends pointing out --

23      THE COURT:  Right.  Right.  We did talk about that.

24  You're right.  Thank you.  Your memory is better than mine.

25      THE PROSPECTIVE JUROR:  It's late.

1        THE COURT:  Question 50, I think you have answered

2   that your sister is a former --

3        THE PROSPECTIVE JUROR:  A cousin.  Cousin.

4        THE COURT:  Sorry.  Cousin is a former prosecutor.

5   Anyone else in the legal field who's a close friend or family

6   member?

7        THE PROSPECTIVE JUROR:  So -- well -- well, legal --

8   so, I mean, probably the only other one is a good friend of

9   mine from -- from high school who is now a district court judge

10  in North Carolina.

11       THE COURT:  Okay.  And do you still keep in touch

12  with --

13       THE PROSPECTIVE JUROR:  Yeah.  At this point it's an

14  annual, hey, what's going on?  Next time you're down, let's go

15  have lunch.  That sort of thing.

16       THE COURT:  All right.  Question 54 asked whether you

17  or a close friend or family member has been the victim of a

18  crime.  And if this is an answer that's personal, we can take

19  it in a private setting.

20       THE PROSPECTIVE JUROR:  No.  I mean, you know, it's a

21  theft from auto multiple times, primarily, so.

22       THE COURT:  And that happened in the District or

23  elsewhere?

24       THE PROSPECTIVE JUROR:  District --

25       THE COURT:  Okay.

```
 1            THE PROSPECTIVE JUROR:  -- and elsewhere.
 2            THE COURT:  And --
 3            THE PROSPECTIVE JUROR:  You know, just -- I'm an old
 4   guy.  So, you know, the car has been broken into a lot.
 5            THE COURT:  It's happened to a lot of us.
 6            THE PROSPECTIVE JUROR:  Now, I did witness one -- and
 7   then, you know, was brought in -- well, you know, it was one of
 8   these things, like, hey, what'd that guy throw?  Wait a second.
 9   You know, I'd go outside and then pick it up, and then I'd have
10   to go ID the guy.  And I do come in to be a witness, but the
11   case got dropped.
12            THE COURT:  Let me ask you this:  Your experience
13   either as a victim of a crime or as a witness, have you formed
14   any opinions or views about the Metropolitan Police Department?
15            THE PROSPECTIVE JUROR:  Well, they did a good job so
16   I think --
17            THE COURT:  Any reason to think that whatever views
18   you may have about the Metropolitan Police Department that you
19   couldn't assess an officer's testimony fairly and give no
20   greater weight than any other witness?
21            THE PROSPECTIVE JUROR:  Oh, yeah.  No, they're --
22   they're people too.
23            THE COURT:  For example, if you thought there was
24   evidence to contradict a law enforcement officer's testimony,
25   do you think you could discredit a law enforcement officer's
```

```
 1   testimony?

 2              THE PROSPECTIVE JUROR:  Sure.

 3              THE COURT:  All right.  Okay.

 4         Mr. Fischer?

 5              MR. FISCHER:  Good afternoon, sir.

 6              THE PROSPECTIVE JUROR:  Good afternoon.

 7              MR. FISCHER:  Thank you for filling the questionnaire

 8   out and being here today.

 9         Just a couple questions.  So, obviously, you've heard a

10   little about the Oath Keepers organization; is that correct?

11              THE PROSPECTIVE JUROR:  That is correct.

12              MR. FISCHER:  And I guess I'd ask you if, say,

13   somebody came from a foreign country, they come to the

14   United States, and they asked you what's this Oath Keepers

15   organization, how would you describe them in your own words?

16              THE PROSPECTIVE JUROR:  Yeah.  So I -- I would call

17   it sort of a right wing organization with militant tendencies.

18              MR. FISCHER:  And by "militant tendencies," could you

19   describe that a little more.

20              THE PROSPECTIVE JUROR:  Well, probably -- probably --

21   well, to me, that means guns and -- and aggression.  How about

22   that?

23              MR. FISCHER:  Okay.  And as far as the -- the right

24   wing -- you say right wing, could you kind of just flesh that

25   out a little bit.
```

1          THE PROSPECTIVE JUROR:  I would say that's more

2     than -- I've spent a lot of time, as you can tell, working on

3     Capitol Hill dealing with Democrats and Republicans.  So to me

4     the right wing is on the far side of -- of, you know, who I

5     would consider, you know, a Pat Robertson or a Ted Stevens or

6     something like that; right?  So.

7          MR. FISCHER:  Sure.  Sure.

8          And is there anything about the Oath Keepers and being

9     right wing like that that would give you pause to be fair and

10    impartial as a juror?

11         THE PROSPECTIVE JUROR:  It -- well, I mean, I have to

12    be honest.  It -- it is a little tougher, but, you know, I

13    think extremism on both sides is -- is challenging; right?  So.

14         MR. FISCHER:  And if -- being that you've seen that

15    they're extreme or -- on the extreme end, that would seem to

16    give you some sort of pause to be able to -- to be able to

17    fairly judge them?

18         THE PROSPECTIVE JUROR:  You know, I try to be a

19    good -- you know, open-minded person.  So I'd do the best that

20    I can there.

21         MR. FISCHER:  But do you -- do you honestly think --

22    I understand this is a tough situation.

23         THE PROSPECTIVE JUROR:  It is.

24         MR. FISCHER:  This will be the softest

25    cross-examination you'll ever get, by the way.

```
 1                THE PROSPECTIVE JUROR:  I know.

 2                MR. FISCHER:  But just truly think and just take a

 3      second.  Do you really think that you could sit and -- and

 4      really keep the same standard of beyond a reasonable doubt that

 5      you would maybe with just any -- any other case?

 6                THE PROSPECTIVE JUROR:  You know, it's -- it would be

 7      tough.  I have to be honest.  It would be tough to do that, and

 8      I think it's a culmination of things; right?  It's -- it's not

 9      so much just that group; right?  It's -- it's proximity and

10      everything, so, you know.

11                MR. FISCHER:  All right.  Fair enough.

12                I have nothing else, Your Honor.

13                Thank you, sir.

14                MR. WOODWARD:  Your Honor, I have one question about

15      the schedule.

16                THE COURT:  Sure.

17                THE COURT REPORTER:  Mr. Woodward; correct?

18                MR. WOODWARD:  Yes, ma'am.

19                THE COURT:  My schedule or the witness's schedule?

20                MR. WOODWARD:  Our schedules are very complicated,

21      but the witness indicated -- or the juror indicated in his

22      schedule that there would be some hardship in serving.  And so

23      I was going to flesh that out a little bit more, or you can.

24                THE COURT:  If you want to ask, that's fine.

25                MR. WOODWARD:  Sir, thank you.  You have my thanks as
```

1    well for being here today.

2              THE PROSPECTIVE JUROR:  Uh-huh.

3              MR. WOODWARD:  In your questionnaire you advised you

4    have some sort of audit going on with respect to your business.

5              THE PROSPECTIVE JUROR:  Well, that's correct.

6              MR. WOODWARD:  And you asked about potentially

7    serving in the beginning of January.

8              THE PROSPECTIVE JUROR:  Yeah, like -- if we can push

9    this to next year, that would be great.  But this trial can't,

10   I'm sure, but service maybe.  The reason to ask -- yeah,

11   because it's a small company, and I'm the vice president over

12   information security and compliance; and, yeah, I have one,

13   two, three, four, five SOC audits and two HIPAA audits going on

14   right now.

15             MR. WOODWARD:  And something more about your

16   involvement -- specifically your involvement in those audits?

17             THE PROSPECTIVE JUROR:  Well, yeah.  I'm in charge of

18   them, and I have to meet with auditors.  I have to meet with

19   the -- yeah, keep it all together and get it done before the

20   end of October.

21             MR. WOODWARD:  How will serving on a jury for what

22   looks like four to six or longer weeks impact your ability to

23   complete those audits?

24             THE PROSPECTIVE JUROR:  It's going to be tough.  I

25   mean, I'm going to go home, and then I'll just work all night.

```
 1           MR. WOODWARD:  So you can't work on the audits --

 2           THE PROSPECTIVE JUROR:  Yeah, I can deal with that.

 3   I don't know.  In terms of scheduling meetings -- I'm sorry.

 4   In terms of scheduling meetings and dealing with that sort of

 5   thing, I can probably figure out how to get through it.

 6           MR. WOODWARD:  Okay.

 7           THE PROSPECTIVE JUROR:  But it's -- yeah, it's

 8   challenging.

 9           THE COURT:  Sir, let me follow up with one question

10   from Mr. Fischer.  I think you said it would be harder because

11   of an affiliation, but the bottom line is -- and I think I

12   asked you this earlier.  If the government, in your view, did

13   not meet its burden of proof --

14           THE PROSPECTIVE JUROR:  Right.

15           THE COURT:  -- would you have any difficulty voting

16   to acquit these defendants?

17           THE PROSPECTIVE JUROR:  Yeah, I think -- yeah, I --

18   yeah, they have to hold -- meet the burden of proof.  So yes.

19           THE COURT:  Okay.  Thank you, sir.

20      Mr. Douyon will show you out and provide you with

21   further instructions.

22           THE PROSPECTIVE JUROR:  You guys keep this; right?

23           THE COURT:  Correct.

24           (REPORTER'S NOTE:  Prospective Juror 1301 left.)

25           (REPORTER'S NOTE:  Prospective Juror 0769 enters.)
```

1          THE COURT:  Hi, sir.  How are you?

2          THE PROSPECTIVE JUROR:  Good.

3          THE COURT:  Thank you for your patience today.  I

4     know it's been a long day.

5          Feel free to remove your mask, if you wish.

6          You are Juror 0769?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  And your juror questionnaire is there in

9     front of you.  If you need to refer to it, by all means, do so.

10         Let me direct you, first, to Question 46.  That question

11    asked you -- this is on the bottom -- this is on page 11.  It

12    asks whether you have seen, read, or heard anything about the

13    Oath Keepers organization.

14         THE PROSPECTIVE JUROR:  Can I get my glasses?

15         THE COURT:  Yeah.  Of course.

16         THE PROSPECTIVE JUROR:  Okay.

17         THE COURT:  Okay.  So Question 46, again, read, seen,

18    or heard anything about the Oath Keepers organization.  Can you

19    tell us why you answered that question yes.

20         THE PROSPECTIVE JUROR:  From what I've heard on TV.

21         THE COURT:  I'm sorry?

22         THE PROSPECTIVE JUROR:  What I've heard on TV.  It's

23    not that much.

24         THE COURT:  And could you just share with us what you

25    think you recall seeing on TV about the Oath Keepers

1    organization.

2              THE PROSPECTIVE JUROR:  Just that they were mentioned

3    on January 4th -- January the 6th.

4              THE COURT:  Okay.  And do you recall precisely what

5    you heard that they did on January 6th?

6              THE PROSPECTIVE JUROR:  No.

7              THE COURT:  You mentioned here that you have followed

8    the January 6th hearings before Congress.

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Can you just tell us generally how -- how

11   many of those hearings you've seen and how closely you followed

12   them.

13             THE PROSPECTIVE JUROR:  I watched the first night.

14             THE COURT:  Just the first night?

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Do you recall any mention of Oath Keepers

17   during your viewing of that testimony -- excuse me -- of that

18   hearing or anybody who testified about Oath Keepers?

19             THE PROSPECTIVE JUROR:  No.

20             THE COURT:  So the fact that you've heard about the

21   Oath Keepers, is that -- and this case -- as you will hear,

22   these defendants are accused -- not accused -- they're alleged

23   to be part of the group.  Do you have any reason to think that

24   their potential membership in that group would cause you not to

25   be fair and impartial to them?

1           THE PROSPECTIVE JUROR:  No.

2           THE COURT:  And you understand, sir, that your job

3    here -- let me just turn to other questions you've answered.

4    You've answered Questions 39, 40.  So you've seen some news

5    coverage and some videos about the case, about the events of

6    January 6th?

7           THE PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Your job as a juror would be to put that

9    aside and evaluate the evidence that's presented, and determine

10   whether the government had met its burden of proof.  Do you

11   think that's something you could do?

12          THE PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And you could put aside whatever media

14   you've seen or any other videos you've seen?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Let me turn back to page 6 and

17   Question 14, which asks whether you have -- you or a close

18   friend or family member has ever been employed by the federal

19   government.  Can you tell us about that.

20          THE PROSPECTIVE JUROR:  I'm employed by the federal

21   government.

22          THE COURT:  Okay.  Can you just tell us what agency

23   and in what capacity.

24          THE PROSPECTIVE JUROR:  TSA.  I'm a program analyst.

25          THE COURT:  You're a programmer at TSA?

1              THE PROSPECTIVE JUROR:  Program analyst at TSA.

2              THE COURT:  Program analyst at TSA.  Okay.

3         And as part of TSA, do you do any work with the law

4    enforcement arms of Homeland Security or the Department of

5    Justice?

6              THE PROSPECTIVE JUROR:  I did when I worked in the

7    airport.

8              THE COURT:  At the airport you did?

9              THE PROSPECTIVE JUROR:  Yeah.  But I'm at

10   headquarters now and don't deal with law enforcement anymore.

11             THE COURT:  Okay.  Anything about your past dealings

12   with law enforcement -- you know, we're going to have law

13   enforcement witnesses in this case.  Do you think there's

14   anything about your past relationship with law enforcement that

15   might cause you to think that you would favor their testimony

16   over any other testimony?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Question 5 -- excuse me.  Question 18

19   asked whether you or a close friend or family member in the

20   last five years have attended a rally, protest, demonstration,

21   or march.  Can you tell us about that.

22             THE PROSPECTIVE JUROR:  I attended by doing

23   George Floyd.

24             THE COURT:  George Floyd?

25             THE PROSPECTIVE JUROR:  Uh-huh.

1            THE COURT:  And -- so that was a few years back;

2     right?

3            THE PROSPECTIVE JUROR:  Right.

4            THE COURT:  And so let me ask you this:  If you were

5     to come to the belief or infer that defendants in this case had

6     different political views than you do, how would you view that

7     fact in your ability to be a fair and impartial juror?

8            THE PROSPECTIVE JUROR:  Everybody got their right to

9     view it however they view it.

10           THE COURT:  Okay.  So if you thought that these

11    defendants had different views than yours, sounds like you

12    could put those aside and still be fair and impartial to them?

13           THE PROSPECTIVE JUROR:  Yes.

14           THE COURT:  You mentioned that you've been inside the

15    Capitol Building.  Can you just tell us in what capacity you've

16    been inside the Capitol Building.

17           THE PROSPECTIVE JUROR:  Just a tour.

18           THE COURT:  All right.  Question 24, you've been a

19    juror at least twice before in criminal cases.  Let me just ask

20    you:  Could you set aside what you've learned about the

21    criminal justice system and anything -- instructions you may

22    have received in those cases and follow my instructions in this

23    case?

24           THE PROSPECTIVE JUROR:  Yes.

25           THE COURT:  If I could ask you to turn to page 11,

1    sir.  You indicated in Question 51 that you, a close friend, or

2    family member has either applied for employment with or

3    received training from or is employed by law enforcement.  Can

4    you tell us about that answer.  Is that you or somebody else?

5              THE PROSPECTIVE JUROR:  That was me.

6              THE COURT:  That's you.  Okay.  So your work with TSA

7    is what you're referring to?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Is there any other law enforcement work

10   in your background?

11             THE PROSPECTIVE JUROR:  No.  Military, that's it.

12             THE COURT:  I'm sorry.  Military?

13             THE PROSPECTIVE JUROR:  Yeah.

14             THE COURT:  And which branch of the service?

15             THE PROSPECTIVE JUROR:  Marine Corps.

16             THE COURT:  And how long did you serve?

17             THE PROSPECTIVE JUROR:  Eleven years.

18             THE COURT:  Eight and a half years?

19             THE PROSPECTIVE JUROR:  Eleven.

20             THE COURT:  Eleven years.  All right.

21         Question 54 asked:  Have you or a close friend or family

22   member ever been the victim of a crime reported or not?  You

23   answered yes.  Can you tell us about that.  And if it's a

24   personal response, we can take it in a private setting.

25             THE PROSPECTIVE JUROR:  I had a first cousin get

1    stabbed to death.

2            THE COURT:  Okay.  I'm sorry to hear that.  Was there

3    anybody arrested for that?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Was that here in the District or

6    elsewhere?

7            THE PROSPECTIVE JUROR:  No.  That was in Tennessee.

8            THE COURT:  All right.  And about how long ago was

9    that, sir?

10            THE PROSPECTIVE JUROR:  I would say maybe 10,

11    12 years.

12            THE COURT:  Is there anything about that experience

13    that would cause you to think you couldn't be fair to the

14    government in this case?

15            THE PROSPECTIVE JUROR:  No.

16            THE COURT:  Any reason to think that that experience

17    would make you biased or prejudiced towards the defendants in

18    this case?

19            THE PROSPECTIVE JUROR:  No.

20            THE COURT:  Next question, 55, is whether you have

21    been a witness to a crime or a close family member has been a

22    witness to a crime.  Can you tell us about that.

23            THE PROSPECTIVE JUROR:  A shooting.

24            THE COURT:  I'm sorry?

25            THE PROSPECTIVE JUROR:  A shooting.

1              THE COURT:  Okay.  And who was a witness to that?

2      You or someone else?

3              THE PROSPECTIVE JUROR:  Someone else.

4              THE COURT:  All right.  And can you identify -- not

5      by name, but by relationship -- who that person is.

6              THE PROSPECTIVE JUROR:  Cousin.

7              THE COURT:  Cousin.  And did that happen in D.C. or

8      somewhere else?

9              THE PROSPECTIVE JUROR:  Tennessee.

10             THE COURT:  All right.  And was that the same

11     incident that we were talking about earlier?

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  No.  All right.  And anything about that

14     event and your family members witnessing that offense --

15     anything about that that caused you to think you couldn't be

16     fair and impartial in this case?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  All right.  Any follow-up questions,

19     Mr. Fischer or Mr. Woodward?

20             MR. FISCHER:  No, Your Honor.

21             THE COURT:  Mr. Nestler?

22             MR. NESTLER:  No, Your Honor.  Thank you.

23             THE COURT:  Thank you, sir, for your time.

24       Mr. Douyon will show you out of the courtroom and

25     provide you additional instructions.  Thank you very much.

316

```
1              THE PROSPECTIVE JUROR:  Thank you.

2              (REPORTER'S NOTE:  Prospective Juror 0769 left.)

3              (Off the record.)

4              THE COURT:  So, yes, there was a motion to strike for

5      cause Juror 1301.  As I was saying, I think he was among a

6      group of similar jurors who were candid in trying to be

7      forthright; said that, sure, they heard of the group and their

8      views of the group might make it more difficult; but ultimately

9      when asked if they could be fair and impartial, they said they

10     could be.  And, more importantly, they said they would

11     acquit -- vote to acquit if the government didn't meet its

12     burden.

13          The juror didn't have, it seemed to me, any kind of

14     emotional reactions we've seen from some of the other jurors

15     when asked about January 6th and the Oath Keepers.  So I'm

16     going to deny the strike for cause.

17             MR. LINDER:  I don't know if she got that all on the

18     record.  I had --

19             THE REPORTER:  No.

20             THE COURT:  What about what I -- did you get what I

21     said on the record?

22             THE REPORTER:  I got what you said but not --

23             MR. LINDER:  We had -- we had moved to strike

24     Juror No. 1301 for cause.  I was talking when you started

25     addressing it.
```

```
 1                THE COURT:  That's fine.  The record reflects.

 2                (REPORTER'S NOTE:  Prospective Juror 0707 enters.)

 3                THE COURT:  Hi.  How are you?

 4                THE PROSPECTIVE JUROR:  I'm good.

 5                THE COURT:  Thank you for your patience.  I know it's

 6      been a long day.

 7           Feel free to remove your mask, if you wish.

 8                THE PROSPECTIVE JUROR:  Okay.

 9                THE COURT:  You are Juror 0707?

10                THE PROSPECTIVE JUROR:  Yes.

11                THE COURT:  Okay.  So your juror questionnaire is in

12      front of you.  And let me ask you, if you would, please, to

13      turn to page 13.  That is the last page of the questionnaire.

14                THE PROSPECTIVE JUROR:  Okay.

15                THE COURT:  And Question 67 asked whether there are

16      any questions you didn't understand.  And you listed a few

17      questions:  11, 65, and 66.  Do you see that?

18                THE PROSPECTIVE JUROR:  Yes.

19                THE COURT:  Let me just ask you:  Did you

20      understand -- were you able to follow and understand all the

21      other questions that were in the questionnaire?

22                THE PROSPECTIVE JUROR:  Some of them, yeah.

23                THE COURT:  Some of them.  Were there any other

24      questions that you were not able to understand?

25                THE PROSPECTIVE JUROR:  No.  Only the ones I've put
```

```
1      on here.

2              THE COURT:  Just the ones that you marked?

3              THE PROSPECTIVE JUROR:  Uh-huh.

4              THE COURT:  And can I ask you -- is English your

5      first language?

6              THE PROSPECTIVE JUROR:  Yes.

7              THE COURT:  All right.  And -- okay.  So --

8          Today or generally speaking?

9              THE COURTROOM DEPUTY:  Today.

10             THE COURT:  I understand that you have -- you may

11     have some hardship in terms of having to pick up a child.

12             THE PROSPECTIVE JUROR:  Two.

13             THE COURT:  I'm sorry?

14             THE PROSPECTIVE JUROR:  Two.

15             THE COURT:  Two children?  Is that -- what time do

16     those children need to be picked up every day?

17             THE PROSPECTIVE JUROR:  At 4:00.

18             THE COURT:  At 4:00.  Is there anybody else that

19     could pick them up other than you?

20             THE PROSPECTIVE JUROR:  No, not really.

21             THE COURT:  Okay.  And so today you're here.  Is

22     somebody else picking them up?

23             THE PROSPECTIVE JUROR:  Yeah.  My brother picked them

24     up for me today.

25             THE COURT:  And could those children -- say you were
```

```
 1    here in court until 5 o'clock, would somebody else be able to

 2    pick them up if you were in trial for, say, four to five weeks

 3    as a juror?

 4              THE PROSPECTIVE JUROR:  It's going to probably be

 5    difficult.

 6              THE COURT:  If would be difficult for you?

 7              THE PROSPECTIVE JUROR:  Yeah, I'm a mom and dad to

 8    both my kids, so.

 9              THE COURT:  Okay.  All right.

10         Okay.  Any objection?

11              MR. LINDER:  No objection.

12              MR. NESTLER:  No, Your Honor.

13              THE COURT:  All right.  Thank you for your service,

14    ma'am.  I appreciate your patience.

15         Mr. Douyon will show you out of the courtroom and

16    provide you additional instructions.  Okay?

17              THE PROSPECTIVE JUROR:  Okay.  Thank you so much.

18              THE COURT:  Thank you.

19              (REPORTER'S NOTE:  Prospective Juror 0707 left.)

20              THE COURT:  Folks, I think we have about four more

21    people.  So if we all row in the same direction, we can

22    hopefully get through them relatively quickly.

23              (REPORTER'S NOTE:  Prospective Juror 1038 enters.)

24              THE COURT:  Good evening, ma'am.  How are you?

25              THE PROSPECTIVE JUROR:  I'm fine.
```

1           THE COURT:  Thank you for your patience.  I know it's

2    been a long day.  Thank you very much for waiting it out with

3    us.

4           Feel free to please remove your mask, if you're

5    comfortable doing so.

6           Juror 1038; is that right?

7           THE PROSPECTIVE JUROR:  That's correct.

8           THE COURT:  Okay.  So your juror questionnaire should

9    be in front of you.  If there -- you can feel free to -- to

10    refer to it.

11           So on page 11 of your juror questionnaire, I'll just ask

12    you to look at Question 46.  That question asked:  Have you

13    read, seen, or heard anything about the Oath Keepers

14    organization?  And you answered that yes.  Can you tell us what

15    you have read, seen, or heard?

16           THE PROSPECTIVE JUROR:  I can't remember any specific

17    details.  Just, you know, heard references in the news.

18           THE COURT:  Okay.  And if you don't recall details,

19    are you left with any impressions of the organization based

20    upon what you've heard or read?

21           THE PROSPECTIVE JUROR:  Not specifically.

22           THE COURT:  Okay.  Do you have any reason to think

23    that whatever you may have read in the news about this

24    organization would affect your ability to be fair to these

25    defendants?

1          THE PROSPECTIVE JUROR:  No.  I think I can be very

2     fair.

3          THE COURT:  Okay.  Even if these defendants are

4     alleged to be part of that organization?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  All right.  So let's turn to the second

7     page -- or page 6, I should say, of the questionnaire.

8     Question 14, that question asks:  Have you or a close friend or

9     family member ever been employed by the federal government?

10    And can you tell us who close to you has been employed by the

11    federal government.

12         THE PROSPECTIVE JUROR:  Yeah.  My husband is retired

13    from the Securities and Exchange Commission.

14         THE COURT:  Okay.  And can you tell us in what

15    capacity he worked for the SEC?

16         THE PROSPECTIVE JUROR:  He was -- he was an attorney.

17         THE COURT:  Okay.  And did he work in enforcement or

18    in a different branch of the SEC?

19         THE PROSPECTIVE JUROR:  He worked in enforcement,

20    doing investigations into a company -- default filings of

21    companies.

22         THE COURT:  Okay.  This is, obviously, a different

23    type of law enforcement.  This is a criminal case.  It's not a

24    civil case or a regulatory matter, the kind of things that your

25    husband worked on.  Any concern that you may have about the

1     fact that your husband was in a law enforcement capacity that

2     might cause you to think you couldn't be fair and impartial in

3     this case?

4            THE PROSPECTIVE JUROR:  No.  It seems pretty

5     different.

6            THE COURT:  Yeah.  All right.  Question 19 asks

7     whether you've been on the Capitol Grounds or inside the

8     Capitol Building.  Can you tell us about that.

9            THE PROSPECTIVE JUROR:  I have taken tours of the

10    Capitol.

11           THE COURT:  Okay.  And can you tell us when the last

12    tour was at the Capitol Building.

13           THE PROSPECTIVE JUROR:  More than ten years ago, I

14    would say.

15           THE COURT:  All right.  Question 24 asked you about

16    prior jury service.  You've indicated that some number of years

17    ago you were on a criminal trial.  Whatever you may remember

18    from that experience, do you think you could put that to the

19    side and follow the instructions that I give you in this case?

20           THE PROSPECTIVE JUROR:  Yes.

21           THE COURT:  All right.  If you would turn, then, to

22    page 10.  Questions 39, 40, and 41, they indicate that you have

23    seen and read some news coverage and some videos of the events

24    of January 6th.  Would you consider yourself to be someone who

25    seeks out news about the events of January 6th or reads it or

1    views it if you happen to come across it?

2            THE PROSPECTIVE JUROR:  I think if I happen to come

3    across it, but I definitely don't seek it out.

4            THE COURT:  And as a juror, you would be asked to put

5    to the side anything that you had learned through the media or

6    social media about the events of that day or about this case.

7    Do you think you would be able to put those things aside and

8    view the evidence dispassionately and fairly as it relates to

9    these defendants?

10           THE PROSPECTIVE JUROR:  Yeah, I think I can do that.

11           THE COURT:  Let me ask you this:  If at the end of

12   the day -- you know, the government has the burden of guilt

13   beyond a reasonable doubt.  If you were convinced that the

14   government had not met its burden, do you have any reason to

15   think you would have any difficulty in acquitting these

16   defendants?

17           THE PROSPECTIVE JUROR:  No, I wouldn't have

18   difficulty if the government did not prove.

19           THE COURT:  Okay.  Question 50 asks whether you have

20   a close friend or family member in the legal profession.

21           THE PROSPECTIVE JUROR:  Right.  Mostly my husband.

22           THE COURT:  Okay.

23           THE PROSPECTIVE JUROR:  I have other friends who are

24   lawyers, but he's the close one.

25           THE COURT:  So let me ask you:  Through your husband

1       or otherwise, do you have friends who have practiced in

2       criminal law, either as prosecutors or defense lawyers?

3                    THE PROSPECTIVE JUROR:  Probably.

4                    THE COURT:  Okay.  Anything about your relationship

5       with whomever that may be that might give you some pause about

6       fairness in this case?

7                    THE PROSPECTIVE JUROR:  No, I don't think so.  Living

8       in D.C., you run into a lot of lawyers.  It's a trend.

9                    THE COURT:  You can't go very far without finding

10      one.

11                   THE PROSPECTIVE JUROR:  Right.

12                   THE COURT:  Okay.  Any follow-up from the defense,

13      Mr. Linder?

14                   MR. LINDER:  No, Your Honor.

15                   THE COURT:  Mr. Nestler?

16                   MR. NESTLER:  No, Your Honor.  Thank you.

17                   THE COURT:  All right.  Ma'am, thank you very much

18      for your time.

19           Mr. Douyon will escort you out of the courtroom and

20      provide you with additional instructions.  And I think you're

21      trying to get to a dinner.  So enjoy.

22                   THE PROSPECTIVE JUROR:  Thank you.

23                   (REPORTER'S NOTE:  Prospective Juror 1038 left.)

24                   (REPORTER'S NOTE:  Prospective Juror 1150 enters.)

25                   THE COURT:  Hi, sir.  How are you?

```
1              THE PROSPECTIVE JUROR:  I'm well.  How are you?

2              THE COURT:  Good.  Thank you.

3         Thank you, first and foremost, for your patience today,

4    and I appreciate it.  I know it's been a long day, but thank

5    you very much.

6         Feel free to remove your mask, if you're comfortable

7    doing so.

8         Are you Juror 1150?

9              THE PROSPECTIVE JUROR:  I am.

10             THE COURT:  Okay.  So let me -- and your juror

11   questionnaire should be in front of you, if you have -- and let

12   me ask, if you would, please, to turn to page 11 of the

13   questionnaire and, in particular, Question 46.  That question

14   asks:  Have you read, seen, or heard anything about the

15   Oath Keepers organization?  Can you tell us what you have read,

16   seen, or heard about the Oath Keepers organization.

17             THE PROSPECTIVE JUROR:  There was a news story -- I

18   can't remember exactly where it came from -- several weeks ago,

19   two, maybe three, four weeks ago that I -- that I read.

20             THE COURT:  And can you recall what the contents of

21   that story were and what impression it left on you?

22             THE PROSPECTIVE JUROR:  I think it talked about how

23   the group was founded, and it talked about how they were

24   involved in events of January 6th.

25             THE COURT:  Okay.  And other than those two facts, is
```

1    is there anything more specific that you can remember coming

2    from that article?

3                THE PROSPECTIVE JUROR:  No.  I mean, it discussed

4    that there were some coordination amongst the group, that they

5    had a plan for the day.  I think that's the -- the gist of it.

6                THE COURT:  Okay.  And after having read the article,

7    are you left with an impression favorable or unfavorable about

8    the group?

9                THE PROSPECTIVE JUROR:  Yes, I would -- I would say

10   so, yeah.

11               THE COURT:  And what would your impression be?

12               THE PROSPECTIVE JUROR:  It would be unfavorable.

13               THE COURT:  Okay.  Now, let me ask you this:  If you

14   were selected as a juror, do you think even having read this

15   article you would be able to keep an open mind and receive

16   evidence that might contradict or be different from what you

17   read in the article?

18               THE PROSPECTIVE JUROR:  I -- I believe so.

19               THE COURT:  Okay.  And so if, for example, you were

20   presented with evidence that these defendants, say

21   hypothetically, did not coordinate in the way that the article

22   suggests, would you be able to consider that evidence and put

23   aside what the article said?

24               THE PROSPECTIVE JUROR:  Yes, I -- I think that's

25   the -- the point of these proceedings is to follow the evidence

1    as it's presented.

2             THE COURT:  Okay.  Let me ask you, if you would,

3    please, to turn to page 7.  You've indicated that you have been

4    in the Capitol Building or on the Capitol Grounds previously.

5             THE PROSPECTIVE JUROR:  I have.

6             THE COURT:  And can you tell us in what capacity.

7             THE PROSPECTIVE JUROR:  Only as a tourist.  I believe

8    as a -- when I was a child, I went on a tour.  And then when I

9    moved to -- to the city, probably 2007 or right after the -- on

10   the east side, the new tourist -- or the visitors center was

11   opened, I went inside.

12            THE COURT:  Okay.  And in 23, you indicated that

13   you've served on a grand jury.  And in 24, you've indicated --

14   it looks like that you've served on a civil jury; is that

15   right?

16            THE PROSPECTIVE JUROR:  Yeah.  This was in, I

17   believe, 2008 or 2009.  It was a D.C. grand jury trial.  I

18   believe it was -- I believe it was civil, but I -- I'm not

19   really sure exactly.

20            THE COURT:  So just to orient you, so a grand jury

21   is -- is a group of people that hear evidence and make a

22   determination of whether somebody should be charged.

