1               **UNITED STATES DISTRICT COURT**
             **FOR THE DISTRICT OF COLUMBIA**

2

UNITED STATES OF AMERICA,    ) Criminal Action

3                     ) No. 1:22-cr-00015-APM
             Plaintiff,  )

4                     ) **Jury Trial - Day 30**
    vs.                ) (afternoon session)

5                     )
    ELMER STEWART RHODES III,   )

6    et al.,             ) Washington, D.C.
                     ) **November 15, 2022**

7             Defendants.  ) Time:  2:00 p.m.
    _____

8
            **Transcript of Jury Trial - Day 30**

9                 **Held Before**
          **The Honorable Amit P. Mehta**

10          **United States District Judge**

11    _____

            A P P E A R A N C E S

12

For the Government:    **Kathryn L. Rakoczy**

13                   **Troy A. Edwards, Jr.**
                   **Jeffrey S. Nestler**

14                   UNITED STATES ATTORNEY'S OFFICE
                   FOR THE DISTRICT OF COLUMBIA

15                   601 D Street, Northwest
                   Washington, D.C. 20579

16

                   **Alexandra S. Hughes**

17                   **Louis J. Manzo**
                   U.S. DEPARTMENT OF JUSTICE

18                   950 Pennsylvania Avenue, Northwest
                   Washington, D.C. 20530

19

For the Defendant Elmer Stewart Rhodes III:

20                   **James Lee Bright**
                   **Edward L. Tarpley, Jr.**

21                   BARRETT BRIGHT LASSITER LINDER
                   3300 Oak Lawn Avenue, Suite 700

22                   Dallas, Texas 75219

23   For the Defendant Kelly Meggs:
                   **Stanley E. Woodward, Jr.**

24                   BRAND WOODWARD LAW
                   1808 Park Road, Northwest

25                   Washington, D.C. 20010

1                    A P P E A R A N C E S, continued

2       For the Defendant Kelly Meggs:
                              **Juli Z. Haller**
3                             LAW OFFICES OF JULIA HALLER
                              601 Pennsylvania Avenue, Northwest
4                             Washington, D.C. 20036

5       For the Defendant Kenneth Harrelson:
                              **Bradford L. Geyer**
6                             FORMERFEDSGROUP.COM LCC
                              141 I Route 130 South, Suite 303
7                             Cinnaminson, New Jersey 08077

8       For the Defendant Jessica Watkins:
                              **Jonathan W. Crisp**
9                             CRISP AND ASSOCIATES, LLC
                              4031 North Front Street
10                            Harrisburg, Pennsylvania 17110

11      For the Defendant Thomas Caldwell:
                              **David W. Fischer, Sr.**
12                            FISCHER & PUTZI, P.A.
                              7310 Governor Ritchie Highway
13                            Glen Burnie, Maryland 21061-3065

14      _____

        Stenographic Official Court Reporter:
15                            Nancy J. Meyer
                              Registered Diplomate Reporter
16                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
17                            Washington, D.C. 20001
                              202-354-3118
18

19

20

21

22

23

24

25

1                               **I N D E X**

2                                                                    <u>PAGE</u>:

3       **<u>Witnesses:</u>**

4       <u>Brendan Dillon</u>

5           Direct Examination by Mr. Crisp................... 8942
            Cross-Examination by Ms. Hughes.................. 8951
6           Redirect Examination by Mr. Crisp............... 8956

7        <u>Thomas Caldwell</u>

8           Cross-Examination by Mr. Manzo.................. 8960
            Cross-Examination by Mr. Crisp.................. 9046
9           Redirect Examination By Mr. Fischer............. 9052

10      <u>Rosier Dulany Washington</u>

11          Direct Examination By Mr. Fischer............... 9048
            Cross-Examination By Mr. Manzo.................. 9051
12

13

14      **<u>Exhibits Admitted</u>:**

15          Government Exhibit 9310 (first message).......... 9029
            Government Exhibit 9310 (last two messages)...... 9031
            Government Exhibit 9310 (third page)............. 8981
16          Government Exhibit 9312.......................... 9017
            Government Exhibit 9313.......................... 9009
17          Government Exhibit 9315.......................... 8993
            Government Exhibit 9315.......................... 9044
18          Government Exhibit 9316.......................... 8977
            Government Exhibit 9317.......................... 9020
19

20          Defendant Caldwell Exhibit 68.1................. 9058
            Defendant Caldwell Exhibit 181................. 9055
21

22

23

24

25

1                    P R O C E E D I N G S

2              (REPORTER'S NOTE:  The morning session of the jury

3      trial was reported by William P. Zaremba who prepared said

4      transcript.)

5              (Proceedings held in the presence of the jury.)

6              THE COURT:  Okay.  Welcome back, everybody.  Please

7      be seated.

8          Ladies and gentlemen, we are going to put a pause on the

9      cross-examination of Mr. Caldwell because we have a witness in

10     from out of town here who's here to testify on Ms. Watkins's

11     behalf.  So we're going to turn to that individual's testimony

12     now.  And then once that person's testimony is completed, we'll

13     then resume -- we'll turn back to Mr. Caldwell and his

14     cross-examination.

15         Mr. Crisp.

16             MR. CRISP:  Thank you, Your Honor.

17         The defense, on behalf of Ms. Watkins, calls Brendan

18     Dillon to the stand.

19         Mr. Dillon, can you please approach the witness stand

20     and turn and face Mr. Douyon.

21             (Oath administered.)

22             THE WITNESS:  Yes.

23             THE COURT:  Mr. Dillon, welcome.

24         Mr. Crisp, whenever you're ready.

25             MR. CRISP:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CRISP:

Q.  Mr. Dillon, can you please state your full name and city and state of residence.

A.  My name is Brendan Jacob Dillon.  I live in Woodstock, Ohio.

Q.  Okay.  And by way of background, were you a member of any of the armed services?

A.  Yes, I was.

Q.  Which one?

A.  I was in the Navy.

Q.  Okay.  And I know it's going to -- we have a tendency to speak quickly when we're in these situations.  I may ask you to slow down so the court reporter can track.  I do the same thing.  So no big deal.

    How long were you in the Navy?

A.  Just shy of four years.

Q.  Okay.  When was that?

A.  I went to boot camp in August of 2011, and I was discharged in March of 2015.

Q.  Okay.  And at that point in time, did you get out and move to Woodstock?

A.  Shortly after.  Yes.  I was in Hawaii for roughly six months after my discharge.

Q.  What did you do in the Navy?

1    A.  I was a gunner's mate, which means that, essentially, I

2    maintained firearms and weapon systems, along with training for

3    tactics and law enforcement and several other things along

4    those lines.

5    Q.  Okay.  I want to direct your attention to Jessica Watkins.

6    Do you know her?

7    A.  Yes.

8    Q.  How do you know her?

9    A.  I met her through the bar that she was running at the time

10   and, subsequently, was recruited on to the militia she was

11   running.

12   Q.  Let's talk about that militia.  Is that also known as the

13   Ohio State Regular Militia or OSRM?

14   A.  Yes.

15   Q.  How did the conversation -- or how did it come up?

16   A.  We were at the bar in the smoking area, and the fact that I

17   was a veteran had come up through casual conversation, and the

18   OSRM was brought up.  And I --

19          THE COURT:  Bless you.

20   A.  I showed my interest, and it kind of went from there.

21   BY MR. CRISP:

22   Q.  Okay.  Did you have an interest in continuing to provide

23   community service to oriented things?

24   A.  Yes.

25   Q.  Okay.  What did you understand the mission of the OSRM to

1    be?

2    A.  So the mission of the OSRM, as it was put to me, is to

3    protect and defend the citizens of the United States from any

4    threat regardless what it is; assist law enforcement in

5    situations, when available and when allowed to; and render

6    medical aid when professional medical aid is unavailable.

7    Q.  So let's talk a little bit about Woodstock.  Is it a large

8    town?

9    A.  It is not.  It's less than 400 people.

10   Q.  Does it have its own dedicated law enforcement agency?

11   A.  No, it doesn't.

12   Q.  Okay.  The nearest one, to your knowledge, is how far away?

13   A.  I can't give you an actual mileage.  Roughly, seven- to

14   ten-minutes' drive when following the speed limit.

15   Q.  All right.  Did you have concerns about mass casualty

16   events and how they may impact Woodstock?

17   A.  Yes.

18   Q.  Uh-huh.

19   A.  Mass casualty kind of implies a little larger than what we

20   were concerned about based on the size of our community, but

21   yes.

22   Q.  And let me be more clear.  What was your concern in that

23   regard?

24   A.  We have some bigger municipalities close by that sometimes

25   would spill over into the Woodstock area.  Since we did not

8945

1    have any law enforcement or medical professionals in town, our

2    goal was to provide those in the event that it is needed.

3    Q.   Okay.  Were you concerned about active shooters spilling

4    out into the area?

5    A.   Yes.

6    Q.   Okay.  Now I want to talk with you a little bit about what

7    your -- when -- approximately, when did you join the OSRM?

8    Let's start with that.

9    A.   I believe in the earlier part -- spring of 2020.

10   Q.   Okay.  And what was your role?

11   A.   I was more along the lines of security.  I had some tactics

12   and law enforcement training.  So in case of, you know, any

13   sort of security measures needing to be taken, that was my job.

14   Q.   So who was a member of the OSRM when you joined?

15   A.   When I joined, to my knowledge, the only members --

16   official members were Jess Watkins and her boyfriend -- I think

17   was the term -- which is -- sorry, Montana Siniff.

18   Q.   Okay.  Was there ever another member that joined by the

19   name of Donovan Crowl?

20   A.   Yes.

21   Q.   Was he before or after you joined?

22   A.   I cannot confirm either way.  I believe after, but I can't

23   be sure.

24   Q.   Okay.  So at most, you would have had four members?

25   A.   Yes.

8946

1    Q.  Now, what role was Jess supposed to take in -- in the OSRM?

2    A.  Jess was the -- I guess she had a dual role.  She was our,

3    for lack of a better term, commanding officer.  She was also

4    the most trained medical professional on the team.  So she was

5    the medic as well.

6    Q.  Okay.  Did you conduct training with the OSRM?

7    A.  No.

8    Q.  All right.  Why not?

9    A.  We had a couple of training events planned, but other

10   things happened that ended up causing them to be canceled or

11   rescheduled.

12   Q.  Let's talk about -- I believe there was an event you were

13   going to have at the Clifton Gorge area.  Do you remember that?

14   A.  Yes, I do.

15   Q.  And when was that supposed to take place?

16   A.  In the middle of November of 2020.

17   Q.  Do you remember, roughly, when you started planning that

18   event?

19   A.  It was, I think, two or three months beforehand.  We had

20   some -- some lead-out on it.

21   Q.  Okay.  What was the purpose in having a training event like

22   that?

23   A.  Just to make sure that those of us in the militia were fit

24   and ready in case some sort of emergency arised that needed our

25   assistance.

```
1    Q.  What were you going to train on?

2    A.  I believe at the Gorge, it was physical fitness, probably

3    some tactics in law enforcement, and probably some medical

4    treatment training.

5    Q.  Weapon safety?

6    A.  Weapon safety, yes.  We were -- we were planning on weapon

7    safety.

8    Q.  Were you involved in any recruiting?

9    A.  I talked to a few people that, you know, I wanted to join

10   that showed similar interest.  But, officially, no.

11   Q.  Okay.  The individuals -- were you planning on training

12   people who were less familiar with weapons, less familiar -- or

13   less physically fit, things like that?

14   A.  Yes.

15   Q.  And were you going to take an active training role as part

16   of this?

17   A.  I believe so, yes.

18   Q.  Okay.  Now, you said the training event in November was

19   scratched.  Do you remember why?

20   A.  I believe because Montana and Jess were going to the MMM.

21   Q.  Okay.  And by "MMM," you mean Million MAGA March?

22   A.  Yes.

23   Q.  All right.  Did you go?

24   A.  I did not.

25   Q.  Why not?
```

1    A.  I had to work.

2    Q.  Okay.  Did you end up rescheduling or attempting to

3    reschedule that training event?

4    A.  Yes, we did.

5    Q.  And what time frame was that to be?

6    A.  The first week of January.

7    Q.  Okay.  Did you have the training event occur on the first

8    week of January?

9    A.  We did not.

10   Q.  Why not?

11   A.  That would be because of the January 6th incident.

12   Q.  All right.  So you mentioned the Million MAGA March.  Let's

13   talk about some events.  Did you participate in any events with

14   the Ohio State Regular Militia prior to January 6th?

15   A.  Yes, I did.

16   Q.  And what event or events, if any?

17   A.  The first one that I attended was -- we went to Louisville

18   for the NFAC protest, and the second one was a small parade

19   through our -- our county through all the municipalities, just

20   in support of President Trump.

21   Q.  Okay.  And what did you do -- what was your intention at

22   Louisville?

23   A.  Our intention at Louisville was to assist in law

24   enforcement, if allowed and if needed, just to try to preserve

25   life.

1    Q.  Are you aware of whether or not any prior coordinations

2    with law enforcement occurred before you went there?

3    A.  I believe that we coordinated with either the police

4    department or the local deputies, and there was some

5    miscommunication between them --

6    Q.  Okay.

7    A.  -- but I can't be a hundred percent sure.

8    Q.  And why do you believe there was a miscommunication?

9    A.  Because we were asked to leave and not -- we were asked to

10   leave.

11   Q.  Okay.  All right.

12   A.  So.

13   Q.  Now I want to talk to you about -- in terms of training

14   that was to occur on January 6th -- I'm sorry, training that

15   was to occur on this training event, were there any concerns

16   raised about what was going on with the inauguration and what

17   would happen at the inauguration?

18   A.  As far as the training specifically, no.

19   Q.  Okay.  Was there a reason to conduct a training in relation

20   to what may happen before or during or after the inauguration?

21   A.  It would have been a small consideration.

22   Q.  Okay.  And what would that consideration have been?

23   A.  In such an event of a UN invasion by support of President

24   Biden or any other Red Dawn-esk scenario, that we would be in

25   support of defending the American people from oppression.

1    Q.  Okay.  Was that something that was discussed as part of a

2    "hey, this could happen" kind of scenario?

3    A.  Yes, it was.

4    Q.  Okay.  And you said it was small, but certainly a

5    possibility.  Was that something that concerned you in any way?

6    A.  Not at the time, no.

7    Q.  Okay.  The concept of being fighting fit by inauguration,

8    have you heard that phrase or heard that concept in a general

9    or specific way?

10   A.  Yes, I have.

11   Q.  Okay.  And can you talk to me a little bit about that.

12   A.  The -- the term to be fighting fit is a military term that

13   basically means that you're trained and ready for any sort of

14   situation that can arise.  As far as specifically in response

15   to the inauguration, I hadn't heard anything about that up

16   until, you know, recently being fighting fit for inauguration,

17   not specifically.  But I can only assume that that was just to

18   be ready in case of any sort of negative events coming up at

19   the inauguration that they were planning to attend.

20   Q.  Were there ever discussions about the Chinese invasion

21   across the Canadian border?

22   A.  There was discussions, yes.

23   Q.  Okay.  Was the OSRM formed to be an offensive unit?

24   A.  Absolutely not.

25   Q.  Was the training event that was going to be conducted

1    either in November or January designed to stop any presidential

2    inauguration, certification, things of that nature?

3    A.  No.

4    Q.  If that had been part of it, would you have wanted to

5    participate?

6    A.  No.

7        MR. CRISP:  Your Honor, I don't have any additional

8    questions at this time for the witness.

9        Thank you.  I tender the witness.

10       THE COURT:  Thank you, Mr. Crisp.

11       All right.  Ms. Hughes.

12                    CROSS-EXAMINATION

13   BY MS. HUGHES:

14   Q.  Good afternoon, sir.  My name is Alexandra Hughes.  I

15   represent the United States.

16       Mr. Dillon, you're a member of the OSRM, the Ohio State

17   Regular Militia?

18   A.  Yes.

19   Q.  And you joined in August or September of 2020?

20   A.  Around there, yes.

21   Q.  And you met with Jessica Watkins and other members of the

22   OSRM approximately three times; is that right?

23   A.  Yes.

24   Q.  And this is because you had family and work obligations so

25   you weren't tremendously able to be involved in the militia; is

1    that right?

2    A.  Correct.

3    Q.  And even your car was not operable so it was difficult for

4    you to even participate in operations; is that right?

5    A.  At times, yes.

6    Q.  And you're not an Oath Keeper; is that right, sir?

7    A.  That is correct.

8    Q.  You aren't on Oath Keepers Signal groups?

9    A.  I don't use Signal, and I never have.

10   Q.  You don't -- you never joined an Oath Keepers GoToMeeting?

11   A.  Nope.

12   Q.  You never had phone calls with Stewart Rhodes?

13   A.  I don't even know who that is.

14   Q.  Do you know who Kelly Meggs is?

15   A.  No.

16   Q.  Do you know who Kenneth Harrelson is?

17   A.  No.

18   Q.  Do you know who Thomas Caldwell is?

19   A.  I've heard the name.

20   Q.  Do you know him?

21   A.  No.

22   Q.  When you were a member of the OSRM, Watkins discussed

23   traveling to Louisville; right?

24   A.  Yes.

25   Q.  And she told you that they, in fact, went to Louisville,

1    and you yourself went to Louisville; correct?

2    A.  Yes.

3    Q.  And you said that you were asked to leave by the police.

4    Why were you asked to leave by the police?

5    A.  They felt that they had it handled and didn't need any

6    outside assistance.  So they asked us to evacuate the area and

7    let them handle it.  So that's what we did.

8    Q.  And they asked you to leave more than once; isn't that

9    correct?

10   A.  Yes, more than once.  But not from the same location.  We

11   left one location and went to another and then were asked to

12   leave again.

13   Q.  How many times were you asked to leave from Louisville?

14   A.  Twice, I believe.

15   Q.  And Ms. Watkins outlined that the OSRM mission might change

16   after the election; correct?

17   A.  I cannot confirm nor deny that, to be honest with you.

18   Q.  Sir, you mentioned that there was a potential for you to

19   rise up against a force that was in support of President Biden;

20   isn't that correct?

21   A.  I mean, it was talked about.  It wasn't anything.

22   Q.  And that force specifically was the UN?

23   A.  That was one of many things talked about:  the UN, the

24   Chinese, the Russians.  Basically the idea was anybody that

25   happened to invade that was against the American way of life.

1    Q.  And in support of President Biden?

2    A.  Not necessarily, but the thought at the time was that

3    President Biden might allow such an action, and the OSRM and

4    those like it didn't want to allow that to happen because they

5    felt like it was against the rights of the American citizens.

6    Q.  And so you would rise up against the UN and the Chinese and

7    the Russians?

8    A.  I would protect my own and the American people.

9    Q.  Sir, you never attended any operation in

10   Washington, D.C. -- correct? -- as part of the OSRM?

11   A.  That is correct.

12   Q.  But you knew about the November 14th, 2020, Million MAGA

13   March in Washington D.C.; right?

14   A.  Yes.

15   Q.  And Jessica Watkins invited you to this event?

16   A.  Yes.

17   Q.  But you could not attend?

18   A.  Correct.

19         MS. HUGHES:  If we could please bring up what's

20   already been introduced into evidence as Government's

21   Exhibit 6617.B.  If we could go to page 12, please.

22   BY MS. HUGHES:

23   Q.  Sir, on your screen, there's a message from Jessica

24   Watkins -- from Jessica Watkins to you, Militia Brendan.

25   The date of this message is November 9th, 2020, and it reads:

1    We march on D.C. on Saturday.  This is the real for real
2    shit.  No weapons allowed, be prepared to fight hand to hand.
3    Want to come?  It's now or never time.  Do you recall this
4    message?
5    A.  Yes, I do.
6    Q.  But you did not attend this rally -- correct? -- the
7    Million MAGA March?
8    A.  Correct.
9    Q.  And you also did not attend on January 6th?
10   A.  Correct.
11   Q.  You said that the event gave you a bad feeling; isn't that
12   right?
13   A.  Yes.
14   Q.  Why did it give you a bad feeling?
15   A.  I -- it's hard to explain.  I was raised to believe and
16   then subsequently trained to believe that if something smells
17   or seems too good to be true, it probably is.  So having a
18   large number of like-minded individuals standing outside the
19   Capitol Building to protest the possibility of President Biden
20   being accepted as President and subsequently inaugurated
21   smelled like a trap to me.
22   Q.  And, sir, you never actually joined the Oath Keepers after
23   January 6th, did you?
24   A.  Correct.
25          MS. HUGHES:  No further questions.  Thank you.

8956

```
1                        REDIRECT EXAMINATION

2    BY MR. CRISP:

3    Q.  Sir, the text that we just showed you, what did you

4    understand that to mean?  Excuse me.  The government just

5    showed you.  I apologize.

6    A.  In respect to the hand-to-hand combat comment?

7    Q.  Yes.  Correct.

8    A.  That told me that -- a number of things, actually.

9    Firstly, that we were going to be abiding by the laws of the

10   Capitol and not bring firearms into the Capitol.

11   Q.  Okay.  Let me stop you right there.  Were there discussions

12   about whether or not -- in precursor messages, were there

13   discussions about whether firearms were permissible in D.C.?

14   A.  In -- in -- I'm sorry?

15   Q.  In earlier texts preceding the text that we just saw, were

16   there discussions about whether firearms were permissible?

17   A.  Not in that particular instance, I don't believe, but

18   I could be mistaken.

19   Q.  Were there ever any discussions about whether there were

20   firearms permissible in D.C.?

21   A.  In D.C., no.  No.

22   Q.  I'm sorry.

23   A.  There was not any discussion of, no.

24   Q.  Okay.  So do you know whether or not weapons were allowed

25   in D.C.?
```

1    A.  The only indication of whether or not weapons were allowed

2    in D.C. was that comment on that text message.

3    Q.  Okay.  So, again, why did you assume what you did?  Please

4    give me your explanation.

5    A.  I -- I assumed that that's what it meant simply based on

6    prior knowledge and experience with Jess; that's kind of how we

7    talked.  We -- we knew enough about each other.

8            MS. HUGHES:  Objection.  He can't testify as to his

9    interpretation of her words.

10           MR. CRISP:  I believe it's what he's doing, Judge.

11   He's saying based on prior interactions this is what he would

12   infer.

13           THE COURT:  I don't think there's any hearsay that's

14   been part of the answer so far.  So you can continue, sir.

15   BY MR. CRISP:

16   Q.  Please continue, sir.

17   A.  So, like I was saying, the way that she and I talked to

18   each other, I just assumed based on my prior knowledge that

19   no -- when she said hand to hand -- you know, be prepared to

20   fight hand to hand, our standard rules -- I don't want to say

21   rules of engagement, but our standard rules for the militia

22   were no combat unless provoked.  And by "provoked," I mean

23   actually attacked.

24   Q.  Okay.

25   A.  It was strict no fire unless fired upon.  So if she's

1    telling me to be prepared to fight hand to hand, that's telling

2    me that if I need to defend myself or somebody else, I'm going

3    to have to do it weapon-free.

4    Q.  Okay.  And was -- what did you think was the mission of --

5    if you had gone, what would your mission have been in the

6    November time frame?

7    A.  Preventing unnecessary loss of life.

8    Q.  Okay.  Was there -- how much detail did you get into in

9    terms of what was going to happen or what the OSRM would do if

10   they were in D.C. in November?

11   A.  Almost no detail.  That message was replied to with a

12   two-word can't, work.  And that was -- the reply to that was

13   understood, and that was the end of it.

14   Q.  Okay.  So it wasn't -- you didn't have any detailed

15   discussions about what was going to happen?

16   A.  Correct.

17   Q.  Or about what the OSRM members were going to do?

18   A.  Correct.

19   Q.  Or anything beyond what was said in that initial text?

20   A.  Correct.

21   Q.  Okay.  Did you have concerns that that was designed to be

22   we're going to go attack people?

23   A.  No.

24   Q.  Why not?

25   A.  Because that's not what we did.

1    Q.  Okay.  And I want to talk real quickly about -- just to be

2    clear, the government brought up the Oath Keepers.  I think you

3    said you were not a member; right?

4    A.  Right.

5    Q.  Did you ever engage in recruiting for the Oath Keepers?

6    A.  No.

7    Q.  Okay.  You engaged in recruiting for whom?

8    A.  The OSRM.

9    Q.  Okay.

10            MR. CRISP:  Judge, thank you -- I'm sorry.  I have

11   one other quick question.  I apologize.

12   BY MR. CRISP:

13   Q.  When you were in Louisville, you were there as an OSRM

14   member; right?

15   A.  Yes.

16   Q.  Didn't interact with or didn't have any dealings with the

17   Oath Keepers?

18   A.  No.

19   Q.  Okay.

20            MR. CRISP:  That's all, Judge.  Thank you.

21          Thank you, sir.

22            THE COURT:  All right.  Mr. Dillon, thank you, sir,

23   for your time and testimony.  You may step down, and safe

24   travels home.

25            (Witness excused.)

1          THE COURT:  All right.  Mr. Caldwell, why don't you

2     come back up, sir.

3          And, Mr. Manzo, your cross-examination.

4                     CROSS-EXAMINATION

5     BY MR. MANZO:

6     Q.  Good afternoon, sir.

7     A.  Good afternoon, Mr. Manzo.

8     Q.  Just to go back in time to your earlier testimony, you

9     talked about somebody named Atkinson staying at your farm;

10    right?

11    A.  Not staying at my farm, no, sir.  I said that I met him at

12    the farm.  He was at the farm.

13    Q.  And you're aware that the FBI has zero record of him being

14    an FBI agent?

15    A.  I'm not aware of that, sir.

16    Q.  You talked a little bit on your direct examination about

17    what a recce is.  And you compared it to a trip to a doctor's

18    office; right?

19    A.  I think that's right, yeah.

20    Q.  Did you ever take pictures of the surrounding neighborhood

21    when you're going to the doctor's office?

22    A.  Not necessarily.

23    Q.  And I say this with all due respect.  Did you ever talk

24    about burning down buildings near where the doctor's office is

25    located?

1    A.  Not that I can recall.

2    Q.  You said that you took pictures of a strip club that

3    brought back memories; is that fair to say?

4    A.  Sure.  Yes, sir.

5            MR. MANZO:  And can we pull up Exhibit 5-11 for

6    Mr. Caldwell.

7            Mr. Caldwell or Defendant Caldwell's 5-11.

8    BY MR. MANZO:

9    Q.  And is this -- you talked briefly about an ornate bank.  Is

10   that what you're speaking about there?

11   A.  Yes, sir.  Uh-huh.

12   Q.  What about that bank did you think was remarkable?

13   A.  Well, it was built in 1888, by a guy named John Windrim, I

14   believe, out of Philadelphia.  If you take a good hard look at

15   it, you can see there's a lot of copper up underneath the eaves

16   and so on.  It was originally built as a -- as a bank building,

17   I do believe.

18   Q.  And you're aware that's the Department of Justice right

19   behind that bank?

20   A.  I was not aware.

21   Q.  And you were pretty angry at the Department of Justice for

22   not adequately investigating the election after November; fair

23   to say?

24   A.  No, sir.

25   Q.  You talked a lot on direct about Antifa; is that correct?

```
 1    A.  Yes, sir.

 2    Q.  And Antifa being bussed in?

 3    A.  There was some rumors about that, uh-huh.

 4    Q.  Did you ever figure out where Antifa was being bussed in

 5    from?

 6    A.  Never did.

 7    Q.  Never got to the bottom of that?

 8    A.  No, sir.  Probably just one of those things.

 9    Q.  And Antifa is basically anyone you disagree with; right?

10    A.  No, sir.  That's not right.

11    Q.  Well, you've got multiple messages about Antifa hunting or

12    'Tifa hunting; is that right?

13    A.  I think that that -- I have used that term, sure.

14    Q.  And did you ever go 'Tifa hunting in Berryville?

15    A.  No.

16    Q.  Why not?

17    A.  I'm not sure that there was Antifa threatening people in

18    Berryville, Virginia.

19    Q.  So you took it upon yourself to come hours into

20    Washington, D.C., to hunt human beings here?

21    A.  I've never hunted human beings, sir.

22    Q.  Well, you have multiple messages about hunting 'Tifa --

23    'Tifa hunting; correct?

24    A.  Which I never did.

25    Q.  So you just talk about it, but didn't do it?  So you
```

```
1    were --
2    A.  I did not do it.
3    Q.  You were not being truthful when you said that you were
4    going 'Tifa hunting?
5    A.  I said I did not go 'Tifa hunting.
6    Q.  But you considered it?
7    A.  Not really.
8    Q.  So you just talk about 'Tifa hunting, coming to D.C. to
9    hunt humans, but don't mean it?
10   A.  No.  You're probably putting your own spin on the word
11   "hunting."
12   Q.  Well, what does it mean to hunt a human being, sir?
13   A.  Well, the way that was being used was the way the Guardian
14   Angels used it.  This is a group that was unarmed that brought
15   an extra level of security to the populace of New York City at
16   a desperate time.  They called going out and showing the colors
17   and riding the subways hunting.
18   Q.  Very well, sir.
19       You talked a lot about BLM or Black Lives Matter on your
20   direct examination; correct?
21   A.  Not a lot, no.
22   Q.  All right.  But you believe that Black Lives Matter is a
23   violent organization?
24   A.  I did not say that, no, and I don't believe it.
25   Q.  And you testified in your examination -- in your direct
```

8964

```
 1    examination that you were an intelligence officer; right?

 2    A.  Yes, sir, I was.

 3    Q.  And that you believe in doing research before coming to a

 4    conclusion?

 5    A.  Yes, sir.  Uh-huh.

 6    Q.  And you testified that you did meticulous research in a

 7    number of areas; correct?

 8    A.  I think I said that I had done a lot of research on Antifa.

 9    Q.  Okay.  And you support attacking Black Lives Matter;

10    correct?

11    A.  No, sir.  I do not.

12            MR. MANZO:  I'd like to pull up 9340.

13    BY MR. MANZO:

14    Q.  Sir, you recognize the name Jonathan on here and the phone

15    number; correct?

16    A.  I sure do, yeah.

17    Q.  And that's a family member; fair to say?

18    A.  Uh-huh.  Sure.

19            MR. FISCHER:  Can we get on the phone?

20            (Bench conference on the record.)

21            THE COURT:  Mr. Fischer.

22            MR. FISCHER:  Your Honor, can you give me a second to

23    read this.  It just got made bigger.

24        You know, Your Honor, this is just ridiculous.  I mean,

25    Mr. Caldwell did not testify about anything with BLM in his --
```

 1    I don't remember him saying BLM in his direct examination.  I

 2    heard him say Antifa.  You've got the word punk ass and faggot

 3    in this; and this, first of all, is probative of nothing, and

 4    it's highly prejudicial.

 5              MR. MANZO:  Your Honor, the witness has testified and

 6    put at issue that he does meticulous research as an

 7    intelligence expert.  We need to display to the jury about this

 8    fact.  Here, he, frankly, just gets information about a family

 9    member beating somebody, and he presumed it's

10    Black Lives Matter and says that's good.  If we had our way, we

11    would never have once brought up Black Lives Matter in this

12    case, but it's central to the defense case, and that they are

13    the defenders against BLM aggression.  This evidence shows that

14    Mr. Caldwell supports an aggression and is not an innocent

15    savior of third parties.

16         This is the government's only message on the topic, and

17    we'd be moving on.  And we're happy to redact punk ass and

18    faggot.  We don't -- we're not particularly -- I don't think

19    those words are important.

20              THE COURT:  Okay.  Look, I think Mr. Caldwell's

21    opened himself up to this type of cross-examination about

22    whose -- views on -- on the use of force, and I think it's fair

23    game.  I'll ask the government to redact those two words, as

24    they've agreed to do, before showing it to Mr. Caldwell.

25              MR. CRISP:  This is Jonathan Crisp for Jessica

1    Watkins.

2         The government just referenced the fact that this is the

3    defense or defendants at large.  In terms of BLM and their

4    intent, whatever that may be, I disagree with that, and I would

5    like a limiting instruction as to whatever this line of inquiry

6    is that does not apply specifically to any of the -- certainly

7    my client -- and that this is for impeachment purposes only.

8         THE COURT:  I think that's -- that's certainly my

9    intention, and I'm not -- I'll permit the government to argue

10   otherwise -- or suggest otherwise.

11        MR. CRISP:  Thanks, Judge.

12        MR. FISCHER:  Your Honor, first of all, can we see

13   the date of this?  I can't even see the date.

14        Your Honor, this is in July of 2020.  This isn't even

15   within the conspiracy.  I mean, this is just character

16   assassination.  This has nothing -- I mean, are they ever going

17   to prove this -- try to prove their case with actual evidence,

18   or is it just going to be character assassination?  That's

19   exactly what this is.

20        THE COURT:  So I don't think it's character

21   assassination.  I mean, somebody takes the stand; as you know,

22   there's a risk they're going to be confronted with statements

23   they've made that are inconsistent with -- with the nature of

24   the testimony that they provided, which is, you know, that he

25   was not interested in engaging in any kind of violence or

1    forcible conduct, and, you know, here's a message in which he's

2    applauding it or -- or certainly not denouncing it.

3              MR. FISCHER:  Your Honor, I don't think he's ever

4    gone out and said -- I mean, when -- when has he ever gone out

5    and said I love BLM or I support BLM?  I don't remember any

6    testimony regarding -- I heard a lot about Antifa.  I haven't

7    heard anything about BLM, and -- I mean, this is not even --

8    this is months before the alleged conspiracy.  And what's the

9    probative value?

10             You have somebody -- somebody who says to him -- it

11   says, "We are at the Walk Away rally in Baltimore," and it

12   sounds like that person was confronted by somebody in BLM, and

13   he's basically saying good for you.  I mean, I don't understand

14   what the probative value of this is whatsoever on any --

15             THE COURT:  Let's be clear what it says.  Somebody

16   named Jonathan says to him, "We are at the Walk Away rally in

17   Baltimore.  I have already put hands on and backed down a

18   punkass blm faggot.  It may get quite spicy today.

19             "Speaking of beating someone's ass, i whooped someone's

20   ass in the middle of the street last night."

21             And then Jonathan continues -- I'm sorry.  Mr. Caldwell

22   continues.  Hang on.  Oh, I'm sorry.  I misspoke.

23             The very first message is from him to Jonathan saying

24   that he was the one who put hands on somebody and saying that

25   it might get spicy today.  And then Jonathan replies that he

8968

1   beat somebody's ass.

2        And then Mr. Caldwell responds, "Damn!  Good for you!  I

3   wish I had seen it.  I hope it was some blm piece of shit.

4   Anyway, I'm certain he deserved it.  Well done, Sir!"

5        MR. FISCHER:  Your Honor, I'd like to be clear.

6   First of all, that first message is not Mr. Caldwell's phone

7   number; it's somebody else.

8        THE COURT:  Well, that's a different issue, but I

9   understood this to be Mr. Caldwell's text messaging.  Is that

10  not accurate?  Whose is it?

11       MR. FISCHER:  Mr. Caldwell has a 540 number.  He's

12  from Virginia.

13       THE COURT:  That's Jonathan's number.  I don't even

14  see Caldwell's number on here, but I assumed it was because of

15  an extraction from Caldwell's phone.

16       MR. MANZO:  That's what I understand it to be.  So if

17  there is a blank -- how I understand is that if there's a blank

18  space in the from category, it's from Caldwell.

19       THE COURT:  That's how I was reading it.

20       MR. FISCHER:  Your Honor, I cannot believe that

21  Mr. Caldwell was at a Walk Away rally in Baltimore.  I've never

22  heard of that.

23       MR. MANZO:  And it says sent in the folder, which,

24  again, is indicative of it being sent.

25       THE COURT:  Anyway, I mean -- I guess the question's:

1    Is there any reason to question that this came from

2    Mr. Caldwell's phone?

3              MR. FISCHER:  Your Honor, first of all, I have never

4    seen it.  And, second of all, yes.  I mean, I'm just saying

5    I've never heard anything about him being at a Walk Away rally

6    in Baltimore.  It would seem unlikely for somebody from the

7    Shenandoah Valley.

8              MR. MANZO:  Your Honor, we can come back to this at a

9    break.

10             THE COURT:  Okay.  Let's do it at a break.

11             (Proceedings held in open court.)

12   BY MR. MANZO:

13   Q.  Okay.  Sir, you talked about never coordinating with anyone

14   about the QRF; correct?

15   A.  I think that's right.

16             MR. MANZO:  And can we pull up 6923, Slide 24.

17   BY MR. MANZO:

18   Q.  And, sir, this is Mr. Stamey sending to you a message.  It

19   says, "Same Comfort Inn."  Correct?

20   A.  Yes, sir, that appears to be that.  Yeah.

21   Q.  Next page, on 25, you talk about getting in a room;

22   correct?

23   A.  Sure.  Yeah.

24   Q.  And that's in a room so that you can have eyes on the car

25   with the guns; correct?

8970

1    A.  No.  It's to have eyes on your car so you don't get broken

2    into.

3    Q.  And your -- your testimony is that the QRF was not to have

4    guns?

5    A.  I didn't say that.  I don't know exactly what was going on

6    with the QRF because I'm not an Oath Keeper, nor was I a member

7    of North Carolina.

8         Can we have context?  Could we go back a couple more

9    slides?

10   Q.  Sir, your attorney will have plenty of time to bring up any

11   questions.

12   A.  Sure.  I'm just trying to -- trying to be helpful.

13   Q.  I know you are.

14        MR. MANZO:  Sir, can we go to -- or, ma'am, can we go

15   to Slide 20.

16   BY MR. MANZO:

17   Q.  So you said that you didn't coordinate with anyone about

18   the QRF; right?

19   A.  That's right.

20   Q.  But here you're messaging Ms. Watkins; correct?

21   A.  Yes.  I'm passing on some information.

22   Q.  So you write, "he is committed to being the [QRF] and

23   bringing the tools if something goes to hell."  Correct?

24   A.  That's what I was told by Mr. Stamey, yes.

25   Q.  Sir, here you're passing on information about the QRF to a

1    third party?

2    A.  Yes, it appears that I am.  Yes.

3    Q.  So that's -- you're coordinating, sir?

4    A.  I would not call that coordination.  Coordination to me

5    suggests a modicum of control over the things that happen.

6    Q.  All right.  Let's go to the election of 2020, and we'll

7    start with 6919.

8         So after the election, you were upset that Trump didn't

9    win; correct?

10   A.  I was -- I was upset, yes.

11   Q.  And your first reaction here on November 7th, just a couple

12   days after the election, is:  Next step, I guess if the

13   Democrats throw out this constitution is Civil War.  Fair to

14   say those are your words?

15   A.  Those are my words, yes.  Good thing they didn't throw out

16   the Constitution.

17   Q.  Excuse me?

18   A.  It's a good thing they didn't throw out the Constitution.

19   People might have gotten angry.

20   Q.  What do you mean by that?

21   A.  Just what I said.

22   Q.  So did the Democrats throw out the Constitution?

23   A.  No, I said it's a good thing.  Other people would have

24   gotten upset.

25   Q.  So civil war -- and you're upset about this.  Civil war is

```
1    a killing of Americans; correct?

2    A.  Civil war is a horrible thing.

3    Q.  Right.  But you're proposing.

4    A.  Not at all.

5    Q.  Well, you're saying civil war is going to come.

6    A.  I think Mr. Greene addressed this when he said something

7    about --

8    Q.  Sir, I'm not asking about Mr. Greene.  He's already

9    testified.  I'm saying you -- about you saying that civil war

10   is going to come.

11   A.  That's not what it says.

12   Q.  All right.  Let's go forward here.  Soon after this, you

13   met some, quote, unquote, very special -- very interesting

14   special operators; right?

15   A.  Can we see?

16   Q.  I'm asking the question, sir.

17   A.  I'd like -- I'd like to see it.

18   Q.  You have no memory of saying I "Met some VERY interesting

19   special operators"?

20   A.  No.  Maybe you could show me.

21   Q.  Okay.  We'll put it up.

22           MR. MANZO:  Can we go to 6923, Slide 4.

23   A.  Ah.

24   BY MR. MANZO:

25   Q.  Let me know when you've had time and you've finished
```

1    reading.

2              MR. MANZO:  Can we put it on the screen.  It's

3    already in evidence.

4    A.  Yes, sir, Mr. Manzo.  I've read that now, yes, and I

5    believe I did write that.

6    BY MR. MANZO:

7    Q.  Okay.  And this is -- you met the Oath Keepers who are

8    these special operators; is that correct?

9    A.  Yes, sir.

10   Q.  And at this time you start beginning to prep for the

11   Million MAGA March; fair to say?

12   A.  Prep, what do you mean "prep"?

13   Q.  Well, you started to consider going to the Million MAGA

14   March?

15   A.  Oh, I personally had already decided to go to the Million

16   MAGA March.

17   Q.  And it's at this time that your calls for civil war get a

18   little bit more concrete; is that fair to say?

19   A.  I don't know that that's fair to say.

20             MR. MANZO:  All right.  Let's go to 6919, Slide 3.

21   BY MR. MANZO:

22   Q.  So -- and this is already in evidence as well.

23             So this is November 14th, and you're saying:  Thanks for

24   coming by today.  It meant a lot.  I sure wish you were coming

25   along tomorrow.  If we cannot get the President another term we

8974

1    are well and truly fucked.  If we don't start mowing down

2    masses of these shit balls they will come for us.  It's kill or

3    be killed I'm afraid.  I don't want to live in a communist

4    country.  I kind of hope there is some shit tomorrow in some

5    way just so we can get on with it!

6         Those are your words; correct?

7    A.  I did write that, yes.

8    Q.  And so here on November 14th, very shortly after the

9    election, you say:  "It's kill or be killed."  Correct?

10   A.  I was wrong, though.

11   Q.  Those are your words?

12   A.  Yes.  But I was wrong.  Good.

13        MR. MANZO:  All right.  Let's go to 6919, Slide 4.

14   BY MR. MANZO:

15   Q.  So now we're a couple days here after the Million MAGA

16   March; correct?

17   A.  11/16, yes, sir.  Uh-huh.

18   Q.  And can you read this message to the jury, please.

19   A.  Yes.

20        It says:  I was in and out of the middle of that throng

21   and actually found Sharon at 3rd Street and marched with her.

22   Then I took snap of us and the video I shared with you

23   before...at least a million.  We could have burned the Congress

24   to the ground if we had wanted to.

25   Q.  Sir, here you are at the Million MAGA March and you're

8975

1    focused on Congress; correct?

2    A.  Not focused, no, sir.

3    Q.  Well, what building did you consider burning to the ground?

4    A.  Didn't consider burning any building to the ground.

5    Q.  What building did you talk about burning to the ground?

6    A.  I was responding to another comment.

7          Can we have context?

8    Q.  Your -- your attorney can get back up and do any context

9    you want.

10    A.  I can't -- I can't make a comment on it because I don't

11    have context.

12    Q.  So when you talk about burning Congress to the ground, do

13    you always need context for that?

14    A.  I'd like to know what I was commenting on.

15    Q.  Sir, after the Million MAGA March, you wrote this message;

16    correct?

17    A.  It would appear, yes, sir.  Uh-huh.

18    Q.  What did you mean by this message when you said:  Burning

19    Congress to the ground?

20    A.  I don't know.  I really can't recall.

21    Q.  Well, it's fair to say that at this time you were very

22    angry at Congress because they weren't helping President Trump

23    get another term; correct?

24    A.  I don't think that's correct, no.

25    Q.  So this was just a message about burning Congress to the

1    ground that you have no further idea about?

2    A.  I really can't recall.

3    Q.  Okay.  You were with Donovan Crowl and Jessica Watkins at

4    the Million MAGA March; correct?

5    A.  No, that's not true.

6    Q.  All right.  Well, you saw them there?

7    A.  No.  They rode to Washington, D.C., with me in my car that

8    day.

9    Q.  Okay.  And afterward you regrouped with them about what

10   happened?

11   A.  Regrouped with them?

12   Q.  Had a conversation.

13   A.  Oh, sure.  When we drove back to my farm, yes.  Uh-huh.

14           MR. MANZO:  Okay.  Let's pull up 9316.

15   BY MR. MANZO:

16   Q.  And, sir, do you remember this message here that Donovan

17   Crowl sent to you?

18   A.  I do, indeed.

19           MR. MANZO:  And, Your Honor, at this time I would

20   seek to admit 9316.  There's one other message on the following

21   page.

22           MR. FISCHER:  Can you blow this up, please.

23           Can I see the next page, please.

24           No objection.

25           THE COURT:  9316 will be admitted.

8977

```
 1                     (Government Exhibit 9316 admitted into evidence.)
 2                MR. MANZO:  Can you zoom out for a second, Ms. Rohde.
 3      BY MR. MANZO:
 4      Q.  Here it's 11/15, and Donovan Crowl sends you this message;
 5      correct?
 6      A.  Yes, sir.  Uh-huh.
 7                MR. MANZO:  And, Ms. Rohde, can you zoom in on this
 8      picture on the message.
 9      BY MR. MANZO:
10      Q.  And here what Donovan Crowl is saying, among other things,
11      is, "War is on the Horizon."  Is that correct?
12      A.  Those were his words, it appears.
13                MR. MANZO:  Okay.  And now can we go to the next
14      page, Ms. Rohde, and zoom in on next time.  All the way down.
15      BY MR. MANZO:
16      Q.  And then you respond, "Next time (and there WILL be a next
17      time) we will have learned and . . . will be stronger.  I think
18      there will be real violence for all of us next time."  And you
19      say a number of other statements; is that correct?
20      A.  Yes, sir.  Uh-huh.
21                MR. MANZO:  You can take that down, Ms. Rohde.
22      BY MR. MANZO:
23      Q.  After the Million MAGA, you've learned two things, and
24      that's, one, you're focused on Congress, potentially burning it
25      down; correct?
```

1    A.  That's not true, no.

2    Q.  And the second thing is that you need to be stronger?

3    A.  That's not what I got out of that, no.

4    Q.  Okay.  But those are the two messages that you wrote close

5    in time to the Million MAGA March?

6    A.  That was a response to Mr. Crowl.

7    Q.  But was it close in time to the Million MAGA March,

8    directly after?

9    A.  It seems very close to the Million MAGA March, yes, but I'm

10   not -- I'm not fixated on Congress.

11   Q.  And you have about 70 firearms in your possession; correct?

12   A.  No.  I have zero firearms in my possession.

13   Q.  At the time of -- before January 6th, you had about

14   70 firearms?

15   A.  Just about.  I would think, yeah.  Uh-huh.

16   Q.  And at that time you were trying to obtain silencers for

17   those firearms; is that correct?

18   A.  No, that is not correct.

19         MR. MANZO:  Okay.  Can we pull up 9310 and go to

20   page 3.

21   BY MR. MANZO:

22   Q.  Sir, do you know somebody named Kirby?

23   A.  Yes, I do.  Uh-huh.

24   Q.  And is this a fair and accurate text message from your

25   phone here?

1    A.  Can't see it.  Can we blow it up just a little bit?

2    Q.  Yep.

3    A.  I see that, yes.

4          MR. MANZO:  Okay.  We would seek to admit the third

5    page here of 9310.

6          MR. FISCHER:  Hold on one second, Your Honor.  I

7    would object.

8          (Bench conference on the record.)

9          MR. FISCHER:  Your Honor, this is a message

10    apparently from Mr. Caldwell to a guy named Kirby.  It said,

11    "Would you be interested in a suppressor for any of your

12    weapons.  Friend is talking about ordering suppressor 'kits'

13    but I just texted him to see what that entails and all the

14    particulars.  Something to think about....."

15        This is not Mr. Caldwell trying to obtain a silencer

16    or -- and, by the way, a suppresser is not a silencer, I would

17    point out.  This is a matter of fact.

18          MR. MANZO:  The text message speaks for itself.  I'm

19    happy to just put it up there and see what he says.

20          MR. FISCHER:  He's saying there's a third party.

21    This is not Mr. Caldwell seeking to go get a silencer.

22          MR. MANZO:  He's seeking to get a suppressor, and I

23    can be more specific and say:  Were you seeking to obtain a

24    suppressor?

25          THE COURT:  What do we think a suppresser is?

1            MR. MANZO:  Excuse me?

2            THE COURT:  What do we think a suppresser is?

3            MR. MANZO:  A suppresser is a silencer.

4            THE COURT:  Okay.

5            MR. WOODWARD:  What is the date of the message?

6        This is Mr. Woodward.  I'm sorry to not --

7            MR. MANZO:  December 30th.

8            MR. WOODWARD:  Thank you.

9            MR. FISCHER:  Your Honor, the way I read this is

10   Mr. Caldwell is saying to Kirby DeHaven, "Would you be

11   interested in a suppressor for any of your weapons."  A friend

12   of his ". . . is talking about ordering suppressor 'kits' but I

13   just texted him to see what that entails . . ."  He's basically

14   saying to Mr. -- to this guy Kirby, do you want one?  He's not

15   saying I'm getting one.

16            MR. MANZO:  That's fine.

17            THE COURT:  Perhaps that's the explanation, but it's

18   a statement he made at the time, and I think it's -- it's --

19   it's certainly something that's proper cross-examination, and

20   he'll answer the way he does, and you have the opportunity to

21   redirect.

22            MR. FISCHER:  Well, can I ask, Your Honor, what does

23   a suppressor, which muffles a little bit of sound in a firearm,

24   have to do with January 6th?

25            THE COURT:  Well, he's not only charged with the

1    events of January 6th, but he's also charged with a greater

2    seditious conspiracy, and we've talked about -- I guess the

3    government's theory in part is the purchasing of weapons and

4    weapons parts not only by your client but Mr. Rhodes.  And so

5    it's -- it's in line at least with that government theory.

6            MR. FISCHER:  Your Honor, I -- I still don't see what

7    the relevance is with him telling somebody else that there's a

8    third party who is talking about ordering legal items;

9    suppressors are legal.

10           THE COURT:  Understood.  Understood.

11        There's -- look, it's fair cross-examination.  He'll

12   explain it, and you'll have an opportunity to redirect and

13   clear it up, if there's any issues left after cross.

14           (Proceedings held in open court.)

15           MR. MANZO:  We seek to admit this evidence -- this

16   exhibit.

17           THE COURT:  All right.  9310 will be admitted.

18           (Government Exhibit 9310 (third page) admitted into

19   evidence.)

20   BY MR. MANZO:

21   Q.  And, sir, just to zoom out for a second, you recognize this

22   as a message that you sent to Kirby?

23   A.  It appears to be, yes, sir.  Uh-huh.

24   Q.  And around about December 30th, 2020?

25   A.  Uh-huh.  Sure.

1    Q.  And in the message you're talking about potentially

2    obtaining suppressor kits; correct?

3    A.  Right.

4    Q.  Thank you.

5    A.  Suppressor is not a silencer.

6    Q.  It's a type of silencer?

7    A.  No, it's not.  Shall I explain to you?

8    Q.  Sure.  Your attorney will have plenty of time to clear it

9    up.  Okay?

10   A.  Sure.

11   Q.  So here on December 30th, you're talking about obtaining a

12   suppressor kit; fair to say?

13   A.  Uh-huh.

14   Q.  Is that a yes?

15   A.  Yes.  Uh-huh.  But not for myself.

16   Q.  All right.  So --

17   A.  I'm asking if he would be interested.

18   Q.  Helping others.  All right.

19   A.  That's important.

20           MR. MANZO:  Can we go to the next step of planning

21   here on 6923, Slide 7.

22   BY MR. MANZO:

23   Q.  And this is your statement here, and you say, "Ranger made

24   me think, though he didn't say it in [as] many words, that

25   maybe I should be planning a MUCH bigger op, for like when

1    we [actually] have to roll into town to . . . save the

2    Republic."  Is that correct?

3    A.  Yes, sir.  Uh-huh.

4    Q.  And to save the republic would be to keep Trump in power;

5    is that fair to say?

6    A.  No, sir.  Uh-uh.

7    Q.  Well, what are you talking about when you're saying "save

8    the Republic"?

9    A.  Here we're talking about the fact that Antifa would be

10   having a much larger operation in the December operation than

11   they had at the Million MAGA, and that was -- that was part of

12   a conversation that I had with Ranger Doug.  I'm sharing that

13   with Mr. Stamey.

14   Q.  But fair to say you don't mention Antifa anywhere in this

15   message?

16   A.  I don't mention President Trump either, sir.

17   Q.  And Antifa was not attacking the republic, were they?

18   A.  I would consider unbridled crime in our inner city an

19   attack on the republic.

20   Q.  So you were going to come in as a police force?

21   A.  I didn't say that, no.

22   Q.  But you're talking about saving the republic.  The

23   republic, in your mind, is in jeopardy because you believe that

24   the election is fraudulent?

25   A.  That's not true.  I just got finished telling you this is

1    about a bigger operation by Antifa.

2    Q.  But, again, nothing about Antifa?

3    A.  Nothing about Trump.

4         MR. MANZO:  Let's go now to 6923, Slide 8.

5    BY MR. MANZO:

6    Q.  You said you have never been an Oath Keeper -- right? --

7    but you're talking here about how you allied yourself with the

8    Oath Keepers; fair to say?

9    A.  Oh, I thought those guys from North Carolina were great

10   guys.

11   Q.  And one of your takeaways from the Million MAGA March was

12   that you needed to be stronger?

13   A.  I don't believe I said that.

14   Q.  Well, you -- do you remember just reading that message a

15   few minutes ago to Donovan Crowl where he said we need to be

16   stronger next time?

17   A.  I -- I think I do remember that.  I don't think I meant

18   like stronger like lifting weights or stronger like more armed

19   or anything like that.

20   Q.  So fair to say that you went out and tried to get involved

21   with more people to get stronger?

22   A.  No, that's not fair to say.

23        MR. MANZO:  Let's go to 6923, Slide 60.

24   BY MR. MANZO:

25   Q.  So one of the ways that you wanted to get stronger was to

1    get a boat; correct?

2    A.  No, sir.  Uh-uh.

3    Q.  Well, you spent a lot of time sending messages to people to

4    try to obtain a boat; isn't that fair to say?

5    A.  After Mr. Stamey asked me to reach out to see if I could

6    find a boat.

7    Q.  And you're aware that Shawn Pugh is a member of the Three

8    Percenters?

9    A.  He's not, no.  You're absolutely incorrect.

10   Q.  And the Three Percenters were very present on January --

11   A.  You're absolutely incorrect, sir.  He is not a member of

12   the Three Percenters.

13   Q.  And you said that, again, you were going to come in and

14   save the republic.  And saving the republic is making sure that

15   the fraudulent election, in your mind, doesn't happen; fair to

16   say?

17   A.  No.  That's not fair to say.

18   Q.  And you said that -- on the next page here that --

19   you're talking about heavy weapons, and on -- on direct

20   examination you said that that was just your creative writing;

21   fair to say?

22   A.  Yes.  As a matter of fact, that's right out of one of my

23   screenplays.

24   Q.  And was Shawn Pugh one of your writing mates?

25   A.  No.

1    Q.  Did you work in creative writing classes together?

2    A.  No, sir.  Uh-uh.

3    Q.  So you were just trying to show off for him heavy weapons,

4    but you didn't -- no intention of meaning it?

5    A.  Was not showing off, no.

6    Q.  You also talked to Mr. Truong about getting a boat; is that

7    correct?

8    A.  That's true.  Yes, sir.

9    Q.  You talked to Matt Combs about getting a boat?

10   A.  I did, yes.

11   Q.  And you unsent messages regarding getting a boat?

12   A.  I don't think that's true.

13   Q.  We'll get to that at the end here.

14   A.  Okay.

15           MR. MANZO:  Well, let's go to 57.

16   BY MR. MANZO:

17   Q.  So this is a message to Matt Combs; correct?

18   A.  Yes, it appears to be.  Yes.  Uh-huh.

19   Q.  And this is a message that you unsent on 11/14/21 [sic];

20   correct?

21   A.  It appears to be, yes, sir.  Uh-huh.

22           MR. MANZO:  And then can we go to the next page.

23   BY MR. MANZO:

24   Q.  And his response was, "Damn I wish I did . . . I'd be your

25   captain for sure!  And off the top of my head I can't think of

1    anyone with a boat.  Smoot has a bass boat."  I wouldn't -- "It

2    wouldn't go on the Potomac though."

3    A.  You dropped off the lol part, though.  He did laugh out

4    loud.

5    Q.  Okay.  But, sir --

6    A.  That is what that means; right?  It's laugh out loud.

7    Q.  You deleted -- you unsent a message regarding the boat;

8    correct?

9    A.  I did not remember that, and I don't know what else was a

10   part of that message.

11   Q.  And you never saved that unsent message in a folder;

12   correct?

13   A.  I don't think so.  No, sir.

14   Q.  And you deleted -- or you unsent that message because it

15   could get you in trouble; fair to say?

16   A.  That's not fair to say.

17   Q.  So you just went out and unsent 180 random messages for

18   fun?

19   A.  No.  Because I was getting off of Facebook.

20   Q.  But you only -- you picked out random messages.  You just

21   didn't delete everything.  You picked out very specific

22   messages that seemed to, in context, be quite inculpatory?

23   A.  Perhaps to you.

24   Q.  Well, why did you delete the previous message where you're

25   talking about a boat?

1    A.  I don't recall.  Maybe there was something off-color there.

2    Q.  There's plenty of messages in your Facebook returns that

3    are very off-color; is that fair to say?

4    A.  That's very true, yes.  Uh-huh.

5    Q.  You didn't delete any of those off-color remarks?

6    A.  Well, we don't know how many, sir.

7    Q.  But you did delete the message about the boat?

8    A.  That particular one, sure, and we know what it is.  Uh-huh.

9    Q.  We know where that message is?

10   A.  No.  I said, we can see this message so we know what we

11   were talking about.

12   Q.  So you do admit that the previous message was about a boat?

13   A.  I'm sure that that was part of it.  Sure.

14   Q.  And that's the message you unsent?

15   A.  Uh-huh.

16          MR. MANZO:  All right.  Let's go to 6923, Slide 77.

17   BY MR. MANZO:

18   Q.  And so here -- this is Doug Smith; right?  And that's

19   somebody that you said you greatly respect; correct?

20   A.  Yes.  Ranger Doug Smith, uh-huh.

21   Q.  And he's asking you, "How far is it form the

22   Capitol Building to the motel on the Virginia side??"  And you

23   respond to that; correct?

24   A.  Uh-huh.  Yes.

25          MR. MANZO:  Can you go to the next slide, Ms. Rohde.

1    BY MR. MANZO:

2    Q.  And you said, "4 miles or so"?

3    A.  Right.

4    Q.  Sir, at the Million MAGA March, you testified -- or you

5    didn't testify.  But you sent a message that you could have

6    burned Congress down; correct?

7    A.  No, I didn't -- I didn't say that I could burn Congress

8    down.

9    Q.  Well, you said -- you said -- you talked about burning

10   Congress down?

11   A.  That's not the way I remember it.

12   Q.  Okay.  Let's go back to that message briefly, then.

13          MR. FISCHER:  Your Honor, objection.

14          THE COURT:  It's overruled.  I mean, you can show him

15   the message and put it in context.

16          MR. MANZO:  Court's indulgence, briefly.

17          Can we go to 6919, Slide 4.

18   BY MR. MANZO:

19   Q.  You wrote:  We could have burned Congress to the ground if

20   we had wanted to.

21   A.  Oh, if we wanted to, yes, sir; but we didn't want to.

22   Q.  But you considered it?

23   A.  Not at all.

24   Q.  All right.  Let's go back to where we left off here.  So in

25   preparation for January 6th, you're coordinating with Ranger

1    Doug; right?  And he's asking you how far the hotel is from the

2    Capitol; correct?

3    A.  No, I was not coordinating with Ranger Doug.  He asked me a

4    question, and I answered him.

5    Q.  And you were talking to somebody about bringing heavy

6    weapons in a boat across the Potomac; correct?

7    A.  I already answered that question.

8    Q.  Could you answer it again, please, sir.

9    A.  Yes.  I said I was just -- *Poetic Justice* there, took

10   something out of my screenplay and threw it out there.

11   Q.  And you know January 6th was an important date; correct?

12   A.  Yes.  Uh-huh.  I think that was going to be the

13   certification of the election.

14            MR. MANZO:  And let's pull up 6923, Slide 31 here.

15   BY MR. MANZO:

16   Q.  And Adrian Grimes wrote to you on Facebook here.  "Trump

17   will win on the 6th if not im personally gonna start the civil

18   war myself so fucking tired of these libtards."  He wrote that;

19   correct?

20   A.  Yes, he did.

21   Q.  And then what was your response here on the next page?

22   A.  I -- I agreed with him.

23   Q.  What did you say?

24   A.  "I am starting it the night of the 6th if necessary."

25   Q.  So you knew that the certification of the Electoral College

1  vote was a very important day if Trump was going to remain in

2  power; correct?

3  A.  I knew it was an important day for our country.

4  Q.  And if Trump wasn't going to remain in power, you were

5  going to take to violence?

6  A.  Not at all, no.

7  Q.  Well, he said -- Adrian Grimes said that he was going to

8  start the civil war, and you said you're starting it

9  specifically on the 6th?

10 A.  Right.  Adrian Grimes is a --

11 Q.  Sir, I'm not asking you that question.  Adrian Grimes said

12 civil war, and you said the 6th?

13 A.  Didn't mean it at all, and I didn't -- I didn't start it on

14 the 6th.

15            MR. MANZO:  Okay.  Let's go to 6923, Slide 35.

16 BY MR. MANZO:

17 Q.  And this is a message from Dennis Godbold; correct?

18 A.  It appears to be, yes.  Uh-huh.

19 Q.  And he says, "I certainly hope so. he always plays

20 mr politically correct nice guy. hope he has a big set of balls

21 when we need them. and we need him now more than ever."

22            MR. MANZO:  And then can we go to the next slide.

23 BY MR. MANZO:

24 Q.  And Thomas Caldwell says, "If he hopes to live till Friday

25 he better stand tall ..."  Is that correct?

```
 1    A.  Uh-huh.  Uh-huh.  Sure.

 2    Q.  And you're talking about Vice President Pence here?

 3    A.  Yes, in a joking way; and everybody on this group

 4    understood it as a joke.

 5    Q.  No one else in this group stormed the Capitol; correct?

 6    A.  Nor did I.

 7    Q.  Well, you assaulted the Capitol, in your own words?

 8    A.  Nor did I.

 9    Q.  Those are your own words; correct, sir?

10    A.  That was -- it's a great exaggeration, just like the

11    charges against me.

12    Q.  Very well.

13              MR. MANZO:  Can we go to 9315.  And pull up the

14    bottom two messages on the screen here.  And can you pull up

15    the whole entire thing, Ms. Rohde.

16    BY MR. MANZO:

17    Q.  Do you know who Matt Combs is?

18    A.  I do, yes.  Uh-huh.

19    Q.  Are these fair and accurate text messages from your phone

20    here?

21    A.  Hold on.  Let me read them and we'll see.

22    Q.  First one is sent by you.  The second one is received by

23    you.

24    A.  Uh-huh.  Uh-huh.  Just guys talking.

25              MR. MANZO:  And can we go to the next page here, just
```

1    for the benefit of Mr. Fischer.

2    BY MR. MANZO:

3    Q.  And is this another message that you sent here on

4    December 11th?

5            MR. MANZO:  And can you zoom in on that a bit,

6    Ms. Rohde.

7    A.  Yes, sir.  And I think that was reflective of my beliefs at

8    the time.

9            MR. MANZO:  Okay.  We would seek to admit these three

10   messages.

11           MR. FISCHER:  No objection.

12           THE COURT:  All right.  9315 will be admitted.

13           (Government Exhibit 9315 admitted into evidence.)

14           MR. MANZO:  All right.  Ms. Rohde, can we zoom in on

15   the bottom two messages on 9315.

16   BY MR. MANZO:

17   Q.  So, sir, this is a message that -- that you sent to

18   Matt Combs on December 10th; is that correct?

19   A.  The top one?

20   Q.  Yes.

21   A.  Yes, uh-huh.  Yes, sir.

22   Q.  And you wrote, "Hope the President is going to release the

23   Kraken and start rounding up and executing some traitors!"

24   Correct?

25   A.  Yes, I did say that.

1    Q.  Executing a traitor is a very drastic measure; correct?

2    A.  I would say so.  Sure.

3    Q.  And that's what you're hoping on December 10th; that people

4    start getting rounded up and executed?

5    A.  No.  And I think that Matt Combs understood I didn't mean

6    it either.

7    Q.  Okay.  And then Matt Combs responded, and he said, "It's

8    going to be an epic show when he gets done showing the true

9    traitors in this country.  I'm strapped and ready.  Give me

10   some targets."  Correct?

11   A.  He did say that too, and I didn't take him seriously

12   either.

13             MR. MANZO:  All right.  And let's go to the next

14   page.  And can you zoom in, Ms. Rohde, on the portion here

15   down --

16   BY MR. MANZO:

17   Q.  So you wrote, "He DID fire the corrupt Secretary of Defense

18   Esper and replace[d] him with his own guy AND

19   [restore] . . . all . . . branches so Special Forces so they

20   ALL report" one -- "only to ONE guy who then reports directly

21   to the Prez so........ I think maybe he is positioning our

22   forces to make a big move.  I can'T BELIEVE he is going to walk

23   away and leave us undefended.  We are fucked if he does.  I am

24   praying he is going to crack them open and we will have to step

25   into the streets and support him.  If on the other hand we

8995

1    [have] to take ON the military it would be real tough.  I hope

2    we end up grinning from ear to ear as the" democrats' --

3    "democraps' heads explode."

4            You wrote that; right, sir?

5    A.  Uh-huh.  Sure.  Uh-huh.

6    Q.  And here you're considering using force against the

7    United States military?

8    A.  No, not really.  And I'm certainly glad that nothing

9    happened.  I was wrong again.

10   Q.  Sir, something did happen.  January 6th happened.  Do you

11   acknowledge that?

12   A.  January 6th did happen, yes, it did, and I had nothing to

13   do with it.

14   Q.  All right.  Let's go now to -- on January 6th here.  Like

15   you said in this message, you actually did end up stepping into

16   the streets; is that fair to say?

17   A.  I don't think I understand the question.

18   Q.  Well, you said that you'd either have to take on the

19   military or step into the streets.

20   A.  Step into the streets, like protest, sure.

21   Q.  And so on January 6th, you met up with a bunch of

22   Oath Keepers; correct?

23   A.  January 6th, no.  That's not correct.

24   Q.  You did not meet up with Oath Keepers on January 6th?

25   A.  I did not meet up with a bunch of Oath Keepers on the 6th.

1    Q.  Did you meet up with Kelly Meggs?

2    A.  No.

3    Q.  So the morning of the 6th, you weren't near any

4    Oath Keepers at all?

5    A.  No.  I think we explained that before; that Ms. Watkins was

6    trying to get myself and my wife into the Ellipse to hear the

7    President.  I didn't know who Kelly Meggs was.  Never talked to

8    the guy.

9    Q.  So that video of you from your own phone with 12 or 15

10   Oath Keepers around you, that's a fake news video?

11   A.  No.  And it's not a video of me.  You just said a video of

12   me.  No, it was video as I panned around, and I never spoke to

13   any of those people, nor did I know who they were, except for

14   Donovan Crowl, who never spoke to me.

15   Q.  So the 15 people around you in military gear, who then --

16   you -- you wore their T-shirt.  You didn't speak to any of

17   them?

18   A.  That's right.  I spoke to Ms. Watkins, and my wife spoke to

19   Ms. Watkins.

20   Q.  Did somebody silently give you a T-shirt?

21   A.  I think Ms. Watkins gave us the T-shirts and -- when she

22   said she was going to get passes to bring us into the Ellipse

23   to see the President.

24   Q.  So then you decided to start marching toward the Capitol;

25   is that correct?

1   A.  No, not then did I decide to start marching to the Capitol.

2   Q.  Eventually, you started marching to the Capitol?

3   A.  We listened to the President.  We did not go inside the

4   Ellipse.  And, eventually, we did begin to move to the Capitol,

5   yes, sir.

6   Q.  Okay.  And along the way, near the African American museum,

7   you threatened Mike Pence?

8   A.  No, sir.  Not really.

9          MR. MANZO:  All right.  Can we pull up Exhibit 1500

10   at 18 seconds.

11   BY MR. MANZO:

12   Q.  And Mike Pence is the person that you said if he hopes to

13   live by Friday, he better do the right thing; correct?

14   A.  Mike Pence was the Vice President at that time.

15   Q.  But that was your statement; that if he hopes to live until

16   Friday he better do the right thing?

17   A.  I did say that, sure.

18          MR. MANZO:  Eighteen seconds, please.

19          (An audio-visual recording was played.)

20   BY MR. MANZO:

21   Q.  So, sir, that's not a threat to Mike Pence to say you know

22   where he lives?

23   A.  No.  That's a goofy little video that was only meant for my

24   wife and I.

25   Q.  You're shouting it in the middle of the street in

8998

1  Washington, D.C.

2  A.  I don't think anybody is paying any attention to me,

3  Mr. Manzo.

4  Q.  All right.  So let's keep going forward here.  So you get

5  to the Peace Circle; correct?

6  A.  I think it's called the Peace fountain.  But yes, sir.

7  Uh-huh.

8  Q.  And there you start seeing smoke bombs?

9  A.  No, sir.  That's not true.

10  Q.  Tear gas?

11  A.  No.  Uh-uh.

12  Q.  You see rubber bullets flying?

13  A.  No.  Nope.

14  Q.  But you just sit there and observe what to you is a normal,

15  peaceful day in Washington, D.C.?

16  A.  I wouldn't say that, no, but I didn't see any of those

17  things that you just talked about personally.

18  Q.  And then you're sitting there, and you don't hear any large

19  sounds; correct?

20  A.  Actually, I didn't.

21  Q.  No celebratory cannon fires, other people may have

22  described it as?

23  A.  No.  No.

24  Q.  So you're sitting there.  And you hear news that Congress

25  has certified the vote?

8999

1    A.  We heard that Congress had -- had left the building, and I

2    presumed that the certification was done.

3    Q.  So you thought it had all been a peaceful, normal process

4    as it is every four years?

5    A.  Well, it -- I didn't know exactly how it was every

6    four years, but there certainly were a lot of people there at

7    the Capitol.

8    Q.  But so you, through all your statements, are a tremendous

9    supporter of President Trump; correct?

10   A.  I was at the time, sure.

11   Q.  And you said that Mike Pence has to do the right thing or

12   he's going to -- he's going to get killed; correct?

13   A.  Well, I already explained that to you.  No, he wasn't going

14   to get killed.

15   Q.  So you hear the certification happens, as it always does?

16   A.  Uh-huh.

17   Q.  It seems like you're awfully happy as you advance on the

18   Capitol.

19   A.  I'm not sure how to answer that statement.  That's not a

20   question.

21   Q.  If you believe that the certification had happened as it

22   ordinarily does --

23   A.  Uh-huh.

24   Q.  -- why were you so happy going to the Capitol if

25   President Trump wasn't going to get another four years?

9000

```
 1    A.  I'm still not following you.  So I got to the Peace
 2    fountain with my wife.  When we were walking there, we didn't
 3    necessarily know whether President Trump was going to get
 4    another four years.
 5    Q.  Sir, you said -- sir, if Congress had done their job, had
 6    certified the election, and then you marched -- then you went
 7    up toward the Capitol; correct?
 8    A.  I said I presumed that they had certified, yes.
 9    Q.  But if they had certified, that would have been a terrible
10    blow for your cause; correct?
11    A.  I don't know what you mean by "my cause."
12    Q.  Sir, that would have been disappointing to you because
13    President Trump would have officially lost?
14    A.  Oh, sure.  Well, there's always somebody disappointed --
15    disappointed in a presidential election, yes.
16    Q.  Then why were you so happy as you advanced to the Capitol
17    and climbed onto the inauguration stage?
18    A.  Because I was with my beautiful wife in a city I was born
19    in, and I was going to go up and stand where Presidents have
20    been inaugurated.  It was a great day for me as a historian and
21    Washingtonian.
22            MR. MANZO:  This might be a good time for an
23    afternoon break, or I can keep going.
24            THE COURT:  Keep going.  We'll go another 15 minutes.
25    Go ahead.
```

9001

1              MR. MANZO:  Okay.

2   BY MR. MANZO:

3   Q.  So you hear that the President's been certified, and to

4   your mind, President Biden would now be coming into power, and

5   you advanced on the Capitol; correct?

6   A.  By "advance on the Capitol," you mean try to walk up to

7   the -- to the inauguration balcony?

8              MR. MANZO:  And can we pull up Caldwell picture

9   45-71.

10  BY MR. MANZO:

11  Q.  You said on your direct that it seemed like people were,

12  like, kids in a playground on monkey bars; correct?

13  A.  Yes, sir.  There's some a lot taller -- a lot farther up

14  than that too.

15  Q.  None of that gave you any indication that you were

16  participating in a riot?

17  A.  No.  Huh-uh.

18  Q.  All right.  So then you get to the top onto the

19  inauguration stage, and you -- you took a picture with your

20  wife; correct?

21              MR. MANZO:  And can we pull up 22.P.8.

22  BY MR. MANZO:

23  Q.  And that's -- that's Ms. Caldwell; right?

24  A.  That is Mrs. Caldwell.

25  Q.  And then here's the lower west terrace tunnel; correct?

1   A.   That's what you say.  I didn't know that at the time.

2   Q.   And that's where people were physically pulling shields

3   from riot officers and pulling them into the crowd; correct?

4   A.   I'm not sure what time that may have happened, but I think

5   I have heard about that on the news, and I've seen that in --

6   in the videos played for the jury.

7   Q.   Let's go to the parapet video -- or the video at 1500,

8   13:24.  I'm just going to ask you a couple questions about

9   this; okay?

10  A.   Uh-huh.

11       (An audio-visual recording was played.)

12  BY MR. MANZO:

13  Q.   So when -- when Ms. Caldwell is saying Congress is gone

14  because they're pussies -- right? -- you heard that?

15  A.   I did hear that.  Sure.

16  Q.   Why didn't you tell her that Congress had just finished

17  their work as normal and they weren't pussies; they had just

18  done the legislative process?  Why didn't you tell her she was

19  wrong?

20  A.   A husband to tell his wife she's wrong, he has to pick his

21  moments.

22  Q.   So for some reason, Ms. Caldwell was under the

23  misimpression that violence had driven Congress out; correct?

24  A.   I didn't get that there at all.  In fact, she never said

25  that to me at all, sir.

1    Q.  So when they -- excuse my language again, but when she's

2    saying they're pussies, that means they couldn't stand up for

3    themselves; correct?

4    A.  No, I didn't get that at all.  And you don't have to

5    apologize for your language.  I think what she was saying was

6    there was a great opportunity for us to start the healing

7    process in our country.  If they had said:  It's done, let's

8    get with it, everything has happened, and at least heard the

9    people, I think they might have been hailed as heroes on both

10   sides.

11   Q.  So at this point you knew the truth.  In your mind -- in

12   your mind, the truth was that Congress had done the legislative

13   process, they had been allowed to complete it, but Ms. Caldwell

14   who's with you the whole afternoon, right by your side, she has

15   a totally different misunderstanding of what's going on, and

16   she thinks that Congress has been driven out because they're

17   pussies?

18   A.  No, that's not true.  She never said that.  I think she

19   felt that maybe they should've just come out and addressed the

20   people, and said, hey, stand down.  We did what we're supposed

21   to do.  There was no evidence.  We did what we were supposed to

22   do.  Get a life.

23   Q.  And it's, again, your testimony here that you didn't go

24   through tear gas?

25   A.  No.  I think what she was doing was the same kind of thing

1    I was doing.  Remember, these are private moments that no one

2    would be offended by if the FBI hadn't raided our home.  These

3    were private moments that probably would have gone into the

4    archives of the family videos and pictures.  Hey, Congress is a

5    bunch of pussies.  Well, you know, and she might feel some of

6    them really are, but not because of what they did or did not do

7    that day.

8    Q.  But, sir, she's just *sua sponte* making it up out of thin

9    air, the tear gas, the smoke bombs and rubber bullets?

10    A.  No.  We heard that from many people who we were shoulder to

11    shoulder with as we were going up the steps.  They said many

12    things, many things; like police were shooting children with

13    rubber bullets.  All those things turned out to not be true,

14    thank God.

15    Q.  Sir, let me just get your -- this straight.  You're walking

16    up the stairs, and people are turning to you and saying there's

17    tear gas, and you're -- and you just keep on going?

18    A.  No.  Many times -- what happened was is people would say,

19    look, look, I'm getting this from my friend at home.  Take a

20    look at that.  And even when we were at the fountain and we

21    heard about such things, I would turn and look.  And I wasn't

22    seeing it.  I'm thinking, where is this happening, or is it

23    more media drivel?  It did cross my mind that it might just be

24    drivel.

25             MR. MANZO:  Okay.  Let's now go to 22.T.27.2883.  And

```
 1    can we go to the next page.

 2    BY MR. MANZO:

 3    Q.  So this is your message on the evening of January 6th;

 4    correct?

 5    A.  Yes.  Uh-huh.

 6    Q.  And you wrote, "Then we heard that Pence fucked us.  [We]

 7    had over a million [people] there.  Then the lying media said

 8    Trump supporters were breaking through barriers . . . i said if

 9    we're going to be blamed, might as well do it so I grabbed my

10    American flag and said let's take the damn capitol . . ."

11    Correct?

12    A.  I did say that to Jonathan and his fraternity brothers,

13    yes.  Uh-huh.

14    Q.  And that's what happened?

15    A.  I'm sorry?

16    Q.  You broke through the barriers and stormed the Capitol?

17    A.  No, not hardly.  I'd love to see the film of that.  That

18    would make a great movie.

19    Q.  Sir, we just watched the film of you storming the

20    inauguration stage.  That's the Capitol.

21    A.  No, I didn't storm anything, Mr. Manzo.

22            MR. MANZO:  All right.  Can we go to 6734.1.

23    BY MR. MANZO:

24    Q.  Sir, you wrote here that you assaulted the Capitol; isn't

25    that correct?
```

1    A.  I did write that to Diann, uh-huh.  Yes.

2    Q.  And that's -- that's your statement, and that's correct;

3    fair to say?

4    A.  I -- I did say that.  I didn't -- I didn't actually do

5    that.  And Dian understood too.  She laughed about it.

6    Q.  When you found out about the violence on January 6th, did

7    you abhor it?  Did you say that was a bad day?

8    A.  Absolutely.  And it was many days later that I found out

9    about it.  It's --

10   Q.  Okay.  So --

11   A.  I was still thinking that it was -- it might have been some

12   hooey because we were there and we didn't see it.

13   Q.  So let's go to 6734.11.  And so this is you on January 6th,

14   and you said, "Proud boys scuffled with cops and drove them

15   inside to hide. Breached the doors. One guy made it all the way

16   to the house floor, another to Pelosi's office.  A good time."

17   Correct?

18   A.  I remember this very well.  Yes.  I was at the hotel with

19   my wife laying on the bed watching the local news, and they

20   reported the Proud Boys scuffled with cops and drove them

21   inside the Capitol and breached the doors.

22   Q.  Sir, you just testified 30 seconds ago that you didn't find

23   out about the violence for days later.

24   A.  I -- what I said to you was I thought it was media hooey.

25   Q.  But here you're saying -- here you're saying it; you're

1    reporting to Donovan Crowl.

2    A.  I'm reporting what the news reported to me, and we still

3    thought it was hooey.

4    Q.  Then why did you think it was a good time?

5    A.  Oh, because that's what the Proud Boys say when they get

6    into street fights.  They say, this is a good time.  You should

7    know that.

8    Q.  Okay.

9         MR. MANZO:  Can we go to 60- -- can we go to

10   22.T.283.

11        All right.  So we'll go back to 22.T.27.2883 and go to

12   page 4.

13   BY MR. MANZO:

14   Q.  So here you are on January 6th again, and you're messaging

15   Jonathan?

16   A.  Uh-huh.  Sure.  Uh-huh.

17   Q.  And then you said, "Then we started stealing the cops riot

18   shields . . . throwing fire extinguishers through windows.  It

19   was a great time.  I will send you some sequence pictures."  Is

20   that correct?

21   A.  I did say that, sure.  Uh-huh.

22   Q.  Sir, you just testified that you didn't know about violence

23   for days later, and here you're saying we're stealing the cops'

24   riot shields.

25   A.  No.  What I was saying was what had been reported.  I

1   didn't steal any shields.  I didn't see it done, but people

2   were reporting them, and so I reported to him, hey, this is

3   what we're hearing.

4   Q.  Sir, you took a picture of your wife right in front of the

5   lower west terrace tunnel where the shields were being stolen.

6   A.  I'm not sure what time they were actually being stolen.  We

7   need to take a look at whatever film you have about that.

8   Q.  And so this is you just making something up, stealing the

9   cops' riot shields?

10  A.  I was saying what had been reported.

11  Q.  But why did you think it was a great time?

12  A.  I would think that people that were doing something

13  obnoxious like that would think it was a great time.

14  Q.  All right.  So you get back to the Comfort Inn that

15  evening; correct?

16  A.  Uh-huh.  Yes, sir.  We did go back there that evening.

17  Q.  And you walked down -- normally down the hallway.  You're

18  smiling; correct?

19  A.  Oh, yeah.  I had a lot of medication in me.

20  Q.  It was a fun day for you; right?

21  A.  I was finally starting to feel the effects of the

22  medication.  So the pain was going away.  This is good.

23  Q.  But you said it was a good time that day?

24  A.  No.  I was talking about that report earlier.

25  Q.  All right.  And so let me pull up now -- according to your

1   testimony that you said you had no idea that there was any

2   violence at the Capitol -- right? -- but just that night you

3   said that you stole shields; fair to say?

4   A.  I was saying that I didn't see any.  My wife and I didn't

5   see any, nor did we capture any in any of our photos.  I'm

6   saying this was what was reported by people around us, and

7   sometimes in the media, but I thought it was hooey because we

8   were right there and we didn't see it.

9          MR. MANZO:  All right.  Let's pull up 9313 now.

10  BY MR. MANZO:

11  Q.  Sir, do you know somebody by the name of Rob Picco?

12  A.  Yes.  We met Rob -- my wife and I met Rob Picco on the

13  grounds of the Washington Monument that very day.

14  Q.  Is this a fair and accurate text message from your phone

15  here?

16  A.  Could you blow it up just a little bit, Mr. Manzo?  Sorry.

17  I don't have my glasses with me.

18          Yes, sir.  Uh-huh.

19  Q.  And this is --

20          MR. MANZO:  Your Honor, we would seek to move in

21  9313.

22          MR. FISCHER:  No objection.

23          THE COURT:  9313 will be admitted.

24          (Government Exhibit 9313 admitted into evidence.)

25          MR. MANZO:  And can you zoom out for a second,

1    Ms. Rohde.

2    BY MR. MANZO:

3    Q.  So Rob was a person that you met at the Capitol; correct?

4    A.  No.  I met him -- my wife and I met him on the grounds of

5    the Washington Monument.

6    Q.  And you said that -- in the second message down here, "I

7    have to say it was exhilarating being up . . . on the parapet

8    with so many real Americans."  Is that correct?

9    A.  I did say that, yes.  Uh-huh.

10   Q.  And then you said, "So it begins."

11   A.  Uh-huh.

12   Q.  Correct?

13   A.  Yeah.  Uh-huh.

14   Q.  So January 6th was just a moment in time, but you weren't

15   done yet; correct?

16   A.  That's not what that means at all.  It's a new beginning

17   for our country.

18          MR. MANZO:  All right.  Let's go to 9312.

19   BY MR. MANZO:

20   Q.  And here is a message from Rob Picco to Thomas Caldwell.

21          MR. MANZO:  Can you go to the next message,

22   Ms. Rohde.

23   BY MR. MANZO:

24   Q.  And then you respond, "Like the black gentleman in the

25   video says."  Do you remember these two messages?

```
 1    A.  I do -- I do remember these.  I don't understand quite what
 2    we were talking about then and what the video was.
 3    Q.  Okay.
 4              MR. MANZO:  And, Your Honor, we would seek to move in
 5    9312.
 6              MR. FISCHER:  Can we get on the phone for a second?
 7              THE COURT:  Why don't we take a break.
 8         We'll resume at 3:45.  See you-all very soon.  Thank you
 9    very much.
10              (Proceedings held outside the presence of the jury.)
11              THE COURT:  All right.  You can step down,
12    Mr. Caldwell.  You can step down, Mr. Caldwell.  You don't need
13    to remain seated.
14              THE WITNESS:  Thank you, Your Honor.
15              MR. MANZO:  We do have the video clips to accompany
16    this YouTube video.
17              THE COURT:  Okay.  What's the objection?
18              MR. FISCHER:  I haven't seen the YouTube video.
19              MR. MANZO:  We can play -- Ms. Rohde, can we play
20    93- --
21              THE COURT:  Hang on for a second.  Is the objection
22    that you haven't seen the video yet?
23              MR. FISCHER:  I haven't seen the video.  I don't know
24    where this is going.
25              THE COURT:  Okay.  So why don't you show Mr. Fischer
```

9012

1    the video so he has some context for what this is all about,

2    and I'll come back a little bit before 3:45 and see where we

3    are.

4              When we're done here today at 5:00, I've got a quick

5    swearing in I need to do, but immediately after that, I want to

6    go through our jury instructions and finalize all that.  So be

7    prepared to stay a little bit later than 5:00 this evening.

8              Thank you, everyone.

9              MR. MANZO:  Your Honor, the Black Lives Matters,

10   we've addressed that and researched it, and it is

11   Mr. Caldwell's phone.

12             THE COURT:  Okay.  Talk to Mr. Fischer about it, and

13   we'll get it resolved.

14             Thanks.

15             (Recess taken.)

16             THE COURT:  Okay.  Were we able to resolve the issue

17   with respect to those two?

18             MR. MANZO:  The government went back and looked at

19   the -- regarding the BLM text messages.  We went back to the

20   original Cellebrite.  It says as it -- the exhibit that we

21   previously made.  So we don't think there's any inaccurate

22   bits -- parts of that exhibit.

23             MR. FISCHER:  Your Honor, I have not -- I, obviously,

24   can't talk to Mr. Caldwell, but -- so I can't say yes or no.

25   It's highly unlikely, but they say it's in the Cellebrite.

```
 1      I -- I have no opinion on that right now.  I would say -- I

 2      would renew the objection because I fail to see -- I fail to

 3      see the relevance of -- I haven't heard Mr. Caldwell say

 4      anything about BLM.  I haven't -- I haven't -- I heard Antifa.

 5      That's all I've heard, Antifa.

 6               THE COURT:  Get on the phone real quick.

 7               (Bench conference on the record.)

 8               THE COURT:  So I took a quick look -- I had the

 9      transcript sent this morning.  There's one reference to BLM,

10      Mr. Fischer.  You had asked why he went to BLM Plaza, and the

11      response was, well, what was the effect if there was a reason

12      to be concerned about BLM, or something to that effect, that he

13      would have notified Stewart Rhodes.  That was the extent of the

14      reference to BLM during the direct testimony.

15               So I think the bigger question is whether he can be

16      cross-examined about it based upon some of what he's testified

17      to now, which is, you know, he wasn't advocating violence,

18      wasn't advocating violence in connection with the election.  I

19      mean, I guess the one issue with this is it's failure to mode

20      and time, and I think that -- now that I think about it, that

21      may be a bigger issue.  And now that I think about it, it's

22      that -- to the extent he has a -- to the extent it's proper to

23      cross-examine his motive and his bias, is in connection with

24      the election and statements of violence in connection with the

25      election.
```

1          This is back in June of 2020, prior to the election

2     occurring, and sort of disconnected from all the other

3     statements he's made in connection with the case.

4          MR. MANZO:  Your Honor, the whole defense in this

5     case has been to point to Louisville, point to Antifa, point to

6     BLM.

7          THE COURT:  But he wasn't involved in Louisville.  So

8     his role in this starts after the election when he first meets

9     Stewart Rhodes.  Before then, Mr. Caldwell has no appearance in

10     this case.

11          MR. MANZO:  But it's to impeach him, and the idea

12     that was brought on on direct that he looks to save people, to

13     help people and to protect them.  This is in a message where

14     somebody is very plainly being aggressive, and he supports

15     that.

16          THE COURT:  I don't know that he ever said anything

17     about saving people and trying to protect them.  I don't think

18     that was his direct examination at all.

19          MR. MANZO:  I believe it was, at least at a minimum,

20     to protect against people -- Antifa attacking people.

21          THE COURT:  Right.  In connection with the election.

22     And yet it was specific to Antifa.  So I do think -- I think

23     given this is not a comment he's made in response to

24     election-related violence.  If this was something he had said

25     about BLM during the election-related violence, then I might

```
 1          have a different view of this.

 2                  But given that it's in June during the summer when these

 3          riots are happening, the fact that he's making comments about

 4          BLM in connection with the summer riots that are disconnected

 5          from the election seems to me to be a little bit more remote in

 6          terms of its probative value.

 7                  MR. MANZO:  Your Honor, you allowed in years' worth

 8          of Antifa research that he did, stretching -- and so this is to

 9          rebut the idea that he's a careful, considerate, thoughtful

10          intelligence officer; that was all brought up extremely long on

11          direct, other than his health issues.

12                  THE COURT:  It's really not.  I mean, this is not

13          being brought in to suggest he's not careful somehow.  I mean,

14          if that's the purpose of the cross-examination, this

15          particular, you know, back and forth in June doesn't go to

16          that.  You want to bring it in to show that he's somebody who

17          promotes violence and doesn't -- doesn't condone violence when

18          it's presented to him.  All right?  I mean, that's the real

19          reason you want to bring it in.

20                  MR. MANZO:  That's fine, Your Honor.

21                  THE COURT:  Okay.  So I'll sustain the objection on

22          that exhibit, but as to the other one, Mr. Fischer, the one we

23          left off on --

24                  MR. FISCHER:  Your Honor, I think if this is the

25          Lindsey Graham video, we're not going to object to it.
```

```
 1              THE COURT:  Okay.  All right.  Is that what this is?
 2              MR. MANZO:  It is the Lindsey Graham issue, and I've
 3      spoken with Mr. Fischer.  And we went through the remainder of
 4      the, kind of, new cross-examine events, I believe, in the
 5      break.
 6              THE COURT:  Okay.  All right.  Great.
 7              (Proceedings held in open court.)
 8              MR. FISCHER:  Your Honor, one other issue too.  We
 9      have, most likely -- we have just one more witness.  He's a
10      character witness, going to be 15 minutes.  I don't know if
11      there's any way -- after -- I think Mr. Manzo is going to end
12      here in a half hour or 40 minutes or so.  If we can take him
13      out of order to make sure we get him in.
14              THE COURT:  Let's see where we are.
15              MR. FISCHER:  Thank you.
16              (Proceedings held in the presence of the jury.)
17              THE COURT:  Okay.  Welcome back, everyone.  Please be
18      seated.
19          Mr. Manzo, you may continue with your cross-examination.
20              MR. MANZO:  Thank you, Your Honor.
21      BY MR. MANZO:
22      Q.  Before we stopped for the break, you remember that you
23      testified about a new beginning?
24      A.  Yeah, I think I might have used that terminology.  Sure.
25      Q.  That January 6th you were happy because it could be a new
```

9017

```
 1    beginning in the country?
 2    A.  Uh-huh.  Absolutely.
 3              MR. MANZO:  All right.  So let's pull up 9312.
 4         We're moving to admit 9312 at this point.
 5              THE COURT:  This is what we talked about before --
 6    okay.  9312 is admitted.  Thank you.
 7              (Government Exhibit 9312 admitted into evidence.)
 8    BY MR. MANZO:
 9    Q.  Sir, you recognize the name Rob Picco?
10    A.  I do recognize the name, yes.  Uh-huh.
11    Q.  Sir, he sent you a YouTube link here; correct?
12    A.  It looks like that, yes, sir.
13    Q.  And then go to the next page.  And what did you say in
14    response?
15    A.  I said, "Like the black gentleman in the video says we
16    could have ended him right then.  I am convinced that is the
17    answer.  Traitors' punishment is clearly delineated and we all
18    know what it is."
19    Q.  So this seems inconsistent with a new beginning; is that
20    fair to say?
21    A.  I'm not sure what the video is, but I'm sure we'll take a
22    look at it.
23    Q.  So we'll pull up the video.
24              MR. MANZO:  Can we go to 9312.1.
25              (An audio-visual recording was played.)
```

```
1              MR. MANZO:  Okay.  Can we go now to the second part
2    of the clip, 9312.2.
3              (An audio-visual recording was played.)
4    BY MR. MANZO:
5    Q.  So, sir, that -- you recognize that as senator --
6    Republican Senator Lindsey Graham; correct?
7    A.  Absolutely.
8    Q.  That's at DCA airport?
9    A.  Okay.  I'll take your word for it.
10   Q.  And that's the Black gentleman that you talk about in your
11   message; correct?
12   A.  Yeah.  He said if we were violent people, we could have
13   ended him right then.
14   Q.  You said here, "Traitors' punishment is clearly delineated
15   and we all know what it is."  Correct?
16   A.  I did say that, uh-huh.
17   Q.  And a traitor's punishment is death?
18   A.  Well, not necessarily.
19   Q.  Well, what is it?
20   A.  Well, to be brought before the bar, as they say.  Do you
21   know the context of what -- what that was?  Because I will tell
22   you that had nothing to do with the certification of the
23   election.  That had to do with the fact that Lindsey Graham had
24   turned down three Black judges for confirmation.  That's what
25   he was upset about.
```

1   Q.  So everyone -- there's a giant crowd at DCA yelling

2   traitor.  And you don't think that's about the election?

3   A.  No, it's not, because there are other -- there are other

4   videos there by that same guy.

5   Q.  And the date on this is 1/8?

6   A.  Uh-huh.

7   Q.  And so you're saying this is about some judges that

8   Lindsey Graham turned down, not that Lindsey Graham just

9   certified the election?

10  A.  Yeah.  That gentleman -- yeah.  Well, he didn't certify.  I

11  mean, everybody voted on the stuff.  I've seen that guy's --

12  that guy's page.  So there's -- there's a lot more video out

13  there from that gentleman.  I can't remember his name, the guy

14  that was just talking into the camera.

15  Q.  But that, specifically, is a video we just watched where

16  Lindsey Graham is being harassed and told he's a traitor?

17  A.  But I don't think he was being harassed about the

18  certification vote, which is what this is kind of all about.

19  Q.  Do you normally see large groups of people saying traitor

20  at somebody for not confirming a judge?

21  A.  Well, I guess it all depends.  I wouldn't call that a large

22  group, but if that's what you think is a large group, yes, sir;

23  that's okay for you.

24  Q.  Okay.  Let's move on to Ranger Doug.

25  A.  Ranger Doug, uh-huh.

```
 1    Q.  You testified on direct that it's a person you have

 2    tremendous respect for; correct?

 3    A.  Yes.  Uh-huh.

 4            MR. MANZO:  And can we go to 9317.

 5    BY MR. MANZO:

 6    Q.  So this is a message exchange between you and Ranger Doug

 7    on Signal.  Do you recognize this?

 8    A.  That is a message from Doug Smith, uh-huh.

 9    Q.  And then on the next page, you respond.

10            MR. MANZO:  Can you go to the next page, Ms. Rohde.

11    BY MR. MANZO:

12    Q.  And is that your response here, "Thanks, my brother"?

13    A.  Uh-huh, yep.

14            MR. MANZO:  Your Honor, we would move to seek 9317

15    into evidence.

16            MR. FISCHER:  No objection.

17            THE COURT:  9317 will be admitted.

18            (Government Exhibit 9317 admitted into evidence.)

19    BY MR. MANZO:

20    Q.  Can we go to the first page here, and I'll read it and then

21    you can read your response.  And this is on January 9th;

22    correct?

23    A.  Yes, sir.  Uh-huh.

24    Q.  So this is when it's a time for a new beginning, as you

25    said?
```

```
 1    A.  Uh-huh.
 2    Q.  So Ranger Doug writes, "I believe we are in good shape, I
 3    believe the president new exactly what was taking place at the
 4    capital, I hope they do have foreign troops coming [in], that
 5    means instant all out war with the democrats,, that will
 6    certainly give us time to clean out the local democrats who
 7    have been a problem all these years, I know my days on earth
 8    are short, my only worry is what will happen to my wife, I'm
 9    depending on her church friends to secure her, the events of
10    the next 21 days will tell the tail, you take care, should you
11    have to evacuate, head down to Columbus County NC, you will
12    find friends [t]here!!"  Correct?
13    A.  That's what he said.
14    Q.  So he's saying here --
15              MR. MANZO:  Can you go back for a second, Ms. Rohde.
16    BY MR. MANZO:
17    Q.  -- that this is going to give him an opportunity to go kill
18    the local Democrats?
19    A.  Yeah, he's nuts.
20    Q.  Sir, moments ago you testified that you had tremendous
21    respect for this person.
22    A.  Absolutely, for his military service to our country.  Darn
23    right.
24    Q.  Okay.  And let's go to your response.  Can you read your
25    response here.
```

1    A.  Uh-huh.

2         It said, "Thanks, my brother" -- for sending me his

3    thoughts.  "Sharon and I are talking about coming to visit next

4    training weekend if we still have a country.  We may have to

5    get the women folk out of the country entirely some time this

6    year.  Something to think about...."

7    Q.  And what do you continue to say?

8    A.  "So, ARE there any patriots in the military or are we all

9    alone?  If the active duty forces are turned against us your

10   location [isn't going to] be any safer than mine."

11   Q.  You don't say you're nuts in any of these messages.

12   A.  Kind of is, because he's talking about, gee, we're going

13   to be safe down here.  In fact, he goes on to talk about

14   Teg Teagan, who I'm not entirely sure who he is, but I think

15   he had something to do with a Benghazi operation in support of

16   our embassy there.  So he's down there with these Ranger guys,

17   so.

18   Q.  Let me get this straight.  So you said after January 6th,

19   it would be a new beginning; correct?

20   A.  Uh-huh.

21   Q.  And then Ranger Doug --

22   A.  That was -- that was my opinion.  That was my opinion.

23   Q.  And Ranger Doug on January 9 is saying we have an

24   opportunity to kill the local Democrats; correct?

25   A.  What a goof.

1   Q.  And then you don't respond what a goof.  You say you're

2   going to come to the next training?

3   A.  Uh-huh.  Training weekend.  Probably after he's sobered up

4   he'll have a different view.

5   Q.  All right.  Let's move on to a new topic here.

6   A.  Okay.

7          MR. MANZO:  Can we pull up 9079.11.  I believe this

8   is already in evidence.

9   BY MR. MANZO:

10  Q.  And this is a conversation between Jessica Watkins and

11  yourself; correct?

12  A.  I guess so.  I don't remember that.

13  Q.  And so Jess Watkins says, "Goddamnit.  Why is my face

14  associated with dead cops?  I was nice to them.  Yes I remember

15  the email."

16         MR. MANZO:  And then can we go to the next slide.

17  BY MR. MANZO:

18  Q.  Commander Tom says -- and that's yourself.  That's how --

19  A.  Right.

20  Q.  -- you were saved in Ms. Watkins's phone.

21      "I think you should download and photoshop out the

22  headline.  Or I will.  Its a nice pic otherwise.  Look, they

23  will try to vilify us all.  Those lying bastards.  But their

24  day will come."

25         MR. MANZO:  And then we can go to the next slide.

1    BY MR. MANZO:

2    Q.  And then you give a password to an email account; correct?

3    A.  Right.  Uh-huh.

4        MR. MANZO:  And then we can go to the next slide.

5    BY MR. MANZO:

6    Q.  Jess Watkins says, "I know, I'm just terrified that I'll be

7    wanted after a title like that."  Correct?

8    A.  Yes.  Uh-huh.

9        MR. MANZO:  Can we go to the next slide.

10   BY MR. MANZO:

11   Q.  And then you say, "Fear not.  One asshole [that had] it on

12   a blog, I copied it.  Can't even find the blog today but it was

13   just a thumbnail crested by the prick most likely."

14       MR. CRISP:  I apologize.  We lost the video.  So the

15   screen went down.  So I was asking if we can stop for a moment.

16   BY MR. MANZO:

17   Q.  So you said the words here.

18       MR. MANZO:  And then can we go to the next slide.

19   A.  Uh-huh.

20   BY MR. MANZO:

21   Q.  You said, "Wish I had written his name down.  Anyway

22   probably very few others saw it [as] . . . nowhere on the

23   news2share site from which it is taken.  If any [other] shit

24   should ever come down, you were with me all the time and I'll

25   swear to it."  Do you remember saying that?

1    A.  I sure do, yeah.

2    Q.  So that's you providing a potential alibi to Ms. Watkins;

3    correct?

4    A.  No.  That's a line from a B movie from the 1940s.  You tell

5    a lie and I'll swear to it.

6    Q.  All right.  So you're not --

7    A.  Edmond O'Brien.

8    Q.  So you're providing an alibi here?

9    A.  No, not at all.  As a matter of fact, I'm the first one, I

10   guess, to find that Ford Fischer video that we've all seen a

11   hundred times.  And that's what she's talking about.  I took a

12   screenshot of that and sent it to her, and she said, oh, you

13   know.

14   Q.  Sir, you deleted your -- all your Facebook messages --

15   conversations with Donovan Crowl; correct?

16   A.  I'm not sure that I did that, but I'm certainly glad that

17   the government was able to restore them because it's -- it's

18   certainly filled in a lot of gaps.

19   Q.  Sir, the government has been unable to restore those.  Do

20   you understand that?

21   A.  I do not understand that.

22   Q.  Sir, the messages that you had with Donovan Crowl are not

23   available to any grand jury or jury.  Do you understand that?

24   A.  I do not know that to be the case.

25   Q.  Sir, you admit that you deleted all the messages of your

1    conversation with Donovan Crowl in its entirety?

2    A.  I do not admit that, no.

3    Q.  All right.  Let's talk about the 180 messages that you

4    unsent.  Do you remember doing that?

5    A.  I did take quite a few things down from Facebook, getting

6    ready to get off Facebook, yeah.

7    Q.  But you didn't just take down everything.  You went and

8    unclicked 180 random -- not random, but particular messages; is

9    that fair to say?

10   A.  Would it have been better if I deleted everything?

11   Q.  Sir, it's not for me to -- but, sir, you went through and

12   unsent 180 messages on Facebook pertaining to January 6th;

13   correct?

14   A.  No.  Not pertaining to January 6th, no.

15   Q.  All right.  Let's look up 2001.T.1 and go to page 180.  And

16   before we get there, do you remember the messages that we went

17   over before about an improvised explosive device?

18   A.  No, I don't.  Actually, I don't.

19   Q.  All right.  So these are messages that you sent here on

20   page 180, and that you then unsent on January 15th.  Do you see

21   those?

22   A.  I do see that.  I don't see anything about an improvised

23   explosive device.

24   Q.  The improvised explosive device is in a different set of

25   messages.

```
 1    A.  Oh, okay.

 2              MR. MANZO:  Ms. Rohde, if you could zoom in on that

 3    section.

 4    BY MR. MANZO:

 5    Q.  And so on December 10th you sent -- you unsent message --

 6    excuse me.  On January 15th you unsent a message that you had

 7    sent on January 10th; correct?

 8    A.  It -- it would appear, yes.  Uh-huh.

 9    Q.  And you then unsent the next message?

10    A.  Uh-huh.

11    Q.  And then --

12    A.  Was it a message or photo?

13    Q.  It's a message.  It's not a photo, sir.

14    A.  Oh, okay.

15    Q.  The photos on your computer have nothing to do with the

16    messages that were unsent here.  You understand that?

17    A.  I didn't understand what you just said.

18    Q.  The photos that you keep talking about on your computer,

19    those are not unsent messages.

20    A.  Oh, I'm not saying they are.  I just don't know if this is

21    a message, or was it an attachment that was actually a photo?

22    Q.  It's a message.

23    A.  Oh, okay.

24    Q.  And then Matt Combs responds, "100% agree brother.  Stack

25    em 6x3.  Shit hits the fan Smoot and I are with you.  As long
```

1    as my wife and son are taken care of I'm good."  Do you

2    remember that?

3    A.  I really don't have any recollection of this.

4    Q.  What does "stack em 6x3" mean?

5    A.  That's something that -- that I believe Adrian Grimes used

6    to say a lot.  Has to do with some kind of lot combat thing in

7    the desert.

8    Q.  Can you explain more?

9    A.  I don't know any more.

10   Q.  All right.

11          MR. MANZO:  Can we go to 9310 and go to the first

12   message.

13          And, Your Honor --

14   BY MR. MANZO:

15   Q.  Well, first of all, sir, do you recognize this as a text

16   message to Jerry Bosserman?

17   A.  Uh-huh.

18   Q.  Jerry Bosserman is a colleague -- a friend of yours?

19   A.  Uh-huh.

20   Q.  And it was sent on -- in 2020 here?

21   A.  Yeah.  Uh-huh.  Yeah.  He's a law enforcement officer,

22   yeah.

23   Q.  Okay.

24          MR. MANZO:  And I seek to move in 9310, this first

25   message at this point.

```
 1              MR. FISCHER:  Your Honor, can we get on the phone for
 2       a second?
 3              (Bench conference on the record.)
 4              MR. FISCHER:  Your Honor, the relevance of this.
 5       It's regarding shooting some steroid Hollywood phony, and --
 6              THE COURT:  So, Mr. Fischer, I'll short-circuit this.
 7       I'll allow it.  This is not about the Hollywood phony --
 8              MR. FISCHER:  That's fine, Your Honor.
 9              THE COURT:  -- it's the six high, three deep and his
10       understanding, and this is actually a message that he wrote,
11       so.
12              (Proceedings held in open court.)
13              THE COURT:  So 9310 will be admitted.
14              (Government Exhibit 9310 (first message admitted into
15       evidence.)
16       BY MR. MANZO:
17       Q.  So, Mr. Caldwell, you recognize that you sent this message
18       to Jerry Bosserman in 2020; correct?
19       A.  Absolutely.  Absolutely.  I remember completely now.
20       Q.  So now you remember what stack 'em 6 high and 3 deep means;
21       correct?
22       A.  Yeah, got that from Adrian.  Yep.
23       Q.  Can you read the message to the jury.
24       A.  "I'll gladly shoot this steroided hollywood phony.  And
25       your right....especially if they come to the country I can tell
```

9030

1    you we will stack them 6 high and 3 deep to produce a bullet

2    stopping pile of human tissue and effluence we can fire from

3    behind."

4              MR. MANZO:  All right.  So let's go back to 2001.T.1

5    on page 180.  So -- and if we can just zoom in here.

6    BY MR. MANZO:

7    Q.  So by context, would it be fair to say that you're speaking

8    about violence; wherein Matt Combs responds stack em 6 by --

9    A.  Absolutely.  I can see that now, uh-huh.  Yes.

10   Q.  So fair to say you're speaking about violence and

11   Matt Combs responds stack 'em 6 by 3; correct?

12   A.  Right.  But I don't know what I said before that.

13   Q.  And that's because you unsent those messages.

14   A.  Well, I have no recollection of what they said, so.

15   Q.  And Smoot was one of the people that you asked to get the

16   boat to carry weapons across the Potomac; fair to say?

17   A.  No, that's not fair to say, and that's not true.

18   Q.  All right.  You're deleting these messages because you have

19   a pretty keen understanding of how the legal process works?

20   A.  Not at all.

21   Q.  All right.

22             MR. MANZO:  Let's pull up 9310 on the first page and

23   go to the bottom two messages.  I'm sorry.  Not these.

24        Can we go to the next page.  And go to the bottom two

25   messages here.

1    BY MR. MANZO:

2    Q.  And do you recognize these messages between you and a

3    family member Jonathan; is that fair to say?

4    A.  Uh-huh.  I sure do.

5    Q.  Okay.

6            MR. MANZO:  Your Honor, I would seek to admit the

7    last two messages here of 9310.

8            MR. FISCHER:  Court's indulgence.

9        No objection to the last two messages.

10           THE COURT:  Okay.  9310 will be admitted.

11           (Government Exhibit 9310 (last two messages) admitted

12   into evidence.)

13   BY MR. MANZO:

14   Q.  Sir, so these are messages that you're sending back and

15   forth to Jonathan.  So Jonathan here writes to you, "it's my

16   roommates birthday so we are going out to eat and we live right

17   by all the shit so i dare a blue haired bitch to try something

18   while i'm eating."

19           And then what did you respond?

20   A.  I said, "choke up on the fork (hands close to the base of

21   the tines) with your thumb on top for leverage and control.

22   Stab for the eyes.  Multiple thrusts quickly.  If you use your

23   steak knife its a deadly weapon.  A fork is cutlery and NOT

24   covered by the same statute.  Easier self-defense argument.

25   Street fighting 101 as taught to me by the CIA in better

```
1     times."
2     Q.  So those are specific messages where you're talking about
3     statutes and your knowledge of the law; fair to say?
4     A.  Well, I don't know anything about the law.  I just know
5     about what's taught as unconventional close-in fighting by the
6     CIA.  And also adopted by Antifa, by the way.
7     Q.  And -- but you're talking specifically about statutes.  So
8     you have some knowledge of the law; fair to say?
9     A.  No, I really don't have any knowledge of the law.
10              MR. MANZO:  Okay.  Can we go now to 9310 and pull up
11    the first three messages of the second page.  First three
12    messages, yeah.
13              Witness only, please.
14    BY MR. MANZO:
15    Q.  Sir, do you recognize these as additional messages with
16    Jonathan?
17    A.  Absolutely.
18              MR. MANZO:  We would seek to move in these three
19    messages at the top of 9310 on the second page.
20              MR. FISCHER:  Objection.
21              THE COURT:  Okay.
22              (Bench conference on the record.)
23              THE COURT:  What's the purpose of --
24              MR. MANZO:  Your Honor, the defense's case is that
25    basically this person is too old and infirmed to actually
```

1    commit anything by force.  Earlier today you said that the

2    government could rebut that by providing evidence of any other

3    manner and means such as teaching, things like that.  Here he's

4    talking about how he's trained to use a sniper rifle and,

5    specifically, to use a silencer.

6        So this directly rebuts the comment -- or the impression

7    put forth to the jury that this person is old, infirm, and

8    cannot use force; where he's talking in 2020 that he could use

9    force and he could kill multiple people very quickly, and he

10   said it, and that he's actually a deadly person.

11           THE COURT:  Mr. Fischer.

12           MR. FISCHER:  Your Honor, it's dated June 18th, and,

13   you know, it's talking about -- God.  I'm not sure he's --

14   if -- Court's indulgence.  I apologize.

15           MR. MANZO:  And we're happy to leave out the Jonathan

16   parts and just rely solely on the statement where he speaks

17   about how dangerous he is.

18           MR. FISCHER:  Your Honor, to me, it just seems --

19   this seems like a joke.  I mean -- and --

20           THE COURT:  Well, I -- Mr. Caldwell apparently likes

21   to use some interesting language in his text messages back and

22   forth.  And it may be a joke; it may not be.  I think the

23   government's theory of why it could be used as

24   cross-examination or impeachment is proper.  It suggests an

25   alternative way in which he could participate in violence -- or

1    force, I should say.

2        So I think I'll allow it, just without the other two

3    Jonathan messages.  I don't think they provide context, and,

4    frankly, I think they're more prejudicial than probative.

5                MR. MANZO:  Yes, sir.  Understood, Your Honor.

6                MR. FISCHER:  Which two?  Are we talking about the

7    two above or the two below?

8                THE COURT:  The two at the bottom are already in.

9    It's the top two, Mr. Fischer.

10               (Proceedings held in open court.)

11   BY MR. MANZO:

12   Q.  So in 2020, do you remember sending a message to Jonathan?

13   A.  I sure do.

14   Q.  Can you read that message to the jury, please.

15   A.  Sure.  This is from Call of Duty.  "Oh, what I could have

16   done with my sniper rifle and silencer.  In my experience you

17   can usually drop 5 to 6 bad guys before they are really sure

18   what's happening.  In a crowd like THIS, you could selectively

19   target and drop 15 to 25 in a 5 minute span and people would

20   just step around them most not having a clue.  They just see

21   some butt [effer] lying on the ground."  Call of Duty.

22   Q.  Sir, Jonathan is not talking about Call of Duty in this

23   conversation.

24   A.  Call of Duty.

25               MR. MANZO:  Your Honor, I'm going to seek to move in

1    the two messages right above it.

2              THE COURT:  Can you drop it back down.

3              MR. MANZO:  I'm sorry, Your Honor.

4              THE COURT:  I'll still leave it out.  You asked him

5    the question.  You tried to introduce it.  He didn't really say

6    one way or the other.  So let's move forward.

7              MR. MANZO:  Sorry, Your Honor.  I couldn't hear you.

8              THE COURT:  I said the question was brought --

9              (Bench conference on the record.)

10             THE COURT:  So let's go to the top two messages.  It

11   was the government -- I think, Mr. Manzo, it was your question

12   that introduced the top two messages and then he responded.  So

13   I don't think he opened the door by referring to Jonathan --

14   what Jonathan said previously.

15             MR. MANZO:  No, Your Honor.  He brought up Call of

16   Duty spontaneously, and that leaves a misimpression on the jury

17   that he's talking about Call of Duty.  Call of Duty is not an

18   outdoor game.  So when Jonathan was saying this was outside our

19   house last week, it's literally impossible for it to be Call of

20   Duty.

21             THE COURT:  Well, I thought the point was a different

22   one, which is that Jonathan was saying nothing about a video

23   game.  Maybe he is.  I have no idea.

24             MR. MANZO:  Right.  So I think if the messages above

25   are clearly not a video game, now they're highly relevant to

1    the message that Mr. Caldwell sent, and I don't even need the

2    top message.  I'll just take this was outside our house last

3    week for the purpose of showing that this is not Call of Duty.

4         MR. FISCHER:  Your Honor, I would take just excluding

5    the top three and asking the jury to disregard.

6         THE COURT:  I'm sorry.  I don't understand,

7    Mr. Fischer.  What do you mean?

8         MR. FISCHER:  I mean, first of all, I think, number

9    one, this message is from June 18th.  Mr. Caldwell is shown the

10   message without context.  First of all, he's shown the message

11   out of context, and I'm not sure he's even answering something

12   from right above it.  It could be from a previous page or

13   something like that, for all I know.

14        MR. MANZO:  We want to show the context.

15        THE COURT:  Let's -- let's do this:  Show it to him

16   only in full context.  If he's still insistent it's Call of

17   Duty, then you can bring the top two lines in.

18        MR. MANZO:  Understood.

19        MR. CRISP:  Judge, before -- Judge, before we go, I'd

20   ask for a limiting instruction -- this is Jonathan Crisp, by

21   the way.  I apologize -- regarding these types of impeachment

22   materials as to their applicability only to the defendant.  I

23   think it's gotten fairly broad, and I would request it -- that

24   the jury be given that instruction at this point.

25        THE COURT:  Okay.

9037

```
 1              MR. CRISP:  Thank you.
 2              (Proceedings held in open court.)
 3   BY MR. MANZO:
 4   Q.  Sir, can you -- can you -- do you see the top two messages
 5   above the message that you just read to the jury?
 6   A.  Uh-huh.
 7   Q.  Fair to say that has nothing to do with Call of Duty?
 8   A.  Oh, fair to say, yes.  Absolutely.  In June of 2020, yeah.
 9   Uh-huh.  Absolutely.
10   Q.  So do you wish to revise your statement that you're talking
11   about Call of Duty when you're talking about --
12   A.  I'm saying my message is from Call of Duty.  Those are game
13   tips, Call of Duty.  He's talking about what -- he's going and
14   busting somebody up or something.  I say, hey, my experience.
15   I -- I do not have a sniper rifle or a silencer, any of those
16   things.
17   Q.  But you were trying to get a suppressor right before
18   January 6th?
19   A.  That is not a silencer.
20              Would you like me to explain it to you, the difference?
21   Q.  Sir, your attorney is going to have ample opportunity for
22   you to put it forward.  Okay?
23   A.  Okay.  Yes, sir.
24   Q.  But it's your testimony here --
25              MR. MANZO:  And can we zoom in on the Jonathan
```

9038

 1    message here and publish it to the jury, the 3112.

 2            Can we publish it.  Can you move it up to hide the top.

 3    BY MR. MANZO:

 4    Q.  So you admit that here Jonathan was not talking about Call

 5    of Duty, but now you're --

 6            THE COURT:  Hang on.  I thought we were going to show

 7    the top two lines.  He can't see it, nor the jury can see the

 8    top two lines.

 9            MR. MANZO:  I thought I was prohibited.

10            THE COURT:  What's that?

11            THE COURTROOM DEPUTY:  I thought he was prohibited

12    from showing the top two.

13            THE COURT:  No.  He can now because of what we just

14    talked about.

15            MR. MANZO:  Okay.  Thank you.

16            Then we would move to admit the -- this whole page of

17    93 --

18            THE COURT:  Let me just confirm a minute.

19            MR. MANZO:  Can you zoom in on the top three

20    messages.

21    BY MR. MANZO:

22    Q.  Okay.  So this is a message where Jonathan writes to you,

23    "i hope some shit happens i've been waiting to beat a

24    motherfuckers ass."  Correct?

25    A.  Uh-huh, yep.

1    Q.  And then Jonathan says, "this was outside our house last

2    week."

3    A.  Uh-huh.

4    Q.  And then you respond, ". . . what [you] could have done

5    with my sniper rifle and silencer."

6    A.  No, I said, "Oh, what I could have done," not what you

7    could have done.

8    Q.  And --

9    A.  This is -- this is a game hint from --

10   Q.  And it's your testimony that you're a Call of Duty expert?

11   A.  No.  I'm not a Call of Duty expert, no, but you can easily

12   find game hints.  All you have to do is search them.

13   Q.  What's your favorite Call of Duty title?

14   A.  I don't have a favorite.  But I know that you can go and

15   you can find these things all the time.

16   Q.  So you just went on the internet and found something about

17   Call of Duty?

18   A.  No.  I've had these things because people like Adrian and

19   people like Jonathan and all the guys in his -- in his frat

20   house play that stuff incessantly.

21   Q.  So do you keep guides of Call of Duty?

22   A.  I wouldn't say I keep guides, but I certainly know how to

23   find some information if I need to say something outrageous to

24   them.

25   Q.  So you weren't providing information based on what we

1    learned about what your long, extensive military career

2    involving the CIA and confidential locations and training all

3    around the world?  You're talking about a video game that

4    you've never played here?

5    A.  I didn't say I never played it.

6         And, also, I didn't have an extensive career around the

7    world training and CIA, no.  I was a desk analyst.  Just a desk

8    jockey.

9              THE COURT:  Mr. Manzo, if I could interrupt for a

10   moment.

11        The cross-examination of Mr. Caldwell with these prior

12   statements that he's made are admissible only as to

13   Mr. Caldwell, and they are not against the other defendants.

14   BY MR. MANZO:

15   Q.  All right.  Let's move on to a new topic here.

16        After January 6th, you were talking about how it was

17   time for a new beginning moments ago.  Do you remember that?

18   A.  I do remember that.

19             MR. MANZO:  Okay.  Let's go to 2001.T.1, and can we

20   go to page 206.  And, Ms. Rohde, let's zoom in on the top three

21   messages.

22   BY MR. MANZO:

23   Q.  And so -- and these messages, they're on 1/13.  So after

24   January 6th.  And somebody named Stu McNamara writes, "Trump

25   fooled me.  Thought he was a stuff guy and a fighter.  But

1    rolled over like a sissy."

2         And then Dennis Godbold said, "99% are pussies stu."

3         And then Matt Truong said, "You are [going] to the lobby

4    day on 1/18?"

5         Is that correct?

6    A.  That's the way I read it too, yes, sir, Mr. Manzo.

7    Q.  And the lobby day is a normal political rally in Richmond

8    every year?

9    A.  If you say so.

10   Q.  Well, Matt Truong is just a Republican politician; correct?

11   A.  No.  He ran for office, but he was not elected, no.  But he

12   might know things like that, sure.

13   Q.  And so he's talking about having people go to Richmond

14   to -- to just do typical lobbying; is that fair to say?

15   A.  Perhaps, yeah.

16   Q.  All right.  So then let's go down a couple -- a little bit

17   down at the bottom here where it says, Stu McNamara --

18        MR. MANZO:  And then going down.  Thank you.

19   BY MR. MANZO:

20   Q.  Okay.  So then Stu McNamara continues, "A peaceful protest?

21   What a fucking joke.  Might as well go to a girl scout

22   bake . . . "

23        Dennis Godbold says, "10 4."

24        And then what do you say?

25   A.  I say "Whats the point?  Drive around in [y]our cars?

1    While they block the streets and won't let us get near

2    anything?  The traitor politicians won't BE there and the pigs

3    won't let us get out and walk around with guns and signs.

4    Better to do something useful like sighting in all your

5    weapons."  At home.

6    Q.  So at this point, other people were talking about peaceful,

7    normal lobbying; correct?

8    A.  Yeah.  Except Stu says, "A peaceful protest?  What

9    a . . . joke."

10    Q.  And then you talk about sighting your weapons.

11    A.  Uh-huh.  Sure.

12    Q.  Is that a commitment to political violence?

13    A.  Not political violence, no.

14    Q.  Is it a commitment to violence?

15    A.  No, not at all.  No.

16    Q.  What does it mean to sight a weapon?

17    A.  If you -- if you have a weapon and you use it on your farm,

18    you need to sight it in.  Most people don't do that.  They let

19    them sit around, and they let them get dirty, and they're not

20    worth anything when you need to shoot a coyote or something

21    like that.  Better to sit at home on your can and sight in your

22    weapon.

23    Q.  All right.  You testified that you've served in classified

24    locations?

25    A.  No.  I never said that, no.

1    Q.  What did you say?

2    A.  I served in the Republic of the Philippines; that's not a

3    classified location.

4    Q.  You stated on direct examination that you served in

5    locations that you couldn't talk about.

6    A.  That is not true.

7    Q.  You received extensive training; correct?

8    A.  I did not.

9    Q.  You were a military veteran of 20 years?

10   A.  I'm sorry?

11   Q.  You were a military veteran of 20 years?

12   A.  Almost 20 years, yes, sir.

13   Q.  A commander?

14   A.  Lieutenant commander, yes, sir.  Uh-huh.

15   Q.  And you know about -- you were taught how to hurt or kill

16   people?

17   A.  No.

18   Q.  You were taught how to plan operations?

19   A.  No.

20   Q.  You were taught to build cover stories?

21   A.  No.

22            MR. MANZO:  All right.  So let's pull up one

23   last message here.  Can we go to 9315 and go to the second

24   message.  On the next page.  Sorry.  Next page.  Sorry.  Final

25   message.

1   BY MR. MANZO:

2   Q.  Sir, do you recognize this message that you send to Adrian?

3   A.  I absolutely do, yes, sir.  Uh-huh.

4        MR. MANZO:  Your Honor, we seek to move this message

5   into evidence, which is the final message on 9315.

6        MR. FISCHER:  No objection.

7        THE COURT:  9315 will be admitted.

8        (Government Exhibit 9315 admitted into evidence.)

9        MR. MANZO:  And, Ms. Rohde, can you please expand

10  this to include the date.

11  BY MR. MANZO:

12  Q.  Sir, this is a message you sent on 12/26/2020; right?

13  A.  Uh-huh.  Yes, sir.  Uh-huh.  I remember this very well.

14  Q.  Just a week before January 6th?

15  A.  Uh-huh.  Yes, sir.

16  Q.  Can you read the message to the jury.

17  A.  Yes.  "Gotcha.  Just think and plan.  I am not kidding

18  about another identity.  I need your help.  Then, after I have

19  a new license, birth certificate and burner phone, we'll get

20  same for YOU.  I have plans I haven't even told you about.

21  Doesn't matter who is President.  There will be payback.

22  Imagine what you could do if you couldn't be traced."

23  Q.  Those are your words?

24  A.  Yes.  Absolutely.

25        MR. MANZO:  Thank you.  No further questions.

9045

1          THE WITNESS:  Uh-huh.

2          THE COURT:  Just on the phone real quick.

3          (Bench conference on the record.)

4          THE COURT:  So, Mr. Fischer, do you want to -- well,

5     how long is your redirect exam going to be?

6          MR. FISCHER:  I imagine it's going to be well over an

7     hour, maybe an hour and a half.

8          THE COURT:  Okay.  Let's then take care of this

9     character witness.  And what's the character trait he's going

10    to be testifying to?

11         MR. FISCHER:  Truthfulness and honesty.

12         THE COURT:  Okay.

13         MR. CRISP:  Judge, this is Jonathan Crisp again.  I

14    had one question from a rule of completeness for the text

15    messages that were shown that I wanted to make sure -- it's

16    already a government exhibit.  I don't know if it's been

17    admitted or not.  But Ms. Watkins answered to all of this, you

18    know, alibi stuff, I wanted the answer there to complete that

19    discourse.  So I wanted to ask him one question about that.

20         THE COURT:  Hold on one second.

21      I'm sorry.  So you want to add another -- I'm sorry.

22    You want to question Mr. Caldwell to do what?  To -- to bring

23    in the other slide that completes the government exhibit?

24         MR. CRISP:  Roger.

25         THE COURT:  Okay.  And that's it?

```
1                MR. CRISP:  Yes, sir.

2                THE COURT:  Any objection, government?

3                MR. MANZO:  No, Your Honor.

4                THE COURT:  Okay.  All right.

5                (Proceedings held in open court.)

6                THE COURT:  Mr. Crisp.

7                MR. CRISP:  Thank you, sir.

8                          CROSS-EXAMINATION

9     BY MR. CRISP:

10    Q.  Mr. Caldwell, good afternoon.

11    A.  Good afternoon, sir.

12    Q.  There's a series of questions that I just wanted to

13    complete pertaining to Ms. Watkins in a conversation you had

14    with her regarding allegations about -- the reference to an

15    alibi.  Do you remember that line of questioning?

16    A.  Yes, sir.  Sure.  Uh-huh.

17    Q.  This was -- I believe this was the last question that the

18    government asked you in that chat line.

19    A.  Uh-huh.  Yes, sir.

20    Q.  If I could direct you to the next slide, please.

21               Was this my client's response to what you said?

22    A.  It was indeed, sir.

23               MR. CRISP:  Okay.  Thank you, sir.  I have nothing

24    further.

25               Thank you, Your Honor.
```

```
 1                THE COURT:  Thank you, Mr. Crisp.

 2           So --

 3                MR. CRISP:  I'm sorry.  Was that -- Judge, I

 4      apologize.  Was that published?  I want to make sure if it was

 5      not published, then I would --

 6                THE COURT:  I think this is already in, but why don't

 7      we make sure the jury has a look.

 8                THE WITNESS:  Would you like me to read it for you or

 9      anything like that?

10                MR. CRISP:  We'll just publish it.  I'm trying to get

11      in and out too quick here.  I'm going too fast.

12                THE COURT:  Okay.  Have you had an opportunity to

13      review it?

14                THE COLLECTIVE JURY:  (Nod heads.)

15                MR. CRISP:  Thank you.  I'm sorry.

16                THE COURT:  All right.  Thank you.

17           All right.  So, again, in the interest of trying to be

18      efficient, given that we have another witness from out of town,

19      we're going to have Mr. Caldwell step down before his redirect

20      examination, and we're going to have one other witness before

21      the end of the day.  Okay?

22                THE WITNESS:  Thank you, Your Honor.

23                THE COURT:  Thank you, Mr. Caldwell.

24                MR. FISCHER:  Your Honor, on behalf of Mr. Caldwell,

25      we call Mr. Dulany Washington.
```

```
1                    (Oath administered.)
2              THE WITNESS:  I do.
3              THE COURT:  Mr. Washington, welcome.  I'll ask you to
4    remove your mask, if you're comfortable doing so.
5              Thank you, sir.
6              THE WITNESS:  Thank you.
7                        DIRECT EXAMINATION
8    BY MR. FISCHER:
9    Q.  Thank you.
10             Mr. Washington, will you state your name and spell it
11   for the record, please.
12   A.  My name is Rosier Delany Washington.  It's R-o-s-i-e-r
13   D-u-l-a-n-y W-a-s-h-i-n-g-t-o-n.
14   Q.  Sir, can you give us the city and state where you live at.
15   A.  I live in Midland, Virginia.
16   Q.  How old are you, sir?
17   A.  Sixty-two.
18   Q.  How far did you go in school?
19   A.  I went to -- high school graduate.
20   Q.  Okay.  I understand you served in the United States Navy;
21   is that correct?
22   A.  Yes, sir.
23   Q.  What -- what year did you join the Navy?
24   A.  I joined the Navy in September of 1978.
25   Q.  Okay.  And how old were you when you joined the Navy?
```

1    A.  I was 18.

2    Q.  What was your first assignment?

3    A.  My first duty assignment was in the Philippines.

4    Q.  Okay.  And at that time did you have an opportunity on

5    assignment to meet someone named Thomas Caldwell?

6    A.  Yes, sir.

7    Q.  I presume you see him in the Court here today?

8    A.  Yes, sir.

9    Q.  Okay.  And I understand you've known Mr. Caldwell since

10   1979.  Is that correct?

11   A.  That's correct.

12   Q.  You served in the military together; is that correct?

13   A.  Yes, sir.

14   Q.  Okay.  And what rank was Mr. Caldwell at that time, if you

15   remember?

16   A.  I believe he was a lieutenant JG.

17   Q.  Okay.  And did you two work together on an everyday basis?

18   A.  Yes, sir.

19   Q.  Okay.  And, sir, during your time in the Navy, what -- what

20   position did you hold?  What was your rank at that time?

21   A.  I was a seaman apprentice when I met him.

22   Q.  Okay.  And do you remember what rank Mr. Caldwell was?

23   A.  I believe he was a lieutenant JG then.

24   Q.  Okay.  And was he your commanding officer?

25   A.  He was my lead, yes.

1    Q.   And the office -- which office did you work in?

2    A.   He worked in the personnel.

3    Q.   Okay.  And you worked together with him there?

4    A.   Yes, sir.

5    Q.   Okay.  And, sir, through your working in this particular

6    office, can I ask you, did you hold a security clearance at

7    that time?

8    A.   Yes, sir, I did.

9    Q.   What type of clearance was that?

10   A.   Secret.

11   Q.   Okay.  And Mr. Caldwell, to your knowledge, did he hold a

12   security clearance in that office as well?

13   A.   To my knowledge, yes.

14   Q.   Okay.  And during that time, did you develop -- and also,

15   obviously, you've had contact with him since being out of the

16   military; is that correct?

17   A.   Yes, sir.

18   Q.   Okay.  And do you know his wife, Sharon Caldwell?

19   A.   Yes, I do.

20   Q.   All right.  And, sir, have you had the opportunity to

21   develop an opinion for Mr. Caldwell's truthfulness and honesty?

22   A.   Yes, sir.

23   Q.   Would you believe him if he testified under oath?

24   A.   Yes, sir.

25   Q.   Sir, what's your current employment?

1    A.  I'm a pastor of the Oakrum Baptist Church in

2    Thoroughfare [sic], Virginia, and I'm also a personal trainer.

3           MR. FISCHER:  Your Honor, I have nothing else.

4           THE COURT:  Mr. Manzo.

5                       CROSS-EXAMINATION

6    BY MR. MANZO:

7    Q.  Thank you for -- sir, for being here.

8           Would it affect your opinion if you learned that someone

9    had -- would it affect your opinion on someone's truthfulness

10   if you learned that they had deleted evidence?

11   A.  It wouldn't affect my opinion of him.

12   Q.  Would it affect your opinion of a person's truthfulness if

13   they had cover stories?

14   A.  I -- would have to be the cover story.  I'm not sure, sir.

15   Q.  Would it affect your opinion if someone provided false

16   alibis?

17   A.  If they provided false alibis, it could affect my opinion.

18   Q.  What if somebody used fake documents, like birth

19   certificates or passports or things like that, would that

20   affect your opinion on that person's truthfulness?

21          MR. FISCHER:  Objection.

22          THE COURT:  That's sustained.  At least as phrased.

23   BY MR. MANZO:

24   Q.  Would it affect your opinion if someone was trying to

25   obtain a new license, birth certificate, or burner phone?

```
 1     A.  It could, yes.

 2               MR. MANZO:  No further questions.

 3               THE COURT:  Any redirect, Mr. Fischer?

 4               MR. FISCHER:  No, Your Honor.

 5               THE COURT:  Okay.  Mr. Washington, I know you've been

 6     here all day.  Thank you for your time and testimony, sir.

 7     Safe travels home.

 8               THE WITNESS:  Thank you.

 9               (Witness excused.)

10               THE COURT:  All right.  When you said it's going to

11     be short, I didn't think it was going to be that short.  So why

12     don't we recall Mr. Caldwell to the stand and start his

13     redirect examination.

14               MR. FISCHER:  I'm here to please, sir.

15                         REDIRECT EXAMINATION

16     BY MR. FISCHER:

17     Q.  Mr. Caldwell, if we could first start out -- first of all,

18     the Jonathan person that keeps being referenced in a lot of

19     these messages, who is Jonathan?

20     A.  Jonathan is my nephew.

21     Q.  How old is he?

22     A.  He is 20 years old.

23     Q.  To your knowledge, has he been questioned by the FBI?

24     A.  No, he has not.

25     Q.  Okay.  Who is Stu McNamara?
```

9053

1    A.  Stu McNamara is a local farmer in the Shenandoah Valley.

2    Q.  How old is Mr. McNamara?

3    A.  He is 68 years old.

4    Q.  Okay.  To your knowledge, has he been questioned by the

5    FBI?

6    A.  He has not.

7    Q.  Sir, I know you were itching to tell the jury what the

8    difference between the suppressor or silencer is.  Could you

9    explain that.

10    A.  I'd be glad to.

11         A suppressor is one that just pulls back some of the

12    sound.  To make it as simple as possible, the great report from

13    the firing of a weapon has to do with the rapid expansion of

14    the gases out of the barrel.  Boom.  It's almost like a sonic

15    boom.

16         Competitive shooters like to use suppressors.  Okay?

17    Not silencers.  What it does, it reduces the amount of noise.

18    This is important because a lot of competitive shooters might

19    shoot as many as a thousand rounds at the range a day.  Even

20    with noise-canceling headphones, you can still get some real

21    sound damage.

22         I have some neighbors that are competitive shooters.

23    One gentleman and his daughter, she is a -- currently, very

24    highly ranked in competitive shooting, and so for them, having

25    that kind of a suppressor on the ends of their rifles and

1    pistols is a must.  Just to protect their hearing.

2    Q.  Mr. Caldwell, I'm glad you brought up the -- something

3    about competitive shooters.  I just pulled up what's going to

4    be marked as Caldwell Exhibit 81 -- 181.  I apologize.  181.

5              MR. FISCHER:  If we can blow that up, please, for the

6    witness -- for the witness only.

7    BY MR. FISCHER:

8    Q.  Sir, do you know who is -- a gentleman by the name of Mike

9    Danjeck (phonetic)?

10   A.  Mike Danjeck is a -- he's an -- an investment counselor,

11   and he is also the gentleman who bought my late father's home

12   in Berryville, Virginia.  He is a competitive shooter and is

13   ranked, and his 14-year-old daughter Sasha is likewise.

14   Q.  Okay.  And, sir, I put up on the screen here --

15             MR. FISCHER:  If we can blow this up for the witness,

16   please.

17   BY MR. FISCHER:

18   Q.  Sir, if you take a look, scroll down to some of the

19   messages.  Do you see what appears to be a text message from

20   Mike Danjeck?

21   A.  Uh-huh.  Yes, sir.

22   Q.  It appears you -- I believe you responded; is that right?

23   A.  Uh-huh.  Yeah, he was talking about suppressor kits, and I

24   said, "What's involved in that?"

25   Q.  Okay.  Do you recognize these text messages?

1    A.   I do, sir, yes.  Uh-huh.

2              MR. FISCHER:  Can we go down farther, please.

3         Okay.  And if we could introduce Caldwell 181 at this

4    time.

5              MR. MANZO:  No objection.

6              THE COURT:  181 is admitted.

7              (Defendant Caldwell Exhibit 181 admitted into

8    evidence.)

9    BY MR. FISCHER:

10   Q.   So you wanted context regarding Mr. Manzo's text message,

11   and we'll go to the very top.  If you can read --

12             MR. FISCHER:  If you can move it down the screen,

13   please.

14   BY MR. FISCHER:

15   Q.   Okay.  Can you read the first message there in the blue

16   from Mike Danjeck?

17   A.   Yes.  Mike writes:  Also, I'm thinking about ordering some

18   suppressor build kits.

19   Q.   And let me stop you there.  So that would be something that

20   a competitive shooter and his 14-year-old daughter, who's a

21   competitive shooter, would use?

22   A.   Yes, sir.

23   Q.   Okay.  Let's move to the next message.  And then you ask a

24   question there; is that right?

25   A.   Yes, sir, that is my question -- response.

1   Q.  What's your question, sir?

2   A.  My question is because I don't know anything about such

3   things, I said:  What is involved in building from a kit?  A

4   suppressor, that is.

5   Q.  So, sir, in context, it appears that you don't even know

6   how to build a suppressor kit, do you?

7   A.  No, I don't.

8   Q.  Okay.  And he replied at the bottom, "Drilling holes."  Is

9   that right?

10  A.  "Drilling holes," that's what he says.  Okay.

11  Q.  So you would agree, context kind of matters, doesn't it?

12  A.  It does.  Yes, it does.

13  Q.  And while we're on --

14          MR. FISCHER:  If we could pull up Government's

15  2001.T.1.

16  BY MR. FISCHER:

17  Q.  While we are on the topic of context, sir, Mr. Manzo was

18  questioning you about some Facebook records.  Okay?

19  A.  Yes, sir.

20          MR. FISCHER:  If we could go to page 62 first.  Thank

21  you.

22  BY MR. FISCHER:

23  Q.  Sir, we're going to blow this up a little bit for you.

24  It's already in evidence so they can be published.

25  A.  Yes, sir.

9057

1    Q.  Sir, who is Diann Tomblin?

2    A.  Diann Tomblin is a nice lady, a grandmother who lives out

3    in Clarke County, Virginia.

4    Q.  How old is she?

5    A.  She is -- she -- shouldn't be talking about a lady's age.

6    She's about my age.

7             MR. FISCHER:  Okay.  If you could scroll down,

8    please.

9    BY MR. FISCHER:

10   Q.  So it appears that you unsent some messages regarding

11   Diann Tomblin; is that correct?

12   A.  That is correct.  Yes, sir.  I remember that.  Uh-huh.

13   Q.  And, sir, was there any -- was -- with Diann Tomblin, was

14   there a particular reason why you recall unsending messages?

15   A.  Yes.  Indeed.  These were actually photos from January 6th,

16   and I had said, hey, go ahead and post these things up.  She

17   came back and she said, as you can see in the middle, "I was

18   gonna post these on FB, but messenger wouldn't let me save

19   them.  Send [them] again in messages," please.  And here's my

20   phone number.  I already had it, but 540 and et cetera.

21             MR. FISCHER:  And we can go to Exhibit 68.1, please.

22   BY MR. FISCHER:

23   Q.  Sir, there appear to be some text messages on the screen?

24   A.  Yes, it's hard to see, but that's just kind of the way it

25   comes out when you do an extract, and these were the pictures

1    that I sent.  And they were just documenting what my wife and I

2    did that day.  And I invited her to take them now in the format

3    that she wanted them so that she could post them up and share

4    them with her friends.

5    Q.  Okay.

6              MR. FISCHER:  We move in Caldwell 68.1, please.

7              MR. MANZO:  No objection.

8              (Defendant Caldwell Exhibit 68.1 admitted into

9    evidence.)

10   BY MR. FISCHER:

11   Q.  So in other words, sir, the photos that you sent to

12   Diann Tomblin, you still -- you had sent them via text message

13   at her request?

14   A.  Yes, sir.  That's right.  Uh-huh.

15   Q.  And when the FBI seized your phone, were these text

16   messages regarding January 6th -- photos of January 6th

17   from Diann Tomblin, were they still on your phone at that

18   time?

19   A.  They were and are.

20   Q.  And are those photos in the possession of the FBI

21   continuously since January 19th, 2021?

22   A.  Yes, sir.

23             MR. FISCHER:  All right.  If we can go back to

24   Government's Exhibit -- the Facebook exhibit.  I apologize.

25   It's 2001.T.1.  Okay.  We're going to move -- if we can go to

1    page 30, please.

2            Actually, I take that back.  If we can please go to --

3            Court's indulgence.

4            Let's go to page 45.

5    BY MR. FISCHER:

6    Q.  Sir, do you know a person named Kirby DeHaven?

7    A.  I certainly do, yes, sir.

8    Q.  So Mr. Manzo made a big deal out of your 180 Facebook

9    messages that were unsent; right?  Is that correct?

10   A.  Yes, he did.

11   Q.  And the suggestion was you were hiding stuff regarding

12   January 6th?

13   A.  He did make that assertion.

14   Q.  Sir, on the screen in front of you, it appears that you and

15   Kirby DeHaven were sending some Facebook messages on -- in

16   December of 2020; is that right?

17   A.  Yes, sir.  That's true.  Uh-huh.

18   Q.  Does it appear that you unsent messages to Kirby DeHaven in

19   December of 2020?

20   A.  Yes, sir, it does.

21   Q.  And if my arithmetic is correct, that's before January 6th,

22   2021?

23   A.  My arithmetic too.

24           MR. FISCHER:  Okay.  Can we go down the page here a

25   little bit.  Go to page 46.

1    BY MR. FISCHER:

2    Q.  Sir, I'm going to direct your attention to below the second

3    thumb there.

4           MR. FISCHER:  Lower, please.  Right there.

5    BY MR. FISCHER:

6    Q.  It appears December 30th, and December 31 -- December 31,

7    it appears that there were unsent messages; correct?

8    A.  Yes, sir.  Uh-huh.

9    Q.  By the way, these all appear to be unsent on January 15th,

10   UTC time, which would translate to the evening of January 14th,

11   2021; is that correct?

12   A.  Yes, sir, I believe that's true.

13   Q.  Okay.  And it looks like those messages were sent in late

14   December; is that correct?

15   A.  That's true.  Yes, sir.

16   Q.  Okay.  Do you have any idea what unsent messages would have

17   to do with covering up evidence of you being at the Capitol?

18   A.  No, sir.

19   Q.  Okay.

20          MR. FISCHER:  If we go to page 47, please.

21   BY MR. FISCHER:

22   Q.  By the way, are these part of the unsent messages that

23   Mr. Manzo has been talking about?

24   A.  I'm pretty sure they are.

25   Q.  Okay.  On 47, it appears -- at the top there, it appears

 1    there's an unsent --

 2              MR. FISCHER:  Can we just go to -- back to the bottom

 3    of 46, please.

 4    BY MR. FISCHER:

 5    Q.  Okay.  It looks like at the bottom there's --

 6              MR. FISCHER:  Oh, if I can go up, actually, above.

 7    The first one that's on the screen.  No, you're fine.  No, go

 8    back.  Thank you.

 9    BY MR. FISCHER:

10    Q.  Where it says -- the first message there where it looks

11    like you sent a message December 30th and unsent it on

12    January 15th; is that right?

13    A.  Right.  And then UTC, that would make it the 14th,

14    Counselor.

15    Q.  And what was Mr. DeHaven's response to what apparently you

16    sent?

17    A.  "Great speech !!!"

18    Q.  Okay.  Do you even know what the speech was, sir?

19    A.  I'm sorry, but I can't recall.

20    Q.  Okay.  And it looks like there's another unsent message

21    below that that you had sent out on December 31st; is that

22    right?

23    A.  Yes, sir.  Uh-huh.

24    Q.  And it appears that you unsent that one on January 15th,

25    which is the 14th again on -- in the Eastern Standard Time;

1    right?

2    A.  Right you are, sir.

3    Q.  And Mr. DeHaven responds, "Gettem."  Right?

4    A.  Yes, sir.

5            MR. FISCHER:  Can we go to the next page.  Top,

6    please.

7    BY MR. FISCHER:

8    Q.  And it appears that there was a message on January 7th at

9    7:27 a.m. UTC time; is that right?

10   A.  Yes, sir.  Uh-huh.

11   Q.  Okay.  And it was sent on January 1st.  I'm sorry.

12   A.  January 1st, yes, sir.

13   Q.  It appears you unsent that as well?

14   A.  Uh-huh.  Yes, sir.

15   Q.  And then the next message you said "Happy New Year"; is

16   that right?

17   A.  Yes, sir, I did.

18   Q.  Okay.  And there's a couple messages down.  January 1st you

19   sent a message; right?

20   A.  Yes, sir.

21   Q.  It was removed January 14th Eastern Standard Time; right?

22   A.  Yes, sir.

23   Q.  Sir, again, does that have anything to do with covering up

24   what you and your wife did at the Capitol on January 6th?

25   A.  No, sir, it doesn't.

1    Q.  Are those part of the messages that Mr. Manzo was talking

2    about in the 180 that were unsent?

3    A.  Yes, sir.

4            MR. FISCHER:  Okay.  Go to page 48, please.

5    BY MR. FISCHER:

6    Q.  At the top it looks like there's --

7            MR. FISCHER:  If we go back to the very bottom of 47.

8    BY MR. FISCHER:

9    Q.  It looks -- again, sir, the very bottom, does it look like

10   you had sent a message on January 2nd of 2021?

11   A.  Yes, sir.  That's right.

12   Q.  And below that on page 48, it looks like you unsent, again,

13   on the evening of January 14th, 2021; is that right?

14   A.  Yes, sir, it is.

15           MR. FISCHER:  Can we go down lower on 48 here.

16   Little lower, please.  Little lower.  Okay.

17   BY MR. FISCHER:

18   Q.  So it looks like, sir, there's yet another message here

19   that was sent well before January 6th and that you unsent.

20   Does that sound right?

21   A.  That's true.  Yes, sir.

22           MR. FISCHER:  Okay.  Can we go to page 50.

23   BY MR. FISCHER:

24   Q.  The very top, sir, looks like a message from January 7th at

25   12:56, there's an unsent message; is that right?

1    A.  Yes, sir.

2    Q.  There are others below it?

3    A.  Yes, sir.

4    Q.  Okay.  And looks like there's messages that were sent --

5    hang on one second -- on January 10th; right?

6    A.  Yes, sir.  Uh-huh.

7    Q.  And then you unsent a message on January 15th again, seems

8    like -- would you agree it seems like everything seems to be

9    unsent right around the same time; right?

10   A.  Yes, sir.

11   Q.  Okay.  We go down a little bit, and Kirby DeHaven

12   apparently has a response to your messages.  What's his

13   response?

14   A.  He says, "Omg," which stands, I presume, for oh, my God,

15   "Prayers brother.  Give her our best."

16   Q.  And I know -- do you recall the specific content of

17   messages?

18   A.  I do.  The messages about that time had to do with the

19   spontaneous explosion, for want of a better term, of my wife's

20   eye, and we rushed her to -- to the emergency room and then

21   into emergency eye surgery.  They were able to save her eye.

22   And I spent a lot of time telling people updates, updates,

23   updates, because that's about all you can do when you're

24   sitting in a waiting room praying, and his response is, "Give

25   her our best."

1   Q.  And it appears that you unsent a message and then you

2   said -- he had a response.  "WOW.  SO GLAD !!!!!"  Is that

3   correct?

4   A.  Yes, sir.  I had told him what the result of the surgery

5   was.

6   Q.  Sir, do you have any idea what your wife's eye surgery had

7   to do with January 6th?

8   A.  I can't fathom it, Counselor.

9            MR. FISCHER:  Can we go to page 37, please.

10           Actually, go to page 63, please.  I apologize.  Looks

11   like page 63.

12   BY MR. FISCHER:

13   Q.  Sir, this is with the farmer Stu McNamara; is that right?

14   A.  Stu McNamara, yes, sir.  Uh-huh.

15   Q.  It appears that -- it appears that on December 20th, 2020,

16   you sent a message to Stu McNamara; is that right?

17   A.  Yes, sir.

18   Q.  It was unsent, again, at that January 14th Eastern Standard

19   Time; is that right?

20   A.  Yes, sir.  I must have been very bored at that time.

21   Q.  Okay.  And, again, this is before January 6th; right?

22   A.  Yes, sir, it is.

23   Q.  And do you remember what -- what, if anything, you had a

24   discussion about with Stu McNamara?

25   A.  I can't really remember, sir.  I'm sorry.

1   Q.  Well, based on what we've done so far, Mr. Manzo said about

2   180 Facebook messages that were unsent involving January 6th.

3   Was that an accurate statement, Mr. Caldwell?

4   A.  No, sir.

5          MR. FISCHER:  Okay.  Let's go to page 70, please.

6   Thank you.  Top of the page.  Just a little -- right there is

7   fine.

8   BY MR. FISCHER:

9   Q.  This appears to be a Facebook message, again, with

10  Stu McNamara; is that right?

11  A.  Yes, sir.

12  Q.  It was sent on January 6th and then unsent, again, on the

13  evening of January 14th Eastern Standard Time; is that right?

14  A.  Yes, sir.

15  Q.  Okay.  Again, this appeared -- and this would be -- this

16  would have been sent January 6th, 12:30 UTC time, which would

17  be 7:30 a.m., I believe; is that correct?

18  A.  Yes, sir.  I think that's about correct.

19  Q.  Were you at the Capitol at that time?

20  A.  No, sir, I was not.

21          MR. FISCHER:  Okay.  You can pull that down.  Thank

22  you.

23          Go through some more.

24          Okay.  Let's go to page 9 -- 9 -- actually, Court's

25  indulgence.

```
1              Let's go to page 98, please.
2    BY MR. FISCHER:
3    Q.  Sir, we were talking -- who is Matt Sear again?
4    A.  Matt Sear was a guy who started out as our pest control
5    specialist for Ehrlich, and he turned into a friend over the
6    years.  He's gone on to other things, and we're still friends.
7    Q.  Okay.  Sir, if we go down just a little bit, it sounds like
8    you're discussing some things on Facebook.  Would you agree
9    with that?
10   A.  Yes, sir.  Uh-huh.
11             MR. FISCHER:  Scroll down a touch, please.  Okay.
12   Right there.
13   BY MR. FISCHER:
14   Q.  So it looks like on January 10th of 2021, you send a
15   message to Mr. Sear; is that right?
16   A.  Yes, sir.  That's right.
17   Q.  And, again, at that same time, on the evening of
18   January 14th, Eastern Standard Time, you unsent a message; is
19   that right?
20   A.  Yes, sir.
21   Q.  What was Mr. Sear's response?
22   A.  Said, "Holy Cow.  Will definitely send prayers . . . your
23   way."
24   Q.  That doesn't sound like anything with January 6th, does it?
25   A.  No.  That sounds like another response to an update message
```

1    about Sharon's medical condition.

2              MR. FISCHER:  Okay.  If we can go to page 102,

3    please.  Okay.  If we can scroll down.

4    BY MR. FISCHER:

5    Q.  Right there it looks like you're having a Facebook

6    conversation with Matt Truong -- Matthew Truong; is that right?

7    A.  Yes, sir.

8    Q.  So it looks like -- we scroll about halfway in the middle

9    of the page, you say -- Author Tom Caldwell, December 25th.  So

10   Christmas of 2020, you apparently sent a message to Truong; is

11   that correct?

12   A.  Yes, sir, I did.

13   Q.  And looks like, again, on the evening of January 4th -- the

14   14th, you -- or maybe that would have been in the early morning

15   hours of January 15th, you unsent a message; is that correct?

16   A.  Yes, sir.

17   Q.  He responds, "Epic indeed."  Is that right?

18   A.  Yes, sir.

19             MR. FISCHER:  And go down a little farther.

20   BY MR. FISCHER:

21   Q.  And, again, December 25th; is that right?

22   A.  Yes, sir, I see that.

23   Q.  You unsent a message as well; right?

24   A.  Yes.

25             MR. FISCHER:  Scroll down a little more.

1    BY MR. FISCHER:

2    Q.  Okay.  Sir, obviously, those were sent Christmas Day.

3    Does Christmas Day -- what you sent to Mr. Truong have anything

4    to do with an attack on the United States Capitol?

5    A.  No, sir, it did not.

6    Q.  Mr. Manzo indicated -- was his statement accurate?

7    A.  It was totally inaccurate, sir.

8    Q.  Okay.  By the way, I have to ask you, Mr. Caldwell, was

9    there anybody you did not converse with by Facebook?

10   A.  I'm sure there are a few people, but I can't remember who

11   they might be right now.

12   Q.  Okay.

13              MR. FISCHER:  Court's indulgence.

14         All right.  Let's go to page 111.

15         Let's go about a third of the way -- well, right --

16   let's stop at the top.

17   BY MR. FISCHER:

18   Q.  So this looks like you -- there were messages that were

19   sent on January 9th, several messages; is that right?

20   A.  Uh-huh.  Yes, sir.  Uh-huh.

21   Q.  Again, it looks like it's January 15th, in the early

22   morning hours, when you unsent these messages; is that right?

23   A.  Yes, sir.  Right.

24   Q.  Okay.  And looks like at the bottom, Mr. Truong responds to

25   the messages.  What does he say?

1    A.  Are you referring to his message on the 9th, sir?

2    Q.  Yes, sir.

3    A.  Yes.  He says, "You guys meeting up?"

4    Q.  Okay.  This is, obviously, three days after January 6th,

5    isn't it?

6    A.  It is, yes, sir.  Uh-huh.

7    Q.  Okay.  To your -- well, let me ask you:  To your knowledge,

8    did Mr. Truong have anything to do with the events of

9    January 6th, 2021?

10   A.  Not to my knowledge at all.

11        MR. FISCHER:  Can we scroll down a little bit.  Okay.

12   Go to one -- Court's indulgence.

13        Go down to 112, please.  Okay.  Let's go right to the --

14   a little further.  Right there.  Okay.

15   BY MR. FISCHER:

16   Q.  Mr. Caldwell, at the top there, Mr. Truong says on

17   January 10th, "Please let me know if there [is] anything I

18   could help."  Is that right?

19   A.  Yes, sir.  Uh-huh.

20   Q.  And you then unsent a message; is that right?

21   A.  Right.

22   Q.  And what did Mr. Truong respond to your unsent message?

23   A.  He said, "Thank God!  If you want to talk my friend I can

24   introduce to give you some more data.  You are in good hands w

25   dr W."

1    Q.  And who's Dr. W?

2    A.  Dr. Wayner (phonetic), who was the guy who saved my wife's

3    eye.

4    Q.  Okay.  Does Dr. W have anything to do with January 6th?

5    A.  No, sir.

6    Q.  Okay.  And, sir, I can go on and on, but did Mr. Manzo give

7    the jury an accurate representation of what your unsent

8    messages were?

9    A.  He did not.

10              MR. MANZO:  Objection, Your Honor.

11              THE COURT:  Sustained.  It's been asked and answered.

12   Go ahead.

13              MR. MANZO:  Your Honor, can that be struck or can

14   we --

15              MR. FISCHER:  I'll withdraw it, Your Honor.

16

17   BY MR. FISCHER:

18   Q.  All right.  Sir, you're aware of the allegation in this

19   case regarding Facebook.  There are two allegations of Facebook

20   tampering.  One has to do with a video that you allegedly --

21   that you allegedly sent to Donovan Crowl and then unsent.  Do

22   you recall that?

23   A.  I do recall that.

24   Q.  Did you ever unsend a video to Donovan Crowl?

25   A.  No, sir.

1    Q.  What did you send to Donovan Crowl?

2    A.  I sent Donovan Crowl a link to an open-source video

3    available to everyone on the internet.

4    Q.  Okay.  And at some point did you send -- and if I recall

5    that exhibit --

6            MR. FISCHER:  Actually, if we could pull up -- can

7    you pull that up for me, please.  52 [sic], please.  For the

8    witness only first.

9            Thank you.

10   BY MR. FISCHER:

11   Q.  All right.  Sir, I'm going to show you what's been marked

12   as Caldwell Exhibit 3 [sic].

13           MR. FISCHER:  Can we pull that up, please.  If you

14   can blow it up, please.  Yep.  Thank you.

15           Go to the top.

16   BY MR. FISCHER:

17   Q.  Sir, are you familiar with this exhibit?

18   A.  I am, sir.  Yes.

19   Q.  What does this exhibit depict?

20   A.  Well, I tried to send a link to Mr. Crowl -- link to a

21   video, and I was technologically challenged, and so it just

22   ground and ground and ground on my phone.

23   Q.  Let me stop you right there, sir.  This exhibit, what --

24   where is this from?  What is this -- what media is this from?

25   A.  I believe this is from Facebook.

9073

1    Q.   Okay.  And so these appear to be your Facebook messages

2    between you and Donovan Crowl; is that right?

3    A.   Yes, sir.  That's right.

4              MR. FISCHER:  We move in Caldwell 53.

5              MR. MANZO:  Can we get on the phone, please?

6              THE COURT:  No.  Let's adjourn for the day.

7         Okay.  Ladies and gentlemen, it's the 5 o'clock hour.

8    We will adjourn for the day.  We will continue tomorrow

9    morning.  I think we're still on track given the schedule we

10   talked about yesterday.

11             So we'll see you tomorrow morning.  Thank you, all.

12             (Proceedings held outside of the jury.)

13             THE COURT:  All right.  Mr. Caldwell, you can step

14   down.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  Have a seat, everybody.

17             (Recess taken.)

18             THE COURT:  All right.  So let's go back on the

19   record.  Mr. Crisp, did you --

20             MR. CRISP:  Your Honor, I don't want to jump your

21   issues in terms of how you want to address it, but there is one

22   small addition I wanted on the jury instructions.  I just let

23   the government know just a few moments ago.  So I apologize.

24   It was something I thought about, but I forgot.

25             I'm going to ask for an instruction for

9074

```
 1   law-abidingness.
 2            THE COURT:  So if you won't mind, what I want to do
 3   is literally flip page by page and make sure everybody is on
 4   board with the final instructions.
 5            But before we do that, given that Mr. Caldwell
 6   testified today, I want to just get a bearing on the schedule
 7   in terms of what the jurors can anticipate in terms of
 8   finishing up this week.  So Mr. Caldwell will finish in the
 9   morning.
10            Does anybody then have any other additional witnesses
11   they had -- well, you've got the cell site expert.  Right,
12   Mr. Crisp?
13            MR. CRISP:  I do.
14            THE COURT:  And does anybody else have any --
15            MR. NESTLER:  Sorry.  It's a CART examiner, so it's a
16   cell phone expert.
17            THE COURT:  Oh.
18            MR. NESTLER:  When we get to it, you'll see it's in
19   here as a cell site expert.  It's different.
20            MR. FISCHER:  Your Honor, it's possible I might have
21   one more character witness named Michael Edwards.  I'm telling
22   the government right now.  I notified them about the witness
23   before, but he may testify.  It would be maybe twice as long as
24   the other character witness.
25            And then Mr. Caldwell, I expect one hour.  I would
```

9075

```
1          try to limit it to an hour.

2                    THE COURT:  Okay.

3                    MR. MANZO:  That's fine, Your Honor.  And I don't

4          know if you wanted to address the objection or we can handle it

5          later at a certain time, what we ended on.

6                    THE COURT:  Yes.  Let's just put a pause on that for

7          a moment.  I want to just get the scheduling sorted out for a

8          minute.

9               So Mr. Caldwell for about another hour, a potential

10         short character witness, and then the CART examiner; right?

11         And so anyone else?  Anything else?

12                   MR. WOODWARD:  We have a few exhibits that we're

13         working through with the government.  We don't want to call

14         anyone to admit the exhibits.  So assuming we work through

15         those issues, we'd simply be moving those in.

16                   THE COURT:  Okay.  So it sounds like --

17                   MR. CRISP:  Alibi.  I have the same issue on the back

18         end of one of the government's exhibits.  I'm going to play the

19         back end of the one of the government's exhibits.  It's already

20         been in.  I've discussed it with Ms. Rakoczy.  It's a

21         government exhibit already.  It -- but it's like 30-some

22         minutes long.  They only played the first part.  I want to play

23         it again just at the end.

24                   THE COURT:  In your case?

25                   MR. CRISP:  In my case.  I'm not going to call a
```

1    witness.  I mean, I can, if we have to, call an FBI agent.

2            THE COURT:  No.  You'll just play it.  Okay.  So the

3    bottom line is, we should be done by lunch tomorrow with

4    evidence.

5            MR. WOODWARD:  Well, the government.

6            THE COURT:  Oh.  Well, right.  But -- how long?

7            MR. NESTLER:  We have an FBI agent witness.  I think

8    it will be very short.  There's a few discrete points we want

9    to address from the defense's case, and we're going to keep it

10   limited.  Maybe he'll testify for half an hour.

11           THE COURT:  Okay.  So I think we're still looking at

12   around lunchtime to finish up?

13           MR. NESTLER:  We expect to be able to close by

14   lunch -- sorry -- close the evidence by lunch.

15           THE COURT:  Okay.  So then I think what that means is

16   that the government ought to be prepared to close tomorrow.  I

17   think if I instruct -- the instructions will, given the length,

18   probably take about an hour or so.  So if we come back at 1:30,

19   2:30.

20           Ms. Rakoczy, how long are you anticipating?

21           MS. RAKOCZY:  Two hours, Your Honor.

22           THE COURT:  So I think that gives us enough time to

23   get the government's closing done.  And I assume we'll have

24   defense closings Thursday.

25           MR. BRIGHT:  We would be willing, if everyone else

1    was willing to guarantee we get it done then, to start a little

2    bit early on Thursday.  I'll be first up, I presume, with

3    Mr. Rhodes.  So if the Court would entertain starting at 9:00,

4    we could --

5            MR. WOODWARD:  Mr. Bright is so gracious to drop my

6    kids off the school in the morning.  I can't thank him enough.

7            MR. BRIGHT:  I apologize, Your Honor.  And I withdraw

8    and strike that for the record.

9            MS. HALLER:  Your Honor, just for clarity, I would

10   point out that we have requested that we recall Agent Lazarus,

11   who testified for the government, but we are working with the

12   government in hopes that if we can stipulate to the CCTV that

13   we're working to put on a little drive for them, I've

14   identified for the government the cameras at issue.  Because

15   otherwise, we'd have to put Lazarus on the stand to have him

16   identify the -- the -- the CCTV cameras.  So I think we're

17   working it out, but I -- I need to bring it to the Court's

18   attention because, obviously, I can't speak for the government.

19           MS. RAKOCZY:  I don't think there's going to be a

20   witness issue, Your Honor.  There is no question of

21   authenticity that we have.  We just wanted to see the clips to

22   make sure we didn't have a relevance objection, but I think the

23   Court will resolve that one way or the other.  So there

24   shouldn't be a witness necessarily.

25           MS. HALLER:  Well, the witness would be for

1    relevance.  That would be the purpose for the witness, not for

2    authenticity.  We're already stipulated on authenticity.

3    But -- yeah, I've gotten the government the CCTV.

4              THE COURT:  I guess I don't understand, which is, if

5    the video can otherwise come in through stipulation, then

6    what --

7              MS. HALLER:  Then that's great.

8              THE COURT:  -- then what would be the relevance of

9    the testimony?

10             MS. HALLER:  Well, he's in the video.  So the whole

11   point is the -- the relevance is for the witness who would be

12   testifying.  That's the issue.  But I'm working with the

13   government on it.

14             THE COURT:  Okay.  All right.  So the bottom line is,

15   it looks like we should finish by lunchtime.  We'll have the

16   government's closing -- excuse me.  I'll read the instructions,

17   the government closing.  That will be the end of the day.

18   Thursday -- there's five of you.  So I don't know that we'll

19   get to the government's redirect on Thursday.

20             You're shaking your head up and down?

21             MR. WOODWARD:  Anybody who is keeping that from

22   happening, I'll personally --

23             THE COURT:  Remember, we've got -- we've got from --

24   we've got three hours in the morning and I've got a break, and

25   then I've essentially got three and a half in the afternoon.

1    There's five of you.  That's -- and plus, I've got to take two

2    afternoon breaks.  So that's really six hours total, and

3    there's five of you.  So if you're promising me that you're

4    going to keep your closings strictly to 60 minutes, which I

5    suspect won't be the case, bottom line for scheduling purposes,

6    I think we ought to just plan not to -- the odds are you will

7    not have rebuttal on Thursday.  We'll do rebuttal Friday

8    morning.

9        And then we will -- I think what I'm prepared to do is I

10   will -- I think we can dismiss Juror 16 at the end of the day

11   Friday, but then recall our other two alternates to get the

12   final instructions done, and then dismiss them.  The last thing

13   I want to have is anybody drop out over the weekend.  I suppose

14   probably not the end -- let's just see where we are, because

15   even if somebody drops out over the weekend, we can always

16   recall them.  I guess there's no harm, no foul.  It's not as if

17   this is -- we've had them sworn in.

18       All right.  It's helpful just to think out loud about

19   what the schedule should be.  Let's talk --

20       MR. NESTLER:  Your Honor, for scheduling, I think

21   Your Honor said an hour for the instructions maybe.  If it ends

22   up taking longer to read these instructions, then we're not

23   able to finish our closing, Ms. Rakoczy's opening -- close on

24   Wednesday, we might need to slip it into Thursday morning.  Not

25   the full thing.  I'm just pointing out that if there's an hour

 1    left, we've got to do what we're prepared to do.

 2            THE COURT:  I think -- look, I think it -- an hour is

 3    probably about right, maybe a little bit longer.  Look, we'll

 4    just have to see.

 5            Do we have anything Wednesday morning?

 6            THE COURTROOM DEPUTY:  Tomorrow --

 7            THE COURT:  I'm sorry.  Thursday.  Tomorrow we

 8    already set.  Thursday morning.  Let's do this --

 9            Can you text the jurors?  We've got Lockwood at 8:45.

10            We'll start at 9:00 tomorrow, and we'll buy every

11    extra minute that we can.  So we'll start at 9:00.  Can you

12    text the jurors, 9 o'clock.  Let the marshals know 9 o'clock.

13    So we'll start then and then we can buy ourselves half an hour

14    to try and get everything in tomorrow.

15            MR. BRIGHT:  With that being said, is Your Honor

16    still planning on the defense starting Thursday morning?

17            THE COURT:  Correct.

18            MR. BRIGHT:  Okay.  Thank you, sir.

19            THE COURT:  Correct.

20            Okay.  All right.  Let's talk about the exhibits and

21    then we'll talk about instructions.  I can't now recall what

22    the exhibit was and what the issue was.

23            MR. MANZO:  Oh, Mr. Fischer was showing an exhibit,

24    and I think he identified it as the Facebook, but it wasn't

25    Facebook.  I believe it was a cell phone.  And I couldn't tell

9081

```
 1   which phone it was, if it was Mr. Caldwell's phone or Mr.

 2   Crowl's phone.

 3          MR. FISCHER:  I can do cleanup tomorrow, if that's

 4   necessary.

 5          MR. MANZO:  I guess the question would be if it's

 6   Mr. Crowl's phone, Mr. Caldwell would have no personal

 7   knowledge about that.

 8          THE COURT:  That's true, although I thought -- well,

 9   what's -- is this something that's already in evidence?

10   Because didn't we see portions of Mr. Crowl's phone already

11   that --

12          MR. FISCHER:  Your Honor, it is -- it's just --

13   there's so many government exhibits.  We were on the fly trying

14   to figure it out.  So it's the same thing because it -- it

15   involves the -- the video that was the plank.

16          THE COURT:  Right.  I thought we saw that.

17          MR. FISCHER:  It's in the government's evidence

18   already.

19          THE COURT:  I thought it was already introduced.

20          MR. MANZO:  I don't think that this witness could

21   testify about what's in somebody else's phone.  The witness has

22   no personal knowledge.

23          THE COURT:  That's fair.  On the other hand, if it's

24   in evidence, he can testify about what it is, about what the

25   communications are.  I mean, he can't say where it comes from
```

1    because he would have no personal knowledge of that, but it's

2    in evidence.

3            MR. FISCHER:  Your Honor, I think we saw -- I believe

4    it's actually -- it's from Mr. Caldwell's -- I'm sorry -- it's

5    from his Facebook -- I apologize.  This was the one that was

6    recovered from Crowl's phone.

7            THE COURT:  Right.

8            MR. FISCHER:  This was the one that was an email.  It

9    was an email message from Ms. Rakoczy.  The Court didn't allow

10   the email, but we were able to talk about the content, which

11   was this particular exhibit, but we got -- the government

12   already introduced it.

13           THE COURT:  All right.

14           MR. MANZO:  I don't think it would be proper just to

15   have a witness be able to kind of opine on what is in somebody

16   else's phone.

17           THE COURT:  Well, it's not an opinion.  Look, it

18   depends on what he's going to ask him.  If he's going to ask

19   him, Mr. Caldwell, is this the unsent message and the link that

20   you sent to -- or -- is this the -- is this the contents of

21   what you unsent to Mr. Crowl, and if he says yes, that's

22   completely proper.  Nothing wrong with that.  I mean, he can't

23   sort of identify what the source of it is, but he can show it

24   to him, and it's in evidence.

25           MR. MANZO:  That's fine.  That's fine.

```
1              THE COURT:  Okay.  All right.  Let's talk
2     instructions, and hopefully we can cruise through these.  I'm
3     just going to flip page by page.  If anybody has something they
4     want to point out, big or small, just speak out.  So --
5              MR. NESTLER:  Yes.  Your Honor, page 1.  Can we
6     please have the caption list all five defendants' names?
7              THE COURT:  Sure.  Okay.
8              Page 2.  Anything anybody wants to discuss on page 2?
9              All right.  Hearing nothing on page 2.
10             Page 3?  And to be clear, I'm working off of what was
11    circulated to everyone -- I think it was last night.
12             All right.  Nothing.
13             On page 4 --
14             MR. WOODWARD:  Sorry, Judge.  One second.
15             THE COURT REPORTER:  Mr. Woodward, can you turn on
16    that microphone by you.
17             MR. WOODWARD.  It's on.
18             MR. CRISP:  That was Mr. Woodward.  He said, "One
19    second."
20             THE COURT:  So page 4, I would propose, having reread
21    this, that we can just do away with the indictment not evidence
22    instruction because we say the same thing right before we
23    summarize the charges.  So just to avoid the redundancy.
24             MR. NESTLER:  No objection, Your Honor.
25             THE COURT:  Page 5?
```

```
 1            Page 6?

 2            All right.  Page 7.  We had left you-all a note with

 3     respect to accomplice testimony.

 4            MR. NESTLER:  We have a proposal.  Considering that

 5     the defense called Ricky Jackson, we propose that we delete the

 6     first sentence and that the second sentence be written to read

 7     more neutrally, something like the following:  The parties are

 8     permitted to call witnesses who testify that they participated

 9     in the offenses charged against -- against the defendants.

10            THE COURT:  Before we get there, is this -- is this

11     the complete list of who we would consider to be accomplices?

12            MR. NESTLER:  No.  We would consider Michael Greene

13     to also be an accomplice, also a defense witness.

14            MR. CRISP:  Judge, from my perspective, I mean, I

15     can't disagree with the government's position.  I mean, my

16     co-counsel may be mad, but we did call a now-indicted

17     co-conspirator.

18            THE COURT:  Okay.  So we'll change that to now

19     reflect the addition of Mr. Greene and to now say the parties

20     are permitted to use a witness who testifies?

21            MR. NESTLER:  I think maybe "call witnesses who

22     testify."

23            THE COURT:  Okay.  "To call witnesses to testify"?

24            MR. NESTLER:  No.  "Who testify."

25            THE COURT:  "Who testify"?
```

1          MR. NESTLER:  That they participated in the offenses

2     charged against the defendants.

3          THE COURT:  Okay.

4          MS. HALLER:  Allegedly.

5          MR. NESTLER:  I'm just reading the same sentence

6     that's already there.

7          THE COURT:  Right.  It says "the offenses charged."

8     So --

9          MR. NESTLER:  And the final sentence has the word

10    "his."  It should say "their" or "an accomplice's."

11         THE COURT:  Sorry.  What's the --

12         MR. NESTLER:  It says, "You should give" --

13         THE COURT:  Their.

14         MR. NESTLER:  -- "their testimony."  And in the first

15    sentence, Mr. Dolan's first name is Jason, not James.

16         THE COURT:  Okay.  All right.  So we move forward.

17         On page 8, just a small change I'm going to make.

18    There's the first full paragraph that begins, "The government

19    is permitted to enter into these kinds of plea agreements."

20    I'm going to change that for grammar purposes, "You, in turn,

21    may accept the testimony of such witnesses and convict the

22    defendants on the basis of his testimony alone, if it" -- if a

23    defendant's guilt "convinces you of the defendants' guilt

24    beyond a reasonable doubt."  I don't think it should be plural

25    to emphasize that they will be making individual judgments

1    about individual defendants.

2              MR. NESTLER:  Your Honor, so for the accomplice

3    testimony, our proposal is to not include the first sentence at

4    all, to list any of the names, and to just tell the jury about

5    an accomplice's testimony.  And that may not have to identify

6    who -- who an accomplice -- who is an accomplice and who is

7    not.

8              THE COURT:  Okay.  Any objection to striking the

9    names of the witnesses?

10              MS. HALLER:  No.  I'm not -- I'm not sure you heard

11    the testimony, so I'm not sure why you'd instruct them.

12              MR. CRISP:  One moment.

13              MR. WOODWARD:  If I could confess ignorance and ask

14    the Court why it would include the names of the accomplices.

15              THE COURT:  Look, I'm indifferent.  It's in *The Red*

16    *Book*.  That's why -- it's in here.  So if you-all want to pull

17    it out, that's fine by me.

18              MR. CRISP:  That's fine.  I concur.

19              THE COURT:  Okay.  Fine.  So we'll take it out.  Take

20    out the first sentence.

21         And let's just change the title from "accomplices" to

22    "participants," because we think we also -- we use "accomplice"

23    later on in connection with aiding and abetting and it has sort

24    of a loaded --

25              MR. NESTLER:  I think that makes sense.

1    Participants' testimony, the plural possessive, probably makes

2    sense.

3            THE COURT:  Yeah.  Okay.  So we'll change that to

4    "participants' testimony."  We'll get rid of the first

5    sentence, and then we'll modify it as discussed.

6            All right.  Page 8?  Any -- other than the change I've

7    suggested, anything else?

8            All right.  Page 9.  We'll obviously change -- well, we

9    will keep No. 19, right of a defendant not to testify to those

10    who are listed here, and then we'll add Mr. Caldwell in 20.

11            And then I'll also -- just small changes here.  Instead

12    of -- so the second sentence will now read:  His testimony

13    should not be disbelieved merely because he is a defendant.  In

14    evaluating his testimony, however -- well, I guess it should be

15    "their."  I guess we'll have to change all "his's" to

16    "their's" -- or "their testimony."

17            So it will be, "Their testimony should not be

18    disbelieved merely because they are defendants.  In evaluating

19    their testimony, however, you may consider the fact that a

20    defendant has a vital interest in the outcome of this trial.

21    As with the testimony of any other witness, you should give a

22    defendant's testimony as much weight as in your judgment it

23    deserves."

24            Okay.  All right.  So then Instruction 21, statements of

25    the defendants.  Any objection to -- to this one or any

9088

1    concerns about how we've referenced it only to Mr. Rhodes?

2            MR. NESTLER:  We suggest removing it.  We do not

3    believe that the government has admitted affirmatively any

4    statements Mr. Rhodes made to law enforcement.

5            THE COURT:  Well, there was the video shown of him

6    down in Texas.  Now, it wasn't a custodial interrogation, but

7    it certainly was a statement made to -- didn't he know it was

8    made to law enforcement?

9            MR. NESTLER:  It was used to impeach him.  So it was

10   not used as affirmative evidence.  It was used to impeach

11   Mr. Rhodes.  It was not being admitted for the truth of the

12   matter asserted.  I believe this is supposed to protect

13   defendants when we're introducing statements for the truth of

14   the matter asserted.

15           THE COURT:  Okay.  All right.  I was misrecollecting.

16   I had forgotten it was only for impeachment purposes.

17           Okay.  So I will take that out.  21 goes.

18           All right.  Character of defendant?

19           MR. CRISP:  Judge, when I posed that with the

20   government, the government did not recollect that there was

21   character evidence that was elicited.  But I did elicit it from

22   Montana about Watkins's character for law-abidingness as to his

23   opinion.  I did not get into reputation, but his opinion.  So I

24   believe it is relevant as to her at a minimum.

25           THE COURT:  All right.  And, of course, Mr. Caldwell

1    has called someone as to his opinion for truthfulness.

2          MR. NESTLER:  Mr. Crisp was correct.  I looked at the

3    transcript.  He did ask that one question, and the answer was

4    yes.

5          MR. CRISP:  It was two questions.

6          THE COURT:  So we'll modify that accordingly to

7    including the relevant names and the relevant characteristics.

8          MR. NESTLER:  I think the phrase "peaceful" should be

9    taken out.  It's just law-abiding.

10         THE COURT:  Right.  I don't know whether anybody was

11   coming or not, and this is I think just *The Red Book*.  All

12   right.

13       All right.  So specialized opinion testimony.  Kathryn

14   Cain.  Did we get the summary -- or the description of the

15   opinion?

16         MR. NESTLER:  She's testifying tomorrow for the

17   defense, and I --

18         MR. CRISP:  I think it's relevant, Judge.

19         MS. HALLER:  But you have another witness.  What

20   was --

21         MR. NESTLER:  So to be clear, so Mr. Crisp is calling

22   tomorrow a government FBI agent who is a CART examiner,

23   C-A-R-T, forensic analysis of evidence, and the government

24   already sponsored twice Jennifer Banks, who is a cell site

25   location information expert.

9090

1          MR. CRISP:  And she did -- they did qualify her as an

2     expert in that capacity too; so I think it's relevant.

3          THE COURT:  All right.  So Kathryn Cain is being

4     called as a --

5          MR. CRISP:  Cell site -- I'm sorry.

6          MR. NESTLER:  Forensic analysis of digital evidence.

7          THE COURT:  Okay.  We will - we'll make those edits.

8          All right.  Page 11 concerns the evaluation of prior

9     inconsistent statements of a witness.  *The Red Book* instruction

10    contemplates identifying who the witness is.  So where -- what

11    are your thoughts?  Because I have to confess I don't recall

12    which witnesses were confronted with prior inconsistent

13    statements.  We could -- we could modify this to make it just

14    generic.

15         MR. NESTLER:  We may need a minute.  So we're fine

16    with making it generic, except that there were some

17    impeachments that were done that are substantive evidence.

18         THE COURT:  Right.

19         MR. NESTLER:  For instance, Mr. Rhodes.  Any

20    statements he made at a prior time is substantive evidence

21    because he's a party opponent.  And any other witnesses who

22    were impeached with their grand jury transcripts would be

23    substantive.

24         MR. CRISP:  But isn't that inconsistent with that

25    video you're saying is only for impeachment purposes?  There

```
 1    would --

 2              MR. NESTLER:  No.

 3              MR. CRISP:  Wouldn't that make that relevant then,

 4    the instruction we just took out?  That's your position about

 5    Rhodes.  I can't disagree with it.

 6              MR. NESTLER:  It was being -- the video was being

 7    introduced to impeach Rhodes.

 8              MR. CRISP:  Agreed.

 9              THE COURT:  Right.  What I don't recall is

10    specifically what he said and whether you are intending to

11    argue that what he said is truthful.

12              MR. NESTLER:  We might need an overnight on the prior

13    inconsistent statements in order to go through the transcripts

14    and find the -- the specific impeachments that we've used to

15    identify certain names and figure out which category of -- if

16    it's Category A or B to put them in.

17              THE COURT:  Okay.  That may be -- all right.  So I

18    guess the bottom line is if the government is prepared to

19    undertake that task --

20              MR. EDWARDS:  Don't look at me.

21              THE COURT:  I'm not.

22              MS. RAKOCZY:  I think the party who wants to alert

23    the jury to any inconsistent statements should bear the

24    responsibility of identifying them.  I think we're happy to

25    point out any defense witnesses for whom we'll seek that
```

1    instruction, and if the defense would like to do the same.

2              THE COURT:  I think that's fair.

3              MR. WOODWARD:  I want it generic.

4              THE COURT:  I think -- look, I would need a

5    commitment from the defense if they're going to do that because

6    I can't leave out -- I can't -- I can't put in only a witness

7    that one party has identified would, in fact, it's -- there are

8    other witnesses as to whom the instruction might apply.  So

9    either everybody does it or no one does it.

10             MS. RAKOCZY:  We could also, Your Honor, generically

11   say the instruction as it is, but note -- followed up with a

12   statement that a defendant's out-of-court statements are

13   admitted for the -- for the truth of the substance.  There

14   could be a generic modification that captures what I think the

15   government's concern is.

16             THE COURT:  All right.  Well, I guess I'm not --

17             MR. NESTLER:  I would say that's fine.  If we

18   genericize the first one, and the second one if we say that

19   defendants made earlier statements or any statement made in the

20   grand jury proceeding is substantive evidence as well.  If

21   we -- if both sides don't want to go through and figure out --

22             THE COURT:  I guess the question is, were there any

23   confrontations with prior statements that a witness made under

24   oath?  Certainly --

25             MR. CRISP:  Yes.

1          THE COURT:  -- none of the defendants, other than

2    Mr. Rhodes, who is not under oath, but that would already come

3    in as an admission if that's what you want it to come in as.

4          MR. CRISP:  I thought we did with Dolan, Judge.

5          MR. BRIGHT:  And with Graydon Young.

6          MR. CRISP:  Young and Dolan is who I thought had

7    prior sworn statement testimony.

8          MR. BRIGHT:  And not unlike what the government has

9    asked for in terms of whether or not there are some transcripts

10   and other things that -- just like the government had said,

11   Your Honor, I mean, an overnight on that so I can go back and

12   revisit.  Mr. Linder's in the air right now, and he's the one

13   that cross-examined the first of those two.  I've got

14   transcripts back at the apartment.  I can start going through

15   it overnight if we didn't want to do the generic on those.

16         MR. NESTLER:  Again, we're fine to name the witnesses

17   for which we want to list them in Category A or Category B if

18   the defense also wants to name the witnesses.

19         MS. HALLER:  Your Honor, I think the generic is

20   easiest for everybody and -- in case --

21         THE COURT:  All right.  So --

22         MS. HALLER:  Do we agree?

23         We would propose what the Court said regarding generic

24   instructions, making it generic, and I don't think the -- what

25   Kate proposed would be objectionable from the sound of it.

1          THE COURT:  Okay.  So let me put it this way:  I

2     guess I'm more comfortable leaving it generic with a prior

3     inconsistent statement that is not made under oath.  However,

4     if you're seeking to argue that a prior inconsistent statement

5     made under oath is for the truth of the matter asserted, I

6     think those witnesses' names should be identified.

7          MR. CRISP:  I agree, Judge.

8          THE COURT:  And so we've got Young and Dolan.  I

9     don't know who else fits in that category.  I don't know

10    whether any FBI agents were confronted with any grand jury

11    testimony.  I don't recall that.  Anyway, think about it

12    overnight, and we'll take care of that.

13         Just to then double back.  So if the government is

14    intending to use Mr. Rhodes's videotaped statements that were

15    given to -- I think it was -- I can't remember the name of the

16    agent that he talked to -- then it seems to me we ought to keep

17    the substantive evidence instruction in.

18         MR. CRISP:  That was Palian.

19         THE COURT:  It wasn't Palian.  It was the FBI agent

20    that he knew -- I thought -- maybe -- was it Palian?

21         MR. NESTLER:  There were two agents there.

22    Agent Palian was the one recording, and we're not planning to

23    argue that Rhodes's statement was made for the truth.  It was

24    only for impeachment value.

25         THE COURT:  Okay.  All right.  So we'll keep that

1    out.  But you're not going to argue it's an admission and,

2    therefore, it could be used for the truth?

3         MS. RAKOCZY:  No, Your Honor.  The only wrinkle is

4    with both Mr. Rhodes and Mr. Caldwell, they were impeached with

5    their prior statements in message format, and so we don't want

6    to leave the jury with the misimpression that those statements

7    only come in for impeachment purposes.  That's -- that's the

8    slight wrinkle.

9         THE COURT:  Right.  Well, although this is -- I mean,

10   the way this is word -- I mean, if that's the concern, the way

11   this is worded, you've heard evidence that Mr. Rhodes made

12   statements to law enforcement.  So it doesn't implicate prior

13   statements that were made in other communications.

14        MR. NESTLER:  Right.  Which is why we don't think

15   that other instruction is appropriate at all.  We're talking

16   now about No. 24; that we do think that a defendant's prior

17   inconsistent statement can be used for the truth of the matter

18   asserted.

19        THE COURT:  I don't disagree with that, but then in

20   Mr. Rhodes's particular case, it's also a statement made to law

21   enforcement, and there is a specific instruction for statements

22   of a defendant made to law enforcement, which is currently

23   Instruction 21.

24        MR. NESTLER:  Right.  And we are saying that we are

25   not going to argue that that statement made to law enforcement

```
 1    has any truthful value.
 2              THE COURT:  Okay.  All right.  So then do you want a
 3    separate paragraph under paragraph -- on Instruction 24 that's
 4    specific to a defendant's prior inconsistent statements?
 5              MR. NESTLER:  Court's indulgence.
 6              THE COURT:  Look, I guess -- I don't know that we
 7    need an instruction about defendants' statements, even if
 8    they're inconsistent or not.  I mean, I think everybody agrees
 9    they come in for both the truth of the matter asserted and for
10    the credibility of the witness to the extent that they've made
11    inconsistent statements.  I don't know that the jury needs to
12    know that specifically.
13              MR. NESTLER:  It's fine, Your Honor.
14              THE COURT:  Okay.  All right.  Okay.
15         Instruction 25, I don't think there are any prior
16    consistent statements.
17              MR. NESTLER:  No, Your Honor.
18              THE COURT:  All right.  That will go.
19         I was going to include the word witness before
20    Mr. Rasheed's name just to jog their memory as to who he is.
21    It's been a while, so.
22         All right.  What do we do about 27?
23         Counsel, 27.  This is the -- the instruction about
24    evidence admitted only against one defendant.  You-all care
25    about this?
```

9097

```
1            MR. CRISP:  An objection to it.
2            THE COURT:  No.  I want to know what you want me to
3     do with it because there are -- at least as contemplated, the
4     instruction requires identification of the particular evidence.
5            MR. CRISP:  Right.
6            MS. HALLER:  I think Your Honor has been very
7     thorough, for the record, and I think this could be
8     generalized, because the jury's heard the -- you know, these
9     statements on Caldwell or Watkins or even Meggs or whoever.
10           THE COURT:  I guess this is statement -- this is an
11    instruction that matters to particular defendants, and if
12    you-all don't care that it's generalized, I think it can be
13    generalized.
14         I'm putting this on you, Mr. Crisp.
15           MR. CRISP:  I know.  I can see it.  My shoulders are
16    sagging.
17           THE COURT:  Well, you know the others should care
18    too, because, you know, the Zello --
19           MR. CRISP:  I think it's -- in all candor, it is more
20    problematic and more applicable to Ms. Watkins being the one
21    potentially implicating others in the jurors' minds, and that's
22    what I was saying contritely, but not insincerely.  I'm not
23    sure -- and then there's comments today we asked for a limiting
24    instruction on it, so.
25           THE COURT:  Did I give a limiting instruction
```

1    following the Zello?

2                MR. CRISP:  Yes, you did.

3                THE COURT:  I did.  Okay.

4                MR. BRIGHT:  And you'll forgive me, Your Honor, there

5    was an agent a week or week and a half, whatever, where a

6    multitude -- it may have been during Hilgeman and -- and/or

7    Kelsey Harris's testimony where he was leaking in Florida,

8    Florida, Ohio.  With Mr. Caldwell, we could give a multitude of

9    limiting instructions.

10               MR. CRISP:  No.  I'm going to ask for a specific

11   instruction.  So I would say we narrow it down to those three.

12   I think it's not -- I think that's been the crux of it.  I

13   would ask that the instruction specify that certain evidence

14   pertaining to the Zello chat only apply to Ms. Watkins, as you

15   heard my instructions earlier, and do -- do you want me to

16   literally go back through the transcripts and say this

17   statement regarding treasonist bastards, whatever the case be,

18   or just reference the particular subsection.

19               THE COURT:  If you're comfortable referencing the --

20   the exhibit number and describing it, I think that's fine.

21               MR. CRISP:  Yep, I am.  And same thing about

22   Mr. Caldwell today and then Mr. Rhodes.  I think that's --

23               THE COURT:  All right.  So I'm going to leave it to

24   defense --

25               MR. CRISP:  Okay.

9099

1          THE COURT:  -- to go back into the transcripts and

2    pull out what you feel appropriately belongs in this

3    instruction, and then we can finalize it tomorrow.

4          MR. NESTLER:  I'll point out for the Zello,

5    Ms. Watkins's own statements are not limited to just her.  They

6    are admissible against all of the defendants, as Your Honor

7    indicated.  So it's actually not as clear as just saying the

8    Zello.  We have to be pretty discrete about which portions of

9    the Zello recording, but not admitting against other

10   defendants.

11         MS. HALLER:  It's not that hard, Your Honor.

12   1% Watchdog does not belong to any of us.  I mean, in all

13   seriousness, Your Honor, the 1 Percent Watchdog is --

14         THE COURT:  Well, I don't think it's that clear-cut

15   because some of the statements by 1% Watchdog were -- were

16   included to provide context for a statement that I determined

17   was either a statement against penal interest or statement in

18   furtherance of the conspiracy, in which case all of it comes in

19   against all of the defendants.

20         So I backtrack, and I think perhaps we may need to have

21   something that identifies specifically which statements are

22   admissible against which defendants.  And I think instead of

23   including it in these instructions, why don't we tell them that

24   there will be an exhibit, a stipulation, among the parties as

25   to the statements on that Zello chat and against which

1   defendants the statements are admissible.

2          MR. CRISP:  I agree.  I think -- but I wouldn't limit

3   it just to the Zello chats.  I think we also had questions

4   about certain other exhibits and other text messages that were

5   relevant too, so.

6          THE COURT:  I agree, but I think given the nature of

7   the Zello --

8          MR. CRISP:  And its inherent complexities, is that

9   what you're saying?

10         THE COURT:  Yes.  I think we need something separate

11  that reflects what my order was.

12         MR. CRISP:  Okay.  Understood.

13         THE COURT:  And we'll enter it as a separate exhibit,

14  and we'll tell the jury that there will be an exhibit that

15  explains against which defendants the statements made on the

16  Zello chat are applicable?

17         MR. CRISP:  Okay.

18         MR. NESTLER:  And is that only for the Zello chat?  I

19  guess from our perspective, if the defense wants to propose

20  which specific piece of evidence or statements come in against

21  only certain other defendants, that the onus is on them.  If --

22  otherwise, it can just be generic.  And Your Honor provided a

23  limiting instruction every time this happened.  And just say, I

24  told you several times throughout the trial that evidence is

25  being admitted only against a certain defendant.  I am

1    reminding you of that here and leave it generic.  But,

2    otherwise, we leave it to the defense.

3         THE COURT:  Well, that's what I said at the

4    beginning, which is if the defense is prepared to deal with

5    something generic, then that's fine by me, because this is an

6    instruction that protects individual defendants.  And if you

7    want something specific, then the onus is on you-all to help me

8    identify what it is that requires specificity.

9         MR. WOODWARD:  Okay.

10        THE COURT:  Okay what?

11        MR. WOODWARD:  We'll get together and either provide

12   the Court with a list -- I don't think it is correct that the

13   Court provided a limiting instruction every time there was a

14   statement admitted that was only admissible as against one

15   defendant.  I think if we go back?

16        THE COURT:  I certainly did when it was requested,

17   and I think there were even a few times I did on my own.

18        MR. WOODWARD:  I'm not -- absolutely it was given,

19   but not every time.  And so are there other messages where the

20   defense would like this instruction to now be given is the open

21   question, and we've got to get you that.

22        THE COURT:  And if what you're proposing is going

23   back into the testimony and identifying all that, good luck.

24        MR. WOODWARD:  I don't see any other way to do it.

25        THE COURT:  Well, good luck in the time we have

1    available, but --

2              MR. CRISP:  What's your suspense for this?  Time

3    being available being 0800 tomorrow?  12 o'clock tomorrow

4    afternoon?  Mr. Albert looks like he can really scramble to put

5    this together fast.  I've got a lot of faith in him.  What's

6    your --

7              THE COURT:  I think I would need something -- if I'm

8    going to -- it would have to be, I'd say, by the time we start

9    tomorrow.

10             MR. CRISP:  So --

11             THE COURT:  I mean, the other thing, look, if you're

12   going to propose things, I still need to discuss it with the

13   government to -- so I need it in the morning such that if I'm

14   going to read it after lunch, we can discuss it at lunch so

15   that I can update the instructions.

16             MR. CRISP:  That's why I'm asking.  I don't want to

17   come to you at 11 o'clock and -- yeah, that works.

18             THE COURT:  All right.  All right.  Forging ahead.

19        All right.  I've got nothing on page 13.

20             MR. NESTLER:  I'm sorry, Your Honor.  On page 12,

21   just for completeness, No. 28 should include video and audio

22   records.

23             THE COURT:  Just in the title you mean?

24             MR. NESTLER:  Right.  I mean, however you want to

25   define it, Your Honor, but it has video throughout, but -- in

 1    fact, a lot of the transcripts come from audio recordings.

 2              THE COURT:  Okay.

 3              MR. NESTLER:  If you want to repeat audio every time,

 4    that's fine.  If you want to just say recordings every time,

 5    that's fine too.

 6              THE COURT:  Why don't I just say recording.

 7              MR. NESTLER:  That's fine.  Video and audio in the

 8    title and then say recording throughout, that works for us.

 9              THE COURT:  Okay.  Anything on 13?

10              MR. NESTLER:  No, Your Honor.

11              THE COURT:  All right.  Page 14.  Mr. Nestler, you

12    wanted to add something to the "in and around."

13              MR. NESTLER:  That's on page 15.

14              THE COURT:  Maybe we're just looking off different

15    printouts.

16              MR. NESTLER:  I was looking at the version we --

17              THE COURT:  So the Instruction 33?

18              MR. NESTLER:  Correct.  I circulated it to Mr. Douyon

19    and Mr. Alpert a couple hours ago.  I don't know if Your Honor

20    had a chance to see it.

21              THE COURT:  Okay.  Defense counsel, any reaction to

22    the proposed change to paragraph 3?

23              MR. WOODWARD:  Yes.  We object to the change.  I

24    mean, this has been a running debate.  The government alleged a

25    conspiracy that began in November of 2020.  It sought to admit

1    a number of statements as against all of the co-conspirators

2    based on the beginning of that conspiracy.  And for the

3    government to now change its theory of the case and argue that

4    the conspiracy did not begin until, hypothetically, the morning

5    of January 6th, that -- it just changes the posture of the

6    case.  The -- we understand that there's some flexibility in

7    defining a conspiracy.

8             THE COURT:  Well, to be clear, I mean, not to

9    interrupt you, but we had this discussion the other day, and

10   Ms. Rakoczy said very clearly the government will not be

11   arguing in closing, in summation, that the conspiracy

12   organically materialized in the hours before -- on January 6th.

13            MR. WOODWARD:  Then the change seems not necessary to

14   us, and the language that is standard is sufficient.

15            MR. CRISP:  Can I --

16            MS. RAKOCZY:  I disagree, Your Honor.

17            THE COURT:  You agree with what I said or the --

18            MS. RAKOCZY:  No, I don't disagree with what you

19   said, Your Honor.  But I do think that the law is clear that,

20   sort of, the precise details of how a conspiratorial plan will

21   be worked out may evolve over time.  Certain other aspects of

22   the conspiratorial agreement may come into crystallization over

23   time.  And I think that what this instruction is proposing is

24   just a clarification of what on or about means with respect to

25   a conspiracy.  Because it is -- it is different and much more

1    nuanced than just with a substantive crime that occurs at a

2    particular place and time.

3              MR. NESTLER:  And just for the record, we believe

4    this statement is a correct statement of the law.  I didn't

5    hear Mr. Woodward say it wasn't a correct statement of the law.

6    He thought it was irrelevant or sort of -- I don't know.  I

7    think -- the word that they were using to object, but it is a

8    correct statement of the law, and that's why we think it's

9    important to include.

10             MR. CRISP:  My concern is, Judge, it creates a

11   greater degree of ambiguity with the language posed in the last

12   phrase in the time window alleged versus near -- reasonably

13   near the date alleged.  The idea that there's a reasonableness

14   attached to this window is, I think, at least some guide for

15   the jury to say, you know, at or near is 30 days -- right? --

16   as opposed to, well, how long is a window?  And that's my

17   concern.  I don't think that gives greater guidance.  I think

18   it gives less guidance to this time frame the government is

19   alleging.

20             THE COURT:  The government's proposed instruction is

21   the proof need not establish that a conspiracy began and ended

22   on the exact dates alleged in the indictment.

23             MR. CRISP:  Concur.

24             THE COURT:  Okay.  Also, the proof need not establish

25   that a conspiracy existed for any particular length of time?

```
 1                MR. CRISP:  No issue.

 2                THE COURT:  It is sufficient if the evidence in the

 3      case establishes beyond a reasonable doubt that the conspiracy

 4      existed at any time and the time window alleged.

 5                MR. CRISP:  In the time window alleged, I think.

 6      Because you don't have -- what am I using to evaluate that time

 7      window now if we're not giving them some -- you know, a

 8      reasonable time, a small time.  You know, there's -- there's no

 9      qualifier into what that window is now.  At least

10      reasonableness, one can say, I think 30 days is unreasonable.

11      They could say 60 days is reasonable.

12                THE COURT:  But --

13                MR. CRISP:  Do you understand what I'm saying, Judge?

14                THE COURT:  I think so.  But what are you proposing

15      to change that would reflect what your concern is?

16                MR. CRISP:  I would propose to keep, you know,

17      existed on the dates reasonably near the time alleged and

18      switch that out within the time window alleged.  Something --

19      something that flows in that sentence.  So -- I'm reading out

20      loud.  It is sufficient if the evidence in the case establishes

21      beyond a reasonable doubt that the conspiracy existed on a date

22      reasonably near the date alleged.

23                MR. WOODWARD:  I think I'll actually contradict my

24      colleague, and I'll concede that I don't disagree it's an

25      accurate statement of the law.  The concern is what does the
```

1    government say in closing concerning the existence of the

2    conspiracy.  And so with an admonition from the Court that --

3    taking advantage of this written language could warrant a

4    sustained objection from defense counsel, then that is an

5    accurate statement of the law.

6          The concern is that, obviously, we have made issue about

7    the proof of the existence of a conspiracy and when.  And so I

8    don't want to limit our objection to the steps of the Capitol

9    when -- the point being, the theory of the case has been

10   there -- long been a conspiracy leading up to January 6.  And

11   if the government's going to change that theory of its case in

12   closing argument, you can expect defense counsel are going to

13   have concerns about that approach.

14         THE COURT:  Understood.

15         MR. NESTLER:  And to be clear, we may argue that

16   certain individuals joined the conspiracy on January 6th.

17   That's a perfectly valid argument to make.  We are committing

18   that the conspiracy itself existed prior to January 6th.  But

19   if certain individuals joined the conspiracy that day,

20   including any one of these defendants, that is a valid argument

21   to make, and we are not foregoing that argument.

22         MR. WOODWARD:  Yeah.  I mean, the conspiracy is a

23   complex one, not -- this is not conspiracy to rob a bank in

24   which somebody is standing at the bank steps, decides to join

25   in.  It's seditious conspiracy, and so the idea that -- I don't

9108

1    know who Mr. Nestler is -- who the government is referring to

2    but, the idea that --

3           THE COURT:  I don't think Mr. Nestler's argument is

4    going to seditious conspiracy.  It's going to the other two

5    conspiracy counts.

6           MR. WOODWARD:  Well, then fair enough, but now our

7    concern would be that the jury probably understand the

8    distinction between the three alleged conspiracies.

9           So 1512(k) --

10          THE COURT:  That's why we painfully stated in the

11   substantive instructions what those conspiracies are and what

12   the elements of those conspiracies are.

13          MR. WOODWARD:  The Court doesn't like surprises,

14   we're airing out all of our concerns about this.

15          If the government very meticulously explains that

16   somebody joined the 1512(k) conspiracy on the steps of the

17   Capitol and acknowledges that they -- therefore, could not have

18   been a part of the other conspiracies, that -- that's okay too;

19   but I don't see how they would argue that somebody joined the

20   1512(k) conspiracy and wasn't, therefore, a part of the

21   seditious conspiracy.

22          MS. RAKOCZY:  I just think it's worth noting,

23   Your Honor, that we have stated all along and will argue in

24   closing that an agreement came into fruition as early as the

25   days and weeks after the election.  But the indictment actually

1    alleges a conspiracy between November and January.  So the

2    indictment does not actually allege a particular start date.

3    It alleges that a conspiracy occurred between November and

4    January.  So I don't think the point that Mr. Nestler is making

5    is any variance from what is alleged in the indictment.

6        The indictment alleges a conspiracy that occurred during

7    this time period, and that does give flexibility both in the

8    way the indictment is charged and in the law that is cited in

9    our jury instruction about the possibility for different

10    defendants to join at different times.  Those principles are

11    consistent with what the evidence shows.

12        And the jury -- the jury may see the facts differently,

13    but it still may fit within -- within what is permitted by the

14    law, and I don't think that the government should be hamstrung

15    from arguing the case in a way that is consistent with the law.

16        THE COURT:  So I think what Mr. Woodward's concern is

17    is that -- correct me if I'm wrong, which is the government

18    suggests that one of these defendants joined the conspiracy on

19    January 6th.  Is the government going to also argue that that

20    defendant joined the conspiracy -- or the seditious conspiracy

21    on January 6th?

22        MS. RAKOCZY:  I think that is consistent -- that

23    would be consistent with the law.  I don't think that you have

24    to join a seditious conspiracy at any particular point in time.

25    So I think that that would be a permissible argument.

1          MR. NESTLER:  And the purpose of an indictment is to

2    give notice to the defense, and so the indictment does give

3    notice to the defense.  And as the case law we cited indicates,

4    the defense is on notice that we allege that a conspiracy

5    existed during these three months and that their clients joined

6    the conspiracy at some point during these three months.  That's

7    the point of the indictment.  So that is sufficient.

8          And then the rest of the law, as we indicated here,

9    is -- it's pretty black letter about the existence of

10   conspiracy does not need to exist for any particular amount of

11   time and a person can join a conspiracy at any time during the

12   pendency of the conspiracy.

13          THE COURT:  Okay.

14          MR. FISCHER:  Your Honor, on behalf of Mr. Caldwell,

15   I do object.  I would say it is true you can join a conspiracy,

16   but the government's been saying something for many, many

17   months that's not suggesting this was anything -- especially of

18   Mr. Caldwell, that he joined a conspiracy on January 6th.

19          And you can't continually argue to the Court to hold

20   people in detention, lock them up because they're involved in a

21   long-term conspiracy, put a very sweeping indictment in, make

22   an opening argument that talks about things that happened in

23   November and December and go on about how they learned lessons;

24   and then turn around and -- and suggest that this indictment is

25   something that is -- oh, they instantaneously joined a

1    conspiracy on January 5th or 6th.

2         That's not what this indictment charges and under the

3    Satrohen (phonetic) case, I think it would be -- I think it

4    would -- it would allow the jury to go back and -- and

5    create -- even if the government didn't argue, the jury could

6    go back and create some -- you know, some in-their-mind

7    conspiracy that's not what the grand jury indicted.

8         THE COURT:  All right.  Let's bring this back to the

9    actual instruction and then -- so let's resolve that.  And

10   so -- so what Mr. Crisp has proposed is -- is sufficient if the

11   evidence in the case establishes beyond a reasonable doubt that

12   the offense was committed on a date -- excuse me.  That the

13   conspiracy existed on a date reasonably near the dates alleged

14   of the conspiracies.  Or the alleged dates of the conspiracies?

15        MR. NESTLER:  We don't believe that's appropriate.  I

16   mean, as the case law makes clear, the conspiracy has to exist

17   within the window of the alleged dates.  And, in fact, there's

18   flexibility on either end.  And so I think that's what this on

19   or about instruction is actually getting at; is that if the

20   jury found the conspiracy existed on January 21st or in late

21   October, it could, because that's why we charged on or about,

22   and that's what this instruction gets at.  Our point is that it

23   has to exist at some point during the time window.

24        THE COURT:  Right.  But isn't that --

25        MR. CRISP:  -- gets to that, in my opinion.  The

```
 1    reasonably near gets to it on front end and back end.  I think,
 2    honestly, it's saying -- and the time window.
 3            THE COURT:  I don't think -- if anything, maybe
 4    I'm -- if anything, it seems like the government's request is
 5    narrower, Mr. Crisp, than what you're asking for because
 6    they're specifying it needs to be within the time window, and
 7    you're suggesting a little bit more flexibility by injecting
 8    the word reasonable in there.
 9            MR. CRISP:  In a sense, you're not wrong.  My greater
10    concern is how is the jury supposed to assess what that window
11    is if we're not giving them some qualifying way to say:  What
12    is that window?  Because -- because then if that's the case, I
13    would be within my rights to say they charged between X and Y
14    date.  That is the window.  Period.  Not the 21st, not the
15    22nd, and so on and forth.
16            MR. NESTLER:  So if I may, the window is in the first
17    two paragraphs.  The -- the Court indicated the window in these
18    first two paragraphs were -- and, by the way, the phrase time
19    window comes from the case law.  We didn't make it up.  That's
20    what we're harkening back to.
21            THE COURT:  Mr. Crisp, does that resolve your
22    concern?
23            MR. CRISP:  Yes, Judge.
24            THE COURT:  Let's keep moving because our court
25    reporter -- well, because we've got a hard stop that's coming
```

 1    in about ten minutes.

 2         Anything on page 16?  17?  I think we're sort of in a

 3    place where, hopefully, everybody is in agreement as to what

 4    the instructions are.

 5         18?  19?  20?  21?

 6         MR. CRISP:  You're talking pages, not paragraphs;

 7    right, Judge?

 8         THE COURT:  Page 22, seditious conspiracy begins.  On

 9    page 23, I was going to simply just put in the numbers 1 and 2

10    under the "Unanimity as the Objects or Goals of the

11    Conspiracy," the second paragraph, just to break up that

12    sentence.

13         All right.  On page 26 I was going to propose the

14    following modifications just to make it a little bit more clear

15    that the conspiracy to obstruction -- I'm sorry.  Count 3 as to

16    each individual defendant.

17         So under definitions, what I would propose to simply

18    modify is to read as follows, "I have already instructed you on

19    conspiracies.  The instructions in Count Three, which charges

20    each defendant individually with obstruction of an

21    individual [sic] proceeding and which I'm about to provide,

22    apply equally to Count Two when you are considering whether

23    each defendant conspired to commit the crime that is charged

24    substantively in Count Three."

25         MR. NESTLER:  That's fine for the government.

9114

1          THE COURT:  Okay.  Everybody okay with that?  And

2     then in the next paragraph under "Obstruction of an Official

3     Proceeding, it would read, "Count Three of the indictment

4     charges each defendant individually with corruptly obstructing

5     an official proceeding on or about January 6 . . . which is a

6     violation of the law.  Count Three also charges each defendant

7     individually with attempting to obstruct or impede an official

8     proceeding and aiding and abetting to commit that offense."

9          MR. NESTLER:  That's fine for the government.

10         THE COURT:  Okay.

11         MR. CRISP:  That's fine.

12         THE COURT:  Same small edit on page 28 under

13    "Attempt" in Count Three.  "Each defendant is also charged

14    individually."  Just to make that consistent.

15         MR. NESTLER:  So, Your Honor, if we go back to

16    page 26 for a second.  Did we hear under Count Three you've

17    also included the phrase co-conspirator liability?  I'm not

18    sure we heard that in Your Honor's proposed revision.

19         THE COURT:  I think it's on page 27.

20         MR. CRISP:  At the bottom of page 26, I think.

21         THE COURT:  I think it depends on what you're working

22    from, but it's the paragraph right -- the second paragraph

23    under obstruction of an official proceeding.

24         MR. CRISP:  Begins with "I will first explain."

25         THE COURT:  Right.

9115

1          MR. NESTLER:  Gotcha.  Right.  Sorry.  In the first

2     paragraph, if you -- when you're explaining what you're about

3     to explain, I think that -- that phrase is missing.  Because

4     the way Your Honor was just indicating, you were going to tweak

5     the language to make it clearly about substantively for each

6     defendant.  If we can just make sure that co-conspirator

7     liability tracks there as well.

8          THE COURT:  So what are you proposing to change in --

9     maybe I'm not following.

10         MR. NESTLER:  I think -- you're using the word

11    individually when you're making clear what the charges are in

12    Count Three.  And so -- but we need to make clear they're

13    charged individually but they can be found guilty under

14    co-conspirator liability.

15         THE COURT:  Right.  I think that's clear once -- the

16    instructions will be.

17         MR. NESTLER:  That's fine.

18         THE COURT:  All right.  I think I said this.  Under

19    "Attempt" on page 28 on Count Three, "Each defendant is also

20    charged individually."

21         Okay.  The main substantive inquiry I have for all of

22    you relates to these counts that have multiple means or

23    multiple theories of culpability or conviction and whether we

24    should include unanimity language in the concluding remarks on

25    page 32, under "Concluding Remark for Count Three."  That would

1    then be carried through into counts -- the other counts that

2    have similar multiple theories of conviction.

3              MR. NESTLER:  We oppose.  I think we've addressed

4    this.  Mr. Woodward might have raised this earlier, but

5    different theories of liability do not require special

6    unanimity or interrogatories, and so our position is that the

7    answer is no.

8              THE COURT:  So here's my thinking, and then -- which

9    is -- it is a correct statement of the law that different means

10   of committing an offense does not require unanimity.  However,

11   if those means rest on different elements, then it does require

12   a unanimity instruction.

13             So each of these theories of conviction rests on

14   different set of elements.  And the jury needs to agree

15   unanimously as to those elements.  And I think it -- that a

16   unanimity instruction is required.  In other words, I don't

17   think three of them can say, all right, they committed the

18   substantive events.  Three of them say it's aiding and

19   abetting, three of them say attempt, and three of them say

20   co-conspirator liability.  I think all 12 have to agree to the

21   theory of liability.

22             MR. CRISP:  I agree.

23             MR. BRIGHT:  I think that makes logical sense.

24             THE COURT:  Of course you do.  I wasn't looking at

25   you.

```
 1              MR. BRIGHT:  Oh, yes, sir.  Yes, sir.

 2              MR. NESTLER:  We respectfully request to provide

 3     Your Honor with some case law.  We don't believe that's --

 4     that's accurate, but we -- we take Your Honor's point, and if

 5     we could get back to the Court later this evening, we would

 6     appreciate it.

 7              THE COURT:  Bear with me.

 8         So this is what I'm reading from, and it's a district

 9     court opinion, but it cites a number of circuit cases.  It's

10     United States v. Adams, 200 F. Supp. 3d 141 at page 146.  In

11     that case, the court writes:  The court also pointed out that

12     the Supreme Court and other circuits have generally held that

13     juries must be unanimous about the elements of offenses but not

14     the means by which defendant's actions satisfy those elements.

15         So, anyway, that's where it's coming from, I think.

16     And --

17              MR. NESTLER:  We understand, Your Honor.  If we have

18     a few hours, we'll be able to get back to the Court.  If we

19     persist in disagreeing, we'll provide some case law to support

20     our position.

21              THE COURT:  Okay.  This also -- anyway, United States

22     v. Washington, D.C. Circuit opinion from 1997, 106 F.3d 93 --

23     excuse me, 983 at 1012.  Court there just wrote:  Because the

24     district court did not require the jury to agree as to the

25     principle factual elements for any of the 924(c)(1)
```

1    convictions -- anyway, take a look.  Let me know what you

2    think, and we'll deal with this tomorrow.

3          MR. FISCHER:  Your Honor, since we have a hard stop

4    coming up here, I just -- very quickly, the evidence tampering

5    count against Mr. Caldwell, the instruction, we -- I believe

6    for Mr. Caldwell, it's the only evidence tampering count where

7    the grand jury specified specific items.  And so I think in

8    paragraphs 166 and 167 of the indictment, it specifies that

9    the -- that what was tampered with was the video that was the

10   link that we were arguing over, number one.

11         And number two, it says that, quote, Caldwell deleted

12   photographs from his Facebook account that documented his

13   participation on the attack on the Capitol on January 6th.  So

14   both Mr. Caldwell's evidence tampering, the instruction under

15   the Satrohen (phonetic) case would have to be tailored with

16   what the grand jury actually indicted on.

17         THE COURT:  Okay.  All right.  Why don't you-all --

18   Mr. Nestler.

19         MR. NESTLER:  I was going to say that is an

20   allegation in the indictment, but that is not the only

21   allegation that supports the count for evidence tampering.

22         THE COURT:  All right.  I'll take a look at the

23   indictment as well.  Wording matters.  I'll have to take a look

24   at it.

25         All right.  All right.  Can everybody be here at 8

1    o'clock tomorrow?

2              MR. FISCHER:  Yes, Your Honor.

3              MR. CRISP:  Yes, sir.

4              MS. RAKOCZY:  Yes, Your Honor.  Just looking for a

5    little clarity on closing, just in light of a number of things

6    that need to be addressed.  Does the Court really think that

7    we're going to be able to get to the government close tomorrow?

8              THE COURT:  That's my goal.

9              MS. RAKOCZY:  Okay.

10             THE COURT:  Because otherwise we have to bleed into

11   Friday afternoon, which I would rather avoid.

12             MS. RAKOCZY:  We understand.  We just may -- you

13   know, if we're getting to 3:30, 4 o'clock, I think the

14   government's preference would not be to completely split the

15   government's close.

16             THE COURT:  I mean, if things -- if the case comes in

17   by lunch, that shouldn't be a problem.

18             MS. RAKOCZY:  Understood, Your Honor.

19        Thank you.

20             THE COURT:  We'll just see where we are.  I mean, I

21   agree.  I don't want to split the government's closing either,

22   but I'm hoping that we can -- we can get through it.

23   Hopefully, there's not too much to talk about the instructions,

24   although I don't --

25             MR. CRISP:  The only thing I was going to say, we

9120

```
 1    have the multiple conspiracy requests that we had.  So we're
 2    going to do that tomorrow after Your Honor has had a chance to
 3    look at it, and then the defense theory, I think, are the only
 4    two what I would consider substantive things we would need to
 5    discuss beyond that.
 6              THE COURT:  I'm sorry.  Say that again, Mr. Crisp.
 7              MR. CRISP:  The defense theory.  And you know, those
 8    are the ones, I would say, would be really meaty in that sense.
 9    I don't know what the government's position is on the multiple
10    conspiracies.  I'm sure --
11              MR. NESTLER:  We object to both.  We got them both
12    this afternoon.  They were supposed to come yesterday, and we
13    need to look at them more.  And we think they're complicated.
14    In fact, very complicated.  And we're not inclined to agree.
15              THE COURT:  That's why we'll come back at 8 o'clock
16    tomorrow and see if we can resolve it.  Okay?
17              Thanks, everybody.  Have a good night.
18              And, defense counsel, you waive your clients' appearance
19    at 8 o'clock in the morning?
20              MR. GEYER:  Yes.
21              MR. WOODWARD:  Yes.
22              MR. FISCHER:  Yep.
23              (Proceedings were concluded at 6:34 p.m.)
24
25
```

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9                    Dated this 16th day of November, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

'

**'em** [2] - 9029:20, 9030:11
**'kits'** [2] - 8979:12, 8980:12
**'Tifa** [7] - 8962:12, 8962:14, 8962:22, 8962:23, 8963:4, 8963:5, 8963:8

**0**

**0800** [1] - 9102:3

**1**

**1** [3] - 9083:5, 9099:13, 9113:9
**1%** [2] - 9099:12, 9099:15
**1/13** [1] - 9040:23
**1/18** [1] - 9041:4
**1/8** [1] - 9019:5
**10** [1] - 9041:23
**100%** [1] - 9027:24
**101** [1] - 9031:25
**1012** [1] - 9117:23
**102** [1] - 9068:2
**106** [1] - 9117:22
**10th** [7] - 8993:18, 8994:3, 9027:5, 9027:7, 9064:5, 9067:14, 9070:17
**11** [2] - 9090:8, 9102:17
**11/14/21** [1] - 8986:19
**11/15** [1] - 8977:4
**11/16** [1] - 8974:17
**111** [1] - 9069:14
**112** [1] - 9070:13
**11th** [1] - 8993:4
**12** [5] - 8954:21, 8996:9, 9102:3, 9102:20, 9116:20
**12/26/2020** [1] - 9044:12
**12:30** [1] - 9066:16
**12:56** [1] - 9063:25
**13** [2] - 9102:19, 9103:9
**13:24** [1] - 9002:8
**14** [1] - 9103:11
**14-year-old** [2] - 9054:13, 9055:20
**141** [1] - 9117:10
**146** [1] - 9117:10
**14th** [12] - 8954:12, 8973:23, 8974:8, 9060:10, 9061:13,

9061:25, 9062:21, 9063:13, 9065:18, 9066:13, 9067:18, 9068:14
**15** [6] - 8996:9, 8996:15, 9000:24, 9016:10, 9034:19, 9103:13
**1500** [2] - 8997:9, 9002:7
**1512(k** [3] - 9108:9, 9108:16, 9108:20
**15th** [8] - 9026:20, 9027:6, 9060:9, 9061:12, 9061:24, 9064:7, 9068:15, 9069:21
**16** [2] - 9079:10, 9113:2
**166** [1] - 9118:8
**167** [1] - 9118:8
**17** [1] - 9113:2
**18** [3] - 8997:10, 9049:1, 9113:5
**180** [10] - 8987:17, 9026:3, 9026:8, 9026:12, 9026:15, 9026:20, 9030:5, 9059:8, 9063:2, 9066:2
**181** [5] - 9054:4, 9055:3, 9055:6, 9055:7
**181.................** [1] - 8940:20
**1888** [1] - 8961:13
**18th** [2] - 9033:12, 9036:9
**19** [2] - 9087:9, 9113:5
**1940s** [1] - 9025:4
**1978** [1] - 9048:24
**1979** [1] - 9049:10
**1997** [1] - 9117:22
**19th** [1] - 9058:21
**1:30** [1] - 9076:18
**1st** [3] - 9062:11, 9062:12, 9062:18

**2**

**2** [4] - 9083:8, 9083:9, 9113:9
**20** [7] - 8970:15, 9043:9, 9043:11, 9043:12, 9052:22, 9087:10, 9113:5
**200** [1] - 9117:10
**2001.T.1** [5] - 9026:15, 9030:4, 9040:19, 9056:15, 9058:25

**2011** [1] - 8942:19
**2015** [1] - 8942:20
**2020** [19] - 8945:9, 8946:16, 8951:19, 8954:12, 8954:25, 8966:14, 8971:6, 8981:24, 9014:1, 9028:20, 9029:18, 9033:8, 9034:12, 9037:8, 9059:16, 9059:19, 9065:15, 9068:10, 9103:25
**2021** [7] - 9058:21, 9059:22, 9060:11, 9063:10, 9063:13, 9067:14, 9070:9
**206** [1] - 9040:20
**20th** [1] - 9065:15
**21** [5] - 9021:10, 9087:24, 9088:17, 9095:23, 9113:5
**21st** [2] - 9111:20, 9112:14
**22** [1] - 9113:8
**22.P.8** [1] - 9001:21
**22.T.27.2883** [2] - 9004:25, 9007:11
**22.T.283** [1] - 9007:10
**22nd** [1] - 9112:15
**23** [1] - 9113:9
**24** [3] - 8969:16, 9095:16, 9096:3
**25** [3] - 8969:21, 9034:19, 9096:15
**25th** [2] - 9068:9, 9068:21
**26** [3] - 9113:13, 9114:16, 9114:20
**27** [3] - 9096:22, 9096:23, 9114:19
**28** [3] - 9102:21, 9114:12, 9115:19
**2:30** [1] - 9076:19
**2nd** [1] - 9063:10

**3**

**3** [9] - 8973:20, 8978:20, 9029:20, 9030:1, 9030:11, 9072:12, 9083:10, 9103:22, 9113:15
**30** [4] - 9006:22, 9059:1, 9105:15, 9106:10
**30-some** [1] - 9075:21
**30th** [5] - 8980:7, 8981:24, 8982:11, 9060:6, 9061:11
**31** [3] - 8990:14,

9060:6
**3112** [1] - 9038:1
**31st** [1] - 9061:21
**32** [1] - 9115:25
**33** [1] - 9103:17
**35** [1] - 8991:15
**37** [1] - 9065:9
**3:30** [1] - 9119:13
**3:45** [2] - 9011:8, 9012:2
**3d** [1] - 9117:10
**3rd** [1] - 8974:21

**4**

**4** [9] - 8972:22, 8974:13, 8989:2, 8989:17, 9007:12, 9041:23, 9083:13, 9083:20, 9119:13
**40** [1] - 9016:12
**400** [1] - 8944:9
**45** [1] - 9059:4
**45-71** [1] - 9001:9
**46** [2] - 9059:25, 9061:3
**47** [3] - 9060:20, 9060:25, 9063:7
**48** [3] - 9063:4, 9063:12, 9063:15
**4th** [1] - 9068:13

**5**

**5** [4] - 9034:17, 9034:19, 9073:7, 9083:25
**5-11** [2] - 8961:5, 8961:7
**50** [1] - 9063:22
**52** [1] - 9072:7
**53** [1] - 9073:4
**540** [2] - 8968:11, 9057:20
**57** [1] - 8986:15
**5:00** [2] - 9012:4, 9012:7
**5th** [1] - 9111:1

**6**

**6** [8] - 9029:20, 9030:1, 9030:8, 9030:11, 9034:17, 9084:1, 9107:10, 9114:5
**60** [4] - 8984:23, 9007:9, 9079:4, 9106:11
**62** [1] - 9056:20
**63** [2] - 9065:10,

9060:6
**9065:11**
**6617.B** [1] - 8954:21
**6734.1** [1] - 9005:22
**6734.11** [1] - 9006:13
**68** [1] - 9053:3
**68.1** [3] - 9057:21, 9058:6, 9058:8
**68.1.................** [1] - 8940:20
**6919** [4] - 8971:7, 8973:20, 8974:13, 8989:17
**6923** [8] - 8969:16, 8972:22, 8982:21, 8984:4, 8984:23, 8988:16, 8990:14, 8991:15
**6:34** [1] - 9120:23
**6th** [61] - 8948:11, 8948:14, 8949:14, 8955:9, 8955:23, 8978:13, 8980:24, 8981:1, 8989:25, 8990:11, 8990:17, 8990:24, 8991:9, 8991:12, 8991:14, 8995:10, 8995:12, 8995:14, 8995:21, 8995:23, 8995:24, 8995:25, 8996:3, 9005:3, 9006:6, 9006:13, 9007:14, 9010:14, 9016:25, 9022:18, 9026:12, 9026:14, 9037:18, 9040:16, 9040:24, 9044:14, 9057:15, 9058:16, 9059:12, 9059:21, 9062:24, 9063:19, 9065:7, 9065:21, 9066:2, 9066:12, 9066:16, 9067:24, 9070:4, 9070:9, 9071:4, 9104:5, 9104:12, 9107:16, 9107:18, 9109:19, 9109:21, 9110:18, 9111:1, 9118:13
**6x3** [2] - 9027:25, 9028:4

**7**

**7** [2] - 8982:21, 9084:2
**70** [3] - 8978:11, 8978:14, 9066:5
**77** [1] - 8988:16
**7:27** [1] - 9062:9
**7:30** [1] - 9066:17

9123

---

**7th** [3] - 8971:11, 9062:8, 9063:24

## 8

**8** [6] - 8984:4, 9085:17, 9087:6, 9118:25, 9120:15, 9120:19
**81** [1] - 9054:4
**8942** [1] - 8940:5
**8951** [1] - 8940:5
**8956** [1] - 8940:6
**8960** [1] - 8940:8
**8977** [1] - 8940:18
**8981** [1] - 8940:15
**8993** [1] - 8940:17
**8:45** [1] - 9080:9

## 9

**9** [6] - 9022:23, 9066:24, 9080:12, 9087:8
**9009** [1] - 8940:16
**9017** [1] - 8940:16
**9020** [1] - 8940:18
**9029** [1] - 8940:14
**9031** [1] - 8940:15
**9044** [1] - 8940:17
**9046** [1] - 8940:8
**9048** [1] - 8940:11
**9051** [1] - 8940:11
**9052** [1] - 8940:9
**9055** [1] - 8940:20
**9058** [1] - 8940:20
**9079.11** [1] - 9023:7
**924(c)(1** [1] - 9117:25
**93** [3] - 9011:20, 9038:17, 9117:22
**9310** [17] - 8940:14, 8940:15, 8940:15, 8978:19, 8979:5, 8981:17, 8981:18, 9028:11, 9028:24, 9029:13, 9029:14, 9030:22, 9031:7, 9031:10, 9031:11, 9032:10, 9032:19
**9312** [6] - 9010:18, 9011:5, 9017:3, 9017:4, 9017:6, 9017:7
**9312.........................**
[1] - 8940:16
**9312.1** [1] - 9017:24
**9312.2** [1] - 9018:2
**9313** [4] - 9009:9, 9009:21, 9009:23, 9009:24

**9313.......................**
[1] - 8940:16
**9315** [8] - 8992:13, 8993:12, 8993:13, 8993:15, 9043:23, 9044:5, 9044:7, 9044:8
**9315...................**
[2] - 8940:17, 8940:17
**9316** [4] - 8976:14, 8976:20, 8976:25, 8977:1
**9316.......................**
[1] - 8940:18
**9317** [4] - 9020:4, 9020:14, 9020:17, 9020:18
**9317.......................**
[1] - 8940:18
**9340** [1] - 8964:12
**98** [1] - 9067:1
**983** [1] - 9117:23
**99%** [1] - 9041:2
**9:00** [3] - 9077:3, 9080:10, 9080:11
**9th** [4] - 8954:25, 9020:21, 9069:19, 9070:1

## A

**a.m** [2] - 9062:9, 9066:17
**abetting** [3] - 9086:23, 9114:8, 9116:19
**abhor** [1] - 9006:7
**abiding** [2] - 8956:9, 9089:9
**abidingness** [2] - 9074:1, 9088:22
**able** [10] - 8951:25, 9012:16, 9025:17, 9064:21, 9076:13, 9079:23, 9082:10, 9082:15, 9117:18, 9119:7
**about...** [1] - 9022:6
**about....** [1] - 8979:14
**absolutely** [16] - 8950:24, 8985:9, 8985:11, 9006:8, 9017:2, 9018:7, 9021:22, 9029:19, 9030:9, 9032:17, 9037:8, 9037:9, 9044:3, 9044:24, 9101:18
**accept** [1] - 9085:21
**accepted** [1] - 8955:20

**accompany** [1] - 9011:15
**accomplice** [6] - 9084:3, 9084:13, 9086:2, 9086:6, 9086:22
**accomplice's** [2] - 9085:10, 9086:5
**accomplices** [3] - 9084:11, 9086:14, 9086:21
**according** [1] - 9008:25
**accordingly** [1] - 9089:6
**account** [2] - 9024:2, 9118:12
**accurate** [10] - 8968:10, 8978:24, 8992:19, 9009:14, 9066:3, 9069:6, 9071:7, 9106:25, 9107:5, 9117:4
**acknowledge** [1] - 8995:11
**acknowledges** [1] - 9108:17
**action** [1] - 8954:3
**actions** [1] - 9117:14
**active** [3] - 8945:3, 8947:15, 9022:9
**actual** [3] - 8944:13, 8966:17, 9111:9
**Adams** [1] - 9117:10
**add** [3] - 9045:21, 9087:10, 9103:12
**addition** [2] - 9073:22, 9084:19
**additional** [3] - 8951:7, 9032:15, 9074:10
**address** [3] - 9073:21, 9075:4, 9076:9
**addressed** [5] - 8972:6, 9003:19, 9012:10, 9116:3, 9119:6
**adequately** [1] - 8961:22
**adjourn** [2] - 9073:6, 9073:8
**administered** [2] - 8941:21, 9048:1
**admissible** [5] - 9040:12, 9099:6, 9099:22, 9100:1, 9101:14
**admission** [2] - 9093:3, 9095:1
**admit** [13] - 8976:20,

8979:4, 8981:15, 8988:12, 8993:9, 9017:4, 9025:25, 9026:2, 9031:6, 9038:4, 9038:16, 9075:14, 9103:25
**admitted** [28] - 8976:25, 8977:1, 8981:17, 8981:18, 8993:12, 8993:13, 9009:23, 9009:24, 9017:6, 9017:7, 9020:17, 9020:18, 9029:13, 9029:14, 9031:10, 9031:11, 9044:7, 9044:8, 9045:17, 9055:6, 9055:7, 9058:8, 9088:3, 9088:11, 9092:13, 9096:24, 9100:25, 9101:14
**Admitted** [1] - 8940:13
**admitting** [1] - 9099:9
**admonition** [1] - 9107:2
**adopted** [1] - 9032:6
**Adrian** [8] - 8990:16, 8991:7, 8991:10, 8991:11, 9028:5, 9029:22, 9039:18, 9044:2
**advance** [2] - 8999:17, 9001:6
**advanced** [2] - 9000:16, 9001:5
**advantage** [1] - 9107:3
**advocating** [2] - 9013:17, 9013:18
**affect** [8] - 9051:8, 9051:9, 9051:11, 9051:12, 9051:15, 9051:17, 9051:20, 9051:24
**affirmatively** [1] - 9088:3
**afraid** [1] - 8974:3
**African** [1] - 8997:6
**afternoon** [12] - 8951:14, 8960:6, 8960:7, 9000:23, 9003:14, 9046:10, 9046:11, 9078:25, 9079:2, 9102:4, 9119:11, 9120:12
**age** [2] - 9057:5, 9057:6
**agency** [1] - 8944:10
**agent** [7] - 8960:14, 9076:1, 9076:7,

9089:22, 9094:16, 9094:19, 9098:5
**Agent** [2] - 9077:10, 9094:22
**agents** [2] - 9094:10, 9094:21
**aggression** [2] - 8965:13, 8965:14
**aggressive** [1] - 9014:14
**ago** [6] - 8984:15, 9006:22, 9021:20, 9040:17, 9073:23, 9103:19
**agree** [15] - 9027:24, 9056:11, 9064:8, 9067:8, 9093:22, 9094:7, 9100:2, 9100:6, 9104:17, 9116:14, 9116:20, 9116:22, 9117:24, 9119:21, 9120:14
**agreed** [2] - 8965:24, 8990:22, 9091:8
**agreement** [3] - 9104:22, 9108:24, 9113:3
**agreements** [1] - 9085:19
**agrees** [1] - 9096:8
**ahead** [4] - 9000:25, 9057:16, 9071:12, 9102:18
**aid** [2] - 8944:6
**aiding** [3] - 9086:23, 9114:8, 9116:18
**air** [2] - 9004:9, 9093:12
**airing** [1] - 9108:14
**airport** [1] - 9018:8
**Albert** [1] - 9102:4
**alert** [1] - 9091:22
**Alexandra** [1] - 8951:14
**alibi** [5] - 9025:2, 9025:8, 9045:18, 9046:15, 9075:17
**alibis** [2] - 9051:16, 9051:17
**ALL** [1] - 8994:20
**allegation** [3] - 9071:18, 9118:20, 9118:21
**allegations** [2] - 9046:14, 9071:19
**allege** [2] - 9109:2, 9110:4
**alleged** [15] - 8967:8, 9103:24, 9105:12, 9105:13, 9105:22,

9106:4, 9106:5, 9106:17, 9106:18, 9106:22, 9108:8, 9109:5, 9111:13, 9111:14, 9111:17
**allegedly** [3] - 9071:20, 9071:21, 9085:4
**alleges** [3] - 9109:1, 9109:3, 9109:6
**alleging** [1] - 9105:19
**allied** [1] - 8984:7
**allow** [6] - 8954:3, 8954:4, 9029:7, 9034:2, 9082:9, 9111:4
**allowed** [7] - 8944:5, 8948:24, 8955:2, 8956:24, 8957:1, 9003:13, 9015:7
**almost** [3] - 8958:11, 9043:12, 9053:14
**alone** [2] - 9022:9, 9085:22
**Alpert** [1] - 9103:19
**alternates** [1] - 9079:11
**alternative** [1] - 9033:25
**ambiguity** [1] - 9105:11
**American** [6] - 8949:25, 8953:25, 8954:5, 8954:8, 8997:6, 9005:10
**Americans** [2] - 8972:1, 9010:8
**amount** [2] - 9053:17, 9110:10
**ample** [1] - 9037:21
**analysis** [2] - 9089:23, 9090:6
**analyst** [1] - 9040:7
**AND** [1] - 8994:18
**Angels** [1] - 8963:14
**angry** [3] - 8961:21, 8971:19, 8975:22
**answer** [8] - 8957:14, 8980:20, 8990:8, 8999:19, 9017:17, 9045:18, 9089:3, 9116:7
**answered** [4] - 8990:4, 8990:7, 9045:17, 9071:11
**answering** [1] - 9036:11
**anticipate** [1] - 9074:7
**anticipating** [1] - 9076:20

**Antifa** [21] - 8961:25, 8962:2, 8962:4, 8962:9, 8962:11, 8962:17, 8964:8, 8965:2, 8967:6, 8983:9, 8983:14, 8983:17, 8984:1, 8984:2, 9013:4, 9013:5, 9014:5, 9014:20, 9014:22, 9015:8, 9032:6
**anyway** [7] - 8968:4, 8968:25, 9024:21, 9094:11, 9117:15, 9117:21, 9118:1
**apartment** [1] - 9093:14
**apologize** [13] - 8956:5, 8959:11, 9003:5, 9024:14, 9033:14, 9036:21, 9047:4, 9054:4, 9058:24, 9065:10, 9073:23, 9077:7, 9082:5
**appear** [6] - 8975:17, 9027:8, 9057:23, 9059:18, 9060:9, 9073:1
**appearance** [2] - 9014:9, 9120:18
**appeared** [1] - 9066:15
**applauding** [1] - 8967:2
**applicability** [1] - 9036:22
**applicable** [2] - 9097:20, 9100:16
**apply** [4] - 8966:6, 9092:8, 9098:14, 9113:22
**appreciate** [1] - 9117:6
**apprentice** [1] - 9049:21
**approach** [2] - 8941:19, 9107:13
**appropriate** [2] - 9095:15, 9111:15
**appropriately** [1] - 9099:2
**archives** [1] - 9004:4
**ARE** [1] - 9022:8
**area** [5] - 8943:16, 8944:25, 8945:4, 8946:13, 8953:6
**areas** [1] - 8964:7
**argue** [13] - 8966:9, 9091:11, 9094:4,

9094:23, 9095:1, 9095:25, 9104:3, 9107:15, 9108:19, 9108:23, 9109:19, 9110:19, 9111:5
**arguing** [3] - 9104:11, 9109:15, 9118:10
**argument** [8] - 9031:24, 9107:12, 9107:17, 9107:20, 9107:21, 9108:3, 9109:25, 9110:22
**arise** [1] - 8950:14
**arised** [1] - 8946:24
**arithmetic** [2] - 9059:21, 9059:23
**armed** [2] - 8942:8, 8984:18
**aspects** [1] - 9104:21
**ass** [6] - 8965:2, 8965:17, 8967:19, 8967:20, 8968:1, 9038:24
**assassination** [3] - 8966:16, 8966:18, 8966:21
**assaulted** [2] - 8992:7, 9005:24
**asserted** [5] - 9088:12, 9088:14, 9094:5, 9095:18, 9096:9
**assertion** [1] - 9059:13
**assess** [1] - 9112:10
**asshole** [1] - 9024:11
**assignment** [3] - 9049:2, 9049:3, 9049:5
**assist** [2] - 8944:4, 8948:23
**assistance** [2] - 8946:25, 8953:6
**associated** [1] - 9023:14
**assume** [3] - 8950:17, 8957:3, 9076:23
**assumed** [3] - 8957:5, 8957:18, 8968:14
**assuming** [1] - 9075:14
**Atkinson** [1] - 8960:9
**attached** [1] - 9105:14
**attachment** [1] - 9027:21
**attack** [4] - 8958:22, 8983:19, 9069:4, 9118:13
**attacked** [1] - 8957:23
**attacking** [3] - 8964:9,

8983:17, 9014:20
**attempt** [1] - 9116:19
**Attempt** [2] - 9114:13, 9115:19
**attempting** [2] - 8948:2, 9114:7
**attend** [4] - 8950:19, 8954:17, 8955:6, 8955:9
**attended** [2] - 8948:17, 8954:9
**attention** [4] - 8943:5, 8998:2, 9060:2, 9077:18
**attorney** [4] - 8970:10, 8975:8, 8982:8, 9037:21
**audio** [8] - 8997:19, 9002:11, 9017:25, 9018:3, 9102:21, 9103:1, 9103:3, 9103:7
**audio-visual** [4] - 8997:19, 9002:11, 9017:25, 9018:3
**August** [2] - 8942:19, 8951:19
**authenticity** [3] - 9077:21, 9078:2
**Author** [1] - 9068:9
**available** [5] - 8944:5, 9025:23, 9072:3, 9102:1, 9102:3
**avoid** [2] - 9083:23, 9119:11
**aware** [7] - 8949:1, 8960:13, 8960:15, 8961:18, 8961:20, 8985:7, 9071:18
**awfully** [1] - 8999:17

### B

**backed** [1] - 8967:17
**background** [1] - 8942:7
**backtrack** [1] - 9099:20
**bad** [4] - 8955:11, 8955:14, 9006:7, 9034:17
**bake** [1] - 9041:22
**balcony** [1] - 9001:7
**balls** [2] - 8974:2, 8991:20
**Baltimore** [4] - 8967:11, 8967:17, 8968:21, 8969:6
**bank** [6] - 8961:9, 8961:12, 8961:16,

8961:19, 9107:23, 9107:24
**Banks** [1] - 9089:24
**Baptist** [1] - 9051:1
**bar** [3] - 8943:9, 8943:16, 9018:20
**barrel** [1] - 9053:14
**barriers** [2] - 9005:8, 9005:16
**bars** [1] - 9001:12
**base** [1] - 9031:20
**based** [8] - 8944:20, 8957:5, 8957:11, 8957:18, 9013:16, 9039:25, 9066:1, 9104:2
**basis** [2] - 9049:17, 9085:22
**bass** [1] - 8987:1
**bastards** [2] - 9023:23, 9098:17
**BE** [1] - 9042:2
**bear** [2] - 9091:23, 9117:7
**bearing** [1] - 9074:6
**beat** [2] - 8968:1, 9038:23
**beating** [2] - 8965:9, 8967:19
**beautiful** [1] - 9000:18
**bed** [1] - 9006:19
**before...at** [1] - 8974:23
**beforehand** [1] - 8946:19
**began** [2] - 9103:25, 9105:21
**begin** [2] - 8997:4, 9104:4
**beginning** [10] - 8973:10, 9010:16, 9016:23, 9017:1, 9017:19, 9020:24, 9022:19, 9040:17, 9101:4, 9104:2
**begins** [4] - 9010:10, 9085:18, 9113:8, 9114:24
**behalf** [4] - 8941:11, 8941:17, 9047:24, 9110:14
**behind** [2] - 8961:19, 9030:3
**beings** [2] - 8962:20, 8962:21
**beliefs** [1] - 8993:7
**BELIEVE** [1] - 8994:22
**belong** [1] - 9099:12
**belongs** [1] - 9099:2
**below** [5] - 9034:7,

9125

9060:2, 9061:21, 9063:12, 9064:2

**Bench** [7] - 8964:20, 8979:8, 9013:7, 9029:3, 9032:22, 9035:9, 9045:3

**benefit** [1] - 8993:1

**Benghazi** [1] - 9022:15

**Berryville** [3] - 8962:14, 8962:18, 9054:12

**best** [2] - 9064:15, 9064:25

**better** [9] - 8946:3, 8991:25, 8997:13, 8997:16, 9026:10, 9031:25, 9042:4, 9042:21, 9064:19

**between** [10] - 8949:5, 9020:6, 9023:10, 9031:2, 9053:8, 9073:2, 9108:8, 9109:1, 9109:3, 9112:13

**beyond** [6] - 8958:19, 9085:24, 9106:3, 9106:21, 9111:11, 9120:5

**bias** [1] - 9013:23

**Biden** [6] - 8949:24, 8953:19, 8954:1, 8954:3, 8955:19, 9001:4

**big** [5] - 8942:15, 8991:20, 8994:22, 9059:8, 9083:4

**bigger** [6] - 8944:24, 8964:23, 8982:25, 8984:1, 9013:15, 9013:21

**birth** [3] - 9044:19, 9051:18, 9051:25

**birthday** [1] - 9031:16

**bit** [22] - 8944:7, 8945:6, 8950:11, 8960:16, 8973:18, 8979:1, 8980:23, 8993:5, 9009:16, 9012:2, 9012:7, 9015:5, 9041:16, 9056:23, 9059:25, 9064:11, 9067:7, 9070:11, 9077:2, 9080:3, 9112:7, 9113:14

**bitch** [1] - 9031:17

**bits** [1] - 9012:22

**black** [3] - 9010:24, 9017:15, 9110:9

**Black** [8] - 8963:19, 8963:22, 8964:9, 8965:10, 8965:11, 9012:9, 9018:10, 9018:24

**blamed** [1] - 9005:9

**blank** [2] - 8968:17

**bleed** [1] - 9119:10

**bless** [1] - 8943:19

**BLM** [18] - 8963:19, 8964:25, 8965:1, 8965:13, 8966:3, 8967:5, 8967:7, 8967:12, 9012:19, 9013:4, 9013:9, 9013:10, 9013:12, 9013:14, 9014:6, 9014:25, 9015:4

**blm** [2] - 8967:18, 8968:3

**block** [1] - 9042:1

**blog** [2] - 9024:12

**blow** [8] - 8976:22, 8979:1, 9000:10, 9009:16, 9054:5, 9054:15, 9056:23, 9072:14

**blue** [2] - 9031:17, 9055:15

**board** [1] - 9074:4

**boat** [14] - 8985:1, 8985:4, 8985:6, 8986:6, 8986:9, 8986:11, 8987:1, 8987:7, 8987:25, 8988:7, 8988:12, 8990:6, 9030:16

**bombs** [2] - 8998:8, 9004:9

**Book** [3] - 8986:16, 9089:11, 9090:9

**boom** [2] - 9053:14, 9053:15

**boot** [1] - 8942:19

**border** [1] - 8950:21

**bored** [1] - 9065:20

**born** [1] - 9000:18

**Bosserman** [3] - 9028:16, 9028:18, 9029:18

**bottom** [18] - 8962:7, 8992:14, 8993:15, 9030:23, 9030:24, 9034:8, 9041:17, 9056:8, 9061:2, 9061:5, 9063:7, 9063:9, 9069:24, 9076:3, 9078:14, 9079:5, 9091:18, 9114:20

**bought** [1] - 9054:11

**boyfriend** [1] - 8945:16

**boys** [1] - 9006:14

**Boys** [2] - 9006:20, 9007:5

**branches** [1] - 8994:19

**breached** [2] - 9006:15, 9006:21

**break** [8] - 8969:9, 8969:10, 9000:23, 9011:7, 9016:5, 9016:22, 9078:24, 9113:11

**breaking** [1] - 9005:8

**breaks** [1] - 9079:2

**Brendan** [4] - 8940:4, 8941:17, 8942:5, 8954:24

**briefly** [3] - 8961:9, 8989:12, 8989:16

**BRIGHT** [9] - 9076:25, 9077:7, 9080:15, 9080:18, 9093:5, 9093:8, 9098:4, 9116:23, 9117:1

**bright** [1] - 9077:5

**bring** [10] - 8954:19, 8956:10, 8970:10, 8996:22, 9015:16, 9015:19, 9036:17, 9045:22, 9077:17, 9111:8

**bringing** [2] - 8970:23, 8990:5

**broad** [1] - 9036:23

**broke** [1] - 9005:16

**broken** [1] - 8970:1

**brother** [4] - 9020:12, 9022:2, 9027:24, 9064:15

**brothers** [1] - 9005:12

**brought** [12] - 8943:18, 8959:2, 8961:3, 8963:14, 8965:11, 9014:12, 9015:10, 9015:13, 9018:20, 9035:8, 9035:15, 9054:2

**build** [3] - 9043:20, 9055:18, 9056:6

**building** [6] - 8961:16, 8975:3, 8975:4, 8975:5, 8999:1, 9056:3

**Building** [2] - 8955:19, 8988:22

**buildings** [1] - 8960:24

**built** [2] - 8961:13, 8961:16

**bullet** [1] - 9030:1

**bullets** [3] - 8998:12, 9004:9, 9004:13

**bunch** [3] - 8995:21, 8995:25, 9004:5

**burn** [1] - 8989:7

**burned** [3] - 8974:23, 8989:6, 8989:19

**burner** [2] - 9044:19, 9051:25

**burning** [8] - 8960:24, 8975:3, 8975:4, 8975:5, 8975:12, 8975:25, 8977:24, 8989:9

**Burning** [1] - 8975:18

**bussed** [2] - 8962:2, 8962:4

**busting** [1] - 9037:14

**butt** [1] - 9034:21

**buy** [2] - 9080:10, 9080:13

**C**

**Cain** [2] - 9089:14, 9090:3

**Caldwell** [83] - 8940:7, 8940:20, 8940:20, 8941:9, 8941:13, 8952:18, 8960:1, 8961:6, 8961:7, 8964:25, 8965:14, 8965:24, 8967:21, 8968:2, 8968:11, 8968:18, 8968:21, 8979:10, 8979:15, 8979:21, 8980:10, 8991:24, 9001:8, 9001:23, 9001:24, 9002:13, 9002:22, 9003:13, 9010:20, 9011:12, 9012:24, 9013:3, 9014:9, 9029:17, 9033:20, 9036:1, 9036:9, 9040:11, 9040:13, 9045:22, 9046:10, 9047:19, 9047:23, 9047:24, 9049:5, 9049:9, 9049:14, 9049:22, 9050:11, 9050:18, 9052:12, 9052:17, 9054:2, 9054:4, 9055:3, 9055:7, 9058:6, 9058:8, 9066:3, 9068:9, 9069:8, 9070:16, 9072:12,

9073:4, 9073:13, 9074:5, 9074:8, 9074:25, 9075:9, 9081:6, 9082:19, 9087:10, 9088:25, 9095:4, 9097:9, 9098:8, 9098:22, 9110:14, 9110:18, 9118:5, 9118:6, 9118:11

**Caldwell's** [12] - 8961:7, 8965:20, 8968:6, 8968:9, 8968:14, 8968:15, 8969:2, 9012:11, 9050:21, 9081:1, 9082:4, 9118:14

**camera** [1] - 9019:14

**cameras** [2] - 9077:14, 9077:16

**camp** [1] - 8942:19

**Canadian** [1] - 8950:21

**canceled** [1] - 8946:10

**canceling** [1] - 9053:20

**candor** [1] - 9097:19

**cannon** [1] - 8998:21

**cannot** [5] - 8945:22, 8953:17, 8968:20, 8973:25, 9033:8

**capacity** [1] - 9090:2

**capital** [1] - 9021:4

**Capitol** [31] - 8955:19, 8956:10, 8988:22, 8990:2, 8992:5, 8992:7, 8996:24, 8997:1, 8997:2, 8997:4, 8999:7, 8999:18, 8999:24, 9000:7, 9000:16, 9001:5, 9001:6, 9005:16, 9005:20, 9005:24, 9006:21, 9009:2, 9010:3, 9060:17, 9062:24, 9066:19, 9069:4, 9107:8, 9108:17, 9118:13

**capitol** [1] - 9005:10

**captain** [1] - 8986:25

**caption** [1] - 9083:6

**capture** [1] - 9009:5

**captures** [1] - 9092:14

**car** [4] - 8952:3, 8969:24, 8970:1, 8976:7

**care** [7] - 9021:10, 9028:1, 9045:8, 9094:12, 9096:24,

9097:12, 9097:17
**career** [2] - 9040:1, 9040:6
**careful** [2] - 9015:9, 9015:13
**Carolina** [2] - 8970:7, 8984:9
**carried** [1] - 9116:1
**carry** [1] - 9030:16
**cars** [1] - 9041:25
**CART** [4] - 9074:15, 9075:10, 9089:22, 9089:23
**case** [38] - 8945:12, 8946:24, 8950:18, 8965:12, 8966:17, 9014:3, 9014:5, 9014:10, 9025:24, 9032:24, 9071:19, 9075:24, 9075:25, 9076:9, 9079:5, 9093:20, 9095:20, 9098:17, 9099:18, 9104:3, 9104:6, 9106:3, 9106:20, 9107:9, 9107:11, 9109:15, 9110:3, 9111:3, 9111:11, 9111:16, 9112:12, 9112:19, 9117:3, 9117:11, 9117:19, 9118:15, 9119:16
**cases** [1] - 9117:9
**casual** [1] - 8943:17
**casualty** [2] - 8944:15, 8944:19
**category** [3] - 8968:18, 9091:15, 9094:9
**Category** [3] - 9091:16, 9093:17
**causing** [1] - 8946:10
**CCTV** [3] - 9077:12, 9077:16, 9078:3
**celebratory** [1] - 8998:21
**cell** [6] - 9074:11, 9074:16, 9074:19, 9080:25, 9089:24, 9090:5
**Cellbrite** [2] - 9012:20, 9012:25
**central** [1] - 8965:12
**certain** [10] - 8968:4, 9075:5, 9091:15, 9098:13, 9100:4, 9100:21, 9100:25, 9104:21, 9107:16, 9107:19
**certainly** [16] - 8950:4,

8966:6, 8966:8, 8967:2, 8980:19, 8991:19, 8995:8, 8999:6, 9021:6, 9025:16, 9025:18, 9039:22, 9059:7, 9088:7, 9092:24, 9101:16
**certificate** [2] - 9044:19, 9051:25
**certificates** [1] - 9051:19
**certification** [8] - 8951:2, 8990:13, 8990:25, 8999:2, 8999:15, 8999:21, 9018:22, 9019:18
**certified** [6] - 8998:25, 9000:6, 9000:8, 9000:9, 9001:3, 9019:9
**certify** [1] - 9019:10
**cetera** [1] - 9057:20
**challenged** [1] - 9072:21
**chance** [2] - 9103:20, 9120:2
**change** [16] - 8953:15, 9084:18, 9085:17, 9085:20, 9086:21, 9087:3, 9087:6, 9087:8, 9087:15, 9103:22, 9103:23, 9104:3, 9104:13, 9106:15, 9107:11, 9115:8
**changes** [2] - 9087:11, 9104:5
**character** [12] - 8966:15, 8966:18, 8966:20, 9016:10, 9045:9, 9074:21, 9074:24, 9075:10, 9088:18, 9088:21, 9088:22
**characteristics** [1] - 9089:7
**charged** [12] - 8980:25, 8981:1, 9084:9, 9085:2, 9085:7, 9109:8, 9111:21, 9112:13, 9113:23, 9114:13, 9115:13, 9115:20
**charges** [7] - 8992:11, 9083:23, 9111:2, 9113:19, 9114:4, 9114:6, 9115:11
**chat** [5] - 9046:18, 9098:14, 9099:25,

9100:16, 9100:18
**chats** [1] - 9100:3
**children** [1] - 9004:12
**Chinese** [3] - 8950:20, 8953:24, 8954:6
**choke** [1] - 9031:20
**Christmas** [3] - 9068:10, 9069:2, 9069:3
**Church** [1] - 9051:1
**church** [1] - 9021:9
**CIA** [4] - 9031:25, 9032:6, 9040:2, 9040:7
**Circle** [1] - 8998:5
**circuit** [2] - 9029:6, 9117:9
**Circuit** [1] - 9117:22
**circuits** [1] - 9117:12
**circulated** [2] - 9083:11, 9103:18
**cited** [2] - 9109:8, 9110:3
**cites** [1] - 9117:9
**citizens** [2] - 8944:3, 8954:5
**City** [1] - 8963:15
**city** [4] - 8942:3, 8983:18, 9000:18, 9048:14
**Civil** [1] - 8971:13
**civil** [9] - 8971:25, 8972:2, 8972:5, 8972:9, 8973:17, 8990:17, 8991:8, 8991:12
**clarification** [1] - 9104:24
**clarity** [2] - 9077:9, 9119:5
**Clarke** [1] - 9057:3
**classes** [1] - 8986:1
**classified** [2] - 9042:23, 9043:3
**clean** [1] - 9021:6
**cleanup** [1] - 9081:3
**clear** [18] - 8944:22, 8959:2, 8967:15, 8968:5, 8981:13, 8982:8, 9083:10, 9089:21, 9099:7, 9099:14, 9104:8, 9104:19, 9107:15, 9111:16, 9113:14, 9115:11, 9115:12, 9115:15
**clear-cut** [1] - 9099:14
**clearance** [3] - 9050:6, 9050:9, 9050:12
**clearly** [5] - 9017:17,

9018:14, 9035:25, 9104:10, 9115:5
**client** [2] - 8966:7, 8981:4
**client's** [1] - 9046:21
**clients** [1] - 9110:5
**clients'** [1] - 9120:18
**Clifton** [1] - 8946:13
**climbed** [1] - 9000:17
**clip** [1] - 9018:2
**clips** [2] - 9011:15, 9077:21
**close** [12] - 8944:24, 8978:4, 8978:7, 8978:9, 9031:20, 9032:5, 9076:13, 9076:14, 9076:16, 9079:23, 9119:7, 9119:15
**close-in** [1] - 9032:5
**closing** [10] - 9076:23, 9078:16, 9078:17, 9079:23, 9104:11, 9107:1, 9107:12, 9108:24, 9119:5, 9119:21
**closings** [2] - 9076:24, 9079:4
**club** [1] - 8961:2
**clue** [1] - 9034:20
**co** [7] - 9084:16, 9084:17, 9104:1, 9114:17, 9115:6, 9115:14, 9116:20
**co-conspirator** [5] - 9084:17, 9114:17, 9115:6, 9115:14, 9116:20
**co-conspirators** [1] - 9104:1
**co-counsel** [1] - 9084:16
**colleague** [2] - 9028:18, 9106:24
**COLLECTIVE** [1] - 9047:14
**College** [1] - 8990:25
**color** [3] - 8988:1, 8988:3, 8988:5
**colors** [1] - 8963:16
**Columbus** [1] - 9021:11
**combat** [3] - 8956:6, 8957:22, 9028:6
**Combs** [9] - 8986:9, 8986:17, 8992:17, 8993:18, 8994:5, 8994:7, 9027:24, 9030:8, 9030:11
**Comfort** [2] - 8969:19,

9008:14
**comfortable** [3] - 9048:4, 9094:2, 9098:19
**coming** [12] - 8950:18, 8963:8, 8964:3, 8973:24, 9001:4, 9021:4, 9022:3, 9089:11, 9112:25, 9117:15, 9118:4
**commander** [3] - 9023:18, 9043:13, 9043:14
**commanding** [2] - 8946:3, 9049:24
**comment** [6] - 8956:6, 8957:2, 8975:6, 8975:10, 9014:23, 9033:6
**commenting** [1] - 8975:14
**comments** [2] - 9015:3, 9097:23
**commit** [3] - 9033:1, 9113:23, 9114:8
**commitment** [3] - 9042:12, 9042:14, 9092:5
**committed** [3] - 8970:22, 9111:12, 9116:17
**committing** [2] - 9107:17, 9116:10
**communications** [2] - 9081:25, 9095:13
**communist** [1] - 8974:3
**community** [2] - 8943:23, 8944:20
**compared** [1] - 8960:17
**competitive** [8] - 9053:16, 9053:18, 9053:22, 9053:24, 9054:3, 9054:12, 9055:20, 9055:21
**complete** [4] - 9003:13, 9045:18, 9046:13, 9084:11
**completed** [1] - 8941:12
**completely** [3] - 9029:19, 9082:22, 9119:14
**completeness** [2] - 9045:14, 9102:21
**completes** [1] - 9045:23
**complex** [1] - 9107:23
**complexities** [1] -

9100:8
**complicated** [2] -
9120:13, 9120:14
**computer** [2] -
9027:15, 9027:18
**concede** [1] - 9106:24
**concept** [2] - 8950:7,
8950:8
**concern** [12] -
8944:22, 9092:15,
9095:10, 9105:10,
9105:17, 9106:15,
9106:25, 9107:6,
9108:7, 9109:16,
9112:10, 9112:22
**concerned** [4] -
8944:20, 8945:3,
8950:5, 9013:12
**concerning** [1] -
9107:1
**concerns** [7] -
8944:15, 8949:15,
8958:21, 9088:1,
9090:8, 9107:13,
9108:14
**concluded** [1] -
9120:23
**concluding** [1] -
9115:24
**Concluding** [1] -
9115:25
**conclusion** [1] -
8964:4
**concrete** [1] - 8973:18
**concur** [2] - 9086:18,
9105:23
**condition** [1] - 9068:1
**condone** [1] - 9015:17
**conduct** [3] - 8946:6,
8949:19, 8967:1
**conducted** [1] -
8950:25
**conference** [7] -
8964:20, 8979:8,
9013:7, 9029:3,
9032:22, 9035:9,
9045:3
**confess** [2] - 9086:13,
9090:11
**confidential** [1] -
9040:2
**confirm** [3] - 8945:22,
8953:17, 9038:18
**confirmation** [1] -
9018:24
**confirming** [1] -
9019:20
**confrontations** [1] -
9092:23
**confronted** [4] -

8966:22, 8967:12,
9090:12, 9094:10
**Congress** [21] -
8974:23, 8975:1,
8975:12, 8975:19,
8975:22, 8975:25,
8977:24, 8978:10,
8989:6, 8989:7,
8989:10, 8989:19,
8998:24, 8999:1,
9000:5, 9002:10,
9002:16, 9002:23,
9003:12, 9003:16,
9004:4
**connection** [7] -
9013:18, 9013:23,
9013:24, 9014:3,
9014:21, 9015:4,
9086:23
**consider** [8] -
8973:13, 8975:3,
8975:4, 8983:18,
9084:11, 9084:12,
9087:19, 9120:4
**considerate** [1] -
9015:9
**consideration** [2] -
8949:21, 8949:22
**considered** [2] -
8963:6, 8989:22
**considering** [3] -
8995:6, 9084:4,
9113:22
**consistent** [6] -
9096:16, 9109:11,
9109:15, 9109:22,
9109:23, 9114:14
**conspiracies** [8] -
9108:8, 9108:11,
9108:12, 9108:18,
9111:14, 9113:19,
9120:10
**conspiracy** [51] -
8966:15, 8967:8,
8981:2, 9099:18,
9103:25, 9104:2,
9104:4, 9104:7,
9104:11, 9104:25,
9105:21, 9105:25,
9106:3, 9106:21,
9107:2, 9107:7,
9107:10, 9107:16,
9107:18, 9107:19,
9107:22, 9107:23,
9107:25, 9108:4,
9108:5, 9108:16,
9108:20, 9108:21,
9109:1, 9109:3,
9109:6, 9109:18,
9109:20, 9109:24,

9110:4, 9110:6,
9110:10, 9110:11,
9110:12, 9110:15,
9110:18, 9110:21,
9111:1, 9111:7,
9111:13, 9111:16,
9111:20, 9113:8,
9113:15, 9120:1
**Conspiracy** [1] -
9113:11
**conspirator** [5] -
9084:17, 9114:17,
9115:6, 9115:14,
9116:20
**conspiratorial** [2] -
9104:20, 9104:22
**conspirators** [1] -
9104:1
**conspired** [1] -
9113:23
**constitution** [1] -
8971:13
**Constitution** [3] -
8971:16, 8971:18,
8971:22
**contact** [1] - 9050:15
**contemplated** [1] -
9097:3
**contemplates** [1] -
9090:10
**content** [2] - 9064:16,
9082:10
**contents** [1] - 9082:20
**context** [20] - 8970:8,
8975:7, 8975:8,
8975:11, 8975:13,
8987:22, 8989:15,
9012:1, 9018:21,
9030:7, 9034:3,
9036:10, 9036:11,
9036:14, 9036:16,
9055:10, 9056:5,
9056:11, 9056:17,
9099:16
**continually** [1] -
9110:19
**continue** [5] -
8957:14, 8957:16,
9016:19, 9022:7,
9073:8
**continues** [3] -
8967:21, 8967:22,
9041:20
**continuing** [1] -
8943:22
**continuously** [1] -
9058:21
**contradict** [1] -
9106:23
**contritely** [1] -

9097:22
**control** [3] - 8971:5,
9031:21, 9067:4
**conversation** [9] -
8943:15, 8943:17,
8976:12, 8983:12,
9023:10, 9026:1,
9034:23, 9046:13,
9068:6
**conversations** [1] -
9025:15
**converse** [1] - 9069:9
**convict** [1] - 9085:21
**conviction** [3] -
9115:23, 9116:2,
9116:13
**convictions** [1] -
9118:1
**convinced** [1] -
9017:16
**convinces** [1] -
9085:23
**coordinate** [1] -
8970:17
**coordinated** [1] -
8949:3
**coordinating** [4] -
8969:13, 8971:3,
8989:25, 8990:3
**coordination** [2] -
8971:4
**coordinations** [1] -
8949:1
**copied** [1] - 9024:12
**copper** [1] - 8961:15
**cops** [4] - 9006:14,
9006:20, 9007:17,
9023:14
**cops'** [2] - 9007:23,
9008:9
**correct** [152] - 8952:2,
8952:7, 8953:1,
8953:9, 8953:16,
8953:20, 8954:10,
8954:11, 8954:18,
8955:6, 8955:8,
8955:10, 8955:24,
8956:7, 8958:16,
8958:18, 8958:20,
8961:25, 8962:23,
8963:20, 8964:7,
8964:10, 8964:15,
8969:14, 8969:19,
8969:22, 8969:25,
8970:20, 8970:23,
8971:9, 8972:1,
8973:8, 8974:6,
8974:9, 8974:16,
8975:1, 8975:16,
8975:23, 8975:24,

8976:4, 8977:5,
8977:11, 8977:19,
8977:25, 8978:11,
8978:17, 8978:18,
8982:2, 8983:2,
8985:1, 8986:7,
8986:17, 8986:20,
8987:8, 8987:12,
8988:19, 8988:23,
8989:6, 8990:2,
8990:6, 8990:11,
8990:19, 8991:2,
8991:17, 8991:20,
8991:25, 8992:5,
8992:9, 8993:18,
8993:24, 8994:1,
8994:10, 8995:22,
8995:23, 8996:25,
8997:13, 8998:5,
8998:19, 8999:9,
8999:12, 9000:7,
9000:10, 9001:5,
9001:12, 9001:20,
9001:25, 9002:3,
9002:23, 9003:3,
9005:4, 9005:11,
9005:25, 9006:2,
9006:17, 9007:20,
9008:15, 9008:18,
9010:3, 9010:8,
9010:12, 9010:15,
9017:11, 9018:6,
9018:11, 9018:15,
9020:2, 9020:22,
9021:12, 9022:19,
9022:24, 9023:11,
9024:2, 9024:7,
9025:3, 9025:15,
9026:13, 9027:7,
9029:18, 9029:21,
9030:11, 9038:24,
9041:5, 9041:10,
9042:7, 9043:7,
9048:21, 9049:10,
9049:11, 9049:12,
9050:16, 9057:11,
9057:12, 9059:9,
9059:21, 9060:7,
9060:11, 9060:14,
9065:3, 9066:17,
9066:18, 9068:11,
9068:15, 9080:17,
9080:19, 9089:2,
9101:12, 9103:18,
9105:4, 9105:5,
9105:8, 9109:17,
9116:9
**corrupt** [1] - 8994:17
**corruptly** [1] - 9114:4
**counsel** [6] - 9084:16,
9096:23, 9103:21,

9107:4, 9107:12, 9120:18
**counselor** [1] - 9054:10
**Counselor** [2] - 9061:14, 9065:8
**count** [3] - 9118:5, 9118:6, 9118:21
**Count** [11] - 9113:15, 9113:19, 9113:22, 9113:24, 9114:3, 9114:6, 9114:13, 9114:16, 9115:12, 9115:19, 9115:25
**country** [10] - 8974:4, 8991:3, 8994:9, 9003:7, 9010:17, 9017:1, 9021:22, 9022:4, 9022:5, 9029:25
**counts** [4] - 9108:5, 9115:22, 9116:1
**county** [1] - 8948:19
**County** [2] - 9021:11, 9057:3
**couple** [8] - 8946:9, 8970:8, 8971:11, 8974:15, 9002:8, 9041:16, 9062:18, 9103:19
**course** [2] - 9088:25, 9116:24
**Court** [17] - 9049:7, 9077:3, 9077:23, 9082:9, 9086:14, 9093:23, 9101:12, 9101:13, 9107:2, 9108:13, 9110:19, 9112:17, 9117:5, 9117:12, 9117:18, 9117:23, 9119:6
**COURT** [237] - 8941:6, 8941:23, 8943:19, 8951:10, 8957:13, 8959:22, 8960:1, 8964:21, 8965:20, 8966:8, 8966:20, 8967:15, 8968:8, 8968:13, 8968:19, 8968:25, 8969:10, 8976:25, 8979:25, 8980:2, 8980:4, 8980:17, 8980:25, 8981:10, 8981:17, 8989:14, 8993:12, 9000:24, 9009:23, 9011:7, 9011:11, 9011:17, 9011:21, 9011:25, 9012:12, 9012:16, 9013:6,

9013:8, 9014:7, 9014:16, 9014:21, 9015:12, 9015:21, 9016:1, 9016:6, 9016:14, 9016:17, 9017:5, 9020:17, 9029:6, 9029:9, 9029:13, 9031:10, 9032:21, 9032:23, 9033:11, 9033:20, 9034:8, 9035:2, 9035:4, 9035:8, 9035:10, 9035:21, 9036:6, 9036:15, 9036:25, 9038:6, 9038:10, 9038:13, 9038:18, 9040:9, 9044:7, 9045:2, 9045:4, 9045:8, 9045:12, 9045:20, 9045:25, 9046:2, 9046:4, 9046:6, 9047:1, 9047:6, 9047:12, 9047:16, 9047:23, 9048:3, 9051:4, 9051:22, 9052:3, 9052:5, 9052:10, 9055:6, 9071:11, 9073:6, 9073:13, 9073:16, 9073:18, 9074:2, 9074:14, 9074:17, 9075:2, 9075:6, 9075:16, 9075:24, 9076:2, 9076:6, 9076:11, 9076:15, 9076:22, 9078:4, 9078:8, 9078:14, 9078:23, 9080:2, 9080:7, 9080:17, 9080:19, 9081:8, 9081:16, 9081:19, 9081:23, 9082:7, 9082:13, 9082:17, 9083:1, 9083:7, 9083:15, 9083:20, 9083:25, 9084:10, 9084:18, 9084:23, 9084:25, 9085:3, 9085:7, 9085:11, 9085:13, 9085:16, 9086:8, 9086:15, 9086:19, 9087:3, 9088:5, 9088:15, 9088:25, 9089:10, 9090:3, 9090:7, 9090:18, 9091:9, 9091:17, 9091:21, 9092:2, 9092:4, 9092:16, 9092:22, 9093:1,

9093:21, 9094:1, 9094:8, 9094:19, 9094:25, 9095:9, 9095:19, 9096:2, 9096:6, 9096:14, 9096:18, 9097:2, 9097:10, 9097:17, 9097:25, 9098:3, 9098:19, 9098:23, 9099:1, 9099:14, 9100:6, 9100:10, 9100:13, 9101:3, 9101:10, 9101:16, 9101:22, 9101:25, 9102:7, 9102:11, 9102:18, 9102:23, 9103:2, 9103:6, 9103:9, 9103:11, 9103:14, 9103:17, 9103:21, 9104:8, 9104:17, 9105:20, 9105:24, 9106:2, 9106:12, 9106:14, 9107:14, 9108:3, 9108:10, 9109:16, 9110:13, 9111:8, 9111:24, 9112:3, 9112:21, 9112:24, 9113:8, 9114:1, 9114:10, 9114:12, 9114:19, 9114:21, 9114:25, 9115:8, 9115:15, 9115:18, 9116:8, 9116:24, 9117:7, 9117:21, 9118:17, 9118:22, 9119:8, 9119:10, 9119:16, 9119:20, 9120:6, 9120:15
**court** [14] - 8942:14, 8969:11, 8981:14, 9016:7, 9029:12, 9034:10, 9037:2, 9046:5, 9092:12, 9112:24, 9117:9, 9117:11, 9117:24
**Court's** [9] - 8989:16, 9031:8, 9033:14, 9059:3, 9066:24, 9069:13, 9070:12, 9077:17, 9096:5
**COURTROOM** [2] - 9038:11, 9080:6
**cover** [3] - 9043:20, 9051:13, 9051:14
**covered** [1] - 9031:24
**covering** [2] - 9060:17, 9062:23
**Cow** [1] - 9067:22
**coyote** [1] - 9042:20

**crack** [1] - 8994:24
**create** [2] - 9111:5, 9111:6
**creates** [1] - 9105:10
**creative** [2] - 8985:20, 8986:1
**credibility** [1] - 9096:10
**crested** [1] - 9024:13
**crime** [3] - 8983:18, 9105:1, 9113:23
**crisp** [7] - 8941:15, 8951:10, 9047:1, 9073:19, 9074:12, 9089:21, 9111:10
**CRISP** [79] - 8941:16, 8941:25, 8942:2, 8943:21, 8951:7, 8956:2, 8957:10, 8957:15, 8959:10, 8959:12, 8959:20, 8965:25, 8966:11, 9024:14, 9036:19, 9037:1, 9045:13, 9045:24, 9046:1, 9046:7, 9046:9, 9046:23, 9047:3, 9047:10, 9047:15, 9073:20, 9074:13, 9075:17, 9075:25, 9083:18, 9084:14, 9086:12, 9086:18, 9088:19, 9089:5, 9089:18, 9090:1, 9090:5, 9090:24, 9091:3, 9091:8, 9092:25, 9093:4, 9093:6, 9094:7, 9094:18, 9097:1, 9097:5, 9097:15, 9097:19, 9098:2, 9098:10, 9098:21, 9098:25, 9100:2, 9100:8, 9100:12, 9100:17, 9102:2, 9102:10, 9102:16, 9104:15, 9105:10, 9105:23, 9106:1, 9106:5, 9106:13, 9106:16, 9111:25, 9112:9, 9112:23, 9113:6, 9114:11, 9114:20, 9114:24, 9116:22, 9119:3, 9119:25, 9120:7
**Crisp** [10] - 8941:24, 8965:25, 9036:20, 9045:13, 9046:6, 9089:2, 9097:14, 9112:5, 9112:21,

9120:6
**Crisp.............** [1] - 8940:6
**Crisp.................** [1] - 8940:5
**Crisp..................** [1] - 8940:8
**CROSS** [4] - 8951:12, 8960:4, 9046:8, 9051:5
**cross** [16] - 8941:9, 8941:14, 8960:3, 8965:21, 8980:19, 8981:11, 8981:13, 9004:23, 9013:16, 9013:23, 9015:14, 9016:4, 9016:19, 9033:24, 9040:11, 9093:13
**Cross** [4] - 8940:5, 8940:8, 8940:8, 8940:11
**CROSS-EXAMINATION** [4] - 8951:12, 8960:4, 8960:8, 9046:8, 9051:5
**cross-examination** [10] - 8941:9, 8941:14, 8960:3, 8965:21, 8980:19, 8981:11, 9015:14, 9016:19, 9033:24, 9040:11
**Cross-Examination** [4] - 8940:5, 8940:8, 8940:8, 8940:11
**cross-examine** [2] - 9013:23, 9016:4
**cross-examined** [2] - 9013:16, 9093:13
**crowd** [3] - 9002:3, 9019:1, 9034:18
**Crowl** [19] - 8945:19, 8976:3, 8976:17, 8977:4, 8977:10, 8978:6, 8984:15, 8996:14, 9007:1, 9025:15, 9025:22, 9026:1, 9071:21, 9071:24, 9072:1, 9072:2, 9072:20, 9073:2, 9082:21
**Crowl's** [4] - 9081:2, 9081:6, 9081:10, 9082:6
**cruise** [1] - 9083:2
**crux** [1] - 9098:12
**crystallization** [1] - 9104:22
**culpability** [1] -

9115:23
**current** [1] - 9050:25
**custodial** [1] - 9088:6
**cut** [1] - 9099:14
**cutlery** [1] - 9031:23

# D

**D.C** [15] - 8954:10,
8954:13, 8955:1,
8956:13, 8956:20,
8956:21, 8956:25,
8957:2, 8958:10,
8962:20, 8963:8,
8976:7, 8998:1,
8998:15, 9117:22
**damage** [1] - 9053:21
**Damn** [2] - 8968:2,
8986:24
**damn** [1] - 9005:10
**dangerous** [1] -
9033:17
**Danjeck** [4] - 9054:9,
9054:10, 9054:20,
9055:16
**dare** [1] - 9031:17
**darn** [1] - 9021:22
**data** [1] - 9070:24
**date** [14] - 8954:25,
8966:13, 8980:5,
8990:11, 9019:5,
9044:10, 9105:13,
9106:21, 9106:22,
9109:2, 9111:12,
9111:13, 9112:14
**dated** [1] - 9033:12
**dates** [5] - 9105:22,
9106:17, 9111:13,
9111:14, 9111:17
**daughter** [3] -
9053:23, 9054:13,
9055:20
**Dawn** [1] - 8949:24
**Dawn-esk** [1] -
8949:24
**days** [12] - 8971:12,
8974:15, 9006:8,
9006:23, 9007:23,
9021:7, 9021:10,
9070:4, 9105:15,
9106:10, 9106:11,
9108:25
**DCA** [2] - 9018:8,
9019:1
**dead** [1] - 9023:14
**deadly** [2] - 9031:23,
9033:10
**deal** [4] - 8942:15,
9059:8, 9101:4,
9118:2

**dealings** [1] - 8959:16
**death** [1] - 9018:17
**debate** [1] - 9103:24
**December** [20] -
8980:7, 8981:24,
8982:11, 8983:10,
8993:4, 8993:18,
8994:3, 9027:5,
9059:16, 9059:19,
9060:6, 9060:14,
9061:11, 9061:21,
9065:15, 9068:9,
9068:21, 9110:23
**decide** [1] - 8997:1
**decided** [2] - 8973:15,
8996:24
**decides** [1] - 9107:24
**dedicated** [1] -
8944:10
**deep** [3] - 9029:9,
9029:20, 9030:1
**defend** [2] - 8944:3,
8958:2
**defendant** [18] -
9036:22, 9087:9,
9087:13, 9087:20,
9088:18, 9095:22,
9096:24, 9100:25,
9101:15, 9109:20,
9113:16, 9113:20,
9113:23, 9114:4,
9114:6, 9114:13,
9115:6, 9115:19
**Defendant** [5] -
8940:20, 8940:20,
8961:7, 9055:7,
9058:8
**defendant's** [6] -
9085:23, 9087:22,
9092:12, 9095:16,
9096:4, 9117:14
**defendants** [23] -
8966:3, 9040:13,
9084:9, 9085:2,
9085:22, 9086:1,
9087:18, 9087:25,
9088:13, 9092:19,
9093:1, 9097:11,
9099:6, 9099:10,
9099:19, 9099:22,
9100:1, 9100:15,
9100:21, 9101:6,
9107:20, 9109:10,
9109:18
**defendants'** [3] -
9083:6, 9085:23,
9096:7
**defenders** [1] -
8965:13
**defending** [1] -

8949:25
**Defense** [1] - 8994:17
**defense** [28] -
8941:17, 8965:12,
8966:3, 9014:4,
9031:24, 9076:24,
9080:16, 9084:5,
9084:13, 9089:17,
9091:25, 9092:1,
9092:5, 9093:18,
9098:24, 9100:19,
9101:2, 9101:4,
9101:20, 9103:21,
9107:4, 9107:12,
9110:2, 9110:3,
9110:4, 9120:3,
9120:7, 9120:18
**defense's** [2] -
9032:24, 9076:9
**define** [1] - 9102:25
**defining** [1] - 9104:7
**definitely** [1] -
9067:22
**definitions** [1] -
9113:17
**degree** [1] - 9105:11
**DeHaven** [6] -
8980:10, 9059:6,
9059:15, 9059:18,
9062:3, 9064:11
**DeHaven's** [1] -
9061:15
**Delany** [1] - 9048:12
**delete** [5] - 8987:21,
8987:24, 8988:5,
8988:7, 9084:5
**deleted** [7] - 8987:7,
8987:14, 9025:14,
9025:25, 9026:10,
9051:10, 9118:11
**deleting** [1] - 9030:18
**delineated** [2] -
9017:17, 9018:14
**democraps'** [1] -
8995:3
**democrats** [2] -
9021:5, 9021:6
**Democrats** [4] -
8971:13, 8971:22,
9021:18, 9022:24
**democrats'** [1] -
8995:2
**Dennis** [3] - 8991:17,
9041:2, 9041:23
**denouncing** [1] -
8967:2
**deny** [1] - 8953:17
**Department** [2] -
8961:18, 8961:21
**department** [1] -

8949:4
**depict** [1] - 9072:19
**deputies** [1] - 8949:4
**DEPUTY** [2] - 9038:11,
9080:6
**described** [1] -
8998:22
**describing** [1] -
9098:20
**description** [1] -
9089:14
**desert** [1] - 9028:7
**deserved** [1] - 8968:4
**deserves** [1] - 9087:23
**designed** [2] - 8951:1,
8958:21
**desk** [2] - 9040:7
**desperate** [1] -
8963:16
**detail** [2] - 8958:8,
8958:11
**detailed** [1] - 8958:14
**details** [1] - 9104:20
**detention** [1] -
9110:20
**determined** [1] -
9099:16
**develop** [2] - 9050:14,
9050:21
**device** [3] - 9026:17,
9026:23, 9026:24
**Dian** [1] - 9006:5
**Diann** [7] - 9006:1,
9057:1, 9057:2,
9057:11, 9057:13,
9058:12, 9058:17
**DID** [1] - 8994:17
**difference** [2] -
9037:20, 9053:8
**different** [15] - 8968:8,
9003:15, 9015:1,
9023:4, 9026:24,
9035:21, 9074:19,
9103:14, 9104:25,
9109:9, 9109:10,
9116:5, 9116:9,
9116:11, 9116:14
**differently** [1] -
9109:12
**difficult** [1] - 8952:3
**digital** [1] - 9090:6
**Dillon** [8] - 8940:4,
8941:18, 8941:19,
8941:23, 8942:3,
8942:5, 8951:16,
8959:22
**direct** [16] - 8943:5,
8960:16, 8961:25,
8963:20, 8963:25,
8965:1, 8985:19,

9001:11, 9013:14,
9014:12, 9014:18,
9015:11, 9020:1,
9043:4, 9046:20,
9060:2
**Direct** [2] - 8940:5,
8940:11
**DIRECT** [2] - 8942:1,
9048:7
**directly** [3] - 8978:8,
8994:20, 9033:6
**dirty** [1] - 9042:19
**disagree** [8] - 8962:9,
8966:4, 9084:15,
9091:5, 9095:19,
9104:16, 9104:18,
9106:24
**disagreeing** [1] -
9117:19
**disappointed** [2] -
9000:14, 9000:15
**disappointing** [1] -
9000:12
**disbelieved** [2] -
9087:13, 9087:18
**discharge** [1] -
8942:24
**discharged** [1] -
8942:19
**disconnected** [2] -
9014:2, 9015:4
**discourse** [1] -
9045:19
**discrete** [2] - 9076:8,
9099:8
**discuss** [4] - 9083:8,
9102:12, 9102:14,
9120:5
**discussed** [4] -
8950:1, 8952:22,
9075:20, 9087:5
**discussing** [1] -
9067:8
**discussion** [3] -
8956:23, 9065:24,
9104:9
**discussions** [7] -
8950:20, 8950:22,
8956:11, 8956:13,
8956:16, 8956:19,
8958:15
**dismiss** [2] - 9079:10,
9079:12
**display** [1] - 8965:7
**disregard** [1] - 9036:5
**distinction** [1] -
9108:8
**district** [2] - 9117:8,
9117:24
**doctor's** [3] - 8960:17,

8960:21, 8960:24
**documented** [1] -
9118:12
**documenting** [1] -
9058:1
**documents** [1] -
9051:18
**Dolan** [3] - 9093:4,
9093:6, 9094:8
**Dolan's** [1] - 9085:15
**done** [21] - 8964:8,
8968:4, 8994:8,
8999:2, 9000:5,
9002:18, 9003:7,
9003:12, 9008:1,
9010:15, 9012:4,
9034:16, 9039:4,
9039:6, 9039:7,
9066:1, 9076:3,
9076:23, 9077:1,
9079:12, 9090:17
**Donovan** [16] -
8945:19, 8976:3,
8976:16, 8977:4,
8977:10, 8984:15,
8996:14, 9007:1,
9025:15, 9025:22,
9026:1, 9071:21,
9071:24, 9072:1,
9072:2, 9073:2
**door** [1] - 9035:13
**doors** [2] - 9006:15,
9006:21
**double** [1] - 9094:13
**doubt** [4] - 9085:24,
9106:3, 9106:21,
9111:11
**Doug** [12] - 8983:12,
8988:18, 8988:20,
8990:1, 8990:3,
9019:24, 9019:25,
9020:6, 9020:8,
9021:2, 9022:21,
9022:23
**Douyon** [2] - 8941:20,
9103:18
**down** [53] - 8942:14,
8959:23, 8960:24,
8967:17, 8974:1,
8977:14, 8977:21,
8977:25, 8989:6,
8989:8, 8989:10,
8994:15, 9003:20,
9008:17, 9010:6,
9011:11, 9011:12,
9018:24, 9019:8,
9021:11, 9022:13,
9022:16, 9024:15,
9024:21, 9024:24,
9026:5, 9026:7,

9035:2, 9041:16,
9041:17, 9041:18,
9047:19, 9054:18,
9055:2, 9055:12,
9057:7, 9059:24,
9062:18, 9063:15,
9064:11, 9066:21,
9067:7, 9067:11,
9068:3, 9068:19,
9068:25, 9070:11,
9070:13, 9073:14,
9078:20, 9088:6,
9098:11
**download** [1] -
9023:21
**dr** [1] - 9070:25
**Dr** [3] - 9071:1,
9071:2, 9071:4
**drastic** [1] - 8994:1
**Drilling** [1] - 9056:8
**drilling** [1] - 9056:10
**drive** [3] - 8944:14,
9041:25, 9077:13
**drivel** [2] - 9004:23,
9004:24
**driven** [2] - 9002:23,
9003:16
**drop** [5] - 9034:17,
9034:19, 9035:2,
9077:5, 9079:13
**dropped** [1] - 8987:3
**drops** [1] - 9079:15
**drove** [3] - 8976:13,
9006:14, 9006:20
**dual** [1] - 8946:2
**due** [1] - 8960:23
**Dulany** [2] - 8940:10,
9047:25
**DULANY** [1] - 9048:13
**during** [12] - 8949:20,
9013:14, 9014:25,
9015:2, 9049:19,
9050:14, 9098:6,
9109:6, 9110:5,
9110:6, 9110:11,
9111:23
**duty** [2] - 9022:9,
9049:3
**Duty** [20] - 9034:15,
9034:21, 9034:22,
9034:24, 9035:16,
9035:17, 9035:20,
9036:3, 9036:17,
9037:7, 9037:11,
9037:12, 9037:13,
9038:5, 9039:10,
9039:11, 9039:13,
9039:17, 9039:21

**E**

**ear** [2] - 8995:2
**early** [4] - 9068:14,
9069:21, 9077:2,
9108:24
**earth** [1] - 9021:7
**easier** [1] - 9031:24
**easiest** [1] - 9093:20
**easily** [1] - 9039:11
**Eastern** [5] - 9061:25,
9062:21, 9065:18,
9066:13, 9067:18
**eat** [1] - 9031:16
**eating** [1] - 9031:18
**eaves** [1] - 8961:15
**edit** [1] - 9114:12
**edits** [1] - 9090:7
**Edmond** [1] - 9025:7
**Edwards** [1] - 9074:21
**EDWARDS** [1] -
9091:20
**effect** [2] - 9013:11,
9013:12
**effects** [1] - 9008:21
**effer** [1] - 9034:21
**efficient** [1] - 9047:18
**effluence** [1] - 9030:2
**Ehrlich** [1] - 9067:5
**eighteen** [1] - 8997:18
**either** [12] - 8945:22,
8949:3, 8951:1,
8983:16, 8994:6,
8994:12, 8995:18,
9092:9, 9099:17,
9101:11, 9111:18,
9119:21
**elected** [1] - 9041:11
**election** [24] -
8953:16, 8961:22,
8971:6, 8971:8,
8971:12, 8974:9,
8983:24, 8985:15,
8990:13, 9000:6,
9000:15, 9013:18,
9013:24, 9013:25,
9014:1, 9014:8,
9014:21, 9014:24,
9014:25, 9015:5,
9018:23, 9019:2,
9019:9, 9108:25
**election-related** [2] -
9014:24, 9014:25
**Electoral** [1] - 8990:25
**elements** [7] -
9108:12, 9116:11,
9116:14, 9116:15,
9117:13, 9117:14,
9117:25
**elicit** [1] - 9088:21

**elicited** [1] - 9088:21
**Ellipse** [3] - 8996:6,
8996:22, 8997:4
**em** [3] - 9027:25,
9028:4, 9030:8
**email** [5] - 9023:15,
9024:2, 9082:8,
9082:9, 9082:10
**embassy** [1] - 9022:16
**emergency** [3] -
8946:24, 9064:20,
9064:21
**emphasize** [1] -
9085:25
**employment** [1] -
9050:25
**end** [16] - 8948:2,
8958:13, 8986:13,
8995:2, 8995:15,
9016:11, 9047:21,
9075:18, 9075:19,
9075:23, 9078:17,
9079:10, 9079:14,
9111:18, 9112:1
**ended** [5] - 8946:10,
9017:16, 9018:13,
9075:5, 9105:21
**ends** [2] - 9053:25,
9079:21
**enforcement** [15] -
8943:3, 8944:4,
8944:10, 8945:1,
8945:12, 8947:3,
8948:24, 8949:2,
9028:21, 9088:4,
9088:8, 9095:12,
9095:21, 9095:22,
9095:25
**engage** [1] - 8959:5
**engaged** [1] - 8959:7
**engagement** [1] -
8957:21
**engaging** [1] -
8966:25
**entails** [2] - 8979:13,
8980:13
**enter** [2] - 9085:19,
9100:13
**entertain** [1] - 9077:3
**entire** [1] - 8992:15
**entirely** [2] - 9022:5,
9022:14
**entirety** [1] - 9026:1
**epic** [1] - 8994:8
**Epic** [1] - 9068:17
**equally** [1] - 9113:22
**esk** [1] - 8949:24
**especially** [1] -
9110:17
**Esper** [1] - 8994:18

**essentially** [2] -
8943:1, 9078:25
**establish** [2] -
9105:21, 9105:24
**establishes** [3] -
9106:3, 9106:20,
9111:11
**et** [1] - 9057:20
**evacuate** [2] - 8953:6,
9021:11
**evaluate** [1] - 9106:6
**evaluating** [2] -
9087:14, 9087:18
**evaluation** [1] -
9090:8
**evening** [10] - 9005:3,
9008:15, 9008:16,
9012:7, 9060:10,
9063:13, 9066:13,
9067:17, 9068:13,
9117:5
**event** [13] - 8945:2,
8946:12, 8946:18,
8946:21, 8947:18,
8948:3, 8948:7,
8948:16, 8949:15,
8949:23, 8950:25,
8954:15, 8955:11
**events** [15] - 8944:16,
8946:9, 8948:13,
8948:16, 8950:18,
8981:1, 9016:4,
9021:9, 9070:8,
9116:18
**eventually** [2] -
8997:2, 8997:4
**everyday** [1] - 9049:17
**evidence** [55] -
8954:20, 8965:13,
8966:17, 8973:3,
8973:22, 8977:1,
8981:15, 8981:19,
8993:13, 9003:21,
9009:24, 9017:7,
9020:15, 9020:18,
9023:8, 9029:15,
9031:12, 9033:2,
9044:5, 9044:8,
9051:10, 9055:8,
9056:24, 9058:9,
9060:17, 9076:4,
9076:14, 9081:9,
9081:17, 9081:24,
9082:2, 9082:24,
9083:21, 9088:10,
9088:21, 9089:23,
9090:6, 9090:17,
9090:20, 9092:20,
9094:17, 9095:11,
9096:24, 9097:4,

9098:13, 9100:20, 9100:24, 9106:2, 9106:20, 9109:11, 9111:11, 9118:4, 9118:6, 9118:14, 9118:21
**evolve** [1] - 9104:21
**exact** [1] - 9105:22
**exactly** [4] - 8966:19, 8970:5, 8999:5, 9021:3
**exaggeration** [1] - 8992:10
**exam** [1] - 9045:5
**examination** [20] - 8941:9, 8941:14, 8960:3, 8960:16, 8963:20, 8963:25, 8964:1, 8965:1, 8965:21, 8980:19, 8981:11, 8985:20, 9014:18, 9015:14, 9016:19, 9033:24, 9040:11, 9043:4, 9047:20, 9052:13
**Examination** [8] - 8940:5, 8940:5, 8940:6, 8940:8, 8940:8, 8940:9, 8940:11, 8940:11
**EXAMINATION** [8] - 8942:1, 8951:12, 8956:1, 8960:4, 9046:8, 9048:7, 9051:5, 9052:15
**examine** [2] - 9013:23, 9016:4
**examined** [2] - 9013:16, 9093:13
**examiner** [3] - 9074:15, 9075:10, 9089:22
**except** [3] - 8996:13, 9042:8, 9090:16
**exchange** [1] - 9020:6
**excluding** [1] - 9036:4
**excuse** [8] - 8956:4, 8971:17, 8980:1, 9003:1, 9027:6, 9078:16, 9111:12, 9117:23
**excused** [2] - 8959:25, 9052:9
**executed** [1] - 8994:4
**executing** [2] - 8993:23, 8994:1
**exhibit** [19] - 8981:16, 9012:20, 9012:22, 9015:22, 9045:16, 9045:23, 9058:24,

9072:5, 9072:17, 9072:19, 9072:23, 9075:21, 9080:22, 9080:23, 9082:11, 9098:20, 9099:24, 9100:13, 9100:14
**Exhibit** [29] - 8940:14, 8940:15, 8940:15, 8940:16, 8940:16, 8940:17, 8940:17, 8940:18, 8940:18, 8940:20, 8940:20, 8954:21, 8961:5, 8977:1, 8981:18, 8993:13, 8997:9, 9009:24, 9017:7, 9020:18, 9029:14, 9031:11, 9044:8, 9054:4, 9055:7, 9057:21, 9058:8, 9058:24, 9072:12
**exhibits** [7] - 9075:12, 9075:14, 9075:18, 9075:19, 9080:20, 9081:13, 9100:4
**Exhibits** [1] - 8940:13
**exhilarating** [1] - 9010:7
**exist** [3] - 9110:10, 9111:16, 9111:23
**existed** [8] - 9105:25, 9106:4, 9106:17, 9106:21, 9107:18, 9110:5, 9111:13, 9111:20
**existence** [3] - 9107:1, 9107:7, 9110:9
**expand** [1] - 9044:9
**expansion** [1] - 9053:13
**expect** [3] - 9074:25, 9076:13, 9107:12
**experience** [3] - 8957:6, 9034:16, 9037:14
**expert** [8] - 8965:7, 9039:10, 9039:11, 9074:11, 9074:16, 9074:19, 9089:25, 9090:2
**explain** [8] - 8955:15, 8981:12, 8982:7, 9028:8, 9037:20, 9053:9, 9114:24, 9115:3
**explained** [2] - 8996:5, 8999:13
**explaining** [1] - 9115:2
**explains** [2] - 9100:15,

9108:15
**explanation** [2] - 8957:4, 8980:17
**explode** [1] - 8995:3
**explosion** [1] - 9064:19
**explosive** [3] - 9026:17, 9026:23, 9026:24
**extensive** [3] - 9040:1, 9040:6, 9043:7
**extent** [4] - 9013:13, 9013:22, 9096:10
**extinguishers** [1] - 9007:18
**extra** [2] - 8963:15, 9080:11
**extract** [1] - 9057:25
**extraction** [1] - 8968:15
**extremely** [1] - 9015:10
**eye** [5] - 9064:20, 9064:21, 9065:6, 9071:3
**eyes** [3] - 8969:24, 8970:1, 9031:22

# F

**F.3d** [1] - 9117:22
**face** [2] - 8941:20, 9023:13
**Facebook** [24] - 8987:19, 8988:2, 8990:16, 9025:14, 9026:5, 9026:6, 9026:12, 9056:18, 9058:24, 9059:8, 9059:15, 9066:2, 9066:9, 9067:8, 9068:5, 9069:9, 9071:19, 9072:25, 9073:1, 9080:24, 9080:25, 9082:5, 9118:12
**fact** [17] - 8943:16, 8952:25, 8965:8, 8966:2, 8979:17, 8983:9, 8985:22, 9002:24, 9015:3, 9018:23, 9022:13, 9025:9, 9087:19, 9092:7, 9103:1, 9111:17, 9120:14
**facts** [1] - 9109:12
**factual** [1] - 9117:25
**faggot** [3] - 8965:2, 8965:18, 8967:18
**fail** [2] - 9013:2

**failure** [1] - 9013:19
**fair** [44] - 8961:3, 8961:22, 8964:17, 8965:22, 8971:13, 8973:11, 8973:18, 8973:19, 8975:21, 8978:24, 8981:11, 8982:12, 8983:5, 8983:14, 8984:8, 8984:20, 8984:22, 8985:4, 8985:15, 8985:17, 8985:21, 8987:15, 8987:16, 8988:3, 8992:19, 8995:16, 9006:3, 9009:3, 9009:14, 9017:20, 9026:9, 9030:7, 9030:10, 9030:16, 9030:17, 9031:3, 9032:3, 9032:8, 9037:7, 9037:8, 9041:14, 9081:23, 9092:2, 9108:6
**fairly** [1] - 9036:23
**faith** [1] - 9102:5
**fake** [2] - 8996:10, 9051:18
**false** [2] - 9051:15, 9051:17
**familiar** [3] - 8947:12, 9072:17
**family** [5] - 8951:24, 8964:17, 8965:8, 9004:4, 9031:3
**fan** [1] - 9027:25
**far** [8] - 8944:12, 8949:18, 8950:14, 8957:14, 8988:21, 8990:1, 9048:18, 9066:1
**farm** [6] - 8960:9, 8960:11, 8960:12, 8976:13, 9042:17
**farmer** [2] - 9053:1, 9065:13
**fast** [2] - 9047:11, 9102:5
**father's** [1] - 9054:11
**fathom** [1] - 9065:8
**favorite** [2] - 9039:13, 9039:14
**FB** [1] - 9057:18
**FBI** [12] - 8960:13, 8960:14, 9004:2, 9052:23, 9053:5, 9058:15, 9058:20, 9076:1, 9076:7, 9089:22, 9094:10, 9094:19

**Fear** [1] - 9024:11
**felt** [3] - 8953:5, 8954:5, 9003:19
**few** [10] - 8947:9, 8984:15, 9024:22, 9026:5, 9069:10, 9073:23, 9075:12, 9076:8, 9101:17, 9117:18
**fight** [3] - 8955:2, 8957:20, 8958:1
**fighter** [1] - 9040:25
**fighting** [5] - 8950:7, 8950:12, 8950:16, 9031:25, 9032:5
**fights** [1] - 9007:6
**figure** [4] - 8962:4, 9081:14, 9091:15, 9092:21
**filled** [1] - 9025:18
**film** [3] - 9005:17, 9005:19, 9008:7
**final** [5] - 9043:24, 9044:5, 9074:4, 9079:12, 9085:9
**finalize** [2] - 9012:6, 9099:3
**finally** [1] - 9008:21
**fine** [24] - 8980:16, 9015:20, 9029:8, 9061:7, 9066:7, 9075:3, 9082:25, 9086:17, 9086:18, 9086:19, 9090:15, 9092:17, 9093:16, 9096:13, 9098:20, 9101:5, 9103:4, 9103:5, 9103:7, 9113:25, 9114:9, 9114:11, 9115:17
**finish** [4] - 9074:8, 9076:12, 9078:15, 9079:23
**finished** [3] - 8972:25, 8983:25, 9002:16
**finishing** [1] - 9074:8
**fire** [4] - 8957:25, 8994:17, 9007:18, 9030:2
**firearm** [1] - 8980:23
**firearms** [9] - 8943:2, 8956:10, 8956:13, 8956:16, 8956:20, 8978:11, 8978:12, 8978:14, 8978:17
**fired** [1] - 8957:25
**fires** [1] - 8998:21
**firing** [1] - 9053:13
**first** [48] - 8940:14, 8948:6, 8948:7,

9132

8948:17, 8965:3,
8966:12, 8967:23,
8968:6, 8969:3,
8971:11, 8992:22,
9014:8, 9020:20,
9025:9, 9028:11,
9028:15, 9028:24,
9029:14, 9030:22,
9032:11, 9036:8,
9036:10, 9049:2,
9049:3, 9052:17,
9055:15, 9056:20,
9061:7, 9061:10,
9072:8, 9075:22,
9077:2, 9084:6,
9085:14, 9085:15,
9085:18, 9086:3,
9086:20, 9087:4,
9092:18, 9093:13,
9112:16, 9112:18,
9114:24, 9115:1
**firstly** [1] - 8956:9
**FISCHER** [121] -
8964:19, 8964:22,
8966:12, 8967:3,
8968:5, 8968:11,
8968:20, 8969:3,
8976:22, 8979:6,
8979:9, 8979:20,
8980:9, 8980:22,
8981:6, 8989:13,
8993:11, 9009:22,
9011:6, 9011:18,
9011:23, 9012:23,
9015:24, 9016:8,
9016:15, 9020:16,
9029:1, 9029:4,
9029:8, 9031:8,
9032:20, 9033:12,
9033:18, 9034:6,
9036:4, 9036:8,
9044:6, 9045:6,
9045:11, 9047:24,
9048:8, 9051:3,
9051:21, 9052:4,
9052:14, 9052:16,
9054:5, 9054:7,
9054:15, 9054:17,
9055:2, 9055:9,
9055:12, 9055:14,
9056:14, 9056:16,
9056:20, 9056:22,
9057:7, 9057:9,
9057:21, 9057:22,
9058:6, 9058:10,
9058:23, 9059:5,
9059:24, 9060:1,
9060:4, 9060:5,
9060:20, 9060:21,
9061:2, 9061:4,
9061:6, 9061:9,

9062:5, 9062:7,
9063:4, 9063:5,
9063:7, 9063:8,
9063:15, 9063:17,
9063:22, 9063:23,
9065:9, 9065:12,
9066:5, 9066:8,
9066:21, 9067:2,
9067:11, 9067:13,
9068:2, 9068:4,
9068:19, 9068:20,
9068:25, 9069:1,
9069:13, 9069:17,
9070:11, 9070:15,
9071:15, 9071:17,
9072:6, 9072:10,
9072:13, 9072:16,
9073:4, 9074:20,
9081:3, 9081:12,
9081:17, 9082:3,
9082:8, 9110:14,
9118:3, 9119:2,
9120:22
**Fischer** [15] - 8964:21,
8993:1, 9011:25,
9012:12, 9013:10,
9015:22, 9016:3,
9025:10, 9029:6,
9033:11, 9034:9,
9036:7, 9045:4,
9052:3, 9080:23
**Fischer.............** [1] -
8940:9
**Fischer...............** [1] -
8940:11
**fit** [6] - 8946:23,
8947:13, 8950:7,
8950:12, 8950:16,
9109:13
**fitness** [1] - 8947:2
**fits** [1] - 9094:9
**five** [4] - 9078:18,
9079:1, 9079:3,
9083:6
**fixated** [1] - 8978:10
**flag** [1] - 9005:10
**flexibility** [4] - 9104:6,
9109:7, 9111:18,
9112:7
**flip** [2] - 9074:3,
9083:3
**floor** [1] - 9006:16
**Florida** [2] - 9098:7,
9098:8
**flows** [1] - 9106:19
**fly** [1] - 9081:13
**flying** [1] - 8998:12
**focused** [3] - 8975:1,
8975:2, 8977:24
**folder** [2] - 8968:23,

8987:11
**folk** [1] - 9022:5
**followed** [1] - 9092:11
**following** [7] -
8944:14, 8976:20,
9000:1, 9084:7,
9098:1, 9113:14,
9115:9
**follows** [1] - 9113:18
**fooled** [1] - 9040:25
**force** [9] - 8953:19,
8953:22, 8965:22,
8983:20, 8995:6,
9033:1, 9033:8,
9033:9, 9034:1
**Forces** [1] - 8994:19
**forces** [2] - 8994:22,
9022:9
**forcible** [1] - 8967:1
**Ford** [1] - 9025:10
**foregoing** [1] -
9107:21
**foreign** [1] - 9021:4
**forensic** [1] - 9089:23,
9090:6
**forging** [1] - 9102:18
**forgive** [1] - 9098:4
**forgot** [1] - 9073:24
**forgotten** [1] -
9088:16
**fork** [2] - 9031:20,
9031:23
**form** [1] - 8988:21
**format** [2] - 9058:2,
9095:5
**formed** [1] - 8950:23
**forth** [5] - 9015:15,
9031:15, 9033:17,
9033:22, 9112:15
**forward** [5] - 8972:12,
8998:4, 9035:6,
9037:22, 9085:16
**foul** [1] - 9079:16
**fountain** [3] - 8998:6,
9000:2, 9004:20
**four** [6] - 8942:17,
8945:24, 8999:4,
8999:6, 8999:25,
9000:4
**frame** [3] - 8948:5,
8958:6, 9105:18
**frankly** [2] - 8965:8,
9034:4
**frat** [1] - 9039:19
**fraternity** [1] - 9005:12
**fraudulent** [2] -
8983:24, 8985:15
**free** [1] - 8958:3
**Friday** [6] - 8991:24,
8997:13, 8997:16,

9079:7, 9079:11,
9119:11
**friend** [6] - 8979:12,
8980:11, 9004:19,
9028:18, 9067:5,
9070:23
**friends** [4] - 9021:9,
9021:12, 9058:4,
9067:6
**front** [3] - 9008:4,
9059:14, 9112:1
**fruition** [1] - 9108:24
**fucked** [2] - 8974:1,
8994:23, 9005:6
**fucking** [2] - 8990:18,
9041:21
**full** [4] - 8942:3,
9036:16, 9079:25,
9085:18
**fun** [2] - 8987:18,
9008:20
**furtherance** [1] -
9099:18

---

# G

**game** [8] - 8965:23,
9035:18, 9035:23,
9035:25, 9037:12,
9039:9, 9039:12,
9040:3
**gaps** [1] - 9025:18
**gas** [4] - 8998:10,
9003:24, 9004:9,
9004:17
**gases** [1] - 9053:14
**gear** [1] - 8996:15
**gee** [1] - 9022:12
**general** [1] - 8950:8
**generalized** [3] -
9097:8, 9097:12,
9097:13
**generally** [1] -
9117:12
**generic** [12] - 9090:14,
9090:16, 9092:3,
9092:14, 9093:15,
9093:19, 9093:23,
9093:24, 9094:2,
9100:22, 9101:1,
9101:5
**generically** [1] -
9092:10
**genericize** [1] -
9092:18
**gentleman** [8] -
9010:24, 9017:15,
9018:10, 9019:10,
9019:13, 9053:23,
9054:8, 9054:11

**gentlemen** [2] -
8941:8, 9073:7
**Gettem** [1] - 9062:3
**GEYER** [1] - 9120:20
**giant** [1] - 9019:1
**girl** [1] - 9041:21
**given** [11] - 9014:23,
9015:2, 9036:24,
9047:18, 9073:9,
9074:5, 9076:17,
9094:15, 9100:6,
9101:18, 9101:20
**GLAD** [1] - 9065:2
**glad** [4] - 8995:8,
9025:16, 9053:10,
9054:2
**gladly** [1] - 9029:24
**glasses** [1] - 9009:17
**goal** [2] - 8945:2,
9119:8
**Goals** [1] - 9113:10
**God** [4] - 9004:14,
9033:13, 9064:14,
9070:23
**Godbold** [3] -
8991:17, 9041:2,
9041:23
**Goddamnit** [1] -
9023:13
**gonna** [2] - 8990:17,
9057:18
**goof** [2] - 9022:25,
9023:1
**goofy** [1] - 8997:23
**Gorge** [2] - 8946:13,
8947:2
**gotcha** [1] - 9044:17,
9115:1
**GoToMeeting** [1] -
8952:10
**government** [55] -
8956:4, 8959:2,
8965:23, 8966:2,
8966:9, 8981:5,
9012:18, 9025:17,
9025:19, 9033:2,
9035:11, 9045:16,
9045:23, 9046:2,
9046:18, 9073:23,
9074:22, 9075:13,
9075:21, 9076:5,
9076:16, 9077:11,
9077:12, 9077:14,
9077:18, 9078:3,
9078:13, 9078:17,
9081:13, 9082:11,
9085:18, 9088:3,
9088:20, 9088:22,
9089:23, 9091:18,
9093:8, 9093:10,

9133

9094:13, 9102:13,
9103:24, 9104:3,
9104:10, 9105:18,
9107:1, 9108:1,
9108:15, 9109:14,
9109:17, 9109:19,
9111:5, 9113:25,
9114:9, 9119:7
**Government** [18] -
8940:14, 8940:15,
8940:15, 8940:16,
8940:16, 8940:17,
8940:17, 8940:18,
8940:18, 8977:1,
8981:18, 8993:13,
9009:24, 9017:7,
9020:18, 9029:14,
9031:11, 9044:8
**government's** [19] -
8965:16, 8981:3,
9033:23, 9075:18,
9075:19, 9076:23,
9078:16, 9078:19,
9081:17, 9084:15,
9092:15, 9105:20,
9107:11, 9110:16,
9112:4, 9119:14,
9119:15, 9119:21,
9120:9
**Government's** [3] -
8954:20, 9056:14,
9058:24
**grabbed** [1] - 9005:9
**gracious** [1] - 9077:5
**graduate** [1] - 9048:19
**Graham** [7] - 9015:25,
9016:2, 9018:6,
9018:23, 9019:8,
9019:16
**grammar** [1] - 9085:20
**grand** [7] - 9025:23,
9090:22, 9092:20,
9094:10, 9111:7,
9118:7, 9118:16
**grandmother** [1] -
9057:2
**Graydon** [1] - 9093:5
**great** [12] - 8984:9,
8992:10, 9000:20,
9003:6, 9005:18,
9007:19, 9008:11,
9008:13, 9016:6,
9053:12, 9061:17,
9078:7
**greater** [4] - 8981:1,
9105:11, 9105:17,
9112:9
**greatly** [1] - 8988:19
**Greene** [4] - 8972:6,
8972:8, 9084:12,

9084:19
**Grimes** [5] - 8990:16,
8991:7, 8991:10,
8991:11, 9028:5
**grinning** [1] - 8995:2
**ground** [12] - 8974:24,
8975:3, 8975:4,
8975:5, 8975:12,
8975:19, 8976:1,
8989:19, 9034:21,
9072:22
**grounds** [2] - 9009:13,
9010:4
**group** [5] - 8963:14,
8992:3, 8992:5,
9019:22
**groups** [2] - 8952:8,
9019:19
**guarantee** [1] - 9077:1
**Guardian** [1] -
8963:13
**guess** [20] - 8946:2,
8968:25, 8971:12,
8981:2, 9013:19,
9019:21, 9023:12,
9025:10, 9078:4,
9079:16, 9081:5,
9087:14, 9087:15,
9091:18, 9092:16,
9092:22, 9094:2,
9096:6, 9097:10,
9100:19
**guidance** [2] -
9105:17, 9105:18
**guide** [1] - 9105:14
**guides** [2] - 9039:21,
9039:22
**guilt** [2] - 9085:23
**guilty** [1] - 9115:13
**gunner's** [1] - 8943:1
**guns** [3] - 8969:25,
8970:4, 9042:3
**guy** [13] - 8961:13,
8979:10, 8980:14,
8991:20, 8994:18,
8994:20, 8996:8,
9006:15, 9019:4,
9019:13, 9040:25,
9067:4, 9071:2
**guys** [7] - 8984:9,
8984:10, 8992:24,
9022:16, 9034:17,
9039:19, 9070:3

## H

**hailed** [1] - 9003:9
**haired** [1] - 9031:17
**half** [6] - 9016:12,
9045:7, 9076:10,

9078:25, 9080:13,
9098:5
**halfway** [1] - 9068:8
**HALLER** [11] - 9077:9,
9077:25, 9078:7,
9078:10, 9085:4,
9086:10, 9089:19,
9093:19, 9093:22,
9097:6, 9099:11
**hallway** [1] - 9008:17
**hamstrung** [1] -
9109:14
**hand** [12] - 8955:2,
8956:6, 8957:19,
8957:20, 8958:1,
8994:25, 9081:23
**hand-to-hand** [1] -
8956:6
**handle** [2] - 8953:7,
9075:4
**handled** [1] - 8953:5
**hands** [4] - 8967:17,
8967:24, 9031:20,
9070:24
**hang** [3] - 9011:21,
9038:6, 9064:5
**Hang** [1] - 8967:22
**happy** [8] - 8965:17,
8979:19, 8999:17,
8999:24, 9000:16,
9016:25, 9033:15,
9091:24
**Happy** [1] - 9062:15
**harassed** [2] -
9019:16, 9019:17
**hard** [6] - 8955:15,
8961:14, 9057:24,
9099:11, 9112:25,
9118:3
**hardly** [1] - 9005:17
**harkening** [1] -
9112:20
**harm** [1] - 9079:16
**Harrelson** [1] -
8952:16
**Harris's** [1] - 9098:7
**Hawaii** [1] - 8942:23
**head** [3] - 8986:25,
9021:11, 9078:20
**headline** [1] - 9023:22
**headphones** [1] -
9053:20
**heads** [2] - 8995:3,
9047:14
**healing** [1] - 9003:6
**health** [1] - 9015:11
**hear** [9] - 8996:6,
8998:18, 8998:24,
8999:15, 9001:3,
9002:15, 9035:7,

9105:5, 9114:16
**heard** [24] - 8950:8,
8950:15, 8952:19,
8965:2, 8967:6,
8967:7, 8968:22,
8969:5, 8999:1,
9002:5, 9002:14,
9003:8, 9004:10,
9004:21, 9005:6,
9013:3, 9013:4,
9013:5, 9086:10,
9095:11, 9097:8,
9098:15, 9114:18
**hearing** [3] - 9008:3,
9054:1, 9083:9
**hearsay** [1] - 8957:13
**heavy** [3] - 8985:19,
8986:3, 8990:5
**held** [12] - 8941:5,
8969:11, 8981:14,
9011:10, 9016:7,
9016:16, 9029:12,
9034:10, 9037:2,
9046:5, 9073:12,
9117:12
**hell** [1] - 8970:23
**help** [4] - 9014:13,
9044:18, 9070:18,
9101:7
**helpful** [2] - 8970:12,
9079:18
**helping** [2] - 8975:22,
8982:18
**heroes** [1] - 9003:9
**hide** [2] - 9006:15,
9038:2
**hiding** [1] - 9059:11
**high** [4] - 9029:9,
9029:20, 9030:1,
9048:19
**highly** [4] - 8965:4,
9012:25, 9035:25,
9053:24
**Hilgeman** [1] - 9098:6
**himself** [1] - 8965:21
**hint** [1] - 9039:9
**hints** [1] - 9039:12
**his's** [1] - 9087:15
**historian** [1] - 9000:20
**hits** [1] - 9027:25
**hold** [7] - 8979:6,
8992:21, 9045:20,
9049:20, 9050:6,
9050:11, 9110:19
**holes** [2] - 9056:8,
9056:10
**Hollywood** [2] -
9029:5, 9029:7
**hollywood** [1] -
9029:24

**Holy** [1] - 9067:22
**home** [7] - 8959:24,
9004:2, 9004:19,
9042:5, 9042:21,
9052:7, 9054:11
**honest** [1] - 8953:17
**honestly** [1] - 9112:2
**honesty** [2] - 9045:11,
9050:21
**Honor** [101] - 8941:16,
8941:25, 8951:7,
8964:22, 8964:24,
8965:5, 8966:12,
8966:14, 8967:3,
8968:5, 8968:20,
8969:3, 8969:8,
8976:19, 8979:6,
8979:9, 8980:9,
8980:22, 8981:6,
8989:13, 9009:20,
9011:4, 9011:14,
9012:9, 9012:23,
9014:4, 9015:7,
9015:20, 9015:24,
9016:8, 9016:20,
9020:14, 9028:13,
9029:1, 9029:4,
9029:8, 9031:6,
9032:24, 9033:12,
9033:18, 9034:5,
9034:25, 9035:3,
9035:7, 9035:15,
9036:4, 9044:4,
9046:3, 9046:25,
9047:22, 9047:24,
9051:3, 9052:4,
9071:10, 9071:13,
9071:15, 9073:15,
9073:20, 9074:20,
9075:3, 9076:21,
9077:7, 9077:9,
9077:20, 9079:20,
9079:21, 9080:15,
9081:12, 9082:3,
9083:5, 9083:24,
9086:2, 9092:10,
9093:11, 9093:19,
9095:3, 9096:13,
9096:17, 9097:6,
9098:4, 9099:6,
9099:11, 9099:13,
9100:22, 9102:20,
9102:25, 9103:10,
9103:19, 9104:16,
9104:19, 9108:23,
9110:14, 9114:15,
9115:4, 9117:3,
9117:17, 9118:3,
9119:2, 9119:4,
9119:18, 9120:2

9134

**Honor's** [2] - 9114:18, 9117:4
**hooey** [4] - 9006:12, 9006:24, 9007:3, 9009:7
**hope** [7] - 8968:3, 8974:4, 8991:19, 8991:20, 8995:1, 9021:4, 9038:23
**Hope** [1] - 8993:22
**hopefully** [3] - 9083:2, 9113:3, 9119:23
**hopes** [4] - 8991:24, 8997:12, 8997:15, 9077:12
**hoping** [2] - 8994:3, 9119:22
**Horizon** [1] - 8977:11
**horrible** [1] - 8972:2
**hotel** [2] - 8990:1, 9006:18
**hour** [13] - 9016:12, 9045:7, 9073:7, 9074:25, 9075:1, 9075:9, 9076:10, 9076:18, 9079:21, 9079:25, 9080:2, 9080:13
**hours** [9] - 8962:19, 9068:15, 9069:22, 9076:21, 9078:24, 9079:2, 9103:19, 9104:12, 9117:18
**house** [5] - 9006:16, 9035:19, 9036:2, 9039:1, 9039:20
**Hughes** [2] - 8951:11, 8951:14
**HUGHES** [5] - 8951:13, 8954:19, 8954:22, 8955:25, 8957:8
**Hughes................** [1] - 8940:5
**human** [4] - 8962:20, 8962:21, 8963:12, 9030:2
**humans** [1] - 8963:9
**hundred** [2] - 8949:7, 9025:11
**hunt** [3] - 8962:20, 8963:9, 8963:12
**hunted** [1] - 8962:21
**hunting** [10] - 8962:11, 8962:12, 8962:14, 8962:22, 8962:23, 8963:4, 8963:5, 8963:8, 8963:11, 8963:17
**hurt** [1] - 9043:15

**husband** [1] - 9002:20
**hypothetically** [1] - 9104:4

**I**

**idea** [11] - 8953:24, 8976:1, 9009:1, 9014:11, 9015:9, 9035:23, 9060:16, 9065:6, 9105:13, 9107:25, 9108:2
**identification** [1] - 9097:4
**identified** [4] - 9077:14, 9080:24, 9092:7, 9094:6
**identifies** [1] - 9099:21
**identify** [5] - 9077:16, 9082:23, 9086:5, 9091:15, 9101:8
**identifying** [3] - 9090:10, 9091:24, 9101:23
**identity** [1] - 9044:18
**ignorance** [1] - 9086:13
**imagine** [2] - 9044:22, 9045:6
**immediately** [1] - 9012:5
**impact** [1] - 8944:16
**impeach** [4] - 9014:11, 9088:9, 9088:10, 9091:7
**impeached** [2] - 9090:22, 9095:4
**impeachment** [7] - 8966:7, 9033:24, 9036:21, 9088:16, 9090:25, 9094:24, 9095:7
**impeachments** [2] - 9090:17, 9091:14
**impede** [1] - 9114:7
**implicate** [1] - 9095:12
**implicating** [1] - 9097:21
**implies** [1] - 8944:19
**important** [7] - 8965:19, 8982:19, 8990:11, 8991:1, 8991:3, 9053:18, 9105:9
**impossible** [1] - 9035:19
**impression** [1] - 9033:6

**improvised** [3] - 9026:17, 9026:22, 9026:24
**in-their-mind** [1] - 9111:6
**inaccurate** [2] - 9012:21, 9069:7
**inaugurated** [2] - 8955:20, 9000:20
**inauguration** [12] - 8949:16, 8949:17, 8949:20, 8950:7, 8950:15, 8950:16, 8950:19, 8951:2, 9000:17, 9001:7, 9001:19, 9005:20
**incessantly** [1] - 9039:20
**incident** [1] - 8948:11
**inclined** [1] - 9120:14
**include** [7] - 9044:10, 9086:3, 9086:14, 9096:19, 9102:21, 9105:9, 9115:24
**included** [2] - 9099:16, 9114:17
**including** [3] - 9089:7, 9099:23, 9107:20
**inconsistent** [13] - 8966:23, 9017:19, 9090:9, 9090:12, 9090:24, 9091:13, 9091:23, 9094:3, 9094:4, 9095:17, 9096:4, 9096:8, 9096:11
**incorrect** [2] - 8985:9, 8985:11
**inculpatory** [1] - 8987:22
**indeed** [4] - 8976:18, 9046:22, 9057:15, 9068:17
**indicated** [4] - 9069:6, 9099:7, 9110:8, 9112:17
**indicates** [1] - 9110:3
**indicating** [1] - 9115:4
**indication** [2] - 8957:1, 9001:15
**indicative** [1] - 8968:24
**indicted** [3] - 9084:16, 9111:7, 9118:16
**indictment** [17] - 9083:21, 9105:22, 9108:25, 9109:2, 9109:5, 9109:6, 9109:8, 9110:1, 9110:2, 9110:7,

9110:21, 9110:24, 9111:2, 9114:3, 9118:8, 9118:20, 9118:23
**indifferent** [1] - 9086:15
**individual** [5] - 9085:25, 9086:1, 9101:6, 9113:16, 9113:21
**individual's** [1] - 8941:11
**individually** [7] - 9113:20, 9114:4, 9114:7, 9114:14, 9115:11, 9115:13, 9115:20
**individuals** [4] - 8947:11, 8955:18, 9107:16, 9107:19
**indulgence** [8] - 8989:16, 9031:8, 9033:14, 9059:3, 9066:25, 9069:13, 9070:12, 9096:5
**infer** [1] - 8957:12
**infirm** [1] - 9033:7
**infirmed** [1] - 9032:25
**information** [6] - 8965:8, 8970:21, 8970:25, 9039:23, 9039:25, 9089:25
**inherent** [1] - 9110:8
**initial** [1] - 8958:19
**injecting** [1] - 9112:7
**Inn** [2] - 8969:19, 9008:14
**inner** [1] - 8983:18
**innocent** [1] - 8965:14
**inquiry** [2] - 8966:5, 9115:21
**inside** [3] - 8997:3, 9006:15, 9006:21
**insincerely** [1] - 9097:22
**insistent** [1] - 9036:16
**instance** [2] - 8956:17, 9090:19
**instant** [1] - 9021:5
**instantaneously** [1] - 9110:25
**instead** [2] - 9087:11, 9099:22
**instruct** [2] - 9076:17, 9086:11
**instructed** [1] - 9113:18
**Instruction** [4] - 9087:24, 9095:23, 9096:3, 9103:17

**instruction** [37] - 8966:5, 9036:20, 9036:24, 9073:25, 9083:22, 9090:9, 9091:4, 9092:1, 9092:8, 9092:11, 9094:17, 9095:15, 9095:21, 9096:7, 9096:15, 9096:23, 9097:4, 9097:11, 9097:24, 9097:25, 9098:11, 9098:13, 9099:3, 9100:23, 9101:6, 9101:13, 9101:20, 9104:23, 9105:20, 9109:9, 9111:9, 9111:19, 9111:22, 9116:12, 9116:16, 9118:5, 9118:14
**instructions** [20] - 9012:6, 9073:22, 9074:4, 9076:17, 9078:16, 9079:12, 9079:21, 9079:22, 9080:21, 9083:2, 9093:24, 9098:9, 9098:15, 9099:23, 9102:15, 9108:11, 9113:4, 9113:19, 9115:16, 9119:23
**intelligence** [3] - 8964:1, 8965:7, 9015:10
**intending** [2] - 9091:10, 9094:14
**intent** [1] - 8966:4
**intention** [4] - 8948:21, 8948:23, 8966:9, 8986:4
**interact** [1] - 8959:16
**interactions** [1] - 8957:11
**interest** [6] - 8943:20, 8943:22, 8947:10, 9047:17, 9087:20, 9099:17
**interested** [4] - 8966:25, 8979:11, 8980:11, 8982:17
**interesting** [3] - 8972:13, 8972:18, 9033:21
**internet** [2] - 9039:16, 9072:3
**interpretation** [1] - 8957:9
**interrogation** [1] - 9088:6
**interrogatories** [1] -

9116:6
**interrupt** [2] - 9040:9, 9104:9
**introduce** [3] - 9035:5, 9055:3, 9070:24
**introduced** [5] - 8954:20, 9035:12, 9081:19, 9082:12, 9091:7
**introducing** [1] - 9088:13
**invade** [1] - 8953:25
**invasion** [2] - 8949:23, 8950:20
**investigating** [1] - 8961:22
**investment** [1] - 9054:10
**invited** [2] - 8954:15, 9058:2
**involved** [7] - 8947:8, 8951:25, 8984:20, 9014:7, 9054:24, 9056:3, 9110:20
**involves** [1] - 9081:15
**involving** [2] - 9040:2, 9066:2
**irrelevant** [1] - 9105:6
**issue** [14] - 8965:6, 8968:8, 9012:16, 9013:19, 9013:21, 9016:2, 9016:8, 9075:17, 9077:14, 9077:20, 9078:12, 9080:22, 9106:1, 9107:6
**issues** [4] - 8981:13, 9015:11, 9073:21, 9075:15
**itching** [1] - 9053:7
**items** [2] - 8981:8, 9118:7
**itself** [2] - 8979:18, 9107:18

## J

**Jackson** [1] - 9084:5
**Jacob** [1] - 8942:5
**James** [1] - 9085:15
**January** [92] - 8948:6, 8948:8, 8948:11, 8948:14, 8949:14, 8951:1, 8955:9, 8955:23, 8978:13, 8980:24, 8981:1, 8985:10, 8989:25, 8990:11, 8995:10, 8995:12, 8995:14, 8995:21, 8995:23, 8995:24, 9005:3, 9006:6, 9006:13, 9007:14, 9010:14, 9016:25, 9020:21, 9022:18, 9022:23, 9026:12, 9026:14, 9026:20, 9027:6, 9027:7, 9037:18, 9040:16, 9040:24, 9044:14, 9057:15, 9058:16, 9058:21, 9059:12, 9059:21, 9060:9, 9060:10, 9061:12, 9061:24, 9062:8, 9062:11, 9062:12, 9062:18, 9062:21, 9062:24, 9063:10, 9063:13, 9063:19, 9063:24, 9064:5, 9064:7, 9065:7, 9065:18, 9065:21, 9066:2, 9066:12, 9066:13, 9066:16, 9067:14, 9067:18, 9067:24, 9068:13, 9068:15, 9069:19, 9069:21, 9070:4, 9070:9, 9070:17, 9071:4, 9104:5, 9104:12, 9107:10, 9107:16, 9107:18, 9109:1, 9109:4, 9109:19, 9109:21, 9110:18, 9111:1, 9111:20, 9114:5, 9118:13
**Jason** [1] - 9085:15
**Jennifer** [1] - 9089:24
**jeopardy** [1] - 8983:23
**Jerry** [3] - 9028:16, 9028:18, 9029:18
**Jess** [7] - 8945:16, 8946:1, 8946:2, 8947:20, 8957:6, 9023:13, 9024:6
**Jessica** [8] - 8943:5, 8951:21, 8954:15, 8954:23, 8954:24, 8965:25, 8976:3, 9023:10
**JG** [2] - 9049:16, 9049:23
**job** [2] - 8945:13, 9000:5
**jockey** [1] - 9040:8
**jog** [1] - 9096:20
**John** [1] - 8961:13
**join** [8] - 8945:7, 8947:9, 9048:23, 9107:24, 9109:10, 9109:24, 9110:11, 9110:15
**joined** [18] - 8945:14, 8945:15, 8945:18, 8945:21, 8951:19, 8952:10, 8955:22, 9048:24, 9048:25, 9107:16, 9107:19, 9108:16, 9108:19, 9109:18, 9109:20, 9110:5, 9110:18, 9110:25
**joke** [5] - 8992:4, 9033:19, 9033:22, 9041:21, 9042:9
**joking** [1] - 8992:3
**Jonathan** [30] - 8964:14, 8965:25, 8967:16, 8967:21, 8967:23, 8967:25, 9005:12, 9007:15, 9031:3, 9031:15, 9032:16, 9033:15, 9034:3, 9034:12, 9034:22, 9035:13, 9035:14, 9035:18, 9035:22, 9036:20, 9037:25, 9038:4, 9038:22, 9039:1, 9039:19, 9045:13, 9052:18, 9052:19, 9052:20
**Jonathan's** [1] - 8968:13
**judge** [5] - 8959:10, 9019:20, 9036:19, 9045:13, 9088:19
**Judge** [14] - 8957:10, 8959:20, 8966:11, 9036:19, 9047:3, 9083:14, 9084:14, 9089:18, 9093:4, 9094:7, 9105:10, 9106:13, 9112:23, 9113:7
**judges** [2] - 9018:24, 9019:7
**judgment** [1] - 9087:22
**judgments** [1] - 9085:25
**July** [1] - 8966:14
**jump** [1] - 9073:20
**June** [6] - 9014:1, 9015:2, 9015:15, 9033:12, 9036:9, 9037:8
**juries** [1] - 9117:13
**Juror** [1] - 9079:10
**jurors** [3] - 9074:7, 9080:9, 9080:12
**jurors'** [1] - 9097:21
**JURY** [1] - 9047:14
**jury** [47] - 8941:2, 8941:5, 8965:7, 8974:18, 9002:6, 9011:10, 9012:6, 9016:16, 9025:23, 9029:23, 9033:7, 9034:14, 9035:16, 9036:5, 9036:24, 9037:5, 9038:1, 9038:7, 9044:16, 9047:7, 9053:7, 9071:7, 9073:12, 9073:22, 9086:4, 9090:22, 9091:23, 9092:20, 9094:10, 9095:6, 9096:11, 9100:14, 9105:15, 9108:7, 9109:9, 9109:12, 9111:4, 9111:5, 9111:7, 9111:20, 9112:10, 9116:14, 9117:24, 9118:7, 9118:16
**jury's** [1] - 9097:8
**Justice** [3] - 8961:18, 8961:21, 8990:9

## K

**Kate** [1] - 9093:25
**Kathryn** [2] - 9089:13, 9090:3
**keen** [1] - 9030:19
**keep** [15] - 8983:4, 8998:4, 9000:23, 9000:24, 9004:17, 9027:18, 9039:21, 9039:22, 9076:9, 9079:4, 9087:9, 9094:16, 9094:25, 9106:16, 9112:24
**Keeper** [3] - 8952:6, 8970:6, 8984:6
**Keepers** [13] - 8952:8, 8952:10, 8955:22, 8959:2, 8959:5, 8959:17, 8973:7, 8984:8, 8995:22, 8995:24, 8995:25, 8996:4, 8996:10
**keeping** [1] - 9078:21
**keeps** [1] - 9052:18
**Kelly** [3] - 8952:14, 8996:1, 8996:7
**Kelsey** [1] - 9098:7
**Kenneth** [1] - 8952:16
**kidding** [1] - 9044:17
**kids** [2] - 9001:12, 9077:6
**kill** [6] - 8974:2, 8974:9, 9021:17, 9022:24, 9033:9, 9043:15
**killed** [4] - 8974:3, 8974:9, 8999:12, 8999:14
**killing** [1] - 8972:1
**kind** [15] - 8943:20, 8944:19, 8950:2, 8957:6, 8966:25, 8974:4, 9003:25, 9016:4, 9019:18, 9022:12, 9028:6, 9053:25, 9056:11, 9057:24, 9082:15
**kinds** [1] - 9085:19
**Kirby** [9] - 8978:22, 8979:10, 8980:10, 8980:14, 8981:22, 9059:6, 9059:15, 9059:18, 9064:11
**kit** [3] - 8982:12, 9056:3, 9056:6
**kits** [3] - 8982:2, 9054:23, 9055:18
**knife** [1] - 9031:23
**knowledge** [16] - 8944:12, 8945:15, 8957:6, 8957:18, 9032:3, 9032:8, 9032:9, 9050:11, 9050:13, 9052:23, 9053:4, 9070:7, 9070:10, 9081:7, 9081:22, 9082:1
**known** [2] - 8943:12, 9049:9
**Kraken** [1] - 8993:23

## L

**lack** [1] - 8946:3
**ladies** [2] - 8941:8, 9073:7
**lady** [1] - 9057:2
**lady's** [1] - 9057:5
**language** [8] - 9003:1, 9003:5, 9033:21, 9104:14, 9105:11, 9107:3, 9115:5, 9115:24
**large** [7] - 8944:7, 8955:18, 8966:3, 8998:18, 9019:19, 9019:21, 9019:22
**larger** [2] - 8944:19, 8983:10

9136

**last** [13] - 8940:15, 8967:20, 9031:7, 9031:9, 9031:11, 9035:19, 9036:2, 9039:1, 9043:23, 9046:17, 9079:12, 9083:11, 9105:11
**late** [3] - 9054:11, 9060:13, 9111:20
**laugh** [2] - 8987:3, 8987:6
**laughed** [1] - 9006:5
**law** [40] - 8943:3, 8944:4, 8944:10, 8945:1, 8945:12, 8947:3, 8948:23, 8949:2, 9028:21, 9032:3, 9032:4, 9032:8, 9032:9, 9074:1, 9088:4, 9088:8, 9088:22, 9089:9, 9095:12, 9095:20, 9095:22, 9095:25, 9104:19, 9105:4, 9105:5, 9105:8, 9106:25, 9107:5, 9109:8, 9109:14, 9109:15, 9109:23, 9110:3, 9110:8, 9111:16, 9112:19, 9114:6, 9116:9, 9117:3, 9117:19
**law-abiding** [1] - 9089:9
**law-abidingness** [2] - 9074:1, 9088:22
**laws** [1] - 8956:9
**laying** [1] - 9006:19
**Lazarus** [2] - 9077:10, 9077:15
**lead** [2] - 8946:20, 9049:25
**lead-out** [1] - 8946:20
**leading** [1] - 9107:10
**leaking** [1] - 9098:7
**learned** [6] - 8977:17, 8977:23, 9040:1, 9051:8, 9051:10, 9110:23
**least** [8] - 8974:23, 8981:5, 9003:8, 9014:19, 9051:22, 9097:3, 9105:14, 9106:9
**leave** [15] - 8949:9, 8949:10, 8953:3, 8953:4, 8953:8, 8953:12, 8953:13, 8994:23, 9033:15,

9035:4, 9092:6, 9095:6, 9098:23, 9101:1, 9101:2
**leaves** [1] - 9035:16
**leaving** [1] - 9094:2
**left** [7] - 8953:11, 8981:13, 8989:24, 8999:1, 9015:23, 9080:1, 9084:2
**legal** [3] - 8981:8, 8981:9, 9030:19
**legislative** [2] - 9002:18, 9003:12
**length** [2] - 9076:17, 9105:25
**less** [5] - 8944:9, 8947:12, 8947:13, 9105:18
**lessons** [1] - 9110:23
**letter** [1] - 9110:9
**level** [1] - 8963:15
**leverage** [1] - 9031:21
**liability** [6] - 9114:17, 9115:7, 9115:14, 9116:5, 9116:20, 9116:21
**libtards** [1] - 8990:18
**license** [2] - 9044:19, 9051:25
**lie** [1] - 9025:5
**lieutenant** [3] - 9043:14, 9049:16, 9049:23
**life** [4] - 8948:25, 8953:25, 8958:7, 9003:22
**lifting** [1] - 8984:18
**light** [1] - 9119:5
**like-minded** [1] - 8955:18
**likely** [2] - 9016:9, 9024:13
**likewise** [1] - 9054:13
**limit** [4] - 8944:14, 9075:1, 9100:2, 9107:8
**limited** [2] - 9076:10, 9099:5
**limiting** [7] - 8966:5, 9036:20, 9097:23, 9097:25, 9098:9, 9100:23, 9101:13
**Linder's** [1] - 9093:12
**Lindsey** [7] - 9015:25, 9016:2, 9018:6, 9018:23, 9019:8, 9019:16
**line** [9] - 8966:5, 8981:5, 9025:4, 9046:15, 9046:18,

9076:3, 9078:14, 9079:5, 9091:18
**lines** [5] - 8943:4, 8945:11, 9036:17, 9038:7, 9038:8
**link** [6] - 9017:11, 9072:2, 9072:20, 9082:19, 9118:10
**list** [5] - 9083:6, 9084:11, 9086:4, 9093:17, 9101:12
**listed** [1] - 9087:10
**listened** [1] - 8997:3
**literally** [3] - 9035:19, 9074:3, 9098:16
**live** [8] - 8942:5, 8974:3, 8991:24, 8997:13, 8997:15, 9031:16, 9048:14, 9048:15
**Lives** [6] - 8963:19, 8963:22, 8964:9, 8965:10, 8965:11, 9012:9
**lives** [2] - 8997:22, 9057:2
**loaded** [1] - 9086:24
**lobby** [2] - 9041:3, 9041:7
**lobbying** [2] - 9041:14, 9042:7
**local** [6] - 8949:4, 9006:19, 9021:6, 9021:18, 9022:24, 9053:1
**located** [1] - 8960:25
**location** [5] - 8953:10, 8953:11, 9022:10, 9043:3, 9089:25
**locations** [3] - 9040:2, 9042:24, 9043:5
**lock** [1] - 9110:20
**Lockwood** [1] - 9080:9
**logical** [1] - 9116:23
**lol** [1] - 8987:3
**long-term** [1] - 9110:21
**look** [28] - 8961:14, 8965:20, 8981:11, 9004:19, 9004:20, 9004:21, 9008:7, 9013:8, 9017:22, 9023:22, 9026:15, 9047:7, 9054:18, 9063:9, 9080:2, 9080:3, 9082:17, 9086:15, 9091:20, 9092:4, 9096:6, 9102:11, 9118:1,

9118:22, 9118:23, 9120:3, 9120:13
**looked** [2] - 9012:18, 9089:2
**looking** [5] - 9076:11, 9103:14, 9103:16, 9116:24, 9119:4
**looks** [22] - 9014:12, 9017:12, 9060:13, 9061:5, 9061:10, 9061:20, 9063:6, 9063:9, 9063:12, 9063:18, 9063:24, 9064:4, 9065:10, 9067:14, 9068:5, 9068:8, 9068:13, 9069:18, 9069:21, 9069:24, 9078:15, 9102:4
**loss** [1] - 8958:7
**lost** [2] - 9000:13, 9024:14
**loud** [4] - 8987:4, 8987:6, 9079:18, 9106:20
**Louisville** [10] - 8948:17, 8948:22, 8948:23, 8952:23, 8952:25, 8953:1, 8953:13, 8959:13, 9014:5, 9014:7
**love** [2] - 8967:5, 9005:17
**lower** [6] - 9001:25, 9008:5, 9060:4, 9063:15, 9063:16
**luck** [2] - 9101:23, 9101:25
**lunch** [1] - 9076:3, 9076:14, 9102:14, 9119:17
**lunchtime** [2] - 9076:12, 9078:15
**lying** [2] - 9005:7, 9023:23, 9034:21

---

## M

**ma'am** [1] - 8970:14
**mad** [1] - 9084:16
**MAGA** [18] - 8947:21, 8948:12, 8954:12, 8955:7, 8973:11, 8973:13, 8973:16, 8974:15, 8974:25, 8975:15, 8976:4, 8977:23, 8978:5, 8978:7, 8978:9, 8983:11, 8984:11, 8989:4

**main** [1] - 9115:21
**maintained** [1] - 8943:2
**manner** [1] - 9033:3
**Manzo** [19] - 8960:3, 8960:7, 8973:4, 8998:3, 9005:21, 9009:16, 9016:11, 9016:19, 9035:11, 9040:9, 9041:6, 9051:4, 9056:17, 9059:8, 9060:23, 9063:1, 9066:1, 9069:6, 9071:6
**MANZO** [201] - 8960:5, 8961:5, 8961:8, 8964:12, 8964:13, 8965:5, 8968:16, 8968:23, 8969:8, 8969:12, 8969:16, 8969:17, 8970:14, 8970:16, 8972:22, 8972:24, 8973:2, 8973:6, 8973:20, 8973:21, 8974:13, 8974:14, 8976:14, 8976:15, 8976:19, 8977:2, 8977:3, 8977:7, 8977:9, 8977:13, 8977:15, 8977:21, 8977:22, 8978:19, 8978:21, 8979:4, 8979:18, 8979:22, 8980:1, 8980:3, 8980:7, 8980:16, 8981:15, 8981:20, 8982:20, 8982:22, 8984:4, 8984:5, 8984:23, 8984:24, 8986:15, 8986:16, 8986:22, 8986:23, 8988:16, 8988:17, 8988:25, 8989:1, 8989:16, 8989:18, 8990:14, 8990:15, 8991:15, 8991:16, 8991:22, 8991:23, 8992:13, 8992:16, 8992:25, 8993:2, 8993:5, 8993:9, 8993:14, 8993:16, 8994:13, 8994:16, 8997:9, 8997:11, 8997:18, 8997:20, 9000:22, 9001:1, 9001:2, 9001:8, 9001:10, 9001:21, 9001:22, 9002:12, 9004:25, 9005:2, 9005:22,

9137

9005:23, 9007:9,
9007:13, 9009:9,
9009:10, 9009:20,
9009:25, 9010:2,
9010:18, 9010:19,
9010:21, 9010:23,
9011:4, 9011:15,
9011:19, 9012:9,
9012:18, 9014:4,
9014:11, 9014:19,
9015:7, 9015:20,
9016:2, 9016:20,
9016:21, 9017:3,
9017:8, 9017:24,
9018:1, 9018:4,
9020:4, 9020:5,
9020:10, 9020:11,
9020:14, 9020:19,
9021:15, 9021:16,
9023:7, 9023:9,
9023:16, 9023:17,
9023:25, 9024:1,
9024:4, 9024:5,
9024:9, 9024:10,
9024:16, 9024:18,
9024:20, 9027:2,
9027:4, 9028:11,
9028:14, 9028:24,
9029:16, 9030:4,
9030:6, 9030:22,
9031:1, 9031:6,
9031:13, 9032:10,
9032:14, 9032:18,
9032:24, 9033:15,
9034:5, 9034:11,
9034:25, 9035:3,
9035:7, 9035:15,
9035:24, 9036:14,
9036:18, 9037:3,
9037:25, 9038:3,
9038:9, 9038:15,
9038:19, 9038:21,
9040:14, 9040:19,
9040:22, 9041:18,
9041:19, 9043:22,
9044:1, 9044:4,
9044:9, 9044:11,
9044:25, 9046:3,
9051:6, 9051:23,
9052:2, 9055:5,
9058:7, 9071:10,
9071:13, 9073:5,
9075:3, 9080:23,
9081:5, 9081:20,
9082:14, 9082:25
**Manzo's** [1] - 9055:10
**Manzo**................. [2] -
9040:8, 9040:11
**March** [17] - 8942:20,
8947:21, 8948:12,
8954:13, 8955:7,

8973:11, 8973:14,
8973:16, 8974:16,
8974:25, 8975:15,
8976:4, 8978:5,
8978:7, 8978:9,
8984:11, 8989:4
**march** [1] - 8955:1
**marched** [2] -
8974:21, 9000:6
**marching** [3] -
8996:24, 8997:1,
8997:2
**marked** [2] - 9054:4,
9072:11
**marshals** [1] -
9080:12
**mask** [1] - 9048:4
**mass** [2] - 8944:15,
8944:19
**masses** [1] - 8974:2
**mate** [1] - 8943:1
**materialized** [1] -
9104:12
**materials** [1] -
9036:22
**mates** [1] - 8985:24
**Matt** [14] - 8986:9,
8986:17, 8992:17,
8993:18, 8994:5,
8994:7, 9027:24,
9030:8, 9030:11,
9041:3, 9041:10,
9067:3, 9067:4,
9068:6
**Matter** [5] - 8963:19,
8963:22, 8964:9,
8965:10, 8965:11
**matter** [9] - 8979:17,
8985:22, 9025:9,
9044:21, 9088:12,
9088:14, 9094:5,
9095:17, 9096:9
**Matters** [1] - 9012:9
**matters** [3] - 9056:11,
9097:11, 9118:23
**Matthew** [1] - 9068:6
**McNamara** [11] -
9040:24, 9041:17,
9041:20, 9052:25,
9053:1, 9053:2,
9065:13, 9065:14,
9065:16, 9065:24,
9066:10
**mean** [52] - 8947:21,
8953:21, 8956:4,
8957:22, 8963:9,
8963:12, 8964:24,
8966:15, 8966:16,
8966:21, 8967:4,
8967:7, 8967:13,

8968:25, 8969:4,
8971:20, 8973:12,
8975:18, 8989:14,
8991:13, 8994:5,
9000:11, 9001:6,
9013:19, 9015:12,
9015:13, 9015:18,
9019:11, 9028:4,
9033:19, 9036:7,
9036:8, 9042:16,
9076:1, 9081:25,
9082:22, 9084:14,
9084:15, 9093:11,
9095:9, 9095:10,
9096:8, 9099:12,
9102:11, 9102:23,
9102:24, 9103:24,
9104:8, 9107:22,
9111:16, 9119:16,
9119:20
**meaning** [1] - 8986:4
**means** [14] - 8943:1,
8950:13, 8987:6,
9003:2, 9010:16,
9021:5, 9029:20,
9033:3, 9076:15,
9104:24, 9115:22,
9116:9, 9116:11,
9117:14
**meant** [4] - 8957:5,
8973:24, 8984:17,
8997:23
**measure** [1] - 8994:1
**measures** [1] -
8945:13
**meaty** [1] - 9120:8
**media** [5] - 9004:23,
9005:7, 9006:24,
9009:7, 9072:24
**medic** [1] - 8946:5
**medical** [6] - 8944:6,
8945:1, 8946:4,
8947:3, 9068:1
**medication** [2] -
9008:19, 9008:22
**meet** [4] - 8995:24,
8995:25, 8996:1,
9049:5
**meeting** [1] - 9070:3
**meets** [1] - 9014:8
**Meggs** [4] - 8952:14,
8996:1, 8996:7,
9097:9
**member** [13] - 8942:7,
8945:14, 8945:18,
8951:16, 8952:22,
8959:3, 8959:14,
8964:17, 8965:9,
8970:6, 8985:7,
8985:11, 9031:3

**members** [5] -
8945:15, 8945:16,
8945:24, 8951:21,
8958:17
**memories** [1] - 8961:3
**memory** [2] - 8972:18,
9096:20
**mention** [2] - 8983:14,
8983:16
**mentioned** [2] -
8948:12, 8953:18
**merely** [2] - 9087:13,
9087:18
**message** [118] -
8954:23, 8954:25,
8955:4, 8957:2,
8958:11, 8965:16,
8967:1, 8967:23,
8968:6, 8969:18,
8974:18, 8975:15,
8975:18, 8975:25,
8976:16, 8976:20,
8977:4, 8977:8,
8978:24, 8979:9,
8979:18, 8980:5,
8981:22, 8982:1,
8983:15, 8984:14,
8986:17, 8986:19,
8987:7, 8987:10,
8987:11, 8987:14,
8987:24, 8988:7,
8988:9, 8988:10,
8988:12, 8988:14,
8989:5, 8989:12,
8989:15, 8991:17,
8993:3, 8993:17,
8995:15, 9005:3,
9009:14, 9010:6,
9010:20, 9010:21,
9014:13, 9018:11,
9020:6, 9020:8,
9027:5, 9027:6,
9027:9, 9027:12,
9027:13, 9027:21,
9027:22, 9028:12,
9028:16, 9028:25,
9029:10, 9029:14,
9029:17, 9029:23,
9034:12, 9034:14,
9036:1, 9036:2,
9036:9, 9036:10,
9037:5, 9037:12,
9038:1, 9038:22,
9043:23, 9043:24,
9043:25, 9044:2,
9044:4, 9044:5,
9044:12, 9044:16,
9054:19, 9055:10,
9055:15, 9055:23,
9058:12, 9061:10,

9061:11, 9061:20,
9062:8, 9062:15,
9062:19, 9063:10,
9063:18, 9063:24,
9063:25, 9064:7,
9065:1, 9065:16,
9066:9, 9067:15,
9067:18, 9067:25,
9068:10, 9068:15,
9068:23, 9070:1,
9070:20, 9070:22,
9082:9, 9082:19,
9095:5
**message**.......... [1] -
8940:14
**messages** [83] -
8956:12, 8962:11,
8962:22, 8978:4,
8985:3, 8986:11,
8987:17, 8987:20,
8987:22, 8988:2,
8992:14, 8992:19,
8993:10, 8993:15,
9010:25, 9012:19,
9022:11, 9025:14,
9025:22, 9025:25,
9026:3, 9026:8,
9026:12, 9026:16,
9026:19, 9026:25,
9027:16, 9027:19,
9030:13, 9030:18,
9030:23, 9030:25,
9031:2, 9031:7,
9031:9, 9031:11,
9031:14, 9032:2,
9032:11, 9032:12,
9032:15, 9032:19,
9033:21, 9034:3,
9035:1, 9035:10,
9035:12, 9035:24,
9037:4, 9038:20,
9040:21, 9040:23,
9045:15, 9052:19,
9054:19, 9054:25,
9057:10, 9057:14,
9057:19, 9057:23,
9058:16, 9059:9,
9059:15, 9059:18,
9060:7, 9060:13,
9060:16, 9060:22,
9062:18, 9063:1,
9064:4, 9064:12,
9064:17, 9064:18,
9066:2, 9069:18,
9069:19, 9069:22,
9069:25, 9071:8,
9073:1, 9100:4,
9101:19
**messages)**..... [1] -
8940:15
**messaging** [3] -

8968:9, 8970:20, 9007:14
**messenger** [1] - 9057:18
**Met** [1] - 8972:18
**met** [12] - 8943:9, 8951:21, 8960:11, 8972:13, 8973:7, 8995:21, 9009:12, 9010:3, 9010:4, 9049:21
**meticulous** [2] - 8964:6, 8965:6
**meticulously** [1] - 9108:15
**Michael** [2] - 9074:21, 9084:12
**microphone** [1] - 9083:16
**middle** [6] - 8946:16, 8967:20, 8974:20, 8997:25, 9057:17, 9068:8
**Midland** [1] - 9048:15
**might** [21] - 8953:15, 8954:3, 8967:25, 8971:19, 9000:22, 9003:9, 9004:5, 9004:23, 9005:9, 9006:11, 9014:25, 9016:24, 9041:12, 9041:21, 9053:18, 9069:11, 9074:20, 9079:24, 9091:12, 9092:8, 9116:4
**Mike** [10] - 8997:7, 8997:12, 8997:14, 8997:21, 8999:11, 9054:8, 9054:10, 9054:20, 9055:16, 9055:17
**mileage** [1] - 8944:13
**miles** [1] - 8989:2
**military** [12] - 8950:12, 8995:1, 8995:7, 8995:19, 8996:15, 9021:22, 9022:8, 9040:1, 9043:9, 9043:11, 9049:12, 9050:16
**militia** [5] - 8943:10, 8943:12, 8946:23, 8951:25, 8957:21
**Militia** [4] - 8943:13, 8948:14, 8951:17, 8954:24
**Million** [18] - 8947:21, 8948:12, 8954:12, 8955:7, 8973:11, 8973:13, 8973:15,

8974:15, 8974:25, 8975:15, 8976:4, 8977:23, 8978:5, 8978:7, 8978:9, 8983:11, 8984:11, 8989:4
**million** [2] - 8974:23, 9005:7
**mind** [8] - 8983:23, 8985:15, 9001:4, 9003:11, 9003:12, 9004:23, 9074:2, 9111:6
**minded** [1] - 8955:18
**minds** [1] - 9097:21
**mine** [1] - 9022:10
**minimum** [2] - 9014:19, 9088:24
**minute** [5] - 9034:19, 9038:18, 9075:8, 9080:11, 9090:15
**minutes** [7] - 8984:15, 9000:24, 9016:10, 9016:12, 9075:22, 9079:4, 9113:1
**minutes'** [1] - 8944:14
**miscommunication** [2] - 8949:5, 8949:8
**misimpression** [3] - 9002:23, 9035:16, 9095:6
**misrecollecting** [1] - 9088:15
**missing** [1] - 9115:3
**mission** [5] - 8943:25, 8944:2, 8953:15, 8958:4, 8958:5
**misspoke** [1] - 8967:22
**mistaken** [1] - 8956:18
**misunderstanding** [1] - 9003:15
**MMM** [2] - 8947:20, 8947:21
**mode** [1] - 9013:19
**modicum** [1] - 8971:5
**modification** [1] - 9092:14
**modifications** [1] - 9113:14
**modify** [4] - 9087:5, 9089:6, 9090:13, 9113:18
**moment** [5] - 9010:14, 9024:15, 9040:10, 9075:7, 9086:12
**moments** [6] - 9002:21, 9004:1, 9004:3, 9021:20, 9040:17, 9073:23

**monkey** [1] - 9001:12
**Montana** [3] - 8945:17, 8947:20, 9088:22
**months** [6] - 8942:24, 8946:19, 8967:8, 9110:5, 9110:6, 9110:17
**Monument** [2] - 9009:13, 9010:5
**morning** [18] - 8941:2, 8996:3, 9013:9, 9068:14, 9069:22, 9073:9, 9073:11, 9074:9, 9077:6, 9078:24, 9079:8, 9079:24, 9080:5, 9080:8, 9080:16, 9102:13, 9104:4, 9120:19
**most** [6] - 8945:24, 8946:4, 9016:9, 9024:13, 9034:20, 9042:18
**motel** [1] - 8988:22
**motherfuckers** [1] - 9038:24
**motive** [1] - 9013:23
**move** [22] - 8942:21, 8994:22, 8997:4, 9009:20, 9011:4, 9019:24, 9020:14, 9023:5, 9028:24, 9032:18, 9034:25, 9035:6, 9038:2, 9038:16, 9040:15, 9044:4, 9055:12, 9055:23, 9058:6, 9058:25, 9073:4, 9085:16
**movie** [2] - 9005:18, 9025:4
**moving** [4] - 8965:17, 9017:4, 9075:15, 9112:24
**mowing** [1] - 8974:1
**MUCH** [1] - 8982:25
**muffles** [1] - 8980:23
**multiple** [9] - 8962:11, 8962:22, 9031:22, 9033:9, 9115:22, 9115:23, 9116:2, 9120:1, 9120:9
**multitude** [2] - 9098:6, 9098:8
**municipalities** [2] - 8944:24, 8948:19
**museum** [1] - 8997:6
**must** [3] - 9054:1, 9065:20, 9117:13

## N

**name** [19] - 8942:3, 8942:5, 8945:19, 8951:14, 8952:19, 8964:14, 9009:11, 9017:9, 9017:10, 9019:13, 9024:21, 9048:10, 9048:12, 9054:8, 9085:15, 9093:16, 9093:18, 9094:15, 9096:20
**named** [2] - 8960:9, 8961:13, 8967:16, 8978:22, 8979:10, 9040:24, 9049:5, 9059:6, 9074:21
**names** [7] - 9083:6, 9086:4, 9086:9, 9086:16, 9089:7, 9091:15, 9094:6
**narrow** [1] - 9098:11
**narrower** [1] - 9112:5
**nature** [3] - 8951:2, 8966:23, 9100:6
**Navy** [8] - 8942:11, 8942:16, 8942:25, 9048:20, 9048:23, 9048:24, 9048:25, 9049:19
**NC** [1] - 9021:11
**near** [11] - 8960:24, 8996:3, 8997:6, 9042:1, 9105:12, 9105:13, 9105:15, 9106:17, 9106:22, 9111:13, 9112:1
**nearest** [1] - 8944:12
**necessarily** [5] - 8954:2, 8960:22, 9000:3, 9018:18, 9077:24
**necessary** [3] - 8990:24, 9081:4, 9104:13
**need** [34] - 8953:5, 8958:2, 8965:7, 8975:13, 8978:2, 8984:15, 8991:21, 9008:7, 9011:12, 9012:5, 9036:1, 9039:23, 9042:18, 9042:20, 9044:18, 9077:17, 9079:24, 9090:15, 9091:12, 9092:4, 9096:7, 9099:20, 9100:10, 9102:7, 9102:12, 9102:13, 9105:21, 9105:24, 9110:10,

9115:12, 9119:6, 9120:4, 9120:13
**needed** [4] - 8945:2, 8946:24, 8948:24, 8984:12
**needing** [1] - 8945:13
**needs** [3] - 9096:11, 9112:6, 9116:14
**negative** [1] - 8950:18
**neighborhood** [1] - 8960:20
**neighbors** [1] - 9053:22
**nephew** [1] - 9052:20
**Nestler** [4] - 9103:11, 9108:1, 9109:4, 9118:18
**NESTLER** [64] - 9074:15, 9074:18, 9076:7, 9076:13, 9079:20, 9083:5, 9083:24, 9084:4, 9084:12, 9084:21, 9084:24, 9085:1, 9085:5, 9085:9, 9085:12, 9085:14, 9086:2, 9086:25, 9088:2, 9089:2, 9089:2, 9089:8, 9089:16, 9089:21, 9090:6, 9090:15, 9090:19, 9091:2, 9091:6, 9091:12, 9092:17, 9093:16, 9094:21, 9095:14, 9095:24, 9096:5, 9096:13, 9096:17, 9099:4, 9100:18, 9102:20, 9102:24, 9103:3, 9103:7, 9103:10, 9103:13, 9103:16, 9103:18, 9105:3, 9107:15, 9110:1, 9111:15, 9112:16, 9113:25, 9114:9, 9114:15, 9115:1, 9115:10, 9115:17, 9116:3, 9117:2, 9117:17, 9118:19, 9120:11
**Nestler's** [1] - 9108:3
**neutrally** [1] - 9084:7
**never** [25] - 8952:9, 8952:10, 8952:12, 8954:9, 8955:3, 8955:22, 8962:6, 8962:7, 8962:21, 8962:24, 8965:11, 8968:21, 8969:3, 8969:5, 8969:13,

8984:6, 8987:11, 8996:7, 8996:12, 8996:14, 9002:24, 9003:18, 9040:4, 9040:5, 9042:25
**New** [2] - 8963:15, 9062:15
**new** [13] - 9010:16, 9016:4, 9016:23, 9016:25, 9017:19, 9020:24, 9021:3, 9022:19, 9023:5, 9040:15, 9040:17, 9044:19, 9051:25
**news** [5] - 8996:10, 8998:24, 9002:5, 9006:19, 9007:2
**news2share** [1] - 9024:23
**next** [37] - 8969:21, 8976:23, 8977:13, 8977:14, 8977:16, 8977:18, 8982:20, 8984:16, 8985:18, 8986:22, 8988:25, 8990:21, 8991:22, 8992:25, 8994:13, 9005:1, 9010:21, 9017:13, 9020:9, 9020:10, 9021:10, 9022:3, 9023:2, 9023:16, 9023:25, 9024:4, 9024:9, 9024:18, 9027:9, 9030:24, 9043:24, 9046:20, 9055:23, 9062:5, 9062:15, 9114:2
**Next** [2] - 8971:12, 8977:16
**NFAC** [1] - 8948:18
**nice** [4] - 8991:20, 9023:14, 9023:22, 9057:2
**night** [5] - 8967:20, 8990:24, 9009:2, 9083:11, 9120:17
**noise** [2] - 9053:17, 9053:20
**noise-canceling** [1] - 9053:20
**none** [2] - 9001:15, 9093:1
**normal** [5] - 8998:14, 8999:3, 9002:17, 9041:7, 9042:7
**normally** [2] - 9008:17, 9019:19
**North** [2] - 8970:7, 8984:9

**NOT** [1] - 9031:23
**note** [2] - 9084:2, 9092:11
**NOTE** [1] - 8941:2
**nothing** [16] - 8965:3, 8966:16, 8984:2, 8984:3, 8995:8, 8995:12, 9018:22, 9027:15, 9035:22, 9037:7, 9046:23, 9051:3, 9082:22, 9083:9, 9083:12, 9102:19
**notice** [3] - 9110:2, 9110:3, 9110:4
**notified** [2] - 9013:13, 9074:22
**noting** [1] - 9108:22
**November** [15] - 8946:16, 8947:18, 8951:1, 8954:12, 8954:25, 8958:6, 8958:10, 8961:22, 8971:11, 8973:23, 8974:8, 9103:25, 9109:1, 9109:3, 9110:23
**now-indicted** [1] - 9084:16
**nowhere** [1] - 9024:22
**nuanced** [1] - 9105:1
**number** [17] - 8955:18, 8956:8, 8964:7, 8964:15, 8968:7, 8968:11, 8968:13, 8968:14, 8977:19, 9036:8, 9057:20, 9098:20, 9104:1, 9117:9, 9118:10, 9118:11, 9119:5
**numbers** [1] - 9113:9
**nuts** [2] - 9021:19, 9022:11

---

**O**

**O'Brien** [1] - 9025:7
**o'clock** [9] - 9073:7, 9080:12, 9102:3, 9102:17, 9119:1, 9119:13, 9120:15, 9120:19
**Oakrum** [1] - 9051:1
**Oath** [18] - 8941:21, 8952:6, 8952:8, 8952:10, 8955:22, 8959:2, 8959:5, 8959:17, 8970:6, 8973:7, 8984:6,

8984:8, 8995:22, 8995:24, 8995:25, 8996:4, 8996:10, 9048:1
**oath** [5] - 9050:23, 9092:24, 9093:2, 9094:3, 9094:5
**object** [6] - 8979:7, 9015:25, 9103:23, 9105:7, 9110:15, 9120:11
**objection** [26] - 8957:8, 8976:24, 8989:13, 8993:11, 9009:22, 9011:17, 9011:21, 9013:2, 9015:21, 9020:16, 9031:9, 9032:20, 9044:6, 9046:2, 9051:21, 9055:5, 9058:7, 9071:10, 9075:4, 9077:22, 9083:24, 9086:8, 9087:25, 9097:1, 9107:4, 9107:8
**objectionable** [1] - 9093:25
**Objects** [1] - 9113:10
**obligations** [1] - 8951:24
**obnoxious** [1] - 9008:13
**observe** [1] - 8998:14
**obstruct** [1] - 9114:7
**obstructing** [1] - 9114:4
**obstruction** [3] - 9113:15, 9113:20, 9114:23
**Obstruction** [1] - 9114:2
**obtain** [5] - 8978:16, 8979:15, 8979:23, 8985:4, 9051:25
**obtaining** [2] - 8982:2, 8982:11
**obviously** [7] - 9012:23, 9050:15, 9069:2, 9070:4, 9077:18, 9087:8, 9107:6
**occur** [3] - 8948:7, 8949:14, 8949:15
**occurred** [3] - 8949:2, 9109:3, 9109:6
**occurring** [1] - 9014:2
**occurs** [1] - 9105:1
**October** [1] - 9111:21
**odds** [1] - 9079:6
**off-color** [3] - 8988:1,

8988:3, 8988:5
**offended** [1] - 9004:2
**offense** [3] - 9111:12, 9114:8, 9116:10
**offenses** [4] - 9084:9, 9085:1, 9085:7, 9117:13
**offensive** [1] - 8950:23
**office** [9] - 8960:18, 8960:21, 8960:24, 9006:16, 9041:11, 9050:1, 9050:6, 9050:12
**officer** [5] - 8946:3, 8964:1, 9015:10, 9028:21, 9049:24
**officers** [1] - 9002:3
**Official** [1] - 9114:2
**official** [4] - 8945:16, 9114:5, 9114:7, 9114:23
**officially** [2] - 8947:10, 9000:13
**Ohio** [5] - 8942:6, 8943:13, 8948:14, 8951:16, 9098:8
**old** [9] - 9032:25, 9033:7, 9048:16, 9048:25, 9052:21, 9052:22, 9053:2, 9053:3, 9057:4
**Omg** [1] - 9064:14
**ON** [1] - 8995:1
**once** [5] - 8941:12, 8953:8, 8953:10, 8965:11, 9115:15
**ONE** [1] - 8994:20
**one** [76] - 8942:10, 8944:12, 8948:17, 8948:18, 8953:11, 8953:23, 8959:11, 8962:8, 8967:24, 8976:20, 8977:24, 8979:6, 8980:14, 8980:15, 8984:11, 8984:25, 8985:22, 8985:24, 8988:8, 8992:5, 8992:22, 8993:19, 8994:20, 9004:1, 9006:15, 9013:9, 9013:19, 9015:22, 9016:8, 9016:9, 9024:11, 9025:9, 9030:15, 9035:6, 9035:22, 9036:9, 9043:22, 9045:14, 9045:19, 9045:20, 9047:20, 9053:11, 9053:23,

9061:7, 9061:24, 9064:5, 9070:12, 9071:20, 9073:21, 9074:21, 9074:25, 9075:18, 9075:19, 9077:23, 9082:5, 9082:8, 9083:18, 9086:12, 9087:25, 9089:3, 9092:7, 9092:9, 9092:18, 9093:12, 9094:22, 9096:24, 9097:20, 9101:14, 9106:10, 9107:20, 9107:23, 9109:18, 9118:10
**One** [1] - 9083:14
**ones** [1] - 9120:8
**onus** [2] - 9100:21, 9101:7
**op** [1] - 8982:25
**open** [10] - 8969:11, 8981:14, 8994:24, 9016:7, 9029:12, 9034:10, 9037:2, 9046:5, 9072:2, 9101:20
**open-source** [1] - 9072:2
**opened** [2] - 8965:21, 9035:13
**opening** [2] - 9079:23, 9110:22
**operable** [1] - 8952:3
**operation** [5] - 8954:9, 8983:10, 8984:1, 9022:15
**operations** [2] - 8952:4, 9043:18
**operators** [3] - 8972:14, 8972:19, 8973:8
**opine** [1] - 9082:15
**opinion** [21] - 9013:1, 9022:22, 9050:21, 9051:8, 9051:9, 9051:11, 9051:12, 9051:15, 9051:17, 9051:20, 9051:24, 9082:17, 9088:23, 9089:1, 9089:13, 9089:15, 9111:25, 9117:9, 9117:22
**opponent** [1] - 9090:21
**opportunity** [9] - 8980:20, 8981:12, 9003:6, 9021:17, 9022:24, 9037:21, 9047:12, 9049:4, 9050:20

**oppose** [1] - 9116:3
**opposed** [1] - 9105:16
**oppression** [1] - 8949:25
**order** [3] - 9016:13, 9091:13, 9100:11
**ordering** [4] - 8979:12, 8980:12, 8981:8, 9055:17
**ordinarily** [1] - 8999:22
**organically** [1] - 9104:12
**organization** [1] - 8963:23
**oriented** [1] - 8943:23
**original** [1] - 9012:20
**originally** [1] - 8961:16
**ornate** [1] - 8961:9
**OSRM** [19] - 8943:13, 8943:18, 8943:25, 8944:2, 8945:7, 8945:14, 8946:1, 8946:6, 8950:23, 8951:16, 8951:22, 8952:22, 8953:15, 8954:3, 8954:10, 8958:9, 8958:17, 8959:8, 8959:13
**otherwise** [8] - 8966:10, 9023:22, 9077:15, 9078:5, 9100:22, 9101:2, 9119:10
**ought** [3] - 9076:16, 9079:6, 9094:16
**ourselves** [1] - 9080:13
**out-of-court** [1] - 9092:12
**outcome** [1] - 9087:20
**outdoor** [1] - 9035:18
**outlined** [1] - 8953:15
**outrageous** [1] - 9039:23
**outside** [7] - 8953:6, 8955:18, 9011:10, 9035:18, 9036:2, 9039:1, 9073:12
**overnight** [4] - 9091:12, 9093:11, 9093:15, 9094:12
**overruled** [1] - 8989:14
**own** [9] - 8944:10, 8954:8, 8963:10, 8992:7, 8992:9, 8994:18, 8996:9, 9099:5, 9101:17

**P**

**p.m** [1] - 9120:23
**PAGE** [1] - 8940:2
**page** [85] - 8954:21, 8969:21, 8976:21, 8976:23, 8977:14, 8978:20, 8979:5, 8981:18, 8985:18, 8986:22, 8990:21, 8992:25, 8994:14, 9005:1, 9007:12, 9017:13, 9019:12, 9020:9, 9020:10, 9020:20, 9026:15, 9026:20, 9030:5, 9030:22, 9030:24, 9032:11, 9032:19, 9036:12, 9038:16, 9040:20, 9043:24, 9056:20, 9059:1, 9059:4, 9059:24, 9059:25, 9060:20, 9062:5, 9063:4, 9063:12, 9063:22, 9065:9, 9065:10, 9065:11, 9066:5, 9066:6, 9066:24, 9067:1, 9068:2, 9068:9, 9069:14, 9074:3, 9083:3, 9083:5, 9083:8, 9083:9, 9083:10, 9083:13, 9083:20, 9083:25, 9084:1, 9084:2, 9085:17, 9087:6, 9087:8, 9090:8, 9102:19, 9102:20, 9103:11, 9103:13, 9113:2, 9113:8, 9113:9, 9113:13, 9114:12, 9114:16, 9114:19, 9114:20, 9115:19, 9115:25, 9117:10
**page)**............ [1] - 8940:15
**pages** [1] - 9113:6
**pain** [1] - 9008:22
**painfully** [1] - 9108:10
**Palian** [4] - 9094:18, 9094:19, 9094:20, 9094:22
**panned** [1] - 8996:12
**parade** [1] - 8948:18
**paragraph** [9] - 9085:18, 9096:3, 9103:22, 9113:11, 9114:2, 9114:22, 9115:2

**paragraphs** [4] - 9112:17, 9112:18, 9113:6, 9118:8
**parapet** [2] - 9002:7, 9010:7
**part** [17] - 8945:9, 8947:15, 8950:1, 8951:4, 8954:10, 8957:14, 8981:3, 8983:11, 8987:3, 8987:10, 8988:13, 9018:1, 9060:22, 9063:1, 9075:22, 9108:18, 9108:20
**participants** [1] - 9086:22
**participants'** [2] - 9087:1, 9087:4
**participate** [4] - 8948:13, 8951:5, 8952:4, 9033:25
**participated** [2] - 9084:8, 9085:1
**participating** [1] - 9001:16
**participation** [1] - 9118:13
**particular** [16] - 8956:17, 8988:8, 9015:15, 9026:8, 9050:5, 9057:14, 9082:11, 9095:20, 9097:4, 9097:11, 9098:18, 9105:2, 9105:25, 9109:2, 9109:24, 9110:10
**particularly** [1] - 8965:18
**particulars** [1] - 8979:14
**parties** [4] - 8965:15, 9084:7, 9084:19, 9090:24
**parts** [3] - 8981:4, 9012:22, 9033:16
**party** [6] - 8971:1, 8979:20, 8981:8, 9090:21, 9091:22, 9092:7
**passes** [1] - 8996:22
**passing** [2] - 8970:21, 8970:25
**passports** [1] - 9051:19
**password** [1] - 9024:2
**pastor** [1] - 9051:1
**patriots** [1] - 9022:8
**pause** [2] - 8941:8, 9075:6
**payback** [1] - 9044:21

**paying** [1] - 8998:2
**Peace** [3] - 8998:5, 8998:6, 9000:1
**peaceful** [6] - 8998:15, 8999:3, 9041:20, 9042:6, 9042:8, 9089:8
**Pelosi's** [1] - 9006:16
**penal** [1] - 9099:17
**Pence** [7] - 8992:2, 8997:7, 8997:12, 8997:14, 8997:21, 8999:11, 9005:6
**pendency** [1] - 9110:12
**people** [46] - 8944:9, 8947:9, 8947:12, 8949:25, 8954:8, 8958:22, 8962:17, 8971:19, 8971:23, 8984:21, 8985:3, 8994:3, 8996:13, 8996:15, 8998:21, 8999:6, 9001:11, 9002:2, 9003:9, 9003:20, 9004:10, 9004:16, 9004:18, 9005:7, 9008:1, 9008:12, 9009:6, 9014:12, 9014:13, 9014:17, 9014:20, 9018:12, 9019:19, 9030:15, 9033:9, 9034:19, 9039:18, 9039:19, 9041:13, 9042:6, 9042:18, 9043:16, 9064:22, 9069:10, 9110:20
**Percent** [1] - 9099:13
**percent** [1] - 8949:7
**Percenters** [3] - 8985:8, 8985:10, 8985:12
**perfectly** [1] - 9107:17
**perhaps** [4] - 8980:17, 8987:23, 9041:15, 9099:20
**period** [2] - 9109:7, 9112:14
**permissible** [4] - 8956:13, 8956:16, 8956:20, 9109:25
**permit** [1] - 8966:9
**permitted** [4] - 9084:8, 9084:20, 9085:19, 9109:13
**persist** [1] - 9117:19
**person** [1] - 8967:12, 8997:12, 9010:3, 9020:1, 9021:21,

9032:25, 9033:7, 9033:10, 9052:18, 9059:6, 9110:11
**person's** [3] - 8941:12, 9051:12, 9051:20
**personal** [4] - 9051:2, 9081:6, 9081:22, 9082:1
**personally** [4] - 8973:15, 8990:17, 8998:17, 9078:22
**personnel** [1] - 9050:2
**perspective** [2] - 9084:14, 9100:19
**pertaining** [4] - 9026:12, 9026:14, 9046:13, 9098:14
**pest** [1] - 9067:4
**Philadelphia** [1] - 8961:14
**Philippines** [2] - 9043:2, 9049:3
**phone** [33] - 8952:12, 8964:14, 8964:19, 8968:6, 8968:15, 8969:2, 8978:25, 8992:19, 8996:9, 9009:14, 9011:6, 9012:11, 9013:6, 9023:20, 9029:1, 9044:19, 9045:2, 9051:25, 9057:20, 9058:15, 9058:17, 9072:22, 9073:5, 9074:16, 9080:25, 9081:1, 9081:2, 9081:6, 9081:10, 9081:21, 9082:6, 9082:16
**phonetic** [4] - 9054:9, 9071:2, 9111:3, 9118:15
**phony** [3] - 9029:5, 9029:7, 9029:24
**photo** [3] - 9027:12, 9027:13, 9027:21
**photographs** [1] - 9118:12
**photos** [7] - 9009:5, 9027:15, 9027:18, 9057:15, 9058:11, 9058:16, 9058:20
**photoshop** [1] - 9023:21
**phrase** [6] - 8950:8, 9089:8, 9105:12, 9112:18, 9114:17, 9115:3
**phrased** [1] - 9051:22

9141

**physical** [1] - 8947:2
**physically** [2] - 8947:13, 9002:2
**pic** [1] - 9023:22
**Picco** [4] - 9009:11, 9009:12, 9010:20, 9017:9
**pick** [1] - 9002:20
**picked** [2] - 8987:20, 8987:21
**picture** [4] - 8977:8, 9001:8, 9001:19, 9008:4
**pictures** [5] - 8960:20, 8961:2, 9004:4, 9007:19, 9057:25
**piece** [2] - 8968:3, 9100:20
**pigs** [1] - 9042:2
**pile** [1] - 9030:2
**pistols** [1] - 9054:1
**place** [4] - 8946:15, 9021:3, 9105:2, 9113:3
**plainly** [1] - 9014:14
**plan** [4] - 9043:18, 9044:17, 9079:6, 9104:20
**plank** [1] - 9081:15
**planned** [1] - 8946:9
**planning** [8] - 8946:17, 8947:6, 8947:11, 8950:19, 8982:20, 8982:25, 9080:16, 9094:22
**plans** [1] - 9044:20
**play** [6] - 9011:19, 9039:20, 9075:18, 9075:22, 9076:2
**played** [8] - 8997:19, 9002:6, 9002:11, 9017:25, 9018:3, 9040:4, 9040:5, 9075:22
**playground** [1] - 9001:12
**plays** [1] - 8991:19
**Plaza** [1] - 9013:10
**plea** [1] - 9085:19
**plenty** [3] - 8970:10, 8982:8, 8988:2
**plural** [2] - 9085:24, 9087:1
**plus** [1] - 9079:1
**Poetic** [1] - 8990:9
**point** [26] - 8942:21, 8979:17, 9003:11, 9014:5, 9017:4, 9028:25, 9035:21, 9036:24, 9041:25,

9042:6, 9072:4, 9077:10, 9078:11, 9083:4, 9091:25, 9099:4, 9107:9, 9109:4, 9109:24, 9110:6, 9110:7, 9111:22, 9111:23, 9117:4
**pointed** [1] - 9117:11
**pointing** [1] - 9079:25
**points** [1] - 9076:8
**police** [5] - 8949:3, 8953:3, 8953:4, 8983:20, 9004:12
**political** [3] - 9041:7, 9042:12, 9042:13
**politically** [1] - 8991:20
**politician** [1] - 9041:10
**politicians** [1] - 9042:2
**populace** [1] - 8963:15
**portion** [1] - 8994:14
**portions** [2] - 9081:10, 9099:8
**posed** [2] - 9088:19, 9105:11
**position** [6] - 9049:20, 9084:15, 9091:4, 9116:6, 9117:20, 9120:9
**positioning** [1] - 8994:21
**possession** [3] - 8978:11, 8978:12, 9058:20
**possessive** [1] - 9087:1
**possibility** [3] - 8950:5, 8955:19, 9109:9
**possible** [2] - 9053:12, 9074:20
**post** [3] - 9057:16, 9057:18, 9058:3
**posture** [1] - 9104:5
**potential** [3] - 8953:18, 9025:2, 9075:9
**potentially** [3] - 8977:24, 8982:1, 9097:21
**Potomac** [3] - 8987:2, 8990:6, 9030:16
**power** [4] - 8983:4, 8991:2, 8991:4, 9001:4
**Prayers** [1] - 9064:15

**prayers** [1] - 9067:22
**praying** [2] - 8994:24, 9064:24
**preceding** [1] - 8956:15
**precise** [1] - 9104:20
**precursor** [1] - 8956:12
**preference** [1] - 9119:14
**prejudicial** [2] - 8965:4, 9034:4
**prep** [3] - 8973:10, 8973:12
**preparation** [1] - 8989:25
**prepared** [10] - 8941:3, 8955:2, 8957:19, 8958:1, 9012:7, 9076:16, 9079:9, 9080:1, 9091:18, 9101:4
**presence** [3] - 8941:5, 9011:10, 9016:16
**present** [1] - 8985:10
**presented** [1] - 9015:18
**preserve** [1] - 8948:24
**president** [1] - 9021:3
**President** [22] - 8948:20, 8949:23, 8953:19, 8954:1, 8954:3, 8955:19, 8955:20, 8973:25, 8975:22, 8983:16, 8992:2, 8993:22, 8996:7, 8996:23, 8997:3, 8997:14, 8999:9, 8999:25, 9000:3, 9000:13, 9001:4, 9044:21
**President's** [1] - 9001:3
**presidential** [2] - 8951:1, 9000:15
**Presidents** [1] - 9000:19
**presume** [3] - 9049:7, 9064:14, 9077:2
**presumed** [3] - 8965:9, 8999:2, 9000:8
**pretty** [5] - 8961:21, 9030:19, 9060:24, 9099:8, 9110:9
**preventing** [1] - 8958:7
**previous** [3] - 8987:24, 8988:12, 9036:12

**previously** [2] - 9012:21, 9035:14
**Prez** [1] - 8994:21
**prick** [1] - 9024:13
**principle** [1] - 9117:25
**principles** [1] - 9109:10
**printouts** [1] - 9103:15
**private** [2] - 9004:1, 9004:3
**probative** [5] - 8965:3, 8967:9, 8967:14, 9015:6, 9034:4
**problem** [2] - 9021:7, 9119:17
**problematic** [1] - 9097:20
**Proceeding** [1] - 9114:3
**proceeding** [5] - 9092:20, 9113:21, 9114:5, 9114:8, 9114:23
**Proceedings** [12] - 8941:5, 8969:11, 8981:14, 9011:10, 9016:7, 9016:16, 9029:12, 9034:10, 9037:2, 9046:5, 9073:12, 9120:23
**process** [5] - 8999:3, 9002:18, 9003:7, 9003:13, 9030:19
**produce** [1] - 9030:1
**professional** [2] - 8944:6, 8946:4
**professionals** [1] - 8945:1
**prohibited** [2] - 9038:9, 9038:11
**promising** [1] - 9079:3
**promotes** [1] - 9015:17
**proof** [3] - 9105:21, 9105:24, 9107:7
**proper** [5] - 8980:19, 9013:22, 9033:24, 9082:14, 9082:22
**proposal** [2] - 9084:4, 9086:3
**propose** [8] - 9083:20, 9084:5, 9093:23, 9100:19, 9102:12, 9106:16, 9113:13, 9113:17
**proposed** [5] - 9093:25, 9103:22, 9105:20, 9111:10, 9114:18

**proposing** [5] - 8972:3, 9101:22, 9104:23, 9106:14, 9115:8
**protect** [7] - 8944:3, 8954:8, 9014:13, 9014:17, 9014:20, 9054:1, 9088:12
**protects** [1] - 9101:6
**protest** [5] - 8948:18, 8955:19, 8995:20, 9041:20, 9042:8
**Proud** [3] - 9006:14, 9006:20, 9007:5
**prove** [2] - 8966:17
**provide** [8] - 8943:22, 8945:2, 9034:3, 9099:16, 9101:11, 9113:21, 9117:2, 9117:19
**provided** [5] - 8966:24, 9051:15, 9051:17, 9100:22, 9101:13
**providing** [4] - 9025:2, 9025:8, 9033:2, 9039:25
**provoked** [2] - 8957:22
**publish** [3] - 9038:1, 9038:2, 9047:10
**published** [3] - 9047:4, 9047:5, 9056:24
**Pugh** [2] - 8985:7, 8985:24
**pull** [26] - 8961:5, 8964:12, 8969:16, 8976:14, 8978:19, 8990:14, 8992:13, 8992:14, 8997:9, 9001:8, 9001:21, 9008:25, 9009:9, 9017:3, 9017:23, 9023:7, 9030:22, 9032:10, 9043:22, 9056:14, 9066:21, 9072:6, 9072:7, 9072:13, 9086:16, 9099:2
**pulled** [1] - 9054:3
**pulling** [2] - 9002:2, 9002:3
**pulls** [1] - 9053:11
**punishment** [3] - 9017:17, 9018:14, 9018:17
**punk** [2] - 8965:2, 8965:17
**punkass** [1] - 8967:18

9142

**purchasing** [1] - 8981:3
**purpose** [6] - 8946:21, 9015:14, 9032:23, 9036:3, 9078:1, 9110:1
**purposes** [6] - 8966:7, 9079:5, 9085:20, 9088:16, 9090:25, 9095:7
**pussies** [6] - 9002:14, 9002:17, 9003:2, 9003:17, 9004:5, 9041:2
**putting** [2] - 8963:10, 9097:14

## Q

**QRF** [6] - 8969:14, 8970:3, 8970:6, 8970:18, 8970:22, 8970:25
**qualifier** [1] - 9106:9
**qualify** [1] - 9090:1
**qualifying** [1] - 9112:11
**question's** [1] - 8968:25
**questioned** [2] - 9052:23, 9053:4
**questioning** [2] - 9046:15, 9056:18
**questions** [9] - 8951:8, 8955:25, 8970:11, 9002:8, 9044:25, 9046:12, 9052:2, 9089:5, 9100:3
**quick** [6] - 8959:11, 9012:4, 9013:6, 9013:8, 9045:2, 9047:11
**quickly** [5] - 8942:13, 8959:1, 9031:22, 9033:9, 9118:4
**quite** [4] - 8967:18, 8987:22, 9011:1, 9026:5
**quote** [2] - 8972:13, 9118:11

## R

**raided** [1] - 9004:2
**raised** [3] - 8949:16, 8955:15, 9116:4
**Rakoczy** [4] - 9075:20, 9076:20, 9082:9, 9104:10
**RAKOCZY** [13] -

9076:21, 9077:19, 9091:22, 9092:10, 9095:3, 9104:16, 9104:18, 9108:22, 9109:22, 9119:4, 9119:9, 9119:12, 9119:18
**Rakoczy's** [1] - 9079:23
**rally** [6] - 8955:6, 8967:11, 8967:16, 8968:21, 8969:5, 9041:7
**ran** [1] - 9041:11
**random** [4] - 8987:17, 8987:20, 9026:8
**range** [1] - 9053:19
**Ranger** [12] - 8982:23, 8983:12, 8988:20, 8989:25, 8990:3, 9019:24, 9019:25, 9020:6, 9021:2, 9022:16, 9022:21, 9022:23
**rank** [3] - 9049:14, 9049:20, 9049:22
**ranked** [2] - 9053:24, 9054:13
**rapid** [1] - 9053:13
**Rasheed's** [1] - 9096:20
**rather** [1] - 9119:11
**reach** [1] - 8985:5
**reaction** [2] - 8971:11, 9103:21
**read** [23] - 8964:23, 8973:4, 8974:18, 8980:9, 8992:21, 9020:20, 9020:21, 9021:24, 9029:23, 9034:14, 9037:5, 9041:6, 9044:16, 9047:8, 9055:11, 9055:15, 9078:16, 9079:22, 9084:6, 9087:12, 9102:14, 9113:18, 9114:3
**reading** [6] - 8968:19, 8973:1, 8984:14, 9085:5, 9106:19, 9117:8
**reads** [1] - 8954:25
**ready** [6] - 8941:24, 8946:24, 8950:13, 8950:18, 8994:9, 9026:6
**real** [10] - 8955:1, 8959:1, 8977:18, 8995:1, 9010:8, 9013:6, 9015:18,

9045:2, 9053:20
**really** [16] - 8963:7, 8975:20, 8976:2, 8995:8, 8997:8, 9004:6, 9015:12, 9028:3, 9032:9, 9034:17, 9035:5, 9065:25, 9079:2, 9102:4, 9119:6, 9120:8
**reason** [6] - 8949:19, 8969:1, 9002:22, 9013:11, 9015:19, 9057:14
**reasonable** [7] - 9085:24, 9106:3, 9106:8, 9106:11, 9106:21, 9111:11, 9112:8
**reasonableness** [2] - 9105:13, 9106:10
**reasonably** [5] - 9105:12, 9106:17, 9106:22, 9111:13, 9112:1
**rebut** [2] - 9015:9, 9033:2
**rebuts** [1] - 9033:6
**rebuttal** [2] - 9079:7
**recce** [1] - 8960:17
**received** [2] - 8992:22, 9043:7
**recently** [1] - 8950:16
**Recess** [2] - 9012:15, 9073:17
**recognize** [12] - 8964:14, 8981:21, 9017:9, 9017:10, 9018:5, 9020:7, 9028:15, 9029:17, 9031:2, 9032:15, 9044:2, 9054:25
**recollect** [1] - 9088:20
**recollection** [2] - 9028:3, 9030:14
**record** [13] - 8960:13, 8964:20, 8979:8, 9013:7, 9029:3, 9032:22, 9035:9, 9045:3, 9048:11, 9073:19, 9077:8, 9097:7, 9105:3
**recording** [8] - 8997:19, 9002:11, 9017:25, 9018:3, 9094:22, 9099:9, 9103:6, 9103:8
**recordings** [2] - 9103:1, 9103:4
**records** [2] - 9056:18,

9102:22
**recovered** [1] - 9082:6
**recruited** [1] - 8943:10
**recruiting** [3] - 8947:8, 8959:5, 8959:7
**Red** [4] - 8949:24, 9086:15, 9089:11, 9090:9
**redact** [2] - 8965:17, 8965:23
**REDIRECT** [2] - 8956:1, 9052:15
**Redirect** [2] - 8940:6, 8940:9
**redirect** [7] - 8980:21, 8981:12, 9045:5, 9047:19, 9052:3, 9052:13, 9078:19
**reduces** [1] - 9053:17
**redundancy** [1] - 9083:23
**reference** [4] - 9013:9, 9013:14, 9046:14, 9098:18
**referenced** [3] - 8966:2, 9052:18, 9088:1
**referencing** [1] - 9098:19
**referring** [3] - 9035:13, 9070:1, 9108:1
**reflect** [2] - 9084:19, 9106:15
**reflective** [1] - 8993:7
**reflects** [1] - 9100:11
**regard** [1] - 8944:23
**regarding** [14] - 8967:6, 8986:11, 8987:7, 9012:19, 9029:5, 9036:21, 9046:14, 9055:10, 9057:10, 9058:16, 9059:11, 9071:19, 9093:23, 9098:17
**regardless** [1] - 8944:4
**regrouped** [2] - 8976:9, 8976:11
**Regular** [3] - 8943:13, 8948:14, 8951:17
**related** [2] - 9014:24, 9014:25
**relates** [1] - 9115:22
**relation** [1] - 8949:19
**release** [1] - 8993:22
**relevance** [7] - 8981:7, 9013:3, 9029:4, 9077:22, 9078:1,

9078:8, 9078:11
**relevant** [8] - 9035:25, 9088:24, 9089:7, 9089:18, 9090:2, 9091:3, 9100:5
**rely** [1] - 9033:16
**remain** [3] - 8991:1, 8991:4, 9011:13
**remainder** [1] - 9016:3
**Remark** [1] - 9115:25
**remarkable** [1] - 8961:12
**remarks** [2] - 8988:5, 9115:24
**remember** [37] - 8946:13, 8946:17, 8947:19, 8965:1, 8967:5, 8976:16, 8984:14, 8984:17, 8987:9, 8989:11, 9004:1, 9006:18, 9010:25, 9011:1, 9016:22, 9019:13, 9023:12, 9023:14, 9024:25, 9026:4, 9026:16, 9028:2, 9029:19, 9029:20, 9034:12, 9040:17, 9040:18, 9044:13, 9046:15, 9049:15, 9049:22, 9057:12, 9065:23, 9065:25, 9069:10, 9078:23, 9094:15
**reminding** [1] - 9101:1
**remote** [1] - 9015:5
**remove** [1] - 9048:4
**removed** [1] - 9062:21
**removing** [1] - 9088:2
**render** [1] - 8944:5
**renew** [1] - 9013:2
**repeat** [1] - 9103:3
**replace[d** [1] - 8994:18
**replied** [2] - 8958:11, 9056:8
**replies** [1] - 8967:25
**reply** [1] - 8958:12
**report** [3] - 8994:20, 9008:24, 9053:12
**reported** [7] - 8941:3, 9006:20, 9007:2, 9007:25, 9008:2, 9008:10, 9009:6
**reporter** [2] - 8942:14, 9112:25
**REPORTER** [1] - 9083:15
**REPORTER'S** [1] - 8941:2

9143

**reporting** [3] - 9007:1, 9007:2, 9008:2
**reports** [1] - 8994:20
**represent** [1] - 8951:15
**representation** [1] - 9071:7
**Republic** [3] - 8983:2, 8983:8, 9043:2
**republic** [7] - 8983:4, 8983:17, 8983:19, 8983:22, 8983:23, 8985:14
**Republican** [2] - 9018:6, 9041:10
**reputation** [1] - 9088:23
**request** [4] - 9036:23, 9058:13, 9112:4, 9117:2
**requested** [2] - 9077:10, 9101:16
**requests** [1] - 9120:1
**require** [4] - 9116:5, 9116:10, 9116:11, 9117:24
**required** [1] - 9116:16
**requires** [2] - 9097:4, 9101:8
**reread** [1] - 9083:20
**reschedule** [1] - 8948:3
**rescheduled** [1] - 8946:11
**rescheduling** [1] - 8948:2
**research** [5] - 8964:3, 8964:6, 8964:8, 8965:6, 9015:8
**researched** [1] - 9012:10
**residence** [1] - 8942:4
**resolve** [5] - 9012:16, 9077:23, 9111:9, 9112:21, 9120:16
**resolved** [1] - 9012:13
**respect** [8] - 8956:6, 8960:23, 8988:19, 9012:17, 9020:2, 9021:21, 9084:3, 9104:24
**respectfully** [1] - 9117:2
**respond** [8] - 8977:16, 8988:23, 9010:24, 9020:9, 9023:1, 9031:19, 9039:4, 9070:22
**responded** [3] - 8994:7, 9035:12,

9054:22
**responding** [1] - 8975:6
**responds** [7] - 8968:2, 9027:24, 9030:8, 9030:11, 9062:3, 9068:17, 9069:24
**response** [20] - 8950:14, 8978:6, 8986:24, 8990:21, 9013:11, 9014:23, 9017:14, 9020:12, 9020:21, 9021:24, 9021:25, 9046:21, 9055:25, 9061:15, 9064:12, 9064:13, 9064:24, 9065:2, 9067:21, 9067:25
**responsibility** [1] - 9091:24
**rest** [2] - 9110:8, 9116:11
**restore** [3] - 8994:19, 9025:17, 9025:19
**rests** [1] - 9116:13
**result** [1] - 9065:4
**resume** [2] - 8941:13, 9011:8
**returns** [1] - 8988:2
**review** [1] - 9047:13
**revise** [1] - 9037:10
**revision** [1] - 9114:18
**revisit** [1] - 9093:12
**Rhodes** [15] - 8952:12, 8981:4, 9013:13, 9014:9, 9077:3, 9088:1, 9088:4, 9088:11, 9090:19, 9091:5, 9091:7, 9093:2, 9095:4, 9095:11, 9098:22
**Rhodes's** [3] - 9094:14, 9094:23, 9095:20
**Richmond** [2] - 9041:7, 9041:13
**Ricky** [1] - 9084:5
**rid** [1] - 9087:4
**ridiculous** [1] - 8964:24
**riding** [1] - 8963:17
**rifle** [4] - 9033:4, 9034:16, 9037:15, 9039:5
**rifles** [1] - 9053:25
**right....especially** [1] - 9029:25
**rights** [2] - 8954:5, 9112:13

**riot** [5] - 9001:16, 9002:3, 9007:17, 9007:24, 9008:9
**riots** [2] - 9015:3, 9015:4
**rise** [2] - 8953:19, 8954:6
**risk** [1] - 8966:22
**rob** [1] - 9107:23
**Rob** [6] - 9009:11, 9009:12, 9010:3, 9010:20, 9017:9
**rode** [1] - 8976:7
**Roger** [1] - 9045:24
**Rohde** [17] - 8977:2, 8977:7, 8977:14, 8977:21, 8988:25, 8992:15, 8993:6, 8993:14, 8994:14, 9010:1, 9010:22, 9011:19, 9020:10, 9021:15, 9027:2, 9040:20, 9044:9
**role** [5] - 8945:10, 8946:1, 8946:2, 8947:15, 9014:8
**roll** [1] - 8983:1
**rolled** [1] - 9041:1
**room** [4] - 8969:21, 8969:24, 9064:20, 9064:24
**roommates** [1] - 9031:16
**Rosier** [2] - 8940:10, 9048:12
**ROSIER** [1] - 9048:12
**roughly** [3] - 8942:23, 8944:13, 8946:17
**rounded** [1] - 8994:4
**rounding** [1] - 8993:23
**rounds** [1] - 9053:19
**rubber** [3] - 8998:12, 9004:9, 9004:13
**rule** [1] - 9045:14
**rules** [3] - 8957:20, 8957:21
**rumors** [1] - 8962:3
**running** [3] - 8943:9, 8943:11, 9103:24
**rushed** [1] - 9064:20
**Russians** [2] - 8953:24, 8954:7

**S**

**safe** [3] - 8959:23, 9022:13, 9052:7
**safer** [1] - 9022:10
**safety** [3] - 8947:5,

8947:6, 8947:7
**sagging** [1] - 9097:16
**Sasha** [1] - 9054:13
**satisfy** [1] - 9117:14
**Satrohen** [2] - 9111:3, 9118:15
**Saturday** [1] - 8955:1
**save** [7] - 8983:1, 8983:4, 8983:7, 8985:14, 9014:12, 9057:18, 9064:21
**saved** [3] - 8987:11, 9023:20, 9077:2
**saving** [3] - 8983:22, 8985:14, 9014:17
**savior** [1] - 8965:15
**saw** [5] - 8956:15, 8976:6, 9024:22, 9081:16, 9082:3
**scenario** [2] - 8949:24, 8950:2
**schedule** [3] - 9073:9, 9074:6, 9079:19
**scheduling** [3] - 9075:7, 9079:5, 9079:20
**school** [3] - 9048:18, 9048:19, 9077:6
**scout** [1] - 9041:21
**scramble** [1] - 9102:4
**scratched** [1] - 8947:19
**screen** [9] - 8954:23, 8973:2, 8992:14, 9024:15, 9054:14, 9055:12, 9057:23, 9059:14, 9061:7
**screenplay** [1] - 8990:10
**screenplays** [1] - 8985:23
**screenshot** [1] - 9025:12
**scroll** [7] - 9054:18, 9057:7, 9067:11, 9068:3, 9068:8, 9068:25, 9070:11
**scuffled** [2] - 9006:14, 9006:20
**seaman** [1] - 9049:21
**Sear** [3] - 9067:3, 9067:4, 9067:15
**Sear's** [1] - 9067:21
**search** [1] - 9039:12
**seat** [1] - 9073:16
**seated** [3] - 8941:7, 9011:13, 9016:18
**second** [29] - 8948:18, 8964:22, 8969:4, 8977:2, 8978:2,

8979:6, 8981:21, 8992:22, 9009:25, 9010:6, 9011:6, 9011:21, 9018:1, 9021:15, 9029:2, 9032:11, 9032:19, 9043:23, 9045:20, 9060:2, 9064:5, 9083:14, 9083:19, 9084:6, 9087:12, 9092:18, 9113:11, 9114:16, 9114:22
**seconds** [3] - 8997:10, 8997:18, 9006:22
**secret** [1] - 9050:10
**Secretary** [1] - 8994:17
**section** [1] - 9027:3
**secure** [1] - 9021:9
**security** [5] - 8945:11, 8945:13, 8963:15, 9050:6, 9050:12
**seditious** [7] - 8981:2, 9107:25, 9108:4, 9108:21, 9109:20, 9109:24, 9113:8
**see** [57] - 8961:15, 8966:12, 8966:13, 8968:14, 8972:15, 8972:17, 8976:23, 8979:1, 8979:3, 8979:13, 8979:19, 8980:13, 8981:6, 8985:5, 8988:10, 8992:21, 8996:23, 8998:12, 8998:16, 9005:17, 9006:12, 9008:1, 9009:4, 9009:5, 9009:8, 9011:8, 9012:2, 9013:2, 9013:3, 9016:14, 9019:19, 9026:20, 9026:22, 9030:9, 9034:20, 9037:4, 9038:7, 9049:7, 9054:19, 9057:17, 9057:24, 9068:22, 9073:11, 9074:18, 9077:21, 9079:14, 9080:4, 9081:10, 9097:15, 9101:24, 9103:20, 9108:19, 9109:12, 9119:20, 9120:16
**seeing** [2] - 8998:8, 9004:22
**seek** [13] - 8976:20, 8979:4, 8981:15, 8993:9, 9009:20,

9144

9011:4, 9020:14, 9028:24, 9031:6, 9032:18, 9034:25, 9044:4, 9091:25

**seeking** [4] - 8979:21, 8979:22, 8979:23, 9094:4

**seem** [1] - 8969:6

**seized** [1] - 9058:15

**selectively** [1] - 9034:18

**self** [1] - 9031:24

**self-defense** [1] - 9031:24

**senator** [1] - 9018:5

**Senator** [1] - 9018:6

**send** [8] - 9007:19, 9044:2, 9057:19, 9067:14, 9067:22, 9072:1, 9072:4, 9072:20

**sending** [6] - 8969:18, 8985:3, 9022:2, 9031:14, 9034:12, 9059:15

**sends** [1] - 8977:4

**sense** [5] - 9086:25, 9087:2, 9112:9, 9116:23, 9120:8

**sent** [40] - 8968:23, 8968:24, 8976:17, 8981:22, 8989:5, 8992:22, 8993:3, 8993:17, 9013:9, 9017:11, 9025:12, 9026:19, 9027:5, 9027:7, 9028:20, 9029:17, 9036:1, 9044:12, 9058:1, 9058:11, 9058:12, 9060:13, 9061:11, 9062:11, 9062:19, 9063:10, 9063:19, 9064:4, 9065:16, 9066:12, 9066:16, 9068:10, 9069:2, 9069:3, 9069:19, 9071:21, 9072:2, 9082:20

**sentence** [11] - 9084:6, 9085:5, 9085:9, 9085:15, 9086:3, 9086:20, 9087:5, 9087:12, 9106:19, 9113:12

**separate** [3] - 9096:3, 9100:10, 9100:13

**September** [2] - 8951:19, 9048:24

**sequence** [1] - 9007:19

**series** [1] - 9046:12

**seriously** [1] - 8994:11

**seriousness** [1] - 9099:13

**served** [5] - 9042:23, 9043:2, 9043:4, 9048:20, 9049:12

**service** [2] - 8943:23, 9021:22

**services** [1] - 8942:8

**session** [1] - 8941:2

**set** [4] - 8991:20, 9026:24, 9080:8, 9116:14

**seven** [1] - 8944:13

**several** [3] - 8943:3, 9069:19, 9100:24

**shaking** [1] - 9078:20

**shall** [1] - 8982:7

**shape** [1] - 9021:2

**share** [1] - 9058:3

**shared** [1] - 8974:22

**sharing** [1] - 8983:12

**Sharon** [3] - 8974:21, 9022:3, 9050:18

**Sharon's** [1] - 9068:1

**Shawn** [2] - 8985:7, 8985:24

**Shenandoah** [2] - 8969:7, 9053:1

**shields** [7] - 9002:2, 9007:18, 9007:24, 9008:1, 9008:5, 9008:9, 9009:3

**shirt** [2] - 8996:16, 8996:20

**shirts** [1] - 8996:21

**shit** [8] - 8955:2, 8968:3, 8974:2, 8974:4, 9024:23, 9027:25, 9031:17, 9038:23

**shoot** [3] - 9029:24, 9042:20, 9053:19

**shooter** [3] - 9054:12, 9055:20, 9055:21

**shooters** [5] - 8945:3, 9053:16, 9053:18, 9053:22, 9054:3

**shooting** [3] - 9004:12, 9029:5, 9053:24

**short** [6] - 9021:8, 9029:6, 9052:11, 9075:10, 9076:8

**short-circuit** [1] - 9029:6

**shortly** [2] - 8942:23, 8974:8

**should've** [1] - 9003:19

**shoulder** [2] - 9004:10, 9004:11

**shoulders** [1] - 9097:15

**shouting** [1] - 8997:25

**show** [11] - 8972:20, 8986:3, 8989:14, 8994:8, 9011:25, 9015:16, 9036:14, 9036:15, 9038:6, 9072:11, 9082:23

**showed** [4] - 8943:20, 8947:10, 8956:3, 8956:5

**showing** [7] - 8963:16, 8965:24, 8986:5, 8994:8, 9036:3, 9038:12, 9080:23

**shown** [4] - 9036:9, 9036:10, 9045:15, 9088:5

**shows** [2] - 8965:13, 9109:11

**shy** [1] - 8942:17

**sic** [4] - 8986:19, 9051:2, 9072:7, 9113:21

**sic]** [1] - 9072:12

**side** [2] - 8988:22, 9003:14

**sides** [2] - 9003:10, 9092:21

**sight** [3] - 9042:16, 9042:18, 9042:21

**sighting** [2] - 9042:4, 9042:10

**Signal** [3] - 8952:8, 8952:9, 9020:7

**signs** [1] - 9042:3

**silencer** [12] - 8979:15, 8979:16, 8979:21, 8980:3, 8982:5, 8982:6, 9033:5, 9034:16, 9037:15, 9037:19, 9039:5, 9053:8

**silencers** [2] - 8978:16, 9053:17

**silently** [1] - 8996:20

**similar** [2] - 8947:10, 9116:2

**simple** [1] - 9053:12

**simply** [4] - 8957:5, 9075:15, 9113:9, 9113:17

**Siniff** [1] - 8945:17

**sissy** [1] - 9041:1

**sit** [3] - 8998:14, 9042:19, 9042:21

**site** [5] - 9024:23, 9074:11, 9074:19, 9089:24, 9090:5

**sitting** [3] - 8998:18, 8998:24, 9064:24

**situation** [1] - 8950:14

**situations** [2] - 8942:13, 8944:5

**six** [3] - 8942:24, 9029:9, 9079:2

**sixty** [1] - 9048:17

**sixty-two** [1] - 9048:17

**size** [1] - 8944:20

**Slide** [12] - 8969:16, 8970:15, 8972:22, 8973:20, 8974:13, 8982:21, 8984:4, 8984:23, 8988:16, 8989:17, 8990:14, 8991:15

**slide** [9] - 8988:25, 8991:22, 9023:16, 9023:25, 9024:4, 9024:9, 9024:18, 9045:23, 9046:20

**slides** [1] - 8970:9

**slight** [1] - 9095:8

**slip** [1] - 9079:24

**slow** [1] - 8942:14

**small** [9] - 8948:18, 8949:21, 8950:4, 9073:22, 9083:4, 9085:17, 9087:11, 9106:8, 9114:12

**smelled** [1] - 8955:21

**smells** [1] - 8955:16

**smiling** [1] - 9008:18

**Smith** [3] - 8988:18, 8988:20, 9020:8

**smoke** [2] - 8998:8, 9004:9

**smoking** [1] - 8943:16

**Smoot** [3] - 8987:1, 9027:25, 9030:15

**snap** [1] - 8974:22

**sniper** [4] - 9033:4, 9034:16, 9037:15, 9039:5

**SO** [1] - 9065:2

**so.......** [1] - 8994:21

**sobered** [1] - 9023:3

**solely** [1] - 9053:16

**someone** [5] - 9049:5, 9051:8, 9051:15, 9051:24, 9089:1

**sometimes** [2] -

8944:24, 9009:7

**son** [1] - 9028:1

**sonic** [1] - 9053:14

**soon** [2] - 8972:12, 9011:8

**sorry** [35] - 8945:17, 8949:14, 8956:14, 8956:22, 8959:10, 8967:21, 8967:22, 8980:6, 9005:15, 9009:16, 9030:23, 9035:3, 9035:7, 9036:6, 9043:10, 9043:24, 9045:21, 9047:3, 9047:15, 9061:19, 9062:11, 9065:25, 9074:15, 9076:14, 9080:7, 9082:4, 9083:14, 9085:11, 9090:5, 9102:20, 9113:15, 9115:1, 9120:6

**sort** [10] - 8945:13, 8946:24, 8950:13, 8950:18, 9014:2, 9082:23, 9086:23, 9104:20, 9105:6, 9113:2

**sorted** [1] - 9075:7

**sought** [1] - 9103:25

**sound** [6] - 8980:23, 9053:12, 9053:21, 9063:20, 9067:24, 9093:25

**sounds** [5] - 8967:12, 8998:19, 9067:7, 9067:25, 9075:16

**source** [2] - 9072:2, 9082:23

**space** [1] - 8968:18

**span** [1] - 9034:19

**speaking** [4] - 8961:10, 8967:19, 9030:7, 9030:10

**speaks** [2] - 8979:18, 9033:16

**special** [5] - 8972:13, 8972:14, 8972:19, 8973:8, 9116:5

**Special** [1] - 8994:19

**specialist** [1] - 9067:5

**specialized** [1] - 9089:13

**specific** [13] - 8950:9, 8979:23, 8987:21, 9014:22, 9032:2, 9064:16, 9091:14, 9095:21, 9096:4, 9098:10, 9100:20, 9101:7, 9118:7

**specifically** [12] - 8949:18, 8950:14, 8950:17, 8953:22, 8966:6, 8991:9, 9019:15, 9032:7, 9033:5, 9091:10, 9096:12, 9099:21
**specificity** [1] - 9101:8
**specified** [1] - 9118:7
**specifies** [1] - 9118:8
**specify** [1] - 9098:13
**specifying** [1] - 9112:6
**speech** [2] - 9061:17, 9061:18
**speed** [1] - 8944:14
**spell** [1] - 9048:10
**spent** [2] - 8985:3, 9064:22
**spicy** [2] - 8967:18, 8967:25
**spill** [1] - 8944:25
**spilling** [1] - 8945:3
**spin** [1] - 8963:10
**split** [2] - 9119:14, 9119:21
**spoken** [1] - 9016:3
**sponsored** [1] - 9089:24
**spontaneous** [1] - 9064:19
**spontaneously** [1] - 9035:16
**sponte** [1] - 9004:8
**spring** [1] - 8945:9
**stab** [1] - 9031:22
**stack** [6] - 9027:24, 9028:4, 9029:20, 9030:1, 9030:8, 9030:11
**stage** [3] - 9000:17, 9001:19, 9005:20
**stairs** [1] - 9004:16
**Stamey** [4] - 8969:18, 8970:24, 8983:13, 8985:5
**stand** [9] - 8941:18, 8941:19, 8966:21, 8991:25, 9000:19, 9003:2, 9003:20, 9052:12, 9077:15
**Standard** [5] - 9061:25, 9062:21, 9065:18, 9066:13, 9067:18
**standard** [3] - 8957:20, 8957:21, 9104:14
**standing** [2] - 8955:18, 9107:24

**stands** [1] - 9064:14
**start** [22] - 8945:8, 8971:7, 8973:10, 8974:1, 8990:17, 8991:8, 8991:13, 8993:23, 8994:4, 8996:24, 8997:1, 8998:8, 9003:6, 9052:12, 9052:17, 9077:1, 9080:10, 9080:11, 9080:13, 9093:14, 9102:8, 9109:2
**started** [5] - 8946:17, 8973:13, 8997:2, 9007:17, 9067:4
**starting** [5] - 8990:24, 8991:8, 9008:21, 9077:3, 9080:16
**starts** [1] - 9014:8
**State** [3] - 8943:13, 8948:14, 8951:16
**state** [4] - 8942:3, 8942:4, 9048:10, 9048:14
**statement** [32] - 8980:18, 8982:23, 8997:15, 8999:19, 9006:2, 9033:16, 9037:10, 9066:3, 9069:6, 9088:7, 9092:12, 9092:19, 9093:7, 9094:3, 9094:4, 9094:23, 9095:17, 9095:20, 9095:25, 9097:10, 9098:17, 9099:16, 9099:17, 9101:14, 9105:4, 9105:5, 9105:8, 9106:25, 9107:5, 9116:9
**statements** [36] - 8966:22, 8977:19, 8999:8, 9013:24, 9014:3, 9040:12, 9087:24, 9088:4, 9088:13, 9090:9, 9090:13, 9090:20, 9091:13, 9091:23, 9092:12, 9092:19, 9092:23, 9094:14, 9095:5, 9095:6, 9095:12, 9095:13, 9095:21, 9096:4, 9096:7, 9096:11, 9096:16, 9097:9, 9099:5, 9099:15, 9099:21, 9099:25, 9100:1, 9100:15, 9100:20, 9104:1

**States** [7] - 8944:3, 8951:15, 8995:7, 9048:20, 9069:4, 9117:10, 9117:21
**statute** [1] - 9031:24
**statutes** [2] - 9032:3, 9032:7
**stay** [1] - 9012:7
**staying** [2] - 8960:9, 8960:11
**steak** [1] - 9031:23
**steal** [1] - 9008:1
**stealing** [3] - 9007:17, 9007:23, 9008:8
**step** [11] - 8959:23, 8971:12, 8982:20, 8994:24, 8995:19, 8995:20, 9011:11, 9011:12, 9034:20, 9047:19, 9073:13
**stepping** [1] - 8995:15
**steps** [4] - 9004:11, 9107:8, 9107:24, 9108:16
**steroid** [1] - 9029:5
**steroided** [1] - 9029:24
**Stewart** [3] - 8952:12, 9013:13, 9014:9
**still** [16] - 8981:6, 9000:1, 9006:11, 9007:2, 9022:4, 9035:4, 9036:16, 9053:20, 9058:12, 9058:17, 9067:6, 9073:9, 9076:11, 9080:16, 9102:12, 9109:13
**stipulate** [1] - 9077:12
**stipulated** [1] - 9078:2
**stipulation** [2] - 9078:5, 9099:24
**stole** [1] - 9009:3
**stolen** [2] - 9008:5, 9008:6
**stop** [8] - 8951:1, 8956:11, 9024:15, 9055:19, 9069:16, 9072:23, 9112:25, 9118:3
**stopped** [1] - 9016:22
**stopping** [1] - 9030:2
**stories** [2] - 9043:20, 9051:13
**storm** [1] - 9005:21
**stormed** [2] - 8992:5, 9005:16
**storming** [1] - 9005:19
**story** [1] - 9051:14
**straight** [2] - 9004:15,

9022:18
**strapped** [1] - 8994:9
**street** [4] - 8967:20, 8997:25, 9007:6, 9031:25
**Street** [1] - 8974:21
**streets** [5] - 8994:25, 8995:16, 8995:19, 8995:20, 9042:1
**stretching** [1] - 9015:8
**strict** [1] - 8957:25
**strictly** [1] - 9079:4
**strike** [1] - 9077:8
**striking** [1] - 9086:8
**strip** [1] - 8961:2
**stronger** [8] - 8977:17, 8978:2, 8984:12, 8984:16, 8984:18, 8984:21, 8984:25
**struck** [1] - 9071:13
**Stu** [11] - 9040:24, 9041:17, 9041:20, 9042:8, 9052:25, 9053:1, 9065:13, 9065:14, 9065:16, 9065:24, 9066:10
**stu** [1] - 9041:2
**stuff** [5] - 9019:11, 9039:20, 9040:25, 9045:18, 9059:11
**sua** [1] - 9004:8
**subsection** [1] - 9098:18
**subsequently** [3] - 8943:10, 8955:16, 8955:20
**substance** [1] - 9092:13
**substantive** [10] - 9090:17, 9090:20, 9090:23, 9092:20, 9094:17, 9105:1, 9108:11, 9115:21, 9116:18, 9120:4
**substantively** [2] - 9113:24, 9115:5
**subways** [1] - 8963:17
**sufficient** [5] - 9104:14, 9106:2, 9106:20, 9110:7, 9111:10
**suggest** [4] - 8966:10, 9015:13, 9088:2, 9110:24
**suggested** [1] - 9087:7
**suggesting** [2] - 9110:17, 9112:7
**suggestion** [1] - 9059:11

**suggests** [3] - 8971:5, 9033:24, 9109:18
**summarize** [1] - 9083:23
**summary** [1] - 9089:14
**summation** [1] - 9104:11
**summer** [2] - 9015:2, 9015:4
**Supp** [1] - 9117:10
**support** [10] - 8948:20, 8949:23, 8949:25, 8953:19, 8954:1, 8964:9, 8967:5, 8994:25, 9022:15, 9117:19
**supporter** [1] - 8999:9
**supporters** [1] - 9005:8
**supports** [3] - 8965:14, 9014:14, 9118:21
**suppose** [1] - 9079:13
**supposed** [7] - 8946:1, 8946:15, 9003:20, 9003:21, 9088:12, 9112:10, 9120:12
**suppresser** [4] - 8979:16, 8979:25, 8980:2, 8980:3
**suppressor** [18] - 8979:11, 8979:12, 8979:22, 8979:24, 8980:11, 8980:12, 8980:23, 8982:2, 8982:5, 8982:12, 9037:17, 9053:8, 9053:11, 9053:25, 9054:23, 9055:18, 9056:4, 9056:6
**suppressors** [2] - 8981:9, 9053:16
**Supreme** [1] - 9117:12
**surgery** [3] - 9064:21, 9065:4, 9065:6
**surprises** [1] - 9108:13
**surrounding** [1] - 8960:20
**suspect** [1] - 9079:5
**suspense** [1] - 9102:2
**sustain** [1] - 9015:21
**sustained** [3] - 9051:22, 9071:11, 9107:4
**swear** [2] - 9024:25, 9025:5
**swearing** [1] - 9012:5

**sweeping** [1] - 9110:21
**switch** [1] - 9106:18
**sworn** [2] - 9079:17, 9093:7
**systems** [1] - 8943:2

# T

**T-shirt** [2] - 8996:16, 8996:20
**T-shirts** [1] - 8996:21
**t]here** [1] - 9021:12
**tactics** [3] - 8943:3, 8945:11, 8947:3
**tail** [1] - 9021:10
**tailored** [1] - 9118:15
**takeaways** [1] - 8984:11
**talks** [1] - 9110:22
**tall** [1] - 8991:25
**taller** [1] - 9001:13
**tampered** [1] - 9118:9
**tampering** [5] - 9071:20, 9118:4, 9118:6, 9118:14, 9118:21
**target** [1] - 9034:19
**targets** [1] - 8994:10
**task** [1] - 9091:19
**taught** [5] - 9031:25, 9032:5, 9043:15, 9043:18, 9043:20
**teaching** [1] - 9033:3
**Teagan** [1] - 9022:14
**team** [1] - 8946:4
**tear** [4] - 8998:10, 9003:24, 9004:9, 9004:17
**technologically** [1] - 9072:21
**Teg** [1] - 9022:14
**ten** [2] - 8944:14, 9113:1
**ten-minutes'** [1] - 8944:14
**tendency** [1] - 8942:12
**tender** [1] - 8951:9
**term** [9] - 8945:17, 8946:3, 8950:12, 8962:13, 8973:25, 8975:23, 9064:19, 9110:21
**terminology** [1] - 9016:24
**terms** [8] - 8949:13, 8958:9, 8966:3, 9015:6, 9073:21, 9074:7, 9093:9

**terrace** [2] - 9001:25, 9008:5
**terrible** [1] - 9000:9
**terrified** [1] - 9024:6
**testified** [15] - 8963:25, 8964:6, 8965:5, 8972:9, 8989:4, 9006:22, 9007:22, 9013:16, 9016:23, 9020:1, 9021:20, 9042:23, 9050:23, 9074:6, 9077:11
**testifies** [1] - 9084:20
**testify** [14] - 8941:10, 8957:8, 8964:25, 8989:5, 9074:23, 9076:10, 9081:21, 9081:24, 9084:8, 9084:22, 9084:23, 9084:24, 9084:25, 9087:9
**testifying** [3] - 9045:10, 9078:12, 9089:16
**testimony** [35] - 8941:11, 8941:12, 8959:23, 8960:8, 8966:24, 8967:6, 8970:3, 9003:23, 9009:1, 9013:14, 9037:24, 9039:10, 9052:6, 9078:9, 9084:3, 9085:14, 9085:21, 9085:22, 9086:3, 9086:5, 9086:11, 9087:1, 9087:4, 9087:12, 9087:14, 9087:16, 9087:17, 9087:19, 9087:21, 9087:22, 9089:13, 9093:7, 9094:11, 9098:7, 9101:23
**Texas** [1] - 9088:6
**text** [22] - 8956:3, 8956:15, 8957:2, 8958:19, 8968:9, 8978:24, 8979:18, 8992:19, 9009:14, 9012:19, 9028:15, 9033:21, 9045:14, 9054:19, 9054:25, 9055:10, 9057:23, 9058:12, 9058:15, 9080:9, 9080:12, 9100:4
**texted** [2] - 8979:13, 8980:13
**texts** [1] - 8956:15

**their's** [1] - 9087:16
**themselves** [1] - 9003:3
**theories** [4] - 9115:23, 9116:2, 9116:5, 9116:13
**theory** [9] - 8981:3, 8981:5, 9033:23, 9104:3, 9107:9, 9107:11, 9116:21, 9120:3, 9120:7
**therefore** [3] - 9095:2, 9108:17, 9108:20
**they've** [3] - 8965:24, 8966:23, 9096:10
**thin** [1] - 9004:8
**thinking** [4] - 9004:22, 9006:11, 9055:17, 9116:8
**thinks** [1] - 9003:16
**third** [8] - 8940:15, 8965:15, 8971:1, 8979:4, 8979:20, 8981:8, 8981:18, 9069:15
**THIS** [1] - 9034:18
**Thomas** [5] - 8940:7, 8952:18, 8991:24, 9010:20, 9049:5
**thorough** [1] - 9097:7
**Thoroughfare** [1] - 9051:2
**thoughtful** [1] - 9015:9
**thoughts** [2] - 9022:3, 9090:11
**thousand** [1] - 9053:19
**threat** [2] - 8944:4, 8997:21
**threatened** [1] - 8997:7
**threatening** [1] - 8962:17
**three** [22] - 8946:19, 8951:22, 8993:9, 9018:24, 9029:9, 9032:11, 9032:18, 9036:5, 9038:19, 9040:20, 9070:4, 9078:24, 9078:25, 9098:11, 9108:8, 9110:5, 9110:6, 9116:17, 9116:18, 9116:19
**Three** [12] - 8985:7, 8985:10, 8985:12, 9113:19, 9113:24, 9114:3, 9114:6, 9114:13, 9114:16,

9115:12, 9115:19, 9115:25
**threw** [1] - 8990:10
**throng** [1] - 8974:20
**throughout** [3] - 9100:24, 9102:25, 9103:8
**throw** [4] - 8971:13, 8971:15, 8971:18, 8971:22
**throwing** [1] - 9007:18
**thrusts** [1] - 9031:22
**thumb** [2] - 9031:21, 9060:3
**thumbnail** [1] - 9024:13
**Thursday** [9] - 9076:24, 9077:2, 9078:18, 9078:19, 9079:7, 9079:24, 9080:7, 9080:8, 9080:16
**tines** [1] - 9031:21
**tips** [1] - 9037:13
**tired** [1] - 8990:18
**tissue** [1] - 9030:2
**title** [5] - 9024:7, 9039:13, 9086:21, 9102:23, 9103:8
**today** [10] - 8967:18, 8967:25, 8973:24, 9012:4, 9024:12, 9033:1, 9049:7, 9074:6, 9097:23, 9098:22
**together** [6] - 8986:1, 9049:12, 9049:17, 9050:3, 9101:11, 9102:5
**Tom** [2] - 9023:18, 9068:9
**Tomblin** [6] - 9057:1, 9057:2, 9057:11, 9057:13, 9058:12, 9058:17
**tomorrow** [22] - 8973:25, 8974:4, 9073:8, 9073:11, 9076:3, 9076:16, 9080:6, 9080:7, 9080:10, 9080:14, 9081:3, 9089:16, 9089:22, 9099:3, 9102:3, 9102:9, 9118:2, 9119:1, 9119:7, 9120:2, 9120:16
**took** [5] - 8961:2, 8962:19, 8974:22, 8990:9, 9001:19,

9008:4, 9013:8, 9025:11, 9091:4
**tools** [1] - 8970:23
**top** [27] - 8986:25, 8993:19, 9001:18, 9031:21, 9032:19, 9034:9, 9035:10, 9035:12, 9036:2, 9036:5, 9036:17, 9037:4, 9038:2, 9038:7, 9038:8, 9038:12, 9038:19, 9040:20, 9055:11, 9060:25, 9062:5, 9063:6, 9063:24, 9066:6, 9069:16, 9070:16, 9072:15
**topic** [4] - 8965:16, 9023:5, 9040:15, 9056:17
**total** [1] - 9079:2
**totally** [2] - 9003:15, 9069:7
**touch** [1] - 9067:11
**tough** [1] - 8995:1
**toward** [2] - 8996:24, 9000:7
**town** [5] - 8941:10, 8944:8, 8945:1, 8983:1, 9047:18
**traced** [1] - 9044:22
**track** [2] - 8942:14, 9073:9
**tracks** [1] - 9115:7
**train** [1] - 8947:1
**trained** [4] - 8946:4, 8950:13, 8955:16, 9033:4
**trainer** [1] - 9051:2
**training** [23] - 8943:2, 8945:12, 8946:6, 8946:9, 8946:21, 8947:4, 8947:11, 8947:15, 8947:18, 8948:3, 8948:7, 8949:13, 8949:14, 8949:15, 8949:18, 8949:19, 8950:25, 9022:4, 9023:2, 9023:3, 9040:2, 9040:7, 9043:7
**trait** [1] - 9045:9
**traitor** [5] - 8994:1, 9019:2, 9019:16, 9019:19, 9042:2
**traitor's** [1] - 9018:17
**traitors** [2] - 8993:23, 8994:9
**traitors'** [1] - 9017:17
**Traitors'** [1] - 9018:14

transcript [3] - 8941:4, 9013:9, 9089:3
transcripts [7] - 9090:22, 9091:13, 9093:9, 9093:14, 9098:16, 9099:1, 9103:1
translate [1] - 9060:10
trap [1] - 8955:21
traveling [1] - 8952:23
travels [2] - 8959:24, 9052:7
treasonist [1] - 9098:17
treatment [1] - 8947:4
tremendous [3] - 8999:8, 9020:2, 9021:20
tremendously [1] - 8951:25
trial [3] - 8941:3, 9087:20, 9100:24
tried [3] - 8984:20, 9035:5, 9072:20
trip [1] - 8960:17
troops [1] - 9021:4
trouble [1] - 8987:15
true [5] - 8955:17, 8976:5, 8978:1, 8983:25, 8986:8, 8986:12, 8988:4, 8994:8, 8998:9, 9003:18, 9004:13, 9030:17, 9043:6, 9059:17, 9060:12, 9060:15, 9063:21, 9081:8, 9110:15
truly [1] - 8974:1
Trump [15] - 8948:20, 8971:8, 8975:22, 8983:4, 8983:16, 8984:3, 8990:16, 8991:1, 8991:4, 8999:9, 8999:25, 9000:3, 9000:13, 9005:8, 9040:24
Truong [11] - 8986:6, 9041:3, 9041:10, 9068:6, 9068:10, 9069:3, 9069:24, 9070:8, 9070:16, 9070:22
truth [10] - 9003:11, 9003:12, 9088:11, 9088:13, 9092:13, 9094:5, 9094:23, 9095:2, 9095:17, 9096:9
truthful [3] - 8963:3, 9091:11, 9096:1

truthfulness [6] - 9045:11, 9050:21, 9051:9, 9051:12, 9051:20, 9089:1
try [8] - 8948:24, 8966:17, 8985:4, 9001:6, 9023:23, 9031:17, 9075:1, 9080:14
trying [12] - 8970:12, 8978:16, 8979:15, 8986:3, 8996:6, 9014:17, 9037:17, 9047:10, 9047:17, 9051:24, 9081:13
tunnel [2] - 9001:25, 9008:5
turn [7] - 8941:11, 8941:13, 8941:20, 9004:21, 9083:15, 9085:20, 9110:24
turned [5] - 9004:13, 9018:24, 9019:8, 9022:9, 9067:5
turning [1] - 9004:16
tweak [1] - 9115:4
twice [3] - 8953:14, 9074:23, 9089:24
two [43] - 8940:15, 8946:19, 8958:12, 8965:23, 8977:23, 8978:4, 8992:14, 8993:15, 9010:25, 9012:17, 9030:23, 9030:24, 9031:7, 9031:9, 9031:11, 9034:2, 9034:6, 9034:7, 9034:8, 9034:9, 9035:1, 9035:10, 9035:12, 9036:17, 9037:4, 9038:7, 9038:8, 9038:12, 9048:17, 9049:17, 9071:19, 9076:21, 9079:1, 9079:11, 9089:5, 9093:13, 9094:21, 9108:4, 9112:17, 9112:18, 9118:11, 9120:4
Two [1] - 9113:22
two-word [1] - 8958:12
type [3] - 8965:21, 8982:6, 9050:9
types [1] - 9036:21
typical [1] - 9041:14

## U

UN [4] - 8949:23,

8953:22, 8953:23, 8954:6
unable [1] - 9025:19
Unanimity [1] - 9113:10
unanimity [5] - 9115:24, 9116:6, 9116:10, 9116:12, 9116:16
unanimous [1] - 9117:13
unanimously [1] - 9116:15
unarmed [1] - 8963:14
unavailable [1] - 8944:6
unbridled [1] - 8983:18
unclicked [1] - 9026:8
unconventional [1] - 9032:5
undefended [1] - 8994:23
under [18] - 9002:22, 9050:23, 9092:23, 9093:2, 9094:3, 9094:5, 9096:3, 9111:2, 9113:10, 9113:17, 9114:2, 9114:12, 9114:16, 9114:23, 9115:13, 9115:18, 9115:25, 9118:14
underneath [1] - 8961:15
understood [12] - 8958:13, 8968:9, 8981:10, 8992:4, 8994:5, 9006:5, 9034:5, 9036:18, 9100:12, 9107:14, 9119:18
undertake [1] - 9091:19
unit [1] - 8950:23
United [7] - 8944:3, 8951:15, 8995:7, 9048:20, 9069:4, 9117:10, 9117:21
unless [2] - 8957:22, 8957:25
unlike [1] - 9093:8
unlikely [2] - 8969:6, 9012:25
unnecessary [1] - 8958:7
unquote [1] - 8972:13
unreasonable [1] - 9106:10
unsend [1] - 9071:24

unsending [1] - 9057:14
unsent [48] - 8986:11, 8986:19, 8987:7, 8987:11, 8987:14, 8987:17, 8988:14, 9026:4, 9026:12, 9026:20, 9027:5, 9027:6, 9027:9, 9027:16, 9027:19, 9030:13, 9057:10, 9059:9, 9059:18, 9060:7, 9060:9, 9060:16, 9060:22, 9061:1, 9061:11, 9061:20, 9061:24, 9062:13, 9063:2, 9063:12, 9063:19, 9063:25, 9064:7, 9064:9, 9065:1, 9065:18, 9066:2, 9066:12, 9067:18, 9068:15, 9068:23, 9069:22, 9070:20, 9070:22, 9071:7, 9071:21, 9082:19, 9082:21
up [96] - 8943:15, 8943:17, 8943:18, 8946:10, 8948:2, 8950:15, 8950:18, 8953:19, 8954:6, 8954:19, 8959:2, 8960:2, 8961:5, 8961:15, 8964:12, 8965:11, 8965:21, 8969:16, 8970:10, 8972:21, 8975:8, 8976:14, 8976:22, 8978:19, 8979:1, 8979:19, 8981:13, 8982:9, 8990:14, 8992:13, 8992:14, 8993:23, 8994:4, 8995:2, 8995:15, 8995:21, 8995:24, 8995:25, 8996:1, 8997:9, 9000:7, 9000:19, 9001:6, 9001:8, 9001:13, 9001:21, 9003:2, 9004:8, 9004:11, 9004:16, 9008:8, 9008:25, 9009:9, 9009:16, 9010:7, 9015:10, 9017:3, 9017:23, 9023:3, 9023:7, 9026:15, 9030:22, 9031:20, 9032:10, 9035:15, 9037:14, 9038:2,

9043:22, 9054:2, 9054:3, 9054:5, 9054:14, 9054:15, 9056:14, 9056:23, 9057:16, 9058:3, 9060:17, 9061:6, 9062:23, 9070:3, 9072:6, 9072:7, 9072:13, 9072:14, 9074:8, 9076:12, 9077:2, 9078:20, 9079:22, 9092:11, 9107:10, 9110:20, 9112:19, 9113:11, 9118:4
update [2] - 9067:25, 9102:15
updates [3] - 9064:22, 9064:23
upset [5] - 8971:8, 8971:10, 8971:24, 8971:25, 9018:25
useful [1] - 9042:4
UTC [4] - 9060:10, 9061:13, 9062:9, 9066:16

## V

valid [2] - 9107:17, 9107:20
Valley [2] - 8969:7, 9053:1
value [5] - 8967:9, 8967:14, 9015:6, 9094:24, 9096:1
variance [1] - 9109:5
version [1] - 9103:16
versus [1] - 9105:12
VERY [1] - 8972:18
veteran [3] - 8943:17, 9043:9, 9043:11
via [1] - 9058:12
Vice [2] - 8992:2, 8997:14
video [42] - 8974:22, 8996:9, 8996:10, 8996:11, 8996:12, 8997:23, 9002:7, 9010:25, 9011:2, 9011:15, 9011:16, 9011:18, 9011:22, 9011:23, 9012:1, 9015:25, 9017:15, 9017:21, 9017:23, 9019:12, 9019:15, 9024:14, 9025:10, 9035:22, 9035:25, 9040:3, 9071:20, 9071:24, 9072:2, 9072:21, 9078:5,

9078:10, 9081:15, 9088:5, 9090:25, 9091:6, 9102:21, 9102:25, 9103:7, 9118:9
**videos** [3] - 9002:6, 9004:4, 9019:4
**videotaped** [1] - 9094:14
**view** [2] - 9015:1, 9023:4
**views** [1] - 8965:22
**vilify** [1] - 9023:23
**violation** [1] - 9114:6
**violence** [21] - 8966:25, 8977:18, 8991:5, 9002:23, 9006:6, 9006:23, 9007:22, 9009:2, 9013:17, 9013:18, 9013:24, 9014:24, 9014:25, 9015:17, 9030:8, 9030:10, 9033:25, 9042:12, 9042:13, 9042:14
**violent** [2] - 8963:23, 9018:12
**Virginia** [7] - 8962:18, 8968:12, 8988:22, 9048:15, 9051:2, 9054:12, 9057:3
**visit** [1] - 9022:3
**visual** [4] - 8997:19, 9002:11, 9017:25, 9018:3
**vital** [1] - 9087:20
**vote** [3] - 8991:1, 8998:25, 9019:18
**voted** [1] - 9019:11

### W

**W-a-s-h-i-n-g-t-o-n** [1] - 9048:13
**waiting** [2] - 9038:23, 9064:24
**waive** [1] - 9120:18
**walk** [3] - 8994:22, 9001:6, 9042:3
**Walk** [4] - 8967:11, 8967:16, 8968:21, 8969:5
**walked** [1] - 9008:17
**walking** [2] - 9000:2, 9004:15
**wants** [4] - 9083:8, 9091:22, 9093:18, 9100:19
**War** [2] - 8971:13, 8977:11

**war** [10] - 8971:25, 8972:2, 8972:5, 8972:9, 8973:17, 8990:18, 8991:8, 8991:12, 9021:5
**warrant** [1] - 9107:3
**Washington** [15] - 8940:10, 8954:10, 8954:13, 8962:20, 8976:7, 8998:1, 8998:15, 9009:13, 9010:5, 9047:25, 9048:3, 9048:10, 9048:12, 9052:5, 9117:22
**Washingtonian** [1] - 9000:21
**Watchdog** [3] - 9099:12, 9099:13, 9099:15
**watched** [2] - 9005:19, 9019:15
**watching** [1] - 9006:19
**Watkins** [25] - 8941:17, 8943:5, 8945:16, 8951:21, 8952:22, 8953:15, 8954:15, 8954:24, 8966:1, 8970:20, 8976:3, 8996:5, 8996:18, 8996:19, 8996:21, 9023:10, 9023:13, 9024:6, 9025:2, 9045:17, 9046:13, 9097:9, 9097:20, 9098:14
**Watkins's** [4] - 8941:10, 9023:20, 9088:22, 9099:5
**Wayner** [1] - 9071:2
**ways** [1] - 8984:25
**weapon** [10] - 8943:2, 8947:5, 8947:6, 8958:3, 9031:23, 9042:16, 9042:17, 9042:22, 9053:13
**weapon-free** [1] - 8958:3
**weapons** [14] - 8947:12, 8955:2, 8956:24, 8957:1, 8979:12, 8980:11, 8981:3, 8981:4, 8985:19, 8986:3, 8990:6, 9030:16, 9042:5, 9042:10
**Wednesday** [2] - 9079:24, 9080:5
**week** [9] - 8948:6,

8948:8, 9035:19, 9036:3, 9039:2, 9044:14, 9074:8, 9098:5
**weekend** [4] - 9022:4, 9023:3, 9079:13, 9079:15
**weeks** [1] - 9108:25
**weight** [1] - 9087:22
**weights** [1] - 8984:18
**welcome** [4] - 8941:6, 8941:23, 9016:17, 9048:3
**west** [2] - 9001:25, 9008:5
**whatsoever** [1] - 8967:14
**wherein** [1] - 9030:8
**whole** [5] - 8992:15, 9003:14, 9014:4, 9038:16, 9078:10
**whooped** [1] - 8967:19
**wife** [17] - 8996:6, 8996:18, 8997:24, 9000:2, 9000:18, 9001:20, 9002:20, 9006:19, 9008:4, 9009:4, 9009:12, 9010:4, 9021:8, 9028:1, 9050:18, 9058:1, 9062:24
**wife's** [3] - 9064:19, 9065:6, 9071:2
**WILL** [1] - 8977:16
**William** [1] - 8941:3
**willing** [2] - 9076:25, 9077:1
**win** [2] - 8971:9, 8990:17
**window** [18] - 9105:12, 9105:14, 9105:16, 9106:4, 9106:5, 9106:7, 9106:9, 9106:18, 9111:17, 9111:23, 9112:2, 9112:6, 9112:10, 9112:12, 9112:14, 9112:16, 9112:17, 9112:19
**windows** [1] - 9007:18
**Windrim** [1] - 8961:13
**Wish** [1] - 9024:21
**wish** [4] - 8968:3, 8973:24, 8986:24, 9037:10
**withdraw** [2] - 9071:15, 9077:7
**witness** [39] - 8941:9, 8941:19, 8951:8,

8951:9, 8965:5, 9016:9, 9016:10, 9032:13, 9045:9, 9047:18, 9047:20, 9054:6, 9054:15, 9072:8, 9074:21, 9074:22, 9074:24, 9075:10, 9076:1, 9076:7, 9077:20, 9077:24, 9077:25, 9078:1, 9078:11, 9081:20, 9081:21, 9082:15, 9084:13, 9084:20, 9087:21, 9089:19, 9090:9, 9090:10, 9092:6, 9092:23, 9096:10, 9096:19
**Witness** [2] - 8959:25, 9052:9
**WITNESS** [9] - 8941:22, 9011:14, 9045:1, 9047:8, 9047:22, 9048:2, 9048:6, 9052:8, 9073:15
**witnesses** [12] - 9074:10, 9084:8, 9084:21, 9084:23, 9085:21, 9086:9, 9090:12, 9090:21, 9091:25, 9092:8, 9093:16, 9093:18
**Witnesses** [1] - 8940:3
**witnesses'** [1] - 9094:6
**women** [1] - 9022:5
**Woodstock** [5] - 8942:5, 8942:22, 8944:7, 8944:16, 8944:25
**WOODWARD** [21] - 8980:5, 8980:8, 9075:12, 9076:5, 9077:5, 9078:21, 9083:14, 9083:17, 9086:13, 9092:3, 9101:9, 9101:11, 9101:18, 9101:24, 9103:23, 9104:13, 9106:23, 9107:22, 9108:6, 9108:13, 9120:21
**Woodward** [5] - 8980:6, 9083:15, 9083:18, 9105:5, 9116:4
**Woodward's** [1] - 9109:16

**word** [10] - 8958:12, 8963:10, 8965:2, 9018:9, 9085:9, 9095:10, 9096:19, 9105:7, 9112:8, 9115:10
**worded** [1] - 9095:11
**wording** [1] - 9118:23
**words** [15] - 8957:9, 8965:19, 8965:23, 8971:14, 8971:15, 8974:6, 8974:11, 8977:12, 8982:24, 8992:7, 8992:9, 9024:17, 9044:23, 9058:11, 9116:16
**wore** [1] - 8996:16
**works** [3] - 9030:19, 9102:17, 9103:8
**world** [2] - 9040:3, 9040:7
**worry** [1] - 9021:8
**worth** [3] - 9015:7, 9042:20, 9108:22
**WOW** [1] - 9065:2
**wrinkle** [2] - 9095:3, 9095:8
**write** [4] - 8970:22, 8973:5, 8974:7, 9006:1
**writes** [6] - 9021:2, 9031:15, 9038:22, 9040:24, 9055:17, 9117:11
**writing** [3] - 8985:20, 8985:24, 8986:1
**written** [3] - 9024:21, 9084:6, 9107:3
**wrote** [12] - 8975:15, 8978:4, 8989:19, 8990:16, 8990:18, 8993:22, 8994:17, 8995:4, 9005:6, 9005:24, 9029:10, 9117:23

### Y

**y]our** [1] - 9041:25
**year** [3] - 9022:6, 9041:8, 9048:23
**Year** [1] - 9062:15
**years** [12] - 8942:17, 8999:4, 8999:6, 8999:25, 9000:4, 9021:7, 9043:9, 9043:11, 9043:12, 9052:22, 9053:3, 9067:6
**years'** [1] - 9015:7

9149

**yelling** [1] - 9019:1
**yesterday** [2] -
  9073:10, 9120:12
**York** [1] - 8963:15
**YOU** [1] - 9044:20
**you-all** [7] - 9011:8,
  9084:2, 9086:16,
  9096:24, 9097:12,
  9101:7, 9118:17
**Young** [2] - 9093:5,
  9094:8
**young** [1] - 9093:6
**yourself** [5] - 8953:1,
  8962:19, 8984:7,
  9023:11, 9023:18
**YouTube** [3] -
  9011:16, 9011:18,
  9017:11

## Z

**Zaremba** [1] - 8941:3
**Zello** [11] - 9097:18,
  9098:1, 9098:14,
  9099:4, 9099:8,
  9099:9, 9099:25,
  9100:3, 9100:7,
  9100:16, 9100:18
**zero** [2] - 8960:13,
  8978:12