23            THE PROSPECTIVE JUROR:  Okay.

24            THE COURT:  Is that something you sat on or something

25   else?

```
1              THE PROSPECTIVE JUROR:  It was something else.

2              THE COURT:  Okay.  So --

3              THE PROSPECTIVE JUROR:  It was a trial about a --

4    there was a disagreement over a payment of rent and, I believe,

5    some damages to a -- to a condo or something.

6              THE COURT:  So that -- as you've indicated, that's a

7    civil case.

8              THE PROSPECTIVE JUROR:  Okay.

9              THE COURT:  And in a civil case, the standard of

10   proof is lower than it is in a criminal case.  It's by a

11   preponderance of the evidence in a civil case.  Here the

12   standard of proof is higher.  It's beyond a reasonable doubt.

13   Do you think you would be able to -- to apply that higher

14   standard of proof?

15             THE PROSPECTIVE JUROR:  I do.

16             THE COURT:  And so the alternate question for any

17   juror is this, which is:  If you believed that the government

18   in this case did not believe -- excuse me -- meet its burden of

19   proof -- that is, they had not proven guilt beyond a reasonable

20   doubt -- do you have any reason to question whether you would

21   be able to return or vote for acquittal?

22             THE PROSPECTIVE JUROR:  If the government does not

23   meet that burden of proof, then -- then I would vote for

24   acquittal.

25             THE COURT:  Okay.  Let me ask you to please turn to
```

```
1    page 10.  So on lines -- Question 37 asked whether you were
2    able to identify anybody on the list of potential people you
3    may hear from or who may be mentioned.  Alex Jones and
4    John Eastman is who you've listed.  It's highly unlikely those
5    two gentlemen will either be mentioned or testify -- or I
6    should say, not going to testify, let alone be -- and not
7    likely to be mentioned.
8         You've indicated already, and we've talked about it a
9    little bit, that you've seen videos and news coverage of the
10   events of January the 6th.  Can you sort of describe for us
11   whether you are someone who actively seeks out news coverage
12   about January the 6th or somebody who reads it passively.  In
13   other words, if it comes across your screen or your news feed,
14   if it's something that you read only in those circumstances.
15        THE PROSPECTIVE JUROR:  Certainly on the day of, I --
16   you know, I heard from a friend this was happening, and I did
17   watch live coverage.
18        THE COURT:  Uh-huh.
19        THE PROSPECTIVE JUROR:  And I did actively seek out
20   information about it in the days and weeks afterwards.
21        THE COURT:  Right.  But how about since then?
22        THE PROSPECTIVE JUROR:  As information has come out,
23   I think I do have an interest in -- in, you know, whether or
24   not people involved were brought to justice, you know, if --
25   you know, if -- if they were found guilty.
```

```
1              THE COURT:  And have you recently read about any
2    trials that might have happened involving January 6th
3    defendants?
4              THE PROSPECTIVE JUROR:  I have -- you know, I did
5    watch the -- the hearings.
6              THE COURT:  Right.
7              THE PROSPECTIVE JUROR:  Not all of it, but some of
8    the hearings.  In the last -- you know, I've stayed away from
9    it in the last two weeks per your instructions.  You know,
10   there has been, you know -- I did notice a headline, but -- you
11   know, I didn't dive into that.
12             THE COURT:  So, you know, as I said to everybody
13   earlier today, your job as a juror would be to sort of put to
14   the side anything that you've seen in the media or heard in the
15   media, and evaluate the facts as they're presented and the
16   evidence that's presented in the case.  Do you have any concern
17   about whether you could do that in this case?
18             THE PROSPECTIVE JUROR:  I mean, I -- we're all
19   creatures of -- of, you know, our surroundings.
20             THE COURT:  Sure.
21             THE PROSPECTIVE JUROR:  So I think it is -- you know,
22   as much as I would like to only focus on the evidence as -- as
23   it's presented, it is tough to overcome, you know, the -- you
24   know, the experiences I've had in my life and the things I've
25   seen and the way that I feel; but, you know, I think that
```

 1    would -- I would take it as my job to, you know, focus only on

 2    what I see.

 3            THE COURT:  In terms of how you feel, do you -- are

 4    there feelings that you have about the events of January

 5    the 6th that you think could give you trouble in being fair and

 6    impartial?

 7            THE PROSPECTIVE JUROR:  I -- yes, I think that's

 8    possible.  I think -- I do -- I do have opinions on -- on what

 9    happened and how it happened.  And I do think -- I don't know

10    all of the evidence, you know, and I think that's part of this

11    process, you know, and that's not -- it's not for me to -- to

12    judge until I hear that evidence; but it is difficult to not

13    have a view based on the --

14            THE COURT:  Sure.

15            THE PROSPECTIVE JUROR:  -- you know, what I've seen

16    and, you know, my worldview.

17            THE COURT:  So I think I've asked you this question

18    in a slightly different form previously, which is, look,

19    people -- we expect jurors will have -- people don't live

20    sealed off.  They may have viewed news.  They may have formed

21    opinions.  But the bigger question is:  Could you set all of

22    that aside and focus in this case only on the evidence that's

23    presented and ultimately decide whether that evidence would

24    sustain the government's burden of proving guilt beyond a

25    reasonable doubt?

1          THE PROSPECTIVE JUROR:  I -- I believe so.  I think

2     that's -- that would be my goal would be to do so.

3          THE COURT:  Okay.  You've indicated that you've

4     watched some portion of the congressional hearings.  Can you

5     just tell us generally how much of it you have seen.

6          THE PROSPECTIVE JUROR:  So I think the parts that

7     I -- I watched the -- the video, I think, that came out at --

8     in the beginning that showed -- I think it was a ten-minute

9     segment that had been put together.  I think I watched that.  I

10     watched the -- I believe her name was Cassidy Hutchinson, I

11     believe.  I've watched that part live.  For some reason, I

12     was -- you know, watched it on that particular day.  I think

13     those are the only parts that I watched live.  I think I did

14     follow news about the hearings.

15          THE COURT:  Do you recall as part of either watching

16     it or reading news or seeing news about it any testimony or

17     commentary about Oath Keepers during those hearings?

18          THE PROSPECTIVE JUROR:  I don't think Oath Keepers

19     was -- was something that I really knew about or thought about

20     at that -- at that time.  I think it was in -- you know, since

21     then I think that I, you know, sort of -- I can't remember

22     exactly, as I mentioned before.

23          THE COURT:  You read an article, but nothing from --

24     sounds like nothing from the hearings?

25          THE PROSPECTIVE JUROR:  I don't -- I don't think -- I

1    don't recall Oath Keepers --

2            THE COURT:  Okay.

3            THE PROSPECTIVE JUROR:  -- from the hearings.

4            THE COURT:  And just like with the media, do you

5    think you would be able to set aside what you've viewed or seen

6    and read about the January 6th hearings and, again, focus on

7    the evidence in the case?

8            THE PROSPECTIVE JUROR:  That would be my goal, yes.

9            THE COURT:  All right.  Questions 50 and 51 asked

10   whether you or close members of your family or friends have

11   either worked in the legal field or in law enforcement.  Can

12   you tell us about that.

13           THE PROSPECTIVE JUROR:  Yes.  I -- I have a friend

14   who is an attorney here in D.C., another who is a judge.  We're

15   not particularly close.  We see each other, you know, maybe

16   once a year.

17           THE COURT:  Your friend in D.C. who is a lawyer, does

18   that person work -- do any kind of criminal work?

19           THE PROSPECTIVE JUROR:  I don't believe so.  We don't

20   talk a lot about his -- the work that he does.

21           THE COURT:  Okay.  Questions 54 and 55 asked about

22   you or close friends or family members who have been victims of

23   crime or witnesses of crime.  And if this is something you'd

24   rather, you know, answer in a more private setting, we can do

25   that, if it's a personal response.

1          THE PROSPECTIVE JUROR:  Yeah, I -- I don't -- I don't

2     have strong emotions from it.  They were not particularly

3     violent.  I mean, I've been -- you know, I've been robbed, you

4     know, at gunpoint.  It was traumatic for me.  You know, I think

5     I've had some friends that have had similar experiences.

6          THE COURT:  So I'm sorry you've had to go through

7     that.

8          The gunpoint robbery, was that something that happened

9     to you in Washington?

10         THE PROSPECTIVE JUROR:  No.

11         THE COURT:  And your experience with that, do you

12    think that could impact your view on how you view law

13    enforcement testimony, for example?

14         THE PROSPECTIVE JUROR:  I don't think that

15    incident -- I don't think -- like, for this particular

16    question, I don't think this has a strong influence on -- on

17    how I would view law enforcement testimony.

18         THE COURT:  Okay.  So let me ask a different question

19    that comes out of that, which is it's my expectation there will

20    be testimony and evidence about gun possession in this case.

21    There's no allegation that a gun was pointed at anybody or

22    anything like that, to my knowledge.  But that said, how would

23    you feel about hearing testimony and evidence relating to

24    firearms given what your experience was as a victim of an armed

25    robbery?

1      THE PROSPECTIVE JUROR:  I -- I don't think it would

2    impact my ability to -- to take a look at the evidence.

3      THE COURT:  Okay.  All right.  Mr. Fischer -- oh, one

4    more question.  You have indicated you have international

5    travel booked from November the 18th through the 26th.  Can

6    you -- is that a personal trip or a business trip?

7      THE PROSPECTIVE JUROR:  It's a personal trip.

8      THE COURT:  And, you know, I don't -- it's my

9    expectation that the case should be to the jury and, hopefully,

10   concluded by then.  What -- nobody would like to reschedule a

11   trip.  I understand that.  But what -- can you tell us how

12   difficult it would be for you to find time to take that trip

13   during another period?

14     THE PROSPECTIVE JUROR:  It would be difficult.

15   It's -- it's -- you know, we made this trip specifically for

16   the week of Thanksgiving.  It's when my son has school off for

17   a week.  So it's, you know, kind of that week or, you know,

18   some other -- some other time.  So I think it would be -- it

19   would be difficult to reschedule that trip.

20     THE COURT:  Okay.  All right.  We'll certainly take

21   that into account.

22       Okay.  Any follow-up from Mr. Linder?

23     MR. LINDER:  Yes.  Good afternoon.  How are you?

24     THE PROSPECTIVE JUROR:  Well.

25       How are you?

1           MR. LINDER:  Thanks for spending your entire day with

2     us.  Thank you for completing the questionnaire.

3           You indicated when the judge asked you a question -- I

4     don't remember exactly what he asked, but you indicated you had

5     an opinion about J6 and what happened and how it happened.  Can

6     you tell us a little bit more about that.

7           THE PROSPECTIVE JUROR:  Sure.  I -- I think --

8     there's a lot to talk about, I think.  I'm not -- you know, I

9     don't know how much to -- to get into it.  I think -- for me,

10    the -- I have, you know -- I have a lot of feelings about it.

11    I don't know how --

12          MR. LINDER:  I think a lot of us do.

13          THE PROSPECTIVE JUROR:  Sure.

14          MR. LINDER:  It would be normal.

15          THE PROSPECTIVE JUROR:  Sure.

16          MR. LINDER:  What I need to explore is, you know, if

17    you can put some of those opinions in words.  Because, I mean,

18    you indicated that you have an opinion of what happened, how it

19    happened.  We just need to know if any of those opinions affect

20    our clients over here.

21          THE PROSPECTIVE JUROR:  Sure.  So I think, you know,

22    I have -- on one side I believe that the people that were

23    involved in January 6th were misled, I believe, by -- by -- by

24    certain powers, by certain people.  I believe there's a lot of

25    misinformation in our world.  I believe that, you know,

1    there's -- there's a responsibility on an individual to try to

2    discern what's -- what's real and what isn't.

3         I believe there's also a responsibility for people in

4    power and people in the media to try to put out information as

5    truthful as possible.  So I think -- I think there's -- you

6    know, I think there's sort of both -- you know, individuals

7    have responsibility, but I think there's -- the world at large

8    has responsibility as well for doing better.

9         MR. LINDER:  Okay.  And do you attribute any of that

10   misinformation or miscommunication to the Oath Keepers?

11        THE PROSPECTIVE JUROR:  I -- not specifically, no.  I

12   believe -- if I -- if I -- you know, I would say that the

13   Oath Keepers have been -- been fed this misinformation more

14   than they have been provided misinformation, would be my --

15        THE COURT:  And is your -- correct me if I'm wrong,

16   but you were unaware of the Oath Keepers as a group until a

17   story you read a few weeks ago?

18        THE PROSPECTIVE JUROR:  That's correct.  I believe

19   other groups I had heard of more so.

20        MR. LINDER:  Okay.

21        THE PROSPECTIVE JUROR:  I think -- I don't think I

22   had heard of the Oath Keepers before January 6th, and I

23   don't -- I don't believe that I was aware of them until maybe a

24   month ago.

25        MR. LINDER:  Sure.  Okay.  Thank you very much.

```
 1                THE COURT:  Mr. Nestler?

 2                MR. NESTLER:  Good afternoon, sir.

 3                THE PROSPECTIVE JUROR:  Hello.

 4                MR. NESTLER:  Are you a scientist by your profession?

 5                THE PROSPECTIVE JUROR:  Not technically.  I'm a data

 6      scientist.

 7                MR. NESTLER:  Okay.

 8                THE PROSPECTIVE JUROR:  So sort of.

 9                MR. NESTLER:  Do you sometimes work with hypotheses

10      and assumptions and then look at facts and then reach a

11      different or -- a different conclusion than you thought you

12      would reach before you came into the process?

13                THE PROSPECTIVE JUROR:  I do.

14                MR. NESTLER:  Is that something that you think --

15      well, does that form your worldview and how you approach

16      looking at facts now?

17                THE PROSPECTIVE JUROR:  It does.

18                MR. NESTLER:  No further questions, Your Honor.

19                THE COURT:  Okay.  Sir, thank you very much for your

20      time.

21           Mr. Douyon will escort you out of the courtroom and

22      provide you with additional instructions.

23                THE PROSPECTIVE JUROR:  Okay.

24                THE COURT:  Thank you.

25                THE PROSPECTIVE JUROR:  Thank you.
```

```
 1            (REPORTER'S NOTE:  Prospective Juror 1150 left.)

 2            (REPORTER'S NOTE:  Prospective Juror 0975 enters.)

 3            THE COURT:  Hi.  Good evening, ma'am.  How are you?

 4            THE PROSPECTIVE JUROR:  Good.  How you are?

 5            THE COURT:  Good.

 6        Thank you for your patience today.  I know it's been a

 7   long day, and thank you for your service today and also for

 8   coming in and completing the questionnaire.

 9        Feel free to remove your mask, if you wish.

10        You're Juror 0975?

11            THE PROSPECTIVE JUROR:  Yeah.

12            THE COURT:  And your questionnaire should be in front

13   of you.  So let me just ask you, if you would, turn to page 6

14   and Question 11 of the questionnaire.

15            THE PROSPECTIVE JUROR:  Yes.

16            THE COURT:  All right.  And in that question you

17   indicated that a friend and neighbor is a D.C. police sergeant

18   and one of the first D.C. police to respond on January 6th.

19            THE PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Have you discussed what happened to him

21   or her on January the 6th?

22            THE PROSPECTIVE JUROR:  No.

23            THE COURT:  And --

24            THE PROSPECTIVE JUROR:  I'm aware of -- I'm friends

25   with his wife on Facebook, and she had a post after that
```

1    happened about what happened to him.

2              THE COURT:  Okay.  And do you recall what that post

3    consisted of, what she said in that post?

4              THE PROSPECTIVE JUROR:  It, basically, just alluded

5    to some chaos and also that people had brought bear repellant

6    spray to the Capitol Building to use against the law

7    enforcement.

8              THE COURT:  Okay.  Now, you know, your role as a

9    juror would be to try and set aside things you have heard,

10   whether it's from neighbors or otherwise, about the events of

11   January 6th.  Do you think you would be able to, if you were

12   asked to serve, do that in this case with respect to these

13   defendants?

14             THE PROSPECTIVE JUROR:  I think it may be a struggle.

15             THE COURT:  Say it again.

16             THE PROSPECTIVE JUROR:  It may be a struggle knowing

17   that information.

18             THE COURT:  You have to repeat what --

19             THE PROSPECTIVE JUROR:  It may be difficult knowing

20   that information.

21             THE COURT:  Knowing what information?

22             THE PROSPECTIVE JUROR:  Per my friend and her

23   husband.

24             THE COURT:  Okay.  So I can tell you there's -- to my

25   knowledge, there's no allegation in this case that anybody used

 1   any bear spray, for example, in this case.  There are, however,

 2   other allegations.  Do you think the fact that -- for example,

 3   if this case didn't involve something of the kind that happened

 4   to your neighbor's husband, that you could then sit fairly in

 5   judgment?

 6             THE PROSPECTIVE JUROR:  Possibly.

 7             THE COURT:  Okay.  Do you have any reason to question

 8   whether you could sit fairly in judgment?

 9             THE PROSPECTIVE JUROR:  It's hard to say without

10   knowing.

11             THE COURT:  Sure.  Of course.  But as you sit here

12   today, do you have any reason to doubt your capacity to be able

13   to sit fairly and in an unbiased way?

14             THE PROSPECTIVE JUROR:  It's hard to say without

15   knowing.

16             THE COURT:  Okay.  Let me just ask you:  Question 1

17   was a hardship question, which says -- and you answered:  If my

18   husband is traveling, I will not have childcare if either of my

19   two children are sick and need to stay home from school.

20        So you're the mother of two children.  And can I just

21   ask what age they are.

22             THE PROSPECTIVE JUROR:  Eight and 3.

23             THE COURT:  And during what hours of the day,

24   including from drop-off to pick-up, are they in school?

25             THE PROSPECTIVE JUROR:  8:30 is drop-off, and I have

 1    to pick them up by 6:00 p.m. at the latest.

 2           THE COURT:  Okay.  And if you were asked to be here

 3    at 8:30, would that present a hardship for you?

 4           THE PROSPECTIVE JUROR:  Yes.

 5           THE COURT:  How soon after 8:30 do you think you

 6    could be in court?

 7           THE PROSPECTIVE JUROR:  Probably by 9:15.

 8           THE COURT:  Okay.  Let me just ask:  Question 46 asks

 9    whether you've read, seen, or heard anything about the

10    Oath Keepers organization, and in Question 47 you said that

11    what you have heard would cause -- or affect your ability to be

12    fair and impartial.  Could you share with us why you answered

13    that question -- those questions yes.

14           THE PROSPECTIVE JUROR:  Yeah.  I don't know if I'm

15    mixing up the Oath Keepers and the Proud Boys, because I think

16    I generalize the two groups together, in my mind.

17           THE COURT:  Okay.  And what do you think you know

18    about which of the two organizations that is in your mind?

19           THE PROSPECTIVE JUROR:  That they probably lean more

20    extreme hard right in terms of political leaning.

21           THE COURT:  Okay.  And the fact that they -- that you

22    think that they -- or would characterize them as that, leaning

23    in that direction, how would that affect your ability to be a

24    juror in this case and be fair and impartial?

25           THE PROSPECTIVE JUROR:  With regard to what their

1    potential intent was on that day.  In terms of potentially

2    breaching the Capitol.

3              THE COURT:  Okay.  And if you heard evidence, would

4    you be open to hearing evidence that the reasons for entering

5    the Capitol were different than what your assumptions may be or

6    what you may have heard in the media?  Is that something you

7    would be open to?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Let me go back for a moment to the

10   question I asked earlier about dropping off your children.  If

11   you are asked to come to court, say, by 8:45, is there a way

12   that you could -- somebody else could facilitate the drop-off

13   so that you could get here earlier?

14             THE PROSPECTIVE JUROR:  So it depends.  So my husband

15   typically can, but he also sometimes travels.  Sometimes he has

16   to travel last minute unexpectedly; so it sort of depends on

17   that.  We have friends that live nearby, but it would depend.

18        Most typically, the childcare that I use when he's out

19   of town for a long time would be their grandparents who live in

20   New Jersey, and they will come down sometimes if he -- my

21   husband is traveling for like a week at a time, but for shorter

22   periods they don't.

23             THE COURT:  Okay.  So let me ask you this, which is:

24   The government in every criminal case bears the burden of

25   proving guilt beyond a reasonable doubt.  If you were selected

344

1    as a juror and you were convinced that the government had not

2    met its burden, do you think you would have any difficulty

3    voting to acquit these defendants?

4                THE PROSPECTIVE JUROR:  No.

5                THE COURT:  All right.  Let me ask you:  -- please

6    turn to page 6.  Question 14 asks whether you, a close friend,

7    or family member has ever been employed by the federal

8    government.  Can you tell us about that.

9                THE PROSPECTIVE JUROR:  So my son -- so -- okay.

10   Depending on -- so my son, one of his best friends in his

11   class, the mother works in one of the senator's office.  I

12   think a senator from Wisconsin.  And in terms of federal

13   government, another friend's parent works for the Department of

14   Health and Human Services.

15               THE COURT:  So your son's friend's mother who's --

16   works on Capitol Hill, do you know whether she was on Capitol

17   Hill --

18               THE PROSPECTIVE JUROR:  I don't.

19               THE COURT:  -- on January 6th?

20               THE PROSPECTIVE JUROR:  I don't know.

21               THE COURT:  Have you had any conversations about the

22   events of January 6th?

23               THE PROSPECTIVE JUROR:  No.

24               THE COURT:  Your friend who works at HHS, I think you

25   said, does that person work in any sort of enforcement

```
1   capacity, law enforcement capacity?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  You have indicated, Question 17, that you

4   have strong views about firearms and laws concerning firearms.

5              THE PROSPECTIVE JUROR:  Uh-huh.

6              THE COURT:  So it's my expectation that there will be

7   evidence in this case about firearms possession.  However --

8   access to firearms.  However, there's no charge in this case of

9   unlawful possession of a firearm.

10             THE PROSPECTIVE JUROR:  Uh-huh.

11             THE COURT:  How -- knowing those facts, how, if

12  any -- how, if in any way, would your views on firearms and

13  firearm possession affect your ability to be fair and impartial

14  as a juror?

15             THE PROSPECTIVE JUROR:  Unlikely.

16             THE COURT:  I'm sorry?

17             THE PROSPECTIVE JUROR:  Unlikely.

18             THE COURT:  Unlikely?

19             THE PROSPECTIVE JUROR:  Uh-huh.

20             THE COURT:  So do I understand you correctly to say

21  that you could set aside your policy views about guns and gun

22  rights and view the evidence in this case fairly?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Question 19, 20, and 21 asks whether

25  close members or family friends were living or working on the
```

1    Hill on January the 6th.  Can you tell us about that.

2              THE PROSPECTIVE JUROR:  I attended the Women's March

3    in 2016.  I can't remember when it was.  My husband attended

4    the Black Lives Matter march in June of -- was that 2021?

5              THE COURT:  Okay.  And this is -- you're answering

6    Question 18, which, unfortunately, I skipped over.  But let me

7    ask you the following based upon that:  If you were to learn

8    that the defendants in this case may have different political

9    views than you do, how do you think that would affect your

10   ability to be a juror and sit in judgment of them?

11             THE PROSPECTIVE JUROR:  It would not.

12             THE COURT:  And then Questions 19, 20, and 21, again,

13   concern the events of January the 6th, and you've indicated

14   that you were concerned for the safety of yourself, a close

15   friend, or family member, can you tell us about that.

16             THE PROSPECTIVE JUROR:  Okay.  So I had been on the

17   Capitol Grounds.  I've not been inside the Capitol Building.

18   My son attends a Capitol Hill elementary school.  So we are

19   friends, of course, with some of the parents.  We sometimes do,

20   like, camping trips with them.  So we are friendly with them.

21   The neighbor was the sergeant that was at the Capitol Building

22   on that day.

23             And in terms of concern for safety, more general.  My

24   daughter's day care was around between 6th and 7th and

25   Maryland.  So, roughly, six and a half blocks from the

1    Capitol Building on that day in the heat of the -- in the chaos

2    of the moment, I was concerned for her welfare.  In fact, I

3    ended up picking her up early because it seemed a bit chaotic

4    on that day.

5              THE COURT:  Okay.  So how would you say -- the

6    experiences of that day and your concern for friends and your

7    family, how would you say that would affect your ability to

8    serve in judgment in this case?

9              THE PROSPECTIVE JUROR:  I think that I have -- there

10   are some emotions that I can still remember feeling on that

11   day; of concern.

12             THE COURT:  And if, for example, there was video

13   evidence, which I expect will be presented -- about the events

14   of January 6th were presented, do you think -- do you have

15   concerns that the emotions from that day could return and make

16   it difficult for you to serve as a juror?

17             THE PROSPECTIVE JUROR:  Yeah.

18             THE COURT:  Okay.

19       All right.  Any follow-up questions from the defense or

20   from the government?

21       Actually, let me rephrase.  Any objections from either

22   side?

23             MR. LINDER:  No objection.

24             MR. NESTLER:  Yes, Your Honor.

25             THE COURT:  Okay.  Mr. Nestler.

1          MR. NESTLER:  Good evening, ma'am.

2          THE PROSPECTIVE JUROR:  Hi.

3          MR. NESTLER:  I understand that it would be

4    difficult, as you said, to hear evidence about the case given

5    what you learned from your -- is it a Facebook post from your

6    neighbor's wife?

7          THE PROSPECTIVE JUROR:  Yes.  And my husband also

8    plays poker and has gone on vacation with the police sergeant.

9    So I believe -- it was similar information, all posted through

10   him.

11         MR. NESTLER:  Sure.  But you have not spoken to the

12   police sergeant directly; is that correct?

13         THE PROSPECTIVE JUROR:  No.  No.

14         MR. NESTLER:  Okay.  And as the judge indicated, if

15   you were instructed to do so, you're going to hear evidence

16   here in the courtroom, be asked to render a verdict based

17   purely on what you hear here in court, not what you heard in

18   the news, or someone else told you, or what your read, or your

19   husband told you.  Do you think you'd be able to follow those

20   instructions even if it would be difficult?

21         THE PROSPECTIVE JUROR:  Yes.

22         MR. NESTLER:  Thank you.

23         THE COURT:  Ma'am, let me just ask:  In terms of --

24   you know, we talked about -- let me put it this way:  You've

25   described emotions that you've experienced as a result of the

1    events of January 6th.  How confident are you that you could

2    put those to the side and sort of dispassionately evaluate the

3    evidence in the case?

4            THE PROSPECTIVE JUROR:  Fairly confident.

5            THE COURT:  Okay.  Let me ask, if you would, on

6    pages 50 and 51 -- excuse me.  Questions 50 and 51, you

7    indicated you know people in the legal field and -- and law

8    enforcement.  I think we've talked about law enforcement.

9            THE PROSPECTIVE JUROR:  Uh-huh.

10           THE COURT:  How about in the legal profession?

11           THE PROSPECTIVE JUROR:  In the legal profession, one

12   of my very good friends is a lawyer in Pennsylvania.

13           THE COURT:  And what kind of law does that -- your

14   friend practice?

15           THE PROSPECTIVE JUROR:  I don't -- not even sure.

16           THE COURT:  Okay.  And other than the police

17   detective who's your neighbor, is there anybody else in law

18   enforcement?

19           THE PROSPECTIVE JUROR:  Yes.  There are -- my

20   biological brother by birth is a former Marine and now works as

21   a state police officer in Connecticut.  And my nephew -- I have

22   one nephew who just became a police officer in Syracuse and

23   another nephew who is in the Army.

24           THE COURT:  So in Question 52 you were asked if you

25   answered yes to 50 or 51 would any of those experiences affect

350

1    your ability to be fair and impartial in this case.  You

2    answered yes.

3              THE PROSPECTIVE JUROR:  Okay.  Sorry.  One more

4    person.  Also my husband -- besides the police sergeant, my

5    husband's other best friend is a D.C. police detective.

6              THE COURT:  Okay.

7              THE PROSPECTIVE JUROR:  I think I would struggle with

8    anything, understanding that somebody was doing something

9    against or potentially at the expense of safety to an officer.

10             THE COURT:  Okay.  If you were to learn there's a

11   charge in this case of conspiring to prevent an officer from

12   discharging their duties, does the mere fact of that charge --

13   how does that affect your view on -- or ability to be fair?

14             THE PROSPECTIVE JUROR:  Can I ask what that charge

15   means or --

16             THE COURT:  No, that's fair.  I mean, it -- so it

17   means what it says, which is that people are alleged to have

18   conspired to prevent an officer from -- from doing what they

19   were -- what their duties were that day.

20             THE PROSPECTIVE JUROR:  Uh-huh.  I -- that does

21   confer some emotions, knowing that I have some significant

22   loved ones who are in law enforcement and also --

23             THE COURT:  Okay.  All right.  Thank you.

24        All right.  Ma'am, thank you very much for your time and

25   testimony.

1          Mr. Douyon will show you out of the courtroom and

2    provide you with further instructions.

3               THE PROSPECTIVE JUROR:  Thank you.

4               (REPORTER'S NOTE:  Prospective Juror 0975 left.)

5               THE COURT:  Okay.  I'm going to strike 0975 for

6    cause.  I just have too many concerns about her connections to

7    the events of January 6th, and although she said that she could

8    be fair and impartial, it's just not something I'm convinced of

9    based on her body language and her answers to multiple

10   questions.

11          We have one more.

12               (REPORTER'S NOTE:  Prospective Juror 0952 enters.)

13               THE COURT:  Ma'am, how are you?

14               THE PROSPECTIVE JUROR:  Good.  Thanks.

15               THE COURT:  You are Juror 0952?

16               THE PROSPECTIVE JUROR:  Yes.

17               THE COURT:  Feel free to take your mask off, if you

18   feel comfortable doing so.

19          Thank you very much.  You are our last juror of the day.

20   You have been the most patient of them all.  I wish I could

21   give you some sort of award, but thank you very much.  I can't

22   do more than give you my thanks.

23          So you should have your juror questionnaire in front of

24   you.  And if you would turn, please, to page 11; and turn first

25   to Question 46.  And that question asked:  Have you read, seen,

1   or heard anything about the Oath Keepers organization?  Can you

2   tell us what you have read, seen, or heard.

3           THE PROSPECTIVE JUROR:  I've heard just a little bit

4   about the organization on television.

5           THE COURT:  Okay.  And can you share with us what you

6   recall hearing?

7           THE PROSPECTIVE JUROR:  That they're a loosely formed

8   organization.

9           THE COURT:  Okay.  Do you know anything more than the

10   loose formation of the organization?  For example, do you -- do

11   you think you recall anything about their beliefs, mission,

12   et cetera?

13           THE PROSPECTIVE JUROR:  I don't know much about it.

14           THE COURT:  Okay.  And do you have any recollection

15   about what their role might have been on January the 6th?

16           THE PROSPECTIVE JUROR:  No.

17           THE COURT:  All right.  Let me ask you:  You also

18   have answered Question 44 which says you've listened to

19   portions of the hearings of January 6th by Congress.  Can you

20   give us a sense of how frequently and to what extent you follow

21   those hearings?

22           THE PROSPECTIVE JUROR:  I have watched the televised

23   hearings.

24           THE COURT:  You have?

25           THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And do you recall in any of the hearings

2     that you have watched any testimony or commentary about

3     Oath Keepers?

4          THE PROSPECTIVE JUROR:  No, I don't remember the

5     Oath Keepers being part of that.

6          THE COURT:  Okay.

7          THE PROSPECTIVE JUROR:  I thought it was mostly the

8     former administration.

9          THE COURT:  All right.  Just above Question 44 are

10    Questions 39, 40, and 41.  Those concern the amount of exposure

11    you've had to video or news coverage about the events of

12    January the 6th.  Would you describe yourself as somebody who

13    actively seeks out news and information about January 6th or

14    someone who, you know, if you come across it and -- it may be

15    something you read?

16         THE PROSPECTIVE JUROR:  Well, I took this to mean --

17    obviously, on the day of January 6th, I was watching

18    television.  I lived in D.C., so it was, obviously --

19         THE COURT:  Right.

20         THE PROSPECTIVE JUROR:  -- of interest.

21         THE COURT:  To be clear, the question, at least in

22    terms of media coverage, is not limited just to that day.

23    It's --

24         THE PROSPECTIVE JUROR:  Yeah.

25         THE COURT:  -- over the course of, you know, the year

1    plus since the events of that day.

2              THE PROSPECTIVE JUROR:  I would say -- I don't -- I

3    wouldn't say I actively seek out January 6th information.

4    I'm -- I do watch the news on a regular basis, and so it is a

5    topic.

6              THE COURT:  Okay.  And whatever you may have learned

7    or seen in the news, is that something -- do you think you

8    could set that aside and view the evidence in this case fairly

9    and impartially as to these defendants?

10             THE PROSPECTIVE JUROR:  Yes, I believe I can.

11             THE COURT:  Okay.  Let me ask you to turn to page 6.

12   Question 14 asked whether you or a close friend or family

13   member has ever been employed by the federal government, and

14   you indicated the answer was yes.  Can you tell us about that.

15             THE PROSPECTIVE JUROR:  Sure.  My husband works for

16   the Department of the Interior.

17             THE COURT:  Okay.  And you say he's an oil and gas

18   policy analyst?

19             THE PROSPECTIVE JUROR:  Uh-huh.

20             THE COURT:  Okay.  So I -- has he ever had any role

21   in terms of law enforcement?

22             THE PROSPECTIVE JUROR:  No.

23             THE COURT:  And Question 18 asks about -- last

24   five years whether you, a close friend, or family have

25   participated in any rally, protest, or demonstration.  Can you

1    tell us about that.

2            THE PROSPECTIVE JUROR:  Yes.  I did the Women's

3    March -- or I have the last couple years.

4            THE COURT:  If during the course of this trial you

5    were to sense the defendants in this case hold political views

6    that are different than yours, how do you think that would

7    affect your ability to be fair and impartial, if at all?

8            THE PROSPECTIVE JUROR:  I don't think it would affect

9    my ability to be fair.  Many people hold many different views.

10           THE COURT:  And so the ultimate question for any

11   juror is, the government bears the burden of proving guilt

12   beyond a reasonable doubt.

13           THE PROSPECTIVE JUROR:  Uh-huh.

14           THE COURT:  Do you believe -- if you were convinced

15   that the government had not met its burden, do you think you

16   would have any difficulty voting to acquit?

17           THE PROSPECTIVE JUROR:  No.  I mean, I think it's

18   very clear that the precedent is it's got to be beyond the

19   burden of proof.

20           THE COURT:  Okay.  If you would turn to page 11,

21   please, and Question 51 asked whether you or a close friend or

22   family member has ever been employed or received training

23   from -- as a law enforcement officer.

24           THE PROSPECTIVE JUROR:  Uh-huh.  My brother-in-law

25   was a police officer in Milwaukee.

356

1          THE COURT:  Okay.  And my expectation is that there

2     will be a fair amount of law enforcement testimony in this

3     case.  Is there anything about your relationship or the fact

4     that your brother-in-law is in law enforcement that would

5     affect your ability to be fair and impartial?

6          THE PROSPECTIVE JUROR:  I don't think so.

7          THE COURT:  And do you think that just because your

8     brother-in-law is in law enforcement that you might tend to

9     give greater weight to law enforcement testimony over the

10    testimony of a non-law enforcement witness?

11         THE PROSPECTIVE JUROR:  I don't think so.

12         THE COURT:  And if, for example, the evidence in the

13    case were such that you thought a law enforcement officer was

14    not credible, do you think you could view a law enforcement

15    officer as not credible?

16         THE PROSPECTIVE JUROR:  I think I would view the

17    testimony similar to any witness.

18         THE COURT:  Okay.  Question 54 asked whether you or a

19    close friend or family member has been the victim of a crime.

20    If there's a particularly personal answer to that, we can take

21    that in a more private manner.

22         THE PROSPECTIVE JUROR:  Oh.  I just meant, like, I

23    think we've had stuff, like, stolen out of our car and stuff

24    like that.

25         THE COURT:  Did that happen in the District of

1    Columbia.

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And did you have experience with D.C. law

4    enforcement as a result of that?

5              THE PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  And did you report that?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Anything on behalf of defense?

9              MR. LINDER:  Good afternoon.  How are you?

10        Did you say you work with Deloitte?

11             THE PROSPECTIVE JUROR:  Yes.

12             MR. LINDER:  Okay.  And do you have any knowledge or

13   information of the Deloitte contract with the Department of

14   Justice?  Do you have anything to do with that at all?

15             THE PROSPECTIVE JUROR:  No.

16             MR. LINDER:  Were you even aware that Deloitte had a

17   contract with the Department of Justice?

18             THE PROSPECTIVE JUROR:  I know Deloitte serves most

19   of the cabinet agencies; so I'm not surprised.  But I'm not

20   directly involved in that.

21             MR. LINDER:  Okay.  Thank you very much.

22             THE PROSPECTIVE JUROR:  Uh-huh.

23             MR. FISCHER:  Good afternoon, ma'am.

24        So you should understand in this case that the --

25   essentially, the allegation is that the defendants were trying

1    to stop Joe Biden from becoming the President of the United

2    States.  Were you aware of that?

3            THE PROSPECTIVE JUROR:  Loosely, yeah.

4            MR. FISCHER:  Okay.  And so, therefore, they were

5    trying to prevent Joe Biden and trying to keep Donald Trump in

6    office.  Are you aware of that?

7            THE PROSPECTIVE JUROR:  In the broadest terms?  Yeah.

8            MR. FISCHER:  Well, that was -- with that in mind,

9    knowing that, would that affect your ability to be fair and

10    impartial to defendants?

11            THE PROSPECTIVE JUROR:  I don't think so.  I think

12    it's still about the rule of law.

13            MR. FISCHER:  Okay.  Fair enough.  Thank you, Your

14    Honor.

15            THE COURT:  Thank you, Mr. Fischer.

16            MR. NESTLER:  No questions, Your Honor.

17            THE COURT:  Ma'am, thank you very much for your time

18    and your service today.

19        Mr. Douyon will escort you out of the courtroom and

20    provide you further directions.  Thank you.

21            THE PROSPECTIVE JUROR:  Thank you.

22            (REPORTER'S NOTE:  Prospective Juror 0952 left.)

23            THE COURT:  Okay, everyone.  Thank you for putting in

24    a long day.  I think we got a lot done.

25        We will start up again tomorrow at 9:30 and, hopefully,

1  have as equally a productive day as today.  And, hopefully, we

2  won't have to go quite as long.

3          We thank the marshals for all of their hard work in

4  staying, and our court reporter, and thank you to the press for

5  sticking around.

6          Thank you, everyone.  Have a good night.  We'll see you

7  tomorrow.

8              (Proceedings were concluded at 6:30 p.m.)

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4      Certified Realtime Reporter, do hereby certify that the above

5      and foregoing constitutes a true and accurate transcript of my

6      stenograph notes and is a full, true, and complete transcript

7      of the proceedings to the best of my ability.

8

9                          Dated this 28th day of September, 2022.

10

11                     /s/ Nancy J. Meyer
                       Nancy J. Meyer
12                     Official Court Reporter
                       Registered Diplomate Reporter
13                     Certified Realtime Reporter
                       333 Constitution Avenue Northwest
14                     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'90s** [2] - 214:23, 216:6
**'94** [2] - 293:15, 294:5
**'99** [1] - 293:15

**0**

**0671** [5] - 191:9, 191:12, 209:22, 210:3, 211:5
**0707** [3] - 317:2, 317:9, 319:19
**0769** [3] - 307:25, 308:6, 316:2
**0775** [3] - 283:1, 283:8, 288:15
**0856** [4] - 229:16, 229:21, 238:21, 238:22
**0926** [3] - 212:12, 212:17, 221:8
**0952** [3] - 351:12, 351:15, 358:22
**0975** [4] - 339:2, 339:10, 351:4, 351:5

**1**

**1** [2] - 206:5, 341:16
**10** [6] - 187:20, 283:14, 283:15, 314:10, 322:22, 329:1
**100** [1] - 189:22
**1038** [3] - 319:23, 320:6, 324:23
**11** [20] - 169:21, 173:17, 191:19, 222:10, 231:8, 231:9, 239:14, 241:4, 254:14, 268:1, 279:22, 289:2, 308:11, 312:25, 317:17, 320:11, 325:12, 339:14, 351:24, 355:20
**1104** [4] - 239:4, 239:7, 249:4, 249:5
**1140** [3] - 267:17, 267:22, 277:13
**1150** [3] - 324:24, 325:8, 339:1
**12** [1] - 314:11
**1233** [3] - 221:21, 222:2, 229:15
**13** [3] - 195:10, 293:4, 317:13
**1301** [5] - 288:16,

288:21, 307:24, 316:5, 316:24
**1369** [4] - 169:5, 169:11, 173:1, 186:1
**14** [12] - 182:18, 187:6, 197:1, 212:23, 213:2, 257:9, 271:15, 294:15, 310:17, 321:8, 344:6, 354:12
**1431** [4] - 279:12, 279:17, 282:24, 282:25
**1489** [3] - 260:9, 260:15, 267:16
**15** [1] - 176:20
**1558** [4] - 249:9, 249:17, 259:13, 259:14
**1560** [3] - 186:2, 186:8, 191:8
**1582** [4] - 173:2, 173:8, 185:15, 185:16
**16** [1] - 185:25
**17** [3] - 176:4, 249:23, 345:3
**18** [11] - 177:23, 197:20, 213:14, 226:4, 251:14, 260:20, 269:22, 295:19, 311:18, 346:6, 354:23
**18th** [1] - 335:5
**19** [14] - 178:21, 181:12, 181:16, 197:8, 197:18, 198:2, 213:14, 214:19, 269:20, 269:22, 271:23, 322:6, 345:24, 346:12
**1991** [1] - 293:14
**1:00** [2] - 204:20, 206:11

**2**

**2,000** [2] - 233:7, 233:17
**20** [7] - 181:12, 185:6, 198:4, 216:11, 297:2, 345:24, 346:12
**2000s** [1] - 217:11
**2005** [1] - 214:25
**2007** [1] - 327:9
**2008** [1] - 327:17
**2009** [1] - 327:17
**2010** [2] - 226:25,

228:19
**2011** [2] - 198:6, 226:24
**2015** [1] - 228:21
**2016** [2] - 228:21, 346:3
**2018** [1] - 261:1
**2020** [2] - 173:21, 231:24
**2021** [2] - 198:6, 346:4
**21** [3] - 181:12, 345:24, 346:12
**22** [5] - 178:21, 181:12, 181:16, 198:18, 231:16
**23** [1] - 327:12
**24** [5] - 214:24, 297:6, 312:18, 322:15, 327:13
**26th** [1] - 335:5
**27** [2] - 176:11, 179:15

**3**

**3** [1] - 341:22
**30** [1] - 216:2
**32** [1] - 239:14
**33** [2] - 230:2, 230:3
**34** [1] - 230:16
**35** [1] - 255:21
**37** [5] - 198:24, 262:1, 272:6, 298:3, 329:1
**39** [10] - 187:22, 215:9, 225:6, 254:14, 261:25, 262:20, 283:15, 310:4, 322:22, 353:10
**3:25** [1] - 238:23
**3:35** [1] - 238:24
**3:50** [1] - 238:24

**4**

**40** [8] - 187:22, 215:9, 225:6, 254:14, 283:15, 310:4, 322:22, 353:10
**41** [8] - 187:22, 215:9, 225:6, 254:15, 262:20, 283:15, 322:22, 353:10
**42** [4] - 187:22, 257:14, 263:19, 285:18
**43** [1] - 187:22
**44** [4] - 200:6, 224:23, 352:18, 353:9
**45** [11] - 169:21, 169:22, 181:18, 182:19, 191:20,

191:21, 192:4, 231:8, 241:5, 241:9, 289:4
**46** [15] - 181:18, 200:22, 219:14, 222:9, 241:5, 255:6, 268:1, 290:25, 300:19, 308:10, 308:17, 320:12, 325:13, 342:8, 351:25
**47** [10] - 181:18, 182:9, 191:20, 191:23, 200:22, 200:23, 201:9, 201:12, 241:5, 342:10
**48** [2] - 241:5, 268:17
**49** [2] - 241:5, 241:9
**4:00** [2] - 318:17, 318:18
**4th** [1] - 309:3

**5**

**5** [2] - 311:18, 319:1
**50** [10] - 202:18, 215:23, 255:12, 273:23, 301:1, 323:19, 333:9, 349:6, 349:25
**50/50** [1] - 244:4
**51** [7] - 217:1, 313:1, 333:9, 349:6, 349:25, 355:21
**52** [1] - 349:24
**54** [11] - 203:13, 217:5, 227:16, 264:10, 264:15, 264:16, 274:21, 301:16, 313:21, 333:21, 356:18
**55** [3] - 217:20, 314:20, 333:21
**57** [2] - 189:10, 256:21
**5:00** [1] - 206:7

**6**

**6** [7] - 213:1, 293:4, 310:16, 321:7, 339:13, 344:6, 354:11
**65** [1] - 317:17
**65-year-old** [1] - 205:2
**66** [1] - 317:17
**67** [1] - 317:15
**6:00** [1] - 342:1
**6:30** [1] - 359:8
**6th** [110] - 169:24, 170:9, 170:11, 170:16, 171:14,

171:24, 177:5, 178:22, 178:24, 181:2, 182:4, 182:20, 187:24, 188:15, 188:20, 189:1, 191:22, 192:6, 192:12, 196:6, 198:5, 198:10, 198:15, 199:23, 200:7, 200:19, 201:7, 206:22, 210:21, 215:11, 218:23, 222:16, 222:18, 223:11, 225:7, 225:8, 225:12, 225:15, 225:19, 225:24, 231:12, 232:14, 232:22, 240:15, 241:7, 244:6, 244:18, 245:16, 245:17, 246:21, 248:4, 248:7, 249:7, 253:25, 254:7, 254:16, 254:18, 255:2, 262:22, 262:23, 263:12, 263:21, 264:3, 272:20, 272:21, 273:7, 277:19, 280:5, 281:13, 283:23, 283:25, 284:6, 284:9, 285:20, 286:5, 286:9, 289:7, 299:19, 309:3, 309:5, 309:8, 310:6, 316:15, 322:24, 322:25, 325:24, 329:10, 329:12, 330:2, 331:5, 333:6, 336:23, 337:22, 339:18, 339:21, 340:11, 344:19, 344:22, 346:1, 346:13, 346:24, 347:14, 349:1, 351:7, 352:15, 352:19, 353:12, 353:13, 353:17, 354:3

**7**

**7** [7] - 226:3, 249:23, 250:5, 250:6, 260:20, 260:21, 327:3
**7th** [1] - 346:24

**8**

**8** [2] - 176:12, 186:14
**800** [1] - 233:7
**8:30** [6] - 218:18, 229:4, 229:5, 341:25, 342:3, 342:5
**8:45** [1] - 343:11

**9**

**9** [2] - 182:18, 230:2
**9/11** [3] - 192:8, 192:15, 211:7
**9:00** [1] - 206:6
**9:15** [1] - 342:7
**9:30** [1] - 358:25

**A**

**abiding** [1] - 177:5
**ability** [47] - 169:24, 173:19, 173:23, 174:17, 178:16, 179:25, 182:8, 191:23, 191:25, 208:4, 214:8, 218:14, 218:16, 220:8, 226:15, 226:17, 231:12, 232:17, 234:20, 236:7, 250:25, 253:14, 253:15, 257:6, 259:21, 268:24, 270:16, 272:15, 279:24, 287:11, 289:7, 298:10, 306:22, 312:7, 320:24, 335:2, 342:11, 342:23, 345:13, 346:10, 347:7, 350:1, 350:13, 355:7, 355:9, 356:5, 358:9
**able** [43] - 172:12, 184:19, 190:2, 193:5, 198:15, 200:17, 202:9, 215:4, 215:6, 225:23, 227:11, 232:2, 234:14, 236:18, 240:13, 243:11, 245:9, 250:15, 252:21, 263:4, 281:21, 281:23, 286:24, 290:22, 292:15, 292:21, 297:22, 299:14, 304:16, 317:20, 317:24,

319:1, 323:7, 326:15, 326:22, 328:13, 328:21, 329:2, 333:5, 340:11, 341:12, 348:19
**abortion** [2] - 226:14
**Abramoff** [1] - 230:22
**absence** [1] - 221:19
**absent** [1] - 205:10
**absolutely** [3] - 208:22, 214:17, 223:13
**accept** [1] - 292:21
**acceptable** [1] - 278:6
**access** [3] - 267:1, 270:13, 345:8
**account** [2] - 264:5, 264:6, 335:21
**accounts** [2] - 208:18, 218:23
**accurate** [2] - 184:15, 227:15
**accused** [6] - 175:19, 201:22, 201:23, 204:8, 309:22
**acquit** [8] - 194:8, 195:8, 296:23, 307:16, 316:11, 344:3, 355:16
**acquittal** [2] - 328:21, 328:24
**acquitting** [1] - 323:15
**act** [2] - 277:21, 280:2
**acting** [1] - 206:18
**action** [1] - 277:22
**actions** [1] - 281:5
**active** [1] - 272:23
**actively** [12] - 175:2, 225:15, 254:17, 262:23, 272:22, 283:24, 299:8, 329:11, 329:19, 353:13, 354:3
**activities** [1] - 201:4
**acts** [1] - 233:10
**actual** [1] - 208:24
**additional** [16] - 171:1, 172:24, 185:12, 191:7, 209:21, 221:6, 229:13, 238:18, 265:2, 267:14, 277:11, 288:13, 315:25, 319:16, 324:20, 338:22
**addressing** [1] - 316:25
**adjudicated** [2] - 189:21

**Administration** [1] - 293:21
**administration** [3] - 274:6, 280:18, 353:8
**adult** [1] - 185:24
**advised** [1] - 306:3
**affect** [50] - 169:24, 173:18, 178:15, 179:25, 181:4, 181:5, 182:8, 191:22, 191:25, 196:1, 199:17, 204:9, 206:9, 211:19, 214:8, 214:11, 218:13, 220:7, 231:12, 234:19, 234:20, 234:23, 236:6, 251:22, 253:14, 253:15, 257:6, 268:23, 270:16, 270:19, 279:24, 285:11, 289:7, 298:8, 298:9, 320:24, 336:19, 342:11, 342:23, 345:13, 346:9, 347:7, 349:25, 350:13, 355:7, 355:8, 358:9
**affected** [3] - 233:4, 282:6, 290:21
**affects** [1] - 208:3
**affiliate** [1] - 239:15
**affiliated** [2] - 274:8, 291:20
**affiliation** [1] - 307:11
**afraid** [3] - 176:16, 176:17, 192:5
**afternoon** [19] - 183:15, 190:17, 190:18, 191:10, 205:17, 221:22, 228:11, 238:23, 257:23, 257:24, 265:4, 275:20, 277:9, 303:5, 303:6, 335:23, 338:2, 357:9, 357:23
**afterwards** [2] - 244:22, 329:20
**age** [1] - 341:21
**agencies** [2] - 197:16, 357:19
**agency** [2] - 294:20, 310:22
**agenda** [2] - 193:10, 194:12
**aggression** [1] - 303:21

**ago** [17] - 179:15, 185:6, 189:15, 192:6, 216:10, 216:11, 218:13, 226:23, 226:25, 278:8, 314:8, 322:13, 322:17, 325:18, 325:19, 337:17, 337:24
**agree** [2] - 184:6, 208:15
**agreed** [1] - 238:8
**agricultural** [1] - 197:11
**ahead** [1] - 171:2
**aide** [1] - 272:3
**aids** [2] - 186:23, 186:24
**air** [2] - 245:19, 245:20
**Air** [2] - 197:7, 216:5
**airport** [2] - 311:7, 311:8
**alarming** [1] - 192:11
**Alex** [4] - 262:3, 272:9, 298:3, 329:3
**allegation** [6] - 177:15, 254:6, 270:14, 334:21, 340:25, 357:25
**allegations** [4] - 196:8, 218:8, 218:9, 341:2
**alleged** [8] - 175:1, 177:16, 201:19, 268:22, 291:16, 309:22, 321:4, 350:17
**allow** [1] - 281:6
**allowed** [1] - 235:3
**alluded** [1] - 340:4
**alluding** [1] - 227:23
**alone** [3] - 199:20, 205:2, 329:6
**alongside** [2] - 242:23, 245:23
**altercations** [1] - 227:25
**alternate** [1] - 328:16
**alternative** [1] - 278:5
**Amendment** [1] - 270:10
**American** [4] - 175:22, 178:17, 285:4, 285:14
**Americans** [1] - 181:24
**amount** [9] - 239:16, 241:6, 241:7, 241:11, 243:13, 283:22, 286:5,

353:10, 356:2
**analyst** [4] - 310:24, 311:1, 311:2, 354:18
**anger** [1] - 180:6
**animal** [2] - 213:11, 274:7
**animals** [1] - 214:16
**announced** [1] - 226:10
**annual** [1] - 301:14
**answer** [22] - 193:14, 201:11, 212:6, 217:2, 217:3, 217:20, 217:24, 231:13, 231:14, 232:12, 236:24, 237:1, 260:24, 266:18, 274:23, 278:9, 301:18, 313:4, 333:24, 354:14, 356:20
**answered** [40] - 170:1, 170:2, 176:9, 177:23, 178:20, 181:12, 181:18, 182:10, 186:13, 187:8, 189:10, 192:1, 197:19, 201:9, 202:5, 212:25, 226:7, 230:5, 241:10, 250:1, 250:2, 254:14, 255:6, 279:25, 285:19, 289:8, 290:7, 290:25, 294:16, 301:1, 308:19, 310:3, 310:4, 313:23, 320:14, 341:17, 342:12, 349:25, 350:2, 352:18
**answering** [2] - 222:8, 346:5
**answers** [6] - 210:5, 266:7, 278:6, 282:14, 283:13, 351:9
**anticipate** [1] - 281:15
**apartment** [2] - 218:1, 218:4
**apologize** [1] - 300:18
**appeal** [1] - 237:9
**Appeals** [1] - 238:4
**appear** [2] - 199:2, 272:8
**appearing** [1] - 230:13
**applied** [1] - 313:2
**apply** [13] - 170:14, 175:16, 193:3,

193:7, 195:1,
215:15, 225:2,
234:8, 236:20,
261:21, 261:22,
280:9, 328:13
**appointments** [1] -
205:3
**appreciate** [9] -
176:23, 191:2,
205:6, 205:14,
209:14, 238:16,
282:14, 319:14,
325:4
**approach** [1] - 338:15
**appropriate** [2] -
238:4, 277:17
**appropriately** [1] -
270:11
**area** [2] - 228:22,
295:7
**armed** [1] - 334:24
**arms** [1] - 311:4
**Army** [1] - 349:23
**arrested** [4] - 189:12,
189:15, 256:22,
314:3
**article** [7] - 326:2,
326:6, 326:15,
326:17, 326:21,
326:23, 332:23
**articles** [1] - 232:5
**aside** [34] - 179:19,
183:24, 200:3,
201:24, 224:25,
225:23, 227:11,
241:23, 243:5,
243:22, 244:1,
250:16, 251:11,
254:22, 256:3,
261:21, 269:16,
273:3, 280:7,
290:13, 296:18,
299:1, 299:15,
310:9, 310:13,
312:12, 312:20,
323:7, 326:23,
331:22, 333:5,
340:9, 345:21, 354:8
**aspect** [2] - 231:11,
289:6
**aspects** [2] - 169:23,
191:21
**assault** [1] - 264:18
**assess** [1] - 302:19
**assistance** [1] -
186:20
**associated** [3] -
199:16, 274:23,
291:20
**associates** [1] -

199:19
**association** [3] -
272:15, 298:8,
298:25
**assuage** [1] - 237:18
**assume** [3] - 220:3,
227:7, 247:21
**assumed** [1] - 276:24
**assumptions** [2] -
338:10, 343:5
**attack** [1] - 289:16
**attempt** [1] - 175:2
**attend** [1] - 221:14
**attended** [18] - 177:25,
200:7, 213:23,
214:7, 226:5, 226:9,
251:16, 251:18,
253:3, 253:24,
260:22, 269:24,
270:24, 295:20,
311:20, 311:22,
346:2, 346:3
**attends** [1] - 346:18
**attorney** [8] - 204:16,
210:7, 258:3,
271:19, 275:21,
294:21, 321:16,
333:14
**attorneys** [2] - 211:2,
274:15
**attribute** [1] - 337:9
**audit** [1] - 306:4
**auditors** [1] - 346:18
**audits** [5] - 306:13,
306:16, 306:23,
307:1
**aunt** [2] - 187:10,
257:13
**auto** [1] - 301:21
**avid** [2] - 225:8, 299:9
**avoid** [1] - 279:7
**avoided** [1] - 225:20
**avoids** [1] - 279:8
**award** [1] - 351:21
**aware** [9] - 219:12,
258:10, 265:11,
268:6, 337:23,
339:24, 357:16,
358:2, 358:6

**B**

**background** [1] -
313:10
**bad** [5] - 186:23,
186:24, 199:19,
219:19, 238:9
**based** [28] - 172:8,
172:11, 176:2,
177:14, 184:1,

184:12, 184:18,
184:21, 200:4,
201:20, 204:25,
208:17, 210:4,
245:5, 245:7,
266:16, 266:18,
276:15, 279:5,
283:12, 287:11,
320:19, 331:13,
346:7, 348:16, 351:9
**basis** [4] - 182:20,
248:20, 281:24,
354:4
**bear** [3] - 194:24,
340:5, 341:1
**bears** [2] - 343:24,
355:11
**became** [1] - 349:22
**become** [2] - 208:8,
231:20
**becoming** [1] - 358:1
**beforehand** [1] -
282:8
**begin** [3] - 173:17,
212:23, 218:18
**beginning** [3] - 195:9,
306:7, 332:8
**behalf** [1] - 357:8
**behind** [3] - 179:5,
212:3, 282:2
**belabor** [1] - 212:7
**belief** [3] - 171:7,
220:4, 312:5
**beliefs** [2] - 220:14,
352:11
**believes** [1] - 179:16
**best** [8] - 235:17,
287:13, 287:14,
288:4, 299:5,
304:19, 344:10,
350:5
**better** [2] - 300:24,
337:8
**between** [2] - 233:14,
346:24
**beyond** [22] - 184:2,
194:4, 194:19,
194:25, 209:6,
224:21, 234:9,
234:11, 234:24,
237:14, 256:8,
256:16, 278:17,
297:12, 305:4,
323:13, 328:12,
328:19, 331:24,
343:25, 355:12,
355:18
**biased** [2] - 241:16,
314:17
**Biden** [7] - 173:21,

174:17, 175:3,
175:20, 175:25,
358:1, 358:5
**Biden's** [1] - 175:20
**big** [2] - 296:2, 298:13
**bigger** [2] - 206:1,
331:21
**bill** [1] - 204:25
**billing** [1] - 210:6
**biological** [1] - 349:20
**birth** [1] - 349:20
**bit** [20] - 178:1, 200:8,
204:13, 224:8,
230:2, 233:12,
245:3, 248:19,
250:11, 257:2,
269:25, 289:19,
290:2, 290:10,
303:25, 305:23,
329:9, 336:6, 347:3,
352:3
**Black** [2] - 214:3,
253:1, 346:4
**blank** [1] - 211:17
**block** [2] - 171:18,
176:15
**blocks** [2] - 179:4,
346:25
**blog** [1] - 188:4
**Bob** [1] - 234:23
**body** [1] - 351:9
**Bones** [1] - 219:22
**booked** [1] - 335:5
**bothered** [1] - 237:24
**bottom** [5] - 213:1,
250:5, 250:6,
307:11, 308:11
**bounce** [1] - 230:1
**Boys** [5] - 222:17,
223:25, 224:11,
291:7, 342:15
**branch** [2] - 313:14,
321:18
**breach** [1] - 223:2
**breaching** [2] -
222:24, 343:2
**break** [3] - 218:1,
238:23, 264:17
**break-ins** [2] - 218:1,
264:17
**breaking** [2] - 218:3,
232:1
**bricks** [1] - 232:2
**briefly** [4] - 224:2,
228:10, 228:20,
257:22
**bring** [4] - 174:14,
194:11, 223:1,
281:18
**broad** [2] - 214:13,

275:1
**broadcast** [1] - 200:10
**broadest** [1] - 358:7
**broke** [1] - 275:2
**broken** [1] - 302:4
**brother** [5] - 318:23,
349:20, 355:24,
356:4, 356:8
**brother-in-law** [1] -
355:24, 356:4, 356:8
**brought** [6] - 177:9,
177:15, 226:24,
300:9, 300:10,
302:7, 329:24, 340:5
**bubble** [1] - 220:15
**bucks** [1] - 298:14
**building** [10] - 196:9,
196:15, 196:16,
196:19, 196:24,
226:24, 227:1,
293:20, 294:3,
294:12
**Building** [15] - 171:21,
211:18, 214:20,
223:3, 226:20,
227:10, 312:15,
312:16, 322:8,
322:12, 327:4,
340:6, 346:17,
346:21, 347:1
**buildings** [1] - 232:1
**bullies** [1] - 201:15
**bunch** [1] - 201:15
**bundler** [1] - 174:3
**burden** [28] - 194:3,
194:24, 207:11,
209:12, 234:11,
256:8, 256:15,
261:19, 263:16,
284:18, 296:22,
296:25, 297:11,
307:13, 307:18,
310:10, 316:12,
323:12, 323:14,
328:18, 328:23,
331:24, 343:24,
344:2, 355:11,
355:15, 355:19
**burdens** [1] - 209:5
**burgled** [2] - 217:12,
217:18
**business** [4] - 195:22,
258:24, 306:4, 335:6

**C**

**C-SPAN** [1] - 299:24
**cabinet** [1] - 357:19
**calculate** [1] - 282:6
**campaign** [4] -

173:21, 174:1,
174:4, 174:17
**camping** [1] - 346:20
**candid** [2] - 210:19,
316:6
**candidly** [1] - 237:18
**cannot** [1] - 243:19
**capacities** [2] -
290:19, 297:8
**capacity** [15] - 195:12,
197:15, 251:23,
257:16, 293:6,
293:17, 294:4,
310:23, 312:15,
321:15, 322:1,
327:6, 341:12, 345:1
**Capitol** [70] - 169:24,
171:10, 171:14,
171:21, 171:24,
172:3, 172:5,
178:23, 179:1,
192:7, 195:12,
195:14, 195:16,
195:21, 195:22,
195:25, 196:4,
198:3, 198:8, 211:9,
211:18, 211:20,
214:20, 214:21,
222:25, 223:2,
226:19, 226:20,
227:5, 227:10,
231:12, 235:5,
242:11, 254:7,
269:21, 270:3,
271:24, 289:6,
289:11, 289:13,
290:8, 293:6,
293:23, 297:2,
297:4, 304:3,
312:15, 312:16,
322:7, 322:8,
322:10, 322:12,
327:4, 340:6, 343:2,
343:5, 344:16,
346:17, 346:18,
346:21, 347:1
**captain** [1] - 197:7
**car** [4] - 264:17, 275:2,
302:4, 356:23
**care** [1] - 346:24
**career** [1] - 203:1
**Carolina** [2] - 298:21,
301:10
**carried** [2] - 234:11,
256:15
**carry** [1] - 193:24
**carrying** [2] - 192:9,
194:3
**cars** [1] - 232:2
**case** [182] - 169:25,

170:8, 170:14,
172:8, 172:10,
173:18, 173:23,
174:19, 175:16,
175:18, 176:8,
177:8, 177:10,
181:4, 181:6,
184:11, 184:12,
184:18, 184:21,
185:19, 189:7,
190:3, 190:6, 193:3,
196:2, 196:8, 199:6,
199:7, 199:12,
199:16, 200:3,
200:4, 200:20,
201:18, 201:23,
202:2, 202:10,
203:11, 212:2,
214:6, 215:3,
215:15, 216:17,
218:8, 218:14,
218:23, 219:10,
220:5, 220:8, 225:2,
225:19, 225:25,
226:13, 227:9,
230:11, 230:18,
230:22, 234:1,
234:8, 234:21,
235:9, 235:15,
236:15, 236:21,
237:14, 240:14,
240:25, 241:19,
241:24, 242:21,
242:24, 243:6,
243:7, 243:24,
245:4, 245:7, 250:1,
250:14, 250:22,
250:23, 251:6,
251:12, 252:11,
252:13, 253:10,
253:12, 253:14,
254:5, 254:24,
255:3, 256:4, 257:7,
258:7, 259:25,
260:3, 261:7,
261:17, 261:22,
262:3, 262:5, 262:7,
263:6, 263:15,
268:17, 268:21,
268:24, 269:9,
269:13, 270:12,
270:15, 270:17,
270:22, 272:8,
272:11, 272:13,
273:4, 276:22,
279:25, 280:8,
280:10, 284:17,
284:22, 290:14,
290:23, 295:17,
296:7, 296:19,
297:11, 297:12,

297:17, 298:2,
298:7, 299:16,
302:11, 305:5,
309:21, 310:5,
311:13, 312:5,
312:23, 314:14,
314:18, 315:16,
321:23, 321:24,
322:3, 322:19,
323:6, 324:6, 328:7,
328:9, 328:10,
328:11, 328:18,
330:16, 330:17,
331:22, 333:7,
334:20, 335:9,
340:12, 340:25,
341:1, 341:3,
342:24, 343:24,
345:7, 345:8,
345:22, 346:8,
347:8, 348:4, 349:3,
350:1, 350:11,
354:8, 355:5, 356:3,
356:13, 357:24
**cases** [2] - 312:19,
312:22
**Cassidy** [2] - 224:7,
332:10
**casting** [1] - 278:12
**casualties** [1] - 250:9
**category** [1] - 185:23
**caused** [4] - 177:8,
201:11, 255:25,
315:15
**caveat** [2] - 243:17,
243:18
**center** [1] - 327:10
**certain** [9] - 211:10,
230:11, 245:2,
245:25, 254:11,
254:12, 268:10,
336:24
**certainly** [9] - 179:11,
220:18, 235:17,
272:10, 272:23,
273:14, 291:12,
329:15, 335:20
**certainty** [3] - 180:12,
243:21, 243:22
**cetera** [2] - 215:25,
352:12
**challenging** [2] -
304:13, 307:8
**change** [1] - 220:16
**chaos** [2] - 340:5,
347:1
**chaotic** [1] - 347:3
**char** [1] - 291:24
**characterize** [2] -
262:22, 342:22

**characterized** [1] -
291:25
**charge** [10] - 177:10,
250:23, 251:4,
251:6, 270:15,
306:17, 345:8,
350:11, 350:12,
350:14
**charged** [14] - 171:25,
179:13, 189:12,
203:20, 204:7,
228:6, 234:1,
235:23, 251:5,
256:22, 261:18,
275:15, 327:22
**charges** [4] - 232:4,
234:2, 238:2, 242:14
**charging** [2] - 235:13,
235:14
**Charlie** [1] - 293:14
**chatting** [1] - 283:7
**Chief** [2] - 262:7,
262:12
**chief** [1] - 262:16
**child** [2] - 318:11,
327:8
**childcare** [4] - 190:20,
190:24, 341:18,
343:18
**childhood** [2] -
264:21, 264:22
**children** [13] - 176:12,
176:17, 179:4,
182:18, 185:22,
190:24, 289:18,
318:15, 318:16,
318:25, 341:19,
341:20, 343:10
**choice** [1] - 247:4
**church** [2] - 196:5,
211:11
**circle** [1] - 206:21
**circumstances** [2] -
205:11, 329:14
**cited** [1] - 211:25
**citizen** [5] - 175:11,
175:23, 178:18,
219:19, 271:12
**citizens** [2] - 231:22,
280:1
**city** [3] - 176:18,
184:6, 327:9
**City** [1] - 215:2
**civil** [11] - 197:7,
197:8, 209:2, 209:3,
297:17, 321:24,
327:14, 327:18,
328:7, 328:9, 328:11
**claims** [1] - 222:23
**clarification** [2] -

258:21, 259:15
**class** [1] - 344:11
**clear** [7] - 246:18,
260:6, 261:15,
263:10, 287:9,
353:21, 355:18
**clearer** [1] - 245:3
**clearly** [8] - 177:17,
177:21, 178:4,
179:20, 183:2,
185:20, 211:8,
278:14
**click** [1] - 263:2
**client** [2] - 272:2,
278:14
**clients** [1] - 336:20
**cloakroom** [1] -
195:16
**close** [70] - 171:17,
177:24, 178:22,
179:9, 183:4, 187:7,
189:11, 194:13,
194:16, 195:10,
197:1, 197:2, 197:9,
197:21, 198:4,
198:7, 198:19,
203:14, 210:15,
212:9, 212:24,
213:8, 213:15,
216:15, 217:5,
226:4, 227:17,
227:20, 238:24,
251:15, 255:13,
256:21, 257:11,
260:21, 264:11,
269:23, 270:3,
271:15, 273:23,
274:17, 274:22,
289:11, 293:4,
294:16, 295:19,
297:3, 301:5,
301:17, 310:17,
311:19, 313:1,
313:21, 314:21,
321:8, 321:10,
323:20, 323:24,
333:10, 333:15,
333:22, 344:6,
345:25, 346:14,
354:12, 354:24,
355:21, 356:19
**closed** [2] - 192:12,
198:20
**closely** [3] - 181:25,
273:13, 309:11
**closings** [1] - 204:17
**collar** [1] - 203:6
**colleagues** [2] -
240:17, 294:10
**collection** [1] - 213:12

**Columbia** [6] - 203:25,
275:8, 275:12,
275:15, 295:12,
357:1
**comfortable** [5] -
239:10, 288:24,
320:5, 325:6, 351:18
**coming** [9] - 169:19,
184:6, 192:8, 222:7,
222:8, 228:15,
246:13, 326:1, 339:8
**command** [1] - 216:5
**comment** [1] - 263:24
**commentary** [4] -
248:6, 248:13,
332:17, 353:2
**comments** [2] -
263:21, 285:20
**Commerce** [1] -
187:11
**commerce** [2] -
187:13, 187:16
**Commission** [1] -
321:13
**commitments** [1] -
276:13
**committed** [2] -
233:20, 236:17
**committee** [6] -
200:19, 223:11,
223:15, 293:19,
293:21, 293:24
**Committee** [1] -
173:25
**commute** [1] - 266:23
**companies** [1] -
321:21
**company** [2] - 306:11,
321:20
**comparing** [1] - 233:9
**compelled** [2] - 235:7,
235:9
**compensated** [1] -
204:25
**compensation** [1] -
205:1
**complete** [2] - 219:25,
306:23
**completed** [3] -
199:24, 218:23,
255:3
**completely** [1] - 280:1
**completing** [8] -
169:19, 176:24,
191:16, 225:17,
249:14, 288:25,
336:2, 339:8
**compliance** [1] -
306:12
**complicated** [1] -

305:20
**computer** [1] - 294:2
**concentration** [1] -
206:9
**concept** [1] - 236:5
**concern** [13] - 181:3,
198:18, 198:23,
212:1, 279:9, 297:5,
321:25, 330:16,
346:13, 346:23,
347:6, 347:11,
353:10
**concerned** [8] - 180:8,
181:3, 181:13,
197:21, 200:14,
214:1, 346:14, 347:2
**concerning** [3] -
176:6, 249:25, 345:4
**concerns** [12] - 176:5,
177:4, 186:20,
211:14, 213:14,
234:17, 234:18,
234:20, 239:17,
286:22, 347:15,
351:6
**concluded** [2] -
335:10, 359:8
**conclusion** [3] -
256:15, 296:22,
338:11
**concrete** [3] - 247:16,
247:17, 247:18
**condo** [1] - 328:5
**condolences** [1] -
275:23
**conduct** [2] - 196:12,
245:15
**confer** [1] - 350:21
**conference** [2] -
204:17, 204:22
**confident** [2] - 349:1,
349:4
**confirm** [2] - 255:5,
255:8
**Congress** [5] - 179:7,
188:25, 195:14,
309:8, 352:19
**congressional** [4] -
223:4, 224:24,
226:23, 332:4
**Congressman** [1] -
293:14
**congressman's** [2] -
195:18, 272:2
**congressperson's** [1]
- 227:2
**Connecticut** [1] -
349:21
**connecting** [1] - 281:3
**connection** [1] -

245:17
**connections** [2] -
179:9, 351:6
**conscience** [2] -
237:19, 237:24
**consider** [16] - 183:10,
193:2, 211:23,
225:7, 225:14,
225:25, 242:19,
242:23, 272:20,
283:23, 284:16,
290:21, 292:6,
304:5, 322:24,
326:22
**consisted** [1] - 340:3
**conspired** [2] - 175:2,
350:18
**conspiring** [2] -
175:19, 350:11
**Constitution** [1] -
179:16
**constitutional** [1] -
271:12
**consume** [1] - 225:11
**consumer** [1] - 225:8
**contact** [1] - 230:4
**Contee** [2] - 262:6,
262:12
**contents** [1] - 325:20
**context** [3] - 199:12,
201:8, 226:21
**continue** [2] - 277:17,
287:17
**continued** [2] -
293:15, 294:6
**contract** [2] - 357:13,
357:17
**contradict** [4] -
223:10, 223:14,
302:24, 326:16
**contrary** [4] - 178:4,
208:25, 292:7,
292:20
**contributed** [1] -
245:22
**control** [5] - 250:8,
250:9, 250:13,
270:4, 290:3
**convenient** [1] -
204:21
**conversation** [3] -
212:20, 229:20,
260:14
**conversations** [1] -
344:21
**convict** [1] - 235:8
**convicted** [6] -
189:12, 235:3,
237:21, 256:9,
256:18, 256:23

**convictions** [1] -
266:6
**convinced** [4] -
323:13, 344:1,
351:8, 355:14
**coordinate** [1] -
326:21
**coordination** [2] -
222:23, 326:4
**Corps** [1] - 313:15
**correct** [33] - 171:11,
171:12, 185:1,
188:1, 191:13,
206:23, 212:18,
222:3, 229:22,
230:6, 230:19,
239:8, 239:20,
244:25, 247:6,
249:18, 260:16,
265:15, 274:1,
275:21, 275:22,
288:22, 293:11,
299:20, 303:10,
303:11, 305:17,
306:5, 307:23,
320:7, 337:15,
337:18, 348:12
**correctly** [6] - 183:2,
188:3, 196:22,
253:3, 345:20
**Counsel** [3] - 220:24,
244:14, 288:6
**counsel** [2] - 221:9,
275:17
**counter** [1] - 211:6
**country** [3] - 220:1,
250:8, 303:13
**couple** [14] - 170:25,
219:9, 239:13,
258:6, 261:2, 262:2,
265:7, 274:20,
275:2, 278:8, 281:9,
296:1, 303:9, 355:3
**course** [16] - 175:18,
175:22, 184:23,
192:3, 197:13,
207:25, 214:5,
223:18, 251:21,
284:24, 297:24,
308:15, 341:11,
346:19, 353:25,
355:4
**COURT** [790] - 169:6,
169:9, 169:13,
169:16, 170:5,
170:8, 170:18,
170:20, 170:23,
171:2, 172:18,
172:20, 172:23,
173:3, 173:6,

173:10, 173:13,
173:16, 174:2,
174:8, 174:12,
174:21, 174:24,
175:7, 175:9,
175:13, 175:24,
176:4, 176:23,
177:7, 177:13,
177:19, 177:23,
178:6, 178:9,
178:12, 178:15,
178:20, 179:8,
179:18, 179:22,
180:7, 180:13,
180:15, 180:21,
180:25, 181:10,
181:17, 182:3,
182:7, 182:14,
182:19, 183:3,
183:7, 183:10,
185:9, 185:14,
185:16, 186:3,
186:6, 186:10,
186:19, 186:24,
187:2, 187:6,
187:12, 187:15,
187:18, 187:20,
188:3, 188:6,
188:10, 188:14,
188:17, 188:19,
188:22, 188:25,
189:4, 189:6,
189:10, 189:16,
189:18, 189:20,
189:24, 190:1,
190:5, 190:10,
190:13, 190:16,
191:4, 191:10,
191:12, 191:14,
192:18, 192:24,
193:16, 193:20,
193:22, 194:2,
194:6, 194:10,
194:15, 194:21,
194:24, 195:3,
195:9, 195:20,
195:24, 196:7,
196:11, 196:17,
196:22, 197:1,
197:13, 197:18,
198:1, 198:9,
198:13, 198:18,
198:22, 198:24,
199:4, 199:10,
199:15, 199:21,
200:1, 200:6,
200:12, 200:17,
200:22, 201:5,
201:9, 201:17,
202:5, 202:16,
202:23, 202:25,

203:3, 203:7,
203:10, 203:13,
203:18, 203:22,
203:24, 204:2,
204:6, 204:11,
205:6, 205:9,
205:14, 209:15,
209:18, 209:23,
209:25, 210:2,
210:8, 210:13,
210:15, 211:16,
212:4, 212:8,
212:13, 212:16,
212:19, 212:23,
213:3, 213:5, 213:9,
213:13, 213:21,
213:25, 214:4,
214:12, 214:15,
214:19, 214:24,
215:3, 215:9,
215:18, 215:23,
216:3, 216:7, 216:9,
216:12, 216:14,
216:22, 217:1,
217:5, 217:13,
217:17, 217:20,
218:6, 218:17,
218:21, 219:1,
219:4, 220:24,
221:3, 221:9,
221:19, 221:22,
221:25, 222:4,
222:7, 222:12,
222:19, 223:4,
223:8, 223:14,
223:18, 223:22,
224:4, 224:9,
224:15, 224:22,
225:5, 225:13,
225:17, 225:22,
226:3, 226:12,
226:18, 227:4,
227:8, 227:16,
227:24, 228:5,
228:9, 228:25,
229:3, 229:7,
229:10, 229:17,
229:19, 229:23,
230:1, 230:7,
230:12, 230:20,
230:24, 231:2,
231:4, 231:7,
232:11, 232:21,
233:25, 234:14,
234:18, 235:12,
235:18, 235:21,
236:2, 236:13,
236:25, 237:10,
237:12, 238:10,
238:15, 238:20,
238:22, 239:5,

239:9, 239:13,
239:21, 240:1,
240:3, 240:5, 240:9,
240:11, 240:19,
240:23, 241:2,
241:17, 241:21,
242:1, 242:6, 242:9,
242:12, 242:19,
243:2, 243:4,
243:10, 243:15,
243:18, 244:2,
244:5, 244:10,
244:13, 244:16,
245:12, 245:20,
245:22, 246:1,
246:5, 246:8,
246:11, 246:16,
246:18, 247:2,
247:5, 247:7,
247:13, 247:17,
247:22, 248:2,
248:6, 248:10,
248:12, 248:15,
248:19, 248:24,
249:5, 249:10,
249:13, 249:19,
249:22, 250:5,
250:11, 250:20,
251:3, 251:8,
251:10, 251:14,
251:20, 251:25,
252:3, 252:6,
252:11, 252:20,
252:24, 253:2,
253:6, 253:8,
253:17, 253:19,
253:21, 253:23,
254:4, 254:9,
254:11, 254:13,
254:21, 255:1,
255:5, 255:12,
255:18, 255:22,
256:3, 256:6,
256:12, 256:14,
256:21, 257:1,
257:5, 257:9,
257:15, 257:18,
257:21, 259:5,
259:9, 259:14,
259:18, 260:2,
260:7, 260:10,
260:13, 260:17,
261:3, 261:6,
261:15, 261:25,
262:10, 262:12,
262:15, 262:19,
263:4, 263:10,
263:19, 264:1,
264:6, 264:10,
264:15, 264:19,
264:22, 265:1,

266:17, 267:11,
267:18, 267:20,
267:24, 268:13,
268:16, 268:20,
269:1, 269:7, 269:9,
269:13, 269:20,
270:5, 270:12,
270:20, 271:3,
271:8, 271:15,
271:20, 271:23,
272:4, 272:6,
272:18, 273:2,
273:6, 273:10,
273:18, 273:23,
274:2, 274:8,
274:11, 274:14,
274:19, 274:21,
275:3, 275:6,
275:10, 275:14,
275:17, 275:19,
276:10, 276:19,
277:5, 277:8, 278:1,
278:20, 279:6,
279:11, 279:13,
279:15, 279:19,
281:8, 281:11,
282:3, 282:10,
282:13, 282:18,
282:23, 282:25,
283:2, 283:6,
283:10, 283:17,
283:19, 283:21,
284:3, 284:5,
284:13, 284:15,
284:24, 285:3,
285:6, 285:8,
285:10, 285:15,
285:18, 285:23,
286:4, 286:12,
286:16, 286:18,
286:22, 287:3,
287:7, 287:9,
287:14, 287:16,
288:1, 288:3, 288:5,
288:9, 288:13,
288:17, 288:20,
288:23, 289:4,
289:17, 289:22,
289:24, 290:4,
290:9, 290:11,
290:18, 290:25,
291:13, 291:16,
291:19, 291:23,
292:4, 292:6,
292:12, 292:14,
292:18, 292:25,
293:3, 293:9,
293:12, 293:16,
294:7, 294:9,
294:15, 294:22,
295:1, 295:5, 295:8,

295:11, 295:15,
295:19, 296:3,
296:6, 296:13,
296:17, 296:21,
297:1, 297:10,
297:16, 297:20,
297:25, 298:13,
298:22, 298:24,
299:6, 299:14,
299:18, 299:22,
299:25, 300:4,
300:10, 300:13,
300:16, 300:23,
301:1, 301:4,
301:11, 301:16,
301:22, 301:25,
302:2, 302:5,
302:12, 302:17,
302:23, 303:3,
305:16, 305:17,
305:19, 305:24,
307:9, 307:15,
307:19, 307:23,
308:1, 308:3, 308:8,
308:15, 308:17,
308:21, 308:24,
309:4, 309:7,
309:10, 309:14,
309:16, 309:20,
310:2, 310:8,
310:13, 310:16,
310:22, 310:25,
311:2, 311:8,
311:11, 311:18,
311:24, 312:1,
312:4, 312:10,
312:14, 312:18,
312:25, 313:6,
313:9, 313:12,
313:14, 313:16,
313:18, 313:20,
314:2, 314:5, 314:8,
314:12, 314:16,
314:20, 314:24,
315:1, 315:4, 315:7,
315:10, 315:13,
315:18, 315:21,
315:23, 316:4,
316:20, 317:1,
317:3, 317:5, 317:9,
317:11, 317:15,
317:19, 317:23,
318:2, 318:4, 318:7,
318:10, 318:13,
318:15, 318:18,
318:21, 318:25,
319:6, 319:9,
319:13, 319:18,
319:20, 319:24,
320:1, 320:8,
320:18, 320:22,

321:3, 321:6,
321:14, 321:17,
321:22, 322:6,
322:11, 322:15,
322:21, 323:4,
323:11, 323:19,
323:22, 323:25,
324:4, 324:9,
324:12, 324:15,
324:17, 324:25,
325:2, 325:10,
325:20, 325:25,
326:6, 326:11,
326:13, 326:19,
327:2, 327:6,
327:12, 327:20,
327:24, 328:2,
328:6, 328:9,
328:16, 328:25,
329:18, 329:21,
330:1, 330:6,
330:12, 330:20,
331:3, 331:14,
331:17, 332:3,
332:15, 332:23,
333:2, 333:4, 333:9,
333:17, 333:21,
334:6, 334:11,
334:18, 335:3,
335:8, 335:20,
337:15, 338:1,
338:19, 338:24,
339:3, 339:5,
339:12, 339:16,
339:20, 339:23,
340:2, 340:8,
340:15, 340:18,
340:21, 340:24,
341:7, 341:11,
341:16, 341:23,
342:2, 342:5, 342:8,
342:17, 342:21,
343:3, 343:9,
343:23, 344:5,
344:15, 344:19,
344:21, 344:24,
345:3, 345:6,
345:11, 345:16,
345:18, 345:20,
345:24, 346:5,
346:12, 347:5,
347:12, 347:18,
347:25, 348:23,
349:5, 349:10,
349:13, 349:16,
349:24, 350:6,
350:10, 350:16,
350:23, 351:5,
351:13, 351:15,
351:17, 352:5,
352:9, 352:14,

352:17, 352:24,
353:1, 353:6, 353:9,
353:19, 353:21,
353:25, 354:6,
354:11, 354:17,
354:20, 354:23,
355:4, 355:10,
355:14, 355:20,
356:1, 356:7,
356:12, 356:18,
356:25, 357:3,
357:6, 357:8,
358:15, 358:17,
358:23
**Court** [7] - 185:6,
226:11, 237:23,
238:4, 278:9,
279:23, 280:25
**court** [16] - 172:9,
172:10, 172:11,
189:20, 245:5,
245:6, 245:7,
255:19, 263:7,
301:9, 319:1, 342:6,
343:11, 348:17,
359:4
**Court's** [1] - 267:6
**COURTROOM** [1] -
318:9
**courtroom** [26] -
172:21, 174:15,
184:13, 184:19,
184:21, 184:22,
185:11, 191:6,
209:20, 221:5,
229:12, 238:17,
249:1, 250:12,
259:10, 267:13,
277:10, 282:20,
288:10, 315:24,
319:15, 324:19,
338:21, 348:16,
351:1, 358:19
**cousin** [9] - 257:3,
294:19, 294:22,
301:3, 301:4,
313:25, 315:6, 315:7
**cover** [1] - 244:5
**coverage** [28] -
171:10, 183:17,
183:18, 199:22,
199:23, 200:2,
215:10, 222:16,
225:7, 225:24,
233:3, 239:16,
241:11, 241:14,
243:13, 244:8,
244:12, 244:19,
254:15, 283:22,
299:7, 310:5,

322:23, 329:9,
329:11, 329:17,
353:11, 353:22
**covered** [1] - 181:15
**create** [1] - 261:8
**created** [1] - 258:25
**creates** [1] - 259:20
**creatures** [1] - 330:19
**credibility** [2] - 174:6,
174:9
**credible** [2] - 356:14,
356:15
**cried** [2] - 192:16,
211:7
**crime** [23] - 189:13,
203:6, 203:15,
204:7, 204:8, 217:6,
217:21, 227:18,
228:6, 233:20,
233:22, 256:23,
264:12, 274:23,
301:18, 302:13,
313:22, 314:21,
314:22, 333:23,
356:19
**crimes** [4] - 172:1,
235:23, 295:4
**criminal** [28] - 202:20,
203:1, 203:4, 203:6,
215:3, 215:5,
233:16, 255:16,
255:24, 255:25,
256:2, 258:3,
261:15, 274:4,
274:5, 274:11,
274:15, 275:15,
297:11, 297:21,
312:19, 312:21,
321:23, 322:17,
324:2, 328:10,
333:18, 343:24
**CRISP** [4] - 211:6,
212:1, 212:5, 212:11
**Crisp** [1] - 211:17
**cross** [1] - 304:25
**cross-examination** [1]
- 304:25
**crying** [1] - 192:16
**culmination** [1] -
305:8
**culpability** [1] -
233:14

# D

**D.C** [35] - 177:18,
177:22, 179:15,
182:12, 184:5,
185:6, 189:16,
213:24, 215:1,

217:24, 228:17,
228:19, 232:9,
241:13, 255:16,
262:7, 262:14,
264:20, 264:23,
284:11, 286:8,
295:5, 295:6, 315:7,
324:8, 327:17,
333:14, 333:17,
339:17, 339:18,
350:5, 353:18, 357:3
**dad** [1] - 319:7
**daily** [2] - 205:9,
281:24
**damaged** [1] - 196:15
**damages** [1] - 328:5
**dangerous** [1] -
201:16
**darn** [2] - 194:12,
194:16
**data** [1] - 338:5
**date** [2] - 245:17,
272:25
**daughter** [2] - 178:3,
203:17
**daughter's** [1] -
346:24
**David** [2] - 230:23,
258:1
**days** [1] - 329:20
**daytime** [1] - 239:24
**deal** [4] - 237:8,
281:23, 307:2,
311:10
**dealing** [2] - 304:3,
307:4
**dealings** [1] - 311:11
**dealt** [1] - 295:3
**death** [2] - 233:23,
314:1
**decade** [1] - 226:25
**decide** [10] - 172:8,
172:10, 184:12,
184:18, 184:21,
200:3, 238:4, 245:4,
245:7, 331:23
**decision** [4] - 219:23,
226:9, 238:1, 238:3
**decisions** [2] -
235:13, 235:15
**declared** [1] - 259:19
**deeper** [1] - 182:23
**default** [2] - 217:10,
321:20
**defen** [1] - 279:1
**defendant** [9] -
174:10, 199:16,
199:17, 230:22,
272:14, 298:7,
298:9, 298:10,

298:25
**defendants** [91] -
170:21, 174:18,
175:1, 175:18,
176:1, 177:8,
178:13, 179:13,
179:23, 180:10,
181:6, 183:21,
183:25, 193:8,
193:25, 195:6,
196:9, 201:18,
201:22, 203:8,
203:11, 204:6,
211:20, 214:6,
218:10, 219:11,
220:6, 234:9, 238:2,
241:8, 241:19,
242:3, 243:6,
244:20, 249:7,
250:18, 250:22,
251:21, 251:25,
252:13, 252:17,
254:6, 256:19,
258:7, 260:4, 261:7,
261:10, 261:18,
263:6, 266:25,
268:16, 268:18,
268:21, 269:14,
270:22, 273:4,
276:22, 277:20,
278:3, 278:4,
278:14, 279:1,
280:10, 281:14,
284:18, 290:15,
291:16, 291:19,
296:7, 296:10,
299:3, 307:16,
309:22, 312:5,
312:11, 314:17,
320:25, 321:3,
323:9, 323:16,
326:20, 330:3,
340:13, 344:3,
346:8, 354:9, 355:5,
357:25, 358:10
**defense** [18] - 196:23,
202:20, 230:25,
231:1, 238:13,
238:14, 255:17,
255:24, 256:2,
258:3, 274:11,
274:15, 275:17,
295:17, 324:2,
324:12, 347:19,
357:8
**definitely** [1] - 323:3
**definitive** [1] - 237:17
**degree** [2] - 243:21
**Deloitte** [4] - 357:10,
357:13, 357:16,

357:18
**demand** [1] - 194:13
**Democratic** [1] -
195:15
**Democrats** [2] -
293:25, 304:3
**demonstration** [9] -
197:22, 213:16,
226:6, 251:16,
260:23, 269:24,
295:21, 311:20,
354:25
**deny** [2] - 211:5,
316:16
**Department** [10] -
187:11, 197:10,
294:21, 302:14,
302:18, 311:4,
344:13, 354:16,
357:13, 357:17
**department** [3] -
187:13, 197:11,
246:13
**DEPUTY** [1] - 318:9
**describe** [14] - 219:16,
219:25, 220:1,
220:2, 254:16,
258:14, 265:22,
266:11, 268:7,
299:7, 303:15,
303:19, 329:10,
353:12
**described** [6] -
201:10, 202:1,
254:1, 281:19,
290:13, 348:25
**despite** [1] - 243:8
**destroying** [1] - 232:1
**destruction** [2] -
231:21
**detail** [1] - 204:13
**details** [4] - 201:2,
300:9, 320:17,
320:18
**detective** [2] - 349:17,
350:5
**determination** [2] -
234:9, 327:22
**determine** [2] -
284:17, 310:9
**diatribe** [1] - 278:10
**differ** [1] - 220:14
**difference** [2] - 180:5,
285:12
**different** [65] - 170:12,
175:11, 175:14,
177:18, 177:22,
178:12, 179:6,
179:21, 179:24,
180:3, 185:23,

192:22, 193:1,
208:12, 208:24,
210:11, 214:7,
219:25, 223:10,
226:13, 231:3,
231:7, 236:15,
236:17, 236:18,
242:13, 242:15,
242:17, 248:22,
251:22, 252:1,
252:17, 260:1,
261:8, 261:12,
261:14, 263:23,
265:14, 266:21,
270:23, 274:7,
278:4, 280:6, 286:2,
290:19, 292:8,
293:18, 295:13,
296:8, 297:7, 312:6,
312:11, 321:18,
321:22, 322:5,
326:16, 331:18,
334:18, 338:11,
343:5, 346:8, 355:6,
355:9
**differentiation** [1] -
233:14
**differently** [7] -
192:21, 210:25,
243:20, 253:12,
274:3, 278:2, 279:7
**difficult** [25] - 176:7,
240:18, 241:15,
244:3, 249:25,
251:24, 251:25,
252:5, 252:7, 253:1,
280:23, 280:24,
287:6, 287:7, 316:8,
319:5, 319:6,
331:12, 335:12,
335:14, 335:19,
340:19, 347:16,
348:4, 348:20
**difficulty** [16] - 193:17,
193:19, 193:20,
224:25, 237:15,
240:13, 254:22,
256:7, 256:17,
286:20, 287:20,
307:15, 323:15,
323:18, 344:2,
355:16
**dinner** [1] - 324:21
**dire** [1] - 279:5
**direct** [4] - 222:9,
230:2, 268:1, 308:10
**directed** [1] - 179:10
**direction** [2] - 319:21,
342:23
**directions** [2] -

280:25, 358:20
**directly** [4] - 177:8,
228:4, 348:12,
357:20
**disagree** [1] - 266:3
**disagreed** [1] - 195:4
**disagreement** [1] -
328:4
**disappointed** [1] -
254:3
**disappointment** [1] -
254:5
**discern** [1] - 337:2
**discharging** [1] -
350:12
**disconcerting** [1] -
192:10
**discover** [1] - 208:9
**discredit** [1] - 302:25
**discussed** [3] -
176:13, 326:3,
339:20
**discussion** [1] - 173:7
**disingenuous** [1] -
278:11
**dismiss** [1] - 180:4
**dismissing** [1] -
210:16
**dispassionate** [1] -
185:19
**dispassionately** [8] -
202:10, 207:15,
261:23, 263:15,
281:17, 290:14,
323:8, 349:2
**display** [1] - 210:18
**disproportionately** [1]
- 250:8
**disqualifying** [1] -
263:13
**disregard** [2] - 281:3,
281:5
**disrespect** [1] -
176:19
**disrupted** [1] - 231:17
**disruptive** [1] - 231:20
**dissipated** [1] -
289:21
**district** [1] - 301:9
**District** [12] - 176:11,
203:25, 231:16,
231:17, 275:8,
275:11, 275:15,
295:12, 301:22,
301:24, 314:5,
356:25
**disturbances** [1] -
227:25
**dive** [1] - 330:11
**division** [1] - 258:25

**doctor** [1] - 186:22
**documents** [1] -
204:18
**dog** [1] - 176:15
**domestic** [2] - 227:21,
228:7
**Donald** [8] - 258:9,
258:16, 258:23,
265:11, 276:23,
278:12, 278:16,
341:23, 355:4
**done** [11] - 175:13,
176:24, 183:1,
203:1, 203:4, 221:9,
221:15, 246:5,
274:4, 306:19,
358:24
**door** [2] - 196:20,
211:23
**doubt** [23] - 194:4,
194:19, 194:25,
202:9, 209:7,
234:10, 234:11,
234:24, 237:15,
243:10, 256:8,
256:16, 260:2,
292:14, 297:12,
305:4, 323:13,
328:12, 328:20,
331:25, 341:12,
343:25, 355:12
**doubts** [2] - 202:11,
202:14
**Douyon** [20] - 172:21,
185:11, 191:6,
209:20, 221:5,
229:12, 238:17,
249:1, 259:10,
267:13, 277:10,
282:20, 288:9,
307:20, 315:24,
319:15, 324:19,
338:21, 351:1,
358:19
**down** [10] - 174:6,
178:3, 228:15,
232:8, 261:4, 270:3,
272:2, 289:12,
301:14, 343:20
**downtown** [1] - 286:8
**dressed** [3] - 182:17,
278:15
**driven** [1] - 284:25
**driving** [3] - 284:9,
284:11, 285:2
**drop** [3] - 341:24,
341:25, 343:12
**drop-off** [3] - 341:24,
341:25, 343:12
**dropped** [1] - 302:11

**dropping** [1] - 343:10
**during** [17] - 175:17,
199:2, 204:23,
214:5, 217:24,
223:10, 223:15,
223:18, 227:12,
248:7, 251:21,
273:21, 309:17,
332:17, 335:13,
341:23, 355:4
**duties** [2] - 350:12,
350:19
**duty** [7] - 176:22,
193:24, 205:8,
207:16, 207:24,
233:2, 271:12

# E

**early** [5] - 214:23,
217:11, 240:2,
240:3, 347:3
**easier** [2] - 207:10,
207:18
**east** [1] - 327:10
**East** [1] - 198:8
**Eastman** [3] - 199:4,
272:10, 329:4
**Eastman's** [1] -
272:12
**editorial** [2] - 246:8,
246:23
**effect** [1] - 270:20
**eight** [9] - 233:5,
233:12, 235:2,
236:11, 236:16,
276:1, 276:8,
313:18, 341:22
**eight-year** [4] - 233:5,
233:12, 236:11,
236:16
**either** [20] - 177:8,
195:21, 199:5,
223:1, 224:10,
236:13, 236:14,
248:3, 266:5,
266:22, 267:1,
278:21, 302:13,
313:2, 324:2, 329:5,
332:15, 333:11,
341:18, 347:21
**elaborate** [3] - 248:19,
260:24, 271:24
**elected** [1] - 295:24
**election** [2] - 284:10,
284:21
**elementary** [1] -
346:18
**elements** [3] - 233:19,
234:25, 237:6

**eleven** [3] - 313:17,
313:19, 313:20
**elicit** [1] - 282:13
**elsewhere** [7] - 245:8,
264:20, 264:25,
265:1, 301:23,
302:1, 314:6
**embarrassing** [4] -
242:5, 242:7, 242:8,
242:9
**emotion** [1] - 210:18
**emotional** [4] -
185:20, 211:8,
211:13, 316:14
**emotions** [9] - 180:8,
180:20, 193:6,
281:18, 334:2,
347:10, 347:15,
348:25, 350:21
**employed** [19] - 187:7,
195:11, 195:13,
197:3, 197:6,
212:25, 271:16,
293:5, 293:7,
294:17, 295:11,
310:18, 310:20,
313:3, 321:9,
321:10, 344:7,
354:13, 355:22
**employee** [2] - 217:17,
280:22
**employees** [2] - 213:7,
213:8
**employment** [3] -
217:10, 276:2, 313:2
**end** [4] - 221:15,
304:15, 306:20,
323:11
**ended** [2] - 278:18,
347:3
**enforcement** [48] -
190:6, 197:15,
204:3, 204:5,
216:16, 216:19,
216:23, 217:3,
228:2, 231:23,
233:17, 257:16,
271:20, 275:11,
302:24, 302:25,
311:4, 311:10,
311:12, 311:13,
311:14, 313:3,
313:9, 321:17,
321:19, 321:23,
322:1, 333:11,
334:13, 334:17,
340:7, 344:25,
345:1, 349:8,
349:18, 350:22,
354:21, 355:23,

356:2, 356:4, 356:8,
356:9, 356:10,
356:13, 356:14,
357:4
**engaged** [1] - 233:10
**English** [6] - 286:13,
286:14, 286:23,
287:12, 287:22,
318:4
**enjoy** [1] - 324:21
**entered** [4] - 196:9,
196:15, 196:19,
196:24
**entering** [2] - 211:20,
343:4
**enters** [20] - 169:5,
173:2, 186:2, 191:9,
212:12, 221:21,
229:16, 239:4,
249:9, 260:9,
267:17, 279:12,
283:1, 288:16,
307:25, 317:2,
319:23, 324:24,
339:2, 351:12
**entire** [2] - 278:13,
336:1
**entitled** [1] - 266:4
**entity** [2] - 179:16,
211:10
**episode** [3] - 204:3,
204:4, 204:7
**equally** [1] - 359:1
**equated** [1] - 211:7
**erase** [1] - 208:1
**escort** [3] - 324:19,
338:21, 358:19
**especially** [1] - 241:12
**essentially** [3] -
239:15, 241:3,
357:25
**establishment** [1] -
218:3
**et** [2] - 215:25, 352:12
**evaluate** [12] - 196:12,
196:13, 225:1,
234:7, 234:20,
237:5, 263:15,
273:4, 280:9, 310:9,
330:15, 349:2
**evaluating** [2] - 243:6,
269:17
**evening** [6] - 204:19,
239:24, 244:6,
319:24, 339:3, 348:1
**event** [7] - 232:23,
241:13, 244:24,
282:2, 282:7,
294:12, 315:14
**events** [54] - 169:23,

170:9, 179:9, 181:1,
187:24, 188:15,
188:20, 189:1,
191:22, 192:13,
192:22, 196:6,
215:11, 225:7,
225:19, 231:11,
232:19, 232:23,
240:15, 241:7,
244:18, 246:20,
249:6, 254:16,
255:2, 262:21,
263:21, 272:19,
280:5, 280:8,
280:14, 281:13,
285:20, 286:6,
289:6, 290:1,
290:21, 290:23,
310:5, 322:23,
322:25, 323:6,
325:24, 329:10,
331:4, 340:10,
344:22, 346:13,
347:13, 349:1,
351:7, 353:11, 354:1
**everywhere** [1] -
218:4
**evidence** [111] -
170:10, 170:13,
172:8, 172:9,
175:16, 177:7,
180:17, 181:5,
185:19, 193:2,
193:7, 193:12,
196:8, 196:13,
196:14, 200:3,
200:4, 200:20,
201:23, 202:2,
202:10, 207:15,
208:12, 211:10,
218:8, 218:9, 223:5,
223:9, 223:14,
225:1, 225:25,
227:9, 227:12,
234:7, 234:20,
235:3, 236:7,
236:20, 236:23,
241:24, 242:13,
242:20, 242:21,
242:23, 242:24,
243:6, 243:23,
245:6, 245:25,
246:2, 250:14,
250:17, 250:21,
251:12, 253:9,
253:11, 253:13,
254:23, 259:22,
259:25, 263:15,
269:17, 270:13,
273:4, 277:18,
277:19, 279:4,

279:5, 280:8, 281:1,
284:16, 284:17,
287:20, 290:14,
292:7, 292:8,
292:20, 296:18,
297:17, 298:24,
299:2, 299:16,
302:24, 310:9,
323:8, 326:16,
326:20, 326:22,
326:25, 327:21,
328:11, 330:16,
330:22, 331:10,
331:12, 331:22,
331:23, 333:7,
334:20, 334:23,
335:2, 343:3, 343:4,
345:7, 345:22,
347:13, 348:4,
348:15, 349:3,
354:8, 356:12
**evocative** [1] - 185:20
**ex** [1] - 178:3
**ex-wife** [1] - 178:3
**exactly** [7] - 176:23,
194:23, 276:4,
325:18, 327:19,
332:22, 336:4
**examination** [1] -
304:25
**example** [17] - 181:1,
185:21, 199:16,
210:18, 256:7,
264:2, 270:24,
286:18, 296:21,
302:23, 326:19,
334:13, 341:1,
341:2, 347:12,
352:10, 356:12
**excerpts** [1] - 300:2
**Exchange** [1] - 321:13
**excuse** [14] - 185:25,
196:3, 198:6,
205:11, 213:14,
255:13, 261:22,
269:22, 276:10,
283:14, 309:17,
311:18, 328:18,
349:6
**executive** [1] - 246:7
**exists** [1] - 270:10
**expect** [8] - 180:25,
190:5, 192:24,
204:19, 208:7,
272:10, 331:19,
347:13
**expectation** [5] -
270:12, 334:19,
335:9, 345:6, 356:1
**expense** [1] - 350:9

**experience** [13] -
174:16, 190:1,
192:25, 195:25,
257:5, 262:18,
302:12, 314:12,
314:16, 322:18,
334:11, 334:24,
357:3
**experienced** [5] -
170:16, 180:24,
190:7, 218:13,
348:25
**experiences** [8] -
174:15, 193:6,
275:6, 275:10,
330:24, 334:5,
347:6, 349:25
**explain** [2] - 171:5,
231:14
**explained** [1] - 174:13
**explore** [1] - 336:16
**exposed** [1] - 239:15
**exposure** [2] - 241:7,
249:6, 353:10
**expressed** [1] -
205:25
**extended** [1] - 256:25
**extent** [4] - 216:6,
262:20, 273:11,
352:20
**extraordinary** [2] -
205:11, 276:14
**extreme** [2] - 304:15,
342:20
**extremism** [1] -
304:13
**extremist** [1] - 291:8
**eye** [1] - 291:6

# F

**F-i-s-c-h-e-r** [1] -
258:1
**Facebook** [3] - 263:1,
339:25, 348:5
**facilitate** [1] - 343:12
**fact** [22] - 179:23,
180:4, 185:22,
198:13, 199:19,
210:23, 218:12,
235:22, 277:18,
279:3, 284:19,
284:24, 291:19,
295:15, 309:20,
312:7, 322:1, 341:2,
342:21, 347:2,
350:12, 356:3
**factory** [2] - 217:11,
217:18
**facts** [15] - 184:12,

184:18, 208:24,
215:15, 237:6,
247:19, 261:17,
261:21, 261:22,
263:7, 325:25,
330:15, 338:10,
338:16, 345:11
**fair** [117] - 169:25,
170:21, 171:6,
171:25, 173:19,
173:23, 174:18,
175:4, 175:21,
175:25, 176:7,
177:14, 178:16,
178:18, 179:12,
179:17, 182:9,
189:7, 189:8, 190:2,
191:23, 191:25,
193:7, 193:10,
198:15, 202:9,
206:21, 207:16,
207:24, 208:4,
208:5, 208:14,
210:22, 214:8,
215:20, 218:14,
218:16, 220:8,
220:17, 220:19,
226:15, 231:13,
232:17, 232:24,
239:16, 241:6,
242:24, 249:25,
250:25, 251:11,
251:23, 252:3,
252:4, 252:7, 252:8,
252:16, 253:15,
256:4, 259:17,
259:21, 260:6,
261:9, 261:12,
262:19, 266:8,
267:6, 267:9,
268:24, 270:17,
270:25, 272:16,
276:20, 277:1,
277:3, 278:19,
279:24, 284:21,
286:5, 289:7,
290:20, 290:22,
290:24, 291:21,
292:1, 293:1,
295:17, 296:9,
296:12, 298:10,
298:18, 300:16,
304:9, 305:11,
309:25, 312:7,
312:12, 314:13,
315:16, 316:9,
320:24, 321:2,
322:2, 331:5,
342:12, 342:24,
345:13, 350:1,
350:13, 350:16,

370

351:8, 355:7, 355:9,
356:2, 356:5, 358:9,
358:13
**fairly** [20] - 193:8,
196:12, 202:2,
225:25, 236:7,
250:17, 269:17,
280:10, 290:14,
296:19, 299:2,
302:19, 304:17,
323:8, 341:4, 341:8,
341:13, 345:22,
349:4, 354:8
**fairness** [1] - 324:6
**faithfully** [1] - 193:24
**fall** [1] - 210:16
**fallen** [2] - 194:7,
195:5
**familiar** [2] - 244:18,
298:1
**family** [62] - 171:21,
177:24, 178:22,
181:14, 187:7,
189:11, 195:11,
197:2, 197:14,
197:21, 198:5,
198:7, 198:19,
203:14, 212:24,
213:15, 215:24,
216:15, 217:2,
217:6, 226:5,
227:17, 251:15,
255:13, 255:14,
256:22, 256:25,
257:11, 260:22,
264:11, 269:23,
271:16, 273:24,
274:22, 293:5,
294:17, 295:20,
295:25, 296:15,
297:3, 301:5,
301:17, 310:18,
311:19, 313:2,
313:21, 314:21,
315:14, 321:9,
323:20, 333:10,
333:22, 344:7,
345:25, 346:15,
347:7, 354:12,
354:24, 355:22,
356:19
**far** [10] - 180:5, 199:6,
205:23, 220:16,
236:2, 247:11,
281:3, 303:23,
304:4, 324:9
**father** [8] - 216:4,
216:14, 216:18,
255:16, 255:23,
256:9, 256:17,

256:18
**favor** [5] - 187:2,
216:23, 231:23,
233:16, 311:15
**favorable** [2] - 199:14,
326:7
**FBI** [4] - 216:2, 216:7,
233:7, 246:14
**FCC** [2] - 271:19,
271:21
**FDIC** [2] - 257:14,
257:16
**fear** [1] - 289:17
**fearful** [2] - 185:22,
185:24
**February** [1] - 261:1
**fed** [1] - 337:13
**federal** [24] - 187:8,
197:3, 197:6,
212:25, 213:7,
213:8, 217:2, 232:9,
257:11, 271:16,
280:22, 294:17,
294:19, 294:22,
298:16, 310:18,
310:20, 321:9,
321:11, 344:7,
344:12, 354:13
**feed** [1] - 329:13
**feelings** [11] - 176:6,
211:18, 249:24,
250:10, 258:15,
265:23, 270:8,
290:13, 331:4,
336:10
**fell** [1] - 195:7
**felt** [10] - 174:4,
176:21, 182:12,
184:9, 195:4, 195:5,
195:7, 217:23,
224:19
**few** [11] - 207:21,
219:5, 233:25,
264:17, 266:13,
271:10, 275:18,
293:18, 312:1,
317:16, 337:17
**field** [9] - 202:19,
202:20, 215:24,
255:14, 255:24,
273:24, 301:5,
333:11, 349:7
**figure** [2] - 237:6,
307:5
**filings** [1] - 321:20
**filled** [2] - 176:8,
205:24
**filling** [6] - 205:21,
219:7, 228:15,
255:8, 265:6, 303:7

**finally** [1] - 221:12
**Finance** [1] - 173:25
**fine** [10] - 173:4,
212:16, 216:14,
229:9, 260:11,
274:19, 278:25,
305:24, 317:1,
319:25
**fire** [1] - 232:10
**firearm** [4] - 176:19,
250:24, 345:9,
345:13
**firearms** [15] - 176:5,
176:6, 176:18,
249:24, 249:25,
266:25, 267:1,
334:24, 345:4,
345:7, 345:8, 345:12
**firm** [6] - 183:5, 203:5,
204:24, 274:8,
274:10, 274:12
**firmness** [1] - 259:19
**first** [24] - 175:6,
175:8, 175:9,
186:13, 187:23,
213:18, 219:7,
222:7, 230:2,
233:25, 268:1,
273:14, 275:8,
275:23, 286:13,
286:15, 308:10,
309:13, 309:14,
313:25, 318:5,
325:3, 339:18,
351:24
**FISCHER** [52] - 219:5,
219:15, 219:23,
220:5, 220:10,
220:17, 220:22,
238:14, 257:22,
258:1, 258:3, 258:5,
258:12, 258:14,
258:19, 258:22,
259:3, 265:3, 265:6,
265:13, 265:17,
265:21, 266:1,
266:8, 266:11,
266:24, 267:4,
267:9, 275:18,
275:20, 275:23,
276:20, 276:25,
277:3, 278:7,
279:10, 303:5,
303:7, 303:12,
303:18, 303:23,
304:7, 304:14,
304:21, 304:24,
305:2, 305:11,
315:20, 357:23,
358:4, 358:8, 358:13

**Fischer** [13] - 258:1,
259:24, 267:11,
275:19, 276:10,
277:5, 278:2, 279:7,
303:4, 307:10,
315:19, 335:3,
358:15
**Fischer's** [1] - 277:15
**five** [18] - 177:25,
201:18, 205:4,
206:2, 213:17,
213:20, 213:24,
226:6, 231:19,
251:15, 260:22,
269:24, 295:20,
296:5, 306:13,
311:20, 319:2,
354:24
**five-week** [1] - 205:4
**flag** [2] - 285:5, 285:14
**flesh** [2] - 303:24,
305:23
**Floor** [1] - 195:15
**floor** [3] - 195:17,
218:2, 293:22
**Floyd** [3] - 231:25,
311:23, 311:24
**flying** [2] - 218:4,
289:13
**focus** [16] - 175:15,
193:6, 200:3,
200:20, 206:17,
207:25, 227:12,
236:20, 241:23,
243:23, 254:23,
299:15, 330:22,
331:1, 331:22, 333:6
**folks** [5] - 214:14,
238:25, 280:19,
292:24, 319:20
**folks'** [1] - 178:4
**follow** [40] - 171:1,
181:25, 191:18,
215:7, 220:20,
232:12, 234:8,
239:17, 239:18,
240:12, 240:14,
245:9, 263:20,
264:2, 264:4, 264:8,
267:6, 273:11,
280:25, 281:9,
283:12, 284:2,
284:3, 285:19,
286:4, 287:10,
290:9, 297:22,
307:9, 312:22,
315:18, 317:20,
322:19, 324:12,
326:25, 332:14,
335:22, 347:19,

348:19, 352:20
**follow-up** [7] - 171:1,
191:18, 283:12,
315:18, 324:12,
335:22, 347:19
**follow-ups** [1] - 281:9
**followed** [5] - 233:3,
248:3, 262:21,
309:7, 309:11
**follower** [1] - 188:4
**following** [5] - 235:12,
240:14, 251:1,
286:20, 346:7
**follows** [1] - 178:18
**Force** [2] - 197:7,
216:5
**Ford** [1] - 294:3
**foreign** [1] - 303:13
**foremost** [3] - 186:13,
233:25, 325:3
**forget** [2] - 224:7,
294:20
**forgive** [3] - 200:25,
286:12, 287:16
**form** [4] - 255:25,
299:12, 331:18,
338:15
**formation** [1] - 352:10
**formed** [6] - 241:18,
253:8, 302:13,
331:20, 352:7
**former** [15] - 179:1,
252:14, 252:16,
258:9, 259:20,
262:6, 265:10,
276:22, 280:2,
294:10, 296:9,
301:2, 301:4,
349:20, 353:8
**forth** [1] - 227:22
**forthright** [1] - 316:7
**fortunate** [1] - 183:11
**forward** [1] - 285:23
**founded** [1] - 325:23
**four** [7] - 206:2,
272:10, 306:13,
306:22, 319:2,
319:20, 325:19
**frankly** [5] - 174:22,
180:6, 211:2,
278:11, 278:16
**free** [28] - 169:10,
169:16, 173:6,
173:16, 186:7,
191:14, 212:19,
222:1, 222:5,
229:19, 229:24,
239:9, 249:16,
260:13, 260:18,
267:20, 279:16,

371

279:20, 283:6,
283:11, 288:23,
308:5, 317:7, 320:4,
320:9, 325:6, 339:9,
351:17
**freedom** [1] - 247:12
**freedoms** [1] - 280:2
**frequently** [2] -
273:10, 352:20
**Friday** [3] - 221:11,
221:13
**friend** [58] - 178:22,
187:7, 189:11,
197:2, 197:9,
197:10, 197:21,
198:4, 198:19,
203:14, 213:15,
217:6, 226:23,
227:4, 227:6,
227:17, 251:15,
255:14, 256:22,
260:22, 261:2,
264:11, 264:17,
269:23, 271:16,
273:24, 274:22,
293:5, 294:16,
295:20, 297:3,
301:5, 301:8,
301:17, 310:18,
311:19, 313:1,
313:21, 321:8,
323:20, 329:16,
333:13, 333:17,
339:17, 340:22,
344:6, 344:24,
346:15, 349:14,
350:5, 354:12,
354:24, 355:21,
356:19
**friend's** [2] - 344:13,
344:15
**friendly** [1] - 346:20
**friends** [47] - 171:20,
177:24, 179:2,
179:6, 192:7,
195:11, 197:12,
197:13, 198:8,
199:19, 203:3,
206:22, 212:24,
213:8, 213:22,
214:7, 226:5,
227:20, 227:21,
227:24, 240:17,
257:11, 261:14,
263:22, 264:17,
265:14, 265:18,
270:1, 270:23,
274:16, 274:17,
291:5, 298:16,
300:22, 323:23,

324:1, 333:10,
333:22, 334:5,
339:24, 343:17,
344:10, 345:25,
346:19, 347:6,
349:12
**front** [23] - 169:14,
173:14, 186:11,
212:21, 222:5,
225:9, 225:11,
229:24, 239:11,
249:20, 260:18,
262:24, 267:25,
279:20, 283:10,
289:2, 293:22,
308:9, 317:12,
320:9, 325:11,
339:12, 351:23
**fully** [1] - 180:23

## G

**gas** [1] - 354:17
**general** [8] - 180:16,
188:16, 215:12,
216:5, 225:11,
229:8, 229:10,
346:23
**generalize** [1] -
342:16
**generally** [12] -
176:19, 185:24,
187:15, 199:13,
202:7, 213:25,
264:7, 289:24,
293:17, 309:10,
318:8, 332:5
**gentleman** [2] -
183:23, 265:10
**gentlemen** [1] - 329:5
**gently** [1] - 278:18
**genuine** [1] - 210:20
**George** [3] - 231:25,
311:23, 311:24
**Geyer** [1] - 209:23
**gist** [1] - 326:5
**given** [9] - 179:12,
179:13, 185:19,
199:1, 249:5,
283:13, 284:20,
334:24, 348:4
**glasses** [1] - 308:14
**glued** [1] - 289:14
**goal** [3] - 290:19,
332:2, 333:8
**godmother** [1] - 179:3
**goodness** [1] - 214:18
**gotcha** [1] - 198:1
**government** [55] -
187:8, 194:2, 194:6,

194:14, 194:22,
195:5, 195:7, 197:3,
197:6, 207:10,
209:11, 209:24,
212:25, 234:5,
234:10, 234:24,
235:13, 237:14,
238:12, 246:14,
247:12, 256:4,
256:7, 256:15,
257:12, 261:19,
262:14, 263:16,
271:17, 278:12,
279:9, 284:17,
294:17, 296:22,
307:12, 310:10,
310:19, 310:21,
314:14, 316:11,
321:9, 321:11,
323:12, 323:14,
323:18, 328:17,
328:22, 343:24,
344:1, 344:8,
344:13, 347:20,
354:13, 355:11,
355:15
**government's** [1] -
331:24
**grade** [1] - 214:23
**graduate** [1] - 228:19
**grand** [4] - 297:13,
327:13, 327:17,
327:20
**grandparents** [1] -
343:19
**grave** [1] - 211:14
**great** [4] - 191:1,
229:14, 298:19,
306:9
**greater** [6] - 174:23,
184:8, 211:10,
234:2, 302:20, 356:9
**grew** [3] - 264:23,
296:14, 298:20
**gripping** [1] - 224:20
**ground** [1] - 218:2
**Grounds** [9] - 214:20,
226:19, 227:10,
269:21, 271:24,
322:7, 327:4, 346:17
**group** [21] - 182:5,
188:22, 200:14,
201:15, 223:2,
270:2, 291:17,
291:20, 291:24,
300:7, 305:9,
309:23, 309:24,
316:6, 316:7, 316:8,
325:23, 326:4,
326:8, 327:21,

337:16
**groups** [4] - 222:23,
291:6, 337:19,
342:16
**guarantee** [1] - 220:19
**guess** [25] - 175:5,
176:21, 180:15,
180:19, 189:20,
192:20, 217:9,
231:15, 231:18,
231:22, 233:1,
233:3, 233:11,
233:24, 234:17,
234:22, 246:14,
247:10, 247:11,
247:20, 258:11,
258:13, 266:19,
278:24, 303:12
**guidelines** [1] -
235:10
**guilt** [10] - 194:4,
234:11, 236:7,
284:18, 296:23,
323:12, 328:19,
331:24, 343:25,
355:11
**guilty** [5] - 195:6,
234:9, 235:1,
237:16, 329:25
**gum** [1] - 233:13
**gun** [17] - 177:3,
177:5, 177:13,
250:8, 250:9,
250:13, 250:15,
250:22, 270:4,
270:6, 270:9,
270:13, 270:15,
270:23, 334:20,
334:21, 345:21
**gunpoint** [2] - 334:4,
334:8
**guns** [7] - 177:9,
250:13, 250:15,
250:16, 270:13,
303:21, 345:21
**guy** [4] - 296:2, 302:4,
302:8, 302:10
**guys** [3] - 205:24,
291:11, 307:22
**gym** [2] - 192:14,
192:15

## H

**half** [5] - 248:1,
248:23, 255:20,
313:18, 346:25
**hand** [1] - 178:5
**handed** [1] - 233:12
**hands** [1] - 277:22

**happy** [2] - 192:3,
196:16
**hard** [14] - 180:18,
197:12, 202:13,
207:15, 235:25,
243:13, 280:13,
292:16, 298:11,
341:9, 341:14,
342:20, 359:3
**harder** [1] - 307:10
**hardship** [10] -
204:12, 205:23,
206:1, 218:17,
229:3, 276:2,
305:22, 318:11,
341:17, 342:3
**harm** [1] - 207:8
**Hart** [1] - 293:20
**hate** [1] - 259:1
**head** [1] - 210:2
**headline** [1] - 330:10
**headquarters** [1] -
311:10
**Health** [1] - 344:14
**hear** [35] - 169:18,
170:10, 172:9,
172:11, 173:11,
184:12, 184:18,
184:22, 186:21,
187:3, 203:18,
203:19, 222:16,
227:9, 241:18,
245:5, 245:6,
252:13, 272:14,
286:7, 286:24,
287:5, 287:12,
289:13, 292:23,
309:21, 314:2,
327:21, 329:3,
331:12, 348:4,
348:15, 348:17
**heard** [63] - 181:20,
181:22, 181:25,
182:8, 184:20,
188:23, 191:24,
200:19, 200:23,
201:1, 208:23,
222:13, 222:14,
223:8, 223:10,
223:15, 225:1,
245:8, 245:14,
247:14, 250:14,
252:8, 253:2, 255:7,
255:9, 255:10,
266:9, 266:21,
268:2, 268:4, 291:1,
291:3, 291:12,
292:9, 292:20,
300:19, 303:9,
308:12, 308:18,

308:20, 308:22,
309:5, 309:20,
316:7, 320:13,
320:15, 320:17,
320:20, 325:14,
325:16, 329:16,
330:14, 337:19,
337:22, 340:9,
342:9, 342:11,
343:3, 343:6,
348:17, 352:1,
352:2, 352:3
**hearing** [19] - 186:14,
186:16, 186:23,
186:24, 196:23,
200:13, 222:20,
223:4, 223:9,
241:14, 253:11,
292:7, 293:22,
309:18, 334:23,
343:4, 352:6
**hearings** [37] - 188:25,
200:8, 200:19,
222:16, 223:11,
223:15, 223:18,
224:3, 224:4, 224:6,
224:24, 225:1,
248:4, 248:7, 273:7,
273:11, 273:12,
273:17, 273:19,
273:21, 299:19,
299:23, 300:5,
309:8, 309:11,
330:5, 330:8, 332:4,
332:14, 332:17,
332:24, 333:3,
333:6, 352:19,
352:21, 352:23,
353:1
**heart** [1] - 232:13
**heat** [1] - 347:1
**heaviest** [1] - 194:24
**heavily** [1] - 194:12
**helicopters** [1] -
289:13
**hello** [4] - 171:3,
171:4, 265:5, 338:3
**help** [5] - 173:22,
176:8, 182:15,
186:21, 239:21
**helped** [1] - 237:25
**helpful** [1] - 174:13
**hesitate** [1] - 210:25
**HHS** [1] - 344:24
**hi** [10] - 229:17,
260:10, 267:18,
279:13, 288:17,
308:1, 317:3,
324:25, 339:3, 348:2
**high** [1] - 301:9

**higher** [5] - 209:7,
297:12, 297:16,
328:12, 328:13
**highly** [4] - 174:5,
211:8, 276:14, 329:4
**Hill** [28] - 178:23,
179:1, 179:2, 179:3,
179:4, 179:5, 179:7,
179:9, 192:7,
195:21, 195:22,
195:25, 198:5,
198:8, 198:14,
206:22, 227:5,
293:9, 293:15,
294:10, 294:14,
304:3, 344:16,
344:17, 346:1,
346:18
**HIPAA** [1] - 306:13
**hold** [6] - 209:11,
214:6, 296:24,
307:18, 355:5, 355:9
**holds** [1] - 211:9
**home** [11] - 182:12,
182:13, 192:10,
192:14, 192:16,
198:12, 204:20,
280:15, 284:1,
306:25, 341:19
**Homeland** [1] - 311:4
**honest** [9] - 179:20,
193:13, 202:12,
210:19, 211:20,
281:25, 282:13,
304:12, 305:7
**honestly** [5] - 193:14,
196:12, 262:17,
266:14, 304:21
**Honor** [39] - 183:14,
185:8, 190:15,
205:16, 209:16,
210:6, 219:5,
220:23, 221:1,
229:1, 229:18,
238:3, 238:14,
244:15, 257:20,
257:22, 259:4,
259:7, 259:16,
267:10, 275:18,
277:4, 277:7,
277:14, 278:7,
282:17, 288:7,
288:8, 305:12,
305:14, 315:20,
315:22, 319:12,
324:14, 324:16,
338:18, 347:24,
358:14, 358:16
**hope** [5] - 205:12,
237:11, 276:14

**hoped** [1] - 176:24
**hopefully** [4] - 319:22,
335:9, 358:25, 359:1
**hotel** [1] - 176:16
**hour** [1] - 224:2
**hours** [3] - 204:25,
261:2, 341:23
**House** [10] - 171:19,
192:7, 195:15,
195:17, 293:19,
293:21, 294:1, 294:5
**house** [2] - 176:15,
270:9
**houses** [1] - 289:16
**huge** [1] - 295:24
**Hulu** [1] - 219:22
**Human** [1] - 344:14
**hundred** [7] - 180:12,
287:24, 287:25,
288:1, 288:2, 288:3
**hunted** [1] - 176:20
**hunter** [2] - 176:20,
177:3
**husband** [16] - 294:20,
321:12, 321:25,
322:1, 323:21,
323:25, 340:23,
341:4, 341:18,
343:14, 343:21,
346:3, 348:7,
348:19, 350:4,
354:15
**husband's** [1] - 350:5
**Hutchinson** [2] -
224:7, 332:10
**hypotheses** [1] -
338:9
**hypothetically** [1] -
326:21

## I

**ID** [1] - 302:10
**idea** [4] - 187:19,
227:7, 242:12,
253:10
**identified** [2] - 177:1,
272:9
**identify** [3] - 272:7,
315:4, 329:2
**identifying** [1] -
245:22
**illegal** [1] - 177:16
**illegally** [1] - 196:15
**images** [1] - 181:2
**imagine** [1] - 233:17
**impact** [11] - 173:22,
174:17, 205:1,
218:16, 226:15,
226:16, 250:24,

272:15, 306:22,
334:12, 335:2
**impacted** [3] - 171:13,
192:21, 240:1
**impartial** [78] - 169:25,
171:6, 173:19,
173:23, 174:18,
175:4, 175:21,
176:1, 176:7,
177:14, 178:16,
178:19, 179:17,
182:9, 189:7, 189:9,
191:23, 192:1,
193:7, 193:11,
193:12, 198:16,
202:9, 207:16,
207:24, 210:22,
214:9, 215:21,
218:14, 218:16,
220:8, 220:20,
231:13, 232:18,
232:25, 242:24,
250:1, 250:25,
251:23, 253:15,
254:5, 259:17,
259:21, 260:6,
261:9, 261:12,
267:6, 268:24,
270:17, 270:25,
271:7, 277:1,
279:24, 280:3,
280:20, 284:22,
289:8, 290:20,
290:22, 291:21,
292:1, 298:10,
304:10, 309:25,
312:7, 312:12,
315:16, 316:9,
322:2, 331:6,
342:12, 342:24,
345:13, 350:1,
351:8, 355:7, 356:5,
358:10
**impartially** [8] - 193:8,
225:25, 250:17,
261:23, 269:18,
280:10, 299:2, 354:9
**important** [1] - 287:17
**importantly** [1] -
316:10
**impose** [3] - 201:16,
235:10, 236:14
**imposed** [1] - 237:22
**impositions** [1] -
205:9
**impressed** [1] -
258:24
**impression** [11] -
178:9, 199:14,
207:7, 248:21,

253:3, 258:18,
269:16, 275:7,
325:21, 326:7,
326:11
**impressions** [13] -
201:20, 201:24,
208:9, 224:16,
247:18, 249:7,
253:8, 262:15,
269:3, 269:6,
275:11, 275:14,
320:19
**incarceration** [2] -
235:2, 236:12
**incident** [2] - 315:11,
334:15
**including** [3] - 181:19,
211:22, 341:24
**inconsistency** [2] -
210:4, 210:5
**inconvenient** [1] -
205:4
**indicate** [3] - 239:14,
245:2, 322:22
**indicated** [34] -
183:16, 187:23,
204:11, 225:5,
226:18, 230:16,
244:17, 245:13,
248:3, 259:16,
262:1, 272:18,
273:6, 297:25,
305:21, 313:1,
322:16, 327:3,
327:12, 327:13,
328:6, 329:8, 332:3,
335:4, 336:3, 336:4,
336:18, 339:17,
345:3, 346:13,
348:14, 349:7,
354:14
**individual** [5] -
223:24, 224:18,
269:14, 292:3, 337:1
**individuals** [10] -
174:5, 182:2, 232:6,
258:15, 262:2,
265:8, 281:3, 298:2,
298:4, 337:6
**industry** [1] - 209:8
**infer** [2] - 270:22,
312:5
**inferences** [1] -
266:16
**inflection** [1] - 221:12
**influence** [2] - 180:9,
334:16
**inform** [2] - 204:4,
204:7
**Information** [1] -

294:2
**information** [14] - 184:14, 236:9, 294:3, 306:12, 329:20, 329:22, 337:4, 340:17, 340:20, 340:21, 348:9, 353:13, 354:3, 357:13
**informed** [1] - 208:8
**infraction** [1] - 187:1
**ingrained** [1] - 253:24
**inject** [1] - 260:1
**innocence** [1] - 236:7
**innocent** [1] - 193:25
**inquire** [1] - 265:17
**inside** [12] - 198:3, 214:20, 214:21, 226:18, 226:20, 242:15, 271:24, 312:14, 312:16, 322:7, 327:11, 346:17
**inspector** [1] - 216:4
**Instagram** [3] - 263:2, 263:24, 264:5
**instance** [2] - 180:25, 282:5
**instruct** [5] - 170:14, 184:11, 215:16, 250:18, 280:9
**instructed** [2] - 193:3, 348:15
**instructing** [1] - 186:15
**instruction** [4] - 225:21, 239:18, 240:14, 281:5
**instructions** [31] - 172:24, 185:12, 191:7, 209:21, 215:7, 221:6, 229:13, 234:8, 235:8, 238:18, 245:9, 249:2, 259:11, 267:7, 267:14, 277:11, 282:21, 286:19, 288:14, 297:23, 307:21, 312:21, 312:22, 315:25, 319:16, 322:19, 324:20, 330:9, 338:22, 348:20, 351:2
**instructs** [2] - 184:17, 245:4
**insurrection** [1] - 176:13
**intent** [3] - 212:3,

291:8, 343:1
**interaction** [1] - 230:8
**interest** [3] - 233:4, 329:23, 353:20
**Interior** [1] - 354:16
**interior** [1] - 227:10
**intern** [1] - 195:18
**international** [1] - 335:4
**interned** [1] - 195:25
**internet** [1] - 294:5
**interpreted** [1] - 270:11
**interrupt** [3] - 232:11, 281:8, 294:9
**introducing** [1] - 279:3
**invaded** [2] - 182:13, 211:11
**invading** [1] - 182:17
**invalid** [1] - 208:10
**investigations** [1] - 321:20
**investiture** [1] - 221:14
**invited** [1] - 212:3
**invoked** [1] - 259:1
**involve** [4] - 252:11, 257:2, 281:14, 341:3
**involved** [14] - 201:3, 201:6, 209:3, 222:18, 222:23, 224:18, 227:25, 228:4, 233:8, 290:23, 325:24, 329:24, 336:23, 357:20
**involvement** [4] - 222:20, 233:6, 306:16
**involves** [1] - 205:9
**involving** [3] - 230:22, 290:23, 330:2
**inward** [1] - 280:17
**issue** [10] - 174:6, 174:9, 177:3, 178:3, 178:5, 178:6, 217:7, 253:12, 253:13, 261:17
**issues** [2] - 204:13, 211:24
**it'd** [2] - 210:11, 240:18
**itself** [6] - 177:16, 204:24, 244:24, 245:16, 268:20, 291:14

# J

**J6** [1] - 336:5
**Jackson's** [1] - 221:14
**jail** [2] - 232:4, 257:4
**January** [109] - 169:24, 170:9, 170:11, 170:16, 171:14, 171:24, 177:5, 178:22, 178:24, 181:2, 182:4, 182:20, 187:24, 188:15, 188:20, 189:1, 191:22, 192:6, 192:12, 196:6, 198:5, 198:9, 198:15, 199:23, 200:7, 200:19, 201:7, 206:22, 210:21, 215:11, 218:23, 222:16, 222:18, 223:11, 225:7, 225:8, 225:12, 225:15, 225:19, 225:24, 231:12, 232:14, 232:22, 240:15, 241:7, 244:6, 244:18, 245:17, 246:21, 248:4, 248:7, 249:7, 254:7, 254:16, 254:17, 255:2, 262:21, 262:23, 263:12, 263:21, 264:3, 272:19, 272:21, 273:7, 277:19, 280:5, 281:13, 283:23, 283:24, 284:6, 284:9, 285:20, 286:5, 286:9, 289:7, 299:19, 306:7, 309:3, 309:5, 309:8, 310:6, 316:15, 322:24, 322:25, 325:24, 329:10, 329:12, 330:2, 331:4, 333:6, 336:23, 337:22, 339:18, 339:21, 340:11, 344:19, 344:22, 346:1, 346:13, 347:14, 349:1, 351:7, 352:15, 352:19, 353:12, 353:13, 353:17, 354:3
**Jersey** [1] - 343:20
**job** [21] - 170:12,

175:10, 175:11, 175:15, 184:25, 193:1, 193:2, 235:14, 239:15, 240:13, 241:6, 243:23, 262:16, 280:22, 284:15, 284:19, 302:15, 310:2, 310:8, 330:13, 331:1
**Joe** [2] - 237:8, 358:1, 358:5
**John** [4] - 199:4, 272:10, 272:12, 329:4
**joint** [1] - 293:19
**Jones** [6] - 262:3, 262:4, 272:9, 272:12, 298:3, 329:3
**journalist** [2] - 242:21, 264:2
**judge** [22] - 172:7, 179:25, 184:10, 184:17, 206:20, 207:2, 235:9, 236:3, 236:7, 236:24, 237:9, 237:22, 245:1, 245:4, 263:6, 298:17, 301:9, 304:17, 331:12, 333:14, 336:3, 348:14
**Judge** [3] - 175:6, 209:25, 221:18
**judgment** [8] - 237:20, 242:25, 276:7, 280:3, 341:5, 341:8, 346:10, 347:8
**July** [1] - 200:11
**June** [3] - 200:10, 217:25, 346:4
**jurisdiction** [1] - 295:13
**Juror** [62] - 169:5, 169:11, 173:1, 173:2, 173:8, 185:15, 186:2, 186:8, 191:8, 191:9, 191:12, 209:22, 210:3, 212:12, 212:17, 221:8, 221:21, 222:2, 229:15, 229:16, 229:21, 238:21, 239:4, 239:7, 249:4, 249:9, 249:17, 259:13, 260:9, 260:15, 267:16, 267:17, 267:22, 277:13, 279:12,

279:17, 282:24, 283:1, 283:8, 288:15, 288:16, 288:21, 307:24, 307:25, 308:6, 316:2, 316:5, 316:24, 317:2, 317:9, 319:19, 319:23, 324:23, 324:24, 325:8, 339:1, 339:2, 339:10, 351:4, 351:12, 351:15, 358:22
**JUROR** [820] - 169:7, 169:12, 169:15, 170:3, 170:7, 170:17, 170:19, 170:22, 171:4, 171:8, 171:12, 171:15, 171:18, 171:22, 172:2, 172:6, 172:13, 172:15, 172:22, 173:4, 173:9, 173:12, 173:15, 173:24, 174:3, 174:10, 174:20, 174:22, 175:5, 175:8, 175:12, 175:22, 176:2, 176:10, 177:6, 177:12, 177:17, 177:21, 178:2, 178:7, 178:11, 178:14, 178:17, 178:25, 179:14, 179:19, 180:2, 180:11, 180:14, 180:17, 180:22, 181:7, 181:15, 181:24, 182:6, 182:11, 182:15, 182:22, 183:5, 183:8, 183:19, 183:22, 184:2, 184:8, 184:16, 184:23, 185:1, 185:5, 185:13, 186:4, 186:9, 186:18, 186:22, 186:25, 187:5, 187:10, 187:14, 187:17, 187:19, 188:1, 188:5, 188:8, 188:12, 188:16, 188:18, 188:21, 188:24, 189:3, 189:5, 189:8, 189:14, 189:17, 189:19, 189:22,

189:25, 190:4,
190:9, 190:12,
190:18, 190:20,
190:23, 191:3,
191:11, 191:13,
192:3, 192:23,
193:9, 193:19,
193:21, 194:1,
194:5, 194:9,
194:11, 194:18,
194:23, 195:2,
195:7, 195:13,
195:23, 196:3,
196:10, 196:14,
196:18, 196:25,
197:5, 197:17,
197:25, 198:7,
198:11, 198:17,
198:20, 198:23,
199:3, 199:9,
199:13, 199:18,
199:25, 200:5,
200:9, 200:15,
200:21, 201:2,
201:6, 201:13,
202:4, 202:11,
202:22, 202:24,
203:2, 203:5, 203:8,
203:12, 203:16,
203:21, 203:23,
204:1, 204:4, 204:9,
204:15, 205:8,
205:13, 205:18,
206:3, 206:6,
206:12, 206:14,
206:16, 206:24,
207:5, 207:14,
207:20, 207:23,
208:6, 208:14,
208:19, 208:22,
208:25, 209:4,
209:9, 209:13,
212:14, 212:18,
212:22, 213:2,
213:4, 213:6,
213:11, 213:18,
213:22, 214:2,
214:10, 214:13,
214:17, 214:22,
215:2, 215:8,
215:17, 215:22,
216:1, 216:4, 216:8,
216:11, 216:13,
216:21, 216:25,
217:4, 217:9,
217:14, 217:19,
217:22, 218:15,
218:19, 218:25,
219:13, 219:18,
220:3, 220:9,
220:13, 220:21,

221:7, 221:23,
222:3, 222:6,
222:11, 222:15,
222:22, 223:7,
223:13, 223:17,
223:21, 223:23,
224:6, 224:13,
224:17, 225:4,
225:10, 225:16,
225:20, 226:2,
226:8, 226:16,
226:22, 227:6,
227:14, 227:20,
228:3, 228:8,
228:12, 228:18,
229:5, 229:8,
229:14, 229:18,
229:22, 229:25,
230:6, 230:10,
230:19, 230:21,
230:25, 231:15,
232:19, 233:1,
234:13, 234:16,
234:22, 235:17,
235:20, 235:25,
236:8, 236:22,
237:2, 237:11,
237:17, 238:19,
239:8, 239:12,
239:20, 239:25,
240:2, 240:4, 240:7,
240:10, 240:16,
240:22, 241:1,
241:11, 241:20,
241:25, 242:4,
242:8, 242:10,
242:17, 243:1,
243:3, 243:8,
243:12, 243:16,
243:25, 244:3,
244:7, 244:11,
244:21, 244:25,
245:10, 245:18,
245:21, 245:24,
246:4, 246:6,
246:10, 246:12,
246:17, 246:24,
247:3, 247:6,
247:10, 247:15,
247:20, 247:24,
248:5, 248:8,
248:11, 248:14,
248:18, 248:22,
249:3, 249:11,
249:18, 249:21,
250:4, 250:7,
250:19, 251:1,
251:7, 251:9,
251:13, 251:18,
251:24, 252:2,
252:4, 252:9,

252:19, 252:22,
252:25, 253:5,
253:7, 253:16,
253:18, 253:20,
253:22, 254:2,
254:8, 254:10,
254:12, 254:20,
254:25, 255:4,
255:11, 255:16,
255:20, 256:1,
256:5, 256:10,
256:13, 256:20,
256:25, 257:3,
257:8, 257:13,
257:17, 257:24,
258:4, 258:11,
258:13, 258:17,
258:20, 258:23,
259:12, 260:11,
260:16, 261:1,
261:4, 261:11,
261:24, 262:9,
262:11, 262:13,
262:17, 262:25,
263:8, 263:18,
263:22, 264:4,
264:8, 264:14,
264:16, 264:21,
264:25, 265:5,
265:12, 265:16,
265:20, 265:25,
266:2, 266:10,
266:14, 266:20,
267:3, 267:8,
267:15, 267:19,
267:23, 268:6,
268:15, 268:19,
268:25, 269:5,
269:8, 269:12,
269:19, 270:1,
270:7, 270:18,
271:1, 271:4,
271:14, 271:18,
271:22, 272:1,
272:5, 272:17,
272:23, 273:5,
273:9, 273:13,
273:22, 274:1,
274:5, 274:10,
274:13, 274:16,
274:20, 274:25,
275:5, 275:9,
275:13, 275:16,
275:22, 276:3,
276:17, 276:24,
277:2, 277:12,
279:14, 279:18,
280:12, 281:10,
281:20, 282:4,
282:12, 282:22,
283:5, 283:9,

283:16, 283:18,
283:20, 284:1,
284:4, 284:8,
284:14, 284:23,
285:1, 285:4, 285:7,
285:9, 285:13,
285:16, 285:21,
285:25, 286:7,
286:14, 286:17,
286:21, 287:1,
287:4, 287:8,
287:13, 287:15,
287:23, 288:2,
288:4, 288:12,
288:18, 288:22,
289:3, 289:10,
289:19, 289:23,
290:2, 290:5,
290:10, 290:16,
290:24, 291:4,
291:15, 291:18,
291:22, 292:2,
292:5, 292:10,
292:13, 292:16,
292:22, 293:1,
293:8, 293:11,
293:13, 293:18,
294:8, 294:11,
294:18, 294:24,
295:3, 295:6,
295:10, 295:14,
295:18, 295:23,
296:4, 296:11,
296:14, 296:20,
296:24, 297:9,
297:15, 297:19,
297:24, 298:11,
298:15, 298:23,
299:4, 299:11,
299:17, 299:21,
299:24, 300:1,
300:8, 300:12,
300:14, 300:21,
300:25, 301:3,
301:7, 301:13,
301:20, 301:24,
302:1, 302:3, 302:6,
302:15, 302:21,
303:2, 303:6,
303:11, 303:16,
303:20, 304:1,
304:11, 304:18,
304:23, 305:1,
305:6, 306:2, 306:5,
306:8, 306:17,
306:24, 307:2,
307:7, 307:14,
307:17, 307:22,
308:2, 308:7,
308:14, 308:16,
308:20, 308:22,

309:2, 309:6, 309:9,
309:13, 309:15,
309:19, 310:1,
310:7, 310:12,
310:15, 310:20,
310:24, 311:1,
311:6, 311:9,
311:17, 311:22,
311:25, 312:3,
312:8, 312:13,
312:17, 312:24,
313:5, 313:8,
313:11, 313:13,
313:15, 313:17,
313:19, 313:25,
314:4, 314:7,
314:10, 314:15,
314:19, 314:23,
314:25, 315:3,
315:6, 315:9,
315:12, 315:17,
316:1, 317:4, 317:8,
317:10, 317:14,
317:18, 317:22,
317:25, 318:3,
318:6, 318:12,
318:14, 318:17,
318:20, 318:23,
319:4, 319:7,
319:17, 319:25,
320:7, 320:16,
320:21, 321:1,
321:5, 321:12,
321:16, 321:19,
322:4, 322:9,
322:13, 322:20,
323:2, 323:10,
323:17, 323:21,
323:23, 324:3,
324:7, 324:11,
324:22, 325:1,
325:9, 325:17,
325:22, 326:3,
326:9, 326:12,
326:18, 326:24,
327:5, 327:7,
327:16, 327:23,
328:1, 328:3, 328:8,
328:15, 328:22,
329:15, 329:19,
329:22, 330:4,
330:7, 330:18,
330:21, 331:7,
331:15, 332:1,
332:6, 332:18,
332:25, 333:3,
333:8, 333:13,
333:19, 334:1,
334:10, 334:14,
335:1, 335:7,
335:14, 335:24,

336:7, 336:13, 336:15, 336:21, 337:11, 337:18, 337:21, 338:3, 338:5, 338:8, 338:13, 338:17, 338:23, 338:25, 339:4, 339:11, 339:15, 339:19, 339:22, 339:24, 340:4, 340:14, 340:16, 340:19, 340:22, 341:6, 341:9, 341:14, 341:22, 341:25, 342:4, 342:7, 342:14, 342:19, 342:25, 343:8, 343:14, 344:4, 344:9, 344:18, 344:20, 344:23, 345:2, 345:5, 345:10, 345:15, 345:17, 345:19, 345:23, 346:2, 346:11, 346:16, 347:9, 347:17, 348:2, 348:7, 348:13, 348:21, 349:4, 349:9, 349:11, 349:15, 349:19, 350:3, 350:7, 350:14, 350:20, 351:3, 351:14, 351:16, 352:3, 352:7, 352:13, 352:16, 352:22, 352:25, 353:4, 353:7, 353:16, 353:20, 353:24, 354:2, 354:10, 354:15, 354:19, 354:22, 355:2, 355:8, 355:13, 355:17, 355:24, 356:6, 356:11, 356:16, 356:22, 357:2, 357:5, 357:7, 357:11, 357:15, 357:18, 357:22, 358:3, 358:7, 358:11, 358:21

**juror** [87] - 169:13, 169:25, 170:10, 170:12, 173:13, 174:15, 175:10, 175:15, 178:16, 180:1, 184:11, 184:25, 185:4, 185:21, 186:10,

189:7, 193:1, 193:23, 196:1, 201:21, 210:19, 212:21, 218:14, 220:18, 222:4, 226:15, 229:23, 231:13, 235:7, 235:14, 237:13, 239:10, 239:19, 240:20, 240:24, 241:22, 245:4, 249:19, 250:1, 250:14, 251:23, 253:15, 254:5, 257:7, 260:17, 267:5, 267:24, 270:17, 272:16, 279:19, 279:24, 280:6, 283:10, 284:16, 284:19, 285:11, 290:12, 290:22, 297:14, 297:17, 304:10, 305:21, 308:8, 310:8, 312:7, 312:19, 316:13, 317:11, 319:3, 320:6, 320:8, 320:11, 323:4, 325:10, 326:14, 328:17, 330:13, 340:9, 342:24, 344:1, 345:14, 346:10, 347:16, 351:19, 351:23, 355:11

**juror's** [1] - 277:24
**jurors** [9] - 211:2, 226:1, 238:8, 250:12, 279:1, 286:19, 316:6, 316:14, 331:19
**jury** [30] - 174:4, 185:1, 205:7, 210:10, 214:25, 215:4, 218:18, 221:12, 221:15, 229:4, 233:2, 236:3, 256:9, 256:18, 271:6, 271:10, 276:4, 276:6, 277:1, 282:19, 290:20, 297:6, 297:21, 306:21, 322:16, 327:13, 327:14, 327:17, 327:20, 335:9
**justice** [6] - 215:5, 237:20, 255:25, 297:21, 312:21, 329:24

**Justice** [4] - 221:14, 311:5, 357:14, 357:17
**Justin** [3] - 230:17, 231:3, 231:7
**juvenile** [2] - 189:15, 189:20

## K

**keep** [12] - 177:19, 210:24, 211:1, 240:21, 291:6, 292:15, 301:11, 305:4, 306:19, 307:22, 326:15, 358:5
**Keepers** [73] - 181:21, 182:8, 183:17, 188:23, 191:24, 200:14, 200:24, 201:3, 201:11, 201:14, 207:1, 207:17, 208:8, 209:11, 210:23, 219:12, 219:17, 220:2, 222:13, 222:17, 222:21, 223:11, 223:21, 223:25, 224:11, 241:8, 245:14, 245:17, 246:21, 247:9, 248:7, 248:13, 249:8, 255:7, 255:9, 255:10, 266:9, 266:13, 268:3, 268:4, 268:10, 269:3, 273:20, 273:21, 291:2, 291:7, 300:7, 300:20, 303:10, 303:14, 304:8, 308:13, 308:18, 308:25, 309:16, 309:18, 309:21, 316:15, 320:13, 325:15, 325:16, 332:17, 332:18, 333:1, 337:10, 337:13, 337:16, 337:22, 342:10, 342:15, 352:1, 353:3, 353:5
**kept** [1] - 241:13
**kid** [1] - 289:12
**kids** [2] - 296:2, 319:8
**killing** [1] - 231:25
**kind** [17] - 208:17, 208:20, 227:25, 263:2, 274:2,

280:13, 281:7, 281:18, 281:23, 282:5, 303:24, 316:13, 321:24, 333:18, 335:17, 341:3, 349:13
**knowing** [15] - 207:9, 244:19, 250:24, 251:10, 252:14, 270:15, 291:23, 340:16, 340:19, 340:21, 341:10, 341:15, 345:11, 350:21, 358:9
**knowledge** [8] - 201:11, 207:17, 208:2, 208:7, 257:15, 334:22, 340:25, 357:12
**known** [1] - 188:22

## L

**lady** [2] - 278:8
**laid** [1] - 273:14
**language** [7] - 286:13, 286:15, 287:12, 287:22, 287:24, 318:5, 351:9
**large** [2] - 188:17, 337:7
**largely** [1] - 205:4
**last** [23] - 177:25, 182:16, 192:5, 213:17, 226:6, 231:19, 247:25, 248:23, 251:15, 260:22, 269:23, 276:1, 295:20, 296:4, 311:20, 317:13, 322:11, 330:8, 330:9, 343:16, 351:19, 354:23, 355:3
**late** [1] - 300:25
**latest** [1] - 342:1
**latter** [1] - 299:11
**law** [73] - 170:14, 175:16, 180:3, 183:5, 183:9, 190:6, 193:3, 193:7, 194:25, 196:12, 197:15, 203:5, 204:2, 204:5, 215:15, 216:15, 216:16, 216:19, 216:23, 217:3, 220:20, 225:2, 228:1, 231:23, 233:16, 234:8, 261:19, 261:21,

261:22, 274:6, 274:8, 274:10, 274:12, 275:11, 280:9, 281:2, 281:6, 302:24, 302:25, 311:3, 311:10, 311:12, 311:14, 313:3, 313:9, 321:23, 322:1, 324:2, 333:11, 334:12, 334:17, 340:6, 345:1, 349:7, 349:8, 349:13, 349:17, 350:22, 354:21, 355:23, 355:24, 356:2, 356:4, 356:8, 356:9, 356:10, 356:13, 356:14, 357:3, 358:12
**lawmakers** [1] - 280:1
**laws** [15] - 176:6, 176:19, 177:5, 177:13, 177:18, 177:20, 177:21, 177:22, 249:24, 250:9, 250:18, 251:2, 270:6, 345:4
**lawsuits** [1] - 209:3
**lawyer** [17] - 174:11, 202:20, 202:21, 202:22, 202:24, 202:25, 205:7, 206:18, 230:10, 234:7, 236:4, 255:17, 269:14, 271:11, 273:25, 333:17, 349:12
**lawyers** [10] - 183:6, 187:4, 215:24, 230:15, 231:1, 256:2, 274:11, 323:24, 324:2, 324:8
**layout** [1] - 227:9
**leading** [2] - 192:6, 291:5
**lean** [3] - 194:12, 194:15, 342:19
**leaning** [2] - 342:20, 342:22
**learn** [12] - 174:25, 175:17, 199:15, 214:5, 226:12, 251:20, 261:7, 270:21, 272:14, 298:7, 346:7, 350:10
**learned** [24] - 182:5, 184:20, 200:19, 210:21, 215:5, 215:13, 215:19,

225:1, 225:24,
227:11, 243:5,
247:8, 247:14,
254:22, 263:5,
268:14, 268:23,
297:20, 298:25,
312:20, 323:5,
348:5, 354:6
least [10] - 178:21,
211:24, 220:6,
250:11, 258:7,
260:20, 291:24,
312:19, 353:21
leave [9] - 176:14,
185:13, 221:7,
238:19, 238:20,
240:8, 240:9,
240:11, 280:15
leaving [1] - 192:10
led [1] - 282:8
left [27] - 173:1,
185:15, 191:8,
209:22, 221:8,
224:16, 229:15,
238:21, 249:4,
259:13, 267:16,
275:7, 275:10,
277:13, 282:24,
288:15, 294:14,
307:24, 316:2,
319:19, 320:19,
324:23, 325:21,
326:7, 339:1, 351:4,
358:22
legal [16] - 183:3,
183:4, 202:19,
202:20, 215:24,
246:10, 246:12,
255:14, 273:24,
301:5, 301:7,
323:20, 333:11,
349:7, 349:10,
349:11
length [1] - 204:12
less [1] - 199:20
level [2] - 207:11,
287:11
life [3] - 205:10,
214:14, 330:24
lifetime [1] - 261:13
likely [15] - 177:7,
199:6, 218:8,
218:10, 227:8,
227:9, 240:8,
240:18, 243:1,
243:2, 250:21,
252:13, 281:21,
298:4, 329:7
limitations [1] -
287:22

limited [3] - 222:15,
238:7, 353:22
LINDER [51] - 170:24,
185:8, 190:15,
205:16, 205:20,
206:4, 206:8,
206:13, 206:15,
206:18, 206:25,
207:9, 207:19,
207:22, 208:2,
208:11, 208:15,
208:20, 208:23,
209:2, 209:5,
209:10, 209:14,
210:3, 210:10,
210:14, 219:3,
228:10, 228:14,
228:23, 238:13,
257:20, 282:16,
288:8, 316:17,
316:23, 319:11,
324:14, 335:23,
336:1, 336:12,
336:14, 336:16,
337:9, 337:20,
337:25, 347:23,
357:9, 357:12,
357:16, 357:21
Linder [9] - 190:14,
205:15, 219:2,
228:9, 242:2,
257:19, 265:2,
324:13, 335:22
line [3] - 180:3,
277:15, 307:11
lines [1] - 329:1
list [4] - 198:25, 272:7,
298:18, 329:2
listed [3] - 268:17,
317:16, 329:4
listen [4] - 193:11,
207:14, 207:25
listened [6] - 182:5,
200:7, 224:23,
225:18, 299:18,
352:18
listening [1] - 220:15
litigation [3] - 274:2,
274:6, 274:7
live [19] - 176:10,
179:3, 182:11,
182:18, 192:4,
198:8, 198:14,
219:21, 220:14,
244:7, 244:11,
289:11, 329:17,
331:19, 332:11,
332:13, 343:17,
343:19
lived [8] - 176:11,

218:7, 218:12,
228:17, 228:19,
228:21, 231:16,
353:18
Lives [2] - 214:3,
346:4
lives [1] - 205:2
living [8] - 178:23,
179:4, 190:19,
198:5, 213:12,
297:4, 324:7, 345:25
local [2] - 217:2,
239:15
localized [2] - 241:13,
244:12
Longworth [1] -
294:12
look [19] - 179:8,
187:22, 193:22,
210:20, 212:8,
236:9, 240:20,
241:9, 242:17,
259:18, 271:8,
278:20, 283:14,
284:6, 284:16,
320:12, 331:18,
335:2, 338:10
looking [3] - 233:9,
298:19, 338:16
looks [5] - 215:3,
283:24, 297:7,
306:22, 327:14
loose [2] - 250:9,
352:10
loosely [2] - 352:7,
358:3
lost [1] - 293:25
loudly [1] - 186:12
loved [1] - 350:22
lovely [1] - 258:4
loves [1] - 214:15
low [1] - 183:8
lower [1] - 328:10
LSAT [1] - 183:8
lunch [1] - 301:15
lunchtime [1] - 185:21

**M**

Ma'am [1] - 324:17
ma'am [21] - 186:3,
190:17, 191:4,
212:13, 219:7,
221:3, 249:10,
258:6, 260:10,
265:4, 267:12,
305:18, 319:14,
319:24, 339:3,
348:1, 348:23,
350:24, 351:13,

357:23, 358:17
maintain [1] - 196:23
major [2] - 182:1,
222:18
majority [1] - 263:3
Mall [1] - 192:13
man [1] - 205:2
manager [1] - 213:12
manner [1] - 356:21
MANZO [1] - 221:17
map [1] - 227:11
march [7] - 213:16,
214:3, 226:6,
260:23, 295:21,
311:21, 346:4
March [6] - 214:2,
261:2, 295:24,
296:1, 346:2, 355:3
marches [1] - 214:8
marching [1] - 192:8
Marine [2] - 313:15,
349:20
marked [1] - 318:2
marshals [1] - 359:3
Maryland [1] - 346:25
mask [20] - 169:10,
173:6, 186:7,
191:14, 212:19,
222:1, 229:19,
239:9, 249:16,
260:13, 267:20,
279:16, 283:6,
288:24, 308:5,
317:7, 320:4, 325:6,
339:9, 351:17
material [1] - 216:5
math [1] - 213:19
matter [4] - 178:12,
230:22, 233:4,
321:24
Matter [1] - 346:4
Matter's [1] - 214:3
maybes [1] - 206:19
mean [52] - 171:5,
177:1, 177:17,
178:25, 179:14,
179:23, 180:2,
180:18, 182:23,
183:22, 188:11,
193:22, 194:21,
203:16, 203:24,
206:6, 207:23,
211:6, 211:16,
211:17, 224:4,
236:8, 237:3, 243:4,
243:8, 243:12,
243:19, 246:23,
248:2, 259:23,
264:16, 266:15,
271:4, 276:5,

276:11, 278:11,
280:21, 281:21,
282:3, 291:9,
299:12, 301:8,
301:20, 304:11,
306:25, 326:3,
330:18, 334:3,
336:17, 350:16,
353:16, 355:17
means [7] - 171:24,
221:14, 290:17,
303:21, 308:9,
350:15, 350:17
meant [1] - 356:22
media [36] - 188:2,
188:4, 201:20,
208:18, 208:21,
215:13, 215:14,
215:19, 218:22,
225:19, 239:18,
242:14, 242:20,
245:8, 247:24,
248:17, 249:6,
253:9, 254:23,
255:2, 262:21,
262:23, 263:1,
263:5, 263:20,
273:3, 285:19,
310:13, 323:5,
323:6, 330:14,
330:15, 333:4,
337:4, 343:6, 353:22
medical [1] - 205:3
meet [7] - 306:18,
307:13, 307:18,
316:11, 328:18,
328:23
meetings [4] - 204:17,
204:22, 307:3, 307:4
member [40] - 173:24,
178:22, 187:7,
189:11, 197:2,
197:21, 198:5,
198:19, 203:14,
213:15, 217:2,
217:6, 224:1,
227:17, 251:15,
255:13, 255:14,
256:22, 260:22,
264:11, 269:23,
271:16, 274:22,
293:5, 295:20,
297:3, 301:6,
301:17, 310:18,
311:19, 313:2,
313:22, 314:21,
321:9, 323:20,
344:7, 346:15,
354:13, 355:22,
356:19

**members** [18] - 177:24, 179:6, 181:14, 195:11, 201:19, 207:3, 211:10, 215:24, 216:15, 245:16, 257:11, 268:22, 291:17, 294:17, 315:14, 333:10, 333:22, 345:25
**membership** [1] - 309:24
**memories** [1] - 281:18
**memory** [1] - 300:24
**mental** [1] - 188:9
**mention** [1] - 309:16
**mentioned** [17] - 199:6, 199:8, 199:10, 199:11, 262:3, 262:5, 293:6, 298:2, 298:5, 298:6, 309:2, 309:7, 312:14, 329:3, 329:5, 329:7, 332:22
**mentioning** [1] - 199:11
**mentions** [1] - 273:20
**mere** [2] - 291:19, 350:12
**messes** [1] - 188:9
**met** [10] - 230:8, 256:7, 261:19, 263:16, 284:17, 296:22, 310:10, 323:14, 344:2, 355:15
**metro** [1] - 299:13
**Metropolitan** [2] - 302:14, 302:18
**microphone** [5] - 169:17, 173:11, 186:12, 285:24, 285:25
**middle** [1] - 218:3
**midnight** [1] - 204:20
**might** [42] - 173:18, 173:22, 174:5, 174:22, 178:8, 181:4, 185:24, 186:20, 190:2, 190:7, 194:12, 198:15, 199:2, 205:25, 206:17, 223:14, 226:13, 234:14, 248:21, 257:6, 262:2, 268:23, 270:16, 272:7, 272:8, 279:23, 284:21, 286:24, 287:21,

292:8, 298:2, 298:6, 298:21, 311:15, 316:8, 322:2, 324:5, 326:16, 330:2, 352:15, 356:8
**militant** [2] - 303:17, 303:18
**military** [4] - 182:17, 192:9, 313:11, 313:12
**Milwaukee** [1] - 355:25
**mind** [19] - 184:21, 196:23, 208:1, 210:24, 211:1, 227:15, 235:22, 235:24, 236:19, 243:10, 245:3, 265:24, 292:14, 292:15, 297:22, 326:15, 342:16, 342:18, 358:8
**minded** [4] - 208:23, 209:1, 223:9, 304:19
**mine** [2] - 300:24, 301:9
**minute** [2] - 332:8, 343:16
**miscarriage** [1] - 237:20
**miscommunication** [1] - 337:10
**misconduct** [3] - 233:10, 233:16
**misinformation** [4] - 336:25, 337:10, 337:13, 337:14
**misled** [2] - 224:19, 336:23
**misogynists** [1] - 259:2
**misogyny** [1] - 259:1
**missing** [1] - 221:14
**mission** [2] - 269:10, 352:11
**mixing** [1] - 342:15
**modern** [1] - 259:2
**modern-day** [1] - 259:2
**mom** [1] - 319:7
**moment** [4] - 174:25, 232:12, 343:9, 347:2
**moments** [1] - 217:15
**money** [4] - 173:25, 174:17, 175:24, 219:20
**month** [3] - 205:25, 281:24, 337:24
**months** [2] - 192:5, 244:22

**monuments** [1] - 232:9
**morning** [20] - 169:2, 185:10, 186:3, 186:15, 186:16, 187:3, 191:5, 204:21, 206:5, 206:11, 218:18, 221:13, 240:2, 240:3, 244:8, 266:23, 271:9, 286:18, 286:20, 289:20
**most** [12] - 206:5, 240:8, 240:18, 258:7, 258:9, 263:11, 265:10, 266:21, 287:2, 343:18, 351:20, 357:18
**mostly** [3] - 262:25, 323:21, 353:7
**mother** [3] - 341:20, 344:11, 344:15
**motion** [2] - 237:25, 316:4
**motivated** [2] - 247:21, 253:4
**motivation** [1] - 253:25
**move** [2] - 210:3, 285:23
**moved** [6] - 179:14, 228:20, 228:21, 294:24, 316:23, 327:9
**multiple** [2] - 301:21, 351:9
**murder** [1] - 185:5

# N

**name** [17] - 199:8, 199:10, 199:12, 223:25, 224:7, 257:25, 262:5, 265:18, 272:12, 272:13, 272:14, 298:6, 300:12, 300:13, 315:5, 332:10
**named** [2] - 174:3, 199:4
**names** [11] - 184:1, 198:25, 199:2, 222:17, 262:2, 272:8, 298:2, 298:5, 298:18, 298:19
**National** [2] - 173:25, 213:7

**naturally** [1] - 193:18
**Navarro** [4] - 199:4, 272:9, 272:12, 298:3
**Nazis** [2] - 253:5, 253:7
**near** [2] - 192:6, 286:9, 297:4
**nearby** [1] - 343:17
**necessarily** [1] - 181:7
**need** [13] - 175:14, 186:20, 186:21, 210:22, 220:4, 220:15, 260:18, 283:11, 308:9, 318:16, 336:16, 336:19, 341:19
**needs** [1] - 190:25
**negative** [1] - 269:3
**negotiate** [1] - 204:18
**neighbor** [3] - 339:17, 346:21, 349:17
**neighbor's** [2] - 341:4, 348:6
**neighbors** [1] - 340:10
**neo** [2] - 253:5, 253:7
**neo-Nazis** [2] - 253:5, 253:7
**nephew** [3] - 349:21, 349:22, 349:23
**NESTLER** [62] - 170:25, 171:3, 171:5, 171:9, 171:13, 171:17, 171:20, 171:23, 172:4, 172:7, 172:14, 172:17, 172:19, 183:14, 183:20, 183:24, 184:4, 184:10, 184:17, 184:24, 185:3, 185:7, 190:17, 190:19, 190:21, 191:1, 209:16, 221:1, 229:1, 231:3, 231:6, 238:12, 244:15, 244:17, 244:23, 245:1, 245:11, 259:7, 259:15, 259:22, 260:5, 277:7, 277:14, 278:24, 282:17, 288:7, 315:22, 319:12, 324:16, 338:2, 338:4, 338:7, 338:9, 338:14, 338:18, 347:24, 348:1, 348:3, 348:11, 348:14, 348:22, 358:16

**Nestler** [13] - 183:12, 190:16, 209:15, 219:4, 220:25, 228:25, 259:6, 277:6, 278:23, 315:21, 324:15, 338:1, 347:25
**new** [2] - 181:8, 327:10
**New** [2] - 215:2, 343:20
**news** [63] - 171:10, 181:25, 183:17, 184:14, 188:2, 188:7, 188:8, 188:13, 188:16, 199:22, 199:23, 200:1, 215:10, 218:22, 219:20, 225:6, 225:8, 225:11, 225:15, 225:18, 225:24, 239:18, 240:12, 240:14, 242:22, 245:8, 254:17, 255:1, 262:23, 266:22, 272:19, 272:21, 283:22, 283:24, 284:2, 284:3, 284:5, 284:6, 285:22, 286:2, 286:10, 291:12, 299:7, 299:8, 299:9, 310:4, 320:17, 320:23, 322:23, 322:25, 325:17, 329:9, 329:11, 329:13, 331:20, 332:14, 332:16, 348:18, 353:11, 353:13, 354:4, 354:7
**newsroom** [2] - 242:22, 244:6
**next** [8] - 172:9, 213:13, 217:16, 218:2, 271:19, 301:14, 306:9, 314:20
**nice** [1] - 239:5
**night** [10] - 176:14, 192:10, 192:16, 211:8, 218:3, 246:6, 306:25, 309:13, 309:14, 359:6
**nights** [1] - 206:5
**nobody** [4] - 232:6, 234:1, 271:9, 335:10
**non** [1] - 356:10
**non-law** [1] - 356:10
**normal** [1] - 336:14

**North** [2] - 298:21, 301:10
**northern** [1] - 177:9
**NOTE** [41] - 169:2, 169:5, 173:1, 173:2, 185:15, 186:2, 191:8, 191:9, 209:22, 212:12, 221:8, 221:21, 229:15, 229:16, 238:21, 239:4, 249:4, 249:9, 259:13, 260:9, 267:16, 267:17, 277:13, 279:12, 282:24, 283:1, 288:15, 288:16, 307:24, 307:25, 316:2, 317:2, 319:19, 319:23, 324:23, 324:24, 339:1, 339:2, 351:4, 351:12, 358:22
**nothing** [8] - 220:23, 232:19, 247:15, 259:4, 277:4, 305:12, 332:23, 332:24
**notice** [2] - 231:24, 330:10
**noticeable** [1] - 183:23
**notional** [1] - 226:9
**notwithstanding** [4] - 185:17, 216:17, 254:6, 263:14
**November** [1] - 335:5
**NPR** [3] - 264:4, 264:6, 266:22
**nuanced** [1] - 212:6
**number** [12] - 176:16, 177:1, 196:8, 202:5, 213:2, 213:8, 216:5, 216:10, 270:1, 290:8, 297:7, 322:16
**numbered** [1] - 260:20
**numbers** [2] - 182:16, 250:5
**numerous** [1] - 231:17

## O

**o'clock** [2] - 206:5, 319:1
**Oath** [73] - 181:21, 182:8, 183:17, 188:23, 191:24, 200:14, 200:24, 201:3, 201:11, 201:14, 207:1,

207:17, 208:8, 209:11, 210:23, 219:12, 219:17, 220:2, 222:13, 222:17, 222:21, 223:11, 223:21, 223:25, 224:11, 241:8, 245:14, 245:17, 246:21, 247:9, 248:7, 248:13, 249:8, 255:7, 255:9, 255:10, 266:9, 266:13, 268:3, 268:4, 268:10, 269:3, 273:20, 273:21, 291:2, 291:7, 300:7, 300:20, 303:10, 303:14, 304:8, 308:13, 308:18, 308:25, 309:16, 309:18, 309:21, 316:15, 320:13, 325:15, 325:16, 332:17, 332:18, 333:1, 337:10, 337:13, 337:16, 337:22, 342:10, 342:15, 352:1, 353:3, 353:5
**objection** [6] - 170:23, 282:15, 282:16, 319:10, 319:11, 347:23
**objections** [4] - 238:11, 244:14, 288:6, 347:21
**obligations** [4] - 205:12, 211:4, 276:13, 276:16
**observations** [2] - 235:13, 266:12
**observed** [2] - 172:2, 172:4
**observing** [1] - 170:6
**obviously** [15] - 170:8, 175:10, 176:11, 179:8, 197:5, 205:7, 233:15, 242:20, 275:1, 276:21, 291:10, 303:9, 321:22, 353:17, 353:18
**occurred** [4] - 169:23, 231:11, 232:15, 289:6
**occurring** [1] - 191:22
**October** [2] - 204:17, 306:20

**offense** [8] - 189:21, 233:19, 234:25, 235:3, 235:10, 236:18, 237:7, 315:14
**offenses** [3] - 232:7, 234:6, 275:15
**office** [13] - 175:3, 175:21, 192:10, 192:12, 195:18, 198:20, 227:2, 293:19, 294:2, 295:2, 295:12, 344:11, 358:6
**officer** [9] - 349:21, 349:22, 350:9, 350:11, 350:18, 355:23, 355:25, 356:13, 356:15
**officer's** [3] - 302:19, 302:24, 302:25
**officers** [2] - 190:6, 190:11
**offices** [1] - 293:21
**oftentimes** [1] - 263:23
**oil** [1] - 354:17
**old** [2] - 176:20, 302:3
**on-air** [2] - 245:19, 245:20
**once** [2] - 272:2, 333:16
**one** [50] - 181:25, 205:16, 210:10, 211:13, 217:7, 217:16, 222:17, 223:5, 223:6, 223:23, 224:1, 224:5, 224:13, 230:25, 231:4, 231:18, 235:13, 253:13, 258:8, 262:3, 265:9, 268:8, 270:2, 273:14, 276:7, 277:14, 278:7, 280:6, 286:7, 296:1, 296:8, 298:16, 301:8, 302:6, 302:7, 305:14, 306:12, 307:9, 323:24, 324:10, 335:3, 336:22, 339:18, 344:10, 344:11, 349:11, 349:22, 350:3, 351:11
**one-way** [1] - 223:5
**one-week** [1] - 210:10
**ones** [5] - 248:12, 296:5, 317:25,

318:2, 350:22
**open** [22] - 196:20, 196:23, 208:11, 208:23, 209:1, 210:24, 211:1, 223:9, 242:12, 253:10, 253:11, 253:16, 253:18, 253:19, 253:20, 278:18, 292:7, 292:15, 304:19, 326:15, 343:4, 343:7
**open-ended** [1] - 278:18
**open-minded** [4] - 208:23, 209:1, 223:9, 304:19
**opened** [2] - 211:23, 327:11
**opinion** [16] - 169:22, 204:5, 207:17, 208:12, 208:16, 208:17, 220:11, 220:13, 231:10, 265:22, 278:11, 278:25, 282:14, 289:5, 336:5, 336:18
**opinions** [14] - 179:20, 183:25, 191:21, 206:25, 207:1, 207:2, 241:19, 266:4, 292:19, 302:14, 331:8, 331:21, 336:17, 336:19
**oppose** [1] - 175:19
**opposed** [3] - 206:2, 232:16, 247:18
**opposing** [1] - 296:16
**oral** [1] - 210:5
**order** [1] - 194:3
**ordinary** [1] - 276:15
**organization** [69] - 181:21, 181:23, 183:17, 183:25, 191:25, 200:24, 201:1, 201:17, 201:19, 201:25, 202:1, 207:3, 207:4, 207:5, 207:6, 207:7, 207:13, 208:3, 210:21, 210:25, 219:12, 222:13, 223:12, 223:20, 224:19, 245:15, 247:9, 247:11, 247:14, 248:16, 249:8, 255:8, 255:10, 266:9, 266:15, 268:3,

268:5, 268:7, 268:14, 268:20, 268:22, 268:23, 269:4, 269:10, 269:17, 274:9, 291:2, 291:13, 292:9, 292:19, 294:2, 300:20, 303:10, 303:15, 303:17, 308:13, 308:18, 309:1, 320:14, 320:19, 320:24, 321:4, 325:15, 325:16, 342:10, 352:1, 352:4, 352:8, 352:10
**organizations** [5] - 182:1, 222:18, 224:1, 291:9, 342:18
**organized** [2] - 182:1, 270:2
**orient** [1] - 327:20
**originally** [2] - 205:23, 228:20
**otherwise** [3] - 260:8, 324:1, 340:10
**outfit** [1] - 278:15
**outraged** [1] - 280:1
**outrageous** [1] - 237:22
**outside** [2] - 184:20, 302:9
**overall** [1] - 185:18
**overcome** [2] - 254:4, 330:23
**overhead** [1] - 289:13
**overnight** [2] - 240:2, 240:3
**override** [1] - 180:20
**overturning** [1] - 226:10
**own** [8] - 219:16, 219:24, 220:11, 258:15, 265:21, 277:22, 296:18, 303:15

## P

**p.m** [2] - 342:1, 359:8
**page** [44] - 169:21, 187:20, 191:19, 195:14, 195:16, 195:25, 197:5, 213:1, 222:10, 226:3, 230:2, 231:8, 231:9, 249:23, 250:4, 250:5, 250:6, 254:14, 260:20, 260:21, 268:1,

271:19, 283:14,
283:15, 289:2,
293:4, 308:11,
310:16, 312:25,
317:13, 320:11,
321:7, 322:22,
325:12, 327:3,
329:1, 339:13,
344:6, 351:24,
354:11, 355:20
**pages** [1] - 349:6
**paid** [1] - 298:13
**pale** [1] - 278:17
**paper** [1] - 299:12
**paragraphs** [1] -
283:14
**paramilitary** [1] -
201:15
**pardon** [3] - 202:23,
237:11, 238:5
**parent** [1] - 344:13
**parents** [1] - 346:19
**part** [20] - 170:9,
175:6, 175:8, 175:9,
179:15, 219:11,
237:4, 239:16,
239:22, 243:23,
246:2, 260:3, 279:3,
309:23, 311:3,
321:4, 331:10,
332:11, 332:15,
353:5
**partial** [2] - 256:1,
258:5
**partiality** [1] - 256:3
**participated** [4] -
197:22, 213:16,
289:25, 354:25
**particular** [13] -
183:21, 232:20,
246:21, 258:7,
261:17, 264:1,
264:7, 264:8,
266:15, 291:25,
325:13, 332:12,
334:15
**particularly** [3] -
333:15, 334:2,
356:20
**parties** [2] - 252:10,
252:12
**partisan** [1] - 174:5
**partner** [1] - 226:11
**partners** [1] - 203:10
**parts** [2] - 332:6,
332:13
**pass** [1] - 276:6
**passed** [2] - 257:13,
294:12
**passing** [1] - 266:10

**passive** [2] - 272:21,
272:25
**passively** [5] - 254:18,
254:20, 262:24,
262:25, 329:12
**past** [6] - 207:21,
213:20, 213:24,
255:21, 311:11,
311:14
**Pat** [1] - 304:5
**patience** [6] - 308:3,
317:5, 319:14,
320:1, 325:3, 339:6
**patient** [1] - 351:20
**pause** [7] - 174:23,
267:2, 276:25,
291:21, 304:9,
304:16, 324:5
**payment** [1] - 328:4
**peaceful** [3] - 285:14,
285:15, 285:16
**pending** [1] - 232:4
**Pennsylvania** [1] -
349:12
**people** [74] - 171:25,
176:18, 177:4,
179:10, 182:17,
183:1, 184:5, 192:8,
192:9, 192:21,
198:14, 199:19,
201:16, 203:3,
204:6, 207:8,
208:17, 218:3,
218:7, 218:9,
218:11, 220:15,
226:13, 228:7,
232:3, 232:8, 233:5,
233:7, 233:8,
233:17, 233:18,
238:1, 252:23,
253:3, 253:24,
259:1, 259:19,
266:4, 271:10,
272:7, 272:8,
274:14, 275:14,
276:15, 280:4,
284:9, 284:11,
284:13, 284:20,
284:25, 286:9,
286:10, 289:15,
289:25, 290:23,
294:13, 298:15,
302:22, 319:21,
327:21, 329:2,
329:24, 331:19,
336:22, 336:24,
337:3, 337:4, 340:5,
349:7, 350:17, 355:9
**people's** [1] - 282:13
**per** [3] - 225:20,

330:9, 340:22
**perceived** [1] - 178:13
**percent** [7] - 180:12,
189:22, 287:24,
287:25, 288:2, 288:3
**perception** [1] -
289:25
**perfect** [1] - 258:4
**perhaps** [11] - 178:24,
200:24, 208:9,
215:13, 241:8,
251:21, 252:15,
262:5, 262:6, 266:25
**period** [3] - 236:11,
293:9, 335:13
**periods** [1] - 343:22
**perpetrate** [1] - 280:2
**person** [12] - 199:20,
235:1, 236:11,
237:19, 237:21,
258:24, 280:20,
304:19, 315:5,
333:18, 344:25,
350:4
**personal** [15] - 205:10,
217:7, 251:11,
264:12, 274:23,
289:17, 290:10,
290:13, 296:18,
301:18, 313:24,
333:25, 335:6,
335:7, 356:20
**personalize** [1] -
280:13
**personally** [9] -
171:13, 171:25,
192:11, 195:4,
195:5, 197:24,
262:8, 266:3, 270:5
**persons** [1] - 199:1
**perspective** [1] -
220:16
**pertains** [1] - 175:16
**Peter** [3] - 199:4,
272:9, 298:3
**pharmacy** [2] - 218:1,
218:2
**photographs** [1] -
182:16
**phrase** [3] - 219:19,
279:6, 279:8
**pick** [7] - 290:19,
302:9, 318:11,
318:19, 319:2,
341:24, 342:1
**pick-up** [1] - 341:24
**picked** [3] - 220:18,
318:16, 318:23
**picking** [2] - 318:22,
347:3

**pieces** [2] - 233:12,
245:25
**pills** [1] - 218:4
**Pittsburgh** [1] -
228:20, 228:21
**place** [6] - 179:10,
182:18, 217:10,
219:10, 222:24,
282:2
**plan** [1] - 326:5
**planning** [2] - 223:1,
223:2
**platform** [1] - 263:20
**play** [1] - 246:1
**played** [2] - 281:7,
281:13
**plays** [1] - 348:8
**pleasant** [1] - 204:21
**plus** [1] - 354:1
**point** [18] - 178:4,
179:20, 180:3,
180:5, 187:2,
208:13, 208:16,
211:6, 211:17,
212:7, 221:12,
275:25, 277:14,
278:24, 294:1,
296:8, 301:13,
326:25
**pointed** [1] - 334:21
**pointing** [2] - 291:6,
300:22
**points** [1] - 179:24
**poker** [1] - 348:8
**Police** [3] - 262:7,
302:14, 302:18
**police** [15] - 190:6,
190:11, 232:2,
262:16, 275:4,
339:17, 339:18,
348:8, 348:12,
349:16, 349:21,
349:22, 350:4,
350:5, 355:25
**policy** [5] - 250:16,
252:12, 261:16,
345:21, 354:18
**political** [22] - 214:6,
214:15, 250:16,
251:22, 252:1,
252:10, 252:12,
252:17, 261:7,
261:13, 261:14,
261:21, 263:23,
265:14, 268:12,
278:4, 296:7,
296:15, 312:6,
342:20, 346:8, 355:5
**politically** [1] - 179:24
**politics** [1] - 262:14

**Pool** [1] - 261:5
**pop** [1] - 263:24
**portion** [5] - 224:24,
273:7, 299:19, 332:4
**portions** [1] - 352:19
**Portland** [1] - 201:4
**portrayed** [1] - 208:20
**position** [4] - 185:18,
236:17, 287:18,
294:25
**positive** [2] - 269:3,
269:5
**possessed** [2] -
177:8, 177:10
**possessing** [1] -
251:5
**possession** [10] -
250:15, 250:22,
250:23, 270:13,
270:15, 270:23,
334:20, 345:7,
345:9, 345:13
**possibility** [1] - 236:6
**possible** [3] - 176:22,
331:8, 337:5
**possibly** [1] - 341:6
**Post** [1] - 299:12
**post** [4] - 339:25,
340:2, 340:3, 348:5
**Postal** [1] - 197:9
**posted** [1] - 348:9
**postpone** [1] - 205:3
**posts** [1] - 264:2
**potential** [8] - 174:15,
199:1, 204:11,
208:4, 250:14,
309:24, 329:2, 343:1
**potentially** [6] -
210:11, 231:20,
281:4, 306:6, 343:1,
350:9
**power** [2] - 175:20,
337:4
**powers** [1] - 336:24
**practice** [5] - 203:6,
209:2, 231:5,
255:18, 349:14
**practiced** [1] - 324:1
**practicing** [5] -
202:22, 202:24,
202:25, 204:16,
230:10
**preceded** [1] - 232:16
**precedent** [1] - 355:18
**precise** [2] - 250:20,
250:21
**precisely** [1] - 309:4
**preconceptions** [2] -
241:23, 242:2
**predicate** [4] - 234:25,

237:6, 273:15, 279:7
**prefatory** [1] - 279:3
**prefer** [1] - 276:3
**prejudiced** [1] -
314:17
**preparation** [1] -
286:8
**prepared** [1] - 169:3
**preponderance** [3] -
209:6, 297:16,
328:11
**prescribes** [1] - 220:4
**prescription** [1] -
281:23
**presence** [1] - 182:4
**present** [3] - 229:3,
246:22, 342:3
**presented** [28] -
170:13, 193:3,
215:15, 223:6,
224:2, 225:2, 225:3,
227:13, 234:7,
241:24, 242:13,
243:24, 251:12,
254:23, 263:7,
281:2, 287:10,
287:21, 299:16,
310:9, 326:20,
327:1, 330:15,
330:16, 330:23,
331:23, 347:13,
347:14
**presidency** [1] -
258:25
**President** [22] - 175:1,
175:3, 175:19,
175:20, 175:25,
220:7, 220:12,
252:14, 252:16,
258:9, 258:24,
259:20, 265:11,
276:23, 277:16,
277:20, 277:24,
279:2, 280:2, 296:9,
358:1
**president** [1] - 306:11
**press** [3] - 183:23,
299:15, 359:4
**presume** [3] - 193:24,
219:13, 236:14
**pretty** [9] - 194:12,
201:7, 211:2, 227:3,
227:22, 254:2,
289:11, 322:4
**prevent** [6] - 175:2,
177:14, 240:23,
350:11, 350:18,
358:5
**previously** [2] - 327:4,
331:18

**primarily** [3] - 219:21,
295:4, 301:21
**primary** [1] - 296:5
**principles** [1] - 282:1
**prison** [1] - 233:6
**private** [7] - 231:4,
264:13, 274:24,
301:19, 313:24,
333:24, 356:21
**probable** [1] - 297:13
**probation** [1] - 189:25
**problem** [7] - 204:24,
221:20, 237:12,
256:20, 261:9,
276:19, 278:7
**problems** [1] - 259:20
**proceeding** [1] -
278:13
**Proceedings** [1] -
359:8
**proceedings** [1] -
326:25
**process** [7] - 182:24,
183:2, 215:6, 246:9,
331:11, 338:12
**producer** [1] - 246:7
**producers** [1] - 246:24
**product** [1] - 206:10
**productive** [1] - 359:1
**profession** [4] -
323:20, 338:4,
349:10, 349:11
**professional** [4] -
205:10, 205:12,
230:4, 276:12
**professionally** [1] -
248:3
**program** [3] - 310:24,
311:1, 311:2
**programmer** [1] -
310:25
**progresses** [1] -
221:11
**projects** [2] - 293:20,
293:24
**promise** [1] - 220:19
**proof** [17] - 194:7,
207:11, 209:5,
209:12, 256:16,
263:16, 296:22,
296:25, 307:13,
307:18, 310:10,
328:10, 328:12,
328:14, 328:19,
328:23, 355:19
**property** [3] - 207:8,
231:21, 232:9
**proposition** [1] -
215:12
**prosecute** [2] - 238:2

**prosecuted** [6] -
189:12, 189:18,
232:6, 233:11,
234:5, 256:23
**prosecution** [1] -
190:3
**prosecutor** [8] -
202:20, 230:21,
294:19, 294:23,
295:2, 295:16, 301:4
**prosecutorial** [1] -
295:12
**prosecutors** [6] -
204:3, 204:5,
215:25, 274:15,
274:20, 324:2
**prospect** [1] - 170:20
**Prospective** [39] -
169:5, 173:1, 173:2,
186:2, 191:8, 191:9,
209:22, 212:12,
221:8, 221:21,
229:15, 229:16,
238:21, 239:4,
249:4, 249:9,
259:13, 260:9,
267:16, 267:17,
277:13, 279:12,
282:24, 283:1,
288:15, 288:16,
307:24, 307:25,
316:2, 317:2,
319:19, 319:23,
324:23, 324:24,
339:1, 339:2, 351:4,
351:12, 358:22
**prospective** [3] -
185:15, 277:24,
279:1
**PROSPECTIVE** [820] -
169:7, 169:12,
169:15, 170:3,
170:7, 170:17,
170:19, 170:22,
171:4, 171:8,
171:12, 171:15,
171:18, 171:22,
172:2, 172:6,
172:13, 172:15,
172:22, 173:4,
173:9, 173:12,
173:15, 173:24,
174:3, 174:10,
174:20, 174:22,
175:5, 175:8,
175:12, 175:22,
176:2, 176:10,
177:6, 177:12,
177:17, 177:21,
178:2, 178:7,

178:11, 178:14,
178:17, 178:25,
179:14, 179:19,
180:2, 180:11,
180:14, 180:17,
180:22, 181:7,
181:15, 181:24,
182:6, 182:11,
182:15, 182:22,
183:5, 183:8,
183:19, 183:22,
184:2, 184:8,
184:16, 184:23,
185:1, 185:5,
185:13, 186:4,
186:9, 186:18,
186:22, 186:25,
187:5, 187:10,
187:14, 187:17,
187:19, 188:1,
188:5, 188:8,
188:12, 188:16,
188:18, 188:21,
188:24, 189:3,
189:5, 189:8,
189:14, 189:17,
189:19, 189:22,
189:25, 190:4,
190:9, 190:12,
190:18, 190:20,
190:23, 191:3,
191:11, 191:13,
192:3, 192:23,
193:9, 193:19,
193:21, 194:1,
194:5, 194:9,
194:11, 194:18,
194:23, 195:2,
195:7, 195:13,
195:23, 196:3,
196:10, 196:14,
196:18, 196:25,
197:5, 197:17,
197:25, 198:7,
198:11, 198:17,
198:20, 198:23,
199:3, 199:9,
199:13, 199:18,
199:25, 200:5,
200:9, 200:15,
200:21, 201:2,
201:6, 201:13,
202:4, 202:11,
202:22, 202:24,
203:2, 203:5, 203:8,
203:12, 203:16,
203:21, 203:23,
204:1, 204:4, 204:9,
204:15, 205:8,
205:13, 205:18,
206:3, 206:6,

206:12, 206:14,
206:16, 206:24,
207:5, 207:14,
207:20, 207:23,
208:6, 208:14,
208:19, 208:22,
208:25, 209:4,
209:9, 209:13,
212:14, 212:18,
212:22, 213:2,
213:4, 213:6,
213:11, 213:18,
213:22, 214:2,
214:10, 214:13,
214:17, 214:22,
215:2, 215:8,
215:17, 215:22,
216:1, 216:4, 216:8,
216:11, 216:13,
216:21, 216:25,
217:4, 217:9,
217:14, 217:19,
217:22, 218:15,
218:19, 218:25,
219:13, 219:18,
220:3, 220:9,
220:13, 220:21,
221:7, 221:23,
222:3, 222:6,
222:11, 222:15,
222:22, 223:7,
223:13, 223:17,
223:21, 223:23,
224:6, 224:13,
224:17, 225:4,
225:10, 225:16,
225:20, 226:2,
226:8, 226:16,
226:22, 227:6,
227:14, 227:20,
228:3, 228:8,
228:12, 228:18,
229:5, 229:8,
229:14, 229:18,
229:22, 229:25,
230:6, 230:10,
230:19, 230:21,
230:25, 231:15,
232:19, 233:1,
234:13, 234:16,
234:22, 235:17,
235:20, 235:25,
236:8, 236:22,
237:2, 237:17,
237:17, 238:19,
239:8, 239:12,
239:20, 239:25,
240:2, 240:4, 240:7,
240:10, 240:16,
240:22, 241:1,
241:11, 241:20,

241:25, 242:4, 242:8, 242:10, 242:17, 243:1, 243:3, 243:8, 243:12, 243:16, 243:25, 244:3, 244:7, 244:11, 244:21, 244:25, 245:10, 245:18, 245:21, 245:24, 246:4, 246:6, 246:10, 246:12, 246:17, 246:24, 247:3, 247:6, 247:10, 247:15, 247:20, 247:24, 248:5, 248:8, 248:11, 248:14, 248:18, 248:22, 249:3, 249:11, 249:18, 249:21, 250:4, 250:7, 250:19, 251:1, 251:7, 251:9, 251:13, 251:18, 251:24, 252:2, 252:4, 252:9, 252:19, 252:22, 252:25, 253:5, 253:7, 253:16, 253:18, 253:20, 253:22, 254:2, 254:8, 254:10, 254:12, 254:20, 254:25, 255:4, 255:11, 255:16, 255:20, 256:1, 256:5, 256:10, 256:13, 256:20, 256:25, 257:3, 257:8, 257:13, 257:17, 257:24, 258:4, 258:11, 258:13, 258:17, 258:20, 258:23, 259:12, 260:11, 260:16, 261:1, 261:4, 261:11, 261:24, 262:9, 262:11, 262:13, 262:17, 262:25, 263:8, 263:18, 263:22, 264:4, 264:8, 264:14, 264:16, 264:21, 264:25, 265:5, 265:12, 265:16, 265:20, 265:25, 266:2, 266:10, 266:14, 266:20, 267:3, 267:8,

267:15, 267:19, 267:23, 268:6, 268:15, 268:19, 268:25, 269:5, 269:8, 269:12, 269:19, 270:1, 270:7, 270:18, 271:1, 271:4, 271:14, 271:18, 271:22, 272:1, 272:5, 272:17, 272:23, 273:5, 273:9, 273:13, 273:22, 274:1, 274:5, 274:10, 274:13, 274:16, 274:20, 274:25, 275:5, 275:9, 275:13, 275:16, 275:22, 276:3, 276:17, 276:24, 277:2, 277:12, 279:14, 279:18, 280:12, 281:10, 281:20, 282:4, 282:12, 282:22, 283:5, 283:9, 283:16, 283:18, 283:20, 284:1, 284:4, 284:8, 284:14, 284:23, 285:1, 285:4, 285:7, 285:9, 285:13, 285:16, 285:21, 285:25, 286:7, 286:14, 286:17, 286:21, 287:1, 287:4, 287:8, 287:13, 287:15, 287:23, 288:2, 288:4, 288:12, 288:18, 288:22, 289:3, 289:10, 289:19, 289:23, 290:2, 290:5, 290:10, 290:16, 290:24, 291:4, 291:15, 291:18, 291:22, 292:2, 292:5, 292:10, 292:13, 292:16, 292:22, 293:1, 293:8, 293:11, 293:13, 293:18, 294:8, 294:11, 294:18, 294:24, 295:3, 295:6, 295:10, 295:14, 295:18, 295:23, 296:4, 296:11, 296:14, 296:20,

296:24, 297:9, 297:15, 297:19, 297:24, 298:11, 298:15, 298:23, 299:4, 299:11, 299:17, 299:21, 299:24, 300:1, 300:8, 300:12, 300:14, 300:21, 300:25, 301:3, 301:7, 301:13, 301:20, 301:24, 302:1, 302:3, 302:6, 302:15, 302:21, 303:2, 303:6, 303:11, 303:16, 303:20, 304:1, 304:11, 304:18, 304:23, 305:1, 305:6, 306:2, 306:5, 306:8, 306:17, 306:24, 307:2, 307:7, 307:14, 307:17, 307:22, 308:2, 308:7, 308:14, 308:16, 308:20, 308:22, 309:2, 309:6, 309:9, 309:13, 309:15, 309:19, 310:1, 310:7, 310:12, 310:15, 310:20, 310:24, 311:1, 311:6, 311:9, 311:17, 311:22, 311:25, 312:3, 312:8, 312:13, 312:17, 312:24, 313:5, 313:8, 313:11, 313:13, 313:15, 313:17, 313:19, 313:25, 314:4, 314:7, 314:10, 314:15, 314:19, 314:23, 314:25, 315:3, 315:6, 315:9, 315:12, 315:17, 316:1, 317:4, 317:8, 317:10, 317:14, 317:18, 317:22, 317:25, 318:3, 318:6, 318:12, 318:14, 318:17, 318:20, 318:23, 319:4, 319:7, 319:17, 319:25, 320:7, 320:16, 320:21, 321:1, 321:5, 321:12, 321:16, 321:19,

322:4, 322:9, 322:13, 322:20, 323:2, 323:10, 323:17, 323:21, 323:23, 324:3, 324:7, 324:11, 324:22, 325:1, 325:9, 325:17, 325:22, 326:3, 326:9, 326:12, 326:18, 326:24, 327:5, 327:7, 327:16, 327:23, 328:1, 328:3, 328:8, 328:15, 328:22, 329:15, 329:19, 329:22, 330:4, 330:7, 330:18, 330:21, 331:7, 331:15, 332:1, 332:6, 332:18, 332:25, 333:3, 333:8, 333:13, 333:19, 334:1, 334:10, 334:14, 335:1, 335:7, 335:14, 335:24, 336:7, 336:13, 336:15, 336:21, 337:11, 337:18, 337:21, 338:3, 338:5, 338:8, 338:13, 338:17, 338:23, 338:25, 339:4, 339:11, 339:15, 339:19, 339:22, 339:24, 340:4, 340:14, 340:16, 340:19, 340:22, 341:6, 341:9, 341:14, 341:22, 341:25, 342:4, 342:7, 342:14, 342:19, 342:25, 343:8, 343:14, 344:4, 344:9, 344:18, 344:20, 344:23, 345:2, 345:5, 345:10, 345:15, 345:17, 345:19, 345:23, 346:2, 346:11, 346:16, 347:9, 347:17, 348:2, 348:7, 348:13, 348:21, 349:4, 349:9, 349:11, 349:15, 349:19, 350:3, 350:7, 350:14, 350:20, 351:3,

351:14, 351:16, 352:3, 352:7, 352:13, 352:16, 352:22, 352:25, 353:4, 353:7, 353:16, 353:20, 353:24, 354:2, 354:10, 354:15, 354:19, 354:22, 355:2, 355:8, 355:13, 355:17, 355:24, 356:6, 356:11, 356:16, 356:22, 357:2, 357:5, 357:7, 357:11, 357:15, 357:18, 357:22, 358:3, 358:7, 358:11, 358:21

**protect** [1] - 176:14

**protest** [12] - 197:22, 213:16, 226:5, 226:8, 251:16, 260:23, 269:24, 284:12, 284:13, 295:21, 311:20, 354:25

**protested** [1] - 178:3

**protesters** [4] - 231:25, 233:10, 284:20, 285:11

**protesting** [1] - 284:9

**protests** [13] - 177:25, 213:23, 214:1, 214:3, 222:24, 231:17, 231:19, 232:16, 284:25, 286:8, 286:9, 286:11

**Proud** [5] - 222:17, 223:25, 224:11, 291:7, 342:15

**prove** [4] - 194:3, 284:18, 296:23, 323:18

**proved** [1] - 237:14

**proven** [4] - 234:24, 237:7, 237:8, 328:19

**provide** [20] - 172:23, 185:12, 191:7, 209:21, 221:6, 229:13, 238:18, 249:2, 259:11, 267:14, 277:11, 282:21, 288:13, 307:20, 315:25, 319:16, 324:20, 338:22, 351:2, 358:20

**provided** [1] - 337:14

**proving** [4] - 234:11,

331:24, 343:25,
355:11
**proximity** [1] - 305:9
**public** [2] - 217:8,
227:19
**pulling** [1] - 232:8
**purely** [1] - 348:17
**purpose** [1] - 282:11
**push** [1] - 306:8
**puts** [1] - 185:23
**putting** [6] - 184:20,
245:2, 246:19,
254:22, 269:16,
358:23

## Q

**qualifications** [1] -
277:25
**questioning** [4] -
187:4, 277:15,
278:21, 279:5
**questionnaire** [50] -
169:14, 169:20,
169:21, 173:14,
176:25, 186:11,
191:16, 191:19,
195:10, 199:24,
205:21, 212:21,
218:24, 219:8,
222:4, 222:8,
225:18, 228:15,
229:23, 239:11,
249:15, 249:19,
255:3, 255:9,
260:17, 260:21,
265:6, 267:25,
279:19, 282:11,
283:10, 283:13,
288:25, 289:2,
303:7, 306:3, 308:8,
317:11, 317:13,
317:21, 320:8,
320:11, 321:7,
325:11, 325:13,
336:2, 339:8,
339:12, 339:14,
351:23
**questionnaires** [1] -
205:24
**questions** [45] - 171:1,
177:2, 181:19,
183:12, 185:8,
190:15, 191:18,
192:2, 202:6,
209:16, 219:3,
219:6, 219:9, 221:1,
228:24, 229:1,
239:13, 241:10,
245:13, 252:12,
257:20, 258:6,

259:7, 259:16,
265:2, 265:7,
275:17, 277:7,
277:17, 283:12,
283:21, 298:11,
303:9, 310:3,
315:18, 317:16,
317:17, 317:21,
317:24, 338:18,
342:13, 347:19,
351:10, 358:16
**Questions** [16] -
178:21, 181:12,
187:22, 191:20,
215:9, 225:6, 241:9,
254:14, 283:15,
310:4, 322:22,
333:9, 333:21,
346:12, 349:6,
353:10
**quickly** [1] - 319:22
**quite** [5] - 217:23,
278:10, 278:11,
278:16, 359:2

## R

**racially** [1] - 247:21
**racism** [1] - 258:25
**racist** [2] - 252:23,
253:1
**racists** [1] - 259:2
**railroaded** [1] - 237:19
**railway** [1] - 227:1
**raised** [3] - 173:25,
174:17, 175:24
**raising** [1] - 229:9
**rallies** [2] - 177:25,
214:7
**rally** [14] - 197:22,
213:16, 226:5,
251:16, 251:18,
252:23, 253:4,
253:25, 260:23,
269:24, 270:24,
295:21, 311:20,
354:25
**ran** [1] - 294:13
**randomly** [1] - 192:9
**raped** [1] - 203:17
**rather** [3] - 261:17,
269:13, 333:24
**reach** [2] - 338:10,
338:12
**reached** [1] - 215:4
**react** [2] - 281:15
**reaction** [1] - 280:17
**reactions** [2] - 281:21,
316:14
**read** [55] - 181:20,

181:22, 182:5,
182:7, 188:19,
189:4, 191:24,
199:22, 200:23,
201:1, 201:21,
207:20, 218:22,
222:12, 222:14,
245:14, 255:1,
255:7, 263:5,
263:11, 263:14,
268:2, 268:4, 268:7,
273:3, 273:19,
291:1, 291:3,
299:10, 299:15,
300:19, 308:12,
308:17, 320:13,
320:15, 320:20,
320:23, 322:23,
325:14, 325:15,
325:19, 326:6,
326:14, 326:17,
329:14, 330:1,
332:23, 333:6,
337:17, 342:9,
348:18, 351:25,
352:2, 353:15
**reader** [1] - 299:9
**reading** [2] - 300:5,
332:16
**reads** [4] - 262:24,
283:25, 322:25,
329:12
**real** [3] - 259:20,
274:6, 337:2
**realize** [1] - 238:1
**really** [21] - 182:25,
188:2, 192:5, 201:7,
202:12, 203:18,
224:21, 234:17,
235:25, 259:25,
262:13, 268:15,
270:8, 271:6, 276:9,
305:3, 305:4,
318:20, 327:19,
332:19
**reason** [24] - 180:20,
189:6, 194:10,
195:22, 199:5,
202:8, 216:22,
230:7, 234:14,
235:18, 252:20,
262:4, 276:4, 282:7,
302:17, 306:10,
309:23, 314:16,
320:22, 323:14,
328:20, 332:11,
341:7, 341:12
**reasonable** [18] -
194:4, 194:19,
194:25, 209:6,

234:10, 234:11,
234:24, 237:15,
256:8, 256:16,
297:12, 305:4,
323:13, 328:12,
328:19, 331:25,
343:25, 355:12
**reasons** [9] - 198:2,
198:21, 210:4,
211:22, 242:13,
242:15, 242:16,
242:18, 343:4
**receive** [1] - 326:15
**received** [5] - 184:14,
236:16, 312:22,
313:3, 355:22
**receives** [1] - 254:18
**recently** [2] - 216:10,
330:1
**Recess** [1] - 239:3
**recipient** [1] - 272:21
**recitation** [1] - 210:5
**recognize** [1] - 272:7
**recognized** [2] -
198:25, 262:1
**recollection** [3] -
230:13, 244:19,
352:14
**record** [11] - 185:25,
210:1, 217:8,
227:19, 230:12,
260:6, 262:18,
316:3, 316:18,
316:21, 317:1
**records** [1] - 260:3
**refer** [9] - 169:16,
173:16, 222:5,
229:24, 260:18,
279:20, 283:11,
308:9, 320:10
**references** [1] -
320:17
**referendum** [1] -
269:10
**referring** [1] - 313:7
**Reflecting** [1] - 261:4
**reflects** [1] - 317:1
**regalia** [1] - 278:16
**regard** [1] - 342:25
**regarding** [3] -
266:25, 277:15,
278:9
**regretted** [1] - 224:18
**regular** [1] - 354:4
**regularly** [4] - 188:7,
263:20, 264:2,
285:19
**regulatory** [1] - 321:24
**related** [2] - 172:1,
216:2

**relates** [2] - 250:17,
323:8
**relating** [1] - 334:23
**relationship** [5] -
216:18, 311:14,
315:5, 324:4, 356:3
**relative** [2] - 190:11,
295:16
**relatively** [1] - 319:22
**release** [1] - 276:15
**released** [1] - 232:6
**releasing** [1] - 246:17
**relevant** [1] - 277:24
**religion** [2] - 211:12
**remarks** [1] - 181:16
**remember** [22] -
192:12, 192:15,
200:15, 201:3,
223:24, 223:25,
224:1, 224:14,
224:17, 224:20,
295:4, 300:10,
300:14, 320:16,
322:17, 325:18,
326:1, 332:21,
336:4, 346:3,
347:10, 353:4
**remove** [18] - 169:10,
173:6, 191:14,
212:19, 222:1,
229:19, 239:9,
249:16, 260:13,
267:20, 279:16,
283:6, 288:23,
308:5, 317:7, 320:4,
325:6, 339:9
**render** [2] - 242:24,
348:16
**rendering** [1] - 237:15
**rent** [1] - 328:4
**repeat** [2] - 284:23,
340:18
**repeating** [1] - 300:18
**repellant** [1] - 340:5
**rephrase** [2] - 175:9,
347:21
**report** [2] - 229:4,
357:6
**reported** [3] - 169:3,
275:3, 313:22
**reporter** [2] - 264:7,
359:4
**REPORTER** [6] -
209:25, 257:25,
258:2, 305:17,
316:19, 316:22
**REPORTER'S** [41] -
169:2, 169:5, 173:1,
173:2, 185:15,
186:2, 191:8, 191:9,

209:22, 212:12,
221:8, 221:21,
229:15, 229:16,
238:21, 239:4,
249:4, 249:9,
259:13, 260:9,
267:16, 267:17,
277:13, 279:12,
282:24, 283:1,
288:15, 288:16,
307:24, 307:25,
316:2, 317:2,
319:19, 319:23,
324:23, 324:24,
339:1, 339:2, 351:4,
351:12, 358:22
**reporters** [1] - 264:9
**reporting** [1] - 256:8
**reports** [5] - 248:22,
263:20, 285:20,
286:3, 286:5
**repost** [1] - 263:24
**represent** [4] - 203:8,
203:10, 258:8, 265:9
**representing** [1] -
230:17
**Reps** [1] - 294:5
**Republicans** [1] -
304:3
**reputation** [1] -
298:16
**reputationally** [1] -
262:10
**request** [1] - 211:5
**require** [1] - 281:2
**required** [2] - 194:13,
240:12
**reschedule** [2] -
335:10, 335:19
**research** [1] - 213:12
**resident** [1] - 184:5
**respect** [9] - 178:22,
192:4, 192:25,
196:21, 266:4,
279:25, 298:22,
306:4, 340:12
**respond** [2] - 186:12,
339:18
**response** [11] -
173:20, 181:11,
182:20, 211:8,
211:13, 211:15,
211:21, 211:24,
264:12, 313:24,
333:25
**responses** [5] -
185:17, 185:20,
191:19, 202:7, 241:5
**responsibility** [5] -
236:3, 337:1, 337:3,

337:7, 337:8
**result** [5] - 204:3,
208:8, 236:11,
348:25, 357:4
**resume** [1] - 238:24
**retired** [5] - 197:6,
216:8, 216:12,
255:20, 321:12
**return** [2] - 328:21,
347:15
**review** [2] - 193:2,
232:4
**reviewed** [2] - 225:6,
255:2
**rides** [1] - 284:20
**rights** [2] - 226:14,
345:22
**rigid** [1] - 268:8
**rioters** [2] - 172:2,
172:4
**rioting** [2] - 218:7,
218:9
**riots** [1] - 217:24
**rise** [1] - 177:2
**road** [1] - 211:3
**robbed** [1] - 334:3
**robbery** [2] - 334:8,
334:25
**Robert** [1] - 262:6
**Robertson** [1] - 304:5
**robot** [1] - 236:9
**Roe** [2] - 226:10,
251:19
**Roger** [3] - 199:4,
272:9, 298:5
**role** [11] - 185:3,
237:21, 238:6,
238:7, 246:1, 246:8,
246:22, 247:5,
340:8, 352:15,
354:20
**room** [3] - 280:16,
281:22, 293:22
**Rose** [2] - 293:14,
294:11
**roughly** [1] - 346:25
**round** [1] - 232:3
**rounded** [1] - 233:7
**row** [1] - 319:21
**rule** [1] - 358:12
**rules** [2] - 178:18,
211:3
**run** [6] - 245:18,
245:20, 245:23,
245:25, 280:5, 324:8
**running** [1] - 218:4

---

**S**

**sacred** [2] - 196:4

**sad** [1] - 170:3
**sadness** [2] - 170:6,
170:16
**Safavian** [1] - 230:23
**safely** [1] - 198:12
**safety** [13] - 176:17,
179:5, 181:13,
198:18, 198:21,
289:18, 297:5,
346:14, 346:23,
350:9
**sat** [4] - 185:1, 185:5,
256:18, 327:24
**Saturday** [1] - 284:10
**save** [1] - 219:20
**saw** [7] - 170:16,
171:23, 172:12,
176:15, 211:19,
224:8, 227:11
**scenario** [2] - 211:13,
237:24
**schedule** [4] - 305:15,
305:19, 305:22
**schedules** [1] -
305:20
**scheduling** [2] -
307:3, 307:4
**school** [10] - 183:9,
228:19, 270:2,
270:4, 289:12,
301:9, 335:16,
341:19, 341:24,
346:18
**science** [2] - 287:5,
296:2
**Science** [2] - 214:3,
296:1
**scientist** [2] - 338:4,
338:6
**score** [1] - 183:8
**screen** [1] - 329:13
**scrolling** [1] - 266:22
**sealed** [1] - 331:20
**searching** [3] - 273:1,
273:16, 273:17
**seat** [1] - 283:2
**seated** [2] - 180:1,
193:23
**Seattle** [1] - 201:4
**SEC** [2] - 321:15,
321:18
**second** [6] - 205:16,
214:2, 257:3, 302:8,
305:3, 321:6
**Second** [1] - 270:10
**secret** [1] - 260:4
**section** [1] - 299:13
**Securities** [1] - 321:13
**security** [2] - 294:4,
306:12

**Security** [1] - 311:4
**sedition** [1] - 233:22
**see** [26] - 170:3, 172:8,
172:11, 178:2,
188:12, 192:8,
192:9, 220:15,
221:10, 230:14,
236:10, 236:23,
237:3, 245:5, 272:2,
277:23, 285:1,
285:13, 285:21,
285:22, 286:2,
286:3, 317:17,
331:2, 333:15, 359:6
**seeing** [8] - 181:4,
183:24, 233:11,
241:14, 244:20,
281:4, 308:25,
332:16
**seek** [3] - 323:3,
329:19, 354:3
**seeking** [1] - 299:8
**seeks** [7] - 225:15,
254:17, 262:23,
272:22, 322:25,
329:11, 353:13
**seem** [3] - 185:20,
222:25, 304:15
**sees** [2] - 225:9,
262:24
**segment** [1] - 332:9
**selected** [11] - 170:10,
170:13, 221:13,
239:19, 239:22,
239:23, 241:22,
271:13, 326:14,
343:25
**selecting** [2] - 246:2,
246:25
**selection** [1] - 221:15
**Senate** [1] - 293:19
**Senator** [1] - 179:1
**senator** [1] - 344:12
**senator's** [1] - 344:11
**sense** [6] - 170:6,
273:10, 296:6,
299:22, 352:20,
355:5
**sensitive** [1] - 227:18
**sentence** [8] - 233:23,
235:10, 236:6,
236:14, 236:16,
237:22
**sentenced** [1] - 233:5
**sentences** [1] - 233:12
**sentencing** [3] -
235:9, 236:2, 238:3
**sentiment** [1] - 204:2
**separate** [1] - 193:5
**sergeant** [5] - 339:17,

346:21, 348:8,
348:12, 350:4
**serve** [7] - 189:7,
270:16, 271:13,
313:16, 340:12,
347:8, 347:16
**served** [5] - 189:23,
280:21, 297:7,
327:13, 327:14
**serves** [1] - 357:18
**Service** [1] - 197:9
**service** [24] - 169:20,
185:10, 191:17,
197:7, 197:8, 205:7,
214:25, 218:18,
229:4, 238:16,
248:25, 277:9,
280:21, 282:19,
288:11, 288:25,
297:6, 297:21,
306:10, 313:14,
319:13, 322:16,
339:7, 358:18
**Services** [1] - 344:14
**serving** [5] - 196:1,
204:12, 305:22,
306:7, 306:21
**session** [1] - 169:2
**set** [18] - 179:19,
200:2, 225:23,
227:11, 237:25,
243:22, 251:11,
256:3, 261:20,
280:7, 296:18,
299:14, 312:20,
331:21, 333:5,
340:9, 345:21, 354:8
**setting** [7] - 224:25,
232:10, 264:13,
274:24, 301:19,
313:24, 333:24
**seven** [4] - 179:4,
183:6, 206:1, 210:12
**seventh** [1] - 214:23
**seventh-grade** [1] -
214:23
**several** [3] - 172:10,
183:16, 325:18
**sex** [1] - 295:3
**shadow** [1] - 278:13
**shakes** [1] - 210:2
**share** [9] - 192:1,
204:13, 214:21,
224:15, 257:1,
289:8, 308:24,
342:12, 352:5
**shared** [1] - 234:16
**sharing** [1] - 192:18
**Sher** [3] - 230:17,
231:3, 231:7

384

**shifted** [1] - 294:1
**shooting** [2] - 314:23, 314:25
**shootings** [2] - 270:2, 270:4
**short** [3] - 194:7, 195:6, 195:8
**shorter** [1] - 343:21
**show** [21] - 172:21, 185:11, 191:6, 209:20, 218:8, 218:10, 221:5, 229:12, 238:17, 249:1, 259:10, 267:13, 277:10, 277:19, 282:20, 288:9, 307:20, 315:24, 319:15, 351:1
**showed** [5] - 226:25, 227:1, 252:23, 332:8
**showing** [1] - 181:2
**shown** [2] - 181:1, 247:4
**sic** [3] - 186:3, 226:1, 295:16
**sic]** [2] - 187:1, 191:5
**sick** [1] - 341:19
**side** [18] - 200:18, 202:2, 210:16, 215:7, 215:14, 223:6, 236:19, 246:6, 263:5, 278:21, 304:4, 322:19, 323:5, 327:10, 330:14, 336:22, 347:22, 349:2
**sides** [3] - 220:19, 267:5, 304:13
**significant** [1] - 350:21
**similar** [5] - 211:15, 316:6, 334:5, 348:9, 356:17
**simply** [2] - 193:22, 237:21
**sister** [5] - 197:6, 197:14, 295:16, 295:24, 301:2
**sit** [14] - 206:10, 221:11, 221:13, 235:20, 254:5, 282:6, 292:18, 300:1, 305:3, 341:4, 341:8, 341:11, 341:13, 346:10
**sitting** [2] - 184:1, 184:19
**situation** [3] - 194:22,

236:23, 304:22
**situations** [1] - 227:22
**six** [7] - 192:5, 206:1, 210:11, 276:1, 276:8, 306:22, 346:25
**skipped** [2] - 257:10, 346:6
**sleep** [2] - 218:19, 218:21
**sleep-in** [2] - 218:19, 218:21
**slight** [1] - 186:25
**slightly** [6] - 170:12, 175:14, 185:23, 193:1, 280:6, 331:18
**small** [4] - 176:12, 182:18, 237:21, 306:11
**Smith** [1] - 234:23
**Smithsonian's** [1] - 213:7
**SOC** [1] - 306:13
**social** [12] - 188:2, 188:4, 215:14, 218:22, 225:18, 230:4, 239:18, 255:2, 263:20, 285:19, 287:4, 323:6
**softest** [1] - 304:24
**sole** [1] - 226:8
**someone** [17] - 205:12, 220:3, 225:8, 242:22, 254:17, 254:18, 262:22, 262:23, 272:21, 283:25, 285:19, 315:2, 315:3, 322:24, 329:11, 348:18, 353:14
**sometimes** [8] - 212:9, 212:10, 284:9, 338:9, 343:15, 343:20, 346:19
**somewhat** [3] - 208:3, 212:5, 212:6
**somewhere** [2] - 264:23, 315:8
**son** [6] - 189:14, 190:7, 335:16, 344:9, 344:10, 346:18
**son's** [2] - 190:1, 344:15
**soon** [2] - 198:10, 342:5
**sorry** [32] - 174:8, 203:18, 203:19,

237:8, 238:24, 242:6, 246:11, 252:6, 252:24, 253:6, 253:17, 258:12, 264:14, 264:15, 265:25, 266:7, 281:10, 283:17, 287:3, 288:1, 292:12, 294:9, 301:4, 307:3, 308:21, 313:12, 314:2, 314:24, 318:13, 334:6, 345:16, 350:3
**sort** [38] - 205:11, 215:9, 223:5, 225:15, 233:18, 235:21, 240:20, 241:9, 242:1, 245:1, 254:17, 254:18, 257:16, 261:20, 270:3, 272:21, 273:2, 273:14, 273:16, 278:6, 281:23, 291:8, 291:11, 299:14, 301:15, 303:17, 304:16, 306:4, 307:4, 329:10, 330:13, 332:21, 337:6, 338:8, 343:16, 344:25, 349:2, 351:21
**sounds** [6] - 177:4, 188:7, 225:13, 237:10, 312:11, 332:24
**sources** [2] - 248:20, 286:10
**space** [1] - 196:4
**SPAN** [1] - 299:24
**speaking** [5] - 186:15, 199:13, 289:25, 293:17, 318:8
**special** [3] - 190:24, 293:20, 293:24
**specific** [6] - 188:15, 225:12, 244:20, 246:25, 320:16, 326:1
**specifically** [13] - 200:16, 222:19, 223:19, 234:10, 245:24, 267:2, 284:6, 286:4, 295:9, 306:16, 320:21, 335:15, 337:11
**specifics** [1] - 257:4
**spectrum** [4] - 214:13, 214:15, 268:12,

280:6
**speculate** [2] - 266:19, 290:6
**spending** [1] - 336:1
**spent** [2] - 293:23, 304:2
**spoken** [1] - 348:11
**spouses** [1] - 274:16
**spray** [2] - 340:6, 341:1
**spreading** [1] - 289:15
**stabbed** [1] - 314:1
**staff** [2] - 230:4, 230:9
**staffer** [1] - 226:23
**stand** [1] - 175:19
**standard** [8] - 194:19, 195:1, 297:13, 297:17, 305:4, 328:9, 328:12, 328:14
**standby** [1] - 291:11
**standing** [4] - 183:21, 233:18, 233:23, 234:1
**Starbucks'** [1] - 232:1
**start** [8] - 181:21, 191:20, 260:19, 262:1, 279:22, 289:4, 291:9, 358:25
**started** [5] - 192:16, 207:12, 228:19, 294:5, 316:24
**starting** [2] - 277:19, 289:15
**State** [2] - 197:10, 294:21
**state** [2] - 217:2, 349:21
**States** [6] - 179:1, 197:9, 230:17, 268:9, 303:14, 358:2
**stating** [2] - 177:24, 291:11
**station** [2] - 241:12, 246:20
**statues** [2] - 232:9, 232:10
**statute** [1] - 233:24
**stay** [1] - 341:19
**stayed** [1] - 330:8
**staying** [2] - 176:16, 359:4
**steps** [1] - 235:4
**Stevens** [1] - 304:5
**stick** [1] - 177:2
**sticking** [1] - 359:5
**still** [24] - 175:4, 175:25, 179:2, 179:6, 179:7, 187:12, 196:11,

216:7, 227:4, 233:22, 239:23, 240:13, 256:4, 270:25, 291:25, 294:9, 294:10, 295:7, 296:9, 299:2, 301:11, 312:12, 347:10, 358:12
**stolen** [1] - 356:23
**Stone** [3] - 199:6, 272:9, 298:5
**stone** [5] - 199:16, 199:18, 272:15, 298:8, 298:22
**stone's** [1] - 272:13
**stood** [1] - 280:17
**stop** [3] - 240:24, 270:4, 358:1
**stopped** [1] - 219:21
**stories** [4] - 245:23, 246:3, 263:24, 272:22
**story** [8] - 246:19, 246:20, 246:22, 246:23, 247:1, 325:17, 325:21, 337:17
**stranger** [1] - 219:25
**street** [3] - 223:5, 285:2, 289:12
**streets** [1] - 192:9
**stricken** [5] - 185:16, 186:1, 238:22, 249:5, 282:25
**strike** [7] - 210:3, 211:5, 259:14, 316:4, 316:16, 316:23, 351:5
**strong** [17] - 169:22, 176:6, 182:20, 191:21, 206:25, 231:10, 249:24, 254:2, 258:11, 266:5, 270:6, 270:8, 289:5, 292:19, 334:2, 334:16, 345:4
**strongly** [2] - 250:7, 253:23
**struck** [1] - 278:9
**struggle** [3] - 340:14, 340:16, 350:7
**stuck** [1] - 224:21
**stuff** [5] - 188:2, 245:18, 245:20, 356:23
**subject** [2] - 178:12, 235:2
**substitute** [1] - 204:22
**successfully** [1] - 252:21

385

**suggest** [3] - 242:15, 260:8, 278:12
**suggested** [1] - 242:14
**suggests** [1] - 326:22
**summers** [1] - 195:18
**summoned** [1] - 233:2
**Sunday** [1] - 284:10
**Superior** [1] - 185:6
**support** [5] - 220:12, 253:10, 258:16, 260:4, 292:8
**supported** [3] - 175:18, 252:16, 296:8
**supporters** [14] - 175:1, 220:7, 252:14, 258:9, 265:10, 265:19, 265:23, 276:22, 277:16, 277:20, 277:23, 278:10, 278:25, 279:2
**suppose** [2] - 256:1, 258:23
**supposed** [3] - 207:11, 268:9, 290:6
**suppress** [2] - 202:11, 202:13
**Supreme** [1] - 226:11
**surprised** [1] - 357:19
**surprising** [1] - 250:12
**surroundings** [1] - 330:19
**suspect** [1] - 255:23
**sustain** [1] - 331:24
**swear** [1] - 263:14
**swung** [1] - 261:2
**sympathy** [1] - 210:9
**Syracuse** [1] - 349:22
**system** [5] - 215:5, 236:5, 255:25, 297:21, 312:21
**Systems** [1] - 294:2

**T**

**talent** [1] - 246:25
**talks** [1] - 297:6
**tandem** [1] - 239:14
**targeted** [1] - 263:1
**team** [1] - 231:1
**tearful** [1] - 196:5
**technically** [2] - 233:23, 338:5
**Ted** [1] - 304:5
**televised** [1] - 352:22
**television** [6] - 200:10, 215:13,

219:21, 239:15, 352:4, 353:18
**ten** [5] - 179:1, 231:19, 283:16, 322:13, 332:8
**ten-minute** [1] - 332:8
**tend** [4] - 252:22, 252:25, 356:8
**tendencies** [2] - 303:17, 303:18
**Tennessee** [2] - 314:7, 315:9
**term** [1] - 255:9
**terms** [18] - 182:3, 200:1, 217:21, 233:6, 259:21, 261:9, 307:3, 307:4, 318:11, 331:3, 342:20, 343:1, 344:12, 346:23, 348:23, 353:22, 354:21, 358:7
**terribly** [1] - 273:13
**testified** [2] - 224:10, 309:18
**testify** [4] - 298:4, 298:6, 329:5, 329:6
**testifying** [1] - 223:19
**testimony** [32] - 190:5, 190:10, 216:19, 216:20, 216:23, 216:24, 224:16, 224:20, 245:6, 248:6, 248:13, 266:25, 273:20, 287:20, 300:6, 302:19, 302:24, 303:1, 309:17, 311:15, 311:16, 332:16, 334:13, 334:17, 334:20, 334:23, 350:25, 353:2, 356:2, 356:9, 356:10, 356:17
**text** [1] - 240:17
**texted** [1] - 198:11
**texting** [1] - 240:24
**Thanksgiving** [1] - 335:16
**theft** [1] - 301:21
**theirs** [1] - 179:21
**themselves** [1] - 201:16
**then-wife** [1] - 176:13
**therefore** [7] - 181:5, 235:1, 235:6, 238:9, 240:12, 297:12, 358:4
**they've** [2] - 179:13, 280:5

**thinking** [2] - 207:12, 291:21
**thinks** [1] - 206:19
**third** [1] - 293:22
**thoughts** [1] - 282:1
**threatened** [1] - 184:9
**three** [6] - 181:18, 190:23, 204:16, 248:9, 306:13, 325:19
**throw** [1] - 302:8
**throwing** [1] - 232:2
**tie** [1] - 194:21
**ties** [1] - 179:9
**Tina** [1] - 187:10
**today** [22] - 169:20, 219:8, 222:8, 228:16, 238:25, 265:7, 279:15, 292:18, 303:8, 306:1, 308:3, 318:8, 318:9, 318:21, 318:24, 325:3, 330:13, 339:6, 339:7, 341:12, 358:18, 359:1
**together** [5] - 246:19, 246:20, 306:19, 332:9, 342:16
**tomorrow** [4] - 229:6, 286:11, 358:25, 359:7
**took** [3] - 222:24, 272:2, 353:16
**top** [1] - 231:8
**topic** [2] - 227:18, 354:5
**total** [1] - 224:2
**touch** [1] - 301:11
**tough** [6] - 289:11, 304:22, 305:7, 306:24, 330:23
**tougher** [1] - 304:12
**tour** [3] - 312:17, 322:12, 327:8
**tourist** [3] - 272:1, 327:7, 327:10
**tours** [1] - 322:9
**toward** [3] - 194:15, 204:2, 298:10
**towards** [4] - 194:12, 231:22, 314:17
**town** [3] - 192:8, 232:1, 343:19
**train** [1] - 237:25
**training** [4] - 183:3, 183:4, 313:3, 355:22
**traitor** [1] - 277:21
**transactional** [1] - 204:16

**transcript** [1] - 169:4
**transition** [1] - 175:20
**transparent** [3] - 174:7, 176:22, 180:23
**traumatic** [1] - 334:4
**travel** [2] - 335:5, 343:16
**traveling** [2] - 341:18, 343:21
**travels** [1] - 343:15
**travesty** [1] - 237:4
**treason** [2] - 233:21
**treatment** [1] - 233:9
**trend** [1] - 324:8
**trial** [36] - 169:2, 183:21, 185:6, 199:2, 201:18, 204:12, 205:5, 206:1, 207:25, 208:9, 210:11, 214:5, 215:6, 219:10, 220:5, 251:21, 256:18, 261:16, 263:17, 265:8, 265:9, 268:21, 275:25, 276:7, 281:4, 281:13, 286:25, 287:11, 291:14, 291:17, 306:9, 319:2, 322:17, 327:17, 328:3, 355:4
**trials** [2] - 299:13, 330:2
**tried** [2] - 206:20, 286:9
**triggering** [2] - 280:15, 282:9
**trip** [8] - 214:23, 335:6, 335:7, 335:11, 335:12, 335:15, 335:19
**trips** [1] - 346:20
**trouble** [5] - 186:16, 267:2, 269:16, 296:23, 331:5
**troubled** [1] - 211:24
**troubles** [2] - 233:11, 233:24
**truly** [1] - 305:2
**Trump** [22] - 175:1, 175:19, 220:7, 220:12, 258:9, 258:16, 258:23, 265:11, 265:18, 265:23, 276:23, 277:16, 277:20, 277:24, 278:10, 278:12, 278:16,

278:25, 279:2, 291:11, 295:24, 358:5
**truthful** [2] - 282:13, 337:5
**try** [19] - 183:1, 193:10, 193:12, 207:15, 207:25, 208:4, 208:6, 238:24, 240:6, 252:19, 261:12, 287:13, 287:14, 288:4, 299:4, 304:18, 337:1, 337:4, 340:9
**trying** [13] - 193:15, 202:14, 217:14, 233:1, 234:19, 241:4, 270:4, 278:6, 316:6, 324:21, 357:25, 358:5
**TSA** [6] - 310:24, 310:25, 311:1, 311:2, 311:3, 313:6
**turn** [29] - 169:20, 176:4, 181:17, 187:20, 191:19, 198:24, 226:3, 231:8, 249:23, 254:14, 267:25, 283:14, 289:1, 293:4, 310:3, 310:16, 312:25, 317:13, 321:6, 322:21, 325:12, 327:3, 328:25, 339:13, 344:6, 351:24, 354:11, 355:20
**TV** [11] - 172:12, 183:17, 184:13, 188:7, 192:14, 192:15, 233:15, 280:15, 308:20, 308:22, 308:25
**twice** [2] - 211:7, 312:19
**two** [27] - 176:12, 182:1, 182:16, 192:6, 195:14, 195:16, 195:17, 195:18, 210:4, 210:11, 228:17, 276:7, 296:5, 298:3, 306:13, 318:12, 318:14, 318:15, 325:19, 325:25, 329:5, 330:9, 341:19, 341:20, 342:16, 342:18

386

**two-day** [1] - 276:7
**type** [7] - 182:19,
194:22, 216:23,
260:23, 276:2,
295:21, 321:23
**typically** [3] - 205:11,
343:15, 343:18

## U

**U.S** [7] - 169:24,
195:12, 195:14,
216:5, 231:12,
289:6, 293:6
**Uber** [1] - 284:9
**ultimate** [2] - 263:13,
355:10
**ultimately** [9] -
174:16, 184:24,
210:16, 211:21,
232:6, 234:6,
290:12, 316:8,
331:23
**unaware** [1] - 337:16
**unbiased** [2] - 202:3,
341:13
**uncle** [4] - 216:2,
216:7, 216:15,
216:18
**under** [3] - 194:25,
250:18, 261:19
**underground** [1] -
227:1
**understood** [5] -
174:12, 188:3,
210:13, 266:24,
279:10
**Understood** [1] -
276:20
**undoubtedly** [1] -
281:12
**unexpectedly** [1] -
343:16
**unfair** [3] - 190:8,
252:10, 278:21
**unfavorable** [2] -
326:7, 326:12
**unfortunately** [1] -
346:6
**unhappy** [1] - 184:5
**United** [6] - 179:1,
197:9, 230:17,
268:9, 303:14, 358:1
**unjust** [1] - 182:25
**unlawful** [7] - 207:7,
207:8, 207:12,
231:20, 250:23,
270:15, 345:9
**unlawfully** [2] -
177:10, 251:5

**unless** [1] - 276:13
**unlike** [1] - 210:16
**unlikely** [7] - 272:11,
298:5, 298:6, 329:4,
345:15, 345:17,
345:18
**unusual** [1] - 276:14
**up** [62] - 169:17,
171:1, 177:19,
182:17, 191:18,
192:6, 197:20,
201:4, 206:21,
209:7, 209:23,
209:24, 218:2,
222:17, 232:3,
232:12, 233:7,
235:4, 237:9,
252:23, 263:24,
264:24, 266:19,
271:9, 272:13,
272:25, 276:11,
277:22, 281:22,
282:8, 283:2, 283:3,
283:12, 286:2,
291:5, 293:14,
294:12, 295:25,
296:14, 298:20,
300:9, 300:11,
302:9, 307:9,
315:18, 318:11,
318:16, 318:19,
318:22, 318:24,
319:2, 324:12,
335:22, 341:24,
342:1, 342:15,
347:3, 347:19,
358:25
**up-to-date** [1] -
272:25
**uphold** [2] - 220:4,
251:19
**ups** [1] - 281:9
**upset** [2] - 188:12,
188:14

## V

**vacation** [1] - 348:8
**vaguely** [1] - 223:23
**value** [1] - 247:11
**various** [2] - 178:20,
261:13
**verdict** [3] - 215:4,
237:16, 348:16
**versus** [1] - 210:5
**vice** [1] - 306:11
**victim** [12] - 203:15,
217:6, 227:17,
228:7, 264:11,
264:18, 274:22,

301:17, 302:13,
313:22, 334:24,
356:19
**victims** [1] - 333:22
**video** [15] - 211:19,
215:10, 215:19,
245:16, 245:23,
246:2, 246:22,
246:25, 262:21,
281:13, 281:14,
281:16, 332:7,
347:12, 353:11
**videos** [18] - 181:1,
181:4, 187:24,
199:22, 199:23,
200:1, 225:6, 245:5,
246:17, 247:1,
254:15, 272:19,
283:22, 299:7,
310:5, 310:14,
322:23, 329:9
**view** [43] - 170:13,
178:4, 179:24,
180:3, 180:5, 180:9,
181:5, 199:11,
199:17, 202:2,
202:9, 204:8,
215:14, 216:19,
235:22, 247:22,
250:16, 250:24,
251:12, 253:24,
263:15, 268:8,
271:10, 280:8,
281:17, 290:13,
292:8, 296:18,
299:2, 307:12,
312:6, 312:9, 323:8,
331:13, 334:12,
334:17, 345:22,
350:13, 354:8,
356:14, 356:16
**viewed** [6] - 200:7,
200:9, 225:18,
299:23, 331:20,
333:5
**viewing** [3] - 210:24,
254:19, 309:17
**viewpoints** [1] -
261:12
**views** [53] - 177:13,
179:20, 180:9,
182:20, 201:24,
204:10, 214:6,
226:13, 228:1,
228:5, 234:4,
241:18, 248:16,
250:12, 250:16,
251:11, 251:22,
252:1, 252:17,
255:25, 259:19,

261:7, 261:13,
261:14, 261:21,
262:12, 263:23,
265:14, 266:3,
266:5, 270:6,
270:23, 278:4,
280:4, 280:7,
292:19, 296:7,
296:16, 296:18,
298:9, 299:1,
302:14, 302:17,
312:6, 312:11,
316:8, 323:1, 345:4,
345:12, 345:21,
346:9, 355:5, 355:9
**vigilante** [1] - 201:15
**violated** [1] - 211:12
**violating** [1] - 233:23
**violation** [1] - 235:6
**violence** [4] - 181:3,
227:21, 228:7,
231:22
**violent** [2] - 233:10,
334:3
**Virginia** [3] - 177:9,
177:18, 177:22
**virtue** [1] - 241:6
**visceral** [1] - 211:13
**visit** [1] - 227:12
**visitors** [1] - 327:10
**voice** [1] - 177:19
**voir** [1] - 279:5
**volunteer** [1] - 173:20
**vote** [6] - 194:7, 195:6,
195:8, 316:11,
328:21, 328:23
**voted** [3] - 259:1,
259:20, 259:23
**voting** [5] - 260:2,
296:23, 307:15,
344:3, 355:16

## W

**wade** [1] - 251:19
**Wade** [1] - 226:10
**wait** [2] - 271:10,
302:8
**waiting** [1] - 320:2
**wakes** [2] - 271:9,
276:11
**walk** [1] - 281:22
**walked** [1] - 235:4
**walking** [3] - 176:15,
285:4, 285:14
**wall** [2] - 244:11
**wall-to-wall** [1] -
244:11
**Washington** [9] -
179:15, 182:12,

189:16, 192:4,
197:12, 215:1,
264:19, 295:5, 334:9
**watch** [10] - 188:2,
188:8, 188:13,
273:11, 281:16,
284:7, 284:11,
329:17, 330:5, 354:4
**watched** [27] - 189:1,
200:2, 218:22,
219:19, 219:20,
224:2, 233:15,
244:7, 244:18,
248:9, 255:1,
262:21, 272:19,
273:7, 284:13,
298:1, 299:19,
309:13, 332:4,
332:7, 332:9,
332:10, 332:11,
332:12, 332:13,
352:22, 353:2
**watching** [10] - 188:7,
192:14, 192:15,
196:5, 211:14,
219:22, 284:5,
300:5, 332:15,
353:17
**ways** [2] - 192:22,
201:16
**weapon** [1] - 251:5
**weapons** [4] - 177:11,
177:15, 192:9, 223:1
**week** [8] - 205:4,
210:10, 221:10,
221:15, 335:16,
335:17, 343:21
**weekend** [1] - 284:10
**weeks** [12] - 172:10,
206:1, 210:12,
276:1, 276:8,
306:22, 319:2,
325:18, 325:19,
329:20, 330:9,
337:17
**weigh** [2] - 261:12,
280:9
**weight** [2] - 302:20,
356:9
**welcome** [4] - 191:3,
196:20, 239:5,
282:23
**welfare** [2] - 213:11,
347:2
**west** [1] - 293:22
**what'd** [1] - 302:8
**whatsoever** [1] -
274:6
**white** [1] - 203:6
**White** [2] - 171:19,

387

192:7

**white-collar** [1] - 203:6

**whole** [3] - 180:18, 282:2, 295:25

**wife** [6] - 176:13, 178:3, 271:18, 278:15, 339:25, 348:6

**William** [1] - 169:3

**win** [1] - 212:9

**windows** [1] - 232:2

**wing** [6] - 291:8, 303:17, 303:24, 304:4, 304:9

**Wisconsin** [1] - 344:12

**wise** [1] - 248:3

**wish** [9] - 169:16, 173:16, 229:24, 282:4, 308:5, 317:7, 339:9, 351:20

**witness** [17] - 199:7, 216:19, 216:24, 217:21, 224:10, 262:4, 262:7, 302:6, 302:10, 302:13, 302:20, 305:21, 314:21, 314:22, 315:1, 356:10, 356:17

**witness's** [1] - 305:19

**witnessed** [2] - 217:15, 218:5

**witnesses** [10] - 190:11, 199:1, 199:5, 208:24, 216:16, 272:8, 272:11, 278:8, 311:13, 333:23

**witnesses'** [1] - 262:2

**witnessing** [1] - 315:14

**woken** [1] - 218:2

**woman** [1] - 253:1

**Women's** [4] - 261:2, 295:24, 346:2, 355:2

**WOODWARD** [10] - 305:14, 305:18, 305:20, 305:25, 306:3, 306:6, 306:15, 306:21, 307:1, 307:6

**Woodward** [2] - 305:17, 315:19

**word** [3] - 194:20, 267:5, 278:2

**words** [16] - 175:13, 219:16, 219:24, 220:11, 237:14,

248:20, 258:15, 265:21, 265:23, 266:13, 287:2, 287:4, 303:15, 329:13, 336:17

**work-wise** [1] - 248:3

**works** [10] - 197:11, 236:5, 242:22, 294:20, 344:11, 344:13, 344:16, 344:24, 349:20, 354:15

**world** [4] - 175:14, 188:17, 336:25, 337:7

**worldview** [2] - 331:16, 338:15

**worried** [2] - 179:5, 289:15

**worth** [1] - 210:12

**written** [1] - 210:5

**wrote** [4] - 174:6, 176:21, 213:18, 217:22

## Y

**year** [13] - 182:16, 192:5, 200:10, 217:25, 233:5, 233:12, 236:11, 236:16, 247:25, 248:23, 306:9, 333:16, 353:25

**years** [50] - 176:11, 176:20, 177:25, 179:1, 179:15, 183:6, 185:6, 189:15, 190:23, 192:6, 195:14, 195:17, 197:8, 207:21, 213:17, 213:20, 213:24, 216:2, 216:6, 216:10, 216:11, 218:13, 226:6, 226:22, 228:17, 231:16, 231:19, 235:2, 251:15, 255:21, 257:14, 260:22, 269:24, 290:8, 291:5, 295:20, 296:1, 296:5, 311:20, 312:1, 313:17, 313:18, 313:20, 314:11, 322:13, 322:16, 354:24, 355:3

**York** [1] - 215:2

**you-all** [2] - 186:15,

205:24

**young** [2] - 278:8

**yourself** [23] - 169:8, 177:3, 183:10, 186:5, 198:18, 202:19, 205:7, 221:24, 225:8, 225:14, 228:13, 237:5, 254:16, 262:22, 272:20, 273:24, 283:23, 290:21, 292:6, 299:7, 322:24, 346:14, 353:12

**YouTube** [6] - 284:2, 284:3, 284:4, 284:6, 285:22, 286:2

## Z

**Zaremba** [1] - 169:3

**zero** [1] - 207:17

**Zoo** [1] - 213:7

**zoo** [1] - 213:10